No. 24-1328

In the
**United States Court of Appeals
For the Tenth Circuit**

COLORADO MONTANA WYOMING STATE AREA
CONFERENCE OF THE NAACP, *et al.*,

*Plaintiffs–Appellants*

v.

SHAWN SMITH, *et al.*

*Defendants–Appellees*

Appeal from the United States District Court for the District of Colorado,
No. 1:22-cv-00581-CNS-NRN (Judge Charlotte N. Sweeney)

**APPELLANTS' APPENDIX**

Courtney Hostetler
John Bonifaz
Ben Clements
Amira Mattar
Free Speech For People
48 North Pleasant St., Ste. 304
Amherst, Massachusetts 01002
(617) 244-0234

Bryan L. Sells
The Law Office of
Bryan L. Sells, LLC
Post Office Box 5493
Atlanta, Georgia 31107-0493
(404) 480-4212

*Attorneys for the Appellants*

# Index

| ECF | Document | Page |
|---|---|---|
| | District Court Docket Sheet (09/25/2024) .......................... 4 |
| 1 | Complaint (03/09/22) ........................................... 21 |
| 48 | Answer (05/12/22) ............................................. 48 |
| 84 | Order (01/31/23) .............................................. 55 |
| 95 | Final Pretrial Order (05/16/23) ............................... 71 |
| 174 | Final List of Joint Exhibits (07/12/24) ...................... 97 |
| 181 | Courtroom Minutes (07/15/24) ................................. 111 |
| 182 | Courtroom Minutes (07/16/24) ................................. 114 |
| 183 | Courtroom Minutes (07/17/24) ................................. 117 |
| 184 | Courtroom Minutes (07/18/24) ................................. 120 |
| 185 | Final Judgment (07/18/24) .................................... 122 |
| 187 | Transcript – Day 1 (excerpts) (07/30/24) ..................... 124 |
| 188 | Transcript – Day 2 (excerpts) (07/30/24) ..................... 154 |
| 189 | Transcript – Day 3 (excerpts) (07/30/24) ..................... 182 |
| 190 | Transcript – Day 4 (07/30/24) ................................ 206 |
| 198 | Notice of Appeal (08/16/24) .................................. 224 |

Trial Exhibit 1 (admitted)..................................................226

Trial Exhibit 2 (admitted)..................................................252

Trial Exhibit 5 (admitted)..................................................264

Trial Exhibit 8 (placeholder for video) ............................286

Trial Exhibit 25 (excerpt)..................................................287

Trial Exhibit 50 (admitted)...............................................288

Certificate of Service ........................................................298

Query    Reports    Utilities    Help    Log Out

APPEAL,JD1,NDISPO,TERMED

## U.S. District Court - District of Colorado
### District of Colorado (Denver)
### CIVIL DOCKET FOR CASE #: 1:22-cv-00581-CNS-NRN

Colorado Montana Wyoming State Area Conference of the NAACP et al v. United States Election Integrity Plan et al
Assigned to: Judge Charlotte M. Sweeney
Referred to: Magistrate Judge N. Reid Neureiter
Case in other court: U.S Court of Appeals, 10th Cir., 24-01328
Cause: 42:1985 Conspiracy to Interfere with Civil Rights

Date Filed: 03/09/2022
Date Terminated: 07/18/2024
Jury Demand: None
Nature of Suit: 441 Civil Rights: Voting
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 03/09/2022 | 1 | COMPLAINT against All Defendants (Filing fee $ 402,Receipt Number ACODC-8355042)Attorney Amy Elizabeth Erickson added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla), Attorney Amy Elizabeth Erickson added to party League of Women Voters of Colorado(pty:pla), Attorney Amy Elizabeth Erickson added to party Mi Familia Vota(pty:pla), filed by Colorado Montana Wyoming State Area Conference of the NAACP, Mi Familia Vota, League of Women Voters of Colorado. (Attachments: # 1 Civil Cover Sheet, # 2 Summons Ashley Epp, # 3 Summons Holly Kasun, # 4 Summons Shawn Smith) (Erickson, Amy) (Entered: 03/09/2022) |
| 03/09/2022 | 2 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES:Amy Elizabeth Erickson. **DO NOT REFILE THE DOCUMENT. Action to take -** counsel must submit a change of contact request through the Manage my Account tab at the PACER website at https://www.pacer.gov/, pursuant to D.C.COLO.LAttyR 5(c) and 3.5 of the Electronic Case Filing Procedures (Civil cases).(Text Only Entry) (norlin, ) (Entered: 03/09/2022) |
| 03/09/2022 | 3 | Case assigned to Magistrate Judge Nina Y. Wang. Text Only Entry (norlin, ) (Entered: 03/09/2022) |
| 03/09/2022 | 4 | SUMMONS issued by Clerk. (Attachments: # 1 Summons, # 2 Summons, # 3 Magistrate Judge Consent Form) (norlin, ) (Entered: 03/09/2022) |
| 03/09/2022 | 5 | MOTION for Temporary Restraining Order , MOTION for Preliminary Injunction *against all defendants* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 03/09/2022) |
| 03/09/2022 | 6 | BRIEF in Support of 5 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *against all defendants* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 03/09/2022) |
| 03/09/2022 | 7 | DECLARATION of *Casey Breese* regarding MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *against all defendants* 5 by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Attachments: # 1 Exhibit A)(Erickson, Amy) (Entered: 03/09/2022) |
| 03/09/2022 | 8 | DECLARATION of *Beth Hendrix* regarding MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *against all defendants* 5 by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 03/09/2022) |

| 03/09/2022 | 9 | DECLARATION of *Portia Prescott* regarding MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *against all defendants* 5 by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 03/09/2022) |
|---|---|---|
| 03/09/2022 | 10 | DECLARATION of *Salvador Hernandez* regarding MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *against all defendants* 5 by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 03/09/2022) |
| 03/09/2022 | 11 | Proposed Order to 5 Motion for Temporary Restraining Order and Preliminary Injunction by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) Modified on 3/9/2022 to correct event text and create linkage (athom, ). (Entered: 03/09/2022) |
| 03/09/2022 | 12 | MINUTE ORDER by Magistrate Judge Nina Y. Wang on 03/09/2022. IT IS ORDERED that: The Clerk of the Court shall REDRAW this action to a District Judge for further proceedings. (alave, ) (Entered: 03/09/2022) |
| 03/09/2022 | 13 | CASE REASSIGNED pursuant to 12 Minute Order. This case is randomly reassigned to Judge Robert E. Blackburn. All future pleadings should be designated as 22-cv-00581-REB. (Text Only Entry). (alave, ) (Entered: 03/09/2022) |
| 03/09/2022 | 14 | MEMORANDUM RETURNING CASE by Senior Judge Blackburn. This case is randomly reassigned to Chief Judge Philip A. Brimmer and drawn to Magistrate Judge Nina Y. Wang. All future pleadings should be designated as 22-cv-00581-PAB. (athom, ) (Entered: 03/09/2022) |
| 03/16/2022 | 15 | SUMMONS Returned Executed by All Plaintiffs. Ashley Epp served on 3/14/2022, answer due 4/4/2022. (Erickson, Amy) (Entered: 03/16/2022) |
| 03/17/2022 | 16 | SUMMONS Returned Executed by All Plaintiffs. Shawn Smith served on 3/14/2022, answer due 4/4/2022. (Erickson, Amy) (Entered: 03/17/2022) |
| 03/23/2022 | 17 | NOTICE of Entry of Appearance by Amy Elizabeth Erickson on behalf of All Plaintiffs (Erickson, Amy) (Entered: 03/23/2022) |
| 03/23/2022 | 18 | NOTICE of Entry of Appearance by Reid Kelly Day on behalf of All Plaintiffs Attorney Reid Kelly Day added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla), Attorney Reid Kelly Day added to party League of Women Voters of Colorado(pty:pla), Attorney Reid Kelly Day added to party Mi Familia Vota(pty:pla) (Day, Reid) (Entered: 03/23/2022) |
| 03/23/2022 | 19 | NOTICE of Entry of Appearance by Brian Andrew Dillon on behalf of Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia VotaAttorney Brian Andrew Dillon added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla), Attorney Brian Andrew Dillon added to party League of Women Voters of Colorado(pty:pla), Attorney Brian Andrew Dillon added to party Mi Familia Vota(pty:pla) (Dillon, Brian) (Entered: 03/23/2022) |
| 03/23/2022 | 20 | NOTICE of Entry of Appearance by Jean Paul Bradshaw on behalf of All Plaintiffs Attorney Jean Paul Bradshaw added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla), Attorney Jean Paul Bradshaw added to party League of Women Voters of Colorado(pty:pla), Attorney Jean Paul Bradshaw added to party Mi Familia Vota(pty:pla) (Bradshaw, Jean) (Entered: 03/23/2022) |
| 03/23/2022 | 21 | NOTICE of Entry of Appearance by Ben Clements on behalf of All Plaintiffs Attorney Ben Clements added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla), Attorney Ben Clements added to party League of Women Voters of Colorado(pty:pla), Attorney Ben Clements added to party Mi Familia Vota(pty:pla) (Clements, Ben) (Entered: 03/23/2022) |

| 03/24/2022 | 22 | SUMMONS Returned Executed by All Plaintiffs. Holly Kasun served on 3/23/2022, answer due 4/13/2022. (Erickson, Amy) (Entered: 03/24/2022) |
|---|---|---|
| 03/25/2022 | 23 | NOTICE of Entry of Appearance by Ronald Andrew Fein on behalf of All Plaintiffs Attorney Ronald Andrew Fein added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla), Attorney Ronald Andrew Fein added to party League of Women Voters of Colorado(pty:pla), Attorney Ronald Andrew Fein added to party Mi Familia Vota(pty:pla) (Fein, Ronald) (Entered: 03/25/2022) |
| 03/25/2022 | 24 | NOTICE of Entry of Appearance by Casey Carlton Breese on behalf of All Plaintiffs Attorney Casey Carlton Breese added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla), Attorney Casey Carlton Breese added to party League of Women Voters of Colorado(pty:pla), Attorney Casey Carlton Breese added to party Mi Familia Vota(pty:pla) (Breese, Casey) (Entered: 03/25/2022) |
| 03/28/2022 | 25 | NOTICE of Entry of Appearance by Courtney Marie Hostetler on behalf of All Plaintiffs Attorney Courtney Marie Hostetler added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla), Attorney Courtney Marie Hostetler added to party League of Women Voters of Colorado(pty:pla), Attorney Courtney Marie Hostetler added to party Mi Familia Vota(pty:pla) (Hostetler, Courtney) (Entered: 03/28/2022) |
| 04/04/2022 | 26 | NOTICE of Entry of Appearance by R. Scott Reisch on behalf of All Defendants Attorney R. Scott Reisch added to party Ashley Epp(pty:dft), Attorney R. Scott Reisch added to party Holly Kasun(pty:dft), Attorney R. Scott Reisch added to party Shawn Smith(pty:dft), Attorney R. Scott Reisch added to party United States Election Integrity Plan(pty:dft) (Reisch, R.) (Entered: 04/04/2022) |
| 04/04/2022 | 27 | MOTION to Dismiss for Lack of Jurisdiction by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Reisch, R.) (Entered: 04/04/2022) |
| 04/06/2022 | 28 | NOTICE of Entry of Appearance by Jessica Lynn Hays on behalf of All Defendants Attorney Jessica Lynn Hays added to party Ashley Epp(pty:dft), Attorney Jessica Lynn Hays added to party Holly Kasun(pty:dft), Attorney Jessica Lynn Hays added to party Shawn Smith(pty:dft), Attorney Jessica Lynn Hays added to party United States Election Integrity Plan(pty:dft) (Hays, Jessica) (Entered: 04/06/2022) |
| 04/07/2022 | 29 | MOTION to Expedite , MOTION for Hearing/Conference re 27 MOTION to Dismiss for Lack of Jurisdiction , 5 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *against all defendants* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Attachments: # 1 Proposed Order (PDF Only))(Erickson, Amy) (Entered: 04/07/2022) |
| 04/08/2022 | 30 | ORDER by Chief Judge Philip A. Brimmer on 4/8/2022. **ORDERED** that the portion of plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction [Docket No. 5 ] that requests issuance of a temporary restraining order is **DENIED**. **ORDERED** that the portion of plaintiffs' Motion for Expedited Hearing on Plaintiffs' Motion for Preliminary Injunction and Defendants' Motion to Dismiss [Docket No. 29 ] that requests an expedited TRO hearing is **DENIED as moot**. (trvo, ) (Entered: 04/08/2022) |
| 04/08/2022 | 31 | MINUTE ORDER by Chief Judge Philip A. Brimmer on 4/08/2022. It is ORDERED that plaintiffs shall file a witness list by **April 20, 2022** using the form found at http://www.cod.uscourts.gov/JudicialOfficers/Active/ArticleIIIJudges/HonPhilipABrimmer.aspx, indicating the witnesses it intends to call at the preliminary injunction hearing and the length of its direct examinations. It is further ORDERED that defendants shall file by **April 27, 2022**, a witness list for the preliminary injunction hearing, using the same form, which shall include estimates of the time required for cross-examining plaintiffs' witnesses and estimates of time for conducting the direct examinations of defendants witnesses. It is further ORDERED that counsel shall jointly contact Chambers via conference call (303-335-2794) on **April 29, 2022** to schedule a preliminary injunction hearing. It is further ORDERED that defendants shall respond to the portion of plaintiffs' Motion for a Temporary Restraining Order and Preliminary |

|            |      |                                                                                                                                                                                                                                                                                                                                                               |
|------------|------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|            |      | Injunction [Docket No. 5] requesting a preliminary injunction on or before April 20, 2022, and plaintiffs may reply on or before **April 25, 2022**. It is further ORDERED that plaintiffs shall respond to defendants' Motion to Dismiss [Docket No. 27] on or before **April 18, 2022**, and defendants may reply on or before **April 22, 2022**. (pabsec, ) (Entered: 04/08/2022) |
| 04/18/2022 | 32   | NOTICE of Entry of Appearance by John C. Bonifaz on behalf of All Plaintiffs Attorney John C. Bonifaz added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla), Attorney John C. Bonifaz added to party League of Women Voters of Colorado(pty:pla), Attorney John C. Bonifaz added to party Mi Familia Vota(pty:pla) (Bonifaz, John) (Entered: 04/18/2022) |
| 04/18/2022 | 33   | RESPONSE to 27 MOTION to Dismiss for Lack of Jurisdiction filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Attachments: # 1 Proposed Order (PDF Only))(Erickson, Amy) (Entered: 04/18/2022) |
| 04/20/2022 | 34   | Witness List by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 04/20/2022) |
| 04/20/2022 | 35   | RESPONSE to 5 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *against all defendants* filed by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Hays, Jessica) (Entered: 04/20/2022) |
| 04/22/2022 | 36   | REPLY to Response to 27 MOTION to Dismiss for Lack of Jurisdiction filed by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Hays, Jessica) (Entered: 04/22/2022) |
| 04/25/2022 | 37   | REPLY to Response to 5 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *against all defendants* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 04/25/2022) |
| 04/27/2022 | 38   | Witness List *for Preliminary Injunction Hearing* by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Hays, Jessica) (Entered: 04/27/2022) |
| 04/28/2022 | 39   | ORDER by Chief Judge Philip A. Brimmer on 04/28/2022. Defendants' Motion to Dismiss [Docket No. 27 ] is **DENIED**. (athom, ) (Entered: 04/28/2022) |
| 04/28/2022 | 40   | MOTION to Expedite *Limited*, MOTION for Discovery by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Attachments: # 1 Proposed Order (PDF Only))(Erickson, Amy) (Entered: 04/28/2022) |
| 04/29/2022 | 41   | MINUTE ORDER by Chief Judge Philip A. Brimmer on 04/29/2022 re 40 Motion for Limited Expedited Discovery. Defendants shall respond to plaintiffs' motion for expedited discovery on or before **Wednesday, May 4, 2022 at 5:00 p.m.** Text Only Entry (pabsec, ) (Entered: 04/29/2022) |
| 04/29/2022 | 42   | MINUTE ORDER by Chief Judge Philip A. Brimmer on 4/29/2022, re: 5 MOTION for Temporary Restraining Order. **ORDERED** that the Court will hold a full-day preliminary injunction hearing on **June 2, 2022 at 8:30 a.m. ORDERED** that the parties shall exchange exhibits, and submit to the Court electronically, on or before **May 23, 2022 at 5:00 p.m.** (sphil, ) (Entered: 04/29/2022) |
| 05/02/2022 | 43   | RESPONSE to 40 MOTION to Expedite *Limited* MOTION for Discovery filed by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Hays, Jessica) (Entered: 05/02/2022) |
| 05/06/2022 | 44   | ORDER by Chief Judge Philip A. Brimmer on 5/6/2022, re: 40 plaintiffs' Motion for Limited Expedited Discovery is **DENIED**. (sphil, ) (Entered: 05/06/2022) |

| 05/12/2022 | 45 | MOTION to Withdraw 5 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *against all defendants* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 05/12/2022) |
| 05/12/2022 | 46 | ORDER by Chief Judge Philip A. Brimmer on 5/12/2022 re: 45 Motion to Withdraw is **GRANTED**. The portion of Plaintiff's 5 Motion for a Temporary Restraining Order and Preliminary Injunction requesting a preliminary injunction is **WITHDRAWN**. The Preliminary Injunction Hearing set for June 2, 2022 is **VACATED**. The portion of Docket No. 29 requesting an expedited preliminary hearing is **DENIED as moot**. Text Only Entry(pabsec, ) (Entered: 05/12/2022) |
| 05/12/2022 | 47 | NOTICE of Entry of Appearance *of Dion Farganis* by Dion Richard Farganis on behalf of Colorado Montana Wyoming State Area Conference of the NAACPAttorney Dion Richard Farganis added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla) (Farganis, Dion) (Entered: 05/12/2022) |
| 05/12/2022 | 48 | ANSWER to 1 Complaint,, , COUNTERCLAIM against Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota by Ashley Epp, United States Election Integrity Plan, Holly Kasun, Shawn Smith.(Hays, Jessica) (Entered: 05/12/2022) |
| 06/02/2022 | 49 | MOTION to Dismiss *Counterclaims for Defamation and Abuse of Process* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Attachments: # 1 Proposed Order (PDF Only))(Erickson, Amy) (Entered: 06/02/2022) |
| 06/17/2022 | 50 | RESPONSE to 49 MOTION to Dismiss *Counterclaims for Defamation and Abuse of Process* filed by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Hays, Jessica) (Entered: 06/17/2022) |
| 06/28/2022 | 51 | Proposed Scheduling Order *and Rule 26(f) Report* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Attachments: # 1 Exhibit A)(Erickson, Amy) (Entered: 06/28/2022) |
| 06/30/2022 | 52 | REPLY to Response to 49 MOTION to Dismiss *Counterclaims for Defamation and Abuse of Process* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 06/30/2022) |
| 08/01/2022 | 53 | REASSIGNMENT OF JUDGE. This action is reassigned to Judge Charlotte N. Sweeney upon her appointment. Unless otherwise ordered, the dates and times for all previously scheduled matters will be maintained and will now be handled by Judge Sweeney in Courtroom 204 in the Byron Rogers Courthouse. Her chambers are located in C-253 and her telephone number is (303) 335-2610. All future pleadings should be designated as 22-cv-00581-CNS. (Text only entry) (agarc, ) (Entered: 08/01/2022) |
| 08/05/2022 | 54 | MOTION for Judgment on the Pleadings by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Hays, Jessica) (Entered: 08/05/2022) |
| 08/26/2022 | 55 | RESPONSE to 54 MOTION for Judgment on the Pleadings filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 08/26/2022) |
| 08/29/2022 | 56 | Proposed Scheduling Order *and Rule 26(f) Report (Amended)* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 08/29/2022) |
| 08/29/2022 | 57 | ORDER REFERRING CASE to Magistrate Judge N. Reid Neureiter **non-dispositive matters**. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of Local Civ. |

| | | |
|---|---|---|
| | | R. 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other non-dispositive motions, (4) pursuant to Local Civ. R. 16.6 and at the discretion of the Magistrate Judge, convene such early neutral evaluation and/or settlement conferences and direct related procedures as may facilitate resolution of this case without the necessity of a motion or prior authorization of the undersigned. By Judge Charlotte N. Sweeney on 8/29/2022. Text Only Entry (cnssec. ) (Entered: 08/29/2022) |
| 08/30/2022 | 58 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 30 August 2022. It is hereby ORDERED that a Scheduling Conference is set for September 13, 2022 at 9:30 a.m. The parties are directed to call the conference line as a participant at (888) 398-2342, Access Code 5755390# at the scheduled time. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 08/30/2022) |
| 09/06/2022 | 59 | REPLY to Response to 54 MOTION for Judgment on the Pleadings filed by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Hays, Jessica) (Entered: 09/06/2022) |
| 09/13/2022 | 60 | MINUTE ENTRY for proceedings held before Magistrate Judge N. Reid Neureiter: Telephonic Scheduling Conference held on 9/13/2022. Discovery due by 12/2/2022. Dispositive Motions due by 12/16/2022.<br><br>A Discovery Conference is set for September 22, 2022 at 2:00 p.m. before Magistrate Judge N. Reid Neureiter in Courtroom C203, Second floor, Byron G. Rogers Courthouse, 1929 Stout Street, Denver, Colorado 80294.The parties are directed to prepare and email to Chambers (Neureiter_chambers@cod.uscourts.gov) by 12:00 PM on September 21, 2022 a short (no longer than five pages each, ten pages total) joint statement setting forth each side's respective position concerning the dispute. The parties are advised that the joint statement will be attached to the courtroom minutes and made a part of the record. If the parties resolve the dispute, then they shall jointly contact Judge Neureiter's Chambers to vacate the hearing. FTR: Courtroom C203. (rvill, ) (Entered: 09/13/2022) |
| 09/13/2022 | 61 | SCHEDULING ORDER by Magistrate Judge N. Reid Neureiter on September 13, 2022. (rvill, ) (Entered: 09/13/2022) |
| 09/20/2022 | 62 | MINUTE ORDER: A Final Pretrial Conference is set for 5/12/2023 at 8:30 AM in Courtroom C204 before Judge Charlotte N. Sweeney. The parties' Proposed Pretrial Order is due by 5/5/2023. By Judge Charlotte N. Sweeney on 9/20/2022. Text Only Entry (cnssec. ) (Entered: 09/20/2022) |
| 09/21/2022 | 63 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 21 September 2022. In light of the parties' Joint Statement submitted to chambers, it is hereby ORDERED that the Discovery Hearing set for September 22, 2022 at 2:00 p.m. is VACATED. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 09/21/2022) |
| 10/19/2022 | 64 | MOTION for Protective Order by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) Modified on 10/19/2022 to edit event type per chambers. (sphil, ). (Entered: 10/19/2022) |
| 10/19/2022 | 65 | MEMORANDUM regarding 64 MOTION for Protective Order. Motion 64 is referred to Magistrate Judge N. Reid Neureite, by Judge Charlotte N. Sweeney on 10/19/2022. Text Only Entry (cnssec.) (Entered: 10/19/2022) |
| 10/19/2022 | 66 | MINUTE ORDER by Magistrate Judge N. Reid Neureiter on October 19, 2022. The Stipulation and Proposed Protective Order [Motion] (Dkt. # 64 ) is GRANTED. The Protective Order is APPROVED and made an Order of Court. (rvill, ) (Entered: 10/19/2022) |
| 10/19/2022 | 67 | PROTECTIVE ORDER by Magistrate Judge N. Reid Neureiter on October 19, 2022. (rvill, ) (Entered: 10/19/2022) |

| 11/11/2022 | 68 | CERTIFICATE of Mailing/Service *Plaintiffs' Expert Witness Disclosures* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 11/11/2022) |
|---|---|---|
| 11/21/2022 | 69 | NOTICE of Entry of Appearance by Kristin M. Stock on behalf of All Plaintiffs Attorney Kristin M. Stock added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla), Attorney Kristin M. Stock added to party League of Women Voters of Colorado(pty:pla), Attorney Kristin M. Stock added to party Mi Familia Vota(pty:pla) (Stock, Kristin) (Entered: 11/21/2022) |
| 12/02/2022 | 70 | MOTION for Summary Judgment by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Attachments: # 1 Exhibit 1- Prescott Deposition Transcript, # 2 Exhibit 2- Hendrix Deposition Transcript, # 3 Exhibit 3- Hernandez Deposition Transcript)(Hays, Jessica) (Entered: 12/02/2022) |
| 12/16/2022 | 71 | MOTION to Exclude *Expert Testimony* by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Attachments: # 1 Exhibit 1- Expert Opinion, # 2 Exhibit 2- Smith Deposition Transcript)(Hays, Jessica) (Entered: 12/16/2022) |
| 12/23/2022 | 72 | RESPONSE to 70 MOTION for Summary Judgment filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Attachments: # 1 Exhibit A - County & Local Organizing Playbook, dated August, 2021, # 2 Exhibit B - Colorado Canvassing Report, dated 3/11/2022, # 3 Exhibit C - 11/21/2022 Deposition of Salvador Hernandez - Transcript Excerpts, # 4 Exhibit D - 11/22/2022 Deposition of Portia Prescott - Transcript Excerpts, # 5 Exhibit E -11/23/2022 Deposition of Beth Hendrix Nieland - Transcript Excerpts, # 6 Exhibit F - Plaintiffs Second Amended Rule 26(A)(1) Disclosures, dated 12/2/2022, # 7 Exhibit G - 11/29/2022 Deposition of USEIP - Transcript Excerpts, # 8 Exhibit H - 8/16/2022 Deposition of Holly Kasun - Transcript Excerpts, # 9 Exhibit I - 8/15/2022 Deposition of Shawn Smith - Transcript Excerpts, # 10 Exhibit J - 8/23/2022 Deposition of Ashley Epp - Transcript Excerpts, # 11 Exhibit K - Hitchhikers Guide to Election Fraud Analytics, # 12 Exhibit L - April, 2021, Messages from Basecamp, # 13 Exhibit M - May, 2021, Messages from Basecamp, # 14 Exhibit N - April, 2021, Messages from Basecamp, # 15 Exhibit O - 10/5/2022 Deposition of Jeffrey Young - Transcript Excerpts) (Erickson, Amy) (Entered: 12/23/2022) |
| 12/23/2022 | 73 | DECLARATION of *Yvette Roberts* regarding MOTION for Summary Judgment 70 by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 12/23/2022) |
| 01/03/2023 | 74 | USA STATEMENT of Interest re 70 MOTION for Summary Judgment *Statement of Interest of the United States* by Interested Party United States of America. (Wu, Zeyen) Modified on 1/4/2023 to edit text. (sphil, ). (Entered: 01/03/2023) |
| 01/06/2023 | 75 | RESPONSE to 71 MOTION to Exclude *Expert Testimony of Professor Atiba Ellis* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 01/06/2023) |
| 01/06/2023 | 76 | REPLY to Response to 70 MOTION for Summary Judgment filed by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Attachments: # 1 Exhibit 1- Ashley Epp Deposition Transcript, # 2 Exhibit 2- Jeff Young Deposition Transcript, # 3 Exhibit 3- Jeff Young Declaration, # 4 Exhibit 4- Cory Anderson Declaration, # 5 Exhibit 5- USEIP 30(b)(6) Deposition Transcript, # 6 Exhibit 6- Holly Kasun Deposition Transcript, # 7 Exhibit 7- Shawn Smith Deposition Transcript, # 8 Exhibit 8- USEIP Training Materials, # 9 Exhibit 9- Photographs, # 10 Exhibit 10- Beth Hendrix Deposition Transcript)(Hays, Jessica) (Entered: 01/06/2023) |
| 01/16/2023 | 77 | RESPONSE to 74 Statement by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Hays, Jessica) (Entered: 01/16/2023) |

| | | |
|---|---|---|
| 01/20/2023 | 78 | REPLY to Response to 71 MOTION to Exclude *Expert Testimony* filed by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Hays, Jessica) (Entered: 01/20/2023) |
| 01/23/2023 | 79 | MOTION to Withdraw as Attorney by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Day, Reid) (Entered: 01/23/2023) |
| 01/23/2023 | 80 | ORDER denying 79 Motion to Withdraw as Attorney. Denied for failure to comply with D.C.COLO.LAttyR 5(b). By Judge Charlotte N. Sweeney on 1/23/2023. Text Only Entry(cnssec.) (Entered: 01/23/2023) |
| 01/23/2023 | 81 | ORDER granting 49 Plaintiffs' Motion to Dismiss. Defendants' counterclaims for defamation and abuse of process are DISMISSED. by Judge Charlotte N. Sweeney on 1/23/23. Text Only Entry(jdyne) (Entered: 01/23/2023) |
| 01/23/2023 | 82 | MOTION to Withdraw as Attorney by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Day, Reid) (Entered: 01/23/2023) |
| 01/23/2023 | 83 | ORDER granting 82 Motion to Withdraw as Attorney. Attorney Reid Kelly Day is withdrawn. By Judge Charlotte N. Sweeney on 1/23/2023. Text Only Entry(cnssec. ) (Entered: 01/23/2023) |
| 01/31/2023 | 84 | ORDER denying 54 Motion for Judgment on the Pleadings; granting in part and denying in part 70 Motion for Summary Judgment by Judge Charlotte N. Sweeney on 1/31/23.(jdyne) (Entered: 01/31/2023) |
| 02/20/2023 | 85 | MOTION to Clarify re 81 Order on Motion to Dismiss by Counter Claimants Ashley Epp, Holly Kasun, Shawn Smith. (Hays, Jessica) (Entered: 02/20/2023) |
| 03/13/2023 | 86 | RESPONSE to 85 MOTION to Clarify re 81 Order on Motion to Dismiss filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 03/13/2023) |
| 03/31/2023 | 87 | ORDER granting 85 MOTION to Clarify re 81 Order on Motion to Dismiss. Defendants' filed a Motion for Clarification of this Court's Order from January 23, 2023 (ECF No. 81 ), regarding whether their counterclaims were dismissed with prejudice. The Court ruled that Defendants' defamation counterclaim was denied for failure to state a claim because the allegedly defamatory statements are contained within the Complaint and therefore absolutely privileged. This counterclaim was dismissed with prejudice. The Court also ruled that Defendants' second counterclaim, abuse of process, raised arguments that should have been brought under Federal Rule of Civil Procedure 12(b)(6). This counterclaim was also dismissed with prejudice because Defendants had the opportunity to file a Rule 12(b)(6) motion and failed to do so. The Court finds no reason to reconsider its prior order and will not do so. By Judge Charlotte N. Sweeney on 3/31/2023. Text Only Entry(cnssec. ) (Entered: 03/31/2023) |
| 05/03/2023 | 88 | MOTION for Leave to Appear *Remotely* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 05/03/2023) |
| 05/05/2023 | 89 | ORDER granting 88 MOTION for Leave to Appear Remotely. The Court will hold the Final Pretrial Conference set 5/12/2023 at 8:30 a.m. telephonically. The parties are directed to dial (571) 353-2301 and enter Access Code 770126989# when prompted. By Judge Charlotte N. Sweeney on 5/5/2023. Text Only Entry(cnssec. ) (Entered: 05/05/2023) |
| 05/05/2023 | 90 | Proposed Pretrial Order by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 05/05/2023) |
| 05/11/2023 | 91 | MOTION to Amend/Correct/Modify 90 Proposed Pretrial Order by Defendants Ashley Epp, Holly Kasun, Shawn Smith. (Attachments: # 1 Exhibit Amended Proposed Pretrial Order)(Hays, |

|  |  | Jessica) (Entered: 05/11/2023) |
|---|---|---|
| 05/12/2023 | 92 | MINUTE ENTRY for proceedings held before Judge Charlotte N. Sweeney: Final Pretrial Conference held on 5/12/2023. 91 Motion for Leave to Amend Proposed Pretrial Order is DENIED as moot. Four-day Bench Trial set to commence 2/5/2024 at 8:30 AM in Courtroom A 702 before Judge Charlotte N. Sweeney with a Trial Preparation Conference on 1/23/2024 at 1:00 PM in Courtroom A 702 before Judge Charlotte N. Sweeney. Court Reporter: Sarah Mitchell. (jdyne, ) (Entered: 05/12/2023) |
| 05/12/2023 | 93 | ORDER SETTING TRIAL: Four-day Bench Trial set to commence 2/5/2024 at 8:30 AM in Courtroom A 702 before Judge Charlotte N. Sweeney with a Trial Preparation Conference on 1/23/2024 at 1:00 PM in Courtroom A 702 before Judge Charlotte N. Sweeney. by Judge Charlotte N. Sweeney on 5/12/23. (jdyne) (Entered: 05/12/2023) |
| 05/15/2023 | 94 | Proposed Pretrial Order by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Breese, Casey) (Entered: 05/15/2023) |
| 05/16/2023 | 95 | FINAL PRETRIAL ORDER by Judge Charlotte N. Sweeney on 5/16/23. (jdyne) (Entered: 05/16/2023) |
| 06/07/2023 | 96 | ORDER denying 71 Motion to Exclude Testimony of Atiba Ellis by Judge Charlotte N. Sweeney on 6/7/23.(jdyne) (Main Document 96 replaced on 6/7/2023 with executed signature page) (jdyne). (Entered: 06/07/2023) |
| 12/29/2023 | 97 | MOTION to Withdraw as Attorney by Defendants Ashley Epp, Holly Kasun. (Attachments: # 1 Proposed Order (PDF Only))(Hays, Jessica) (Entered: 12/29/2023) |
| 01/02/2024 | 98 | ORDER granting 97 Motion to Withdraw as Attorney. Attorney Jessica Lynn Hays and R. Scott Reisch are withdrawn as to Defendants Epps and Kasun. The Court orders that Defendants Epps and Kasun notify the Court and all parties on or before 1/5/2024 of their up-to-date contact information. By Judge Charlotte N. Sweeney on 1/2/2024. Text Only Entry(cnsja.) (Entered: 01/02/2024) |
| 01/02/2024 | 99 | MOTION in Limine by Defendant Shawn Smith. (Attachments: # 1 Exhibit, # 2 Proposed Order (PDF Only))(Hays, Jessica) (Entered: 01/02/2024) |
| 01/02/2024 | 102 | NOTICE of Change of Address/Contact Information by Defendant Holly Kasun (sphil, ) (Entered: 01/04/2024) |
| 01/03/2024 | 100 | NOTICE of Withdrawal of Counsel by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota (Farganis, Dion) (Entered: 01/03/2024) |
| 01/03/2024 | 101 | MINUTE ORDER re: 100 NOTICE of Withdrawal of Counsel filed by Mi Familia Vota, Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado. The Court will not act on a Notice of Withdrawal of Counsel. Consistent with this Court's Local Rules (See D.C.COLO.LAttyR 5(b)), please file a motion. By Judge Charlotte N. Sweeney on 1/3/2024. Text Only Entry (cnsja. ) Modified on 1/3/2024 to correct text. (cnsja.). (Entered: 01/03/2024) |
| 01/03/2024 | 103 | NOTICE of Change of Address/Contact Information by Defendant Ashley Epp (sphil, ) (Entered: 01/04/2024) |
| 01/04/2024 | 104 | First MOTION to Continue Hearing by Defendant Holly Kasun. (Kasun, Holly) (Entered: 01/04/2024) |
| 01/05/2024 | 105 | RESPONSE to 104 First MOTION to Continue Hearing or Trial filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 01/05/2024) |
| 01/05/2024 | 106 | MINUTE ORDER re: 104 First Motion to Continue Hearing filed by Holly Kasun. The Court is in receipt of the Plaintiffs' Response to Defendant Kasun's Motion to Continue. The Court |

12

|  |  | requests that all other parties file a Response on or before 1/11/2024. By Judge Charlotte N. Sweeney on 1/5/2024. Text Only Entry (cnsja.) (Entered: 01/05/2024) |
|---|---|---|
| 01/08/2024 | 107 | First MOTION to Continue *Trial or Hearing* by Defendant Ashley Epp. (Epp, Ashley) (Entered: 01/08/2024) |
| 01/09/2024 | 108 | RESPONSE to 107 First MOTION to Continue *Trial or Hearing*, 104 First MOTION to Continue *Hearing of Hearing or Trial* filed by Defendant Ashley Epp. (Attachments: # 1 Exhibit Yvette Roberts Statements, # 2 Exhibit COSOS Investigation, # 3 Deposition Excerpts Plaintiff Deposition Excerpts, # 4 Exhibit LWV Safety Plan)(Epp, Ashley) (Entered: 01/09/2024) |
| 01/09/2024 | 109 | RESPONSE to 99 MOTION in Limine *by Defendant Shawn Smith* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 01/09/2024) |
| 01/09/2024 | 110 | RESPONSE to 104 First MOTION to Continue *Hearing*, 107 First MOTION to Continue *Trial or Hearing* filed by Defendant Shawn Smith. (Hays, Jessica) (Entered: 01/09/2024) |
| 01/09/2024 | 111 | RESPONSE to 99 MOTION in Limine *IN SUPPORT* filed by Defendant Ashley Epp. (Epp, Ashley) (Entered: 01/09/2024) |
| 01/09/2024 | 112 | RESPONSE to 99 MOTION in Limine *In Support* filed by Defendant Holly Kasun. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2)(Kasun, Holly) (Entered: 01/09/2024) |
| 01/10/2024 | 113 | RESPONSE to 108 Response to Motion, 107 First MOTION to Continue *Trial or Hearing* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 01/10/2024) |
| 01/10/2024 | 114 | REPLY to Response to 104 First MOTION to Continue *Hearing*, 107 First MOTION to Continue *Trial or Hearing IN SUPPORT* filed by Defendant Ashley Epp. (Attachments: # 1 Exhibit Communications re: Intimidation)(Epp, Ashley) (Entered: 01/10/2024) |
| 01/11/2024 | 115 | REPLY to Response to 104 First MOTION to Continue *Hearing*, 107 First MOTION to Continue *Trial or Hearing* filed by Defendant Holly Kasun. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3)(Kasun, Holly) (Entered: 01/12/2024) |
| 01/16/2024 | 116 | MINUTE ORDER re: 104 First Motion to Continue *Hearing* filed by Holly Kasun and 107 First Motion to Continue *Trial or Hearing* filed by Ashley Epp. A Hearing on the pending motions to continue is set for 1/17/2024 at 1:00 PM before Judge Charlotte N. Sweeney. The hearing will be held by video teleconference. The Court's staff will provide connection information to the parties by separate email. By Judge Charlotte N. Sweeney on 1/16/2024. Text Only Entry (cnsja. ) (Entered: 01/16/2024) |
| 01/16/2024 | 117 | Witness List by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 01/16/2024) |
| 01/16/2024 | 118 | Witness List by Defendant Shawn Smith. (Hays, Jessica) (Entered: 01/16/2024) |
| 01/16/2024 | 119 | Exhibit List *(Joint)* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 01/16/2024) |
| 01/16/2024 | 120 | Witness List *Epp and Kasun* by Defendants Ashley Epp, Holly Kasun. (Epp, Ashley) (Entered: 01/16/2024) |
| 01/17/2024 | 121 | MOTION for Recusal by Defendant Shawn Smith. (Attachments: # 1 Exhibit 1- DU on the Bench, # 2 Exhibit 2- Matthew Shepard Foundation, # 3 Exhibit 3- FEC Report)(Hays, Jessica) (Entered: 01/17/2024) |
| 01/17/2024 | 122 | ORDER granting 104 Motion to Continue; finding as moot 107 Motion to Continue. Due to a water main break, the Arraj courthouse has been evacuated and closed for the day and the Court will be unable to proceed with the 1:00 p.m. hearing. Today's hearing is VACATED. However, the Court grants Defendant Kasun's First Motion to Continue 104 . The Bench Trial set for |

|  |  | 2/5/2024 is VACATED. The Trial Preparation Conference set for 1/23/2024 at 1:00 is converted into a Status Conference (by Video Teleconference) at which time to Court will reset the trial and the trial preparation conference. The Court finds Defendant Epp's Motion to Continue [107](#) to be moot. The Court strongly encourages the parties to review the Uniform Civil Practice Standards, particularly as they relate to page-limitations for motions, responses, and replies. By Judge Charlotte N. Sweeney on 1/17/2024. Text Only Entry(cnsja. ) (Entered: 01/17/2024) |
| 01/22/2024 | [123](#) | NOTICE of Entry of Appearance by Amira Marcella Mattar on behalf of Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia VotaAttorney Amira Marcella Mattar added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla), Attorney Amira Marcella Mattar added to party League of Women Voters of Colorado(pty:pla), Attorney Amira Marcella Mattar added to party Mi Familia Vota(pty:pla) (Mattar, Amira) (Entered: 01/22/2024) |
| 01/22/2024 | [124](#) | First MOTION for Leave to *Reopen Limited Discovery* by Defendant Holly Kasun. (Kasun, Holly) (Entered: 01/22/2024) |
| 01/23/2024 | [125](#) | MINUTE ENTRY for proceedings held before Judge Charlotte N. Sweeney: Status Conference via Video Teleconference held on 1/23/2024. [121](#) Motion to Recuse Judge Sweeney is DENIED. [124](#) Motion for Leave to Reopen Limited Discovery is DENIED. Five-day Jury Trial set to commence 7/15/2024 at 8:00 AM in Courtroom A 702 before Judge Charlotte N. Sweeney with a Trial Preparation Conference on 6/21/2024 at 9:00 AM in Courtroom A 702 before Judge Charlotte N. Sweeney. Court Reporter: Sarah Mitchell. (jdyne) (Entered: 01/23/2024) |
| 01/23/2024 | [126](#) | AMENDED MINUTE ENTRY for proceedings held before Judge Charlotte N. Sweeney re [125](#) Status Conference via Video Teleconference held on 1/23/2024. Amended to reflect Bench Trial (not Jury Trial), as indicated. Court Reporter: Sarah Mitchell. (jdyne) (Entered: 01/23/2024) |
| 01/23/2024 | [127](#) | AMENDED ORDER SETTING TRIAL: Five-day Bench trial set to commence 7/15/2024 at 8:30 a.m. with a Trial Preparation Conference on 6/21/2024 at 9:00 a.m. By Judge Charlotte N. Sweeney on 1/23/24. (jdyne) (Entered: 01/23/2024) |
| 02/27/2024 | [128](#) | First MOTION for Sanctions *Emergency Under FRCP 26 & 37* by Defendant Holly Kasun. (Attachments: # [1](#) Deposition Excerpts Exhibit 1_ B. Hendrix LWV, # [2](#) Exhibit Exhibit 2_Pltf initial disclosures, # [3](#) Exhibit Exhibit 3_Pltf amended disclosures, # [4](#) Deposition Excerpts Exhibit 4_ P. Prescott NAACP, # [5](#) Deposition Excerpts Exhibit 5_ S.H. MFV, # [6](#) Exhibit Exhibit 6_Def Initial disclosures, # [7](#) Exhibit Exhibit 7_ Quick Ref. Guide Pltf violations, # [8](#) Exhibit Exhibit 8_LWV interrog, # [9](#) Exhibit Exhibit 9_ NAACP interrog, # [10](#) Exhibit Exhibit 10_MFV interrog, # [11](#) Exhibit Exhibit 11_pltf comm missing docs, # [12](#) Exhibit Exhibit 12_Def priv log)(Kasun, Holly) (Entered: 02/27/2024) |
| 03/12/2024 | [129](#) | RESPONSE to [128](#) First MOTION for Sanctions *Emergency Under FRCP 26 & 37* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 03/12/2024) |
| 03/12/2024 | [130](#) | DECLARATION of *Amy Erickson* regarding First MOTION for Sanctions *Emergency Under FRCP 26 & 37* [128](#) by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B, # [3](#) Exhibit C)(Erickson, Amy) (Entered: 03/12/2024) |
| 03/22/2024 | [131](#) | Renewed COUNTERCLAIM *Abuse of Process* against All Plaintiffs, filed by Ashley Epp, Holly Kasun. (Attachments: # [1](#) Exhibit Plaintiff Open Records Request, # [2](#) Exhibit James Cannon to SecState and AG, # [3](#) Exhibit Grand Junction Police Department -- No record of investigation, # [4](#) Exhibit Mesa County Sheriffs -- No record of investigation, # [5](#) Exhibit James Cannon -- cant recall records, # [6](#) Exhibit Full production from Mesa (1/2), # [7](#) Exhibit Full production from Mesa (2/2), # [8](#) Exhibit SecState -- First mention of VRA, # [9](#) Exhibit SecState -- Connects with Yvette Roberts)(Epp, Ashley) Modified on 3/25/2024 to edit event type per chambers. (sphil, ). (Entered: 03/22/2024) |
| 03/22/2024 | [132](#) | ERRATA re [131](#) Counterclaim,, *Abuse of Process* by Defendants Ashley Epp, Holly Kasun. (Attachments: # [1](#) Proposed Document Pleading updated to amend date of service)(Epp, Ashley) |

9/25/24, 10:44 AM                                              CM/ECF - U.S. District Court:cod

| | | (Entered: 03/22/2024) |
|---|---|---|
| 03/26/2024 | 133 | REPLY to Response to 128 First MOTION for Sanctions *Emergency Under FRCP 26 & 37 Reply to Plaintiffs Response (ECF 129) to (ECF 128)* filed by Defendant Holly Kasun. (Kasun, Holly) (Entered: 03/26/2024) |
| 04/02/2024 | 134 | Amended COUNTERCLAIM *Abuse of Process* against All Plaintiffs, filed by Holly Kasun, Ashley Epp. (Attachments: # 1 Exhibit Unredacted Emails 1/2, # 2 Exhibit Unredacted Emails 2/2)(Epp, Ashley) Modified on 4/2/2024 to edit event type per chambers. (sphil, ). (Entered: 04/02/2024) |
| 04/11/2024 | 135 | MOTION to Withdraw as Attorney *Ronald Fein* by Counter Defendants Colorado Montana Wyoming State Area Conference of the NAACP, Colorado Montana Wyoming State Area Conference of the NAACP, Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, League of Women Voters of Colorado, League of Women Voters of Colorado, Mi Familia Vota, Mi Familia Vota, Mi Familia Vota, Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Fein, Ronald) (Entered: 04/11/2024) |
| 04/11/2024 | 136 | ORDER granting 135 Motion to Withdraw as Attorney. Attorney Ronald Andrew Fein is withdrawn. By Judge Charlotte N. Sweeney on 4/11/2024. Text Only Entry(cnsja, ) (Entered: 04/11/2024) |
| 04/12/2024 | 137 | RESPONSE to 134 MOTION for Order to, 131 MOTION for Order to filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Stock, Kristin) (Entered: 04/12/2024) |
| 04/17/2024 | 138 | REPLY to 137 Response to Motion *Counterclaim Abuse of Process* by Defendants Ashley Epp, Holly Kasun. (Epp, Ashley) (Entered: 04/17/2024) |
| 04/29/2024 | 139 | ORDER finding as moot 131 Renewed COUNTERCLAIM Abuse of Process. The Court finds the motion at ECF No. 131 to be moot in light of the filing of an Amended Motion at ECF No. 134 . By Judge Charlotte N. Sweeney on 4/29/2024. Text Only Entry(cnsja, ) (Entered: 04/29/2024) |
| 05/30/2024 | 140 | First MOTION in Limine by Defendant Ashley Epp. (Attachments: # 1 Proposed Order (PDF Only) Proposed Order on Epp Motion in Limine)(Epp, Ashley) (Entered: 05/30/2024) |
| 05/31/2024 | 141 | MOTION in Limine by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Stock, Kristin) (Entered: 05/31/2024) |
| 05/31/2024 | 142 | First MOTION in Limine *to Exclude Certain Evidence and Admit Certain Evidence* by Defendant Holly Kasun. (Attachments: # 1 Proposed Order (PDF Only) Order Re: Defendant Kasun's MIL)(Kasun, Holly) (Entered: 05/31/2024) |
| 05/31/2024 | 143 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 141 MOTION in Limine filed by attorney **Kristin Stock**. **DO NOT REFILE THE DOCUMENT. Action to take -** counsel must submit a change of contact request through the Manage my Account tab at the PACER website at https://www.pacer.gov/, pursuant to D.C.COLO.LAttyR 5(c) and 3.5 of the Electronic Case Filing Procedures (Civil cases). (Text Only Entry) (sphil, ) (Entered: 06/03/2024) |
| 06/05/2024 | 144 | Unopposed MOTION for Leave to Appear *Virtually at the 6/21/2024 Trial Preparation Conference* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 06/05/2024) |
| 06/06/2024 | 145 | ORDER granting in part and denying in part 144 Unopposed Motion for Leave to Appear Virtually at the 6/21/2024 Trial Preparation Conference. The Court will require lead counsel for Plaintiffs and lead counsel for Defendant Smith to appear in person. All others may appear via Video Teleconference. The Court's staff will provide connection instructions to the parties by |

15

CM/ECF - U.S. District Court:cod

| | | email prior to the hearing. By Judge Charlotte N. Sweeney on 6/6/2024. Text Only Entry(cnsja, ) (Entered: 06/06/2024) |
|---|---|---|
| 06/06/2024 | 146 | RESPONSE to 141 MOTION in Limine filed by Defendant Ashley Epp. (Epp, Ashley) (Entered: 06/06/2024) |
| 06/06/2024 | 147 | RESPONSE to 141 MOTION in Limine filed by Defendant Holly Kasun. (Kasun, Holly) (Entered: 06/06/2024) |
| 06/07/2024 | 148 | RESPONSE to 142 First MOTION in Limine *to Exclude Certain Evidence and Admit Certain Evidence* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 06/07/2024) |
| 06/07/2024 | 149 | RESPONSE to 140 First MOTION in Limine filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 06/07/2024) |
| 06/10/2024 | 150 | NOTICE *of Attorney Appearance* by Defendant Holly Kasun (Wynne, Michael) (Entered: 06/10/2024) |
| 06/11/2024 | 151 | NOTICE of Entry of Appearance by Cameron C. Powell on behalf of Holly KasunAttorney Cameron C. Powell added to party Holly Kasun(pty:dft) (Powell, Cameron) (Entered: 06/11/2024) |
| 06/11/2024 | 152 | ORDER denying 99 Motion in Limine; denying 128 Motion for Sanctions; denying 134 Motion for Order; granting in part and denying in part 140 Motion in Limine; granting in part and denying in part 141 Motion in Limine; granting in part and taking under advisement 142 Motion in Limine. By Judge Charlotte N. Sweeney on 6/11/24.(jdyne) (Entered: 06/11/2024) |
| 06/13/2024 | 153 | Witness List *with Time Allocation* by Defendant Ashley Epp. (Epp, Ashley) (Entered: 06/13/2024) |
| 06/14/2024 | 154 | Witness List by Defendant Shawn Smith. (Hays, Jessica) (Entered: 06/14/2024) |
| 06/14/2024 | 155 | Witness List by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 06/14/2024) |
| 06/14/2024 | 156 | Witness List by Defendant Holly Kasun. (Wynne, Michael) (Entered: 06/14/2024) |
| 06/14/2024 | 157 | Exhibit List *(Joint)* by Defendants Ashley Epp, Holly Kasun, Shawn Smith. (Wynne, Michael) (Entered: 06/14/2024) |
| 06/18/2024 | 158 | TRIAL BRIEF by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 06/18/2024) |
| 06/18/2024 | 159 | Proposed Findings of Fact *and Conclusions of Law* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Hostetler, Courtney) (Entered: 06/18/2024) |
| 06/19/2024 | 160 | TRIAL BRIEF by Defendant Ashley Epp. (Epp, Ashley) (Entered: 06/19/2024) |
| 06/19/2024 | 161 | Proposed Findings of Fact by Defendant Ashley Epp. (Epp, Ashley) (Entered: 06/19/2024) |
| 06/19/2024 | 162 | Proposed Findings of Fact by Defendant Holly Kasun. (Wynne, Michael) (Entered: 06/19/2024) |
| 06/19/2024 | 163 | TRIAL BRIEF by Defendant Holly Kasun. (Wynne, Michael) (Entered: 06/19/2024) |
| 06/19/2024 | 164 | TRIAL BRIEF by Defendant Shawn Smith. (Hays, Jessica) (Entered: 06/19/2024) |
| 06/19/2024 | 165 | Proposed Findings of Fact *and Conclusions of Law* by Defendant Shawn Smith. (Hays, Jessica) (Entered: 06/19/2024) |
| 06/21/2024 | 166 | MINUTE ENTRY for proceedings held before Judge Charlotte N. Sweeney: Trial Preparation Conference held on 6/21/2024. Court Reporter: Sarah Mitchell. (kmyha) (Entered: 06/21/2024) |

| 06/28/2024 | 167 | Witness List by Defendant Holly Kasun. (Wynne, Michael) (Entered: 06/28/2024) |
|---|---|---|
| 07/05/2024 | 168 | MOTION to Strike *Certain Witnesses* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Stock, Kristin) (Entered: 07/05/2024) |
| 07/08/2024 | 169 | MINUTE ORDER re: 168 Motion to Strike Certain Witnesses. The Court orders that Defendant Kasun respond to the Motion 168 on or before 7/10/2024. By Judge Charlotte N. Sweeney on 7/8/2024. Text Only Entry (cnsja, ) (Entered: 07/08/2024) |
| 07/10/2024 | 170 | Unopposed MOTION for Order to *Connect Public Conference Line for Trial* by Defendant Ashley Epp. (Epp, Ashley) (Entered: 07/10/2024) |
| 07/10/2024 | 171 | RESPONSE to 168 MOTION to Strike *Certain Witnesses* filed by Defendant Holly Kasun. (Attachments: # 1 Exhibit)(Wynne, Michael) (Entered: 07/10/2024) |
| 07/12/2024 | 172 | Witness List by Defendant Holly Kasun. (Wynne, Michael) (Entered: 07/12/2024) |
| 07/12/2024 | 173 | Witness List by Defendant Shawn Smith. (Hays, Jessica) (Entered: 07/12/2024) |
| 07/12/2024 | 174 | Exhibit List *Final List of Joint Exhibits* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 07/12/2024) |
| 07/12/2024 | 175 | ORDER granting 168 Motion to Strike Certain Witnesses. By Judge Charlotte N. Sweeney on 7/12/2024.(cnsja, ) (Entered: 07/12/2024) |
| 07/12/2024 | 176 | ORDER denying 170 Unopposed Motion for Order to Connect Public Conference Line for Trial. The Court declines to connect the public telephone line for a select few family members of one defendant as this trial will be held in-person in the courtroom and will be open to the general public to observe. By Judge Charlotte N. Sweeney on 7/12/2024. Text Only Entry(cnsja, ) (Entered: 07/12/2024) |
| 07/12/2024 | 177 | Witness List by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 07/12/2024) |
| 07/12/2024 | 178 | Witness List by Defendant Ashley Epp. (Epp, Ashley) (Entered: 07/12/2024) |
| 07/12/2024 | 179 | Witness List *AMENDED* by Defendant Ashley Epp. (Epp, Ashley) (Entered: 07/12/2024) |
| 07/12/2024 | 180 | Witness List *AMENDED* by Defendant Holly Kasun. (Wynne, Michael) (Entered: 07/12/2024) |
| 07/15/2024 | 181 | MINUTE ENTRY for proceedings held before Judge Charlotte N. Sweeney: Bench Trial Day One held on 7/15/2024. Opening statements given, evidence and testimony presented, trial continued. Court Reporter: Sarah Mitchell. (jdyne) (Entered: 07/15/2024) |
| 07/16/2024 | 182 | MINUTE ENTRY for proceedings held before Judge Charlotte N. Sweeney: Bench Trial Day Two held on 7/16/2024. Evidence and testimony presented, trial continued. Court Reporter: Sarah Mitchell. (jdyne) (Entered: 07/16/2024) |
| 07/17/2024 | 183 | MINUTE ENTRY for proceedings held before Judge Charlotte N. Sweeney: Bench Trial Day Three held on 7/17/2024. Evidence and testimony presented, trial continued. Court Reporter: Sarah Mitchell. (jdyne) (Entered: 07/17/2024) |
| 07/18/2024 | 184 | MINUTE ENTRY for proceedings held before Judge Charlotte N. Sweeney: Bench Trial Day Four held on 7/18/2024. Oral Motion for Judgment on Partial Findings under Fed. R. Civ. P. 52(c) is GRANTED, judgment to enter, trial concluded. Court Reporter: Sarah Mitchell. (jdyne) (Entered: 07/18/2024) |
| 07/18/2024 | 185 | FINAL JUDGMENT in favor of the defendants, Ashley Epp, Holly Kasun, and Shawn Smith, and against the plaintiffs, Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, and Mi Familia Vota. By Judge Charlotte N. Sweeney on 7/18/24. (jdyne) (Entered: 07/18/2024) |

| 07/26/2024 | 186 | TRANSCRIPT of Trial Preparation Conference held on June 21, 2024 before Judge Sweeney. Pages: 1-23. **NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (smitc, ) (Entered: 07/26/2024) |
|---|---|---|
| 07/30/2024 | 187 | TRANSCRIPT of Bench Trial - Day 1 held on July 15, 2024 before Judge Sweeney. Pages: 1-303. **NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (smitc, ) (Entered: 07/30/2024) |
| 07/30/2024 | 188 | TRANSCRIPT of Bench Trial - Day 2 held on July 16, 2024 before Judge Sweeney. Pages: 304-563. **NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (smitc, ) (Entered: 07/30/2024) |
| 07/30/2024 | 189 | TRANSCRIPT of Bench Trial - Day 3 held on July 17, 2024 before Judge Sweeney. Pages: 564-819. **NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (smitc, ) (Entered: 07/30/2024) |
| 07/30/2024 | 190 | TRANSCRIPT of Bench Trial - Day 4 held on July 18, 2024 before Judge Sweeney. Pages: 820-836. **NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** Transcript may only be viewed at the court's public terminal or purchased through the Court |

CM/ECF - U.S. District Court:cod

| | | |
|---|---|---|
| | | Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (smitc, ) (Entered: 07/30/2024) |
| 07/30/2024 | 191 | MOTION for Attorney Fees *and Costs* by Defendant Shawn Smith. (Attachments: # 1 Affidavit, # 2 Exhibit, # 3 Exhibit)(Hays, Jessica) (Entered: 07/30/2024) |
| 08/01/2024 | 192 | First MOTION for Attorney Fees *OPPOSED* by Defendant Ashley Epp. (Attachments: # 1 Exhibit Attorney Fee Schedule, # 2 Exhibit Epp Declaration / Affidavit, # 3 Exhibit Epp CV, # 4 Exhibit Epp 2023 Income, # 5 Exhibit Estimate of Entitled Reisch Fees, # 6 Exhibit Prescott Tweets During Trial)(Epp, Ashley) (Entered: 08/01/2024) |
| 08/01/2024 | 193 | BILL OF Costs by Defendant Ashley Epp. (Attachments: # 1 Exhibit)(Epp, Ashley) Modified on 8/1/2024 to edit title per chambers. (sphil, ). (Entered: 08/01/2024) |
| 08/01/2024 | 194 | Amended BILL OF COSTS re: 193 Unopposed first bill of costs by Defendant Ashley Epp. (Epp, Ashley) Modified on 8/2/2024 to edit title per chambers. (sphil, ). (Entered: 08/01/2024) |
| 08/01/2024 | 195 | NON-STIPULATED Proposed Bill of Costs by Defendant Holly Kasun. Parties conferred on 8/1/2024.

The following category or categories remain under dispute: Fees of the Clerk. Fees and disbursements for printing. Fees for exemplification and copies of papers necessarily obtained for use in the case.

Per court procedure, any objection to the Proposed Bill of Costs is due within 14 days (Attachments: # 1 Affidavit, # 2 Affidavit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit)(Wynne, Michael) (Entered: 08/01/2024) |
| 08/01/2024 | 196 | STIPULATED Proposed Bill of Costs by Defendant Shawn Smith. Parties conferred on 8/1/2024.


The Proposed Bill of Costs is stipulated to in its entirety by all parties. No costs remain under dispute (Attachments: # 1 Itemized Expenses)(Hays, Jessica) (Entered: 08/01/2024) |
| 08/13/2024 | 197 | RESPONSE to 195 Proposed Bill of Costs,, by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 08/13/2024) |
| 08/16/2024 | 198 | NOTICE OF APPEAL as to 185 Judgment, by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota (Filing fee $ 605, Receipt Number ACODC-9827127) (Erickson, Amy) (Entered: 08/16/2024) |
| 08/19/2024 | 199 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 198 Notice of Appeal filed by Mi Familia Vota, Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado to the U.S. Court of Appeals. ( Retained Counsel, Fee paid,) (Attachments: # 1 Preliminary Record)(sphil, ) (Entered: 08/19/2024) |
| 08/19/2024 | 200 | USCA Case Number 24-1328 for 198 Notice of Appeal filed by Mi Familia Vota, Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado. (sphil, ) (Entered: 08/20/2024) |
| 08/20/2024 | 201 | **"STRICKEN"** - RESPONSE to 192 First MOTION for Attorney Fees *OPPOSED* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Attachments: # 1 Exhibit A)(Erickson, Amy) Modified on 8/22/2024 to STRIKE per 204 MINUTE ORDER (dgumb, ). (Entered: 08/20/2024) |
| 08/20/2024 | 202 | **"STRICKEN"** - RESPONSE to 191 MOTION for Attorney Fees *and Costs* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of |

| | | |
|---|---|---|
| | | Colorado, Mi Familia Vota. (Attachments: # 1 Exhibit A)(Erickson, Amy) Modified on 8/22/2024 to STRIKE per 204 MINUTE ORDER (dgumb, ). (Entered: 08/20/2024) |
| 08/20/2024 | 203 | OBJECTION to 195 Proposed Bill of Costs,, by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. Any reply is due within 14 days. (Attachments: # 1 Exhibit A)(Erickson, Amy) (Entered: 08/20/2024) |
| 08/21/2024 | 204 | MINUTE ORDER re: 201 Response to 192 First MOTION for Attorney Fees and 202 Response to 191 Motion for Attorney Fees and Costs. The Responses at ECF Nos. 201 and 202 are STRICKEN for failure to comply with this Court's Uniform Civil Practice Standards. Specifically, CNS Civ. Practice Standard 10.1(c) which can be found here. The Court grants the Plaintiffs to and including 8/27/2024 to refile page-compliant responses. By Judge Charlotte N. Sweeney on 8/21/2024. Text Only Entry (cnsja, ) (Entered: 08/21/2024) |
| 08/27/2024 | 205 | RESPONSE to 192 First MOTION for Attorney Fees *OPPOSED* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Attachments: # 1 Exhibit A)(Erickson, Amy) (Entered: 08/27/2024) |
| 08/27/2024 | 206 | RESPONSE to 191 MOTION for Attorney Fees *and Costs* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Attachments: # 1 Exhibit A)(Erickson, Amy) (Entered: 08/27/2024) |
| 08/27/2024 | 207 | OBJECTION to 195 Proposed Bill of Costs,, by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. Any reply is due within 14 days. (Attachments: # 1 Exhibit A)(Erickson, Amy) (Entered: 08/27/2024) |
| 08/29/2024 | 208 | TRANSCRIPT ORDER FORM re 198 Notice of Appeal by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota (Hostetler, Courtney) (Entered: 08/29/2024) |
| 08/29/2024 | 209 | LETTER TO USCA and all counsel certifying the record is complete as to 198 Notice of Appeal filed by Mi Familia Vota, Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado. A transcript order form was filed stating that the necessary transcript is already on file. ( Appeal No. 24-1328). Text Only Entry. (sphil, ) (Entered: 08/29/2024) |
| 09/03/2024 | 210 | REPLY to Response to 192 First MOTION for Attorney Fees *OPPOSED* filed by Defendant Ashley Epp. (Epp, Ashley) (Entered: 09/03/2024) |
| 09/03/2024 | 211 | REPLY to 203 Objection to Proposed Bill of Costs, by Defendant Holly Kasun. (Wynne, Michael) (Entered: 09/03/2024) |
| 09/03/2024 | 212 | REPLY to Response to 191 MOTION for Attorney Fees *and Costs* filed by Defendant Shawn Smith. (Hays, Jessica) (Entered: 09/03/2024) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/25/2024 08:44:34 | | |
| **PACER Login:** | bryansellslaw | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-00581-CNS-NRN |
| **Billable Pages:** | 18 | **Cost:** | 1.80 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

Colorado Montana Wyoming
State Area Conference of the NAACP,
League of Women Voters of Colorado, and
Mi Familia Vota,

      Plaintiffs,

v.

United States Election Integrity Plan, Shawn Smith,
Ashley Epp, and Holly Kasun.

      Defendants.

---

## COMPLAINT

---

Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP ("NAACP Colorado"), League of Women Voters of Colorado ("LWVCO"), and Mi Familia Vota ("MFV") (collectively, the "Voter Organizations"), bring this action for damages and injunctive relief enjoining Defendants USEIP, Shawn Smith, Ashley Epp, and Holly Kasun, (collectively, "Defendants"), from continuing to engage in voter intimidation in violation of the Voting Rights Act and the Ku Klux Klan Act.

### INTRODUCTION

1.    United States Election Integrity Plan ("USEIP") is deploying its agents, who are sometimes armed, to go door-to-door around Colorado to intimidate voters.

2.    USEIP agents, wearing badges that identify themselves as official-sounding groups such as the "Voter Integrity Committee," and sometimes introducing themselves in ways that make

1

voters believe that they are associated with government agencies, are using public voter lists to target and intimidate voters. USEIP agents ask residents to confirm their address, question residents about their participation in the 2020 election and their method for voting, and either ask them about allegedly fraudulent ballots or accuse them of casting allegedly fraudulent ballots.

3.      During their door-to-door campaigns, USEIP agents take photos of voters' residences, and the organization maintains a database of photos of voters' residences.

4.      In order to threaten voters, in their own homes, with potentially violent confrontations, USEIP encourages its agents to carry weapons and has informed its canvassers that it is attempting to line up security for its door-to-door voter intimidation campaigns.  In its chatroom, USEIP members regularly offer advice on effective weapons and where to purchase them. During its canvassing events, USEIP has encouraged gun-carrying members to accompany unarmed agents and offer their contact information to unarmed agents.

5.      Defendants' objectives are clear. By planning to, threatening to, and actually deploying armed agents to knock on doors throughout the state of Colorado, USEIP is engaging in voter intimidation.  USEIP's actions not only intimidate voters who cast ballots in the November 2020 election, but also intimidate future eligible voters, dissuading both groups from exercising their constitutional right to vote.  USEIP is actively generating and spreading fear that voters can expect multiple armed and unarmed USEIP members to show up at their doors at any moment to harass and interrogate them about their voting history.

6.      The fear of violence is all the more palpable given USEIP's participation in the events that unfolded at the U.S. Capitol on January 6th, 2021, its ties to QAnon, which the FBI has identified as a domestic terror threat, and its public, and sometimes violent, threats against Colorado election officials. And this fear is even more acute for Black and Latino communities

who have, historically, faced extensive violence and intimidation efforts, often instigated by armed individuals, to prevent their free exercise of the franchise. As USEIP's actions make plain, voter intimidation remains a reality for many voters of color, threatening their ability to exercise their right to vote freely, or feel safe from interference in their own homes. To this end, USEIP's actions are especially drastic and alarming because, rather than confronting voters at the polls or other public places, USEIP agents are intimidating voters in the place where voters should feel safest—their own homes.

7.    Defendants' canvassing has the purpose and effect of intimidating Coloradans from voting, trying to vote, helping others to vote, supporting or advocating for certain political beliefs, or exercising the right to speak, peaceably assemble, or petition the government for redress of grievances, in violation of Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b).

8.    In addition, Defendants Smith, Epp, and Kasun have conspired and worked in concert with one another—namely through USEIP—to threaten to or actually show up at voters doors around Colorado, interrogating them about their voting history, and thereby intimidating voters and preventing Coloradans who are lawfully entitled to vote from giving their support or advocacy towards political candidates, in violation of the Ku Klux Klan Act, 42 U.S.C. § 1985.

9.    With the 2022 elections fast-approaching,[1] Defendants' voter intimidation campaign must be stopped.

---

[1] The first registration deadlines for Colorado's 2022 Elections were in January and February, in advance of the March Party Precinct Caucuses and county assemblies. (*See* https://www.sos.state.co.us/pubs/elections/calendars/2022ElectionCalendar.pdf.) In addition, campaigning for the June 28, 2022 Primary Election is underway in many races.

48271440v4

**JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 because this action arises under Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b), and the Ku Klux Klan Act, 42 U.S.C. § 1985.

11.     This Court has authority to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

12.     Venue in this district is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred in this District, and all Defendants are subject to personal jurisdiction in this District.

**PARTIES**

13.     Plaintiff NAACP Colorado is part of the NAACP. Founded in 1909, the NAACP is the oldest and largest civil rights organization in the United States. The NAACP's and NAACP Colorado's mission is to ensure political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination. NAACP Colorado coordinates the civil rights activities of freedom fighters and game-changing activists in Colorado. Among other things, NAACP Colorado's work is focused on ensuring that every American will have free, open, equal, and protected access to the vote, and fair representation at all levels of the political process. Because USEIP's actions are threatening to NAACP Colorado's core mission, NAACP Colorado has diverted time and other resources from its vital civic engagement and election support programs in order to address Defendants' voter intimidation campaign.  Absent injunctive relief, NAACP Colorado will be required to further divert time and resources to address the Defendant's voter intimidation campaign.

48271440v4

14.    Plaintiff LWVCO is a non-profit civic engagement organization with the mission to encourage informed and active participation in government, increase understanding of major public policy issues, and influence public policy through education and advocacy. LWVCO works with Coloradans to conduct state and local advocacy, voter registration and engagement, civic education, and member enrichment programs. Because voter intimidation is a vital issue of concern to LWVCO members and the public, LWVCO has diverted time and other resources from its civic engagement and election support programs in order to address Defendants' voter intimidation campaign.

15.    Plaintiff MFV is a civic engagement organization that unites Latino, immigrant, and allied communities to promote social and economic justice through citizenship workshops, voter registration, and voter participation. Its mission is to build Latino political power by expanding the electorate, strengthening local infrastructures, and conducting year-round voter engagement. More specifically, MFV works with Coloradans to conduct civic engagement, voter engagement, and voter education programs through activities such as voter registration, phone banking, and door-to-door canvassing. MFV also conducts regular meetings with organizational partners, research groups, and community organizations to discuss issues relevant to the community and determine goals for the next election cycle. MFV has diverted time and other resources from its civic engagement and election support programs in order to address Defendants' voter intimidation campaign.

16.    Defendant United States Election Integrity Plan ("USEIP"), by and through its founders Defendant Shawn Smith, Defendant Ashley Epp, and/or Defendant Holly Kasun, was

48271440v4

established in late 2020 in response to purported election fraud during the 2020 election.[2] The first USEIP chapter was established in Colorado, and USEIP is currently operating in nearly all Colorado counties.  In addition, USEIP is exporting its voter intimidation campaign to other states and has since expanded to Arizona, Georgia, and New Hampshire.  USEIP's Election Analytics Guide states: "It is up to patriots to take back our republic. This requires everyone, regardless of skill level, to join the fight and save our country."  USEIP is an unincorporated organization and is not registered to conduct business in the State of Colorado, or any other state.

17.    Defendant Shawn Smith is a member of USEIP. Upon information and belief, Mr. Smith was, at some points in time relevant to this Complaint, the President and Co-Founder of USEIP. According to public record, Mr. Smith has assisted and/or led efforts to obtain Colorado voter rolls that USEIP has used in its door-to-door voter intimidation campaign.  Mr. Smith also has testified in front of the Colorado Secretary of State on alleged election fraud during a hearing held on August 3, 2021. Mr. Smith is employed and paid for his work with USEIP by Mike Lindell, CEO of My Pillow and a prominent proponent of false and disproven claims that there was massive election fraud in the 2020 presidential election.  Mr. Smith is a Colorado resident.

18.    Defendant Ashley Epp is a member of USEIP.  According to Ms. Epp's own public statements, Ms. Epp is a Co-Founder of USEIP.  Ms. Epp is employed and paid by Mr. Lindell for her work with USEIP.  Ms. Epp is a Colorado resident.

19.    Defendant Holly Kasun is a member of USEIP.  According to Ms. Kasun's own public statements, Ms. Kasun is a Co-Founder of USEIP.  Ms. Kasun is employed and paid by Mr. Lindell for her work with USEIP.  Ms. Kasun is a Colorado resident.

_____

[2] The allegation of election fraud during the 2020 election is rooted in unfounded allegations and theories that have been thoroughly debunked in both the courts and the court of public opinion. *See infra* ¶ 20.

6

48271440v4

## FACTS

**USEIP Background**

20.    USEIP was formed by Defendants Shawn Smith, Ashley Epp, and Holly Kasun, among others, after the 2020 presidential election.  The primary focus of the group is to advance the false claim that former President Trump lost the 2020 election because of "blatant election fraud."  This concept has been referred to as the "Big Lie" and is predicated on false allegations that have been disproven in countless public reports and numerous lawsuits.

21.    Despite its name, the USEIP has no connection to the United States government and has not been authorized by any federal government agency or by any Colorado state or local government agency to conduct any election-related activities. Indeed, USEIP's name is seemingly designed to confuse voters into believing it is a government agency.

22.    The founders and primary members of USEIP originally met in online chatrooms and at rallies, stoking false claims of fraud related to the 2020 presidential election. After becoming acquainted with one another online, these individuals and others decided to coordinate their actions to harass and intimidate voters who did not vote for former President Trump. They formed USEIP, an organization designed to engage in voter intimidation disguised as exploring concerns of election integrity.

23.    USEIP has developed into a coordinated network of agents throughout Colorado that focus their energy on various activities associated with the "Big Lie," including going door-to-door, interrogating voters under the pretense of seeking to uncover "phantom ballots," which they allege were the cause of former President Trump losing the 2020 presidential election.

24.    One of USEIP's primary agents is Defendant Shawn Smith.  Defendant Smith is based in Colorado Springs. He  has appeared at numerous radical right events, some of which are

7

affiliated with groups such as QAnon, to promote the false claim that the results of the 2020 presidential election are faulty because of election fraud.

25.    Defendant Smith has also had run-ins with elected Colorado officials, publicly accusing county clerks—Democrats and Republicans alike—of failing to prevent election interference or actively participating in what USEIP and its members allege is criminal activity. At a recent public town hall meeting held in Castle Rock, Colorado, Shawn Smith publicly threatened Colorado Secretary of State Jena Griswold: "I think if you are involved in election fraud then you deserve to hang. Sometimes the old ways are the best ways."

26.    Defendant Smith, along with Defendants Ashley Epp and Holly Kasun, have made public appearances on talk shows and online programming hosted and funded by Mike Lindell. Lindell has been a vocal proponent of the "Big Lie" and has advanced its messaging at every possible turn. While USEIP claims not to accept donations or be involved in any fundraising, it has been linked to groups such as Cause of America, an organization founded by Lindell and also designed to promote the "Big Lie." Defendants Smith, Epp, and Kasun are employed by Cause of America, or an affiliated entity, and Cause of America is used as a fundraising mechanism for a number of groups throughout the nation that promote the "Big Lie," including USEIP.

27.    An essential part of USEIP's operation is its door-to-door voter intimidation campaign. Using voter rolls purchased by Defendant Shawn Smith (and potentially other members), USEIP agents travel door to door, often targeting high-density housing, communities experiencing growth among racial minority voters, and communities in which a high percentage of voters supported Democratic candidates in the 2020 election. Sometimes armed and donning badges to present an appearance of government officiality, USEIP agents interrogate voters about their addresses, whether they participated in the 2020 election, and—if so—how they cast their

48271440v4

vote.  It is reported that multiple agents have claimed to be from "the county," and have, without any evidence, falsely accused the residents of casting fraudulent ballots.

28.    USEIP's "County & Local Organizing Playbook" (the "Playbook"), which sets forth USEIP's principles and goals, makes clear that USEIP's tactics include violence and intimidation; specifically, threatening and intimidating voters in order to support debunked claims of election fraud. Drafted by founders of the group, Defendants Kasun and Epp, the Playbook is replete with incendiary language that illuminates USEIP's violent and threatening behavior. Among other things, the Playbook exclaims: "This is the fight . . . No one is coming to save us. It's time to stand up . . . . But we are not at a time of peace. And everyone who values freedom and is committed to the fight for our Republic is now needed."  The Playbook also cautions USEIP volunteers to ensure that the group is not infiltrated by outsiders with ulterior motives, even pointing out how the group has altered its vetting procedures, as previous agents "had a criminal history of sexual misconduct."

29.    Finally, the Playbook promotes false and disproven claims of fraud in the 2020 election and states that USEIP does "not consent to be governed by those elected through fraud."

30.    News about the USEIP's door-to-door voter intimidation campaign has spread among the voting rights community in Colorado and has raised serious alarm about the impact of USEIP's intimidation actions, particular on voters of color.

31.    Given the recent history of political agitation and violence, and the fast-approaching 2022 elections, Defendants' threats are objectively and imminently intimidating.  And there is no question that Defendants want their actions to be well-known and intimidating to voters, as they continue to expand across Colorado and into other states and as they widely publicize their actions.  USEIP's public-facing actions are a clear signal to Colorado voters—especially voters of

color—that to exercise their constitutional rights and vote in an upcoming election means facing interrogation by potentially armed and threatening USEIP agents at their doorstep.

### THE VOTER ORGANIZATIONS SEEK TO ADDRESS DEFENDANTS' VOTER INTIMIDATION CAMPAIGN

32.     The Voter Organizations' members and/or the community at large are being intimidated and will continue to be intimidated by Defendants' actions.

33.     The prospect of visits from USEIP members, who may be armed, is particularly intimidating for members of the Black and Latino communities who are served by the Voter Organizations.  That is due, in part, to the history of voter suppression these communities have had to endure.  The prospect of door-to-door visits by potentially armed individuals is particularly intimidating for Black and Latino voters because of the extensive history in these communities of frequently violent, voter intimidation and vigilante interference in their own homes.

34.     Black Americans seeking to exercise their right to vote have faced extensive barriers to casting their ballots.  Not only did Jim Crow laws disenfranchise Black voters, but Black voters were also subject to extensive racialized violence and lynchings intended to keep Black voters from the polls and solidify the power of white Americans by targeting Black Americans and other Americans of color in their homes.

35.     As a consequence of Defendants' actions, the Voter Organizations are now directing resources to address voter intimidation that could have been used elsewhere to further their missions, and they will be required to divert further resources to these efforts if Defendants' conduct is not enjoined.

36.     NAACP Colorado has already exhausted resources actively monitoring this voter intimidation and related safety concerns and strategizing about how to combat Defendants' actions. In addition, NAACP Colorado anticipates having to shift both personnel and financial resources

48271440v4

towards combatting USEIP's voter intimidation campaign.  This shift in resources is a distraction from key programs that NAACP Colorado would otherwise support, such as voter outreach aimed at protecting democracy, enhancing equity, and increasing democratic participation and civic engagement.

37.     USEIP's actions also are a direct assault on LWVCO's foundational mission to help new, young, and/or newly naturalized  voters exercise their rights to participate in democracy. LWVCO is concerned that new voters (such as young people, new citizens, and others who have just become eligible to vote) are especially vulnerable to this intimidation, and may opt to disengage from the voting process rather than face intimidating visits from USEIP agents. As a result of USEIP's actions, voters may question whether voting exposes them to risk of harm. This directly harms LWVCO's mission, which is to increase voter engagement and confidence in casting a ballot.

38.     MFV has been actively monitoring this voter intimidation in Colorado by speaking to organizational partners in the voting rights advocacy community to understand the scope of USEIP's actions, strategizing about how to combat USEIP's actions, and monitoring safety concerns expressed by the Latino community. In particular, MFV's voter outreach strategy for 2022 has been impacted in response to USEIP's actions. For example, because there are concerns of fear stemming from USEIP's actions, MFV plans to invest additional resources into counties targeted by USEIP so that voters there recognize MFV canvassers as distinct from USEIP agents. The time that MFV staff has and will continue to spend responding to USEIP's actions is time that otherwise would have been spent on activities central to its core mission.

48271440v4

**CLAIM FOR RELIEF**

**Count One:**
**Intimidating Voters and Potential Voters in Violation of Section 11(b) of the Voting Rights**
**Act of 1965**

39.     Plaintiffs reallege and incorporate by reference as if fully set forth herein each of the preceding paragraphs and allegations.

40.     Section 11(b) of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10307(b), prohibits voter intimidation and provides that:  "No person, . . .  shall intimidate, threaten, or coerce, . . . any person for voting or attempting to vote . . . ."

41.     Defendants have violated Section 11(b) by their intimidating, threatening, and coercive conduct, which includes threatening to or actually showing up at voters' doors around Colorado to intimidate them and ask whether they engaged in voter fraud.  Defendants' behavior has intimidated and threatened voters and potential voters, in violation of Section 11(b) of the Voting Rights Act.

42.     Defendants have engaged in this conduct with the intent to threaten, intimidate, and coerce voters with the knowledge that the natural consequences of their conduct and speech will be the intimidation of such voters.

43.     Defendants have violated Section 11(b) of the Voting Rights Act and will continue to do so absent judicial relief.

**Count Two:**
**Attempting to Intimidate Voters and Potential Voters in Violation of Section 11(b) of the**
**Voting Rights Act of 1965**

44.     Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b), prohibits voter intimidation and provides that:  "No person, . . .  shall . . . attempt to intimidate, threaten, or coerce" any voter.  Attempts to intimidate, threaten, or coerce voters violate Section 11(b), even if such attempts are unsuccessful.

48271440v4

45.     Defendants have violated Section 11(b) by attempting to intimidate, threaten, or coerce voters by threatening to or actually showing up at voters' doors around Colorado to ask whether they engaged in voter fraud.  Defendants' conduct and statements constitute an attempt to intimidate and threaten voters and potential voters, in violation of Section 11(b) of the Voting Rights Act.

46.     Defendants have violated Section 11(b) of the Voting Rights Act and will continue to do so absent judicial relief.

<div align="center">

**Count Three:**
**Violation of the Ku Klux Klan Act (42 U.S.C. § 1985)**

</div>

47.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

48.     Defendants are two or more persons who have conspired to prevent Plaintiffs and others who are lawfully entitled to vote from giving their support or advocacy toward the election of electors for president, electors for vice president, and/or members of Congress.

49.     Defendants have carried out this conspiracy by threatening to or actually showing up at voters' doors around Colorado to intimidate them and ask whether they engaged in voter fraud.

50.     Plaintiffs and others who are lawfully entitled to vote have been injured by Defendants' behavior, which has intimidated and threatened voters and potential voters.

51.     Under 42 U.S.C. § 1985(3), Plaintiffs are entitled to bring an action for recovery of damages because of Defendants' conspiratorial misconduct.

<div align="center">

**PRAYER FOR RELIEF**

</div>

WHEREFORE, Plaintiffs respectfully request that this Court:

<div align="center">

13

</div>

a.    Declare that Defendants' door-to-door campaign of voter harassment and threats of carrying out such campaigns in the future constitute unlawful voter intimidation in violation of Section 11(b) of the Voting Rights Act.

b.    Declare that Defendants' door-to-door campaign of voter harassment and threats of carrying out such campaigns in the future constitute a conspiracy in violation of Section 42 U.S.C. § 1985(3), the Ku Klux Klan Act.

c.    Order Defendants to cease and desist going uninvited to voters' homes in order to question voters or household members about mail-in ballots, alleged voter fraud, or to intimidate voters from voting (including by mail).

d.    Order Defendant USEIP to cease and desist coordinating or organizing visits to voters' homes in order to question voters or household members about mail-in ballots, alleged voter fraud, or to intimidate voters from voting (including voting by mail).

e.    Order Defendants to stop taking photographs and stop maintaining databases of voters, their residences, or their vehicles; to make no attempt to access or use their copies of existing photographs or databases of voters, their residences, or their vehicles; and to delete their copies of existing photographs or databases of voters, their residences, or their vehicles and to submit an affidavit to the Court attesting to the deletion of the same.

f.    Order Defendants to submit to the Court their original existing photographs and databases of voters, their residences, and their vehicles, and order that these photographs and databases be restricted to the Court and the parties (Level 1) pursuant to D. C., Colo. L. Civ. R. 7.2.

g.    Order Defendants who speak with voters to: (i) clearly state the organization with whom they are affiliated; (ii) inform voters that they are not required to speak with Defendants;

48271440v4

(iii) stop claiming that they affiliated with any government entity; (iv) not make any threat of consequences, reprisals, or criminal charges to voters; and (v) to otherwise not threaten or intimidate voters.

      h.     Order Defendants to cease and desist carrying weapons when going to voters' homes to speak with voters or household members.

      i.     Order Defendants to cease and desist instructing or encouraging anyone to carry weapons during USEIP-related interactions with voters.

      j.     Order Defendants not to engage in other actions that threaten voters for having voted in 2020 or threaten or intimidate voters from voting in future elections.

      k.     Award Plaintiffs compensatory damages.

      l.     Award Plaintiffs reasonable attorneys' fees and costs.

      m.     Retain jurisdiction to ensure Defendants' ongoing compliance with the foregoing orders.

      n.     Grant such other and further relief that this Court deems just and appropriate.

Dated: March 9, 2022          LATHROP GPM LLP

                  By /s/Amy Erickson
                  Casey Breese (#51449)
                  Casey.breese@lathropgpm.com
                  Jean Paul Bradshaw
                  Jeanpaul.bradshaw@lathropgpm.com
                  Dion Farganis (Admission Pending)
                  Dion.farganis@lathropgpm.com
                  Reid Day
                   Reid.day@lathropgpm.com
                  Brian A. Dillon
                  Brian.dillon@lathropgpm.com
                  Amy Erickson (#54710)
                  Amy.erickson@lathropgpm.com
                  1515 Wynkoop Street, Suite 600
                  Denver, CO 80202
                  Telephone: (720) 931-3200

15

Courtney Hostetler
chostetler@freespeechforpeople.org
John Bonifaz
jbonifaz@freespeechforpeople.org
Ben Clements
bclements@freespeechforpeople.org
Ron Fein
rfein@freespeechforpeople.org
FREE SPEECH FOR PEOPLE
1320 Centre Street, Suite 405
Newton, MA 02459
Telephone: (617) 249-3015

*ATTORNEYS FOR Plaintiffs Colorado Montana
Wyoming State Area Conference of the NAACP,
League of Women Voters of Colorado, and
Mi Familia Vota*

16

UNITED STATES DISTRICT COURT
for the
District of Colorado

| | | |
|---|---|---|
| COLORADO MONTANA WYOMING STATE AREA CONFERENCE OF THE NAACP, LEAGUE OF WOMEN VOTERS OF COLORADO, and MI FAMILIA VOTA | ) ) ) ) | Civil Action No. <u>1:22-cv-00581-PAB</u> |
| Plaintiffs, | ) ) ) | |
| -v- | ) ) | BENCH TRIAL |
| UNITED STATES ELECTION INTEGRITY PLAN, SHAWN SMITH, ASHLEY EPP, and HOLLY KASUN | ) ) ) ) ) | |
| Defendants. | ) | |

---

### ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

---

COMES NOW, Defendants, USEIP, Shawn Smith, Ashley Epp, and Holly Kasun (collectively "Defendants"), by and through undersigned counsel, and hereby submit their Answer and Affirmative Defenses to the Complaint as follows:

### INTRODUCTION

1. Defendants deny the allegations contained in paragraph 1 of the Complaint.

2. Defendants deny the allegations contained in paragraph 2 of the Complaint.

3. Defendants deny the allegations contained in paragraph 3 of the Complaint.

1

4.  Defendants deny the allegations contained in paragraph 4 of the Complaint.

5.  Defendants deny the allegations contained in paragraph 5 of the Complaint.

6.  Defendants are without sufficient knowledge or information to determine the veracity of the allegations contained in paragraph 6 of the Complaint and therefore deny the same.

7.  Defendants deny the allegations contained in paragraph 7 of the Complaint.

8.  Defendants deny the allegations contained in paragraph 8 of the Compliant.

9.  Defendants deny the allegations contained in paragraph 9 of the Complaint.

**JURISDICTION AND VENUE**

10.  Defendants admit that this Court has subject matter jurisdiction.

11.  Defendants admit that this Court has authority to issue declaratory and injunctive relief, but deny any other factual allegations contained in paragraph 11 of the Complaint.

12. Defendants admit that venue is proper in this district, but deny all other factual allegations contained in paragraph 12 of the Compliant.

**PARTIES**

13.  Defendants are without sufficient knowledge or information to determine the veracity of the allegations contained in paragraph 13 of the Complaint and therefore deny the same.

14. Defendants are without sufficient knowledge or information to determine the veracity of the allegations contained in paragraph 14 of the Complaint and therefore deny the same.

2

15. Defendants are without sufficient knowledge or information to determine the veracity of the allegations contained in paragraph 15 of the Complaint and therefore deny the same.

16. In response to paragraph 16 of the Compliant, Defendants admit that USEIP is an unincorporated organization. Defendants do not have sufficient knowledge or information to determine the veracity of the claim that USEIP is exporting its campaign to other states and therefore denies the same. Defendants deny all other factual allegations contained in paragraph 16 of the Compliant.

17. Defendants admit that Shawn Smith is a Colorado resident and a member of USEIP. Defendants deny all other factual allegations contained in paragraph 17 of the Complaint.

18.  Defendants admit that Ashley Epp is a Colorado resident and a member of USEIP. Defendants deny all other factual allegations contained in paragraph 18 of the Complaint.

19. Defendants admit that Holly Kasun is a Colorado resident and a member of USEIP. Defendants deny all other factual allegations contained in paragraph 19 of the Complaint.

**FACTS**

**USEIP Background**

20.  Defendants deny the allegations contained in paragraph 20 of the Complaint.

21. Defendants admit that USEIP has no connection to the United States Government. Defendants deny the remaining allegations contained in paragraph 21 of the Complaint.

22. Defendants are without sufficient knowledge or information to determine the veracity of claims regarding others who are not named in this lawsuit and therefore deny.

Any allegations contained in paragraph 22 of the Compliant regarding the named defendants are denied.

23. Defendants deny the allegations contained in paragraph 23 of the Complaint.

24. Defendants admit that Shawn Smith is based in Colorado Springs. Defendants deny the remaining factual allegations contained in paragraph 24 of the Complaint.

25. Defendants deny the allegations contained in paragraph 25 of the complaint.

26. Defendants deny the allegations contained in paragraph 26 of the Complaint.

27. Defendants deny the allegations contained in paragraph 27 of the Complaint pertaining to named parties. Defendants are without sufficient knowledge or information to determine the veracity of claims regarding third parties.

28. Defendants deny the allegations contained in paragraph 28 of the Complaint.

29. Defendants do not have sufficient knowledge or information to determine the veracity of the allegations contained in paragraph 29 of the Complaint and therefore deny the same.

30. Defendants do not have sufficient knowledge or information to determine the veracity of the allegations contained in paragraph 30 of the Complaint and therefore deny the same.

31. Defendants deny the allegations contained in paragraph 31 of the Complaint.

## THE VOTER ORGANIZATIONS SEEK TO ADDRESS DEFENDANTS' VOTER INTIMIDATION CAMPAIGN[1]

32. Defendants are without sufficient knowledge or information to determine the veracity of the allegations contained in paragraph 32 of the Complaint and therefore deny the same. Defendants deny any allegation that their actions caused intimidation.

33. Defendants are without sufficient knowledge or information to determine the veracity of the allegations contained in paragraph 33 of the Complaint and therefore deny the same.

34. Defendants are without sufficient knowledge or information to determine the veracity of the allegations contained in paragraph 34 of the Complaint and therefore deny the same.

35. Defendants are without sufficient knowledge or information to determine the veracity of the allegations contained in paragraph 35 of the Complaint, and therefore deny the same.

36. Defendants are without sufficient knowledge or information to determine the veracity of the allegations contained in paragraph 36 of the Complaint, and therefore deny the same.

37. Defendants are without sufficient knowledge or information to determine the veracity of the allegations contained in paragraph 37 of the Complaint, and therefore deny the same.

---

[1] Defendants utilize the headings from the Complaint for organizational purposes only and do not admit any allegations from their use.

38. Defendants are without sufficient knowledge or information to determine the veracity of the allegations contained in paragraph 38 of the Complaint, and therefore deny the same.

### CLAIM FOR RELIEF

**Count One:**
**Intimidating Voters and Potential Voters in Violation of Section 11(b) of the Voting Rights Act of 1965.**

39. In response to paragraph 39 of the Complaint, Defendants re-allege and reincorporate all responses contained in paragraphs 1-38 of this Answer, as if fully set forth herein.

40. In response to paragraph 40 of the Complaint, Defendants admit that paragraph 40 quotes language from Section 11(b) of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 1307(b). Defendants deny all other allegations contained in paragraph 40 of the Complaint.

41. Defendants deny the allegations contained in paragraph 41 of the Compliant.

42. Defendants deny the allegations contained in paragraph 42 of the Complaint.

43. Defendants deny the allegations contained in paragraph 43 of the Complaint.

**Count Two:**
**Attempting to Intimidate Voters and Potential Voters in Violation of Section 11(b) of the Voting Rights Act of 1965**

44. In response to paragraph 44 of the Complaint, Defendants admit that paragraph 44 quotes language from Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 1307(b). Defendants deny all other allegations contained in paragraph 44 of the Complaint.

45.  Defendants deny the allegations contained in paragraph 45 of the Complaint.

46. Defendants deny the allegations contained in paragraph 46 of the Complaint.

**Count Three:**
**Violation of the Ku Klux Klan Act (42 U.S.C. § 1985)**

47.  In response to paragraph 47 of the Complaint, Defendants re-allege and reincorporate all responses contained in paragraphs 1-46 of this Answer, as if fully set forth herein.

48. Defendants deny the allegations contained in paragraph 48 of the Complaint.

49.  Defendants deny the allegations contained in paragraph 49 of the Complaint.

50. Defendants deny the allegations contained in paragraph 50 of the Complaint.

51. Defendants are without sufficient knowledge or information to determine the veracity of whether Plaintiffs are entitled to bring an action for recovery of damages under 42 U.S.C. § 1985(3). Defendants deny all other allegations contained in paragraph 51 of the Complaint.

**PRAYER FOR RELIEF**

a)  In response to the allegations contained in paragraph a of the Complaint, Defendants admit that paragraph a articulates the relief sought by Plaintiffs. Defendants deny the remaining allegations contained in paragraph a of the Complaint.

b)  In response to the allegations contained in paragraph b of the Complaint, Defendants admit that paragraph b articulates the relief sought by Plaintiffs. Defendants deny the remaining allegations contained in paragraph b of the Complaint.

c) In response to the allegations contained in paragraph c of the Complaint, Defendants admit that paragraph c articulates the relief sought by Plaintiffs. Defendants deny the remaining allegations contained in paragraph c of the Complaint.

d) In response to the allegations contained in paragraph d of the Complaint, Defendants admit that paragraph d articulates the relief sought by Plaintiffs. Defendants deny the remaining allegations contained in paragraph d of the Complaint.

e) In response to the allegations contained in paragraph e of the Complaint, Defendants admit that paragraph e articulates the relief sought by Plaintiffs. Defendants deny the remaining allegations contained in paragraph e of the Complaint.

f) In response to the allegations contained in paragraph f of the Complaint, Defendants admit that paragraph f articulates the relief sought by Plaintiffs. Defendants deny the remaining allegations contained in paragraph f of the Complaint.

g) In response to the allegations contained in paragraph g of the Complaint, Defendants admit that paragraph g articulates the relief sought by Plaintiffs. Defendants deny the remaining allegations contained in paragraph g of the Complaint.

h) In response to the allegations contained in paragraph h of the Complaint, Defendants admit that paragraph h articulates the relief sought by Plaintiffs. Defendants deny the remaining allegations contained in paragraph h of the Complaint.

i) In response to the allegations contained in paragraph i of the Complaint, Defendants admit that paragraph i articulates the relief sought by Plaintiffs. Defendants deny the remaining allegations contained in paragraph i of the Complaint.

j)  In response to the allegations contained in paragraph j of the Complaint, Defendants admit that paragraph j articulates the relief sought by Plaintiffs. Defendants deny the remaining allegations contained in paragraph j of the Complaint.

k)  In response to the allegations contained in paragraph k of the Complaint, Defendants admit that paragraph k articulates the relief sought by Plaintiffs. Defendants deny the remaining allegations contained in paragraph k of the Complaint.

l)  In response to the allegations contained in paragraph l of the Complaint, Defendants admit that paragraph l articulates the relief sought by Plaintiffs. Defendants deny the remaining allegations contained in paragraph l of the Complaint.

m) In response to the allegations contained in paragraph m of the Complaint, Defendants admit that paragraph m articulates the relief sought by Plaintiffs. Defendants deny the remaining allegations contained in paragraph m of the Complaint.

n)  In response to the allegations contained in paragraph n of the Complaint, Defendants admit that paragraph n articulates the relief sought by Plaintiffs. Defendants deny the remaining allegations contained in paragraph n of the Complaint.

## GENERAL DENIAL

Defendants deny each and every allegation contained in the Complaint not expressly admitted herein.

## AFFIRMATIVE DEFENSES

Pursuant to Fed. R. Civ. P. 8(c), Defendants assert these Affirmative Defenses in response to the Complaint and any other claims asserted against them in this action. The Affirmative Defenses set forth herein are pled alternatively or hypothetically pursuant to

9

Fed. R. Civ. P. 8(d)(2) based on facts now known or upon information and belief. Defendants will dismiss, withdraw, or modify and defense pursuant to F.R.C.P. 11, if it becomes known after discovery that it cannot prevail on said defense.

1. Plaintiffs' Complaint, in whole or in part, fails to state a claim upon which relief may be granted.

2. Some or all of Plaintiffs' claims are barred by the applicable statute of limitations.

3. Plaintiffs lack standing to bring some, or all of the claims asserted.

4. Plaintiffs' claims are barred, in whole or in part, due to lack of any legitimate and justiciable controversy.

5. Plaintiffs' claims are barred, in whole or in part, by their failure to join indispensable parties.

6. Plaintiffs have suffered no damage as a result of any of the alleged actions of Defendants.

7. Plaintiffs have failed to mitigate their damages, if any.

8. Plaintiffs' claims are barred by the doctrine of waiver.

9. Plaintiffs' claims are barred by the doctrine of laches.

10. Plaintiffs' claims are barred by the doctrine of estoppel.

11. Plaintiffs' claims are barred because the damages, whether statutory or otherwise, are unconstitutionally excessive and disproportionate to any actual damages that may have been sustained,

12. Plaintiffs' claims are barred by the doctrine of abuse of process.

13. Plaintiffs' claims are barred by the doctrine of unclean hands.

10

14. Plaintiffs' claims are barred to the extent that they violate Defendants' First and Second Amendment Rights guaranteed to them under the United States Constitution.

15. Plaintiffs' claims are barred by the doctrine of consent.

16. Plaintiffs' claims are barred to the extent that any damages allegedly sustained by Plaintiffs are the proximate result of the acts and/or omissions of independent third parties over which Defendants exercised no control.

17. Plaintiffs' claims are barred because at all times Defendants acted in good faith and in a reasonable and lawful manner.

18. Plaintiffs' claims are barred by the doctrine of *de minimis non curat lex*, as any damages allegedly suffered by Plaintiffs have been *de minimis.*

19. Plaintiffs' claims are barred because the matter is moot.

20. Plaintiffs' claims are barred because 42 U.S.C. § 1985(3) is vague and overbroad and therefore unconstitutional.

21. Plaintiffs' claims are barred because Defendants are not ". . .person[s], whether acting under color of law or otherwise. . ." pursuant to 52 U.S.C. § 1307(b).

22. Plaintiffs' claims are barred because 52 U.S.C. § 1307(b) is vague and overbroad and therefore unconstitutional.

WHEREFORE, having answered, Defendants request judgment or relief against Plaintiffs as follows:

1. That the action against Defendants is dismissed with prejudice and that the Plaintiffs are granted no relief; and

11

2.  That Defendants be awarded their costs and disbursements incurred in defending this matter; and

3.  Such other and further relief, including declaratory, equitable relief and damages, to which Defendants are entitled.

## **COUNTERCLAIMS**

Counterclaim Plaintiffs, Shawn Smith, Ashley Epp, and Holly Kasun hereby state as follows for their Counterclaims against Counterclaim Defendants Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, and Mi Familia Vota.

### **Parties, Jurisdiction and Venue**

1.  Shawn Smith is an individual resident of the State of Colorado, who may be contacted c/o the Reisch Law Firm, LLC; 1490 W. 121st Avenue, Suite 202, Denver, Colorado 80234.

2.  Ashley Epp is an individual resident of the State of Colorado, who may be contacted c/o the Reisch Law Firm, LLC; 1490 W. 121st Avenue, Suite 202, Denver, Colorado 80234.

3.  Holly Kasun is an individual resident of the State of Colorado, who may be contacted c/o the Reisch Law Firm, LLC; 1490 W. 121st Avenue, Suite 202, Denver, Colorado 80234.

4.  NAACP Colorado is a nonprofit corporation with a principal office in Colorado Springs, Colorado.

5.   League of Women Voters of Colorado ("LWVCO"), is a non-profit organization with a principal office in Denver, Colorado.

6.   Mi Familia Vota ("MFV") is a foreign nonprofit corporation with a principal office in Phoenix, Arizona.

## JURISDICTION

7.   This Court has jurisdiction over these Counterclaims under 28 U.S.C. § 1367(a) because this Court has supplemental jurisdiction over all other claims related to the claims within the Court's original jurisdiction that form part of the same case or controversy under Article III of the United States Constitution.

8.   Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b)(1) and (2) because the parties reside in this judicial district, and a substantial part of the event or omissions giving rise to the counterclaims occurred in this judicial district.

## GENERAL ALLEGATIONS

9.   Counterclaim Plaintiffs re-allege and reincorporate the allegations contained in paragraphs 1-8 of this Counterclaim as if fully set forth herein.

10. On or about March 9, 2022, Counterclaim Defendants initiated a civil lawsuit alleging intimidation of voters and potential voters in violation of Section 11(b) of the Voting Rights Act of 1965, attempted intimidation of voters and potential voters in violation of Section 11(b) of the Voting Rights Act of 1965, and Violation of the Ku Klux Klan Act (42 U.S.C. §1985).

11. On or about March 9, 2022, Counterclaim Defendants filed a Motion for Preliminary Injunction and Temporary Restraining Order arising out of the same

allegations contained in the Compliant. This Motion was voluntarily withdrawn by Counterclaim Defendants on May 12, 2022.

12. The Complaint and additional filings by Counterclaim Defendants contain numerous unsubstantiated and frivolous allegations.

13. Despite having no independent knowledge of the veracity of the claims being brought, Counterclaim Defendants continue to prosecute their unsupported claims.

14. Counterclaim Defendants, either directly or through their agents, published the same frivolous statements regarding the Counterclaim Plaintiffs through press releases and articles on various websites[2].

15. Contained in the Complaint and other publications, Counterclaim Defendants make allegations that Counterclaim Plaintiffs have ties with QAnon, described as a domestic terror threat.[3]

---

[2] Counsel for Counterclaim Defendants, Free Speech for People, published a press release on March 9, 2022, repeating the false allegations contained in their Complaint. Free Speech for People, *Voting Right Organizations File Federal Lawsuit to Stop Illegal Voter Intimidation in Colorado* (March 9, 2022), https://freespeechforpeople.org/voting-rights-organizations-file-federal-lawsuit-to-stop-illegal-voter-intimidation-in-colorado/ (last visited May 12, 2022). Similarly, League of Women Voters published a press release on March 9, 2022, alleging the same unsupported claims contained in the Complaint. Shannon Augustus, *Colorado Voting Rights Advocates File Lawsuit Against Voter Intimidation,* (March 9, 2022), https://www.lwv.org/newsroom/press-releases/colorado-voting-rights-advocates-file-lawsuit-against-voter-intimidation, (last visited May 12, 2022).

[3] Free Speech for People describe USEIP as "an extremist organization with ties to the January 6 Capitol insurrection." Free Speech for People, *Colorado NAACP, League of Women Voters of Colorado, and Mi Familia Vota v. United States Election Integrity Plan: Challenging illegal voter intimidation in Colorado.* https://freespeechforpeople.org/colorado-naacp-league-of-women-voters-of-colorado-and-mi-familia-vota-v-united-states-election-integrity-plan/ (last visited May 12, 2022).

14

16. As evidenced by Counterclaim Defendants' own filings with the Court, the false allegations of ties with terrorist organizations, targeted voter intimidation, and engaging in violent behavior arise from a single source: The Colorado Times Recorder.

17. Rather than investigate the allegations prior to initiating a lawsuit, Counterclaim Defendants relied on false claims of a third-party journalist.

18. The Complaint seeks declaratory relief as well as monetary damages. Specifically, the Complaint asks the Court to declare that carrying out the door-to-door campaign in the future will constitute unlawful voter intimidation and conspiracy; Order to cease and desist going to voters' homes to question voters; Order to cease and desist coordinating or organizing visits to voters homes; Order to stop taking photographs and maintaining databases of voters and to delete the same; Order that those who speak with voters must state the organization with whom they are affiliated, inform voters they are not required to speak, stop claiming that they are affiliated with any government entity, not make any threat of consequences, reprisals, or criminal charges to voters, and to otherwise not threaten or intimidate voters; Order to cease and desist carrying weapons when going to voters' homes; Order to cease and desist instructing or encouraging carrying of weapons when interacting with voters; and Order not to engage in other actions that threaten voters for having voted.

19. Through the Complaint, Counterclaim Defendants seek declaratory relief which, if granted, would eliminate the Counterclaim Plaintiffs' ability to freely engage in the electoral process.

20. The claims, statements, and filings by Counterclaim Defendants are devoid of factual support and their purpose of bringing a frivolous lawsuit is to harass Counterclaim Plaintiffs and limit their electoral engagement.

**First Counterclaim for Relief**
**Defamation**

21. Counterclaim Plaintiffs fully incorporate the prior paragraphs as if fully set forth herein.

22. Mr. Smith, Ms. Epp, and Ms. Kasun are neither public officials nor public figures.

23. Counterclaim Defendants or their agents published false information that Counterclaim Plaintiffs have ties with terrorist organizations, commit racially motivated voter intimidation, and condone violence.

24. The defamatory meaning of these statements is apparent from their face. These statements are defamatory per se as they inherently injure Counterclaim Plaintiffs' reputation, impute a crime, and disparage their business practices.

25. These defamatory statements are directed to Counterclaim Plaintiffs who are individually named in the publications.

26. Without verifying the truth of their allegations, Counterclaim Defendants published these defamatory statements with reckless disregard of their truth or falsity. Counterclaim Defendants failed to corroborate any of the allegations and

16

conducted a grossly inadequate investigation of the facts prior to publishing these statements.

27. As a direct and proximate result of these statements, Counterclaim Plaintiffs have suffered actual and special damages including, harm to their reputation, loss of employment opportunities, lost earnings, and pain and suffering.

### Second Counterclaim for Relief
**(Abuse of Process)**

28. Counterclaim Plaintiffs incorporate and re-allege the preceding paragraphs as if fully set forth herein.

29. Counterclaim Defendants initiated a civil lawsuit against Counterclaim Plaintiffs by filing a Complaint in the United States District Court of Colorado.

30. Counterclaim Defendants had an ulterior purpose for filing this litigation which was to harass, embarrass, and limit Counterclaim Plaintiffs' access to the electoral process.

31. Counterclaim Defendants willfully used the filing of the Complaint for the improper purpose of harassing, embarrassing, and keeping Counterclaim Plaintiffs from engaging in their constitutional rights.

32. As a result of this abuse of process, Counterclaim Plaintiffs have suffered economic damages, including attorney's fees and costs in defending the action, non-economic damages including injury to their reputation, pain and suffering, humiliation and embarrassment.

17

WHEREFORE, Shawn Smith, Ashely Epp, and Holly Kasun, respectfully request that the Court enter judgment against Counterclaim Defendants for the relief requested above and damages, together with interest, court costs, and attorney fees, the full amount of which will be determined at trial, and for such other relief as the Court may deem appropriate.

Respectfully submitted this 12th day of May, 2022.

*s/ Jessica L. Hays*
R. Scott Reisch, #26892
Jessica L. Hays, #53905
THE REISCH LAW FIRM, LLC
1490 W. 121st Avenue, #202
Denver, CO 80234
(303) 291-0555
Email: scott@reischlawfirm.com
jessica@reischlawfirm.com
cassandra@reischlawfirm.com
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS** has been electronically served through ECF this 12th day of May, 2022, to all counsel of record.

*s/ Jessica L. Hays*
R. Scott Reisch, #26892
Jessica L. Hays, #53905
THE REISCH LAW FIRM, LLC
1490 W. 121st Avenue, #202
Denver, CO 80234
(303) 291-0555
Email: scott@reischlawfirm.com
Email: jessica@reischlawfirm.com
*Attorneys for Defendants*

18

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:22-cv-00581-CNS

COLORADO MONTANA WYOMING STATE AREA CONFERENCE OF THE NAACP,
LEAGUE OF WOMEN VOTERS OF COLORADO,
MI FAMILIA VOTA,

       Plaintiffs,

v.

UNITED STATES ELECTION INTEGRITY PLAN,
SHAWN SMITH,
ASHLEY EPP, and
HOLLY KASUN,

       Defendants.

---

## ORDER

---

Before the Court is Defendants' (1) Motion for Judgment on the Pleadings and (2) Motion for Summary Judgment. (ECF Nos. 54, 70). The Court DENIES the motion for judgment on the pleadings and DENIES IN PART and GRANTS IN PART the motion for summary judgment for the following reasons.

## I. FACTS

Plaintiffs are civil- and voting-rights organizations who have filed this civil action against Defendants, raising three claims for relief: (1) intimidating voters and potential voters in violation of 52 U.S.C. § 10307(b); (2) attempting to intimidate voters and potential voters in violation of 52 U.S.C. § 10307(b); and (3) violation of 42 U.S.C. § 1985. (ECF No. 1, pp. 12-13). On April 4,

1

2022, Defendants moved to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1), which Chief Judge Brimmer denied on April 28, 2022. (ECF No. 39). Specifically, the Court determined that each Plaintiff had organizational standing under Article III and had sufficiently alleged that Defendants' conduct had caused Plaintiffs a redressable injury. The Court noted that Defendants did not argue that Plaintiffs lacked associational standing and would not analyze the issue because it had determined that each Plaintiff had organizational standing. (ECF No. 39, p. 19). Furthermore, the Court determined that neither party had raised the issue of prudential standing and declined to exercise its discretion to consider the issue. (*Id*., p. 20).

In the instant motion, Defendants move for judgment on the pleadings and summary judgment under Federal Rules of Civil Procedure 12(c) and 56. (ECF Nos. 54, 70). In their motion for judgment on the pleadings, Defendants argue that (1) Plaintiffs lack prudential or statutory standing to pursue claims 1 and 2 in the Complaint and (2) Plaintiffs might have statutory standing for claim 3, but fail to state a claim because there is no State involvement or invidious discriminatory animus. (ECF No. 54, pp. 3-4). Defendants similarly argue in their motion for summary judgment that: (1) Plaintiffs' claims under 52 U.S.C. § 10307(b) and 42 U.S.C. § 1985(3) fail because Plaintiffs cannot establish an act of intimidation or attempt to intimidate or that the act was done with specific intent; (2) Plaintiffs do not have prudential standing to raise these claims; and (3) Defendant USEIP is an unincorporated association and cannot be sued under 52 U.S.C. § 10307(b) or 42 U.S.C. § 1985(3). (ECF No. 70, pp. 5-20)

## II. LEGAL STANDARD

### A. Rule 12(c)

The Court reviews a motion for judgment on the pleadings under Rule 12(c) under the same standard as a motion for Rule 12(b)(6). *Adams v. Jones*, 577 F. App'x 778, 781 (10th Cir. 2014). The Court will not grant a motion for judgment on the pleadings "unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." *Id.* at 782. Rule 12(g)(2) precludes successive motions under Rule 12; however, Rule 12(g) is subject to Rule 12(h)(2), which allows parties to raise certain defenses in any pleading allowed under Rule 7(a), in a motion for judgment on the pleadings under Rule 12(c), or at trial. *Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty., Colo.*, 771 F.3d 697, 701 (10th Cir. 2014).

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true and interpreted in the light most favorable to the non-moving party, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Additionally, the complaint must sufficiently allege facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed; however, a complaint may be dismissed because it asserts a legal theory not cognizable as a matter of law. *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007); *Golan v. Ashcroft*, 310 F. Supp. 2d 1215, 1217 (D. Colo. 2004). A claim is not plausible on its face "if [the allegations] are so general that they encompass a wide swath of conduct, much of it innocent," and the plaintiff has failed to "nudge[ the] claims

3

across the line from conceivable to plausible." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). The standard, however, remains a liberal pleading standard, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotations and citation omitted).

**B. Rule 56**

Summary judgment is warranted when (1) the movant shows that there is no genuine dispute as to any material fact and (2) the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The factual record and reasonable inferences must be construed in the light most favorable to the nonmoving party. *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). The moving party bears the initial burden, but once met, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986). Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "[Q]uestions of intent, which involve intangible factors including witness creditability, are matters for consideration of the fact finder after a full trial." *Prochaska v. Marcoux*, 632 F.2d 848, 851 (10th Cir. 1980).

**III. ANALYSIS**

**A. Judgment on the Pleadings**

Defendants raise two arguments in their motion for judgment on the pleadings: (1) Plaintiffs lack statutory, or prudential, standing to raise claims under 52 U.S.C. § 10307(b) or

4

42 U.S.C. § 1985(3), and (2) Plaintiffs fail to show state action and racial animus to raise a claim under 42 U.S.C. § 1985(3).  (ECF No. 54, pp. 4-14).

### 1. *Prudential Standing*

In April 2022, Defendants moved to dismiss the Complaint under Rule 12(b)(1) arguing that Plaintiffs lacked standing and failed to demonstrate any injury that would confer standing onto each organization.  (ECF No. 27, p. 4).  The Court denied the motion to dismiss, finding that Plaintiffs had Article III standing.  The Court noted that Defendants (1) did not address the issue of associational standing in their briefing and (2) failed to raise the issue of prudential standing and the Court would not examine this issue sua sponte.

Prudential standing is not a jurisdictional limitation and may be waived.  *The Wilderness Soc. v. Kane Cnty.*, 632 F.3d 1162, 1168 (10th Cir. 2011); *Advanced Exteriors, Inc. v. Allstate Vehicle & Prop. Ins. Co.*, No. 21-CV-01539-PAB-STV, 2022 WL 3577260, at *3 (D. Colo. Aug. 19, 2022).  There are three general principles under the prudential standing doctrine:  (1) "the general prohibition on a litigant's raising another person's legal rights"; (2) "the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches"; and (3) "the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (internal quotations and citation omitted).  Contrary to Plaintiffs' arguments, prudential standing was not abandoned by the Supreme Court and is still analyzed by courts in some contexts.  *Hill v. Warsewa*, 947 F.3d 1305, 1309 (10th Cir. 2020).  The Court does not need to reach the issue of whether Plaintiffs have prudential standing because (1) Defendants have

waived the argument and did not timely raise the argument within their first Rule 12 motion, and

(2) Plaintiffs have a cause of action under 52 U.S.C. § 10307(b) and 42 U.S.C. § 1985(3).

To begin, Defendants, citing *Grubbs v. Bailes*, 445 F.3d 1275, 1281 (10th Cir. 2006),

misquote the Tenth Circuit when arguing that courts permit prudential standing to be examined

under Rule 12(b)(6) motion.  Rather, the Tenth Circuit indicated that courts may disregard the

issue of prudential standing if the plaintiff had established standing under Article III and the court

could dispose of the case on the merits.  Specifically, the Tenth Circuit stated:

> It thus appears that plaintiff has asserted a direct injury sufficient to satisfy the
> prudential standing principles in *Alcan*. We need not, however, definitively resolve
> the matter here. It has been noted on many occasions that the Supreme Court's
> rejection of the practice of "hypothetical jurisdiction" in *Steel Co. v. Citizens for a
> Better Environment*, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998),
> prohibits federal courts from disposing of claims on the merits without first
> resolving Article III standing issues. Questions relating to prudential standing,
> however, may be *pretermitted* in favor of a straightforward disposition on the
> merits.

*Id*. at 1280–81 (emphasis added); *see Pretermit*, Black's Law Dictionary (11th ed. 2019) ("To

ignore or disregard purposely").  Defendants fail to cite any caselaw that indicates that they are

permitted to raise the issue of prudential standing in a motion under Rule 12(c).

Indeed, the Court finds that Defendants have waived this particular argument by failing to

raise it in their first Rule 12 motion.  In April 2022, Defendants filed the first Rule 12(b) motion

and did not address the issue of prudential standing.  Then in August 2022, Defendants filed the

instant motion (styled as a motion under Rule 12(c)) raising the issue of prudential standing after

the District Court had stated in its prior Order that the argument had not been raised and that the

Court would not examine the issue sua sponte.  (ECF Nos. 39, pp. 19-20; 54).  The Tenth Circuit

has clearly held that prudential standing "is not a jurisdictional limitation and may be waived."

*Niemi v. Lasshofer*, 770 F.3d 1331, 1345 (10th Cir. 2014).  In *Niemi*, the Tenth Circuit found that the defendants had filed an improper second motion to dismiss when challenging the plaintiffs' standing because they had filed a prior Rule 12 motion to dismiss wherein they argued improper service of process, lack of personal jurisdiction, and improper venue.  *Id*. at 1346.  The Tenth Circuit found that a challenge to prudential standing did not implicate subject-matter jurisdiction and therefore was not a proper motion brought under Rule 12(h)(3), but rather was an impermissible second motion to dismiss under Rule 12(g)(2).  *Id.*  Accordingly, this Court finds that Defendants waived the issue of prudential standing because they were aware of this argument and failed to include the issue in their first motion to dismiss.  *Id*.

But even if Defendant had not waived this argument,[1] the Court still finds that 52 U.S.C. § 10307(b) and 42 U.S.C. § 1985(3) permit a private right of action against private conduct.  The Supreme Court clarified in *Lexmark* "that the question of whether a party falls within the class of plaintiffs whom Congress has authorized to sue under a particular statute is not one properly labeled as prudential; rather, it is a question of statutory interpretation."  *Niemi*, 770 F.3d at 1344 (internal quotations and citation omitted).  "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  Accordingly, courts must determine whether Congress intended to create a private right of action by:  (1) determining whether "rights-creating language" is contained within the statute, and (2) the methods of enforcement in the statute "manifest an intent to create a private remedy."  *Id.* at 289.

---

[1] Defendants also raise the issue of prudential standing again in their motion for summary judgment, thus the Court finds it more efficient to address this issue once rather than ending the analysis at Defendants' waiver.  (*See* ECF No. 70, p. 16).

*a.  52 U.S.C. § 10307(b)*

Section 11(b) of the Voting Rights Acts states:

> *No person*, whether acting under color of law *or otherwise*, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce *any person* for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce *any person* for urging or aiding *any person* to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section 10302(a), 10305, 10306, or 10308(e) of this title or section 1973d or 1973g of Title 42.

52 U.S.C. § 10307(b) (emphasis added).  The statute contains rights-creating language that pertains to any individual citizen.  Furthermore, a plain reading of the statutory language indicates that Congress intended that private action as well as government action be regulated.  *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *3 (E.D. Va. Aug. 13, 2018) ("Here, the language 'or otherwise' indicates Congressional intent to reach both government and private conduct under § 11(b).").  Moreover, Section 11(b) can be enforced through a civil action by a private individual.  *See Arizona All. for Retired Americans v. Clean Elections USA*, No. CV-22-01823-PHX-MTL, 2022 WL 15678694, at *3 (D. Ariz. Oct. 28, 2022); *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 509 (S.D.N.Y. 2021); *League of United Latin Am. Citizens*, 2018 WL 3848404, at *3; *see also Allen v. State Bd. of Elections*, 393 U.S. 544, 554-57 (1969) ("We have previously held that a federal statute passed to protect a class of citizens, although not specifically authorizing members of the protected class to institute suit, nevertheless implied a private right of action.").  In their reply, Defendants argue that "Plaintiffs fail to acknowledge the changing landscape of the VRA and subsequent judicial restraint when expanding congressional intent to infer private rights of actions."  (ECF No. 59, p. 2)  However, Defendants fail to cite any caselaw

8

finding that there is no private right of action under 52 U.S.C. § 10307(b) and the Court finds this

argument unavailing.

       *b.   42 U.S.C. § 1985(3)*

      Plaintiffs state that they are pursuing a claim under the "Support or Advocacy Clause" of

42 U.S.C. § 1985(3).[2]  (ECF No. 55, p. 8).  This portion of section 3 (italicized) states:

> *[I]f two or more persons conspire to prevent by force, intimidation, or threat, any
> citizen who is lawfully entitled to vote, from giving his support or advocacy in a
> legal manner, toward or in favor of the election of any lawfully qualified person as
> an elector for President or Vice President, or as a Member of Congress of the
> United States; or to injure any citizen in person or property on account of such
> support or advocacy*; in any case of conspiracy set forth in this section, if one or
> more persons engaged therein do, or cause to be done, any act in furtherance of the
> object of such conspiracy, whereby another is injured in his person or property, or
> deprived of having and exercising any right or privilege of a citizen of the United
> States, the party so injured or deprived may have an action for the recovery of
> damages occasioned by such injury or deprivation, against any one or more of the
> conspirators.

The Supreme Court has determined that "all indicators—text, companion provisions, and

legislative history—point unwaveringly to § 1985(3)'s coverage of private conspiracies."  *Griffin*

*v. Breckenridge*, 403 U.S. 88, 101 (1971).  Defendants argue that Plaintiffs are not citizens with a

---

[2] The first clause of 42 U.S.C. § 1985(3) is generally referred to as the "Equal Protection Clause" while the second
clause of subsection 3 is referred to as the "Support or Advocacy Clause."  *See generally, The Support or Advocacy
Clause of § 1985(3)*, 133 Harv. L. Rev. 1382 (2020).  The Equal Protection Clause of § 1985(3) states:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the
> premises of another, for the purpose of depriving, either directly or indirectly, any person or class
> of persons of the equal protection of the laws, or of equal privileges and immunities under the laws;
> or for the purpose of preventing or hindering the constituted authorities of any State or Territory
> from giving or securing to all persons within such State or Territory the equal protection of the laws.

Under this clause, a plaintiff must show that the conspiracy is aimed "at a deprivation of the equal enjoyment of rights
secured by the law to all" and was motivated by a "racial" or "class-based, invidiously discriminatory animus."  *Griffin
v. Breckenridge*, 403 U.S. 88, 102 (1971).  Under the Support or Advocacy Clause, there is no need to show racial
animus.  *See Kush v. Rutledge*, 460 U.S. 719, 726 (1983).  Defendants concede as much in their reply regarding the
motion for judgment on the pleadings, thus the Court will not consider this argument in the motion.  (*See* ECF No. 59,
pp. 8-9).

right to vote and therefore cannot maintain an action for damages. This argument is unavailing. Corporations are "persons" within the meaning of the Fourteenth Amendment's Equal Protection clause and have been treated as plaintiffs under 42 U.S.C. § 1985(3) even though they do not have the right to vote. *See Triad Assocs., Inc. v. Chicago Hous. Auth.*, No. 87 C 5096, 1992 WL 349655, at *9 (N.D. Ill. Nov. 13, 1992), *aff'd sub nom. Triad Assocs., Inc. v. Robinson*, 10 F.3d 492 (7th Cir. 1993). "When an [organization] meets the constitutional test of standing, as [Plaintiffs] admittedly [do], prudential considerations should not prohibit [them from] asserting that defendants, on racial grounds, are frustrating specific acts of the sort which the [organization] was founded to accomplish." *Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702, 706 (2d Cir. 1982) (citing *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 80 (1978)). Defendants only argue that Plaintiffs cannot vote and therefore cannot raise a claim, which this Court finds unavailing. The Court does not need to delve further into this argument or the organizational structure of each Plaintiff.

\* \* \*

Accordingly, Plaintiffs are permitted to bring a private cause of action against Defendants under 52 U.S.C. § 10307(b) and 42 U.S.C. § 1985(3).[3]

### B. Summary Judgment

Defendants raise two arguments in their motion for summary judgment: (1) Plaintiffs fail to prove that a voter was intimidated, that Defendants attempted to intimidate a voter, or that Defendants' actions were done with the intent to intimidate voters; and (2) USEIP is an unincorporated association and cannot be sued under 52 U.S.C. § 10307(b) or 42 U.S.C. § 1985(3).

---

[3] The Court will not reexamine the issue of prudential standing in Defendants' motion for summary judgment.

(ECF No. 70, pp. 6-20).  Having reviewed the Complaint, the motions and related briefing, and the relevant legal authority, the Court finds that there are disputed questions of material fact that preclude summary judgment in favor of Defendants on the first issue; however, the Court finds that Defendants are entitled to summary judgment on the second issue.

     *1.    Voter Intimidation*

     Defendants argue that they are entitled to summary judgment because Plaintiffs cannot produce evidence that (1) a voter was intimidated by Defendants' actions or (2) Defendants attempted to intimidate voters.  (ECF no. 70, pp. 6, 14).  Section 11(b) prohibits (1) any person from (2) intimidating, threatening, or coercing another person or (3) attempting to do so, (4) for voting, attempting to vote, urging or aiding another person to vote or (5) attempt to vote or exercising any powers or duties under certain provisions listed in the Voting Rights Act.  52 U.S.C. § 10307(b); *see Nat'l Coal. on Black Civic Participation*, 512 F. Supp. at 509-10.  Furthermore, Section 11(b) does not "proscribe only threatening and intimidating language that successfully prevents a person from voting" as the attempts to do so are equally proscribed.  *Nat'l Coal. on Black Civic Participation*, 512 F. Supp. 3d at 516.  Finally, there is no requirement in the language in Section 11(b) that requires Plaintiffs to establish that Defendants acted with the specific intent to intimidate voters.  *League of United Latin Am. Citizens*, 2018 WL 3848404, at *3.

     42 U.S.C. § 1985(3) prohibits (1) conspiracy (2) to prevent by force, intimidation, or threat, (3) any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person or (4) to injure any citizen in person or property on account of such support or advocacy.  *See also Nat'l Coal. on Black Civic Participation*, 512 F. Supp. 3d at 512.

Defendants argue that Plaintiffs must prove that a voter was intimidated or that Defendants attempted to intimidate a voter.  Defendants stated during a deposition that they visited 9,472 homes and spoke to 4,601 individuals at their homes.  (ECF No. 72-7, p. 24).  Plaintiffs identified three voters in its Rule 26(a)(1) disclosures who were contacted by USEIP:  Anne Landman, Michelle Garcia, and Yvette Roberts.  (ECF No. 72, pp. 4-5).  Yvette Roberts, a registered Colorado voter and resident of Grand Junction, Colorado, submitted a declaration stating that she felt intimidated by the members of USEIP who visited her home after the 2020 election.  (ECF No. 73, p. 3).  Ms. Roberts states that a man and a woman affiliated with USEIP came to her home and asked invasive questions, told her that they had voting information from the state of Colorado, wanted to know (1) how she had voted in the last election, (2) who in the household is a citizen, and (3) whether she was the only voter in her household.  (*Id*., p. 2).  Ms. Roberts states that she felt intimidated and was concerned by Defendants' actions and lodged a complaint with the Office of the Colorado Secretary of State.  (*Id*., p. 3).  Defendants deny that the voters identified by Plaintiffs were contacted by USEIP members and claim that they did not conduct canvassing efforts in Mesa County.  (ECF No. 76, p. 2).  Accordingly, there is a genuine dispute as to any material facts and the issue should be left to the factfinder.  Accordingly, the Court denies Defendants' motion for summary judgment on this issue.

### 2. *Unincorporated Associations*

Defendants argue that Defendant USEIP is an unincorporated association and, therefore, cannot be sued as a "person" under 52 U.S.C. § 10307(b) or 42 U.S.C. § 1985(3).  (ECF No. 70, p. 18).  Defendants cite *Lippoldt v. Cole*, 468 F.3d 1204, 1211 (10th Cir. 2006), wherein the Tenth

Circuit determined that an unincorporated association was not a "person" entitled to sue under 42 U.S.C. § 1983.[4]

In *Lippoldt*, wherein an anti-abortion association and members brought a § 1983 action against the city of Wichita, the Tenth Circuit reasoned that an unincorporated association could only "be a Section 1983 plaintiff" if it was a "person" within the jurisdiction of the United States. *Id*. at 1212.  In light of *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) and its progeny, the Tenth Circuit considered the "(1) the legislative history of Section 1983, (2) the general understanding, as of 1871, regarding the legal personality of unincorporated associations, and (3) the Dictionary Act of 1871." *Id*. at 1213.  The Court determined that there was no "general understanding in 1871, when the precursor to Section 1983 was passed, that unincorporated associations should be treated as natural persons" that could sue a municipality and that "the language of the Dictionary Act of 1871 also shows that unincorporated associations were not intended to be 'persons' for Section 1983 purposes." *Id.* at 1213-14 ("Neither is a person in law, and, unless authorized by statute, they have no capacity to sue.").  "In sum, none of the aforementioned factors, legislative history, general understanding, or the Dictionary Act of 1871, suggest Congress' intent *to entitle unincorporated associations to seek redress* under Section 1983." *Id.* at 1215.

Furthermore, in *Becker v. Ute Indian Tribe of the Uintah & Ouray Rsrv*., 868 F.3d 1199, 1202 (10th Cir. 2017), a contractor brought an action against the Ute Indian Tribe of the Uintah

---

[4] Defendants also cite *Hidden Lake Dev. Co. v. Dist. Ct. In & For Adams Cnty.*, 515 P.2d 632, 635 (Colo. 1973) and *Johnson v. Chilcott*, 599 F. Supp. 224 (D. Colo. 1984) for the proposition that an unincorporated association must have, inter alia, bylaws, a stated purpose, and officers in order to exist.  However, these arguments are unavailing as this inquiry is for a court when determining the existence of an unincorporated association under Colorado law and not a person under 52 U.S.C. § 10307(b) or 42 U.S.C. § 1985(3).

13

and Ouray Reservation and the tribe filed counterclaims against the contractor and sought to enjoin the state-court proceedings under 42 U.S.C. § 1983 on the ground that the state court action violated the Tribe's due-process rights. The Tenth Circuit again reaffirmed its narrow definition of the term "person," noting that the Tribe was not a person under 42 U.S.C. § 1983:

> We recognize that Ute Energy Holdings, LLC, is also a plaintiff. But we said in *Lippoldt v. Cole,* 468 F.3d 1204 (10th Cir. 2006), that unincorporated associations are not persons entitled to sue under § 1983, and Ute Energy has presented no argument why an LLC should be distinguished from other unincorporated associations in this respect.[5]

*Becker v. Ute Indian Tribe of the Uintah & Ouray Rsrv.*, 868 F.3d 1199, 1206 n.5 (10th Cir. 2017) (emphasis added). The Tenth Circuit again reaffirmed such a narrow reading of the word "person" in *United States v. Doe*, 572 F.3d 1162, 1169-70 (10th Cir. 2009), wherein the defendants argued that the use of "person" in 18 U.S.C. § 1153 only applied to living individuals. The Tenth Circuit determined that a victim under 18 U.S.C. § 1153, was defined as "living individuals and corporations, but [not] unincorporated associations." *Id*. However, the Tenth Circuit noted that "the Dictionary Act definition does not apply if "the context indicates otherwise." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1129–30 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). The Tenth Circuit clarified that context means "the text of the Act of Congress surrounding the word at issue, or the text of other related congressional Acts." *Id*.

Here, the Court, being bound by Tenth Circuit precedent, finds that it must grant summary judgment to Defendants on their claim that USEIP, as an unincorporated association, cannot be

---

[5] Arguably, by Defendants' own logic, Defendant USEIP would be barred from raising counterclaims against Plaintiffs. Regardless, the Court dismissed Defendants' counterclaims for failure to state a claim under Rule 12(b)(6). (ECF No. 81).

sued under 52 U.S.C. § 10307(b) or 42 U.S.C. § 1985(3).  As the Tenth Circuit has previously

noted, "[w]hile there is no per se rule of statutory interpretation that identical words used in

different parts of the same act are intended to have the same meaning, there is a presumption that

this is so." *Lippoldt*, 468 F.3d at 1213.  In *Lippoldt* and *Becker*, the Tenth Circuit determined that

unincorporated associations could not seek relief under 42 U.S.C. § 1983 as plaintiffs.  Here,

USEIP is a defendant in this case; however, the Tenth Circuit in *Lippoldt* noted that common law

"essentially held that unincorporated associations lacked the capacity to sue or be sued" and that

it would it strain the court's analysis to hold that an entity could be considered a "person" under

one clause of the statute but not a "person" within another clause of the same statute.  *Lippoldt*,

468 F.3d at 1212-13 (quoting *Rural Water Dist. No. 1, Ellsworth Cnty. v. City of Wilson*, 243 F.3d

1263, 1274 (10th Cir. 2001)).  Accordingly, the Court finds that an unincorporated association

cannot be considered a person, whether as a plaintiff or a defendant, under 52 U.S.C. § 10307(b)

or 42 U.S.C. § 1985(3).

While this Court agrees with Plaintiffs that the Tenth Circuit's holding in *Lippoldt* "stands

alone against the trend of treating unincorporated associations as 'persons,'" that does not permit

this Court to ignore binding precedent.  *See Fort Lauderdale Food Not Bombs v. City of Fort

Lauderdale*, 11 F.4th 1266, 1283 (11th Cir. 2021).[6]  Accordingly, this Court finds that Defendants

---

[6] This Court respectfully disagrees with the conclusion in *Lippoldt* and finds the Eleventh Circuit's analysis persuasive. First, the Tenth Circuit only defined the term "person" by the general understanding in 1871 and examined the legislative history of the 1871 Civil Rights Act and the 1871 Dictionary Act, but failed to examine the developments that occurred *after* 1871.  Indeed, as the Eleventh Circuit noted, "Congress re-enacted the word 'person' in § 1983 twice after intervening developments in federal law clarified that unincorporated associations were 'persons.'" *Fort Lauderdale Food Not Bombs*, 11 F.4th at 1283.  The ramifications of concluding that an unincorporated association is not a person under 42 U.S.C. 1985(3) based on a definition frozen in 1871 cannot be ignored given the history of the Ku Klux Klan Act when enacted within the Civil Rights Act of 1871.  Indeed, during the Reconstruction Era when the legislation was passed, the Ku Klux Klan and private individuals were acting in concert to "subvert state law enforcement mechanisms and insure unequal application of state law."  Stephanie M. Wildman, *42 U.S.C.A. § 1985(3)—A Private Action to Vindicate Fourteenth Amendment Rights: A Paradox Resolved*, 17 SAN DIEGO L REV

15

are entitled to summary judgment for this particular claim and Defendant USEIP is dismissed from the case.

## IV.  CONCLUSION

Accordingly, Defendants' Motion for Judgment on the Pleadings is DENIED and the Motion for Summary Judgment is DENIED IN PART AND GRANTED IN PART consistent with the analysis above.  (ECF Nos. 54, 70).  Defendant USEIP is DISMISSED from the case.

DATED this 31st day of January 2023.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge

---

317, 321 (1980).  Moreover, the term, unincorporated association, was a relatively recent legal development at the time that the Ku Klux Klan Act was being drafted, thus explaining why this term was not listed in the initial version of the Dictionary Act in 1871:

> In the interval between the acceptance of the principle that a corporation in English law arises only as a result of state concession, and the passing of the first Companies Act in 1862, there were established many unincorporated associations, some of them of very great importance. Such an association enjoyed no legal existence distinct from that of its members. Its legal status was simply that of an association of persons, linked by contract, and the rights of members were determined by their contractual rights, in respect of the association.

*Association*, Black's Law Dictionary (11th ed. 2019) (citing G.W. Keeton, *The Elementary Principles of Jurisprudence* 169 (2d ed. 1949)).  What results from *Lippoldt* is that civil rights organizations cannot seek relief against unincorporated associations under 42 U.S.C. § 1985(3) to halt an allegedly discriminatory conspiracy committed by the group's members – which is entirely contrary to the purpose and history of the Ku Klux Klan Act. *See generally*, *Griffin*, 403 U.S. at 97.  The Supreme Court instructs courts to examine the context of the text, the Act of Congress surrounding the word at issue, or the text of other related congressional acts. *Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 199 (1993).  The Dictionary Act also gives the courts context about how to determine the meaning of a word or phrase in an Act of Congress, however, the Supreme Court noted that the inquiry permits a court to not accept a definition in the Dictionary Act if it is a "poor fit" with the text of the statute. *Rowland*, 506 U.S. at 200 ("Where a court needs help is in the awkward case where Congress provides no particular definition, but the definition in 1 U.S.C. § 1 seems not to fit. There it is that the qualification 'unless the context indicates otherwise' has a real job to do, in excusing the court from forcing a square peg into a round hole.").  By ignoring the context of the Ku Klux Klan Act, and disregarding congressional action thereafter, which continued to utilize the term "person" after federal law made clear that unincorporated associations were "persons" under the law, it does appear that this result is contrary to the text and meaning under 42 U.S.C. § 1985(3).

16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22:cv-00581-CNS-NRN

Colorado Montana Wyoming State Area Conference of the NAACP,
League of Women Voters of Colorado, and
Mi Familia Vota,

       Plaintiffs,

v.

United States Election Integrity Plan,
Shawn Smith,
Ashley Epp, and
Holly Kasun,

       Defendants.

_____

**FINAL PRETRIAL RDER**
_____

## 1.  DATE AND APPEARANCES

The parties, by and through their undersigned counsel, submit the following Proposed Final Pretrial Order on this 15th day of May, 2023. The Final Pretrial Conference was held on May 12, 2023.

## 2.  JURISDICTION

This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 because this action arises under Section 11(b) of the Voting Rights Acts of 1965, 52 U.S.C. § 10307(b) and the Ku Klux Klan Act, 42 U.S.C. § 1985. This Court has the authority to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

### 3.    CLAIMS AND DEFENSES

**<u>Plaintiffs</u>**

Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP ("NAACP Colorado"), League of Women Voters of Colorado ("LWVCO"), and Mi Familia Vota ("MFV") (collectively, "Plaintiffs") brought this action for damages and injunctive relief against Defendants United States Election Integrity Plan ("USEIP") and three of its founding members—Shawn Smith, Ashley Epp, and Holly Kasun—alleging that Defendants have intimidated or attempted to intimidate voters in violation of the Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b), and the Ku Klux Klan Act, 42 U.S.C. § 1985.  Defendant USEIP was dismissed from this action on the grounds it is an unincorporated association and cannot be sued.  (*See* Doc. 84).  The Court, however, held that the claims against Defendants Shawn Smith, Ashley Epp, and Holly Kasun (the "Individual Defendants") could proceed. (*See id.*)

Plaintiffs allege, and the evidence presented to date has borne out, that the Individual Defendants—both individually and by and through USEIP—have violated both the Voting Rights Act and Ku Klux Klan Act by engaging in a coordinated campaign of voter intimidation and harassment.  More specifically, Plaintiffs have presented and will present evidence at trial that the Individual Defendants have made threatening and intimidating public statements, such as Defendant Smith's public exclamations that anyone involved in election fraud "deserves to hang," and have coordinated USEIP's door-to-door canvassing efforts in attempt to and in a manner that, in fact, intimidated Colorado Voters. In the course of discovery, Plaintiffs uncovered evidence demonstrating that USEIP and its members knocked on over 9,000 doors across

Colorado and, in doing so, carried and potentially brandished firearms, took photographs of voters' home, and represented or implied to voters that they were associated with the government. The Individual Defendants were each intimately involved in coordination efforts for USEIP.

Plaintiffs seek an Order from the Court: (a) declaring that the door-to-door voter intimidation campaign organized by the Individual Defendants constitutes unlawful voter intimidation in violation of Section 11(b) of the Voting Rights Act and the Ku Klux Klan Act; (b) ordering the Individual Defendants to cease and desist from coordinating and organizing visits to voters homes in order to questions voters or household members about mail-in ballots, alleged voters fraud, or otherwise intimidate voters from voting (including by mail); (c) ordering the Individual Defendants to cease and desist from taking photographs of voters' residences or vehicles, instructing or encouraging anyone to take photographs of voters' residences or vehicles, and maintaining databases of voters' residences or their vehicles, and to submit an affidavit to the Court attesting to their deletion of the same; (d) ordering the Individual Defendants to cease and desist from instructing or encouraging anyone to carry weapons during interactions with voters; and (e) ordering the Individual Defendants not to engage in other actions that threaten voters for having voters in past election or intimidate voters from voting in future elections.  Plaintiffs also seek an award of their attorneys' fees and costs.

### **Defendants**

Defendants deny any liability for the factual scenario that led to the filing of this case and further deny that they have intimidated, coerced, or threatened any Colorado voter as alleged by Plaintiffs. To carry their burden on counts 1 and 2 under 52 U.S.C.

§ 10307(b), Plaintiffs must prove that Defendants acted or attempted to intimidate, threaten or coerce a person for voting or attempting to vote. To carry their burden on count 3 under 42 U.S.C. § 1985(3), Plaintiffs must prove that Defendants (1) conspired, (2) the purpose of which was to force, intimidate, or threaten, (3) an individual legally entitled to vote who is engaging in a lawful activity related to voting in federal elections. Plaintiffs are unable to meet their burden for any of their claims. Plaintiffs have not identified a single Colorado voter, much less a member of the Plaintiff organizations, who claims that the Defendants intimidated, threatened, or coerced them in relation to a voting related activity. Likewise, Plaintiffs cannot demonstrate that Defendants conspired with the purpose of forcing, intimidating, or threatening another person engaged in voting related activities.

Through discovery, Plaintiffs were unable to present a single documented complaint identifying Defendants Shawn Smith, Ashley Epp, or Holly Kasun as a canvasser, or any allegations that these individual Defendants intimidated or threatened a voter. Furthermore, Defendant Holly Kasun did not participate in USEIP canvassing which Plaintiffs allege gives rise to the factual allegations in their Complaint. Likewise, Plaintiffs have not produced evidence that a voter has come into personal contact with the individual Defendants, nor have Plaintiffs identified the Defendants as canvassers in the county where their sole witness, Yvette Roberts, resides.

Defendants deny that through USEIP canvassing efforts, Colorado voters were intimidated, threatened, or coerced. Defendants further deny that they attempted to intimidate, threaten or coerce voters. Rather, Defendants received overwhelming

positive feedback from any voter contacted during the canvassing efforts. Further, Defendants will demonstrate that all contact with Colorado voters complied with Colorado and Federal laws.

Plaintiffs' description of Defendant Shawn Smith's public statement that "anyone involved in election fraud deserves to hang" is taken out of context and misrepresents the nature of his statement. The statement upon which Plaintiff relies has been taken out of context because it was abbreviated, and when considered in full, does not evidence an intent to intimidate, or to coordinate or conspire with others to deny the vote to anyone; nor when read in full would the statement have the effect of intimidating a voter.

Defendants further deny that they brandished weapons during canvassing, and Defendants deny that USEIP volunteers were instructed to or encouraged to carry firearms during their canvassing efforts. Plaintiffs have produced no evidence to support these claims. Defendants likewise deny that they identified themselves or insinuated that they were associated with any governmental entity. Rather, Defendants' own training materials specifically caution against a volunteer canvasser misidentifying themselves in any manner. Defendants deny that USEIP canvassing efforts were designed to target any specific voter group, particular residences, or aimed to single out any particular voter or voters.

Finally, Plaintiffs impute liability to Defendants for the actions of third parties who are not parties to this lawsuit. Plaintiffs arrive at the conclusion that based upon the individual Defendants' coordination of canvassing, alleging that voters were intimidated or threatened by other USEIP volunteers. Plaintiffs cannot show that

Defendants condoned, intended, or encouraged volunteers to engage in unlawful voter intimidation. In fact, Defendants have, and will, demonstrate that they defined, planned, and conducted their canvassing activities for Constitutionally protected purposes, in a courteous and neighborly manner. Defendants took all reasonable steps to ensure that the canvassing efforts through USEIP volunteers did not intimidate, threaten, or coerce voters. Likewise, to the extent Plaintiffs attempt to impute liability to the individual Defendants for the actions of third parties, "the doctrine of vicarious liability or respondeat superior has been ruled out in cases arising under the Federal Civil Rights statutes." *Draeger v. Grand Central, Inc.,* 507 F.2d 142, 145 (10th Cir. 1974).

In addition, Defendants affirmatively state that (1) Plaintiffs have failed to state a claim upon which relief may be granted; (2) Plaintiffs lack standing to sue on behalf of their members, none of whom have been identified as claiming voter intimidation; (3) Plaintiffs suffered no damage as a result of any of the alleged actions of Defendants; (4) Plaintiffs' claims are barred to the extent that they violate Defendants' Constitutional rights; and (5) Plaintiffs' claims are barred because any alleged injury to Plaintiffs is the proximate cause of the acts or omission of independent third parties over which Defendants exercised no control.

### 4.  STIPULATIONS

a.  The parties stipulate to the following facts:

    1)  USEIP is an unincorporated organization and has been dismissed from this case.

    2)  Defendant Shawn Smith is a Colorado resident and a member of USEIP.

76

3) Defendant Ashley Epp is a Colorado resident and a co-founder and member of USEIP.

4) Defendant Holly Kasun is a Colorado resident and a co-founder and member of USEIP.

5) USEIP carried out a campaign to go door-to-door to the homes of Colorado voters.

6) USEIP volunteers visited more than 9,000 houses during its door-to-door campaign.

## 5. PENDING MOTIONS

Defendants' Objection to the Proposed Expert Testimony of Atiba Ellis, which was filed on December 16, 2022 (Doc. 71). Plaintiffs' Response to Defendants' Objection to the Proposed Expert Testimony of Professor Atiba Ellis was filed on January 6, 2023 (Doc. 75). Defendants' Reply to Plaintiffs' Response to Defendants' Objection to the Proposed Testimony of Professor Atiba Ellis was filed on January 20, 2023 (Doc. 78).

## 6. WITNESSES

a.    List the nonexpert witnesses to be called by each party.  List separately:

**Plaintiffs**

(1)    witnesses who will be present at trial (see Fed. R. Civ. P. 26(a)(3)(A));

- **Rosemary Lytle** has knowledge of the facts alleged in Plaintiffs' Complaint, and the basis of the claims and damages related to Defendants' alleged conduct. Ms. Lytle may be contacted through Plaintiffs' undersigned counsel.

- **Portia Prescott** has knowledge of the facts alleged in Plaintiff's Complaint, and the basis of the claims and damages related to Defendants' alleged conduct. Ms. Prescott may be contacted through Plaintiffs' undersigned counsel.

- **Salvador Hernandez** has knowledge of the facts alleged in Plaintiffs' Complaint, and the basis of the claims and damages related to Defendants' alleged conduct. Mr. Hernandez may be contacted through Plaintiffs' undersigned counsel.

- **Beth Hendrix** has knowledge of the facts alleged in Plaintiffs' Complaint, and the basis of the claims and damages related to Defendants' alleged conduct. Ms. Hendrix may be contacted through Plaintiffs' undersigned counsel.

- **Colorado Secretary of State Jena Griswold**, and/or another designated representative of the Office of the Colorado Secretary of State, has knowledge of the facts alleged in Plaintiffs' Complaint, including knowledge regarding Colorado voters who were contacted by Defendants' and/or intimidated by Defendants' conduct. Secretary of State Griswold also has knowledge of threats made again her by Defendant Shawn Smith.

- **Gilbert "Bo" Ortiz**, Pueblo County Clerk and Recorder, 215 W. 10th St., Pueblo, CO, (719) 583-6507, has knowledge of the facts alleged in Plaintiffs' Complaint, including but not limited to knowledge regarding Colorado voters who were contacted by Defendants and/or

intimidated by Defendants' conduct.

- **Yvette Roberts**, a Colorado voter, (970) 434-3012, was contacted by USEIP as part of its door-to-door campaign and is expected to testify consistent with the Declaration of Yvette Roberts filed with this Court on December 23, 2022.

- **Shawn Smith** has knowledge of the facts alleged in Plaintiffs' Complaint, including but not limited to his efforts as a founding member of USEIP and his public statements concerning voter fraud. Shawn Smith may be contacted through Defendants' undersigned counsel.

- **Ashley Epp** has knowledge of the facts alleged in Plaintiffs' Complaint, including but not limited to her efforts as a founding member of USEIP. Ashley Epp may be contacted through Defendants' undersigned counsel.

- **Holly Kasun** has knowledge of the facts alleged in Plaintiffs' Complaint, including but not limited to her efforts as a founding member of USEIP. Holly Kasun may be contacted through Defendants' undersigned counsel.

- **Jeff Young** has knowledge of the facts alleged in Plaintiffs' Complaint, including but not limited to his efforts as a founding member of USEIP. Jeff Young may be contacted through Defendants' undersigned counsel.

**Defendants**

- **Holly Kasun**, who can be contacted through Defendants' undersigned counsel, is a Defendant in this matter. She is expected to testify about her involvement in the USEIP voter canvassing efforts and the training materials used by canvassing volunteers. Specifically, Ms. Kasun is expected to testify that she did not participate in the door-to-door canvassing efforts of USEIP. She is also expected to testify that groups of volunteers were locally governed, and therefore, she did not have any control over their actions.

- **Shawn Smith,** who can be contacted through Defendants' undersigned counsel is a Defendant in this matter. He is expected to testify about his involvement in the voter canvassing efforts, his interactions with Colorado voters during canvassing efforts, and the materials used by canvassing volunteers. Specifically, Mr. Smith is expected to testify that during his limited door-to-door canvassing involvement, he experienced overwhelmingly positive interactions with Colorado voters.

- **Ashley Epp**, who can be contacted through Defendants' undersigned counsel is a Defendant in this matter. She is expected to testify about her involvement in the voter canvassing efforts, her interactions with Colorado voters during canvassing efforts, and the materials used by canvassing volunteers. Specifically, Ms. Epp is expected to testify that

during her limited door-to-door canvassing involvement, she experienced overwhelmingly positive interactions with Colorado voters. She is also expected to testify that groups of canvassing volunteers were locally governed, and therefore, she had no control over their actions. Finally, she is also expected to testify that the USEIP training materials and the USEIP playbook were designed specifically to avoid any voter intimidation, threat, or coercion and sought to support only positive interactions with Colorado voters.

- **Portia Prescott** who was disclosed by Plaintiff as a representative of Plaintiff organization, NAACP Colorado. Ms. Prescott's testimony is expected to reveal that NAACP Colorado has no knowledge or information about the facts claimed by Plaintiffs in their Complaint. Her testimony is also expected to reveal that NAACP Colorado has no evidence that a Colorado voter has been intimidated, threatened, or coerced by Defendants.

- **Salvador Hernandez** who was disclosed by Plaintiffs as a representative of Plaintiff organization, Mi Familia Vota. Mr. Hernandez's testimony is expected to reveal that Mi Familia Vota has no knowledge or information about the facts claimed by Plaintiffs in their Complaint. His testimony is also expected to reveal that Mi Familia Vota has no evidence that a Colorado voter has been intimidated, threatened, or coerced by Defendants.

- **Beth Hendrix** who was disclosed by Plaintiffs as a representative of

Plaintiff organization, League of Women Voters of Colorado. Ms. Hendrix's testimony is expected to reveal that LWVCO has no evidence that a Colorado voter has been intimidated, threatened, or coerced by Defendants.

- **Colorado Secretary of State Jena Griswold,** has knowledge of the facts alleged in Plaintiffs' complaint, including knowledge regarding whether any investigations were conducted or referred regarding any alleged complaints submitted to her office by Colorado voters. Secretary of State Griswold also has knowledge of the alleged public statements made by Defendant Shawn Smith.

(2)    witnesses who may be present at trial if the need arises (see Fed. R. Civ. P. 26(a)(3)(A)); and

**<u>Defendants:</u>**

- **Jeffrey Young** may be called if the need arises and whose phone number and address have been previously disclosed. Mr. Young may be called to testify about the canvassing efforts and the ability to determine if any of the witnesses called by Plaintiffs were canvassed by Defendants.

(3)    witnesses where testimony is expected to be presented by means of a deposition and, if not taken steno graphically, a transcript of the pertinent portions of the deposition testimony.  See Fed. R. Civ. P. 26(a)(3)(B).

None.

b.  List the expert witnesses to be called by each party.  List separately:

**Plaintiffs**

(1)      witnesses who will be present at trial (see Fed. R. Civ. P.

26(a)(3)(A));

- **Atiba Ellis**, Professor of Law, Case Western Reserve
  University, 11075 East Blvd., Cleveland, OH 44106, (216)
  368-2510. Professor Ellis to offer an analysis and opinion
  regarding the activities of United States Election Integrity Plan
  and its founders and members, Defendants Shawn Smith,
  Ashley Epp, and Holly Kasun, and the effect of their activities
  on voters, particularly voters of color.  Professor Ellis is
  expected to testify in person.

(2)      witnesses who may be present at trial (see Fed. R. Civ. P.

26(a)(3)(A)); And

      None.

(3)    witnesses where testimony is expected to be presented by means of a
      deposition and, if not taken steno graphically, a transcript of the
      pertinent portions of the deposition testimony.  See Fed. R. Civ. P.
      26(a)(3)(B).

      None.

**Defendants**

      None.


    c.         A final witness list must be provided to the opposing party and the Court

no later than 30 days before trial.

## 7.  EXHIBITS

a.  Exhibits to be offered by each party at trial in this action:

   (1)    **Plaintiff(s):**

- United States Election Integrity Plan, County & Local Organizing Playbook (August 2021) (Dep. Ex. 2)

- Email correspondence between Beth Hendrix and Amanda Carlson (USEIP0013-17)

- Voter Verification Volunteer Training Guide, Version 1 (USEIP0033-004)

- Voter Verification Volunteer Training (USEIP0045-56) (Dep. Ex. 4)

- Email from Shawn Smith With Draft Voter Verification Procedures (USEIP0057)

- USEIP Volunteer Agreement (USEIP0058)

- USEIP Colorado Canvassing Report dated March 11, 2022 (USEIP0073-94)

- United States Election Integrity Plan, Hitchhiker's Guide to Election Fraud Analytics: Guidelines and Learnings from Colorado (Dep. Ex. 11)

- Good Luck on Your Fishing Expedition (Dep. Ex. 7)

- Video of Shawn Smith "I think if you're involved in election fraud, then you deserve to hang . . .", available at https://twitter.com/jenagriswold/status/1491991594018304001?l ang=en

- Ashe in America, are the tides turning on tyranny in Colorado? (USEIP0166-175)

- Ashe in America, a crusade against truth and those who speak it (USEIP0096-0101)

- Ashe in America, denver, despotism, and the death of self governance (USEIP0102-0116)

- Ashe in America, fraud PROVEN in colorado, cabal freaks out, legislators respond (USEIP0117-0130)

- Ashe in America, new evidence in colorado catches embattled secretary of state off guard (USEIP0176-185)

- Ashe in America, the interstate conspiracy (fact) to defraud the American people (USEIP0131-0146)

- Ashe in America, the ultimate gaslight (USEIP0147-0165)

- Ashe in America, the ultimate gaslight 2 (USEIP0186-0228)

- Ashe in America, we are all terrorists now (USEIP0300-0308)

- Bombshell Report Proves State and Federal Election Crimes Were Committed (USEIP0229-0237)

- USEIP, U.S. Election Integrity Project Power Point (USEIP0238-0296)

- The Colorado Election Integrity Project: Statement on the 2020 Election (USEIP0297)

- The Colorado Election Integrity Project: Response to Ken Buck's Livestream on December 2, 2020 (USEIP0298)

- Documents Produced by Jeff Young, including the following (no Bates Nos. provided):

  o All Basecamp Posts

  o General Voter Detail Lists (Cong. Dist. 1)

  o General Voting History Lists (Cong. Dist. 1)

  o General Voter Detail Lists (Cong. Dist. 2)

  o General Voting History Lists (Cong. Dist. 2)

- o General Voter Detail Lists (Cong. Dist. 3)

- o General Voting History Lists (Cong. Dist. 3)

- o General Voter Detail Lists (Cong. Dist. 4)

- o General Voting History Lists (Cong. Dist. 4)

- o General Voter Detail Lists (Cong. Dist. 5)

- o General Voting History Lists (Cong. Dist. 5)

- o General Voter Detail Lists (Cong. Dist. 6)

- o General Voting History Lists (Cong. Dist. 6)

- o General Voter Detail Lists (Cong. Dist. 7)

- o General Voting History Lists (Cong. Dist. 7)

- o General Voters with Returned Ballots List

- o Rejected and Cure Lists 2020 Primary

- o Rejected and Cure Lists 2020 General

- o Ballots Counted 2020 with Voter History

- o Registered Voters Lists

- o Final Walklist Assumptions

- o Walks Assumptions

- o Walks at Home Assumptions

- o Walk No Answer Assumptions

- o Walk Visited Assumptions

- o Moved Voters Mailed Ballot Cross Check 2020

o  All Walklists produced by Jeff Young

o  Precinct 5111821168 Batch 1268-1289 Walklist (Dep. Ex. 10)

o  All Voter Opportunity Score Documents Produced by Jeff Young

o  Douglas County Precincts and Voter Opportunity Scores (Dep. Ex. 12)

o  Canvassing Script

o  VV Script

o  Volunteer Questions to Ask Revised

o  Confirmed Residences

o  VV Walk Training PDF

o  VV Walk Training Power Point

o  VV Captains Training

o  USEIP County Captains Guide

o  VV Volunteer Guide

o  Voter Verification Training Potential Takeaway Document

o  Resident Occupant Affidavit Form

o  Comms Training

o  Key for Walk Lists

o  Tips and Tricks

o  Walklist Tracker Template

- o   All Volunteer Affidavit Forms

- o   VV Phone Script

- o   Voter Verification County Plan

- o   Affidavit List

- o   Affidavit Indexes from Douglas, El Paso, Pueblo, and Weld Counties

- o   Affidavit Curing and Indexing Processes

- o   Cure Affidavit Tracker

- o   Election Summaries Douglas County, Pueblo County, El Paso County, Weld County

- o   Election Analytics Guide

- o   How to Determine the Correct Sample Size

- o   Logistic Regression: An Overview

- o   Power Transform – Wikipedia

- o   Sampling Error – Wikipedia

- o   Standard Deviation – Wikipedia

- o   Statistical Sampling Case Law – Relevant Precedent

- o   Weibull distribution - Wikipedia.pdf

- o   All other documents produced by Jeff Young

- Records from the Colorado Secretary of State's Office related to Unofficial Door-to-Door Canvassing Efforts (COSOS0000001)

- Records from the Adams County Clerk and Recorder's Office (Adams0000001-120)

- Records from the Douglas County Clerk and Recorder's Office (Douglas0000001-576)

- Records from the El Paso County Clerk and Recorder's Office (ElPaso0000001)

- Defendant USEIP's Answers to Requests for Admissions

- Defendant USEIP's Answers to Plaintiffs' First Set of Interrogatories

- Defendant Ashley Epp's Answers to Interrogatories

- Defendant Holly Kasun's Answers to Interrogatories

- Shawn Smith's Answers to Interrogatories

- Colorado Public Radio Story Concerning USEIP Canvassing Efforts (PLTF0000001)

- KOA, Holly Kasun Recent Colorado Voter Canvass (Mar. 16, 2022) (PLTF0000002)

- Eric Maulbetsch, CO GOP Selects Member of QAnon-Linked Conspiracy Group That Organized Jan 6 Caravan As Its 'Election Integrity' Chair (Aug. 11, 2021) (PLTF0000003-15)

- Video, Colorado Election Conspiracist Three Percenter Leads USEIP's Door-to-Door Voter Verification Efforts (PLTF0000016)

- Miles Parks, The election denial movement is now going door to door (July 21, 2022) (PLTF0000017-35)

- Video, Colorado Election Fraud Conspiracy Group Still Knocking on Voters' Doors (PLTF0000036)

- Erik Maulbetsch, Colorado Election Fraud Group Is Training Conspiracists in Other States to Knock Doors in Search of 'Phantom Ballots' (PLTF0000037-48)

- Jan Wondra, Election Conspiracy Fraud Group is Expanding States in Door-to-Door Effort (PLTF0000049-52)

- Peter Stone, Group's perpetuating Trump's 2020 election lie face scrutiny and lawsuits (PLTF0000054-57)

- Election Integrity Plan, Colorado Secretary of State Jen Griswold Sued Over Destruction of Election Records, Failure to Properly Test Voting Equipment, and Obstruction of Independent Election Audits (Nov. 19, 2021) (PLTF0000058-59)

- Lindell TV, Holly Kasun MAGA Securing Colorado's Elections Has Gained the Attention of MSM (PLTF0000060)

- Real America's Voice, Holly Kasun on the Bombshell New Report About Voting Machine Vulnerabilities (PLTF0000061-62)

- Liz Dye, Mike Lindell Group Protects Election By Sending Armed Volunteers Out to Harass Minority Voters in Their Homes (PLTF0000064-66)

- Mike Lindell says God endorses his pursuit of election-fraud claims (April 29, 2022) (PLTF0000067-80)

- NPR, They Don't Trust Election Officials, So They're Doing Their Own Door-to-Door Audit (July 14, 2022) (PLTF0000081-98)

- Screenshot, "anyone who carries protection might want to let us know so we can offer your cell phone numbers to those who are concerned" (PLTF0000099)

- League of Women Voters of Colorado Email Re: Election Questions (LWVCO0000002-3)

- Email from Karen Sheek to Beth Hendrix Re: Edited Draft (LWVCO0000009)

- Email correspondence between Beth Hendrix and Ann-Marie Fleming (LWVCO0000032-35)

- Email correspondence from Debra McKee (LWVCO0000036-39)

- Email correspondence between Ruth Nerenberg, Karen Sheek, and Beth Hedrix Re: County Clerk (LWVCO0000041)

- Email     correspondence     from     Jennifer     Fillipowski

(LWVCO0000046-47)

- Email from Eric Maulbetsch to Beth Hendrix (LWVCO0000070)

- September Issue if the Voter: The Voice of LWVCO (Sep. 2021) (LWVCO00000720-85)

- League of Women Voters of Colorado, Colorado's Innovative and Stellar Election System (May 2022) (LWVCO0000086-109)

- League of Women Voters of Colorado, Safety Plan 2022 for Board & Staff (LWVCO0000112)

(2) **Defendant(s)**

- Affidavit of Beth Hendrix (Docket No. 8)

- Affidavit of Portia Prescott (Docket No. 9)

- Affidavit of Salvador Hernandez (Docket No. 10)

- LWVCO Answers to Written Discovery (October 21, 2022)

- NAACP Answers to Written Discovery (October 21, 2022)

- MFV Answers to Written Discovery (October 20 & 21, 2022)

- Email exchange between Matthew Menza and Beth Hendrix (September 14, 2021) (LWVCO 0000013)

- Email exchange between Jerry Kelley and Beth Hendrix (September 12, 2021) (LWVCO 0000029-30)

- Email exchange between Andy Sullivan and Beth Hendrix (October 17, 2021) (LWVCO 0000031)

- Email exchange between Ruth Nerenberg and Beth Hendrix (April 20, 2022) (LWVCO 0000041)

- Email exchange between Amanda Carlson and Beth Hendrix

(September 9, 2021) (LWVCO 0000043)

- Email exchange between Joani Walton and Beth Hendrix (September 7, 2021) (LWVCO 0000050-51)

- Voter Verification training PowerPoint (USEIP 0033-44)

- Voter Verification training PowerPoint (USEIP 0045-56)

- USEIP Volunteer Agreement (USEIP 0058)

- Document produced by Jeffrey Young (final_walklist_assumptions)

- Document produced by Jeffrey Young (Registered_Voters_List_Part 1-9)

- Email Yvette Roberts to Colorado Secretary of State (CSOS 0000006-7)

- Deposition transcript of Beth Hendrix

- Deposition transcript of Portia Prescott

- Deposition transcript of Salvador Hernandez

- Deposition transcript of Jeffrey Young

- Deposition transcript of Holly Kasun

- Deposition transcript of Shawn Smith

- Deposition transcript of Ashley Epp

- Deposition transcript of USEIP pursuant to Fed.R.Civ.P. 30(b)(6)

- Video of Shawn Smith's statement available at: https://twitter.com/jenagriswold/status/1491991594018304001?lang= en

- Email from former Secretary of State Wayne Williams regarding
  USEIP canvassing efforts (USEIP 0063-0067)

- USEIP canvassing report and press release (USEIP 0073-0094)

- Testimonial video with USEIP canvassing volunteers (available at
  https://useip.org/)

- USEIP statement denouncing violence (available at https://useip.org/;
  archived on 1/3/21
  http://web.archive.org/web/20211207165301/https://useip.org/)

(3)    Other

parties:

b.    A final exhibit list and copies of listed exhibits must be provided to opposing
counsel and any *pro se* party no later than 30 days before trial.   The objections
contemplated by Fed. R. Civ. P. 26(a)(3) shall be filed with the clerk and served by hand
delivery or facsimile no later than 14 days after the exhibits are provided.

### 8.  DISCOVERY

Discovery has been completed.

### 9.  SPECIAL ISSUES

**Plaintiff:**

None.

**Defendants**

None.

## 10.  SETTLEMENT

Counsel for the parties met by telephone on May 2, 2023 to discuss in good faith the settlement of the case. The parties were promptly informed of all offers of settlement. Counsel for the parties intend to engage in ongoing settlement discussions. It appears from the discussion by all counsel that there is some possibility of settlement. Counsel for the parties considered ADR in accordance with D. Colo. L. Civ. R. 16.6.

## 11.  OFFER OF JUDGMENT

Counsel and any *pro se* party acknowledge familiarity with the provision of Rule 68 (Offer of Judgment) of the Federal Rules of Civil Procedure.   Counsel have discussed it with the clients against whom claims are made in this case.

## 12. EFFECT OF FINAL PRETRIAL ORDER

Hereafter, this Final Pretrial Order will control the subsequent course of this action and the trial, and may not be amended except by consent of the parties and approval by the court or by order of the court to prevent manifest injustice.  The pleadings will be deemed merged herein.  This Final Pretrial Order supersedes the Scheduling Order.  In the event of ambiguity in any provision of this Final Pretrial Order, reference may be made to the record of the pretrial conference to the extent reported by stenographic notes and to the pleadings.

## 13. TRIAL AND ESTIMATED TRIAL TIME;
## FUTHER TRIAL PREPARATION PROCEEDINGS

This action shall be tried by the Court before the Honorable Charlotte N. Sweeney at the Alfred A. Arraj Courthouse, 901 19th Street, Denver, Colorado 80294.   The

estimated length of trial is 4 days.

Dated this 16th day of May 2023.

By the Court

Charlotte N. Sweeney
United States District Court

APPROVED:

| THE REISCH LAW FIRM, LLC | LATHROP GPM LLP |
|---|---|
| By: /s/Jessica Hays<br>R. Scott Reisch, #26892<br>Scott@reischlawfirm.com<br>Jessica L. Hays, #53905<br>Jessica@reischlawfirm.com<br>1490 W. 121st Avenue, #202<br>Denver, CO 802134<br>(303-291-0555<br><br>*ATTORNEYS for Defendants* | By /s/Casey Breese<br>*Casey Breese (#51448)*<br>*Casey.breese@lathropgpm.com*<br>*Jean Paul Bradshaw*<br>*Jeanpaul.bradshaw@lathropgpm.com*<br>*Dion Farganis*<br>*Dion.farganis@lathropgpm.com*<br>*Kristin Stock*<br>*Kristin.Stock@lathropgpm.com*<br>*Brian A. Dillon*<br>*Brian.dillon@lathropgpm.com*<br>*Amy Erickson (#54710)*<br>*Amy.erickson@lathropgpm.com*<br>*1515 Wynkoop Street, Suite 600*<br>*Denver, CO 80202*<br>*Telephone: (720) 931-3200*<br><br>*Courtney Hostetler*<br>*chostetler@freespeechforpeople.org*<br>*John Bonifaz*<br>*jbonifaz@freespeechforpeople.org*<br>*Ben Clements*<br>*bclements@freespeechforpeople.org*<br>*Ron Fein*<br>*rfein@freespeechforpeople.org*<br>*FREE SPEECH FOR PEOPLE*<br>*1320 Centre Street, Suite 405*<br>*Newton, MA 02459*<br>*Telephone: (617) 249-3015*<br><br>*ATTORNEYS FOR Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, and Mi Familia Vota* |

**FINAL LIST OF JOINT EXHIBITS**

**CASE NO.: 1:22-cv-00581-CNS-NRN**

**CASE CAPTION:** Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, and Mi Familia Vota, Plaintiffs v. United States Election Integrity Plan, Shawn Smith, Ashley Epp, and Holly Kasun, Defendants.

**DATE:** July 12, 2024

| EXHIBIT NO. | WITNESS | DESCRIPTION | AUTH-ENTICITY | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Smith, Epp, Kasun, USEIP, Young | United States Election Integrity Plan, County & Local Organizing Playbook (August 2021) (Dep. Ex. 2) | | X | | | | | Marked as stipulated based on prior correspondence with counsel for S. Smith. |
| 2 | Smith, Epp, Kasun, USEIP, Young, | Voter Verification Volunteer Training Guide, Version 1 (USEIP0033-0044) | | X | | | | | Marked as stipulated based on prior correspondence with counsel for S. Smith. |
| 3 | Smith, Epp, Kasun, USEIP, Young | Voter Verification Volunteer Training (USEIP0045-56) | | X | | | | | Marked as stipulated based on prior correspondence with counsel for S. Smith. |
| 4 | Smith | Email from Shawn Smith, dated April 12, 2021, with Draft Voter Verification Procedures (USEIP0057) | | | | | | | |

1

| EXHIBIT NO. | WITNESS | DESCRIPTION | AUTH-ENTICITY | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO |
|---|---|---|---|---|---|---|---|---|---|
| 5 | Smith, Epp, Kasun, USEIP, Young | USE1P Colorado Canvassing Report dated March 11, 2022 (USEIP0073-94) | | X | | | | | Marked as stipulated based on prior correspondence with counsel for S. Smith. |
| 6 | Smith, Epp, Kasun, USEIP, Young | United States Election Integrity Plan, Hitchhiker's Guide to Election Fraud Analytics: Guidelines and Learnings from Colorado (Dep. Ex. 11) | | | | | | | |
| 7 | Young | Good Luck on Your Fishing Expedition (Dep. Ex. 7) | | | | | | | Fed. R. Ev. 401 (Epp) |
| 8 | Smith | Video of Shawn Smith "I think if you're involved in election fraud, then you deserve to hang . . .", available at https://twitter.com/jenagriswold/status/1491991594 0183 04001?1%20ang= | | | | | | | |
| 9 | Smith, Epp, Kasun, USEIP, Young | USEIP, U.S. Election Integrity Project Power Point, April 2021 (USEIP0238-0296) | | | | | | | Fed. R. Ev. 801; Fed. R. Ev. 401 (Epp) |
| 10 | Smith, Epp, Kasun, USEIP, Young | The Colorado Election Integrity Project: Statement on the 2020 Election (USEIP0297) | | | | | | | Fed. R. Ev. 801; Fed. R. Ev. 401 (Epp) |

| EXHIBIT NO. | WITNESS | DESCRIPTION | AUTH-ENTICITY | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO |
|---|---|---|---|---|---|---|---|---|---|
| 11 | Smith, Epp, Kasun, USEIP, Young | The Colorado Election Integrity Project: Response to Ken Buck's Livestream on December 2, 2020 (USEIP0298) | | | | | | | Fed. R. Ev. 801; Fed. R. Ev. 401 (Epp) |
| 12 | Epp | Ashe in America, are the tides turning on tyranny in Colorado?, dated November 23, 2021 (USEIP0166-175) | | | | | | | Fed. R. Ev. 801; Fed. R. Ev. 401 (Epp) |
| 13 | Epp | Ashe in America, a crusade against truth and those who speak it, dated May 16, 2022 (USEIP0096-0101) | | | | | | | Fed. R. Ev. 801; Fed. R. Ev. 401 (Epp) |
| 15 | Epp | Ashe in America, fraud PROVEN in colorado, cabal freaks out, legislators respond, dated March 22, 2022 (USEIP0117-0130) | | | | | | | Fed. R. Ev. 801; Fed. R. Ev. 401 (Epp) |
| 17 | Epp | Ashe in America, the interstate conspiracy (fact) to defraud the American people, dated September 27, 2021 (USEIP0131-0146) | | | | | | | Fed. R. Ev. 801; Fed. R. Ev. 401 (Epp) |
| 18 | Epp | Ashe in America, the ultimate gaslight, dated August 26, 2021 (USEIP0147-0165) | | | | | | | Fed. R. Ev. 801; Fed. R. Ev. 401 (Epp) |
| 19 | Epp | Ashe in America, the ultimate gaslight 2, dated September 04, 2021 (USEIP0186-0228) | | | | | | | Fed. R. Ev. 801; Fed. R. Ev. 401 (Epp |

| EXHIBIT NO. | WITNESS | DESCRIPTION | AUTH-ENTICITY | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO |
|---|---|---|---|---|---|---|---|---|---|
| 20 | Epp | Ashe in America, we are all terrorists now, dated May 10, 2021 (USEIP0300-0308) | | | | | | | Fed. R. Ev. 801; Fed. R. Ev. 401 (Epp) |
| 21 | Smith, Epp, Kasun, USEIP, Young | Canvassing Script (USEIP000928-929) | | | | | | | |
| 22 | Smith, Epp, Kasun, USEIP, Young | Photos and Affidavits Combined (USEIP000930-944) | | | | | | | |
| 25 | Smith, Epp, Kasun, USEIP, Young | Basecamp Posts | | | | | | | Fed. R. Ev. 801; Fed. R. Ev. 401 (Epp) |
| 26 | Young | Affidavit Reports from Douglas, El Paso, Pueblo, and Weld Counties | | | | | | | |
| 27 | Young | Peer Review Data | | | | | | | |
| 27.a | Young | Report Data | | | | | | | |
| 27.b | Young | Responder VOS | | | | | | | |
| 27.c | Young | Responder VOS | | | | | | | |

| EXHIBIT NO. | WITNESS | DESCRIPTION | AUTH-ENTICITY | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO |
|---|---|---|---|---|---|---|---|---|---|
| 27.d | Young | Total State Estimates | | | | | | | |
| 27.e | Young | VOS Table Review | | | | | | | |
| 27.f | Young | VOS Table Review | | | | | | | |
| 28 | Young | Precinct Voter Opportunity Score Documents | | | | | | | |
| 28.a | Young | Douglas Precinct VOS | | | | | | | |
| 28.b | Young | El Paso Precinct VOS | | | | | | | |
| 28.c | Young | Pueblo Precinct VOS | | | | | | | |
| 28.d | Young | Weld Precinct VOS | | | | | | | |
| 31 | Young | Jefferson County Walk List | | | | | | | |
| 35 | Young | USEIP VV County Captains Guide | | | | | | | |
| 36 | Young | VV Captains Training V2 | | | | | | | |

| EXHIBIT NO. | WITNESS | DESCRIPTION | AUTH-ENTICITY | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO |
|---|---|---|---|---|---|---|---|---|---|
| 37 | Young | VV Volunteer Guide v6 | | | | | | | |
| 38 | Rep. from Office of AG or SOS | Public Advisory Voter Intimidation (October 19, 2020) | | | | | | | |
| 39 | Rep. from Office of AG or SOS | Public Advisory Voter Intimidation (October 13, 2022) | | | | | | | |
| 41 | Hendrix | League of Women Voters of Colorado Email Re: Election Questions, dated September 04, 2021(LWVCO0000002-3) | | | | | | | |
| 43 | Hendrix | Email correspondence between Beth Hendrix and Ann-Marie Fleming, dated March 10, 2022 (LWVCO0000032-35) | | | | | | | |
| 45 | Hendrix | Email correspondence between Ruth Nerenberg, Karen Sheek, and Beth Hendrix Re: County Clerk, dated April 21, 2022 (LWVCO0000041) | | | | | | | |
| 48 | Hendrix | September Issue if the Voter: The Voice of LWVCO (Sep. 2021) (LWVCO0000072-85) | | | | | | | |

| EXHIBIT NO. | WITNESS | DESCRIPTION | AUTH-ENTICITY | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/INFO |
|---|---|---|---|---|---|---|---|---|---|
| 49 | Hendrix | League of Women Voters of Colorado, Colorado's Innovative and Stellar Election System (May 2022) (LWVCO0000086-109) | | | | | | | Fed. R. Ev. 801; Fed. R. Ev. 401 (Epp) |
| 50 | Rep. from Office of SOS | Records from the Colorado Secretary of State's Office related to Unofficial Door-to-Door Canvassing Efforts (COSOS0000001) | | | | | | | |
| 51 | Rep. from Adams | Records from the Adams County Clerk and Recorder's Office (Adams0000001-120) | | | | | | | Fed. R. Ev. 801; Fed. R. Ev. 401 (Epp) |
| 52 | Rep. from Douglas Cty. Clerk | Records from the Douglas County Clerk and Recorder's Office (Douglas0000001-576) | | | | | | | Fed. R. Ev. 801; Fed. R. Ev. 401 (Epp) |
| 53 | Rep. from El Paso | Records from the El Paso County Clerk and Recorder's Office (ElPaso0000001) | | | | | | | |
| 54 | USEIP | Defendant USEIP's Answers to Requests for Admissions, dated August 08, 2022 | | | | | | | |
| 55 | USEIP | Defendant USEIP's Answers to Plaintiffs' First Set of Interrogatories, dated September 26, 2022 | | | | | | | |
| 56 | Epp | Defendant Ashley Epp's Answers to Interrogatories, dated August 05, 2022 | | | | | | | |

| EXHIBIT NO. | WITNESS | DESCRIPTION | AUTH-ENTICITY | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/INFO |
|---|---|---|---|---|---|---|---|---|---|
| 57 | Kasun | Defendant Holly Kasun's Answers to Interrogatories, dated August 05, 2022 | | | | | | | |
| 58 | Smith | Shawn Smith's Answers to Interrogatories, dated August 05, 2022 | | | | | | | |
| 60 | Hendrix, Prescott, Hernandez | Miles Parks, The election denial movement is now going door to door (July 21, 2022) (PLTF0000017-35) | | | | | | | Fed. R. Ev. 801 (Epp) |
| 61 | Kasun | KOA, Holly Kasun Recent Colorado Voter Canvass (Mar. 16, 2022) (PLTF0000002) | | | | | | | Fed. R. Ev. 801 (Epp) |
| 65 | Hendrix, Prescott, Hernandez | Erik Maulbetsch, Colorado Election Fraud Group Is Training Conspiracists in Other States to Knock Doors in Search of `Phantom Ballots', dated October 01, 2021 (PLTF0000037-48) | | | | | | | Fed. R. Ev. 801 (Epp) |
| 68 | Hendrix, Prescott, Hernandez | Lindell TV, Holly Kasun MAGA Securing Colorado's Elections Has Gained the Attention of MSM (PLTF0000060) | | | | | | | Fed. R. Ev. 801; Fed. R. Ev. 401 (Epp) |
| 69 | Hendrix, Prescott, Hernandez | Real America's Voice, Holly Kasun on the Bombshell New Report About Voting Machine Vulnerabilities (PLTF0000061-62) | | | | | | | Fed. R. Ev. 801; Fed. R. Ev. 401 (Epp) |

| EXHIBIT NO. | WITNESS | DESCRIPTION | AUTH-ENTICITY | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO |
|---|---|---|---|---|---|---|---|---|---|
| 70 | Hendrix, Prescott, Hernandez | Mike Lindell says God endorses his pursuit of election-fraud claims (April 29, 2022) (PLTF0000067-80) | | | | | | | Fed. R. Ev. 801; Fed. R. Ev. 401 (Epp) |
| 72 | Ellis | Expert Witness Report of Dr. Atiba R. Ellis dated October 28, 2022 | | | | | | | Fed. R. Ev. 801; Fed. R. Ev. 401 (Epp) |
| 73 | Ellis | Dr. Atiba R. Ellis Curriculum Vitae | | | | | | | |
| 74 (SS1) | Hendrix | Email exchange between Matthew Menza and Beth Hendrix (LWVCO000055) | | X | | | | | |
| 75 (SS2) | Hendrix | Email exchange between Jerry Kelley and Beth Hendrix (LWVCO000029-30) | | X | | | | | |
| 76 (SS4) | Hendrix | Email exchange between Joani Walton and Beth Hendrix (LWVCO 000050-51) | | X | | | | | |
| 77 (SS7) | Smith, Kasun, Epp | USEIP Volunteer Agreement (USEIP 0058) | | X | | | | | |
| 78 (SS8) | Williams | Email exchange with Wayne Williams re: canvassing (USEIP 0063-0067) | | X | | | | | |
| 79 (SS12) | Smith | Photo/ video by Shawn Smith on June 23, 2021 | | | | | | | Fed. R. Ev. 401 |

| EXHIBIT NO. | WITNESS | DESCRIPTION | AUTH-ENTICITY | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO |
|---|---|---|---|---|---|---|---|---|---|
| **80** (SS13) | Hendrix | Email exchange with Andy Sullivan and Beth Hendrix (LWVCO 000031) | | X | | | | | |
| **81** (SS15) | Smith | Shawn Smith Bank Statement 06/17-28/2021 | | | | | | | Fed. R. Ev. 401 |
| **82** (EPP03) | Kasun, Smith | ACLU Philadelphia Statement on Canvassing (AEHK03) | | | | | | | Fed. R. Ev. 401 |
| **83** (EPP04) | Kasun, Williams | Email exchange with Wayne Williams re: canvassing (USEIP 0067-0068) (AEHK004) | | | | | | | Fed. R. Ev. 106; Fed. R. Ev. 901 |
| **84** (EPP09) | Hendrix, Menza | Email exchange between Tara Menza and Beth Hendrix (AEHK09) | | X | | | | | |
| **85** (EPP11) | Hendrix | Email exchange between Amanda Carlson and Beth Hendrix (LWVCO 000042-45) (AEHK11) | | X | | | | | |
| **86** (EPP13) | Kasun, SecState | Mesa County DA Unredacted Emails (Exhibit 6A-6B/Epp002); Includes First Mention of VRA in this Case (Epp007) | | X | | | | | |
| **87** (EPP16) | Kasun, SecState | James Cannon Email with Holly Kasun - Cannot Recall Records (Epp005) | | | | | | | Fed. R. Ev. 401 |

| EXHIBIT NO. | WITNESS | DESCRIPTION | AUTH-ENTICITY | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO |
|---|---|---|---|---|---|---|---|---|---|
| **88** (EPP18) | Epp, SecState | SecState Open Records Produced to Ms. Epp (Epp008) | | | | | | | |
| **89** (EPP19) | Roberts | Yvette Roberts Sworn Declaration (Epp011) | | | | | | | Fed. R. Ev. 801 |
| **90** (EPP20) | Hendrix | The LWVCO Safety Plan (LWVCO0000112) (Ex. 50) | | X | | | | | |
| **91** (EPP21) | Breese | Declaration of Casey Breese (ECF No. 07) | | | | | | | Fed. R. Ev. 801; Fed. R. Ev. 401 |
| **92** (EPP021-1) | Breese | Declaration of Casey Breese Exhibit A (ECF No. 07-1) | | X | | | | | Pltf's object to any attempt to authenticate this exhibit through Pltf's counsel |
| **93** (EPP22) | Hendrix | Declaration of Beth Hendrix (ECF No. 08) | | | | | | | Fed. R. Ev. 801 |
| **94** (EPP23) | Prescott | Declaration of Portia Prescott (ECF No. 09) | | | | | | | Fed. R. Ev. 801 |
| **95** (EPP24) | Hernandez | Declaration of Salvador Hernandez | | | | | | | Fed. R. Ev. 801 |
| **96** (EPP25) | Hendrix, SecState | Plaintiff Privilege Log | | | | | | | Fed. R. Ev. 401 |
| **97** (KAS1) | Hendrix | LWV's Response to Defendants' First Discovery | | | | | | | Fed. R. Ev. 801 |
| **98** (KAS2) | Hernandez | MFV's Response to Defendants' First Discovery | | | | | | | Fed. R. Ev. 801 |
| **99** (KAS3) | Prescott | NAACP's Response to Defendants' First Discovery | | | | | | | Fed. R. Ev. 801 |

11

| EXHIBIT NO. | WITNESS | DESCRIPTION | AUTH-ENTICITY | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/INFO |
|---|---|---|---|---|---|---|---|---|---|
| **100** (KAS4) | Hendrix | LWV Voter Intimidation Notice (Sept 2021 email) (Adams 001; part of PLTF51) | | | | | | | Duplicate of Ex. 51 |
| **101** (KAS5) | Roberts; SecState | Yvette Roberts — June 2021 Complaint and Redacted Emails from SOS (COSOS 01-10) | | | | | | | Duplicate of Ex. 50 |
| **102** (KAS6) | Hendrix | Christian Science Monitor email to Beth Hendrix re: USEIP (LWVCO 001) | | | | | | | Fed. R. Ev. 401 |
| **103** (KAS7) | Hendrix | Beth Hendrix email re: USEIP intimidation (Sept 2021) (LWVCO 002-3) | | X | | | | | |
| **104** (KAS8) | Hendrix | Email from Thomson-Reuters to B. Hendrix (LWVCO 031) | | | | | | | Duplicate of SS13 |
| **105** (KAS9) | Hendrix | LWV Announcement of filing of Complaint against USEIP (LWVCO 033-35) | | | | | | | Fed. R. Ev. 401 |
| **106** (KAS10) | Hendrix | Email from donor Debra McKee to B. Hendrix responding to announcement of Complaint (LWVCO 036) | | | | | | | Fed. R. Ev. 401 |
| **107** (KAS11) | Hendrix | 5/20/22 Email from CNN to LWV and thread re: Complaint (LWVCO 040) | | | | | | | Fed. R. Ev. 401 |
| **108** (KAS12) | Hendrix | 9/8/21 LVW email notifying subscribers of voter intimidation (LWVCO 072) | | X | | | | | Duplicate of Ex. 48 |
| **109** (KAS13) | Hendrix | Email from Marjorie Gray to Beth Hendrix re: media (LWVCO 069) | | | | | | | Fed. R. Ev. 401 |
| **110** (KAS14) | Hendrix | 9/10/21 LVW email notifying subscribers of voter intimidation (LWVCO 056) | | X | | | | | |

| EXHIBIT NO. | WITNESS | DESCRIPTION | AUTH-ENTICITY | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO |
|---|---|---|---|---|---|---|---|---|---|
| **111** (KAS15) | Hendrix | Voter Matthew Menza email to Beth Hendrix about LWV statements re: USEIP (Sept 2021) (LWVCO0013-15) | | X | | | | | |
| **112** (KAS16) | Smith Young | Email and Photo from Voter Laurie W (ELPASO 001; part of PLTF53) | | | | | | | Duplicate of Ex. 53 |
| **113** (KAS17) | Hendrix | Vice News email to LWV (LWVCO0028) | | | | | | | Fed. R. Ev. 401 |
| **114** (KAS18) | Hendrix | LWV Program of Study and Action (2022) ("programbook-reformat-final.pdf") | | | | | | | Fed. R. Ev. 401 |
| **115** (KAS19) | Epp | Welcome Guide [0095].pdf (USEIP 0095) | | X | | | | | |
| **116** (KAS20) | Hendrix | LWV "Study Material to LWVUS 021722.pdf" (Dec 2021) | | | | | | | Fed. R. Ev. 401; Fed. R. Ev. 901 |
| **117** (KAS21) | Hendrix | LWV article "The 2016 Election WAS Rigged" (Produced; Bates TBD) | | | | | | | Fed. R. Ev. 401; Fed. R. Ev. 901 |
| **118** (KAS22) | Smith | VV Walk Training.pptx (Produced; Bates TBD) | | X | | | | | |
| **119** (KAS23) | Young Smith | Weld County "Voter Verification Volunteer Training" | | X | | | | | |
| **120** (KAS24) | Smith Epp Young | Voter Verification worksheet - "vv_list_example.pdf" (Produced; Bates TBD) | | X | | | | | |
| **121** (KAS25A) | Young | Voter Log Processing - Post Canvassing ("completed_log_instructions_printer_friendly.pdf") (Produced; Bates TBD) | | X | | | | | |

| EXHIBIT NO. | WITNESS | DESCRIPTION | AUTH-ENTICITY | STIP | OFFER | RECD. | REF. | RUL. RSVD. | COMMENTS/ INFO |
|---|---|---|---|---|---|---|---|---|---|
| **122** (KAS25B) | Hendrix | Emails between Amanda Carlson and B. Hendrix (starting 10/5/21) LVW 0064-68 | | X | | | | | |
| **123** (KAS25C) | Hendrix | 9/6/21 Email from Colorado Times Recorder to B. Hendrix LVW 0070 | | X | | | | | |
| **124** (KAS26) | SecState Young Kasun | Combined Registered Voter List (Parts 1-9) (Produced; Bates TBD) | | | | | | | |
| **125** (KAS27) | | Declaration of Cory Anderson (ECF No. 76-4) | | | | | | | Fed. R. Ev. 401; Fed. R. Ev. 801 |
| **126** (KAS28) | | Jeff Young – Revised Canvassing Distributions | | | | | | | |
| **127** (KAS29) | | Prepared VV Walker - female canvasser with red lanyard- Def RFP 6 | | | | | | | Fed. R. Ev. 401; document not disclosed |
| **128** (KAS 30) | | Image of female canvasser in grey sweatshirt | | | | | | | Fed. R. Ev. 401; document not disclosed |
| **129** (KAS 31) | | Image of female canvasser in floral shirt and glasses | | | | | | | Fed. R. Ev. 401; document not disclosed |
| **130** (KAS32) | | Image of male canvasser in glasses | | | | | | | Fed. R. Ev. 401; document not disclosed |
| **131** (KAS33) | | Image of female canvasser in white shirt | | | | | | | Fed. R. Ev. 401; document not disclosed |
| **132** (KAS34) | | Pair of canvassers walking away | | | | | | | Fed. R. Ev. 401; document not disclosed |

64031873v4

14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**JUDGE CHARLOTTE N. SWEENEY**

---

| | |
|---|---|
| Civil Action:           22-cv-00581-CNS-NRN | Date:  July 15, 2024 |
| Courtroom Deputy:    Julie Dynes | Court Reporter: Sarah Mitchell |

---

| *Parties* | *Counsel* |
|---|---|
| COLORADO MONTANA WYOMING STATE AREA | *Casey Breese* |
| CONFERENCE OF THE NAACP | *Amy Erickson* |
| LEAGUE OF WOMEN VOTERS OF COLORADO | *Brian Dillon* |
| MI FAMILIA VOTA | *Kristin Stock* |
| **Plaintiffs** | |
| | |
| **v.** | |
| | |
| SHAWN SMITH | *Scott Reisch* |
| | *Jessica Hays* |
| ASHLEY EPP | *Pro Se* |
| HOLLY KASUN | *Cameron Powell* |
| | *Michael Wynne* |
| **Defendants** | |

---

**COURTROOM MINUTES**

---

**BENCH TRIAL DAY ONE**

Court in Session:  8:32 a.m.

Appearance of counsel and pro se defendant. Also present at the plaintiffs' counsel table is Hashini Rathnayaka. Also present at the defense table is Heather Martinez.

**ORDERED:  Renewed Oral Motion to Recuse by Defendant Shawn Smith is DENIED.**

**Witness sequestration issued.**

**Stipulated exhibits 1, 2, 3, 5, 74, 75, 76, 77, 78, 80, 84, 85, 86, 90, 92, 103, 108, 110, 111, 115, 118, 119, 120, 121, 122, 123 are admitted.**

8:37 a.m.          Opening statement given by Ms. Erickson.

| | |
|---|---|
| 8:53 a.m. | Opening statement given by Mr. Powell. |
| 9:13 a.m. | Opening statement given by Ms. Hays. |
| 9:16 a.m. | Opening statement given by Ms. Epp. |

Defendant, Shawn Smith, called and sworn.

| | |
|---|---|
| 9:29 a.m. | Direct examination of Mr. Smith by Mr. Dillon. |

**10:27 a.m.**     **Court in recess.**
**10:43 a.m.**     **Court in session.**

| | |
|---|---|
| 10:44 a.m. | Continued direct examination of Mr. Smith by Mr. Dillon. **Exhibit 25 (p. 47) is admitted.** |
| 11:38 a.m. | Cross examination of Mr. Smith by Mr. Reisch. |

**12:16 p.m.**     **Court in recess.**
**1:20 p.m.**       **Court in session.**

| | |
|---|---|
| 1:20 p.m. | Continued cross examination of Mr. Smith by Mr. Reisch. |
| 1:44 p.m. | Cross examination of Mr. Smith by Mr. Wynne. |
| 1:46 p.m. | Cross examination of Mr. Smith by Ms. Epp. |
| 1:54 p.m. | Redirect examination of Mr. Smith by Mr. Dillon. |
| 2:04 p.m. | Examination of Mr. Smith by the Court. |
| 2:09 p.m. | Additional examination of Mr. Smith by Mr. Reisch. |
| 2:11 p.m. | Additional examination of Mr. Smith by Mr. Wynne. |

Defendant, Ashley Epp, called and sworn.

| | |
|---|---|
| 2:17 p.m. | Direct examination of Ms. Epp by Mr. Breese. **Exhibit 17 is admitted.** |

**3:10 p.m.**     **Court in recess.**
**3:30 p.m.**     **Court in session.**

3:30 p.m.        Continued direct examination of Ms. Epp by Mr. Breese.
                 **Exhibits 11, 15 and 25 (p. 90) are admitted.**

4:29 p.m.        Cross examination of Ms. Epp by Mr. Wynne.

Parties excused until tomorrow at 8:30 a.m.

Court in Recess:  5:00 p.m.          Hearing concluded.          Total time in Court:  06:48

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**JUDGE CHARLOTTE N. SWEENEY**

---

| | | |
|---|---|---|
| Civil Action: | 22-cv-00581-CNS-NRN | Date:  July 16, 2024 |
| Courtroom Deputy: | Julie Dynes | Court Reporter: Sarah Mitchell |

---

| *Parties* | *Counsel* |
|---|---|
| COLORADO MONTANA WYOMING STATE AREA CONFERENCE OF THE NAACP LEAGUE OF WOMEN VOTERS OF COLORADO MI FAMILIA VOTA | *Casey Breese* *Amy Erickson* *Brian Dillon* *Courtney Hostetler* *Kristin Stock* |
| **Plaintiffs** | |
| **v.** | |
| SHAWN SMITH | *Scott Reisch* *Jessica Hays* |
| ASHLEY EPP | *Pro Se* |
| HOLLY KASUN | *Cameron Powell* *Michael Wynne* |
| **Defendants** | |

---

**COURTROOM MINUTES**

---

**BENCH TRIAL DAY TWO**

Court in Session:  8:40 a.m.

Defendant, Ashley Epp, recalled and remains under oath.

| | |
|---|---|
| 8:41 a.m. | Cross examination of Ms. Epp by Mr. Reisch. |
| 8:44 a.m. | Ms. Epp presents testimony as a *pro se* defendant. |
| 8:50 a.m. | Examination of Ms. Epp by the Court. |
| 8:56 a.m. | Additional examination of Ms. Epp by Mr. Reisch |

114

8:59 a.m.          Redirect examination of Ms. Epp by Mr. Breese.
                   **Exhibits 20 and 25 (p. 48) are admitted.**

9:32 a.m.          Additional examination of Ms. Epp by Mr. Wynne.

9:40 a.m.          Additional examination of Ms. Epp by the Court.

Plaintiffs' witness, Christopher Beall, called and sworn.

9:44 a.m.          Direct examination of Mr. Beall by Ms. Erickson.

**10:18 a.m.          Court in recess.**
**10:41 a.m.          Court in session.**

10:41 a.m.         Continued direct examination of Mr. Beall by Ms. Erickson.
                   **Exhibit 50 is admitted.**

11:27 a.m.         Cross examination of Mr. Beall by Mr. Reisch.

12:10 p.m.         Cross examination of Mr. Beall by Mr. Powell.

**12:17 p.m.          Court in recess.**
**1:17 p.m.          Court in session.**

1:17 p.m.          Cross examination of Mr. Beall by Ms. Epp.

1:59 p.m.          Redirect examination of Mr. Beall by Ms. Erickson

Plaintiffs' witness, Yvette Roberts, called and sworn.

2:07 p.m.          Direct examination of Ms. Roberts by Ms. Hostetler.

2:31 p.m.          Cross examination of Ms. Roberts by Mr. Powell.

2:55 p.m.          Cross examination of Ms. Roberts by Mr. Reisch.

3:17 p.m.          Cross examination of Ms. Roberts by Ms. Epp.

3:22 p.m.          Cross examination of Ms. Roberts by Ms. Hostetler.

3:23 p.m.          Examination of Ms. Roberts by the Court.

**3:24 p.m.          Court in recess.**

Case No. 1:22-cv-00581-CNS-NRN   Document 182   filed 07/16/24   USDC Colorado   pg 3 of 3

**3:46 p.m.**      **Court in session.**

Plaintiffs' witness, Beth Hendrix, called and sworn.

3:49 p.m.       Direct examination of Ms. Hendrix by Ms. Stock.
                **Exhibit 41 is admitted.**

4:14 p.m.       Cross examination of Ms. Hendrix by Mr. Reisch.

Parties excused until tomorrow at 8:30 a.m.

Court in Recess:  4:53 p.m.          Hearing concluded.          Total time in Court:  06:35

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**JUDGE CHARLOTTE N. SWEENEY**

---

| | |
|---|---|
| Civil Action: | 22-cv-00581-CNS-NRN |
| Courtroom Deputy: Julie Dynes | |

Date:  July 17, 2024
Court Reporter: Sarah Mitchell

---

| *Parties* | *Counsel* |
|---|---|
| COLORADO MONTANA WYOMING STATE AREA CONFERENCE OF THE NAACP LEAGUE OF WOMEN VOTERS OF COLORADO MI FAMILIA VOTA | *Casey Breese* *Amy Erickson* *Brian Dillon* *Courtney Hostetler* *Kristin Stock* |
| **Plaintiffs** | |
| **v.** | |
| SHAWN SMITH | *Scott Reisch* *Jessica Hays* |
| ASHLEY EPP | *Pro Se* |
| HOLLY KASUN | *Cameron Powell* *Michael Wynne* |
| **Defendants** | |

---

**COURTROOM MINUTES**

---

**BENCH TRIAL DAY THREE**

Court in Session:  8:31 a.m.

Plaintiffs' witness, Beth Hendrix, recalled and remains under oath.

| | |
|---|---|
| 8:32 a.m. | Cross examination of Ms. Hendrix by Mr. Powell. **Exhibit 107 is admitted.** |
| **9:47 a.m.** | **Court in recess.** |
| **10:10 a.m.** | **Court in session.** |
| 10:10 a.m. | Cross examination of Ms. Hendrix by Ms. Epp. **Exhibits 43, 102, 105, 106 and 109 are admitted.** |

11:15 a.m.     Redirect examination of Ms. Hendrix by Ms. Stock.
**Exhibit 65 is admitted.**

Discussion held on witness testimony.

**11:26 a.m.     Court in recess.**
**11:36 a.m.     Court in session.**

Continued discussion held on witness testimony.

Defendant, Holly Kasun, called and sworn.

11:40 p.m.     Direct examination of Ms. Kasun by Ms. Stock.

12:11 p.m.     Cross examination of Ms. Kasun by Mr. Wynne.

**12:55 p.m.     Court in recess.**
**2:02 p.m.     Court in session.**

Discussion held on remaining witnesses in the plaintiffs' case.

2:03 p.m.     Cross examination of Ms. Kasun by Ms. Epp.

2:08 p.m.     Redirect examination of Ms. Kasun by Ms. Stock.

2:15 p.m.     Additional examination of Ms. Kasun by Mr. Wynne.

2:16 p.m.     Examination of Ms. Kasun by the Court.

Offer of proof as to the plaintiffs' witnesses given by Ms. Erickson and Mr. Powell.

**2:44 p.m.     Court in recess.**
**3:08 p.m.     Court in session.**

Plaintiffs' witness, Professor Atiba Ellis, called and sworn.

3:09 p.m.     Direct examination of Professor Ellis by Ms. Erickson.
**Exhibit 73 is admitted.**

3:58 p.m.     Cross examination of Professor Ellis by Mr. Wynne.

4:21 p.m.     Cross examination of Professor Ellis by Mr. Reisch.

4:42 p.m.        Redirect examination of Professor Ellis by Ms. Erickson.

Offer of proof as to the plaintiffs' witnesses given by Mr. Breese and Ms. Hostetler.

Plaintiffs' rest.

Argument on Oral Motion for Judgment on Partial Findings under Fed. R. Civ. P. 52(c) given by Mr. Reisch, Mr. Wynne, Ms. Epp, and Ms. Erickson.

**ORDERED:   Oral Motion for Judgment on Partial Findings under Fed. R. Civ. P. 52(c) is TAKEN UNDER ADVISEMENT.**

Parties excused, to return tomorrow at 9:00 a.m.

Court in Recess:  5:28 p.m.            Hearing concluded.            Total time in Court:  06:53

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**JUDGE CHARLOTTE N. SWEENEY**

---

| | | |
|---|---|---|
| Civil Action: | 22-cv-00581-CNS-NRN | Date:  July 18, 2024 |
| Courtroom Deputy: | Julie Dynes | Court Reporter: Sarah Mitchell |

---

| *Parties* | *Counsel* |
|---|---|
| COLORADO MONTANA WYOMING STATE AREA CONFERENCE OF THE NAACP LEAGUE OF WOMEN VOTERS OF COLORADO MI FAMILIA VOTA | *Casey Breese* *Amy Erickson* *Brian Dillon* *Courtney Hostetler* *Kristin Stock* |
| **Plaintiffs** | |
| **v.** | |
| SHAWN SMITH | *Scott Reisch* *Jessica Hays* |
| ASHLEY EPP HOLLY KASUN | *Pro Se* *Cameron Powell* *Michael Wynne* |
| **Defendants** | |

---

**COURTROOM MINUTES**

---

**BENCH TRIAL DAY FOUR**

Court in Session:  9:12 a.m.

The Court makes findings of fact, conclusions of law.  As outlined on the record, it is

**ORDERED:   Oral Motion for Judgment on Partial Findings under Fed. R. Civ. P. 52(c) is GRANTED as to both claims.**

**Judgment to enter in favor of the defendants.**

Court in Recess:  9:36 a.m.          Trial concluded.          Total time in Court:  00:24

120

Case No. 1:22-cv-00581-CNS-NRN   Document 184   filed 07/18/24   USDC Colorado   pg 2 of 2

Clerk's note:   Exhibits and depositions returned to counsel or a representative of counsel.
Counsel to retain exhibits until such time as all need for the exhibits has terminated
and the time to appeal has expired or all appellate proceedings have been
terminated plus sixty days.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-00581-CNS-NRN

COLORADO MONTANA WYOMING STATE AREA CONFERENCE OF THE NAACP,
LEAGUE OF WOMEN VOTERS OF COLORADO,
MI FAMILIA VOTA,

       Plaintiffs,

v.

SHAWN SMITH,
ASHLEY EPP,
HOLLY KASUN,

       Defendants.

---

**FINAL JUDGMENT**

---

In accordance with the orders filed during the pendency of this case, and pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

This action was tried before United States District Judge Charlotte N. Sweeney and the Court rendered its findings of fact, conclusions of law, and granted the Oral Motion for Judgment on Partial Findings under Fed. R. Civ. P. 52(c) on July 18, 2024, in open court [Minute Entry at ECF No. 184]. It is

ORDERED that judgment is entered in favor of the defendants, Shawn Smith, Ashley Epp and Holly Kasun, and against the plaintiffs, Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, and Mi Familia Vota. It is

FURTHER ORDERED that as the prevailing party the defendants are awarded costs to be taxed by the Clerk of the Court pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.  It is

FURTHER ORDERED that the case is closed.

Dated at Denver, Colorado this 18th day of July, 2024.

FOR THE COURT:
JEFFREY P. COLWELL, CLERK

By:  s/   J Dynes
_____

J DYNES
Deputy Clerk

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    84

1    citizen volunteers?

2    A.   We had previously tried to look at other methods.  I mean,

3    we had tried to go through the data and do analysis of the

4    data, but we concluded that if you want ground truth, you have

5    to go and see, especially because we had a lot of anecdotal

6    evidence.  And you've heard it, other people have heard it

7    about people getting extra ballots or people getting ballots

8    for people who didn't live at the houses or people who were

9    not sure if their ballot was counted or anything like that.

10   We thought let's just go collect the data.  We canvassed just

11   like all three plaintiff organizations canvass.  We all

12   canvass.  That's how you get truth.

13   Q.   I appreciate the extra detail.  I'm just simply asking you

14   to confirm that the method by which USEIP and its volunteers

15   went about testing the accuracy of the election-related data

16   --

17   A.   I wouldn't call it testing, but -- I'm sorry.  I did it

18   again.  I wouldn't call it testing.  We were just trying to

19   verify whether the Secretary of State's data was accurate.

20   Q.   Fair enough.  And you did that -- the method by which you

21   did that was door-to-door canvassing, questioning Colorado

22   residents, voters about the data personal to them?

23   A.   Exactly.

24   Q.   Okay.  Thank you.  And the work product of this effort

25   consisted of, among other things, affidavits that were

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   85

1   prepared to document purported anomalies or irregularities in

2   the data, correct?

3   A.  I wouldn't say purported.  They were what we observed.

4   The volunteers observed disparities between the Secretary of

5   State's data and what they could either observe themselves or

6   were told by their residents that they visited that were

7   correlated to the records in the Secretary of State's data.  I

8   mean, I guess you could say the affiants were purporting,

9   but...

10  Q.  I'm trying to be simpler.  The work product, though, were

11  affidavits?

12  A.  In the walk -- in the walk data.  So the affidavits were

13  just where there were irregularities, but there were also the

14  logs of all of the houses that they contacted, including which

15  questions they asked, what they got responses to, and if they

16  were given any additional information.

17  Q.  Okay.  That's helpful.  Back to the affidavits, my

18  understanding is that those affidavits were signed either by

19  the voter themselves, correct?  That's one way?

20  A.  The resident.  So in some cases it wasn't the voter.  It

21  was a resident who stated, for example, that the individual

22  named in the Secretary of State's data didn't live there and

23  had never lived there.

24  Q.  Or, alternatively, one of the citizen canvassers if the

25  citizen was uncomfortable signing the affidavit?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   86

 1    A.   That's correct.  Well, not necessarily uncomfortable.

 2    Just didn't for some reason.  Like, sometimes there was a

 3    language barrier or sometimes the individual they were talking

 4    about wasn't present.

 5    Q.   Citizen canvassers were also advised to take photographs

 6    of residents where discrepancies were identified?

 7    A.   Did you say residents or residences?

 8    Q.   Residences.  Let me restate the question so that the

 9    record is clear.  Citizen canvassers were also advised to take

10    photographs of the residences where discrepancies were

11    identified, correct?

12    A.   I think it's a little bit more detailed than that.  It was

13    more a matter of where the discrepancies were associated with

14    the residence itself.  It wasn't like here's a white house and

15    inside that is somebody who didn't vote or whatever.  It was

16    more like there's an address listed, and instead of being a

17    residential address, it's a storage location or it's an empty

18    lot or it's a commercial, you know, establishment from where

19    someone would not be permitted to, you know, be registered as

20    a voter.  Or it's -- you know, it's literally a street corner

21    that somebody is purported to have received and sent an

22    absentee ballot from.  So I think it was a -- I don't remember

23    the exact wording in the training, but I think it wasn't just

24    any anomaly.  It was about specifically where there was

25    something about the location that they wanted to document.

                      Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   89

1   Q.  Do you see the first page of Exhibit 22, at the bottom

2   it's got what we lawyers refer to as a Bates stamp.  It says

3   USEIP_000930.

4   A.  I do.

5   Q.  Okay.  I'll just represent to you that this is a set of

6   documents that were produced by your counsel in this case.

7   A.  Okay.

8   Q.  Do you recognize these documents and particularly the

9   photographs that are included in this Exhibit 22?

10  A.  The first photograph I do not.  The second page with the

11  four photographs I do not.  The third page is not a

12  photograph, but an affidavit.  It's from Pueblo it says.  I

13  don't recognize that.  And then there are three photos on the

14  next page.  I don't recognize any of the photographs.  The

15  next page is another affidavit from Pueblo.  And then the

16  following page has two photographs, and I don't recognize

17  either of them.  Do you want me to keep going?

18  Q.  Well, let's turn back to the page with the Bates stamp

19  USEIP_000932.

20  A.  Okay.

21  Q.  And that's one of the affidavits that's in this set of

22  materials?

23  A.  Okay.

24  Q.  And in this affidavit a couple lines from the bottom it

25  says, quote, photos taken for this affidavit, period, closed

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   90

1    quote.

2         MR. REISCH:  Objection, hearsay, lack of foundation,

3    lack of personal knowledge.

4         MR. WYNNE:  Join the objection, Your Honor.

5         THE COURT:  Sustained.

6    Q.  (By MR. DILLON) Let me just back up.  You've testified

7    already this morning that you're not sure if any volunteers

8    took photographs when they were out canvassing or whether

9    those photographs were maintained by anyone, correct?

10   A.  Correct.

11   Q.  Does this document refresh your recollection as to whether

12   any photographs were taken or maintained?

13   A.  Well, I didn't have a recollection.  I didn't realize that

14   these photos were included.  I don't know if these were part

15   of the data that was given to the Pueblo DA with the

16   affidavits or if these were solicited for the case and then

17   obtained and provided to counsel.  So it doesn't refresh

18   anything.  I didn't know that there were photos in it.

19   Q.  So your testimony remains unchanged.  You don't know if

20   volunteers took any photos and you don't know if any photos

21   were maintained?

22   A.  Well, this indicates --

23        MR. REISCH:  Your Honor, I'm going to ask him to not

24   to respond.  It's nonresponsive.

25        MR. WYNNE:  The question asked to elicit hearsay, so

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1     07/15/2024   91

1    we object.

2          THE COURT:  The objection is sustained.  He hasn't

3    seen the photos.  He's not familiar with them, so he can't

4    possibly answer any questions about them.

5          MR. DILLON:  Okay.  We'll move on.

6    Q.  (By MR. DILLON) Mr. Smith, you personally participated in

7    USEIP's canvassing, efforts, correct?

8    A.  I did.

9    Q.  You did three days of door-knocking work, correct?

10   A.  I think that's correct.

11   Q.  And you knocked on 70 to 75 doors, correct?

12   A.  Roughly.

13   Q.  And that was in two counties, correct, Weld and El Paso

14   County?

15   A.  That's correct.

16   Q.  And in your work you canvassed in at least two mobile home

17   parks, correct?

18   A.  Correct.

19   Q.  And collectively you're aware that USEIP volunteers

20   knocked on more than 9,400 doors?

21   A.  Correct.

22   Q.  And talked to more than 4,600 residents?

23   A.  Correct.

24   Q.  And all of that work was in Colorado, correct?

25   A.  Correct.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    107

1    witness because it is not my client's statement.

2              THE COURT:  Well, I understand that.

3              Proceed, please.

4              MR. DILLON:  Thank you, Your Honor.

5    Q.  (By MR. DILLON) Mr. Smith, this entry into Basecamp is

6    dated April 12th of 2021, and it -- there's a line in here

7    that refers to folks, quote, getting ready to begin VV in Mesa

8    County, period, closed quote.  VV, is that a reference to

9    voter verification?

10   A.  It is.

11   Q.  And who is the reference to they?  Who is getting ready to

12   do voter verification in Mesa County?

13   A.  I can't remember the name of their group.  There were some

14   people that we had connected to.  We realized that they were

15   going to do some -- they were wanting to do some of the same

16   kinds of things, and so we were sharing information back and

17   forth.  And one of their individuals in that group was USEIP's

18   county captain for Mesa, but they began their voter

19   verification using different procedures and a different data

20   set.  They were using an app called Sidekick or something like

21   that, and they used county data.  We never used county data.

22   We only used Secretary of State data.  So they never got our

23   data and canvassed with our data, and it wasn't USEIP people

24   doing it, although we were in contact with the people who were

25   organizing it.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    114

1    wanted people to be professional and courteous.  Also, just

2    looking at that it looks like --

3           THE COURT:  Let me stop you there.  You have to wait

4    for a question to be asked, even though you might have thought

5    of something else.

6           THE WITNESS:  Yes, ma'am.  I was trying to continue

7    the response.  Sorry.

8           THE COURT:  That's okay.  You can ask him a

9    follow-up, if you want.

10   Q.  (By MR. DILLON) Let's look at page 63, Exhibit 25.  And

11   before we look at the document, I asked you a question

12   previously if you were aware of efforts to -- for volunteers

13   who were concerned about their safety, sort of pairing them up

14   with other canvassers who were armed.  Do you recall that?

15   A.  I do.

16   Q.  And refresh my memory here.  Are you aware of those

17   discussions?

18   A.  I don't believe I was aware of them at the time.  I

19   believe I've read about them in the excerpts from Basecamp

20   that were provided as exhibits for -- in the course of the

21   case.

22   Q.  Okay.  And is this Exhibit 25, page 63, an example of

23   that.  Look at the bottom entry.

24          MR. REISCH:  Objection, relevance, lack of

25   foundation, hearsay.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    115

1              THE COURT:  Overruled.

2              MR. REISCH:  Speculation.

3              THE COURT:  Overruled.

4    A.  What was your question again?

5    Q.  (By MR. DILLON) My question is the line -- the few lines

6    of text on the bottom of page 63 of Exhibit 25 an example of

7    the effort to -- that you're now aware of to pair voters up --

8    or pair canvassers up who are armed with those who were not?

9              MR. REISCH:  Objection, lack of foundation.

10             MR. DILLON:  That's a bad question.

11             THE WITNESS:  It's a terrible question.

12             THE COURT:  Sustained.  He's going to try again.

13   Q.  (By MR. DILLON) Is the last two lines on Exhibit 63 --

14   Exhibit 25, page 63, is this indicative of the correspondence

15   on Basecamp that you had indicated you were aware of of an

16   effort to try to pair canvassers who were concerned with

17   safety with other canvassers who were armed?

18             THE COURT:  Don't even say anything.  Sustained.

19   Let's -- you've got to stop referring to documents he's not a

20   part of.  If he's read it after the fact, it doesn't matter.

21   Let's ask him about his awareness at the time, and if he has

22   one, you don't need to refer to the document.  He's already

23   said he's read about it.  It has limited relevance.  If you

24   can ask him a follow-up about what he knew at the time, that

25   would have relevance.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    123

1  Q.  Do you believe that Ms. Griswold's violations have

2  deprived the citizens of Colorado of their right to

3  self-determination at that ballot box?

4  A.  Yes.  Certainly they've interfered with the transparency

5  necessary for citizens to be able to verify that for

6  themselves, which -- without which what evidence do they have?

7  Q.  Do you believe the Secretary of State has engaged in

8  election fraud?

9  A.  Election fraud?

10          MR. REISCH:  Objection, relevance.

11          THE COURT:  Sustained as to that.

12          MR. WYNNE:  I'll add another objection.  That calls

13  for a legal conclusion for which this witness is not qualified

14  to make.

15          THE COURT:  All right.  I've sustained the objection.

16  Q.  (By MR. DILLON) Mr. Smith, are you affiliated with a group

17  called FEC United?

18  A.  No.  I know many members, but I'm not affiliated.

19  Q.  Have you spoken at FEC United events?

20  A.  Yes.

21          MR. REISCH:  Objection, relevance.

22          THE COURT:  I don't know the group or what the --

23  what is the relevance?

24          MR. DILLON:  I'm laying some foundation for the

25  relevance, Your Honor.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1   07/15/2024   124

1               THE COURT:  I'll give him a short rope.  Overruled.

2               MR. DILLON:  Thank you.  Can you read back the

3     question, please?

4          (The requested portion was read back.)

5     Q.  (By MR. DILLON) And at those events you've talked about

6     election integrity issues, correct?

7     A.  That's correct.  That's why I was invited to speak.

8     Q.  And isn't it true that at this event you stated publicly

9     that you had in your possession evidence of criminal conduct

10    by the Secretary of State and her staff?

11              MR. REISCH:  Objection, relevance, 401, 403.

12              THE COURT:  Well, 403 really doesn't come into play

13    with a trial to the Court.  I'll allow a short rope to explore

14    what this is about.

15              MR. DILLON:  Thank you.

16    A.  Could you repeat the question, please?

17    Q.  (By MR. DILLON) Isn't it true at this event you stated

18    publicly that you have in your possession evidence of criminal

19    conduct by the Secretary of State and her staff?

20    A.  Which event?

21    Q.  At this FEC United event that we've been discussing.

22    A.  I've been to several.  Are you talking about specifically

23    at The Rock in Castle Rock?

24    Q.  That probably is the one, yes.

25    A.  Okay.  Yes .

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    125

1    Q.  Okay.  When was that event?

2    A.  I believe February of '22.

3    Q.  Of '22?

4    A.  Correct.  So long after canvassing was completed.

5    Q.  Okay.  And at this event you also stated that you believe

6    anyone involved in election fraud deserves to hang, correct?

7            MR. REISCH:  Objection, relevance.

8            THE COURT:  Overruled.

9            MR. WYNNE:  I'm going to object based on hearsay.

10           THE COURT:  Overruled.  You may answer.

11   A.  I believe what I stated was much more extensive than that.

12   Q.  (By MR. DILLON) Did you say --

13   A.  Do you have a full quote?

14           MR. DILLON:  Look, Your Honor, we have the video.  I

15   would like to play the video so that Your Honor and the Court

16   can hear Mr. Smith's own words at this event.  I think it's

17   incredibly important, and I think that video should be entered

18   into evidence.

19           THE COURT:  Is there an objection?

20           MR. WYNNE:  Yes.  I object based on hearsay as to

21   both Ms. Kasun and Ms. Epp since it's not a statement by them

22   as parties.

23           THE COURT:  All right.  Mr. Reisch?

24           MR. REISCH:  I would object as to lack of foundation,

25   authenticity.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1     07/15/2024    126

1       THE COURT:  All right.  I don't know anything about

2  the video.  Why don't we try asking him what he said?

3       MR. DILLON:  Well, that is what I've been doing.

4  Q.  (By MR. DILLON) So did you say --

5       THE COURT:  No, let's just ask him what he said.

6       MR. DILLON:  Sure.

7  Q.  (By MR. DILLON) Did you say that anyone involved in

8  election fraud --

9       THE COURT:  Mr. Dillon, you're not hearing me.  Ask

10  the witness what he said.  I'm not allowing you to show me the

11  video.  It seems to me he remembers what he said, so let's

12  just ask him.

13  Q.  (By MR. DILLON) What did you say at this February 2022 FEC

14  United event?

15  A.  Well, I said a lot, but what I think you're asking about

16  is I specifically said I have in my possession evidence of

17  violations of election law by Secretary of State Griswold,

18  which I did and which I provided to the Colorado Attorney

19  General under sworn affidavit, my own sworn affidavit.  I

20  stated I am in favor of due process.  I stated I've been

21  accused of advocating violence.  I'm not advocating violence.

22  And I stated that I believe that anybody who is involved in

23  election fraud -- not voter fraud -- election fraud deserves

24  to hang .

25       And I said that because if you're involved in

Sarah K. Mitchell, RPR, CRR

136

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    127

1  election fraud, then you are usurping the will and consent of

2  the people, and that is an act of treason, and there are

3  punishments under federal statute for treason, which have been

4  enacted by the federal government.  Hanging is one of the

5  methods of execution when treason has been found in a court of

6  law through due process.

7          But what your clients and now you repeatedly have

8  tried to do apparently is excerpt one aspect of that comment

9  from my statement.  My statement was intact.  It involved the

10  entirety of it.  I believe in due process.  I've supported

11  that my whole life.  So the idea that I would advocate for

12  some kind of extrajudicial action is a fantasy on the part of

13  your clients, and they helped create that with the media,

14  which did the same thing.  That was Kyle Clark.  That was Erik

15  Maulbetsch.  That was Quentin Young.  All deliberatively

16  excerpting my comments out of the context that surrounded them

17  and which was available to them and which is available to you.

18  Q.  So it's your testimony that your statements were taken out

19  of context?

20  A.  When you excerpt just that part and leave out that I

21  stated I am in favor of due process and I'm not advocating for

22  violence, yes.

23  Q.  Okay.

24  A.  And obviously.

25  Q.  After stating that anyone -- anyone involved in election

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    128

1    fraud deserves to hang, is it true that you also stated

2    sometimes the old ways are the best ways?

3    A.    That's correct.  And I was talking about accountability,

4    which we apparently lack in our state.

5    Q.    Are you aware of anyone in the United States being

6    executed by hanging for being found guilty of election fraud?

7    A.    No.  I think the last hanging in the United States was in

8    '96.

9    Q.    Okay.  You're aware there's a fairly dark history in the

10   United States of hanging and lynching Native and

11   African-American persons?

12            MR. REISCH:  Objection, relevance.

13            THE COURT:  Sustained.

14            MR. DILLON:  Your Honor, I have no further questions.

15            THE COURT:  All right.  Cross-examination,

16   Mr. Reisch.

17            MR. REISCH:  Yes, Your Honor.  Thank you.  If I can

18   have just a moment to get set up here, please.

19            THE COURT:  Mr. Reisch, I assume you're doing your

20   full examination?

21            MR. REISCH:  That was my understanding from the

22   Court's order.

23            THE COURT:  Yes, okay.

24            MR. REISCH:  That I should respond and ask questions

25   I would have asked if he was my witness.

                         Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    163

1    Q.  Let's take a look there.  There's a procedure there under

2    paragraph 6, subparagraph E.  Do you see that, sir?

3    A.  I do.

4    Q.  Why would you introduce yourself as related to the --

5    you're a concerned citizen with the Election Integrity

6    Project.  Why would you do that?

7    A.  Why would you introduce yourself or state the

8    organization?

9    Q.  It says if the occupant answers, introduce yourself,

10   correct?

11   A.  Yes.

12   Q.  If you walked up to a door, what would you say when you

13   were canvassing, sir?

14   A.  I would have said, I'm Shawn Smith.  I'm with U.S.

15   Integrity Election Plan.  We're doing citizen volunteer

16   canvassing to verify the Secretary of State's data.  Would you

17   be willing to answer a few questions, something like that.

18   Q.  And if they agreed, then what would you ask them?

19   A.  Then we would say -- sometimes we'd show them the data,

20   especially if they showed interest, because we would have an

21   excerpt from the state's data on the clipboard.  That's how

22   you got your walk list, was it was excerpted.

23   Q.  And where did that excerpt come from?  What database?

24   A.  The Secretary of State's database.  It was directly --

25   directly out of the Secretary of State's database.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    166

1    Q.    When did you go to Mesa County to do any canvassing?

2    A.    Never.

3    Q.    When were you controlling any organization that was doing

4    an audit in Mesa County?

5    A.    Never.

6    Q.    What were the individuals in Mesa County doing differently

7    as it relates to the database than USEIP was doing?

8         MR. DILLON:    Objection, foundation.

9         THE COURT:    Sustained.

10   Q.    (By MR. REISCH) All right.    Sir, where did USEIP get their

11   database -- their information from?

12   A.    Directly from the Secretary of State's secure file

13   transfer protocol site.

14   Q.    Okay.    To your knowledge, and if you know, do you know

15   where the individuals that were doing this information

16   collection in Mesa County, do you know what database they were

17   using their information from?

18        MR. DILLON:    Object, foundation.    He's testified he

19   doesn't know anything about Mesa County.

20        THE COURT:    Overruled.    I'll let him answer.

21   A.    I don't think I said I don't know anything about Mesa

22   County.    They stated they were using an app called Sidekick

23   and that they were using county data, presumably from the

24   county clerk and recorder, but I don't know exactly what the

25   source was.    I only know what they stated.    I know that they

Sarah K. Mitchell, RPR, CRR

140

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    167

1    didn't have our data.  I wanted them to use our data, because

2    we knew it was from the Secretary of State's Office, and

3    that's what we were trying to verify.

4    Q.  (By MR. REISCH) Okay.  All right.  You were asked a

5    question about carrying a firearm, or possibly carrying a

6    firearm when you, in fact, went canvassing; is that right?

7    A.  That's correct.

8    Q.  And I think your response was that you may have on some

9    occasions had a firearm with you; is that right?

10   A.  That's right.

11   Q.  Okay.

12   A.  I think I said probably.  And I probably would have been

13   carrying.  I just don't remember.

14   Q.  Okay.

15   A.  But it would have been concealed.

16   Q.  And when you mean concealed, I know it sounds obvious, but

17   for the record, what do you do when you conceal carry?

18   A.  Like the method or are you asking me what -- what happens

19   when you conceal carry?  It's not visible.  It's not an open

20   carry.  It's typically underneath my garments.

21   Q.  Okay.  So it's -- so it's hidden; is that right?

22   A.  That's right.

23   Q.  Okay.

24   A.  You wouldn't notice.  I mean, you'd really have to look to

25   see whether or not I was carrying.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    189

1    State's data.

2    Q.  (By MR. DILLON) Okay.  And we talked about the Mesa -- the

3    canvassing that was going on in Mesa.  I just want to confirm,

4    you were one of the people communicating with others who were

5    doing canvassing work in Mesa, correct?

6    A.   Correct.

7    Q.   Okay.  And you were sharing information with the people in

8    Mesa about USEIP's canvassing activity, correct?

9    A.   Yes, although they had begun canvassing before we had our

10   procedures.

11   Q.   Fair enough.  But you were sharing information with the

12   people on the ground in Mesa, correct?

13   A.   In a much less formal way than you and I are even talking

14   right now.  Like we're doing this.  We think this is going to

15   be ready.  We're going to prep this.  Have you got this?  That

16   kind of --

17   Q.   I believe you've testified that you were trying to

18   persuade the folks in Mesa to use the same sorts of data that

19   the USEIP canvassers were following in doing their canvassing

20   efforts; is that right?

21   A.   I think what I said is I would have liked them to use and

22   tried to get them to use the USEIP data which was the

23   Secretary of State's data because we wanted to be able to

24   aggregate the results.

25   Q.   Do you know if any of the folks doing canvassing in Mesa

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    193

1    about this publicly, but Senator Fann from Arizona -- State

2    Senator Fann had some people that she was asking about how to

3    proceed with some of the audit decisions there, and Dennis

4    Haugh, the gentleman that I said had brought me sort of into

5    USEIP by asking me to go meet with Jeff Young in the analytic

6    session, Dennis was connected through somebody else to Senator

7    Fann.  So I ended up in this bizarre world where I ended up on

8    the phone with Senator Fann trying to answer questions about

9    who they should have do the audit of their ballots.

10           THE COURT:  Let me interrupt you, because I want to

11   stay on Mesa County.  Who was the Mesa County captain, if you

12   remember?

13           THE WITNESS:  I can't remember.  His first name is

14   Cory.  I can't remember his last name.

15           THE COURT:  Did you have any conversations with Cory

16   about canvassing?

17           THE WITNESS:  I don't remember if I did.  I knew that

18   they were going to do canvassing, but I didn't know when.  At

19   some point -- I did for sure at some point after they had

20   begun canvassing, but before we had any of our training

21   materials or anything like that ready.  And then it was only

22   much later, maybe the end of -- maybe in May when I figured

23   out that they weren't using -- I remember being really

24   surprised when I found out they weren't using the data from

25   the Secretary of State's data, they were using county data

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1     07/15/2024    221

1              MR. BREESE:  And we'll get into it a little bit more,

2    Your Honor, as we work through the playbook, and I don't

3    intend to go through every single line, but I do believe that

4    the playbook as Ms. Epp has testified is from information that

5    -- it establishes and defines information that was gathered

6    through USEIP's activities.  So it is backwards looking at

7    what USEIP was actually doing before the playbook was actually

8    finalized and disseminated.

9              THE COURT:  I'll give you a limited rope, but I want

10   you to get to some relevant matters fairly rapidly.

11             MR. BREESE:  Sure.

12   Q.  (By MR. BREESE) So we're still on this same page.  Just

13   throughout this playbook the word "we" is used a lot, and when

14   you say we, it's referring to the United States integrity

15   plan, correct?

16   A.  It's referring to activists in Colorado.

17   Q.  It's not referring to just the United States Election

18   Integrity Plan?

19   A.  No.

20   Q.  What other groups?

21   A.  Well, so there are -- so Stand for the Constitution --

22             MR. REISCH:  Your Honor, I object.  Relevance.  It

23   has nothing to do with the allegations in the complaint.

24             THE COURT:  Well, I'll allow a limited basis, but,

25   again, Counsel, this just really isn't that germane to what

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    222

1    we're doing here today.

2              Go ahead.  You may answer.

3    A.  Can you repeat the question?

4    Q.  (By MR. BREESE) I asked you what other groups when the

5    word we is used?

6    A.  So there were many groups that were doing many things

7    around election integrity in the State of Colorado.  Stand for

8    the Constitution came up.  That's one of them.  The reason

9    Mesa County is in the playbook is because some members of

10   Stand for the Constitution were at the cyber symposium.  And

11   there was a mom with me from Weld County.  I was there from

12   Douglas County.  Ms. Kasun was there from Summit County.

13   There were people there from Jefferson County and El Paso

14   County.

15             And then there was like eight people from Mesa

16   County, and it was coming from Colorado, and they were there

17   in the room, and it felt weird not to include them.  So that's

18   why -- that's why Mesa County is in the playbook at all.  And

19   so it's not -- it wasn't just USEIP.  When I said we in this

20   playbook, it was referring to people in Colorado, because the

21   audience of this playbook is people outside of the State of

22   Colorado.

23   Q.  Okay.  I appreciate that.  If you could turn to page 6,

24   and I believe it's not the sixth page of the -- it's got six

25   at the bottom right.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   237

1   pertains to Mesa County, Colorado, and Maricopa County,

2   Arizona, having the same sources and methods that appeared

3   through their audit and forensic investigative activities.

4   Q.  So the answer would be yes?

5   A.  Yes.

6   Q.  And one of USEIP's goals, as you stated, is to expose the

7   truth, right?

8   A.  Correct.

9   Q.  And part of that exposing the truth or maybe the restoring

10  election integrity leg of USEIP's mission would be to hold

11  those in government responsible for election fraud, correct?

12          MR. REISCH:  Objection, relevance.

13          MS. EPP:  It's also compound.

14          THE COURT:  Well, I'm going to sustain the objection

15  and plead with you to get to something that pertains to voter

16  intimidation.  I understand the backdrop here, but we're not

17  on anything that's even remotely close to what the claim in

18  this case is.

19          MR. BREESE:  Okay.

20  Q.  (By MR. BREESE) I will turn your attention to -- look

21  through my notes real quickly -- if you could turn to

22  Exhibit 17.

23  A.  I have 16, and then 18 and 19 in this binder.  I'm there.

24  Q.  And this is a blog that you posted on -- I believe the

25  date says September 27th of 2021, correct?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1   07/15/2024   240

1    were to click that press release, it would take them to the

2    USEIP website, correct?

3    A.   That's correct.

4    Q.   Okay.  And it's fair to say that in this blog you were

5    also analyzing and commenting on the results of those two

6    audits in Maricopa County and Mesa County, correct?

7    A.   Correct.

8    Q.   And moving to page 15, so it's 15 of 19.  It says 145.

9    A.   I'm there.

10   Q.   There's a big section that says, So what can you do about

11   it, correct?

12   A.   Correct.

13   Q.   So you're talking about what can the reader do, you know,

14   in response to these two audit results, correct?

15   A.   I would say it's in response to -- usually when I'm

16   writing, the subheaders are a thread.  So, yes, it's in

17   response to the rest of the article that's been presented and

18   the rest of the article.

19   Q.   Which is what you say is proof of an interstate conspiracy

20   to defraud the American people, correct?

21   A.   I believe it is.

22        MR. REISCH:  Objection, relevance.  I mean, this has

23   nothing to do, Your Honor, with elements they have to prove of

24   their cause of action.

25        THE COURT:  I agree.  I'm just waiting for somehow

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    241

1    this to be tied in, and I've warned you several times, but it

2    doesn't come.

3            MR. BREESE:  I appreciate it, Your Honor, but part of

4    our case is the rhetoric that defendants used in public

5    documents was that of an aggressive or in some ways a violent

6    nature.  So I'm getting to the point here.  I have two further

7    questions on this particular document, and then I will move

8    on.

9            THE COURT:  All right.  Let's go quickly.

10            MR. REISCH:  And I will just note, these blogs are

11    after the alleged canvassing, so I don't think they have

12    relevance.

13            THE COURT:  I understand.  Let's move on.

14            MR. BREESE:  Could the court reporter please read my

15    last sentence -- or question back?

16        (The requested portion was read back.)

17    Q.  (By MR. BREESE) And then down at the bottom portion of the

18    blog you say, It's time for pitchforks and angry mostly

19    peaceful crowds, correct?

20    A.  Yes.

21    Q.  You also say, Keep fighting and calling, writing,

22    pressuring, correct?

23    A.  Correct.

24    Q.  I believe in another blog you refer to tarring and

25    feathering, correct?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    258

1    Q.  And who is the -- when you refer to you and your

2    throughout, who are you referring to?  Is it the Colorado

3    legislature?

4    A.  Can you give me a specific?

5    Q.  Sure.  If you look in the middle of it in bold, in the

6    middle of the document, you say, Your orchestrated,

7    coordinated, and manipulative narrative intended to gaslight

8    and pacify the people of Colorado is wholly rejected?

9          THE COURT:  All right.

10         MR. REISCH:  Objection, relevance.

11         THE COURT:  Counsel, can we approach, please?

12         MR. BREESE:  Sure.

13     (Bench conference held on the record:)

14         THE COURT:  This is the microphone, so if you're

15   speaking, speak one at a time into the microphone.  I don't

16   understand the relevance of what we're doing.  This is taking

17   a ton of time.  Most of this evidence is stipulated to.  I

18   don't think Ms. Epp denies the statements in any of these

19   documents.  The issue for this case is is she guilty of voter

20   intimidation, not sending out blogs, not talking about

21   election fraud.  What is the connection to your claim?

22         MR. BREESE:  The connection is with USEIP and Ms. Epp

23   and Mr. Smith established that they publicize a lot of things

24   related to election fraud, election integrity, that formulated

25   the reason and the basis for moving forward with their

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    259

1    canvassing.  We're going to argue the statements made on

2    behalf of USEIP three months or four months before they

3    started canvassing are certainly relevant to the motives

4    behind USEIP's canvassing efforts.  And also the publicized

5    nature of their statements and some of the rhetoric is

6    certainly relevant to whether voters could, in fact, have been

7    intimidated by USEIP volunteers.

8            THE COURT:  I find this connection so very slim.  Any

9    comments?

10           MR. WYNNE:  I have nothing to add to Your Honor's

11   comments.

12           THE COURT:  All right.  I need you to move.  You

13   haven't even established that she engaged in canvassing or

14   talked to a single person.  I want to know what Ms. Epp did,

15   not -- I have dismissed the organization.  It's not on trial

16   here.  We're talking about three individuals and their actions

17   for voter intimidation.  You've got to tie this to Ms. Epp and

18   what she is doing to intimidate voters, not express her

19   opinion about the election.  Do you understand the difference?

20           MR. BREESE:  I respectfully disagree, but I do

21   understand what the Court is saying.

22           THE COURT:  Well, given that, let's try to proceed to

23   that so we stop wasting so much time.  I imagine -- is there

24   any dispute about any of these documents you sent?  No.  So

25   you could point them out, let me read them.  I think I know

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1     07/15/2024    263

1   intent --

2            THE COURT:  You have two witnesses so far saying they

3   have nothing to do with canvassing, that it was run by the

4   counties on their own, that what they did was post a resource

5   site essentially, and encouraged them to get data and use the

6   Colorado Secretary of State.  You don't have any organized

7   canvassing effort by these three individuals or this

8   association yet.

9            MR. BREESE:  Well, we will show evidence that

10  connects all of these dots, Your Honor.  I think the notion

11  that there's no connection between the defendants, USEIP, and

12  the volunteers that were out getting the information that they

13  were needing to then disseminate to prove their conclusions --

14           THE COURT:  What is the evidence?  Who's it coming in

15  through?

16           MR. BREESE:  The evidence is in the playbook that

17  establishes the organizational structure which canvassing is

18  one part of.  In addition to that, the Basecamp posts

19  establish a centralized discussion, you know, forum by which

20  they all discussed canvassing.  They discussed the specifics

21  related to canvassing.

22           THE COURT:  Okay.  But you have Mr. Smith barely on

23  two of those posts.  You don't even have Ms. Epp on any of

24  those posts yet.

25           MR. BREESE:  I'm getting there.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1   07/15/2024   292

1   Cause of America?

2   A.  It was actually right around the time of those posts we

3   were looking at.  The first or second week of October of 2021,

4   which is probably why I don't remember because I had other

5   things going on.

6   Q.  In October of 2021?

7   A.  Uh-huh.

8   Q.  So was Mike Lindell involved in the canvassing that we've

9   been talking about today?

10  A.  No.

11  Q.  Is Mike Lindell a defendant in this case?

12  A.  No.

13  Q.  Why did you leave employment with Mike Lindell?

14  A.  Cost is the reason that I was let go.

15  Q.  You talked earlier about preparing materials and

16  presenting them, quote, to the authorities.  What authorities

17  were you responding to in response to counsel's question?

18  A.  As it pertains to canvassing?

19  Q.  Canvassing, yeah.  I'm sorry.  We're getting back into

20  this case.

21  A.  Okay.  Can you ask the question again?

22  Q.  Yeah.  You mentioned providing the results of the

23  canvassing project, the civics project, as my co-counsel

24  referred to it, presenting those findings to among others the

25  authorities.  What authorities were they?

22-cv-00581-CNS-NRN    Bench Trial - Day 1      07/15/2024    293

1    A.  So I think it was -- and I wasn't involved in this.  I

2    have heard about it, so I guess it's hearsay, but I do --

3    Q.  Your understanding.

4    A.  My understanding is local DAs with jurisdiction to

5    investigate, and the Colorado AG.

6    Q.  Okay.  Also the Colorado Secretary of State?

7    A.  Also the Secretary of State, yes.

8    Q.  Okay.  Now, certainly it's your understanding -- is it

9    your understanding that the data results, say, the anomalies

10   that somebody who voted from a location was actually a parking

11   -- a commercial parking lot or something, that USEIP intended

12   to have local district attorneys prosecute any canvassee, was

13   that your intention?

14   A.  No.

15          MR. BREESE:  Objection, Your Honor.  He's leading the

16   witness.

17          THE COURT:  Overruled.

18   A.  No.

19   Q.  (By MR. WYNNE) So in presenting this information to the

20   local district attorney -- it can initially be a little

21   confusing -- but I want to clarify you did not and USEIP did

22   not intend that anyone who voted in a precinct or at an

23   address other than one at which they lived, that you were

24   reporting them and asking the district attorney to prosecute

25   them, right?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    377

1   think we have occasions where we've seen like video clips.

2   Q.  How about Ms. Kasun?  Is your office familiar with

3   statements that she has made concerning USEIP's efforts or

4   otherwise related to elections in Colorado?

5   A.  I don't believe so.  I believe that all we have from

6   Ms. Kasun is the CORA requests, but I couldn't be sure.

7   Q.  What about Defendant Smith, what public statements have

8   you seen by him or heard by him concerning your office,

9   election integrity, or USEIP's efforts?

10  A.  So Colonel Smith was involved in what I understand to be

11  the early days of the USEIP efforts in the spring of '21.  I

12  understand that he was involved with then Mesa County Clerk

13  Tina Peters, and made public statements through his social

14  media accounts concerning the Secretary's actions against or

15  concerning Clerk Peters.  And I'm also aware, because they

16  were provided to us, of video clips of Colonel Smith making

17  statements about the Secretary, about the election, calling

18  for the Secretary to be hung, and calling for those involved

19  in what he characterized as election fraud to be -- to be

20  killed.

21  Q.  Have you seen the video of Mr. Smith making those

22  comments?

23  A.  I've seen video clips from the -- from an event at a

24  church in Castle Rock, I believe.  I believe the church's name

25  is The Rock.  And -- so yes.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2        07/16/2024    378

1    Q.    What was your office's reaction to that video?

2              MR. REISCH:  Objection, relevance.

3              THE COURT:  Overruled.

4    A.    The Secretary was very concerned.  She directed me to make

5    a request to Executive Director Stan Hilkey of the Colorado

6    Department of Public Safety to provide security protection for

7    the Secretary in regards to her physical safety.  At that time

8    the legislature had not yet enacted legislation to provide the

9    Secretary with public Colorado State Patrol security coverage.

10             In addition, I submitted the clip to the U.S.

11   Department of Justice's Elections Threats Task Force that was

12   stood up by Attorney General Merrick Garland in August of '21

13   in response to Attorney General Garland's direction to state

14   elections officials to provide his office with any evidence of

15   threats against election officials or election workers.

16             I also provided the clip to the Colorado State

17   Patrol.  And we provided the clip to the district attorney in

18   the Boulder judicial district, which I think is the 20th,

19   because the Secretary resides in Boulder, and to the extent

20   that she is a victim, she was a victim in Boulder.

21   Q.    (By MS. ERICKSON) So would you -- did you consider that

22   video a threat against the Secretary of State?

23   A.    I did.

24             MR. REISCH:  Objection, calls for legal conclusion.

25             THE COURT:  Overruled.

                         Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    379

1  A.  I did.

2  Q.  (By MS. ERICKSON) Were any other threats made against the

3  Secretary of State's Office in the aftermath of the 2020

4  election?

5          MR. REISCH:  Objection, relevance.

6          THE COURT:  Overruled.

7  A.  Thousands.

8  Q.  (By MS. ERICKSON) And did any other threats come from the

9  defendants?

10 A.  I'm not aware of any threats from either Ms. Epps or

11 Ms. Kasun.  I am aware of public statements where Colonel

12 Smith has repeated his call for, in his words, due process

13 against the Secretary.  I understand that those -- that call

14 for, quote, due process is code for --

15         MR. REISCH:  Objection, lack of foundation,

16 speculation.

17         THE COURT:  Sustained.

18 Q.  (By MS. ERICKSON) Were you concerned that the public

19 statements made by defendants could cause further threats

20 against the Secretary of State's Office?

21         MR. REISCH:  Objection.  What he thinks is of no

22 relevance.

23         THE COURT:  Overruled.

24 A.  I was very concerned.  In fact, that was the explicit

25 request to Executive Director Hilkey, that I believed the

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    380

1    video clip that showed the chanting and reaction of the

2    audience at the church in Castle Rock to illustrate the impact

3    that Colonel Smith's statement -- words -- was having on the

4    people in that audience and was likely to cause more threats.

5    I believe also that history has proven me right, that we have

6    seen a --

7            MR. REISCH:  Your Honor, objection, relevance,

8    nonresponsive.

9            THE COURT:  Overruled.

10   A.  -- substantial increase in threats against the Secretary.

11   We now have a security service that monitors threats against

12   the Secretary, and they are extraordinary.

13   Q.  (By MS. ERICKSON) You mentioned that security measures

14   were put in place for the Secretary of State; is that correct?

15   A.  That is correct.

16   Q.  And in your view, were some of those security measures put

17   in place as a direct result of defendants' words or actions?

18   A.  I haven't testified as to any threats by Ms. Epps or

19   Ms. Kasun, but yes as to Colonel Smith, yes.

20   Q.  To your knowledge, did anyone on your staff that you

21   oversee fear for their safety as a result of defendants' words

22   and actions?

23           MR. REISCH:  Objection, lack of foundation, hearsay,

24   relevance.

25           THE COURT:  Overruled.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024   381

1   A.   Yes.   Principally in our elections division, but also in

2   our IT division, I have had conversations with individuals who

3   have expressed to me their terror at being exposed as working

4   on elections in Colorado as a result of statements that are

5   from both Colonel Smith and others.

6   Q.   (By MS. ERICKSON) Are those individuals who work in your

7   office also eligible registered voters?

8   A.   Yes.

9        MR. REISCH:  Objection, lack of foundation and

10  hearsay.

11       THE COURT:  Sustained as to lack of foundation.  You

12  may follow up.

13  Q.   (By MS. ERICKSON) Mr. Beall, are you familiar with the

14  voter registration status of the individuals who work in your

15  office?

16  A.   I am.

17       MR. REISCH:  Objection, hearsay.

18       THE COURT:  Overruled.

19  A.   I am as a result of my role as the appointing authority in

20  the office.  Appointing authority is a defined term within the

21  classified system.  We require any individual who is going to

22  touch elections, whether that's -- wherever they work in the

23  department, to sign an understanding that they will not engage

24  in any partisan political activity, and that they will

25  maintain their status as registered voters.

                     Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    389

1          MS. ERICKSON:  Understood.

2          THE COURT:  You may proceed.

3          MS. ERICKSON:  Thank you, Your Honor.

4     (Exhibit 50 received.)

5  Q.  (By MS. ERICKSON) I'm going to back up a little bit before

6  we turn to talk about the documents and turn back to USEIP and

7  defendants' efforts.  Did the Secretary of State's Office have

8  concerns about the efforts of USEIP?

9  A.  Yes, we did.

10 Q.  And what were those specific concerns?

11 A.  Our concern was that the use of untrained partisan

12 motivated canvassers who may or may not have been armed would

13 be threatening to the people they encountered, and that the

14 secretary wished to ensure that people who might be

15 encountered, might be -- have their doors knocked on, would

16 know their rights, would know that they have a constitutional

17 right to the secrecy of their vote, and that they had no

18 obligation to disclose anything but certainly how they voted.

19 Q.  What steps did the Secretary of State's office take to

20 address or combat USEIP's and defendants' efforts?

21 A.  We engaged in an effort of public education to -- so this

22 news release was part of an effort to communicate primarily

23 through news media about voters' rights and to get the message

24 out that you don't have to tell someone how you voted.

25 Q.  And when you say this news release, are you referring to

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024   390

1  page 1 of Exhibit 50?

2  A.  I am.

3  Q.  And was this news release put out in direct response to

4  concerns about USEIP and defendants?

5  A.  Yes.

6  Q.  I'd like to take a look at some of the specific things in

7  this news release.  The news release it looks like

8  specifically notes that an individual is not required to

9  answer questions about voting history, registration status, or

10 how a voter voted.  That's reflected in paragraphs 1 and 2.

11 A.  That's correct.

12 Q.  Was the Secretary of State's Office concerned that USEIP

13 was asking these questions at voters' doors?

14 A.  Yes.

15 Q.  And why did you have those concerns?

16 A.  We had had the reports that are part of the e-mails, and

17 we were aware of controversy in the public sphere about what

18 USEIP was doing.  I had seen the playbook for USEIP and was

19 concerned that the questions that USEIP was proposing to ask

20 would be intrusive and would potentially lead to confusion

21 among the public about their rights.

22 Q.  The news release also -- it specifically notes that any

23 claim that door-to-door canvassing is official business of the

24 Colorado Secretary of State's Office or the State of Colorado

25 is false.  No state or local election office in Colorado is

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024   391

1    conducting door-to-door voter participation surveys.  Was the

2    Secretary of State's Office concerned that USEIP and

3    defendants were representing to people at their doors that

4    they were acting on behalf of the Secretary of State's Office?

5            MR. REISCH:  I'm going to object, speculation, lack

6    of foundation.

7            THE COURT:  Overruled.

8    A.  Yes, we were concerned.  We had had actual phone calls

9    from clerks' offices in El Paso and Mesa.

10           MR. REISCH:  Objection, hearsay, lack of foundation.

11           THE COURT:  Overruled.

12   Q.  (By MS. ERICKSON) The news release also notes that if you

13   feel harassed or threatened, please reach out to local law

14   enforcement or the Department of Justice.  At the time this

15   press release was released, had the Secretary of State's

16   Office received reports that voters were feeling harassed or

17   threatened?

18   A.  Yes.

19   Q.  From whom were reports received?

20   A.  We received the two e-mails that are part of this exhibit.

21   We received phone calls from election staff in El Paso and

22   Mesa.  We received -- I mean, we were aware of news coverage

23   of USEIP's efforts, and I was aware of the recruiting that

24   USEIP was doing on the Internet and through social media.

25   Q.  I'd like to -- I understand that a report was received by

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    392

1  your office from a woman named Yvette Roberts; is that

2  correct?

3  A.   That's correct.

4  Q.   And what was the nature of the report that Ms. Roberts

5  made to the Secretary of State's Office?

6         MR. REISCH:  Objection, hearsay.  The document speaks

7  for itself, and Ms. Roberts is supposed to be here.

8         THE COURT:  Overruled for the same reason as last

9  time.  Go ahead.

10 A.   The nature of her report was that she had been encountered

11 at her home, and that she felt that the encounter was

12 inappropriate.

13 Q.   (By MS. ERICKSON) What, if anything, did the Secretary of

14 State's Office do after receiving that specific report?

15 A.   I directed Ms. Kessler, who worked with Mr. Thornton, who

16 is the manager of the legal team within the elections

17 division, to reach out to Ms. Roberts and to speak with her.

18 I don't believe I ever got a written report of that, but what

19 I recall is --

20         MR. REISCH:  Objection, hearsay.

21         THE COURT:  Sustained on that basis.

22         MS. ERICKSON:  Can you -- I'm sorry.  Can you read

23 back the question that was asked?

24         THE COURT:  What, if anything, did the Secretary of

25 State's Office do after receiving the specific report?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    393

1   Q.   (By MS. ERICKSON) Could you try again to answer that

2   question, please.

3   A.   Thank you.

4          MR. REISCH:   Same objection, hearsay.

5          THE COURT:   Overruled for now.

6   A.   We provided -- in addition to the effort to contact

7   Ms. Roberts, we provided this e-mail from Ms. Roberts to the

8   district attorney's office and the investigator at the

9   district attorney's office, James Cannon, whom we had been --

10  who had been identified to us as the appropriate party to

11  receive that information.   We also provided it to the U.S.

12  Department of Justice U.S. Attorney's Office civil rights

13  attorney here in Colorado.

14  Q.   (By MS. ERICKSON) Was the Secretary of State's Office

15  concerned based on what it heard from Ms. Roberts that it

16  amounted to voter intimidation?

17         MR. REISCH:   Objection, calls for legal conclusion,

18  speculation.

19         THE COURT:   Well, sustained as to -- well, I'm going

20  to sustain it on leading.   Let's try to get the witness to use

21  his own words.

22  Q.   (By MS. ERICKSON) What were the Secretary of State's

23  Office's specific concerns about the substance of the report

24  it received from Ms. Roberts?

25  A.   We were concerned that what Ms. Roberts was reporting

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    394

1    could be part of a sustained effort at voter intimidation, and

2    we, for purposes of referrals to law enforcement agencies,

3    wished for law enforcement agencies to look into it.

4    Q.  Did the Secretary of State's Office receive any additional

5    written communications from voters concerned about USEIP's

6    activities?

7    A.  We received the other e-mail that is in Exhibit 50, the

8    one at the end from Ms. Roberts.

9    Q.  I believe --

10   A.  Not Roberts.  I'm sorry.  It is from Powell.  Sorry.

11   Q.  Thank you.  And what was the nature of the report made by

12   Ms. Powell to the Secretary of State's Office?

13            MR. REISCH:  Objection, hearsay.

14            THE COURT:  Overruled.

15   A.  A similar report of what we understood to be a different

16   incident of contact with a canvasser that Ms. Powell felt was

17   intrusive and inappropriate, and I think she says threatening.

18   Q.  (By MS. ERICKSON) Again, with respect to Ms. Powell, what,

19   if anything, did the Secretary of State's Office do after

20   receiving the report?

21   A.  I believe we took the similar effort of trying to contact

22   Ms. Powell.  I do not know whether we were successful.  And we

23   also relayed Ms. Powell's report again to the district

24   attorney in Mesa County and to the U.S. Attorney's Office.

25   Q.  And what were the Secretary of State's Office's specific

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    395

1   concerns about the report that was received from Ms. Powell?

2   A.  The concern was that after the first contact in June, it

3   looked like this was continuing, and it looked like it might

4   continue to -- that might be building.  And we were concerned

5   that there was -- that this -- the first e-mail was not a

6   one-off.  That it was beginning to look like a pattern.

7   Q.  Were there -- other than the report from Ms. Roberts and

8   the report from Ms. Powell that we've discussed, did the

9   Secretary of State's Office receive any other reports from

10  voters regarding USEIP's or defendants' conduct?

11  A.  Not that I'm aware of.

12  Q.  What about any -- so we've talked about written reports.

13  Were there any reports received over the phone?

14  A.  Yes.

15  Q.  And --

16  A.  But they weren't from voters.  They were from county

17  clerks' offices that were reporting their contacts from

18  voters.

19  Q.  So can you tell me -- maybe you already said this.  I

20  apologize.  But what counties did those reports come from?

21  A.  El Paso County, the county around Colorado Springs; and

22  Mesa County, the county around Grand Junction.

23  Q.  To your knowledge, were reports received from any other

24  counties?

25  A.  Not to my knowledge.  It's conceivable, but not to my

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2       07/16/2024    435

1                           CROSS-EXAMINATION

2    BY MS. EPP:

3    Q.  Good afternoon, Mr. Beall.

4    A.  Good afternoon, Ms. Epp, and I apologize for mangling your

5    name.

6    Q.  That's okay.  I get asked if I'm related to the

7    representative quite often.  I'm not, for the record.

8    A.  I'm not related to the actress either.

9    Q.  You stated that you are, and I'm paraphrasing, the

10   official in the Secretary of State's Office with oversight

11   over CORA; is that right?

12   A.  Yes.

13   Q.  The CORA buck stops with you; is that right?

14   A.  It stops with me, until a Court overrules me.

15   Q.  And I believe you stated that your office believes that

16   the activities mentioned by the two complaints for Mesa County

17   were in relation to USEIP canvassing; is that correct?

18   A.  We did at the time, yes.

19   Q.  Okay.  Can we go back to Exhibit 50, please.  Can we go to

20   the complaint, the Yvette Roberts' complaint.

21           THE COURT:  I think it's page 5.

22   Q.  (By MS. EPP) And my colleagues established that

23   Ms. Roberts' complaint does not mention USEIP; is that

24   correct?

25   A.  It doesn't.

                      Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    465

1              THE COURT:  All right.  You may proceed.

2              Ms. Roberts, what is going to happen is there's

3    several attorneys in this case, so you will actually be

4    answering questions posed by several of them.

5              THE WITNESS:  Okay.

6              THE COURT:  After they ask questions, I might have a

7    few questions for you, so I don't anticipate your testimony

8    will be lengthy, but you might have several folks asking you

9    questions.

10             THE WITNESS:  Thank you.

11             THE COURT:  You may proceed, Ms. Hostetler.

12                        DIRECT EXAMINATION

13   BY MS. HOSTETLER:

14   Q.  Good afternoon, Ms. Roberts.  Thank you so much for

15   joining us.  Before we get started, I do just want to ask, and

16   going to remind myself of this, that we're going to try to

17   talk slowly for the record.  So I will try to remind you, and

18   others can remind me when I forget.  You've already stated

19   your name, so we'll move on from there.  Where do you live?

20   A.  Grand Junction, Colorado.

21   Q.  And how long have you lived in Grand Junction?

22   A.  Six years.

23   Q.  How long have you lived in Colorado?

24   A.  All my life.

25   Q.  What do you do for a living?

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2        07/16/2024    466

1    A.  I have been a teacher and also in broadcast, radio, and

2    now I'm retired.

3    Q.  Congratulations.

4    A.  Thank you.

5    Q.  And thank you for your work as a teacher.  You were much

6    needed.  Do you recall making a complaint via the Secretary of

7    State's Office on June 23rd, 2021?

8    A.  Yes.

9    Q.  Could you tell me about the events that prompted you to

10   make this complaint?

11   A.  I had just had two people, a man and a woman, show up at

12   my door and explain to me that -- they introduced themselves.

13   I didn't catch their names.  They told me that they were

14   interested -- he told me -- I apologize -- that they were

15   wanting to --

16        MR. REISCH:  I'm going to object to hearsay, Your

17   Honor.

18        THE COURT:  Overruled.  You may go ahead.

19        THE WITNESS:  Yes.  Thank you.

20   A.  They were going to -- they were part of an investigation

21   in looking into the Colorado 2020 election, and then there was

22   some kind of a name like investigation or inquiry or something

23   of that, which I didn't think that I needed to remember.  So

24   at that point the gentleman -- I noticed that both of them,

25   they introduced themselves, and they had on some official

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    467

1   looking badges, and they -- they lacked an emblem, and also

2   the badges were professional looking.  I mean, you know, the

3   outsides.  But then it was clear that the printed material was

4   not as well done.  So I interpreted that as being an effort to

5   be official without really being official.  And then they --

6   the gentleman told me that --

7           MR. REISCH:  Objection, hearsay, foundation.

8           THE COURT:  Overruled, and you don't need to make it

9   each time.  You're just interrupting.  Your objection to

10  hearsay will persist throughout this testimony, but it's

11  unhelpful to interrupt her after every sentence.  You may

12  proceed.

13  A.  I'm sorry.  I don't know what --

14  Q.  (By MS. HOSTETLER) I can ask a question to keep things

15  going.  So you talked about the man and the woman came up to

16  your door.  Do you remember where they were standing?

17  A.  They were standing at my front door, and I was standing at

18  the top step of my porch.  So on my step I was almost eye to

19  eye with the gentleman, and I was really happy with that,

20  because it's for a short woman to have a face-to-face

21  conversation that close with a tall man, a tall stranger is a

22  little stressful.  So he proceeded to look down at his paper

23  clip -- clipboard is what I'm trying to say -- and he informed

24  me that he had this information and that the state had sent

25  it.  And I kind of glanced down.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    468

1      Of course, I couldn't see exactly what it was.  And
2  upside down too, that's not too easy to see.  So I sort of
3  figured he must have a voter roll.  Okay.  So fine and dandy.
4  And then he seemed to want to really with his -- his stance
5  and his way he was holding his clipboard to impress me that he
6  was official.  And I was thinking to myself, well, gosh, you
7  could have just gone down to the county and bought the voter
8  roll.  You didn't have to have the state send it to you, but
9  whatever, okay.

10      So he began to ask me questions about things like who
11  was in my household, and he didn't ask those directly, though.
12  He was asking things like are you the only registered voter in
13  your household, and I said yes.  And I said how many people
14  are in your household, and I kind of dodged that, because,
15  again, I'm a little old lady.  I don't want to tell any
16  strange man or woman on my doorstep that I live alone.  That's
17  not smart, okay?

18      So I kind of dodged questions where he was trying to
19  establish -- in my mind, I felt like he was establishing who I
20  lived with, whether they were voters, whether they were
21  citizens, that kind of thing.  And he went on, and I answered
22  things that I felt made me comfortable.  And then he finally
23  got around to asking me how I had submitted my ballot, and I
24  didn't think that was any of his business.  So I thought,
25  gosh, this has gone on long enough, and I asked them both to

Sarah K. Mitchell, RPR, CRR

170

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024   469

1  leave.  And there was some discussion this way and that, and I

2  basically said I've had enough, please get off my property,

3  you're trespassing.

4          And then once I shut the door on those people, I made

5  sure they went all the way to the end of the drive and made a

6  turn to get completely out of sight almost.  You know, as long

7  as they were 20 feet past my mailbox, fine and dandy.  And I

8  shut the door, and I thought about that, and I went, oh, my

9  gosh.  Two things I thought.  One was I just told that guy a

10 whole lot of stuff I didn't want to.  I don't know exactly who

11 those people were.  He had told me in the beginning he was

12 somehow associated with the Republicans, and he sort of

13 flopped his fist off into the direction where I knew there was

14 a Republican campaign office at one time.  So I just sort of

15 assumed.

16         And then I thought about it, and I went I don't

17 actually know anything about those people, and I don't know

18 what kind of repercussions there would be for me just having

19 chased them off my property, and that was pretty scary.  And I

20 didn't want anybody else to go through that, so that's when I

21 went and filed the complaint.

22 Q.  Thank you.  I'm going to take you back a couple of steps,

23 and I would like to get to the complaint as well.  You

24 mentioned that the man I believe was standing on your front

25 step.  Where was the -- and there was a woman with him?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024   470

1    A.  Uh-huh.

2    Q.  Where was she standing during this?

3    A.  She was standing back and to the side, and she really

4    didn't have anything to say.  She didn't contribute in

5    anything.  She didn't make any noises.  She just was there,

6    and -- yeah.

7    Q.  And you mentioned that you were -- you were surprised that

8    they had -- and I hope I'm paraphrasing you right.  That you

9    were surprised that they hadn't just gotten the county

10   documents, that they had gone to the state.  How do you know

11   that he had documents from the state?

12   A.  I'm sorry?

13   Q.  How do you know that the documents that he had were from

14   the state?

15   A.  That's what he told me.

16   Q.  Do you remember what he said?

17   A.  The state sent this to us, and he said something else

18   about the state and the paperwork, the documents.  I'm -- so,

19   yeah, it was at least twice that he told me the state had sent

20   it.  And the way that that was phrased, it made it seem like,

21   And we are following up on it.

22   Q.  Understood.  Thank you.  And you mentioned they had --

23   they had badges?

24   A.  Uh-huh.  Yes.

25   Q.  Could you -- sorry.  I think you already told me.  Just

Sarah K. Mitchell, RPR, CRR

172

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    471

1    for my sake, could you remind me what those badges looked like

2    to you?

3    A.  Something they got from an office supply store.  And there

4    were no emblems.  There was no identification.  There was

5    nothing on that that a regular kind of investigator I would

6    assume -- anybody who was trying to do something officially

7    would have normally had, in my mind.

8    Q.  And when they asked questions of you, or when the man

9    asked questions of you, did he have any information about you

10   already?

11   A.  Oh, yeah.

12   Q.  What information did he have?

13   A.  He knew my name.  He knew, of course, where I was living.

14   In my mind, I figured he was working off of a voter roll.  He

15   already had my phone number and my affiliation with political

16   parties, although he did not ask about that.

17   Q.  Did he ask about your citizenship or the citizenship of

18   anyone in your household?

19   A.  Yes.  And I told him that, well, everybody in my household

20   was a citizen, mainly because I have a dog that was born in

21   this country.  Again, you know, I did not want to tell him how

22   many people there were in my household, so I figured that was

23   a nice way to put it.

24   Q.  At some point during this encounter did you become

25   concerned?

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    472

1    A.   Always when a little old lady meets a strange man at her

2    door, or strange people, there is an intimidation factor,

3    because one knows one is vulnerable, and so I had that

4    concern.  And then when he said he was investigating things,

5    then I had an additional concern, because I had read about

6    back East some groups that were doing something similar in an

7    effort apparently to intimidate people in the way they voted.

8    So I was on alert, yes.

9    Q.   And you mentioned that -- when you asked them to leave,

10   were they saying anything?  And I'm not asking you -- were

11   they talking as they left?

12   A.   They were.  I have no idea what they were saying, though,

13   because I wanted to emphasize I didn't want to have any more

14   interaction with them.  And I probably even told them that I

15   don't want to do this anymore.  I don't want to interact with

16   you.  I want you to leave now.

17   Q.   And sorry, to go back to the badges -- I know I'm popping

18   around.  I apologize.

19   A.   No.

20   Q.   In your affidavit in this case you mentioned that the

21   badges were official looking.  In your complaint to the

22   Secretary of State I believe you called them homemade, and I

23   think I'm getting these phrases right.

24   A.   Yes.

25   Q.   Could you explain those descriptions?  Do you see them as

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    473

1   being at odds with each other?

2   A.  Not really, because I was trying to be as succinct as I

3   could be in my letter to the Secretary of State.  So I thought

4   homemade would pretty much accurately describe what was

5   something that was kind of put together and not officially

6   issued.  Is that --

7   Q.  Yes.  Thank you.  And did they provide you with any

8   physical identification?  Did they give you a business card or

9   a pamphlet or anything like that?

10  A.  Not a bit.

11  Q.  Did you think -- sorry.

12  A.  And if I can add, that was part of why when I closed the

13  door I went, oh, this is not good, because I didn't actually

14  know where those people were from, and I didn't really realize

15  it until I had shut the door and thought to myself, I don't

16  have anything that they provided with me that gave me any clue

17  about who they were or who they were working with or anything.

18  Q.  Did they give you any way to verify who they were?

19  A.  No.  No.

20  Q.  Did they give you a way to contact their organization with

21  any concerns you might have?

22  A.  No.

23  Q.  So you had no way to contact them or follow up after they

24  left?

25  A.  Not a bit.

Sarah K. Mitchell, RPR, CRR

175

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    474

1  Q.  And to the best of your knowledge, realizing you can't

2  speak for them, but to the best of your knowledge, they came

3  to your door because you voted in 2020?

4  A.  I believe so.

5          MR. REISCH:  Objection, speculation.

6          THE COURT:  The objection is sustained.  You may try

7  and reword it.

8  Q.  (By MS. HOSTETLER) Based on the questions that they asked

9  you, what was your understanding of how they came to your

10 door?

11 A.  It seemed that they had picked out my house, and I'm not

12 certain --

13         MR. REISCH:  Your Honor, I'm going to object,

14 speculation.

15         THE COURT:  Overruled.  I'll allow it.  You can keep

16 -- finish your answer.

17 A.  I was not certain whether they had just come down the road

18 -- when I first encountered them, they just came down the

19 road, and I happened to be the one that was home.  But then

20 later, as I said, they knew my name.  They had the roll and

21 were looking at this paper as to who I was.

22 Q.  (By MS. HOSTETLER) Did they ask you specific questions

23 about the 2020 elections?  Was that the election they were

24 asking about?

25 A.  Yes.


                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024   475

1   Q.  And then did you make the complaint to the Secretary of

2   State on the same day?

3   A.  Yes.

4   Q.  And how -- how did you make that complaint?

5   A.  I e-mailed.

6   Q.  By e-mail, okay.  And why did you make that complaint?

7   A.  Because I didn't want anybody else to go through what I

8   had just gone through.  And I could -- they had the paperwork,

9   and they were headed down the street, so I assumed there may

10  be more people that they planned to do this to, and I didn't

11  think that was appropriate.

12  Q.  Did you make any other complaint that day?

13  A.  I actually filed a report with the sheriff's department.

14  I -- and it was a report, yeah.

15  Q.  Why did you file that report?

16  A.  Because that's what teachers do.  I'm sorry.  We are used

17  to documenting things, and I felt that I needed to let the

18  sheriff's department know that these were people who were

19  going around, strangers, asking people strange questions.  And

20  it was just a matter of getting information out, so if someone

21  else ran into this, then the sheriff's department would know

22  this was not just a one-off.

23  Q.  Do you recall if anyone from the Secretary of State's

24  Office followed up with you?

25  A.  Yes.  I heard from them, and they told me that they had

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    476

1    gotten my e-mail, but that was not something that was within

2    their jurisdiction, and that they would be passing it on to

3    the Attorney General's Office.

4    Q.  Do you recall if anyone from the Attorney General's Office

5    followed up with you?

6    A.  I believe what I was told is that they had received that

7    information and they would follow up on it.

8    Q.  Do you remember if they did?

9    A.  I never heard back from them, so I assume they were still

10   -- had the paperwork, and if something came up, they would let

11   me know.

12   Q.  What about the sheriff's office, did the sheriff's office

13   follow up with you?

14   A.  Well, no, not really, but I didn't expect them to.

15   Q.  Have you had visits from canvassers or solicitors before?

16   A.  Uh-huh, yes.

17   Q.  Have you ever felt intimidated by other canvassers?

18   A.  Not like that, no.

19   Q.  Ever made a report about any of the other canvassers or

20   solicitors?

21   A.  No.

22   Q.  What made this different?

23   A.  Because the solicitors usually have come to my door and

24   wanted to persuade me to buy new windows or doors or a roof.

25   They don't know my name.  They don't have my address.  They

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    477

1   are not asking me questions about my household.

2   Q.   When -- it sounded like they didn't -- you didn't get a

3   clear idea of who they were; is that correct?  In your

4   affidavit you wrote that you identified this group as USEIP.

5   Can you explain why you referred to them in that way?

6   A.   Kind of a process of elimination.  I had thought about it,

7   and there had been no talk, rumors, anything like that among

8   the local letters to the editor about this kind of thing.

9   There's an anonymous setup in the local paper that people can

10  comment, short comments about this, that, and the other, and

11  it's pretty free commentary, so lots of stuff comes up

12  politically in those things.  Nobody that I had any contact

13  with on Facebook, social media, any of that had said anything

14  at all about that.

15          So in my mind that meant this was not kind of a local

16  thing.  Yes, these were local people.  But it was from the way

17  they were asking questions and things, it seemed as though

18  they had had some kind of training, and they did have a list

19  that were asking the questions from, so that was organized.

20  So then after I had put together my letters and things like

21  that, I was contacted by...

22  Q.   And are you concerned that you'll get a visit from this

23  group if you vote in 2024?

24          MR. REISCH:  Objection, speculation.

25          MS. HOSTETLER:  Your Honor, this goes to her -- she

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    478

1   received this visit.  This goes to her concerns about the risk

2   that she now faces having experienced it once before.

3           THE COURT:  Well, I'm going to sustain the objection

4   as to how it's worded.  I'm not sure we've established this is

5   a group.  Perhaps you can reword this.

6   Q.  (By MS. HOSTETLER) Are you concerned that you would get

7   another visit like this if you vote in 2024?

8           MR. REISCH:  Objection, speculation, foundation.

9           THE COURT:  Overruled.

10  A.  If they did it once, I'm sure they probably might want to

11  do it again.

12  Q.  (By MS. HOSTETLER) What would your reaction to that be or

13  how does that make you feel?

14  A.  I would be unhappy, but it's not going to keep me from

15  voting, and it -- I would be much more cautious in dealing

16  with them.  It has been very difficult to not know who these

17  people were, what they had in mind, how they might retaliate.

18  Q.  Would you say that you were intimidated during this

19  encounter?

20          MR. REISCH:  Objection, leading.

21          THE COURT:  Overruled.  I'll allow it.

22  A.  I'm sorry.  Could you repeat?

23  Q.  (By MS. HOSTETLER) Did you feel intimidated during this

24  encounter?

25  A.  Yes.  And when I sent my letter off to the Secretary of

                Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    479

1    State's Office, I titled it Grand Junction voter intimidation

2    effort, because I felt like that's what I had gone through.

3    Q.  You said you're going to vote in 2024 anyway?

4    A.  Yeah.

5    Q.  Why?

6    A.  Because I used to be an American history teacher, and I

7    told my students it matters what you vote, that you do vote

8    every time.  And so for the entirety of my school teaching

9    career, I voted every election, and I intend to do that.

10         MS. HOSTETLER:  Thank you, Ms. Roberts.  I don't have

11    anymore questions for you.

12         THE COURT:  All right.  Let me warn members of the

13    gallery, the laughing, the head nodding, the repeating

14    answers, if I see it again, you will be asked to leave, so

15    know that I am watching.  My clerks are watching.  This is

16    your last warning.

17         All right.  Who's proceeding next?

18         MR. POWELL:  Just one moment, Your Honor.

19         THE COURT:  You won.  I didn't see rock, paper,

20    scissors.  You won by default.

21         MR. POWELL:  Mine was implied, Your Honor.

22                        CROSS-EXAMINATION

23    BY MR. POWELL:

24    Q.  Good afternoon, Ms. Roberts.  I hope you're enjoying the

25    Western Slope and your last six years there.  I'm actually

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    572

1    Q.  What about their method for voting?

2    A.  I don't know.

3    Q.  So it was media reports that told you that a group called

4    USEIP was sending canvassers who were sometimes armed to

5    interrogate voters about the voting record?

6    A.  Correct.

7    Q.  Do you know what the evidence was in the media reports for

8    the idea they were sometimes armed?

9    A.  I would say probably the playbook.

10   Q.  The playbook is evidence that someone was armed?

11   A.  Yes.

12   Q.  How so?

13   A.  They discussed security and how they were planning to line

14   up people with people who carried.

15   Q.  So that's a statement of possible intent.  Do you have

16   evidence anyone did carry?

17   A.  Media reports stating that at times volunteers were openly

18   armed.

19   Q.  So, again, media reports are the evidence for your case?

20   A.  Yes, as well as some eyewitness accounts.

21   Q.  Did you talk to a witness who saw a USEIP canvasser was

22   armed?

23   A.  No.

24   Q.  Who in your organization did?

25   A.  I don't know that anyone did.

                        Sarah K. Mitchell, RPR, CRR

Case No. 1:22-cv-00581-CNS-NRN    Document 189    filed 07/30/24    USDC Colorado
pg 106 of 257

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    669

1   Q.   (By MS. STOCK) When you say you were talking about press,

2   can you be more specific as to the types of matters you

3   discussed?

4   A.   Well, it evolved over time, because at the very beginning

5   I wasn't -- I wasn't handling press, because the nature of

6   USEIP at that -- at the beginning was much like a startup.

7   I'm a startup founder, so that's the nature of the

8   organization, and in those early days, it's very chaotic.

9   People are coming and going.  I mean, chaotic not in terms of

10  panic, but just it's not extremely organized.  There are no

11  processes, procedures.  It's people just doing the things that

12  they want to do.  And so early on in the process -- in terms

13  of press early on, it wasn't structured.  There was no press

14  person.  As the organization matured, I took on the role of

15  press to -- you know, that's what I do for a living, part of

16  what I do.  And so I just applied my professional skills to

17  USEIP in terms of press.

18  Q.   And at one point you became a spokesperson for USEIP.  Is

19  that fair to say?

20  A.   That's right.

21  Q.   You created USEIP's website, correct?

22  A.   Yes.

23  Q.   And you maintained USEIP's website?

24  A.   I did with volunteers as well.  There were a number of

25  people that were contributing to the website.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    670

1    Q.   You designed USEIP's logo?

2    A.   Yes.

3    Q.   And you created communication plans for USEIP; is that

4    correct?

5    A.   Yes.

6    Q.   Can you describe what a communication plan entails?

7    A.   So it was basically -- a communication plan comes from

8    corporate America.  What you do is you identify all of the

9    platforms that you're able to communicate on and maintain.

10   And you figure out the purpose of those outlets, whether it's

11   -- for example, I'll make it more tangible, social media, your

12   website, what role PR is going to play.  You take a

13   comprehensive view of all types of communication.  You analyze

14   what that looks like.  And once you have your domain,

15   basically your media footprint established, then you start

16   figuring out how each one of those platforms is going to be

17   used and what purpose do they serve.

18           For example, for Nike, a Twitter -- a Twitter feed

19   might not accept or be equipped to handle customer complaints,

20   and you would kind of figure out, well, where do we channel,

21   you know, free-form customer complaints, that kind of thing.

22   So you kind of figure out the features and functionality of

23   that media footprint.  And then you start looking -- getting

24   more tactical in terms of how you're going to use those --

25   those outlets in terms of what messaging you're going to

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3       07/17/2024    671

1    produce and which platforms are going to be maintained.

2    Q.  One way you contributed to USEIP was training volunteers

3    regarding the press.  Is that fair to say?

4    A.  Correct.

5    Q.  And you at times helped USEIP volunteers, I believe you've

6    testified, become press ready?

7    A.  Yes.

8    Q.  And you provided press training for Shawn Smith and

9    Ms. Epp; is that correct?

10   A.  Yes.  And others.

11   Q.  In fact, you were in charge of providing press training

12   for anybody who was speaking on behalf USEIP?

13   A.  Correct.

14   Q.  And you helped USEIP volunteers place stories in local

15   newspapers, correct?

16   A.  Correct, if they came to me and asked.  I didn't tell them

17   to take a story to the press and go to their local paper with

18   the story.  That was not how the press operated through USEIP.

19   So if, for example, a volunteer wanted an op ed in their local

20   paper, and they didn't know how to do it, they didn't know how

21   to approach their local newspaper and ask for an op ed to be

22   published.  I would instruct them on how to do it.

23   Q.  Let's talk a bit about the communication plans.  You

24   discussed more generally what a communication plan is, and I

25   believe you mentioned being concerned about a media footprint.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3      07/17/2024    672

1  Can you discuss what sort of media footprint you were hoping

2  to make on behalf of USEIP?

3  A.  The media footprint I was concerned about making was

4  mostly what could we maintain as volunteers.  It's a rule of

5  thumb from the corporate world where I come from working in

6  media is that you don't want to be everywhere.  You don't want

7  to spin up every single possible social media platform, for

8  example, because it's really difficult to maintain.  So it was

9  much more strategic in terms of what we could maintain and

10  what was the functionality of the press outlets or platforms

11  that were available to us.

12  Q.  Is it fair to say you were strategic about what

13  information you put out on USEIP's behalf?

14  A.  Yes.

15  Q.  And is it fair to say you were strategic about the sorts

16  of media outlets in which you put out messaging on USEIP's

17  behalf?

18  A.  Could you repeat the question?

19  Q.  Is it fair to say that you were strategic in selecting the

20  media outlets through which you put out USEIP's messaging?

21  A.  When you say outlets, are you talking like newspapers and

22  communications outlets, or are you talking about Twitter

23  versus Facebook versus --

24  Q.  Let's talk about -- can you identify specific newspapers

25  that you conducted interviews with on behalf of USEIP?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3      07/17/2024    673

1   A.   I can't give you a totally comprehensive list, but I would

2   receive inbound inquiries for press, and I would write press

3   releases with my media contact information for USEIP, and I

4   would distribute those press releases on the website, just

5   post them, so if anybody visited the website they could read

6   the press release and download it.  So oftentimes, you know,

7   reporters would come to the website and download the press --

8   press releases.  And I also did e-mail -- I built

9   relationships with media outlets and would send them press

10  releases that were relevant to the types of news that they

11  covered and basically their beat and their audience.

12          So I can give you -- I've spoken to CNN, The New York

13  Times, the New York Post, Vice, the Epic Times.  I've spoken

14  to the Colorado Times Recorder.  I have spoken to the Denver

15  Post.  KDVR is a radio show.  I mean, the list goes on and on.

16  I was not exclusively looking at any specific like genre, I

17  guess you could say, of media outlet.  Just depended on what

18  the news was.

19  Q.   Do you recall making an appearance on the KOA radio show?

20  A.   I do.

21  Q.   Do you recall when that was?

22  A.   It was after canvassing was over.  I believe it was late

23  March of 2022.

24  Q.   What was your purpose for participating in that interview?

25  A.   They requested an interview.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    674

1   Q.  And do you recall some of the topics that were discussed

2   during that interview?

3   A.  I do.

4   Q.  What were some of those topics?

5   A.  The premise of the interview was to talk about the

6   Colorado report.

7   Q.  And so did you discuss USEIP's canvassing activities?

8   A.  I spoke about the result of USEIP's canvass activities,

9   which were summarized in the Colorado report.

10  Q.  Did you discuss how USEIP's canvassing activities were

11  conducted?

12  A.  No.  Not to my recollection.

13  Q.  Do you recall if you discussed the questions that were

14  asked of voters during canvassing activities?

15  A.  I'm sorry.  Could you repeat that question?

16  Q.  Do you recall if during the interview with KOA that you

17  discussed the specific questions that were asked during

18  canvassing efforts by USEIP volunteers?

19  A.  I don't recall.

20  Q.  Would it be helpful to have your recollection refreshed?

21  A.  Yes, please.

22          MS. STOCK:  Hashini, can you please pull up clip

23  number two.  And this is Exhibit No. 61.

24          MR. REISCH:  Your Honor -- Your Honor?

25          THE COURT:  Yes.


                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    675

1           MR. REISCH:  I believe that she would have to listen

2    to it not in open court because it's not admitted and then be

3    asked questions about refreshing recollection.

4           MR. WYNNE:  Look, I'll tell you what.  Could I have a

5    moment to confer with co-counsel?

6           THE COURT:  Sure.

7           MR. WYNNE:  After conferring, I do think the most

8    prudent course, because I don't know what it is, is to join in

9    the objection and suggest perhaps we wait until later in the

10   questioning.  I do object to foundation.

11          MS. STOCK:  If I may be heard, Your Honor?

12          THE COURT:  Yes.

13          MS. STOCK:  I don't intend to offer the exhibit.  I

14   only intend to refresh Ms. Kasun's recollection.  I'm also

15   happy to lay a foundation.

16          THE COURT:  All right.  Why don't you lay the

17   foundation and reoffer it.  I understand you're not -- you're

18   offering it for -- to refresh her recollection, and normally

19   it's a document that she could read silently.  In the interest

20   of time, if there is a foundation, I will just let you play it

21   and see if it refreshes her recollection.

22   Q.  (By MS. STOCK) Ms. Kasun, I believe you previously

23   testified that you recall giving an interview on the KOA radio

24   show on March of 2022; is that correct?

25   A.  Yes.


                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024     676

1   Q.  Were you aware that that interview was being recorded?

2   A.  Yes.  It was a radio interview.

3   Q.  Were you aware that that interview was played live on the

4   radio as you were giving your interview?

5   A.  I didn't know if it was taped or live.

6   Q.  Was it your understanding at some point that your

7   interview would appear or be played on the radio station?

8   A.  Potentially.  I mean, the thing is with interviews, you're

9   never sure if the story is going to be published, and the same

10  thing with radio interviews.  I didn't know if it was taped or

11  live, so I didn't know if it was going to be played or not.

12  Q.  At the time you gave the interview, you were aware that

13  there was a possibility it could be played live on the radio.

14  Is that fair to say?

15  A.  Yes.

16      MS. STOCK:  At this time I would seek to refresh

17  Ms. Kasun's recollection.

18      THE COURT:  Let's play -- how long is the clip?

19      MS. STOCK:  Well, I don't intend to -- it's eight

20  minutes, I suppose depending upon her testimony, but I don't

21  intend to play the entire video, just clips.

22      THE COURT:  The clip you're going to, is it

23  refreshing her recollection on that last question you just

24  asked?

25      MS. STOCK:  Yes.

Sarah K. Mitchell, RPR, CRR

190

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024    677

1          THE COURT:  Then let's play that, but then stop the

2    clip.

3        (Audio played.)

4    Q.  (By MS. STOCK) Ms. Kasun, does that refresh your

5    recollection regarding whether you spoke with the KOA radio

6    station regarding the questions that were asked during USEIP's

7    canvassing efforts?

8    A.  I'm sorry.  Could you repeat the question?

9    Q.  Sure.  Does that clip refresh your recollection as to

10   whether you spoke on the KOA radio show regarding the

11   questions that were asked of voters during USEIP's canvassing

12   efforts?

13   A.  Yes.

14   Q.  You also stated during that interview that we definitely

15   know we found anomalies.  Do you recall stating that?

16   A.  Yes.

17   Q.  For example, you explained that some voters did not cast a

18   ballot in the election, and then Secretary of State's own

19   public records showed that a ballot was cast in a voter's

20   name.  Do you recall using that as an example of an anomaly

21   that you found?

22   A.  That came from the Colorado report, yes.

23   Q.  And you also stated that USEIP found lost votes.  Do you

24   recall stating that?

25   A.  I don't recall that.

Sarah K. Mitchell, RPR, CRR

191

22-cv-00581-CNS-NRN    Bench Trial - Day 3      07/17/2024    678

1   Q.   Would it help if I refreshed your recollection regarding

2   whether you made that statement?

3   A.   Yes, please.

4        (Audio played.)

5   Q.   (By MS. STOCK) Ms. Kasun, does that refresh your

6   recollection as to whether you discussed USEIP's finding of

7   lost votes during its canvassing efforts?

8   A.   Yes.  And, again, that came from the Colorado report.

9   Q.   And lastly, during this interview you explained that these

10  anomalies affect local races, and it impacts every Colorado

11  voter.  Do you recall stating that?

12  A.   Yes.

13  Q.   Are these the types of topics that you usually addressed

14  during interviews that you gave on USEIP's behalf?

15  A.   Are these the topics?

16  Q.   Yes.

17  A.   No, not across the board.  This was one of many

18  interviews.  Given the fact that USEIP did more than

19  canvassing, I gave interviews on numerous types of topics

20  surrounding elections.  So at this time in November -- or

21  sorry -- March of 2022, that was right after the Colorado

22  report had been published.  So in that timeframe, this would

23  be a typical topic that I would be talking about, but other

24  than that -- it depended from interview to interview what I

25  talked about.

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    679

1    Q.  Upon the Colorado report being published, is it fair to

2    say you gave numerous interviews regarding the contents of

3    that report?

4    A.  Yes.

5    Q.  And what was your intention in providing interviews on the

6    topic of the Colorado report and USEIP's canvassing efforts?

7    A.  I was responding to inbound press inquiries, and the

8    interviewers -- or the news outlets wanted to talk about the

9    Colorado report, so I was granting that interview.

10   Q.  And you aimed to share the contents of that report during

11   interviews.  Is that fair to say?

12   A.  If they asked me the questions about the contents of the

13   report, yes.

14   Q.  Let's talk briefly about USEIP's canvassing efforts.  Your

15   role was to publicize the conclusions learned from these

16   efforts; is that correct?

17   A.  To -- yes.  To talk about the Colorado canvassing report

18   results.

19   Q.  And you wrote press releases about the Colorado report; is

20   that correct?

21   A.  Yes.

22   Q.  Your job was to ensure that the public was aware of the

23   canvassing efforts undertaken by USEIP; is that correct?

24   A.  Could you repeat the question?

25   Q.  Your role was to ensure that the public was aware of the

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    680

1   canvassing efforts undertaken by USEIP, correct?

2           MR. WYNNE:  I'm going to object to vague as to

3   timeframe.

4           THE COURT:  Sustained.  You can -- would you add a

5   timeframe to make it more clear?

6   Q.  (By MS. STOCK) Sure.  As of -- well, let me ask it this

7   way.  In 2021 did you conduct any interviews regarding the

8   canvassing activities of USEIP?

9   A.  Not to my recollection.

10  Q.  And in 2022 did you conduct any interviews regarding the

11  canvassing efforts of USEIP?

12  A.  To my recollection, only after the Colorado report was

13  published.

14  Q.  And in 2022 your goal was to ensure that the public was

15  aware of the conclusions of -- that USEIP drew from its

16  canvassing efforts; is that correct?

17  A.  No.  I would say that was the journalist's aim.  My job

18  was to answer their questions to the best of my ability to

19  conduct the interview.

20  Q.  Previously you discussed that you put together

21  communication plans on USEIP's behalf, correct?

22  A.  Correct.

23  Q.  And I believe you testified about being strategic about a

24  media footprint for USEIP; is that correct?

25  A.  Correct.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    681

1   Q.  And as part of your communication plans, you intended to

2   broadcast the conclusions that USEIP had reached.  Isn't that

3   fair to say?

4   A.  Broadcast as in disseminate?

5   Q.  Disseminate to the general public.

6   A.  Not -- yes.  Yes.

7   Q.  I mean, USEIP did not conduct canvassing efforts to keep

8   those results to itself, correct?

9   A.  Well, the canvassing effort was -- I'm not quite sure how

10  to answer that.

11  Q.  I can rephrase the question.

12  A.  Okay.

13  Q.  USEIP did not conduct canvassing efforts for the purpose

14  of not sharing the results of the canvassing efforts; is that

15  fair?

16  A.  That's not fair to say.  We conducted the canvassing for

17  -- to get an understanding, to isolate the problem as we saw

18  it potentially, and to verify, you know, the theories that we

19  had about what could or could not be true with the data from

20  the Secretary of State's voter lists.  The decision to make

21  the canvassing report, which is what we're talking about, came

22  later.  That was not part of the inception of and the purpose

23  of canvassing.

24  Q.  The canvassing report produced by USEIP was disseminated

25  to county and state officials in the State of Colorado,

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    682

1   correct?

2   A.  Correct.  We disseminated that -- the Colorado report to

3   all House and -- Colorado House and Senate members, all

4   Colorado county clerks, and I believe -- and anybody else who

5   wanted to see the report.

6   Q.  And you posted the report on your USEIP website, correct?

7   A.  Correct.

8   Q.  Just very briefly, you've heard a lot of testimony in this

9   matter regarding the platform Basecamp.  Did you communicate

10  with other members of USEIP on the Basecamp platform?

11  A.  I did.

12  Q.  And at one point you purchased a license for the use of

13  Basecamp, correct?

14  A.  Yes.

15  Q.  And you had administration privileges on the Basecamp

16  platform for USEIP; is that correct?

17  A.  Correct.

18  Q.  I'd also like to briefly discuss the playbook.  You're

19  familiar with the county and local organizing playbook that's

20  been discussed during this matter, correct?

21  A.  Yes.

22  Q.  And you took part in creating this playbook by editing it

23  before it was finalized, correct?

24  A.  I took part in editing it for grammar, style, punctuation,

25  not any of the content, and I did that after it was printed.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    785

 1          THE COURT:  Overruled.  You may answer.

 2   A.  I'm sorry.  Could you repeat?

 3   Q.  (By MR. REISCH) I will try.  Did you consider that when

 4   these badges that were used by canvassers, that it was a --

 5   something you get at a seminar or a CLE, you get a lanyard,

 6   maybe a piece of plastic, they stick your name in it, it's

 7   printed, and it says, you know, Scott Reisch, and maybe my

 8   date or something along those lines, so that if somebody did,

 9   in fact, say, hey, I had a problem, this guy, this Scott

10   Reisch guy came up to my door, and he was a real jerk, but at

11   least they'd know my name so if it came back, they'd know who

12   to talk to?

13          MS. ERICKSON:  Objection, compound.

14          THE COURT:  Overruled.

15   A.  I didn't consider that, no.

16          MR. REISCH:  I'm sorry, Your Honor, I'm trying not to

17   duplicate stuff, so that's why I'm trying to take my time but

18   trying to move as expeditiously as possible given the hour of

19   the day.

20          THE COURT:  That's fine.

21   Q.  (By MR. REISCH) Are you good to go?

22   A.  Yes, sir.

23   Q.  Sir, I do want to talk about the video that you reviewed

24   as it relates to Mr. Smith.  There were some questions asked

25   about a limited audience and things of that nature, but you

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    786

1    recall that was in generally February of 2022, correct?

2    A.  Yes, sir.

3    Q.  All right.  And although you don't recall, because it's

4    been some time, the exact language of that video, do you

5    recall the language basically being that Mr. Smith stated that

6    he had some evidence of election fraud.  Do you recall that

7    statement?

8    A.  That does sound familiar.

9    Q.  Do you recall him stating that he believes in due process?

10   A.  I don't recall that.

11   Q.  Okay.  Do you recall that he says he believes in justice?

12   A.  That does sound familiar.

13   Q.  Okay.  Do you believe -- or do you recall him stating I am

14   not advocating violence in any way?

15   A.  I don't recall that, sir.

16   Q.  Okay.  And he said that if he had this information, and it

17   was presented -- obviously people are entitled to due process,

18   justice -- and that if there was widespread voter fraud, that

19   those persons should be potentially charged with treason.  Do

20   you recall that?

21        MS. ERICKSON:  Objection, misstates prior testimony.

22        THE COURT:  Well, overruled.  I'll allow him to

23   answer if he recalls anything like that.

24   A.  I'm sorry.  You're saying that there would be --

25   Q.  (By MR. REISCH) If there was widespread election fraud,

Sarah K. Mitchell, RPR, CRR

198

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    787

1  that people involved should be tried for treason.  Do you

2  recall that statement?

3  A.   Those words do sound familiar.

4  Q.   And that obviously one of the punishments under the United

5  States Code for treason is, in fact, death.  That's one of the

6  maximum penalties, correct, sir?

7  A.   Yes.

8  Q.   Okay.  And Mr. Smith never mentioned anyone in particular

9  by name as it related to if there was voter fraud, if they

10 went through the process and got their due process, if they

11 were charged with treason, and if they were convicted, they

12 should be put to death.  There's nothing in there where he

13 specifically said, for example, the Secretary of State Jena

14 Griswold, correct?

15 A.   I don't recall that from that video, sir.

16 Q.   You don't recall that at all, or you don't recall --

17 you're agree with me that he never mentioned Ms. Griswold, the

18 Secretary of State?

19 A.   My recollection of the video is that he did not mention

20 the Secretary of State.

21 Q.   Okay.  Now, you don't follow Secretary of State Jena

22 Griswold on her Facebook page, do you, sir?

23 A.   No, sir.

24 Q.   How about her Twitter account?

25          MS. ERICKSON:  Objection, relevance.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    788

1          THE COURT:  Overruled.

2    A.  No, sir.

3    Q.  (By MR. REISCH) Okay.  And you thought your conclusion was

4    was that this speech by Mr. Smith could have had some chilling

5    effect on someone's ability to vote in the future; is that

6    right?

7    A.  Yes.  To the extent that the fraud talk, as you said,

8    right, is someone tried and convicted should be treated as a

9    traitor and could among other things be hung, my view is that

10   that kind of talk plugs into other rhetoric throughout history

11   that has been used and targeted at voters discriminately or

12   indiscriminately.

13   Q.  And if Secretary of State Jena Griswold put on her

14   personal Facebook page that video, would she be trying to

15   suppress voters?

16   A.  That's rather a leap, sir.

17   Q.  Well, if Mr. Smith says it and it's suppressing voters,

18   and she puts it up on her Facebook page, does that mean that

19   she is suppressing voters, sir?

20   A.  I think the fact that the transmitting and broadcasting of

21   these threats is problematic, and I agree with -- I agree with

22   myself that -- I stand by my view, sir, is what I'm saying,

23   that this kind of rhetoric is dangerous, and that it can

24   confuse voters and make them afraid to exercise their rights.

25   Q.  So we've heard some testimony, one of the lead plaintiffs

                 Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024   789

1    in this case, the League of Women Voters put out a statement,

2    the national office, and just to be clear, in 2016 that the

3    presidential election was rigged, was illegitimate.  Is that

4    also voter suppression, a statement like that, sir?

5    A.  That say that the election was rigged is, per se, voter

6    suppression?  I think that in my opinion that there's a

7    difference between making claims about the validity of the

8    election and making, you know, a threat.

9    Q.  Okay.

10   A.  As I said in prior -- the prior cross-examination.

11   Q.  So one is just political rhetoric, right?  I mean, the

12   election was rigged, it was fraudulent, there was Russian

13   interference.  That doesn't go to voter suppression in any way

14   according to you.  It's just good old-fashioned political

15   rhetoric?

16   A.  In the abstract, it is political rhetoric.

17   Q.  Okay.  And obviously I won't bore you with all the

18   details, but the *Counterman* case goes through the history of

19   political rhetoric and that sometimes sharp words are used,

20   and that's why they have to prove scienter.  You're familiar

21   with that, correct, sir?

22        MS. ERICKSON:  Objection, Your Honor, asked and

23   answered.

24        THE COURT:  Well, overruled.  He's provided

25   additional details.  You may answer whether you're familiar.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024   790

1    A.  This does sound familiar.

2    Q.  (By MR. REISCH) In your report you cite the DOJ manual in

3    regards to voter intimidation cases.  Do you recall that, sir?

4    A.  Yes, sir.

5    Q.  And it relates to the operative words as they define

6    intimidates, you're familiar with the definitions from the

7    Department of Justice, sir?

8    A.  Yes.

9    Q.  You're familiar that they state the scienter elements

10   require proof that an actor intended to force voters to act

11   against their will by placing them in fear of losing something

12   of value.  You're familiar with that language from the DOJ

13   manual?

14   A.  I am.

15   Q.  Okay.  And that feared loss has to be something tangible,

16   such as money or economic benefits, or intangibles, such as

17   liberty or safety.  Would you agree with me, sir?

18   A.  Yes, sir.

19   Q.  Sir, I just -- you never met Mr. Smith before today.

20   Would that be fair to say?

21   A.  Yes, sir.

22   Q.  All right.  You may have learned from his deposition that

23   he served honorably in the United States Air Force for

24   25 years.  Are you aware of that?

25   A.  I do recall that, sir.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    791

1    Q.  Obtained the rank of Colonel.  Are you aware of that?

2    A.  Now that you've refreshed my recollection, that does sound

3    familiar.

4    Q.  But you never met him as far as sat down and had a beer,

5    fair?

6    A.  No, sir.  Just rode on an elevator.

7    Q.  I just want to be clear for the record, because maybe it's

8    just me or maybe it's the way you came off in your report, but

9    you're not accusing Mr. Smith of being a racist, are you?

10           MS. ERICKSON:  Objection, relevance, Your Honor.

11           THE COURT:  Overruled.

12   A.  No, sir.

13   Q.  (By MR. REISCH) Okay.  Because he has two stepchildren

14   that are of mixed race, African-American descent.  Did you

15   know that, sir?

16           MS. ERICKSON:  Objection, relevance, Your Honor.

17           THE COURT:  Sustained.

18   Q.  (By MR. REISCH) Do you know that his brother is half

19   black?

20           MS. ERICKSON:  Same objection, Your Honor.

21           MR. REISCH:  If I can have just one moment, Your

22   Honor.  That's all I have, Your Honor.  Thank you very much.

23           THE COURT:  Ms. Epp.

24           MS. EPP:  I have no questions, Your Honor.

25           THE COURT:  Thank you.  Any redirect?

                  Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    792

1          MS. ERICKSON:  Just a couple, Your Honor.  Your

2    Honor, before I ask a couple of questions, I did want to just

3    ask for permission to play the video of Mr. Smith's

4    statements, because I think repeatedly in the course of this

5    questioning and this case counsel has been representing what

6    has been said in that video, and I do not think some of the

7    representations that have been made have been accurate.  And

8    we're asking a witness who reviewed that video to comment on

9    counsel's statements about that video, and it feels to me like

10   at this point it should be played at the very least for this

11   witness, but also for the Court.

12          THE COURT:  Any objection?

13          MR. REISCH:  Actually, Your Honor, the appropriate

14   witness that should have been asked to authenticate it would

15   have been Mr. Smith when he testified.  The plaintiffs did not

16   offer it at that time.  This witness has been endorsed for

17   several years.  Part of his trial preparation should have been

18   perhaps to review the items where he thought that he was going

19   to be opining on, so I do object.

20          MR. WYNNE:  Your Honor, I object too.  I think this

21   is -- amounts to bolstering.  In addition, I think that this

22   is not directed at any particular question relevant to a

23   redirect examination.  It's within the Court's purview to

24   consider characterizations made by counsel in any particular

25   question, whether they were correct or incorrect.  And this is

Sarah K. Mitchell, RPR, CRR

204

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024    793

1   already in evidence.  I don't think this is necessary in a

2   public forum at this time.

3          THE COURT:  All right.  I'm not going to allow that

4   request at this time.  We received direct testimony from

5   Mr. Smith during his examination about that video.  He would

6   be the best person to ask.  To the extent you want to correct

7   anything you believe was a misrepresentation about the video,

8   you could certainly ask this witness in redirect.

9          MS. ERICKSON:  May I go ahead, Your Honor?

10          THE COURT:  Yes, proceed.

11                      REDIRECT EXAMINATION

12   BY MS. ERICKSON:

13   Q.  Professor Ellis, you were asked about the timing of

14   Mr. Smith's comments as it relates to the timing of

15   defendants' canvassing efforts.  Do you recall that?

16   A.  Yes, ma'am.

17   Q.  Even if defendants' canvassing efforts had stopped at the

18   time Mr. Smith made the statements, would you still have

19   concerns about the effect of those statements on voters?

20   A.  I would.

21   Q.  And what concerns would you have?

22   A.  My concern at the end of the day is what we discussed

23   earlier.  That these statements create an atmosphere of threat

24   motivated by unfounded claims around voter fraud and the

25   rigging of the election, and that those who might be caught up

                    Sarah K. Mitchell, RPR, CRR

1                  IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF COLORADO

3    Civil Action No. 22-cv-00581-CNS-NRN

4
      COLORADO MONTANA WYOMING STATE AREA          Pages 820 - 836
5     CONFERENCE OF THE NAACP, et al.,

6          Plaintiffs,

7          vs.

8     SHAWN SMITH, et al.,

9          Defendants.

10   -------------------------------------------------------------
                         REPORTER'S TRANSCRIPT
11                        Bench Trial - Day 4
     -------------------------------------------------------------
12
      Proceedings before the HONORABLE CHARLOTTE N. SWEENEY, Judge,
13    United States District Court for the District of Colorado,
      commencing on the 18th day of July, 2024, in Courtroom A-702,
14           United States Courthouse, Denver, Colorado.

15                         APPEARANCES

16   For the Plaintiffs:
     AMY E. ERICKSON and BRIAN A. DILLON and KRISTIN M. STOCK,
17   Lathrop GPM LLP, 80 South Eighth St., Ste. 500, Minneapolis,
     MN 55402
18   COURTNEY M. HOSTETLER, Free Speech for People, 48 North
     Pleasant St., Ste. 304, Amherst, MA 01002
19   CASEY C. BREESE, Lathrop GPM LLP, 675 15th St., Ste. 2650,
     Denver, CO 80202
20
     For Defendant Smith:
21   R. SCOTT REISCH and JESSICA L. HAYS, Reisch Law Firm, LLC,
     1490 W. 121st Ave., Ste. 202, Denver, CO 80234
22   For Defendant Kasun:
     MICHAEL J. WYNNE and CAMERON C. POWELL, Gregor Wynne Arney
23   PLLC 4265 San Felipe St., Ste. 700, Houston, TX 77027
     For Defendant Epp:
24   PRO SE

25      Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
               Denver, CO 80294, 303-335-2108
          Proceedings reported by mechanical stenography;
               transcription produced via computer.

22-cv-00581-CNS-NRN   Bench Trial - Day 4      07/18/2024    821

1              *         *         *         *         *

2        (The proceedings commenced at 9:12 a.m.)

3            THE COURT:  You will recall we left off yesterday

4   with defendants making a Rule 52(c) motion.  Let me just put

5   some standards on the record.  Rule 52(c) is the equivalent of

6   Rule 50(a) which is used in jury trials.  In a trial to the

7   Court we operate under Rule 52(c) which allows the Court -- if

8   a party has been fully heard on a particular issue during a

9   trial and the Court believes judgment is appropriate against

10  that party, the Court may issue that finding.  The standard is

11  similar, frankly, to a summary judgment standard in the sense

12  that it really requires the Court to look at whether or not

13  every piece of evidence presented by the plaintiffs is true,

14  and if it is, is judgment appropriate.

15            The parties know we are here based -- on the basis of

16  two claims.  The first is an alleged violation of Section

17  11(b) of the Voting Rights Act.  That section provides that no

18  person shall intimidate, threaten, or coerce, or attempt to

19  intimidate, threaten, or coerce any person from voting or

20  attempting to vote.  Courts have defined intimidate as making

21  timid or fearful, or to inspire or affect with fear,

22  especially to compel action or inaction as by threats.

23            To threaten means to utter threats against or to

24  promise punishment, reprisal, or other distress.  To coerce

25  means to restrain, control, or dominate, nullifying individual

22-cv-00581-CNS-NRN    Bench Trial - Day 4    07/18/2024    822

1    will or desire.

2          It is well settled that there's a private right of

3    action under Section 11(b), and it's also equally settled that

4    it does not require plaintiffs to establish that defendants

5    acted with specific intent to intimidate voters.  We must

6    focus on the acts of defendants directly or those of others

7    who they specifically directed or controlled.

8          The second claim is under the Ku Klux Klan Act, 42

9    U.S.C. Section 1985(3), which prohibits conspiring to prevent

10   by force, intimidation, or threat any citizen from giving

11   support or advocacy to a candidate, which simply means in this

12   context interfering with the right to vote.  Let me just

13   remind everyone here that the United States Election Integrity

14   Plan is not a defendant.  They were dismissed earlier in the

15   case because no action exists under the above statutes against

16   an unincorporated association, so that has left us with three

17   individual defendants.

18         Let me just note that it seems that all parties want

19   this case to be about something it is not about.  It's not

20   about the January 6th insurrection or the history of voter

21   intimidation in this country.  It's not about the defendants'

22   collective belief that there was election fraud.  It's not

23   about the security or lack of security of elections in

24   Colorado.  It's not about alleged vulnerabilities of voting

25   machines in Colorado, and it's not about the actions or

Sarah K. Mitchell, RPR, CRR

208

22-cv-00581-CNS-NRN   Bench Trial - Day 4      07/18/2024     823

1    inactions of the secretary of state in Colorado.  It's

2    certainly not about who is paying for this litigation for

3    either party -- any party.

4            These are all sideshows, and I was careful to try and

5    reel those sideshows in to focus us on the sole issue which is

6    before this Court which is did the plaintiffs prove that

7    defendants violated Section 11(b) of the Voter Rights Act or

8    42 U.S.C. Section 1985(3).  And for purposes of Rule 52, I am

9    now looking at whether or not there is any evidence to allow

10   the Court to find in the plaintiffs' favor on the issue of

11   voter intimidation.  For the following reasons, I find there

12   is not.

13           After consideration of the evidence, I make the

14   following findings of fact.  There's little dispute about each

15   defendants' role in forming or working with the USEIP,

16   including whether, where, and how often each defendant

17   canvassed Colorado voters.  The Court will briefly summarize

18   the testimony of the defendants, plaintiffs' one

19   representative called, and the remaining witnesses called by

20   the plaintiffs.

21           Mr. Smith testified as to his interest in the

22   integrity of elections.  Following the 2020 election, he set

23   about a course of conduct to conduct an investigation, in his

24   mind.  He shortly thereafter met Defendants Epp and Kasun, and

25   he was prompted to get involved with the USEIP at the end of

22-cv-00581-CNS-NRN    Bench Trial - Day 4    07/18/2024    824

1    February 2021.  He admits to being a member of the core team

2    of USEIP, along with Jeff Young, Ms. Kasun and Ms. Epp.  He

3    attended weekly meetings of the core team.  Mr. Smith believes

4    there's not enough information to verify the 2020 election and

5    believes there's been large-scale election fraud.  None of

6    that actually matters.  What matters is whether or not he

7    engaged in proven actions that can be said to objectively

8    intimidate voters.

9         Mr. Smith conducted three days of canvassing in Weld

10    and El Paso Counties as part of the voter verification effort

11    undertaken by USEIP.  Such effort was loosely designed to test

12    accuracy of voter registration and voter history.  This

13    occurred during the spring of 2021.  The testimony of all of

14    the defendants' witnesses indicate it was during April through

15    August.  The voter verification guide, which has been admitted

16    into evidence, is clear on how one must go about canvassing.

17         The guide makes perfectly clear that canvassers are

18    to be polite.  They may go two to a house.  One should go to

19    the door.  One should stay back so as not to intimidate

20    people.  If there's a trespassing sign, they're advised not to

21    enter that property.  Mr. Smith was an integral part of

22    drafting that voter registration guide.

23         Throughout 2021, USEIP canvassed approximately 9,400

24    doors.  4,600 people were contacted.  Importantly, the

25    testimony reveals that other organizations may have been

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 4        07/18/2024    825

1    canvassing in Mesa County.  What is clear through the

2    testimony of defendants that has gone unrebutted is that USEIP

3    did not canvass in Mesa County.  The Court has reviewed the

4    playbook and the voter verification training guide in detail.

5    The parties highlighted some parts of those documents, but the

6    Court has thoroughly reviewed them all.  The Court finds

7    nothing in either document that is remotely or objectively

8    intimidating on its face.

9           The voter verification guide was provided to county

10   captains, as also a captain's manual was provided.  In

11   reviewing the history of Ms. Epp's contacts with county

12   captains, it appears that individual counties were somewhat

13   organized on their own.  The meetings held with captains were

14   primarily to get updates from individual county captains, and

15   that was the purpose of those meetings.  There was no evidence

16   of what canvassers in Mesa County were trained to do.

17   Apparently they did -- Mesa County canvassers or the captain

18   did receive a copy of an early version of the voter

19   verification materials of USEIP, but it is unclear to this

20   Court if they were actually using that manual or using a

21   manual of their own.

22           With respect to Mr. Smith, the most concerning action

23   was a speech he gave in February of 2022 at an event at a

24   church in Castle Rock.  Apparently Mr. Smith made a comment

25   about treason and the notion that anyone involved in election

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 4    07/18/2024    826

1    fraud is committing treason and deserves to hang.  This was

2    well after -- this comment was made well after canvassing had

3    ceased.  The Court, of course, does not condone this type of

4    language, nor the action it apparently elicited from folks in

5    the crowd, but that is certainly not the standard for voter

6    intimidation, and plaintiffs have established no connection

7    between this statement and an attempt to intimidate any

8    particular voter or group of voters, much less how the

9    statement in February 2022 can be used to prove that the

10   alleged intimidating nature of canvassing occurred back a full

11   six months prior.

12        Ms. Epp for her part was one of the founders of the

13   organization in November of 2020.  She testified that the

14   purpose of the organization was to verify the official record

15   to ensure the integrity of the elections.  She was a member of

16   the core team.  She herself canvassed three times, twice in El

17   Paso and once in Douglas County.  Never in Mesa or Weld

18   Counties.  There's no evidence that's been provided that she

19   did anything personally during canvassing to intimidate a

20   voter.

21        Again, it is worth highlighting that there is no

22   evidence that defendants canvassed in Mesa County where Grand

23   Junction sits.  Although there was some testimony about this

24   attenuated connection between the canvassing in Mesa County

25   and USEIP, the evidence does not establish that USEIP was

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 4    07/18/2024    827

1    controlling that canvassing or, frankly, had any part in

2    controlling the canvassers there or dictating what those

3    canvassers said to any individual voters.

4          The canvassers in Mesa County were apparently using

5    different datasets, specifically information that they had

6    received from the county clerk's office, whereas USEIP

7    canvassers were relying on information obtained from the

8    secretary of state.  Ms. Epp created the playbook.  She

9    testified it was not a training document, not used in

10    training.  It was for knowledge sharing.  In review of the

11    playbook, it is clear that it appears to be a playbook that

12    governs organizing for various groups that could be used by

13    groups to really get their own groups in order, and it, in

14    fact, did not really even address canvassing.

15          There is an appendix where apparently folks could ask

16    for more information on other training materials, but within

17    the playbook itself there was no guide for canvassing and no

18    guide on voter verification efforts.  The claims against

19    Ms. Epp appear to be based solely on her founding of USEIP

20    and/or her status as a member of the core team.  What is

21    notably lacking, however, is any evidence that she or anyone

22    under her direction attempted to intimidate a voter.  Did she

23    attempt to organize?  Yes.  Did she provide a manual for

24    organizing?  Absolutely.  Does the manual contain hyperbole or

25    false information?  Maybe.  But, again, that is not the issue

Sarah K. Mitchell, RPR, CRR

213

22-cv-00581-CNS-NRN    Bench Trial - Day 4    07/18/2024    828

1    in front of this Court.  There is no objective effort to

2    intimidate voters through the creation of that document.  No

3    such evidence that that document was thereafter used by others

4    to intimidate voters has been presented to the Court.

5         Turning to Defendant Kasun, of the three defendants,

6    the least amount of information has been provided about her

7    alleged wrongdoing.  She testified that she too was a founding

8    member of USEIP, she helped form the organization in 2020,

9    and, like her codefendants, was a member of the core team.

10   She testified she was in charge of press for USEIP and handled

11   many press inquiries.

12        Defendant Kasun herself never canvassed, and there

13   are no allegations that she did individually engage in conduct

14   that was intimidating to any particular voter.  Her

15   involvement is apparently due to her being a spokesperson for

16   USEIP, but no language has been set forth for this Court that

17   could be construed as objectively intimidating.  The brief

18   excerpts of a radio interview that plaintiffs introduced

19   wholly fail to demonstrate any attempt to intimidate voters

20   and, in fact, reiterated the benign nature of the canvassing

21   that was ongoing.

22        Plaintiffs called Christopher Beall, or Chris Beall,

23   the Deputy Secretary of State in support of their claims.

24   Mr. Beall testified that the secretary of state's office

25   received two e-mails regarding alleged USEIP activities, one

Sarah K. Mitchell, RPR, CRR

214

22-cv-00581-CNS-NRN   Bench Trial - Day 4     07/18/2024    829

1   from Yvette Roberts and one from a Ms. Powell, both in Mesa

2   County.  Mr. Beall also claimed that county clerks received

3   complaint calls.  However, there was no admissible testimony

4   offered regarding those alleged complaints because those

5   complaints were never documented.

6          One would expect the county clerks and/or the

7   secretary of state's office to document official complaints in

8   some way, shape, or form, but no such documentation exists.

9   As such, the Court deemed that those complaints could not be

10  considered in this action.  There was no real investigation by

11  the secretary of state into the two e-mails received.  Those

12  were turned over to authorities, and no charges were filed.

13         A review of those e-mails simply does not support any

14  claim of voter intimidation.  There were no active threats, no

15  intimidating conduct revealed in those e-mails.  It was simply

16  reporting a matter of public concern, more as if to notify the

17  secretary of state's office that people were going door to

18  door.

19         Mr. Beall testified that the playbook instructs

20  people on how to canvass, and that was the source of his

21  concern.  As I've already indicated, it does not, however.  He

22  has not seen any training materials of USEIP.  Mr. Beall's

23  testimony revealed he's concerned about canvassing in general,

24  more along the lines of a statistician.  He thinks it must be

25  statistically relevant and utilize traditional survey

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 4      07/18/2024     830

1   techniques.  That is not a matter for this Court to determine.

2   The right of canvassing in this country is long and true, and

3   certainly does not require canvassing to have any statistical

4   significance to it, nor does it require folks to use

5   particular methods to canvass.

6          Importantly, his testimony was that with respect to

7   USEIP, and by extension these three defendants, there was no

8   effort of voter intimidation, but simply a risk of voter

9   intimidation.  This Court will not act on risks that have

10  proven unfounded.

11         Ms. Hendrix is the executive director of one of the

12  plaintiffs, the League of Women Voters of Colorado.  She

13  testified that she has no personal knowledge of any voter who

14  felt intimidated by the defendants or USEIP's canvassing

15  efforts.  Her organization decided to file this lawsuit in

16  large part based on numerous articles and media reports of

17  voter intimidation by defendants.

18         Some of those media reports were admitted into

19  evidence not for the truth of the complaints, but to establish

20  why the plaintiffs felt the need to file this action, so I

21  considered those in this context.  And while they may have

22  supported a need to file an action, it is certainly not

23  something that I can base a finding of liability on in the

24  sense that the reports contained in those media reports are

25  hearsay, and the actual complainants that the news journalists

22-cv-00581-CNS-NRN    Bench Trial - Day 4    07/18/2024    831

1    relied on did not come forward to offer any particular

2    testimony, and there was no abilities of the defendants to

3    cross-examine such witnesses.

4          There was a passing reference to Jean Coleman I

5    believe in Weld County as somebody who had contacted a board

6    member and relayed information as to intimidation.  However,

7    despite my belief that defendants opened the door to such

8    testimony being admitted, the plaintiffs did not offer that

9    testimony into evidence, so I have no idea what Ms. Coleman

10   reported, and I cannot rely on that either.  Surely the board

11   member who spoke to Ms. Coleman could have been called to

12   testify, even if Ms. Coleman did not wish to testify.  So with

13   respect to any possible evidence offered by Ms. Hendrix to

14   support a finding of liability, the Court finds there was

15   none.

16          So that would leave us with Ms. Roberts.  The Court

17   denied defendants' motion for summary judgment based almost

18   exclusively on the affidavit provided by Ms. Roberts by

19   plaintiffs in this action.  Yvette Roberts is from Grand

20   Junction.  The Court finds no ill will in her testimony, and

21   she seemed to be doing her best to recall the events as she

22   knew them.  However, her testimony was wholly unhelpful to the

23   plaintiffs.  She established that two people knocked on her

24   door during the middle of the day, one being a tall man.  As

25   an older woman living alone, she was fearful and, indeed, a

22-cv-00581-CNS-NRN   Bench Trial - Day 4      07/18/2024   832

1    bit intimidated right off the bat because of the tall man who

2    was at her door.

3            However, the two people simply introduced themselves

4    and the group they represented.  They were wearing some sort

5    of badge, and badge I shouldn't even say.  Some sort of name

6    tag that she described as an informal marking perhaps from

7    something you might get at Staples of a name label perhaps on

8    a lanyard that said something like Colorado election

9    intimidation, interrogation -- she wasn't sure, but she knew

10   the first two words were Colorado election.  The two

11   individuals, regardless, engaged in no conduct that could be

12   objectively considered intimidating.

13           She was apparently unsure if they were carrying voter

14   information from the state or from Mesa County.  In court she

15   indicated she believed it was from Mesa County, which would

16   support the notion that the Mesa County canvassers that were

17   unaffiliated with the USEIP were using Mesa County voter rolls

18   to canvass.  Regardless, the questions asked of her were not

19   intimidating and not improper.  When she asked them to leave,

20   they left with no trouble whatsoever.

21           Her sole regret seemed to be her own failure of

22   memory to remember their names or what organization they were

23   with, but that surely cannot be the fault of the canvassers

24   who actually introduced themselves and the organization with

25   whom they were with.  She had no basis or reason to conclude

22-cv-00581-CNS-NRN   Bench Trial - Day 4       07/18/2024    833

1    that these two were from USEIP and, in fact, did not know from

2    which group they hailed.

3           It was upon suggestion apparently from plaintiffs'

4    counsel that USEIP was the group canvassing in her county that

5    she got -- at which point she adopted that position and

6    included it in her affidavit.  The law, however, requires much

7    more than this.  We cannot act upon a suggestion from counsel

8    as to actual evidence in a case.

9           Ms. Roberts, regardless, even if these folks were

10   from USEIP, testified that she did not suffer any threats of

11   violence, threatening phone calls, vandalism during or after

12   the event, and that the single canvassing event would not

13   affect her decision to vote in future elections.

14          So with that, the Court finds that there is simply

15   insufficient evidence to proceed any further in this matter.

16   Normally I would have reviewed my prior conclusions on

17   standing as part of this analysis, but I find no need to do

18   that.  The conclusions of this Court would likely have

19   remained the same on that issue.  But since the issue of

20   liability was teed up through these witnesses, the Court felt

21   it was appropriate to entertain a Rule 52(c) motion on the

22   issue of voter intimidation itself in the interest of judicial

23   economy.

24          In sum, plaintiffs have failed to introduce any

25   evidence that can remotely be perceived as intimidating or

22-cv-00581-CNS-NRN   Bench Trial - Day 4      07/18/2024    834

1    threatening on behalf of the three defendants.  There's no

2    evidence that any defendant or even an agent of USEIP engaged

3    in canvassing that objectively could rise to the level of

4    voter intimidation.  The playbook, which has been discussed

5    extensively, is also not objectively intimidating.

6         The timing of the alleged canvassing efforts is

7    important to the Court's analysis, although not discussed much

8    by the parties.  The canvassing efforts were after the

9    election and well in advance of the next election.  There was

10   no indication or evidence offered that any of the canvassing

11   attempted to assess a voter's intention to vote in the next

12   election or even discussed an upcoming election.  The

13   questions concerned the prior election, and in this context,

14   the evidence would be required to show an intent to interfere

15   with the right to vote in a much more significant way, and no

16   such evidence was presented.

17        Plaintiffs have made much of the fact that

18   photographs were allegedly taken of some residences.  There

19   was no real evidence of this, but regardless, even if true,

20   that would not rise to the level of surveillance that has been

21   found to support a claim for voter intimidation.  Such photos

22   are available on Google maps, and there's no evidence

23   presented in this case that any voter had such actions taken

24   against them or that they found that action to be

25   intimidating.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 4      07/18/2024    835

1            Sensing a lack of evidence to support their claims,

2     plaintiffs attempted to broaden the theory of the case

3     midstream.  I did not allow that.  The pretrial order controls

4     the claims brought in a case, and that claim was not argued

5     that way or asserted that way in the pretrial order.  Even if

6     it was, that would not have commanded a different result, as

7     there was simply no evidence of sufficient voter intimidation

8     here.

9            I will add that I found Professor Ellis's testimony

10    helpful and insightful as to the abstract issue of voter

11    intimidation.  The Court has no doubt that indirect voter

12    intimidation efforts as described by the professor have

13    occurred in this country and continue to occur in this

14    country.  Yet, the Court cannot infer that these defendants

15    are part of that effort without credible evidence establishing

16    that connection.

17           The alleged actions here are nothing like the cases

18    referred to by Professor Ellis or plaintiffs in any of their

19    briefs.  I will simply note a couple of those.  This is not

20    akin to following Native American voters into polling places

21    or recording license plate numbers of those who voted.  It is

22    similarly not threatening phone calls or asserting economic

23    retaliation over folks.  It is not blocking people from their

24    polling stations.  And it is also not indicating that the

25    ballot drop box is under any type of surveillance and fraud

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 4      07/18/2024    836

1   will result in crimes being pursued.  This is simply far too

2   remote without any testimony of any voter who found any of

3   these efforts to be intimidating.

4        As a result, the Court finds that plaintiffs have

5   failed to show any violation of Section 11(b) or Section

6   1985(3) by any of the named defendants in this case, and

7   judgment shall enter in favor of the defendants.

8        With that, I will thank counsel for their

9   professionalism, and we will be in recess.

10        THE COURTROOM DEPUTY:  All rise.  Court is in recess.

11      (The proceedings were concluded at 9:36 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sarah K. Mitchell, RPR, CRR

222

1                        REPORTER'S CERTIFICATE

2

3            I, SARAH K. MITCHELL, Official Court Reporter for the

4   United States District Court for the District of Colorado, a

5   Registered Professional Reporter and Certified Realtime

6   Reporter, do hereby certify that I reported by machine

7   shorthand the proceedings contained herein at the time and

8   place aforementioned and that the foregoing pages constitute a

9   full, true and correct transcript.

10           Dated this 30th day of July, 2024.

11

12

13

14            _____/s/ Sarah K. Mitchell_____

15                    SARAH K. MITCHELL
                    Official Court Reporter
16             Registered Professional Reporter
                 Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-00581-CNS-NRN

Colorado Montana Wyoming
State Area Conference of the NAACP,
League of Women Voters of Colorado, and
Mi Familia Vota,

                  Plaintiffs,

  v.

United States Election Integrity Plan, Shawn Smith,
Ashley Epp, and Holly Kasun,

                  Defendants.

---

**NOTICE OF APPEAL FROM FINAL JUDGMENT**

---

       Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of

Women Voters of Colorado, and Mi Familia Vota appeal to the United States Court of Appeals for

the Tenth Circuit from the final judgment entered on July 18, 2024.

Dated:  August 16, 2024             LATHROP GPM LLP

                                 By */s/ Amy Erickson*
                                 Casey Breese (#51448)
                                 Casey.breese@lathropgpm.com
                                 Jean Paul Bradshaw
                                 Jeanpaul.bradshaw@lathropgpm.com
                                 Kristin Stock
                                 Kristin.Stock@lathropgpm.com
                                 Brian A. Dillon
                                 Brian.dillon@lathropgpm.com
                                 Amy E. Erickson (#54710)
                                 Amy.erickson@lathropgpm.com
                                 1515 Wynkoop Street, Suite 600
                                 Denver, CO 80202
                                 Telephone: (720) 931-3200

64184741v1

Courtney Hostetler
chostetler@freespeechforpeople.org
John Bonifaz
jbonifaz@freespeechforpeople.org
Ben Clements
bclements@freespeechforpeople.org
Amira Marcella Mattar
amira@freespeechforpeople.org
FREE SPEECH FOR PEOPLE
48 N. Pleasant St.
Amherst, MA 01002
Telephone: (617) 249-3015

*Attorneys for Plaintiffs Colorado Montana Wyoming
State Area Conference of the NAACP,
League of Women Voters of Colorado, and
Mi Familia Vota*



# COUNTY & LOCAL ORGANIZING PLAYBOOK

AUGUST 2021

U.S. ELECTION INTEGRITY PLAN
COPYRIGHT 2020-2021, USEIP. All Rights Reserved.

1:22-cv-581
**TRIAL EXHIBIT**
**1**

Dedication

*In April 2021, Dr. Douglas G. Frank came to Colorado and told us that Super Moms are going to save the world. Challenge accepted.*

*This resource guide is dedicated to Dr. Frank, Mike Lindell, Professor David Clements, COL Phil Waldren, Col Shawn Smith, and all the incredible Patriots that are risking Lives, Fortunes and Sacred Honor in the name of truth. Thank you for inspiring us and leading the way.*

- The Super Moms of Colorado

1

## WE ARE THE PLAN

### It s Going to Take Every Single One of Us

The U.S. Integrity Plan began in response to the November 2020 fraudulent election. A group of three like-minded patriots started off as strangers at the Colorado State Capitol on November 7th, 2020. By November 21st, we were no longer strangers, we realized that we had an incredible wealth of skills, experiences, and expertise, and we began organizing with a dozen volunteers from diverse political and professional backgrounds.



We knew then that this is the fight. Like you, we had watched as politicians and special interests drove our country into the ground and ensured the rise of our current communist nightmare. But in November 2020, they crossed a line. When they stole our election, they stole our Republic.

If we allow the fraud to stand, we become complicit in the destruction of the greatest nation in the history of earth. We become complicit in their crime. No. No one is coming to save us. It's time to stand up.

The mission and vision of this association of patriots is, and has always been, to organize our friends, neighbors, and newfound compatriots to stand in the wake of November 2020 and say, "Enough." Until the truth of November 2020 comes to light, and the consequences felt those complicit realized, we can have no confidence in the government installed by them. And we do not consent to be governed by those elected through fraud.

**Fraud corrupts everything.**

2

## About This Guide

Since we began organizing in November 2020, we have documented our efforts, on all fronts, to be able to ensure that we don t continually recreate the wheel, and so that we can provide resources (and a lot of lessons learned) for patriots in other states, counties, and localities. The resources provided here are free of charge. USEIP is an association of like-minded people working together to affect change locally. We don t raise funds, and we don t accept donations for any of the work we are doing. No one owns USEIP, and we don t want your money either. We want YOU.

No, not to join USEIP. I mean, we re awesome, but that s not our goal. We want you to bring your skills, talents, and God-given passions to the movement to restore our Republic. Gather, understand what resources you have collectively – what skills, talents, and passions everyone brings to the table – and get to work. It s going to take every single one of us.

We are scientists, mathematicians, cyber security experts, community organizers, writers, artists, former politicians, current and former military, corporate strategists, digital experts, super moms, pastors, prayer warriors, and so much more. We are young and we are old. We are black, white, and brown.

We are the American People. AND, WE ARE THE PLAN.

## Contents

Just Get Started ................................................................................................................................... 5

Building Your Team ............................................................................................................................ 6

    Focusing Your Efforts .................................................................................................................. 6

    Organizing for Connection .......................................................................................................... 7

    Engaging the People ................................................................................................................... 8

        Recruiting .............................................................................................................................. 8

        Volunteer Vetting ................................................................................................................. 9

        Volunteer Onboarding ....................................................................................................... 10

    Stay Organized & Grow Your Trusted Team ........................................................................... 11

            Everyone Has a Job – Roles for Your County ................................................................. 11

Relationship Management ............................................................................................................... 12

Knowledge Management .................................................................................................................. 12

Meetings & Events ........................................................................................................................... 12

Calendar Management ..................................................................................................................... 12

Voter Verification Canvassing ......................................................................................................... 12

Walker Training ................................................................................................................................ 12

Walk Scheduling .............................................................................................................................. 12

Walklist & Data Coordination .......................................................................................................... 12

Artifact Organization ....................................................................................................................... 12

3

Volunteer Coordination ......................................................................................................................... 12

Vetting Phone Calls ............................................................................................................................. 12

Volunteer Onboarding ......................................................................................................................... 12

    Communicating & Collaborating – Meetings & Events ................................................................. 12

    Communicating & collaborating – The In-Between Time .............................................................. 14

References ........................................................................................................................................... 15

    Appendix A: Documentation, Templates, and Guidance .............................................................. 15

    Appendix B: Sample Resources ................................................................................................... 16

        Volunteer Vetting – Call Script .............................................................................................. 16

USEIP Voter Verification Guide ........................................................................................................... 17

    About This Guide ......................................................................................................................... 17

Why Voter Verification? ....................................................................................................................... 19

Voter Verification Roles ....................................................................................................................... 19

Overview of Voter Verification Process ............................................................................................... 20

    Step One: Train Your Leaders ..................................................................................................... 20

    Step Two: Prepare County Data Files .......................................................................................... 21

    Step Three: Review County Data Files ......................................................................................... 21

    Step Four: Prepare Walk Kits ....................................................................................................... 21

    Step Five: Train Volunteers & Complete First Walk ..................................................................... 22

    Step Six: Transcribe Data to Logbooks ....................................................................................... 22

    Step Seven: Notify Analytics of Incoming Data ........................................................................... 22

    Step Eight: Retro to Continuously Improve .................................................................................. 22

    Step Nine: Repeat with Next Precinct .......................................................................................... 22

Resources Available to You ................................................................................................................. 23

    Connect with Us! .......................................................................................................................... 23

References ........................................................................................................................................... 24

    Appendix A: Documentation, Templates, and Guidance .............................................................. 24

    Appendix B: Volunteer Recruiting ................................................................................................ 25

4

## Just Get Started

Please don t become overwhelmed by this guide. It s simply a resource, and it s based on months and months of experimenting, adjusting, abandoning, and finding success. **The most important thing is that you just get started.**



During the American Revolution, patriots planned and organized in churches and pubs. Today, our tendency is to organize online, especially since Coronavirus has radically changed our standard of living. But you cannot save America from behind a keyboard. While some of the patriots who join you locally will have limitations on how they can participate, if you re stepping up to lead in your county or in your state, you re going to have to go outside. This work is in real life. It s local and collaborative and challenging and messy.

You can t save your state and our country alone. So, we recommend starting with building your team.

5

## Building Your Team

Don t over engineer it. Just schedule a meeting. The first thing is to find other patriots concerned about election fraud – or, frankly, all the communism, and start talking. If you use socials, check Next Door, Telegram, Gab, or (grr) Facebook and find the conversation. Then say,  Hey, who wants to grab coffee?"

In December and January, when we weren t protesting at the Capitol on Saturdays – every Saturday between November 07, 2021, and January 16, 2021 – we were holding local coffee meet ups and happy hours in our respective areas of the Colorado Front Range.

We also attended everyone s events. GOP, Libertarians, FEC United, Women s Groups, Tea Party Groups, and any other groups where we might find some common ground. The key is meet people, talk to other leaders, collaborate, share ideas, share intel, and row in the same direction. The power of our collective scale is formidable.

## Focusing Your Efforts

Once you have your core group of trusted compatriots, you re going to want to set your immediate focus areas. These are flexible and will change with the growth and evolution of your effort. But the important goal is to be intentional about them. There are so many distractions, laser focus is critical to forward progress.

*It was raining when four strangers met in the Lost Coffee Shop in Castle Rock. I posted the event on our message board and three other people showed up. Weather can be a real killer. Interestingly, the people who did show up represented the four main communities of Douglas County: Castle Rock, Highlands Ranch, Parker, and Roxborough. After getting to know each other and sharing intel (and speculation), we got down to what needed to be done. By the end of the meeting, we had all agreed to be Douglas County Captains and each one of us took a specific focus area."*

- Douglas County, Colorado

We have stories like this in almost half the counties in Colorado, including the 12 largest. Each county looks different because each county is different. Focus areas will vary based on the current county landscape, the nature and patriotism of the elected officials there, and your priorities for the county. That said, there are priorities that are important to laying the foundation to grow and scale. Here are the focus areas that we have in pretty much every county.

6

## Organizing for Connection

This is your "air traffic control" for the county. The objective is to **build your county coalition** and grow your team. Coalitions are very important to us. You see, communists are very good at marching in the same direction because their meals depend on it. With Act Blue, if you fall in line, you get a cut. You get fed (until you don't).

Freedom loving people are, by nature, independent. We are entrepreneurial and opinionated and critical thinkers. So, in times of peace, we are much keener to disagree and debate and ideate and innovate – and compete. And most of us love every minute of it.

*"In Weld County, we focused initially on connecting all the conservative groups to collectively fight for election integrity. After pooling our volunteer lists together, our captains team began organizing, training, establishing talents, and best fits. Staying connected, while dividing and conquering on our priorities, has helped us to rapidly scale our efforts. Accountability and ownership are critical, as are open communication and ongoing, real-time collaboration. The mission demands these attributes – and when we all organize and work together, we are unstoppable."*

- Weld County Colorado

But we are not in a time of peace. And everyone who values freedom and is committed to the fight for our Republic is now needed. If we can agree on the Bill of Rights, we can debate everything else later. The secret our enemy doesn't want you to know is that pretty much everyone agrees on the Bill of Rights.



### Top Tips

1. Be intentional about relationship management.
   People are your most important asset and it's going to take every one of us.
2. Work with people you disagree with and find common ground. But beware of infiltrators.
3. Get to know your local elected officials. Watch them and take notes. Find out where they line up; and don't forget.
4. Communicate with your County Clerk and Recorder regularly. They should know you.
5. Attend your Board of County Commissioner Meetings and testify on election-related topics.
6. Communicate with the leaders of other groups in your county and compare notes.
7. Use a shared calendar to track all the patriot events, public meetings, etc. Someone on your team should be accountable for this calendar.

7

8. Define clear accountabilities for yourself and your fellow captains. This should be collaborative.
9. Track your work – bonus points for not collaborating on social media (stay off their radar if you can).
10. Stay focused on election integrity!

## Engaging the People

This is where you want your extroverts. Like we said, this work is in real life and self-governance is the overall goal here! This focus area includes Volunteer Recruiting, bringing new volunteers into the team, and setting them up for success. We connect and collaborate to optimize our scale and build a formidable, local, reliable team!

*"In El Paso County, we have lots of like-minded organizations and everyone spun up an election integrity committee after November 3. Connecting these efforts for maximum scale was our goal. By connecting in the community, enlisting the diverse leadership that already existed, and giving motivated individuals immediate actions where they could impact change, we quickly pulled together an engaged, powerhouse team. Connect with your local GOP, retirees, conservative churches, business owners and community leaders for further word of mouth recruiting. We ask volunteers to enlist passionate friends and partners to continue growing our ranks. And that works. The people are out there and want to get involved. They need someone to show them the way."*

– El Paso County, Colorado

This focus area also includes vetting these volunteers and getting them immediately plugged in to help you as part of your team. Let s break this down a bit more.

### *Recruiting*

You can recruit anywhere. We initially recruited, for our first two months, almost exclusively at in-person rallies, using a notepad and collecting emails and phone numbers. But as you grow and scale, you should be mindful of security and vetting while also remaining vigilant to not make your process so cumbersome that it inhibits people joining you. Many of those who have attempted to get involved with USEIP in recent months can testify to the fact that this is a lesson learned for us. More on that below in the  Volunteer Vetting" section.

**Social media** is useful for recruiting as long as you have additional controls in place to validate that you are not inadvertently admitting Antifa and Act Blue into your core group (your brain trust). A great example of online organizing is the  America First Audit" groups on Telegram. There are groups in all 50 states. In Colorado, there are over three thousand people in that specific Telegram room, and every day more and more people join and ask,  What can we do?" There are many answers to that question, but we generally, respond,

What is that thing for you? That thing that, when you re doing it, time flies by and you re in the zone and you feel like you are doing what you were born to do? Because that is what we want you to bring to this movement."

We work closely with AFA s Colorado team, to get people who want to do more in real time plugged into their County Coalition. We have recently asked all our County Captains to join the AFA Telegram group to limit the gap and lag time between people saying, I want to help!" and us getting them plugged in to help. It s an agile process, and we intentionally revisit how it s going each month to evolve our processes and understand, and manage, points of scale.

In-Person Events are great for recruiting. Like we said, since election day, there have been Election Integrity Committees pop up all over the place. Go to these events, talk about your plans and specific actions that you want to recruit people to help complete, and engage people in real life.

The bottom line is that you can recruit new volunteers from everywhere: social media, in-person events, flyers, message boards, wherever. But the next step of vetting volunteers as you bring them into the fold is critical to keeping your effort secure and on track.

*Volunteer Vetting*

This area has been a journey for us. We always wanted to be careful of who we let into the fold of what we are doing. So, we began with a social media check, looking for a history of freedom-posting before bringing someone into the team. This worked well for a while, until social media companies began banning people.

Our second attempt was to add a verification phone call to the social media checks. So, when a person signed up, we would check their social media and call them to do a gut check" on the person. This process was in place for many months, until we learned (roundaboutly) that there were a couple of people in our group, who were volunteering for our events, who had a criminal history of sexual misconduct. Since our events are always open for people to bring their kids, we couldn t continue to be so relaxed in our approach.

We finally landed on a process that incorporates the social review, the phone call, and a background check. We aren t going to detail all our processes and tools for security reasons, but the principle here is to know who you re working with. It s unfortunate that we must check volunteers for pedophilic leanings, but welcome to 2021.

9

*Volunteer Onboarding*

Another lesson learned for us was with the experience of our new volunteers. We put a lot of effort into vetting them and getting them into our project management tool, but there was an experience gap between getting them approved and getting them plugged in. When we were small (<50 volunteers), we used a survey tool to understand people s passion areas and core skill sets, and we allocated people to functional teams based on that survey output. But as we grew, this became unmanageable.

To scale this, and try to address the experience gap, we did two very intentional things. First, we created county-specific rooms in our project management tool, and all new volunteers were put into their county room by default.

- Whenever someone is added, we post a welcome message into the county room, and engage the new volunteer in discussion. "Tell us a little bit about yourself."
- Because this happens in the county room, right away they are getting plugged into the local team that is working near them.
- Because we are asking them about themselves, we get insight into where they can help with our priorities for the county – and new priorities they might raise!

The second thing we did was to create a **Welcome Guide** for all new volunteers that orients them to our purpose and mission. This guide (which is really a folder of documents) includes:

- **Welcome Message**: Welcomes them and guides them through Onboarding
- **Getting Started Checklist**: Activities to bring them up to speed
- **Project Management Tool Tutorial**: Orientation to our project management tool
- **How to Get Plugged in**: Links to county rooms, captains, and other helpful resources

So, our Onboarding approach is really a combination of high-touch engagement activities and self-guided resources. We are continuously evolving this process and improving our approach based on feedback. Of course, onboarding is just the first step, and you need to manage your team of volunteers with similar focus and nuance as you would manage a group of paid professionals – but as a rule, treat volunteers better. They aren t getting paid!



10

Top Tips

1. The bottom line is that you can recruit new volunteers from everywhere: social media, in-person events, flyers, message boards, wherever.

2. Vetting volunteers as you bring them into the fold is critical to keeping your effort secure and on track.

3. Evolve your vetting process as necessary, as your team grows, to keep it efficient. If you have a long lead time between contact and engagement, it's probably time to upgrade your approach.

4. Onboard new volunteers with a combination of high-touch engagement activities and self-guided resources to bring them in and keep them engaged.

5. Manage your team of volunteers with similar focus and nuance as you would manage a group of paid professionals.

6. Treat your volunteers better than your employees. They aren't getting paid!

## Stay Organized & Grow Your Trusted Team

There is so much to do. As you can tell from the first couple focus areas, no one person can save the country alone. So, as a captain, finding passionate self-starters to help share the load is critical to setting up for success and ensuring that YOU don t burn out.

### *Everyone Has a Job – Roles for Your County*

When you first start out in your county, you will very likely be overwhelmed. We all were. So, understanding where to focus – and the people and skillsets you need to be successful – is a good first start for new captains. Consider these three buckets:

"Build the coalition. Get everyone you know to bring their skills, talents, and passions to this movement. Together, we are formidable. In Mesa County, we have defined areas of responsibilities and accountabilities. As the guide says, everyone has a job. And in Colorado, Mesa is a target because we are so effective. We stand united and we hold each other accountable – which is why we have been so successful in exposing the fraud in our elections."

- Mesa County, Colorado

When you get started, you might just have two to three people trying to execute on all of this – but as you grow and bring people into your team, having a long view of how you want to organize is important. Here are the roles we recommend you start bringing in:



- **Lead Captain**: This is probably you. But you need someone who can look across the county – and all the activities for election integrity – and think strategically about where to go and how to get there.

- **Relationship Lead**: For many of our counties, the Lead Captain is also the Relationship Lead, and for some counties it's not – so do what works for you. This person will be the first point of contact for your relationship to other organizations and building the relationships that allow you to partner within the county.

- **County Admin**: The county admin should make sure the County Calendar has all the county government meetings, grassroots events, and other important meetings and events up to date. The county admin will also help with new member phone calls and process management.

*Communicating & Collaborating – Meetings & Events*

Ideally, you re setting up your county in the context of setting up your state. Real-time communication and cross-county collaboration are your friends! Colorado is a diverse state of 64 counties, including progressive cities and towns like Denver, Boulder and Vail as well as rural areas that comprise most of our landmass. Our efforts from one county to the next look differently as the priorities for those counties are different – but it is all election integrity.

For example, in a few Colorado counties, the elected officials and bureaucrats were concerned about election fraud. They were friendly to calls for transparency and allowed some audit activities. In other (most) counties, these people were obstructive and repeated the excuses and lies of the Secretary of State. Our strategies, approaches and tactics vary due to the landscape and priorities for the county.

That said, you will likely have several counties with the same challenges and priorities, so communicating across counties can be a real accelerator. We host two recurring video call cadences in Colorado:

- **Weekly Captains Meeting:** All county captains are invited to attend to learn about what is happening in Colorado and USEIP, share what is happening in their counties, and share ideas and resources across counties.

12

      Agenda
- o State Updates
- o New Tools and Processes
- o County Roundtable

ı **Monthly New Captains Call:** All new captains are invited to attend to get an overview of the role of a captain and the resources available, to meet members of our core team and other county captains, and to ask their questions.

      Agenda
- o Ice breaker
- o Overview of our efforts, the role of captains, and core responsibilities
- o Overview of our Project Management Tool
- o County-specific stories (rotates depending on which captains are on the call)
- o Q&A

We also recommend that you hold county-specific calls with your core captain team and your volunteers. We have different flavors of these, but recommend:

ı **Weekly County Captains Call (Specific to County):** This is more of a strategy and planning call, as opposed to the cross-county call which is more collaborative and knowledge sharing. This call is where you plan your activities and divide and conquer among the leads within your county. Use an agenda (sample below), keep a record of the meeting (including discussion points and action items), and track all activities and actions through to completion.

      Agenda
- o Action Item Review
- o Roundtable Updates
- o Review Targets (Dashboard)
- o Status (Recruiting, Voter Verification, etc.)
- o Specific Planning Activities (Trainings, Booth Events, Meetings with Electeds, etc.)

ı **Regular County Meetups:** These can be virtually via video chat or locally at a coffee shop. You should invite all your volunteers and use the in-person time to build relationships, understand what skills you have in your county team, and recruit more people to be hands on with activities.

13

Agenda
- o Introductions & Ice Breaker (We like, "What first woke you up?")
- o Overview Mission and Purpose
- o Share Ways to Get Involved
- o Open Discussion (This is important – when people show up, they want to talk!)

*Communicating & collaborating – The In-Between Time*

In addition to these scheduled meetings, you should try to build collaboration into your team at the start, as a part of the culture. Phone calls, video chats, text messages, in person gatherings are essential. What is just as essential but less intuitive is the in-between time collaboration. We use a project management tool for this, and as soon as people have been through our vetting process, they get added to that tool. We have our tool organized by both functional area (voter canvassing, data analysis, content, and media, etc.) and by geography (county and state). All volunteers are added to their county room by default. The tool has capabilities beyond the social media platforms, such as a shared calendar, document library, task management, automation, and more. Also, it s not social media which is a bonus.

The county rooms are very important. They are the drop zone for our new volunteers, and they are the primary communication space for communicating, collaborating, and organizing the people in the county! In between calls and meetings, you should get in the regular rhythm of spending time in your county room each day and engaging with your volunteers. Being intentional with your communication and collaboration – how you are interacting with all your audiences and partners – will connect your team in a deeper way and help build trusting relationships!

Tips
1. Be intentional with your communication and collaboration.
2. Build your team to ensure that you don't burn out. No one person can save the country!
3. Look across your county to understand what you want to build and prioritize your efforts.
4. Don't be afraid to change course and evolve your process to stay effective.
5. Consider using a project management tool (Asana, Slack, Basecamp, Teams, etc.) to bring capabilities that social media lacks.
6. Hold regular meetings and touch points in your county.
7. Model the behaviors you want the team to adopt – demonstrate for them!
8. Never forget that The People are your most important resource and your greatest asset.

14

# References

## Appendix A: Documentation, Templates, and Guidance

This is the boring and painful part. But it is critically important. By keeping a record of your journey, you have resources to go back to and reference. That means you don t solve problems over and over again. Through a LOT of mishaps and pitfalls, we have learned this lesson: Solve the problem once and document it.

Here is an example of what we have some answers, or at least some clarity, for:

The following appendix provides a sample of what we have to offer. Reach out if you d like to go deeper into any of this – we d love to help!

### Data & Analytics

- Canvassing Algorithms
- Homemade Optical Scanning Software
- Analytical Tools
- Guidance for Election Integrity Data & Analytics

### Voter Verification

- Leader's Guide
- Process Flow and Journey
- Detailed Procedures from Start to Finish
- Targeting Your Canvassing
- Walk List Creation
- Voter Verification – Lead Training
- Voter Verification – Walker Training
- Walk Kits
- Guide to Your First Walk
- All About Paper (Records of Your Walk)
- Data & Record Management

### Meetings & Events

- Event Planning Tips
- Engaging Your Elected Officials
- Media 101
- Running a Booth

### And more!

15

## Appendix B: Sample Resources
*Volunteer Vetting – Call Script*

This is a sample of the Volunteer Vetting call script that we use for USEIP.

#BEGIN#

Hello, this is <NAME> from <GROUP>. I got your information from our website so I'm calling you to get you more involved. How did you hear about us?

*They list how they heard about us on the website so you can also prompt them from that, "I see you heard about us from when Ashe spoke at the Tea Party. What got your attention about Election Integrity?"*

Tell me about you.

*Get them talking about themselves, and their concerns with election integrity. They will typically have a lot to say. If they mention another group, ask follow-up questions – maybe they are an election integrity committee to connect with! Keep it conversational and authentic to you, and consider these prompts if you need help:*

*What do you do for a living? And how about for fun?*

*What are your passions or skills?*

*What are your biggest concerns?*

How do you want to plug in?

*This is where you find out what skills and expertise they bring to the team. From here, propose some options of how they could plug in.  So, you sound pretty data-oriented, would you be interested in getting involved with our data and analytics team?" Or,  Oh, you re a writer! We definitely need help with messaging and other writing. Would you like to help out with that?"*

OK, here are our next steps!

*If you made agreements on the call to connect them, summarize those actions. Make sure that you connect them to their county room, invite them to any county specific activities on the schedule, and have a tangible next step for what THEY need to do next. As a default, point them to the Welcome Guide orientation.*

Thanks so much for your time! We are so excited to have you on the team. Please be on the lookout for that email invitation and feel free to DM or call me with any questions!

#END#

16

# USEIP Voter Verification Guide

## About This Guide

In Colorado, we won't get a forensic audit without hard evidence. In December 2020, the grassroots movement forced a hearing in the Colorado General Assembly's Legislative Audit Committee. The hearing was scheduled for two hours and went for eight. For the first six, the state brought their witnesses, including two former Republican Secretaries of State, to gush and rave about the "Gold Standard of Elections."

We had our own experts as well, but we didn't have the opportunity to fully present our side. Some of our experts were thrown out of the hearing for "Covid concerns." Others were bumped due to "lack of time." Remember, they scheduled two hours and took six to pontificate and filibuster. Colonel Shawn Smith was able to testify at the very end of the day, when the media and many of the legislators had left, and the measure to forensically audit the Colorado election failed on a party line vote.

If we are going to get an audit in Colorado, we need to bring evidence. In Colorado, we have been canvassing to verify the November 2020 election for months. As many other states begin this effort, we decided to write down our approach so others can learn from our experience.

Please connect with us to go deeper. We are happy to share our resources and experiences with the entire country.

We are the American People. AND, WE ARE THE PLAN.

17

# Contents

USEIP Voter Verification Guide ........................................................................................................ 17

    About This Guide .................................................................................................................... 17

Why Voter Verification? ................................................................................................................. 19

Voter Verification Roles ................................................................................................................ 19

Overview of Voter Verification Process ......................................................................................... 20

    Step One: Train Your Leaders ............................................................................................... 20

    Step Two: Prepare County Data Files .................................................................................... 21

    Step Three: Review County Data Files ................................................................................... 21

    Step Four: Prepare Walk Kits ................................................................................................. 21

    Step Five: Train Volunteers & Complete First Walk ............................................................... 22

    Step Six: Transcribe Data to Logbooks ................................................................................. 22

    Step Seven: Notify Analytics of Incoming Data ..................................................................... 22

    Step Eight: Retro to Continuously Improve ........................................................................... 22

    Step Nine: Repeat with Next Precinct .................................................................................... 22

Resources Available to You ........................................................................................................... 23

    Connect with Us! .................................................................................................................... 23

References .................................................................................................................................... 24

    Appendix A: Documentation, Templates, and Guidance ........................................................ 24

    Appendix B: Volunteer Recruiting ......................................................................................... 25

18

## Why Voter Verification?

To ensure free and fair elections and to restore The People's confidence in our election system, we must undertake citizen audit activities to either refute or confirm serious allegations of election malfeasance.

Voter Verification efforts are structured and executed to support future legal action, should that action be necessary. Additionally, voter verification results – regardless of outcome – are valuable in ensuring The People's trust in future election cycles.



## Voter Verification Roles

**County Captain**: Leader and "air traffic controller" for all election integrity activities in the county. Serves as a point of escalation for voter verification teams.

**Training Lead**: Responsible for training all County Captains and other leaders on voter verification activities. This is a train-the-trainer activity, and the Training Lead will, in turn, train your volunteers.

**County Data Lead**: Serves as county liaison to the Data & Analytics Team; the County Data Lead is responsible for preparing walk lists, supporting walk teams from a data standpoint, and shepherding the data from the county into the voter verification database.

**Walk Lead(s)**: Responsible for organizing and scheduling walks, preparing walk kits, recruiting volunteer and all other "on-the-ground" activities for voter verification.

**Analytics**: Team responsible for data strategy and execution statewide; servant leader to County Data Lead to support and enable county canvassing efforts.

19

## Overview of Voter Verification Process



Figure 1.0: Voter Verification Process

## Step One: Train Your Leaders

As a County Captain, you need leverage. Overseeing the voter verification efforts in your county is a huge undertaking. Before you begin any voter verification activities, please take the time to ensure you have people trained up to complete the Voter Verification Roles, above.

This training is a train-the-trainer activity. You have two goals in this training:

1. Help your leaders understand the purpose, process, and execution of voter verification and canvassing activities.
2. Prepare your leaders to train volunteers to complete voter verification.

USEIP has training materials that we use for this activity in Colorado. Please connect with us to learn more.

20

## Step Two: Prepare County Data Files

Your County Data Lead will work the Analytics team to determine where to walk, and they will create precinct-level walk lists for your volunteers. Specific details on the data step are included in the Data & Analytics Guide.

## Step Three: Review County Data Files

Once you have the walk lists, you will need to review this with your County Data Lead assure the quality of these lists prior to your first walk. You will want to examine the details; for example, are the apartment numbers in order and is the walk list manageable to complete within a two-hour walk?

**Bonus!** It is extremely helpful for ALL members of your county leadership to complete a walk prior to scaling your process. There is not replacement for firsthand experience.

## Step Four: Prepare Walk Kits

Once your lists are created, you are almost ready to walk! Your Walk Leads should begin creating Walk Kits for your first walk. Walk Kits should include:

- Walk Lists
- Blank Affidavits (Spanish and English)
- Volunteer Script (Spanish and English)
- Procedure Overview (One Pager)
- Clipboard
- Black or Blue Pens
- Lanyard
- Name Tag
    - First Name
    - Volunteer ID Number
    - Organization Name

21

## Step Five: Train Volunteers & Complete First Walk

Now that you have created your Walk Kit, you are now ready to recruit and train your volunteers! Your Training Lead and Walk Leads will work together to get this scheduled. Training is generally one hour in the classroom, then transitioning immediately to walking to put the learning into practice!

For information on recruiting volunteers for voter verification, refer to *Appendix B: Recruiting Volunteers.*

## Step Six: Transcribe Data to Logbooks

Once your walk is complete, you need to submit the data and records from your walk back to your County Data Lead and Analytics. Details about data and records management is available upon request. This is not something that we will broadly publish; however, we are happy to meet with you and share our process and resources.

## Step Seven: Notify Analytics of Incoming Data

Once the data has been logged, you need to give your Analytics team a heads up that new data is coming into the database. This process could likely be automation via notifications, but we haven't gotten there yet. Realtime, open communication is critical to ensuring your process is undisrupted as your volunteers continuously submit the data from their walks!

## Step Eight: Retro to Continuously Improve

After each walk, gather feedback. What works well? What parts of the process are becoming bottlenecks or other barriers to the efficient completion of voter verification canvassing? Keep in constant communication with your entire team to ensure you are evolving and scaling your process in a way that will serve your county – and your team – as you continue to grow in numbers and experience.

## Step Nine: Repeat with Next Precinct

Once the volunteer is trained in person and has completed their first supervised walk, we let them loose! We require that all volunteers walk in teams of at least two for volunteer safety and data security. You can assign pairs of walkers or let the volunteers select their own partners.

22

## Resources Available to You

We are so happy to share our experiences and resources with you, and we hope to hear from you soon. We have documentation, ideas, solutions for lots of the challenges and problems that you are going to face as you organize in your state. We will share these freely and enthusiastically. We will not, however, publish all our inner workings and strategies for our enemies to pour over. That would be dumb.

## Connect with Us!

Instead of publishing the ingredients of the sausage, we encourage you to connect with us on Telegram (@useip) or on our website at useip.org. We would love to connect with you, answer questions, collaborate on solutions, and share resources! Telegram is probably the quickest way, as we are growing so fast and making tons of phone calls to vet new volunteers!

The following appendices provide a sample of what we have to offer. Reach out if you d like to go deeper into any of this – we d love to help! This is our country, and our founding principles hold.

We are the American People. And we are The Plan!

Thank you!

23

# References

## Appendix A: Documentation, Templates, and Guidance

By keeping a record of your journey, you have resources to go back to and reference. That means you don t solve problems over and over again. Through a LOT of mishaps and pitfalls, we have learned this lesson: Solve the problem once and document it.

Here is an example of what we have some answers, or at least some clarity, for:

The following appendix provides a sample of what we have to offer. Reach out if you d like to go deeper into any of this – we d love to help!

### Data & Analytics

- ï Canvassing Algorithms
- ï Homemade Optical Scanning Software
- ï Analytical Tools
- ï Guidance for Election Integrity Data & Analytics

### Voter Verification

- ï Voter Verification – Leader Training
- ï Voter Verification – Volunteer Training
- ï Walk Kit Templates
- ï Data & Record Management

### Meetings & Events

- ï Event Planning Tips
- ï Engaging Your Elected Officials
- ï Media 101
- ï Running a Booth

### And more!

24

## Appendix B: Volunteer Recruiting

*Where do we get all these volunteers?*

This is where we go back to Build Your Team from the County & Local Organization Playbook. There are several ways to communicate your goals and recruit your fellow Americans to help complete the task.

Here are a few of our recommended approaches to recruit volunteers.

1. **Start with what you've got.** Try to fill the Voter Verification roles with people you know and trust. Be explicit in the requirements and expectations of the role.

2. **Attend lots of events.** The best way to recruit is in-person, face-to-face. And it's very likely that local conservative (or other) groups are holding events. Go! Get on the agenda, if you can, and have a clear call to action for people to get involved.

3. **Consider running a booth.** County fairs and other local events are a great opportunity to meet potential volunteers! Our "Running a Booth" guide is available upon request.

25

# Voter Verification

## Volunteer Training

1:22-cv-581

**TRIAL EXHIBIT**

**2**

USEIP 0033

# Overview

- Purpose of Voter Verification
- Safety
- Legal restrictions
- Procedures
- FAQ

USEIP 0034

# Terms Used

- Affidavit – statement by either a) voter or b) volunteer that there is a discrepancy in the state's record of voting, signed by either a) voter & volunteer (witness) or by Volunteer and second Volunteer (witness)
- Assignment List – list of voters to verify in a given geographic area, provide by County Coordinator to Volunteer
- Check-In/Out – text message from Volunteer to County Coordinator when beginning and ending Voter Verification (VV) activity; contains Volunteer ID #, location, Assignment List #, and beginning or ending voter # (from Assignment List)
- Daily Log – record kept by Volunteer of results of VV, returned via hard copy, or by email (e.g. photo of log taken w/cell phone camera) at end of each day of VV activitiesto County Coordinator
- Discrepancy – any Volunteer-discovered or voter-reported inaccuracy in State-reported voting record, e.g.: a) no residence at address, b) no such person at residence/address, c) person at residence reports they did not vote, and/or did not register, d) or their name in the voting record is inaccurate, or e) they voted by a different method (either in-person or mail-in/drop-off) than the state reports
- County Coordinator – single point-of-contact for VV Volunteers in each county; vets volunteers, maintains contact info for volunteers, provides Assignment Lists, tracks Check-In/Out, receives Daily Logs
- Volunteer – U.S. & Colorado citizens conducting VV
- Voter Verification – process of confirming CO record of voting/voters is accurate (person, residence, method)

USEIP 0035

# Purpose of Voter Verification

- We intend to ensure free & fair Colorado elections and to restore Coloradans' confidence in our election system by either refuting or confirming concerns of fraud

- Voter Verification is one of several means of conducting independent audits of election records and results, and one which is critical to determining whether CO voter registration and voting records are accurate

- Voter Verification will be presented as evidence, both in and out of legal settings, so we must be consistent in our conduct and consistent and accurate in our documentation of what we observe – don't write down, submit, or sign any log, result, or statement to which you would not pledge your "life, fortune, and sacred honor"

USEIP 0036

# Safety

- Safety is Third! (Padded rooms are the safest!) Ships are safest in harbors, but ships aren't made for harbors...
- But...don't put yourself in danger; highly recommend:
  - Work in teams of two
  - Record audio and/or video of activity (bodycam, cellphone, etc)
  - Have one Volunteer approach the residence door while the other remains at sidewalk
  - Do not enter properties with, e.g. "No Trespass" sign, loose dogs, loose men...
  - Be POLITE and HONEST
  - DO NOT ARGUE with anyone; verbal conflicts can escalate unpredictably. (Also, best not to debate election integrity, fraud, sports, burrito preferences, religion, etc)
  - Do NOT forget to check-in/check-out, so we know where you are if you need help
  - Dress the way you want to be perceived: business casual? Hells Angel? Tennis pro?

USEIP 0037

# Legal Restrictions

- This is NOT soliciting

-  (?) Volunteers are ALLOWED to record conversations (audio or video) which THEY, themselves take part in, without consent of any other party, and without notifying them (CRS § 18-9-304)

- You DO NOT have to identify yourself AT ALL, but may NOT misidentify yourself (neither your name, nor your org, nor your purpose)

- Protect yourself and the reputation/credibility of our team/effort – conduct yourself above reproach

- Do NOT complete any portion of anyone else's affidavit for them (beyond signing as a witness).  It MUST be the signer's statement (need legal review on this)

USEIP 0038

# Procedures (1 of 5)

1. Obtain Assignment List from County Coordinator

2. Plan walking route (e.g. using Google Maps, etc)

3. If available or desired, review addresses/area, including closest police/fire station

4. Wear "Hello" sticker/badge with first name and Volunteer ID#; do NOT wear other logo/message/campaign/organization attire

5. Check-in with County Coordinator

USEIP 0039

# Procedures (2 of 5)

6. Conduct VV:

   a.   Match address to Assignment List

   b.   If not a residence, log result

   c.   Approach entrance of listed residence and knock/ring doorbell.

   d.   If no response, log result.

   e.   If occupant answers, introduce self (first name) and organization (?), e.g. "Hi, I'm NAME, from CONCERNED CITIZENS/the ELECTION INTEGRITY PROJECT. We're contacting Colorado voters to verify the state's voting records are accurate. Could I ask you a few questions?"

   f.   Proceed w/questions: Confirm name, address, whether they are an eligible voter, whether they are a registered voter, whether they voted in the election, and by what method (in-person, mail-in/drop-box ballot).

   g.   If individual refuses to answer questions, THANK THEM, leave property, log result.

   h.   If individual answers/responds, log result.

   i.   If individual notes discrepancy, ask them "Would you be willing to complete a short/quick statement so we can correct the error in the state's records?"  If yes, take their affidavit and sign as witness when they are complete.  If no, then complete Volunteer affidavit of observation/statement as heard.

   j.   Remember to take photo of location/address for each discrepancy.

   k.   Proceed to next address and repeat.

USEIP 0040

7. When done for the day, Check-out with County Coordinator, send in Daily Log,

259

# Procedures (3 of 5) – Assignment List

- Awaiting copy of voter list; will insert graphic here illustrating fields/fields to verify

USEIP 0041

# Procedures (4 of 5) – Daily Log

| Assignment List: ELP-109 | | | Volunteer ID: 1013, 1028 | | | Date: 22 Apr 2021 | |
|---|---|---|---|---|---|---|---|
| Voter # | Voter Name (Last, First I) | Voter Address (## St, zip) | All Info from AL Correct/ Confirmed | Discrepancy (DR)non-resid. (DI)Inaccurate | Affidavit (N)one (O)ccupant (V)olunteer | Volunteer Notes | |
| 345256 | Black, Jack R. | 17 Hotel St, 80901 | X | | | | |
| 345259 | Blue, Karen S. | 22 Hotel St, 80901 | | DR | | No house; looks like mailbox; photo: Apr 22,2020/1015am | |
| 355091 | Tom, Major Y. | 1234 Some Ave, 80901 | | DI | V | Occ. Refused aff.; stated Major Tom does not/has not ever resided. Affidavit: 1013/1028 | |
| 365713 | Steuben, Hans M | 1775 Some Ave, 80901 | | DI | O | Occ. states not-registered, did not vote; ~5'8", Caucasian male, ~40-ish. Aff. 1013. | |
| 355014 | Martines, Mary L. | 1988 Some Ave, 80901 | | DI | O | Occ states reg, voted, but in-person, not by mail; ~5'4", Hispanic female, ~60-ish. Aff. 1013 | |

USEIP 0042

# Procedures (5 of 5) - Affidavit

Complete an affidavit for each logged discrepancy.

- Insert affidavit graphic

USEIP 0043

# Frequently Asked Questions

- What do I do if asked…
- What to do if someone photographs/films me
- What to do if approached aggressively/attacked
- What to do if I lose Assignment List/Daily Log
- What to do if approached by media
- What to do if followed

USEIP 0044



# COLORADO CANVASSING REPORT

Results from Four Colorado Counties, Comprising 1.1M+ Voters

Implications for Colorado



March 11, 2022



1:22-cv-581

**TRIAL EXHIBIT**

**5**

USEIP 0073

# Contents

Bottom-Line Up Front .................................................................................................................... 2

Introduction ................................................................................................................................... 3

Purpose ......................................................................................................................................... 4

Part 1: Methodology ...................................................................................................................... 5

    Methodology for Canvassing ..................................................................................................... 5

    Methodology for Statistical Analysis and Precinct Selection .................................................... 5

Part 2: Findings ............................................................................................................................. 6

    Discrepancy Rate Calculation ................................................................................................... 8

    Total (All Four Counties Combined) .......................................................................................... 8

    El Paso County ......................................................................................................................... 10

    Weld County ............................................................................................................................ 11

    Pueblo County ......................................................................................................................... 13

    Douglas County ....................................................................................................................... 14

Conclusions ................................................................................................................................. 16

Appendix ..................................................................................................................................... 17

    Reviewers' Credentials ............................................................................................................ 17

    Statistical Methodology ........................................................................................................... 18

## Bottom-Line Up Front

In order to verify the accuracy of the Colorado Secretary of State's voter rolls and voting history records concerning the November 2020 General Election, Colorado citizens took on the arduous task of canvassing residences that were listed on the aforementioned rolls. More specifically, canvassing took place in 2021, in four Colorado counties (Douglas, El Paso, Pueblo, and Weld), and successfully reached 4,601 of the 9,472 visited residences. Statistical analysis was performed on both the data and affidavits collected from this randomized canvassed sample. Results indicate that between 5% and 11%, or conservatively 8% (123,852 out of 1.1M), of voters in those four counties were affected by unexplained irregularities in Colorado's voter rolls and voting records. This irregularity rate is a conservative estimate that does not account for other, uncanvassed indicators of irregularity and inaccuracy. For Example, over 120,000 statewide ballots were undeliverable, which are likely due to inaccuracies in the Statewide Colorado Voter Registration and Election (SCORE) system.[1] Using the results of the canvassing-discovered irregularities as a proxy for the entire state indicates that 7-12% of all election races and measures on Colorado's November 2020 ballots may be questionable.[2]

Colorado elections belong to Colorado citizens. The Citizens of Colorado conducted this canvassing and analysis; this is their report. The intent of this report is to exhibit what was found and inform the public; especially public officials. For it is the sworn obligation and statutory duty of every Colorado election official to investigate all Colorado election irregularities, determine any impacts, and resolve said issues. Those officials who fail to look for, discover, report, investigate, and remedy these irregularities are potentially negligent, and/or in complete denial of any issues. Additionally, inaction on known issues constitutes a failure of duty to satisfy Article VII, Section 11 of the Colorado Constitution's requirement to "secure the purity of elections and guard against abuses of the elective franchise."

No public official bears more responsibility than the CO Secretary of State, whose powers under Colorado statute are explicitly enacted so that she may "secure the purity of elections and to guard against the abuses of the elective franchise,"[3] and who has control over SCORE, the certification of voting systems, and the Code of Colorado Regulations pertaining to elections.[4] Despite multiple reports from concerned citizens pertaining to election irregularities, vulnerabilities, and potential dilution of Colorado citizens' elective franchise, the Secretary has yet to investigate (or remedy) said issues. Instead, the Secretary continues to emphatically report that Colorado's election system accuracy and

---

[1] In El Paso County (EPC) alone, 14,485 mail ballots sent to names on the Colorado Secretary of State's Statewide Colorado Voter Registration and Election (SCORE) system list of Active Registered voters for the Nov 2020 General Election were returned as "undeliverable" by the USPS. The CO SecState's VoterCountsbyStatus for Nov 01, 2020 shows 452,715 Active voters in EPC, representing 12% of CO's Active Voters two days prior to the General Election. Unless inaccuracies in EPC's voter registration data are anomalous in comparison to other CO counties, this implies a likely statewide total of more than 120,000 mailed ballots addressed according to SCORE records but reported as undeliverable by USPS."
(https://www.sos.state.co.us/pubs/elections/VoterRegNumbers/2020/October/VoterCountsByStatus.pdf)
[2] This is based on all ballot measures and races where only a single candidate could win. The races and measures in question are those with margins of failure or pass that were less than the estimated ballot irregularity rates. Calculations of these numbers available upon request. Data retrieved from:
https://results.enr.clarityelections.com//CO//105975/276916/reports/summary.zip
[3] § 1-1-107(5) CRS, from https://codes.findlaw.com/co/title-1-elections/co-rev-st-sect-1-1-107.html
[4] 8 CCR 1505-1, from
https://www.sos.state.co.us/CCR/NumericalCCRDocList.do?deptID=20&deptName=1505%20Department%20of%20State&agencyID=104&agencyName=1505%20Secretary%20of%20State

safeguards are not only adequate but exemplary. The citizens' evidence-based report suggests otherwise.

The irregularities and issues identified in this report directly impact (and call into question) statewide, county, and local elections. To fully determine the magnitude, impact, and root causes of these issues, a statewide investigation (encompassing canvassing and a full forensic audit of all election-related systems and processes) must be performed by independent auditors, selected by and reported to the citizens of Colorado. The vote of each Colorado citizen is sacred and must be secured. If crimes have been committed against any Colorado citizen's vote, it must be investigated and, where appropriate, prosecuted. Such action must be accomplished to ensure the integrity and security of all Colorado elections.

## Introduction

"All political power is vested in and derived from the people; all government, of right, originates from the people, is founded upon their will only, and is instituted solely for the good of the whole." – *Constitution of the State of Colorado, Article II (Bill of Rights), Section 1*

"HAVA resulted from a national consensus that the nation's electoral system needs improvements to ensure that every eligible voter has the opportunity to vote, that every vote that should be counted will be counted, and that *no legal vote will be canceled by a fraudulent vote*." (Emphasis added) – *Colorado Revised Statute CRS 1-1.5-1015*

The Colorado Secretary of State asserts that elections in Colorado are "… the gold standard, but not only that, we are a beacon of hope for rest of nation."[6] However, Judicial Watch concludes that Colorado's elections are in the bottom tier, ranking 34th out of 50 states, of free and fair elections when judged on security and integrity.[7] These perspectives cannot be reconciled; either one perspective is true, but not the other, or neither is true.

A logical approach and the standard wherever fiduciary duties are involved would be to subject Colorado's election system and elections to independent audit, free from conflict of interest. The Secretary of State's fiduciary duty is clarified in CRS 24-18-103. Being that the citizens of Colorado are sovereign, such that all Colorado state authority and power is vested in and derived from the people, founded upon their will, and instituted solely for the good of the whole, no public official can reasonably or legally claim any authority to limit their access or ability to demand and conduct that independent audit.

In December 2020, several hundred Colorado citizens requested that an independent audit be conducted on Colorado's 2020 election through a petition of Colorado's General Assembly. The Legislative Audit Committee denied the audit and, further, voted not to study whether an audit should be conducted. That denial betrays their Constitutional obligation. Six months later (June 17, 2021), the Colorado Secretary of State created and enacted new "emergency" election rules, including prohibiting

---

[5] https://codes.findlaw.com/co/title-1-elections/co-rev-st-sect-1-1-5-101.html
[6] https://denver.cbslocal.com/2021/07/13/colorado-secretary-state-jena-griswold-elections-all-star-game-georgia/
[7] https://web.archive.org/web/20220225161500/https://www.heritage.org/press/heritage-foundation-launches-election-integrity-scorecard-ranking-states-election-laws

third-party (independent) audits.[8] Over 1,900 citizens submitted written comments objecting to the Secretary's new rules, with none supporting the new rules. Hundreds of citizens took the time to state their objections at an August 3, 2021 hearing required before permanent adoption of the "emergency" rules.[9] Those written comments and stated objections of citizens reflect their will, and their lack of consent for the Secretary's rules.  Colorado citizens never voted on this new rule to abridge citizens' authority. It was enacted by the sole authority of the Secretary of State, with the blessing of the Colorado Attorney General.

With no independent audit of Colorado's elections or election system, and a new rule prohibiting independent audits, Colorado's "gold standard" election system is merely an unsubstantiated, unverifiable claim. Nor are Colorado citizens' concerns unique; an October 2021 Rasmussen Reports survey showed that 56% of the US population[10] question the integrity of the November 3, 2020 election. Any claim about the standards of Colorado's election practices, whether purporting the strengths or weaknesses therein, should be backed by evidence. Voters must have confidence in the election system, and it can be restored with transparency and unbiased investigations.

It is the People who have full and unrestricted Constitutional rights to transparency and integrity in their elections and it is not subject to arbitrary abridgment by the Secretary of State. Many of the Colorado citizens who had petitioned the General Assembly and objected to the Secretary of State's rules, joined efforts and launched an independent canvass of Colorado's November 2020 election. Their coalition of several hundred citizens, from all backgrounds, expertise, and political affiliations, was met with unfair and inaccurate disparagement by the Secretary of State.[11] Despite this opposition, the citizens took on the responsibilities that the public officials refused to do, and they completed the canvass and summarized their findings.  This report is the citizens' report.

This report details the methodology used in canvassing, precinct selection (i.e., "population"), statistical analysis, and the overall findings pertaining to the Colorado elections. This report is not affiliated with any political party. All efforts and results of this report are the product of citizen volunteers seeking to understand the Colorado election system by asking: *What was the anomaly rate, if any, within the Secretary of State's record of Colorado's November 3, 2020 election*? Canvassing was accomplished entirely by volunteers and encompassed over 7,850 people-hours. This report is a testament to the caliber and character of the citizens who volunteered: everyday citizens who stepped up to civic duty to preserve and protect our sacred elections.

## Purpose

The purpose of this report is to expose issues that were identified from canvassing, comprehensively assess the extent and severity of these issues, summarize these findings, and to provide recommendations for a full, independent forensic audit on the entire election system (to include records, technology, processes, etc.). Part 1 details the methodology used for data collection

---

[8] https://www.sos.state.co.us/pubs/newsRoom/pressReleases/2021/PR20210617Rules.html
[9] https://www.coloradosos.gov/pubs/rule_making/hearings/2021/ElectionsRulesHearing20210803.html
[10]
https://www.rasmussenreports.com/public_content/politics/general_politics/october_2021/vote_by_mail_most_voters_think_it_will_cause_more_cheating
[11] https://www.sos.state.co.us/pubs/newsRoom/pressReleases/2021/PR20210909Canvassing.html

4

USEIP 0077

and statistical analysis. Part 2 details the findings from the data collected and highlights multiple categories of irregularities and election laws violated during the 2020 election.

# Part 1: Methodology

## Methodology for Canvassing

Canvassing involves going door-to-door in selected communities and speaking face-to-face with the residents of those dwellings. The volunteers who performed the canvassing received standardized training on how to professionally and objectively interact with the resident, collect data (about the resident's November 3, 2020 voting experience), and complete affidavits. Volunteers were issued a standardized script, a walk-list to fill out (i.e., collect data), blank affidavit forms (to document irregularities), and they canvassed in teams of two or more, to ensure their safety and eyewitness accounts for all interactions.

Each volunteer team's script was designed to prevent biased discussions with the resident while giving the resident ample opportunity to speak without interference from the volunteer. Volunteers did not ask anyone what their voting selections or choices were; they simply verified the information in Secretary of State public records. The script also helped ensure the standardization of data collection. The script was as follows:

1. Did you vote in the November 3, 2020 election?

2. If so, by what means did you return your ballot (mail-in, drop box, or in-person)?

3. Did you receive any extra ballots at this address?

4. Is your voter information accurate (i.e., name, address, party affiliation, etc.)?

5. Are there any other experiences you would like to share?

## Methodology for Statistical Analysis and Precinct Selection

A statistical sampling approach was used to make valid assertions about entire counties. Statistical sampling has been deemed credible in legal settings, as data collected in this manner can illustrate underlying features of a whole population while also maintaining randomness in the sample.[12] Following this methodology, the required sample size was determined based on the standard deviation of a precinct's aggregate propensity to vote, a predetermined confidence interval, and a desired margin of error limit. A 99% confidence level was selected, with a desired margin of error of 3%.

The propensity to vote was determined using a metric called the "Voter Opportunity Score" (VOS). The VOS is derived from voting history, which is contained in the Secretary of State's public data. This VOS metric is calculated by taking the number of Colorado elections a registered voter *actually* participated in and dividing it by the total number of Colorado elections that a voter had the *opportunity* to participate in (based on their age/date of registration[13]). The VOS is noted in the following equation:

---

[12] https://forensus.com/statistical-sampling-case-law/

[13] Age was chosen as the variable to determine opportunities due to issues with the registration date (e.g., there are many voters who have a voting history that predates their registration date).

$$VOS = \frac{number\ of\ CO\ elections\ that\ an\ individual\ voter\ actually\ participated\ in}{number\ of\ CO\ elections\ that\ an\ individual\ voter\ had\ an\ opportunity\ to\ vote}$$

The VOS indicates the likelihood that an individual will participate in any given election and is represented as a number ranging from 0 to 1 (where 0 indicates the voter has not participated in any elections, and 1 indicates the voter participated in every possible election). A VOS was calculated for every voter within a selected county. Similarly, a Precinct VOS was computed using a weighted-average formula for each precinct.

$$Precinct\ VOS = \frac{total\ number\ of\ CO\ elections\ that\ all\ voters\ in\ a\ precinct\ participated\ in}{total\ number\ of\ CO\ elections\ that\ all\ voters\ had\ an\ opportunity\ to\ vote}$$

Given that the VOS indicates the voting likelihood of an individual, and that social scientists assume human behavior can theoretically be modeled on a bell curve, extreme outliers of the behavior can be identified (on either side of the curve), and inferences made regarding the most frequent behaviors (i.e., the middle point or region of the curve). Applying this theory to voting propensity, the VOS identifies (and selects) the "extreme" precincts to be canvassed. Specifically, precincts with the highest and lowest weighted-average VOS are chosen to be canvassed since they represent the extreme behaviors, as noted above. Lastly, equal sampling from both the high and low VOS precincts is made to identify any behavioral changes around a specific election.[14]

Canvassing occurred in Weld, Douglas, El Paso, and Pueblo counties. The results for these counties are included in Part 2: Findings.

## Part 2: Findings

Affidavits generated from canvassing were notarized, scrutinized, verified, and organized into four categories:

☐ Election Law Violation
☐ Multiple Ballot(s) Received
☐ Voter Moved but Registration Database Never Updated
☐ Probable Election Law Violation

Election Law Violation

o Voter did not cast a ballot, but records indicate a ballot was cast in their name. Violation of CRS 1-13-705: "Any person who falsely personates any elector and votes at any election provided by law under the name of such elector shall be punished by a fine of not more than five thousand dollars or by imprisonment in the county jail for not more than eighteen months, or by both such fine and imprisonment."[15]

o The voter did cast a ballot, but records do not indicate a ballot was cast. Violation of CRS 1-13-723: "Every officer upon whom any duty is imposed by any election law who violates his duty or who neglects or omits to perform the same is guilty

---

[14] For more detailed statistical information, please refer to the appendix.
[15] https://codes.findlaw.com/co/title-1-elections/co-rev-st-sect-1-13-705.html

of a misdemeanor and, upon conviction thereof, shall be punished as provided in section 1-13-111."[16]

- o The voter did not live at the address at the time of the 2020 election. Violation of CRS 1-2-228: "Any person who votes by knowingly giving false information regarding the elector's place of present residence commits a class 6 felony and shall be punished as provided in section 18-1.3-401, CRS."[17]

- o Voter's party affiliation changed without their authorization. Violation of CRS 1-2-218.5: "The declaration of affiliation of each registered elector shall remain as recorded in the registration record until the elector changes or withdraws his or her affiliation."[18]

Multiple Ballot(s) Received
- o Multiple ballots were sent to voters (with correct address), and/or residents received multiple ballots for a voter who did not live there.

Voter Moved but Registration Database Never Updated
- o The voter does not reside at an address that is officially documented in the registration database. Thus, the registration database is outdated and inaccurate (as of December 2021).

Probable Election Law Violation
- o The voter's address or other information contained errors (intentionality unknown).

- o The voter did not receive a ballot and had to vote in person.

Information from each affidavit category was processed into data spreadsheets and utilized as a function in the statistical analysis portion of this report. Findings from the statistical analysis are detailed in the next section. Note: to protect an individual's identity, all personal information (i.e., names, addresses, etc.) are removed from this report. That being said, affidavits and accompanying data will be provided to officials.

---

[16] https://codes.findlaw.com/co/title-1-elections/co-rev-st-sect-1-13-723.html
[17] https://codes.findlaw.com/co/title-1-elections/co-rev-st-sect-1-2-228.html
[18] https://codes.findlaw.com/co/title-1-elections/co-rev-st-sect-1-2-218-5.html

## Discrepancy Rate Calculation

After all affidavits were collected for El Paso, Weld, Pueblo, and Douglas counties, they were peer-reviewed by multiple volunteers to ensure proper inclusion in the final results presented. The total number of affidavits collected was divided by the number of confirmed residences to determine the discrepancy rate percentages. Confirmed residences denote the successful ability to collect data about the resident (actual "face-to-face" discussion with resident), and/or information about the address (i.e., address was a vacant or commercial lot).

$$Discrepancy\ Rate = \frac{total\ number\ of\ affidavits}{confirmed\ residences}$$

## Total (All Four Counties Combined)

After the peer-review process was completed, it was determined that 367 affidavits met the criteria for inclusion in the report. Using the discrepancy rate formula from above, it was calculated that 367 affidavits equate to approximately an 8% affidavit rate.

$$Discrepancy\ Rate = \frac{367}{4,601} = 0.797 \sim 8\%$$

In statistics, this above discrepancy rate can be described as a "best estimate" rate when applying a designated sampling error[19] to the value. For this study, a 3% margin of error was used to calculate the needed sample size for each county. Subtracting the 3% margin of error from the best estimate discrepancy rate obtains a low estimated discrepancy rate (or lower bound). Conversely, adding the 3% margin of error to the best estimate discrepancy rate obtains a high estimated discrepancy rate (or higher bound). Additionally, a 99% confidence level was used. The combination of the 99% confidence level and 3% margin of error confirms that if this methodology was used in canvassing repeatedly, 9.9 out of 10 times, the discrepancy rate would fall between 5% and 11%.

Note: many affidavits were not included because of the uncertainty of what the affiants (the person that signed the affidavit) meant. Thus, it is highly probable that this report's number of affidavits (i.e., election discrepancies) is underrepresented versus the actual count. The table below shows the final canvassing results, including the range of estimated voters affected by irregularities in voter registration and voting history records in Colorado.

| FINAL CANVASSING RESULTS (EL PASO, WELD, PUEBLO, AND DOUGLAS COUNTIES) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Sample Information | | | | Affidavit Rates | | | Voters Negatively Impacted | | |
| County | Registered Voters | Houses Canvassed | Confirmed Residences | Best Estimate Discrepancy Rate | High Estimate Discrepancy Rate | Low Estimate Discrepancy Rate | Best Estimate Voters Negatively Impacted | High Estimate Voters Negatively Impacted | Low Estimate Voters Negatively Impacted |
| Total | 1,128,337 | 9,472 | 4,601 | 8.0% | 11.0% | 5.0% | 90,002 | 123,852 | 56,152 |
| Estimates are based on a 99% confidence rate with a 3% margin of error | | | | | | | | | |

[19] https://en.wikipedia.org/wiki/Sampling_error#:~:text=The%20sampling%20error%20is%20the,unknown%20value%20of%20the%20parameter

8

USEIP 0081

Below is a breakdown of all 367 affidavits, from all four counties, by category:



As the above figure illustrates, 3.4% of the affidavits reflected election law violations, 3.0% reflected inaccuracies in the registration database, 1.0% were from multiple ballots being received, and 0.6% reflected probable election law violations.

Below is a breakdown of all four counties' election law violation categories:



Regarding voters who had moved, if the affiant confirmed that the voter *did not* live at the address at the time of the 2020 General Election, then these affidavits were considered election law violations. If the affiant did not confirm whether the voter lived at the address at the time of the election, but the registration database reflected that the voter still resided at that residential address (as of December 2021), then these affidavits were put into a separate category called "Affidavit for Voter Moved but Registration Database never Updated." If ballots for "moved" voters are cast, but they do not live in the precinct (let alone the county or state), these votes are illegal and can illegally affect election results at any level of government (e.g., from Federal to school board elections).

9

The following four sections investigate the discrepancy rates within each county (listed in descending order of total discrepancy rates).

## El Paso County

Of the four counties canvassed, El Paso had the highest discrepancy rate of 10.5% (best estimate). This reflects that discovered irregularities affected over 54,000 voters in El Paso County in Colorado. The table below shows the range of possible discrepancy rates for El Paso County.

| FINAL CANVASSING RESULTS (EL PASO COUNTY) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Sample Information | | | | Affidavit Rates | | | Voters Negatively Impacted | | |
| County | Registered Voters | Houses Canvassed | Confirmed Residences | Best Estimate Discrepancy Rate | High Estimate Discrepancy Rate | Low Estimate Discrepancy Rate | Best Estimate Voters Negatively Impacted | High Estimate Voters Negatively Impacted | Low Estimate Voters Negatively Impacted |
| El Paso | 515,697 | 2,142 | 1,091 | 10.5% | 13.5% | 7.5% | 54,359 | 69,829 | 38,888 |
| Estimates are based on a 99% confidence rate with a 3% margin of error | | | | | | | | | |

The most significant portion of issues noted above was attributable to election law violations. Issues in this category included but were not limited to, voters listed as having voted from commercial addresses and vacant lots, voters who did not live at the address at the time of the 2020 general election, and unauthorized party affiliation changes.

Below is a breakdown of El Paso County's discrepancy percentages by category:



Below is the breakdown of El Paso County's election law violation affidavits category:



Given the results discussed above, any race won, or ballot measure that passed/failed with a margin less than or equal to 10.5% in El Paso County should be questioned.

## Weld County

Weld County had the next highest discrepancy rate of the canvassed counties. The majority of issues were attributed to election law violations. Other issues included commercial addresses, vacant lots, voters who did not live at the address at the time of the 2020 general election, and unauthorized party affiliation changes.

| FINAL CANVASSING RESULTS (WELD COUNTY) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Sample Information | | | Affidavit Rates | | | Voters Negatively Impacted | | |
| County | Registered Voters | Houses Canvassed | Confirmed Residences | Best Estimate Discrepancy Rate | High Estimate Discrepancy Rate | Low Estimate Discrepancy Rate | Best Estimate Voters Negatively Impacted | High Estimate Voters Negatively Impacted | Low Estimate Voters Negatively Impacted |
| Weld | 216,325 | 2,257 | 1,294 | 8.6% | 11.6% | 5.6% | 18,556 | 25,046 | 12,067 |
| Estimates are based on a 99% confidence rate with a 3% margin of error | | | | | | | | | |

Below is a breakdown of Weld County's discrepancy percentages by category:



Below is the breakdown of Weld County's election law violation affidavits category:



Most election law violations were related to voters who didn't live at the stated registration address during the 2020 election. The second-largest category of election law violations was for voters who were registered and/or voted from a commercial address or vacant lot. An interesting finding from this second category is that multiple people were registered to the Weld County Clerk and Recorder's office.

Given the results discussed above, any race won or ballot measure that passed/failed with a margin less than or equal to 8.6% in Weld County should be questioned and audited.

12

USEIP 0085

## Pueblo County

      Pueblo County had significant issues with the registration database not being updated to reflect voters corrected residential addresses. This means that many precinct-level ballot measures voted on may have been influenced by those who did not reside in those precincts. Additionally, Pueblo County had the most significant portion of voters in the four canvassed counties who were affected by "lost votes." Lost votes are when the voter confirmed via affidavit that they had either mailed in a ballot or voted in person, but the Secretary of State reporting has no record of the vote.

| FINAL CANVASSING RESULTS (WELD COUNTY) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Sample Information | | | | Affidavit Rates | | | Voters Negatively Impacted | | |
| County | Registered Voters | Houses Canvassed | Confirmed Residences | Best Estimate Discrepancy Rate | High Estimate Discrepancy Rate | Low Estimate Discrepancy Rate | Best Estimate Voters Negatively Impacted | High Estimate Voters Negatively Impacted | Low Estimate Voters Negatively Impacted |
| Pueblo | 119,374 | 2,516 | 1,223 | 8.4% | 11.4% | 5.4% | 10,054 | 13,635 | 6,472 |
| Estimates are based on a 99% confidence rate with a 3% margin of error | | | | | | | | | |

Below is a breakdown of Pueblo County's discrepancy percentages by category:



Below is the breakdown of Pueblo County's election law violation affidavits category:



Given the results discussed above, any race won or ballot measure that passed/failed with a margin less than or equal to 8.4% in Pueblo County should be questioned and audited.

## Douglas County

Douglas County suffered from the same primary issue as Pueblo, where the registration database was not updated to reflect voters' corrected residential addresses. This means that many precinct-level issues that were voted on may have been influenced by those who did not reside in those precincts. Additionally, Douglas County had the largest percentage of voters in the four canvassed counties who voted from a vacant or commercial lot.

| FINAL CANVASSING RESULTS (WELD COUNTY) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Sample Information | | | Affidavit Rates | | | Voters Negatively Impacted | | |
| County | Registered Voters | Houses Canvassed | Confirmed Residences | Best Estimate Discrepancy Rate | High Estimate Discrepancy Rate | Low Estimate Discrepancy Rate | Best Estimate Voters Negatively Impacted | High Estimate Voters Negatively Impacted | Low Estimate Voters Negatively Impacted |
| Douglas | 276,941 | 2,557 | 993 | 3.8% | 6.8% | 0.8% | 10,598 | 18,906 | 2,290 |
| Estimates are based on a 99% confidence rate with a 3% margin of error | | | | | | | | | |

Below is a breakdown of Douglas County's discrepancy percentages by category:



Below is the breakdown of Douglas County's election law violation affidavits category:



Given the results discussed above, any race won or ballot measure that passed/failed with a margin less than or equal to 3.8% in Douglas County should be questioned and audited.

## Conclusions

The results of voter canvassing in four Colorado counties (Douglas, El Paso, Pueblo, and Weld) showed significant discrepancies and irregularities in the Colorado election records, indicating failure of safeguards to achieve the Colorado Constitution's mandate that the general assembly secure the purity of elections and guard against abuses of the elective franchise. A "best estimate" statistical analysis indicated, conservatively, that approximately 8% of voters (123,852 out of 1.1M) in those four Colorado counties were affected by election canvassing-detected irregularities, alone. Mail-in ballots were sent to individuals who were either deceased, had moved, or were non-citizens. Additionally, 3% of the voter registration reflected irregularities in the residential addresses, highlighting that the current Colorado registration system (SCORE) data is inaccurate. The counting of Illegitimate ballots not only deprives the rights of Colorado citizens and dilutes their sacred vote, but it also is in violation of state law. These irregularities and issues directly impact (and call into question) statewide, county, and local elections. A statewide independent investigation (encompassing canvassing and a full forensic audit of the *entire* election system) must be performed to understand the magnitude and impact of the known and unknown issues. To reiterate a statewide independent investigation must be accomplished to ensure integrity, security, and transparency in every aspect of Colorado's elections. Demanding that independent investigation is unequivocally within the Constitutional rights of Colorado citizens.

# Appendix

## Reviewers' Credentials

They/Their/Theirs #1

- Ph.D. in Economics; M.S. in Mathematics; M.A. in International Economics; M.A. in Education; Retired USAF, LtCol (served 25yrs); Assistant Professor in Mathematics (USAFA) and Assistant Professor in Economics (USAFA); Financial & Economic advisor to Deputy Assistant Secretary of the Air Force (Pentagon); Additional Experience includes Flight Test Analyst, Chief of Defense Satellite Test Branch, and Laser Lab Intern

They/Their/Theirs #2

- Master's and Ph.D. in Mathematical Statistics; 30+ years as a Professional Statistician

They/Their/Theirs #3

- Master's in Business Analytics; Certified Analytics Professional; 10+ Years of Analytical and Financial Experience

They/Their/Theirs #4

- Certified Public Accountant; 10+ Years of Accounting Experience

They/Their/Theirs #5

- Exemplary prior US military service; Bachelor and Master's Degrees in Arts, Sciences, and Information Technologies; 40 Years of Combined Experience: Programming, Systems Engineering, Product Development, Curriculum Planning, Operations Analysis, and Systems Architecture; Additional Experience: Fortune 500 Companies, Corporate & Commercial education, Higher Education, Communications, Video Game/Simulations, and defense industries.

They/Their/Theirs #6

- 27+ years of software development and engineering expertise; Experience in Healthcare, Jail Systems, and Marketing development

They/Their/Theirs #7

- 40+ years of software development and engineering expertise; Experience in Marketing, Real Estate, and Voter Data Acquisition and Development

They/Their/Theirs #8

- 25+ years Active-Duty military, including command of military installations and operational forces, staff assignments, including Office of the Secretary of Defense, and formal research for Department of Defense; BA, Political Science/MAS, Aeronautical Science/MA, National Security Affairs; operational test manager, director, analyst; trained in Scientific Test and Analysis Techniques (STAT), statistical research.

Statistical Methodology

☐ All code and raw data are available upon request to see how the statistical methodology was implemented.

☐ A stratified sampling methodology utilizing voter opportunity score was used to target precincts. Stratified sampling was chosen because it provides more precision than simple random sampling[20]

☐ It was noted that each county's Voter Opportunity Scores reflected a Weibull distribution[21], therefore, a box-cox transformation[22] was used to normalize the distribution to derive a standard deviation for sample size calculations[23]

　　o Exhibit 1 below shows an example of the distribution type of the voter opportunity score in each county canvassed as well as how the lambda was chosen to transform the distribution to a normal distribution for calculation of the standard deviation.

☐ For canvassing purposes, a 99% confidence level (z-score) with a 3% margin of error was used

　　o $Sample size = ((z_{score}^2 \times standard\ deviation \times (1 - standard\ deviation)) \div margin\ of\ error^2) \div (1 + (((z_{score}^2 \times standard\ deviation \times (1 - standard\ deviation)) \div (margin\ of\ error^2 \times county\ voter\ population))))$

---

[20] More information on this strategy can be found here: https://en.wikipedia.org/wiki/Stratified_sampling. Another resource is the book Complex Surveys by Thomas Lumley.

[21] Information on Weibull Distributions: https://en.wikipedia.org/wiki/Weibull_distribution

[22] Information on Box-Cox Transformation: https://en.wikipedia.org/wiki/Power_transform#Box%E2%80%93Cox_transformation

[23] Sample Size Formula - retrieved from https://www.qualtrics.com/experience-management/research/determine-sample-size/. Additionally, Sample size with finite population correction factor calculation retrieved from https://byjus.com/sample-size-formula/. For more information on standard deviation, you can check out this source: https://en.wikipedia.org/wiki/Standard_deviation

**Exhibit 1**







- ☐ Once sample size was known for each county, the sample size was split in half with one half going towards the lowest voter opportunity score precincts and the other half going towards the highest voter opportunity score precincts

  - o This methodology created a linear regression model which allowed for better canvassing while still holding to a random sample methodology

- ☐ A t-test was performed where the voter opportunity scores were compared between voters who responded, and those who did not to see if a statistically significant difference was apparent. If the difference between these groups' voter opportunity score distributions was significant, then there would have been a potential issue with applying the discrepancies found in canvassing to the entire county population. The difference was shown to not be statistically

significant.  Additionally, visual inspection of the probability of voter opportunity score distributions by county confirmed that the distributions were very similar.[24]

- Welch Two Sample t-test
  - data:  non_responder_vos_vector and responder_vos_vector
    - t = -0.61021, df = 8621.3, p-value = 0.5417
    - alternative hypothesis: true difference in means is not equal to 0
    - 95 percent confidence interval:
      - -0.008521271  0.004475490
    - sample estimates:
      - mean of x mean of y
        - 0.2291709 0.2311937

- Logistic regression[25] confirmed that the precinct and voter opportunity score interaction is statistically significant, but potentially not practically significant.[26] Next steps will include refining the sampling process to look at spatially balanced cluster sampling.[27]

---

[24] Visual inspection of the distributions can be found under the section title Probability density of VOS by canvass response here: https://ln5.sync.com/dl/e817b9880/hwtchqqx-7tag86gk-r6x8yngc-sg5zimwp

[25] https://www.sciencedirect.com/topics/computer-science/logistic-regression

[26] Information on this can be found under the section titled Logistic regression for response rate found here: https://ln5.sync.com/dl/e817b9880/hwtchqqx-7tag86gk-r6x8yngc-sg5zimwp

[27] https://en.wikipedia.org/wiki/Cluster_sampling

20

# USEIP 0093

I helped prepare and am responsible for the foregoing Colorado Canvassing Report content.

This 10<sup>th</sup> day of March 2022

X _____

Jeff Young
Certified Analytics Professional

I contributed to and stand by this report.

_____

Shawn Smith

# Native Exhibit Placeholder



1:22-cv-581
TRIAL EXHIBIT
8

Fantastic!!  Thank you Pam!  And please let me know which day they plan to come up.  Also please be sure to send them the training presentation and script to practice!!

File...

Jul 22, 2021



We are coming on Sunday. Will leave Pueblo at 2pm so will probably get there well before 3:30pm so may have time to get some training. We're up to 8 people now if everyone shows.

File...

Jul 23, 2021

 See above

Thanks so much Pam.  That  is fantastic!!

And we are attempting to line up security.  However, anyone who carries protection might want to let us know so we can offer your cell phone numbers to those who are concerned.

Exhibit 25.063



## News Release

**Media contact**
303-860-6903

Annie Orloff
annie.orloff@coloradosos.gov

Steve Hurlbert
steve.hurlbert@coloradosos.gov

**State of Colorado**
**Department of State**
1700 Broadway
Suite 550
Denver, CO 80290

**Jena Griswold**
Secretary of State

**Chris Beall**
Deputy Secretary of State

### In Response to Reported Unofficial Door-to-Door Canvassing of Colorado Voters, the Colorado Secretary of State's Office Reminds Voters of Their Constitutionally Protected Rights

Denver, September 9, 2021 - In response to reported unofficial door-to-door canvassing of Colorado voters, the Colorado Secretary of State's office issued the following reminders to voters:

1. If an individual comes to your door and requests information about your voting history or registration status, you are not required to answer.

2. Every voter's right to a secret ballot is constitutionally protected in Colorado. If a door-to-door canvasser asks how you voted in a particular race, you are not required to tell the canvasser how you voted.

3. Any claim that door-to-door canvassing is official business of the Colorado Secretary of State's office or the state of Colorado is false. No state or local election office in Colorado is conducting door-to-door voter participation surveys.

4. You have the right to request the name and credentials of door-to-door solicitors, as well as the organization they represent.

5. If you feel harassed or threatened, please reach out to local law enforcement or the Department of Justice at civilrights.justice.gov.

Several pieces of information in a voter record are considered a "public record," and the Secretary of State's office is required by law to provide this information to any member of the public who requests it. This information includes your full name, residential address, political party affiliation and date of affiliation, phone number (if provided by the voter), gender identity (if provided by the voter), birth year, and information about whether you have voted in prior elections. If you believe that you or a member of your household will be exposed to criminal harassment or bodily harm because your voter information is publicly available, you may elect to become a confidential voter. Confidential voters' registration information is NOT released to the public, nor is it obtainable through a download of the list of registered voters. To become a confidential voter, you must go to your local county clerk and recorder's office, fill out a voter confidentiality form, and pay a $5.00 fee. Refer to this list of county clerk and recorder offices for the necessary contact information.

Survivors of domestic violence, sexual offenses, or stalking may also consider enrolling in the Colorado Address Confidentiality Program. Voters who are part of this program will NOT have any of their voter information released to the public.

# # #

✉ Sign up to receive Newsroom email updates

1:22-cv-581
**TRIAL EXHIBIT**

**50**

^ Top

| | |
|---|---|
| **From:** | Teitelbaum, Aaron (USACO) |
| **To:** | Melissa Kessler |
| **Subject:** | [EXTERNAL] RE: Suspicious Election Related Activity |
| **Date:** | Friday, August 13, 2021 2:34:38 PM |

Hi Melissa,

I am stuck in a multi-hour hearing but I will call you back around 330. Sorry to be unavailable at this particular moment…

Aaron

**Aaron M. Teitelbaum**

Assistant United States Attorney

United States Attorney's Office | District of Colorado

1801 California Street, Suite 1600

Denver, CO 80202

Phone: (303) 454-0209

Email: aaron.teitelbaum@usdoj.gov

---

**From:** Melissa Kessler <Melissa.Kessler@SOS.STATE.CO.US>

**Sent:** Monday, August 2, 2021 9:34 PM

**To:** Teitelbaum, Aaron (USACO) <ateitelbaum@usa.doj.gov>

**Subject:** RE: Suspicious Election Related Activity

Aaron,

There was recently an article in a small, political publication that offers more insight on this group and their recruiting effort. It also indicates that this effort exists beyond Mesa County. So Much For "Needle Nazis"—Who's Going Door To Door Now? - Colorado Pols (Sorry for the inflammatory title! The information appears reliable. The publication itself… who knows?)

Melissa

**Melissa Belle Kessler**

Legal and Policy Director | Department of State

303.860.6947 (desk) | ██████████████

**From:** Teitelbaum, Aaron (USACO) <Aaron.Teitelbaum@usdoj.gov>

**Sent:** Friday, July 30, 2021 4:20 PM

**To:** Melissa Kessler <Melissa.Kessler@SOS.STATE.CO.US>

**Subject:** [EXTERNAL] RE: Suspicious Election Related Activity

Hi Melissa,

Nice to meet you. I will be attempting to fill Rebecca's massive shoes in the Election Officer role going forward. All of my contact info is below, ████████████████████████████ ████████████████ Please contact me any time.

As for the activity in Grand Junction: thanks very much for bringing this to our attention. I am going to confer with the FBI point of contact in Colorado for election matters and then we will get back to you asap. You are correct, this is the kind of thing that DOJ wants to hear about, so please don't hesitate to keep us in the loop about these sorts of things.

In the meantime, if you want to communicate something back to the complainants or to local SOS folks out in GJ, I would mention two things: (1) they should (obviously) call 911 if they feel their immediate safety is threatened, and (2) if people have any Ring doorbell footage of these encounters or the like, or recall any license plate numbers or other identifying information about these individuals, they should preserve that information for the time being.

I will be in touch next week as soon as I've had a chance to discuss with FBI.

Cheers,

Aaron

**Aaron M. Teitelbaum**

Assistant United States Attorney

United States Attorney's Office | District of Colorado

1801 California Street, Suite 1600

Denver, CO 80202

Phone: (303) 454-0209

Email: aaron.teitelbaum@usdoj.gov

---

**From:** Weber, Rebecca (USACO) <rweber@usa.doj.gov>

**Sent:** Friday, July 30, 2021 4:02 PM

**To:** Melissa Kessler <Melissa.Kessler@sos.state.co.us>

**Cc:** Teitelbaum, Aaron (USACO) <ateitelbaum@usa.doj.gov>

**Subject:** Re: Suspicious Election Related Activity

Melissa,

Thanks very much for passing this along. I've CCed the new District Election Officer, Aaron Teitelbaum.

Hope we can connect again soon!

- Rebecca

> On Jul 30, 2021, at 12:52 PM, Melissa Kessler <Melissa.Kessler@sos.state.co.us> wrote:

Hello – happy Friday!

I know you're not the election contact anymore, but I'm hoping you might forward this along to whoever has picked up the mantle from you.

The two attachments to this email describe some reports that we've been getting out of Grand Junction about a strange sort of in-person audit, wherein a group is traveling door-to-door and attempting to "confirm" residents' votes. We've reported this issue to the AG and the local DA. ███████████████████████████████████████████
███████████████████████████████████████

Please let me know if you have any questions or if we can get you any additional information.

I hope you're doing well. We should get together soon - I would propose this weekend, but it looks like the weather is going to be bad!



**Melissa Belle Kessler**
Legal and Policy Director | Department of State
303.860.6947 (desk) | ████████████
melissa.kessler@sos.state.co.us
1700 Broadway, Suite 200
Denver, CO 80290

&lt;image001.png&gt;

&lt;mime-attachment&gt;

&lt;mime-attachment&gt;







**From:** Public Elections
**Sent:** Wednesday, June 23, 2021 3:14 PM
**To:** Caleb Thornton <Caleb.Thornton@SOS.STATE.CO.US>; Matt Domboski
<Matt.Domboski@SOS.STATE.CO.US>
**Subject:** FW: [EXTERNAL] Grand Junction voter intimidation effort
Thank you
Cheryl

**From:** Y. Roberts
**Sent:** Wednesday, June 23, 2021 12:22 PM
**To:** Public Elections <Public.Elections@SOS.STATE.CO.US>
**Subject:** [EXTERNAL] Grand Junction voter intimidation effort

I just had two people at my door holding a copy of the Mesa County registered voter roll. They wore homemade badges reading Colorado Election ....something or other... They introduced themselves. A tall older man and a short older woman in sporting caps. Hers was brim-only.
He then began questioning me about the accuracy of the info on the voter roll. I told him that all was public information available in the county courthouse. He shrugged and said it came from the state. I said, "Yes. It goes from all the counties to the state." As long as they kept themselves to the information of public record, I held my peace. When they asked if I was only registered voter at this address, I was uncomfortable. Then he told me that I'd voted in the last election (also a matter of public record) and followed that with "Do you happen to remember how you returned that ballot? Did you mail it, take it back in person? Use a dropbox?..."
That's when I interrupted him. I told him that it was a secret ballot; how I returned the ballot was none of their business.
I added that what they were doing was intrusive and could be considered voter

intimidation which is illegal. I then stated they should leave my property.
This is a right-wing community. If these people or their group doesn't like/approve voters' responses, I think the chances are high that they will harass those voters in the traditional ways used here in the past--anonymous vandalism, threats of violence, threatening phone calls. And just the possibiliy of that quells political participation on the local level.
I'm interested in taking any legal action that can prevent this behavior of knocking on voters' doors to 'check' the validity of their right to vote. I will press charges, etc.
Yvette Roberts
970 434-3012







**From:** Public Elections
**Sent:** Thursday, July 29, 2021 12:34 PM
**To:** Matt Domboski <Matt.Domboski@SOS.STATE.CO.US>
**Subject:** FW: [EXTERNAL] Suspicious Activity

**From:** Debra Powell ▮▮▮▮▮▮▮▮▮▮▮▮ >
**Sent:** Thursday, July 29, 2021 12:11 PM
**To:** Public Elections <Public.Elections@SOS.STATE.CO.US>
**Subject:** [EXTERNAL] Suspicious Activity

Hi there,

I wanted to make someone aware of something that happened at my house in Grand Junction this morning. This is a copy of my FB post describing it. I would make an official complaint, but I have no idea who these gentlemen were. They wore tags pinned to their shirt that said "Concerned Citizen" or something to that effect. I was so appalled that I just closed the door on them. I got no additional information. I'm wondering if they are gearing up for some kind of "audit" a la Arizona's cyber-ninjas. So I'm sitting here in my house, minding my own business, scrolling. When a few minutes ago, the doorbell rings. John is sleeping. I usually have him answer the door, but I got it this time. Parked in front of my house is an older white car. It looked like there was someone sitting in the passenger seat and that maybe there was a dog also, but I didn't look that closely. I answered the door. There were two men there. An older man wearing a cap with an American Flag brim, and a somewhat younger guy, about my age. Younger, but not young... Anyway, the old man is holding a clipboard. He introduces himself and his son. I don't remember their names. But he says they're concerned about "cleaning up the voter rolls" and then proceeds to ask if John, I and mom voted in the last election. I slammed the door in their faces. They had a copy of the voter rolls and knew my name, John's name, mom's name. They weren't going to everyone's house. They drove away. I would be interested to know if anyone else in Grand Junction has had a similar experience or knows of something going on around this. ???

## Certificate of Service

I hereby certify that on November 7, 2024, I electronically filed the foregoing document using the court's CM/ECF system, which will send notification of such filing to all parties.  I further certify that I have served each party by U.S. Mail with a copy of a flash drive containing Trial Exhibit 8, which the Court has authorized the appellants to file in hard copy only.

**/s/ Bryan L. Sells**
Georgia Bar No. 635562
Attorney for the Appellants
The Law Office of Bryan L. Sells, LLC
Post Office Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com