No. 24-1328

In the
**United States Court of Appeals
For the Tenth Circuit**

COLORADO MONTANA WYOMING STATE AREA
CONFERENCE OF THE NAACP, *et al.*,

*Plaintiffs–Appellants*

v.

SHAWN SMITH, *et al.*

*Defendants–Appellees*

Appeal from the United States District Court for the District of Colorado,
No. 1:22-cv-00581-CNS-NRN (Judge Charlotte N. Sweeney)
**Oral Argument Requested**

**APPELLANTS' BRIEF**

Courtney Hostetler
John Bonifaz
Ben Clements
Amira Mattar
Free Speech For People
48 North Pleasant St., Ste. 304
Amherst, Massachusetts 01002
(617) 244-0234

Bryan L. Sells
The Law Office of
Bryan L. Sells, LLC
Post Office Box 5493
Atlanta, Georgia 31107-0493
(404) 480-4212

*Attorneys for the Appellants*

# Table of Contents

Table of Contents .................................................................... 2

Table of Citations .................................................................. 4

Statement of Related Cases ...................................................... 9

Glossary ................................................................................ 10

Statement of Jurisdiction ....................................................... 11

Statement of the Issues .......................................................... 12

Introduction ........................................................................... 13

Statement of the Case ............................................................. 14

    I.      Statutory Background .................................................. 14

       A.    The Voting Rights Act ........................................... 14

       B.    The Ku Klux Klan Act ........................................... 19

    II.    The Plaintiffs' Lawsuit .............................................. 20

    III.   The Bench Trial .......................................................... 23

    IV.   Judgment on Partial Findings .................................... 26

Standards of Review ............................................................... 29

Summary of the Argument ...................................................... 31

Argument ............................................................................... 34

    I.      Unincorporated associations can be sued under the Voting Rights Act and the Ku Klux Klan Act. ........... 34

       A.    The Voting Rights Act ........................................... 34

B.    The Ku Klux Klan Act ............................................... 39

II.    The district court improperly excluded a video of a defendant stating that anyone involved in election fraud "deserves to hang." ........................................... 43

III.    The district court's finding that the canvassers who questioned a key witness "engaged in no conduct that could be objectively considered intimidating" is clearly erroneous and based on the wrong legal standard. ... 46

IV.    The district court applied the wrong legal standard to the plaintiffs' claims by refusing to consider the context in which the challenged acts occurred. ......... 51

Conclusion ................................................................. 55

Oral Argument Statement ....................................... 56

Certificate of Compliance ........................................ 58

Addendum ................................................................. 59

52 U.S.C. § 10307 ................................................. 59

42 U.S.C. § 1985 .................................................. 62

Summary Judgment Order .................................... 64

Judgment on Partial Findings ............................. 81

# Table of Citations

## Cases

*Allen v. City of Graham,* No. 1:20-CV-997,
  2021 WL 2223772 (M.D.N.C. June 2, 2021) ................................. 17

*Allen v. State Board of Elections,*
  393 U.S. 544 (1969) ...................................................................... 36

*Arizona Alliance for Retired Americans v. Clean Elections
  USA,* 638 F. Supp. 3d 1033 (D. Ariz. 2022),
  *opinion vacated, appeal dismissed as moot,* No. 22-16689,
  2023 WL 1097766 (9th Cir. Jan. 26, 2023) ................................... 16

*Baca v. Berry,*
  806 F.3d 1262 (10th Cir. 2015) ..................................................... 29

*BP America Production Co. v. Burton,*
  549 U.S. 84 (2006) ........................................................................ 34

*Chisom v. Roemer,*
  501 U.S. 380 (1991) ...................................................................... 36

*Collins v. Hardyman,*
  341 U.S. 651 (1951) ...................................................................... 41

*Dansie v. Union Pacific Railroad Co.,*
  42 F.4th 1184 (10th Cir. 2022) ...................................................... 30

*Daschle v. Thune,* No. 04-cv-4177,
  ECF No. 6, (D.S.D. Nov. 2, 2004) ................................................. 18

*Democratic National Committee, v. Republican National
  Committee,* 671 F. Supp. 2d 575 (D.N.J. 2009)*,
  aff'd,* 673 F.3d 192 (3d Cir. 2012) ............................................... 37

*Fair Fight, Inc. v, True the Vote, Inc.,*
  710 F. Supp. 3d 1237 (N.D. Ga. 2024) .......................................... 15

*Farmer v. Banco Popular of North America*,
   791 F.3d 1246 (10th Cir. 2015) ..................................................... 30

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
   11 F.4th 1266 (11th Cir. 2021)................................................. 23, 42

*Hobby Lobby Stores, Inc. v. Sebelius*,
   723 F.3d 1114 (10th Cir. 2013), *aff'd sub nom.*
   *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) .... 35, 36

*INS v. National Center For Immigrants' Rights, Inc.*,
   502 U.S. 183 (1991) ...................................................................... 41

*Katzenbach v. Original Knights of the Ku Klux Klan*,
   250 F. Supp. 330 (E.D. La. 1965)............................................ 18, 37

*Kennedy v. Meta Platforms, Inc.*, No. 3:24-cv-02869-WHO,
   2024 WL 4031486 (N.D. Cal. Sept. 3, 2024)........................... 15, 19

*League of United Latin American Citizens v. Public Interest*
   *Legal Foundation*, No. 18-CV-00423,
   2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ............... 14, 15, 18, 19

*Lippoldt v. Cole*,
   468 F.3d 1204 (10th Cir. 2006) ............................ 22, 39, 40, 41, 42

*Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*,
   263 F.3d 208 (2d Cir. 2001)......................................................... 18

*Monroe v. Pape*,
   365 U.S. 167 (1961) ................................................................ 41, 42

*National Coalition on Black Civic Participation v. Wohl*,
   498 F. Supp. 3d 457 (S.D.N.Y. 2020) ................................. 14, 15, 17

*National Coalition on Black Civic Participation v. Wohl*,
   661 F. Supp. 3d 78 (S.D.N.Y. 2023).......16, 18-20, 37-38, 43, 48-49

*Pierce v. Shorty Small's of Branson, Inc.*,
　137 F.3d 1190 (10th Cir. 1998) ...................................................... 29

*Romero v. City of Albuquerque*,
　190 F. App'x 597 (10th Cir. 2006) ................................................. 29

*Rowland v. California Men's Colony*,
　506 U.S. 194 (1993) ....................................................................... 35

*United States v. Beaty*,
　288 F.2d 653 (6th Cir. 1961) .................................................... 16, 51

*United States v. Dillard*,
　795 F.3d 1191 (10th Cir. 2015) .......................................... 16, 17, 51

*United States v. Lang*,
　364 F.3d 1210 (10th Cir. 2004) ..................................................... 20

*United States v. McLeod*,
　385 F.2d 734 (5th Cir. 1967) .............................. 17, 18, 33, 49, 51

*United States v. Nguyen*,
　673 F.3d 1259 (9th Cir. 2012) ....................................................... 18

*United States v. Pena*,
　115 F.4th 1254 (10th Cir. 2024) .................................................... 29

*United States v. Pulido-Jacobo*,
　377 F.3d 1124 (10th Cir. 2004) ..................................................... 20

*United States v. Small*,
　423 F.3d 1164 (10th Cir. 2005) ..................................................... 20

*United States v. Wheeler*,
　776 F.3d 736 (10th Cir. 2015) ................................................. 17, 51

*Virginia v. Black*,
　538 U.S. 343 (2003) ............................................................. 16, 17, 51

*Willingham v. County of Albany*,
593 F. Supp. 2d 446 (N.D.N.Y. 2006) ............................................ 15

**Statutes**

1 U.S.C. § 1 ......................................................................... 31, 35

28 U.S.C. § 1291 ........................................................................ 11

28 U.S.C. § 1331 ........................................................................ 11

42 U.S.C. § 1971 ........................................................................ 36

42 U.S.C. § 1973i ....................................................................... 14

42 U.S.C. § 1983 .................................................... 22, 39, 40, 41, 43

42 U.S.C. § 1985 .............. 13, 19, 20, 21, 22, 31, 39, 40, 41, 42, 43, 62

52 U.S.C. § 10101 ...................................................................... 36

52 U.S.C. § 10307 ................. 13, 14, 19, 20, 21, 22, 31, 34, 35, 36, 59

**Other Authorities**

Act of June 25, 1948,
Pub. L. No. 80-772, 62 Stat. 683 (1948)......................................... 35

Antonin Scalia & Bryan A. Garner, *Reading Law:
The Interpretation of Legal Texts* (2012) ................................. 41, 43

Ben Cady & Tom Glazer, *Voters Strike Back:
Litigating Against Modern Voter Intimidation*,
39 N.Y.U. Rev. L. & Soc. Change 173 (2015) ......................... 15, 19

Bryan A. Garner et al., *The Law of Judicial
Precedent* (2016) ..................................................................... 39, 40

Civil Rights Act of 1957,
Pub. L. No. 85-315, 71 Stat. 634 (1957)......................................... 36

E-mail from Pamela S. Karlan, Principal Deputy Assistant
   Attorney General, to Karen Fann, President of the Arizona
   State Senate (May 5, 2021) ........................................................ 47

Federal Rule of Civil Procedure 26 ................................................. 44

Federal Rule of Civil Procedure 52 ........................................... 26, 29

Federal Rule of Evidence 103 .......................................................... 44

Federal Rule of Evidence 801 .......................................................... 45

Federal Rules of Appellate Procedure 32 ....................................... 58

H.R. Rep. No. 89-439 (1965),
   *as reprinted in* 1965 U.S.C.C.A.N. 2437 ..................................... 15

Note, *The Support or Advocacy Clause of 1985(3)*,
   133 Harv. L. Rev. 1382 (2020) .............................................. 19, 42

## Statement of Related Cases

There are no prior or related appeals.

## Glossary

**USEIP.** United States Election Integrity Plan is an unincorporated association founded in November 2020 in response to false claims of fraud during the 2020 presidential election. It was an original defendant in this case.

## Statement of Jurisdiction

This is an appeal from a final judgment of the district court entered on July 18, 2024. The plaintiffs filed a notice of appeal in the district court 29 days later. (App. 224.) This Court therefore has jurisdiction under 28 U.S.C. § 1291.

The district court had subject-matter jurisdiction because this case presents federal questions. 28 U.S.C. § 1331.

## Statement of the Issues

1.      Can unincorporated associations be sued for voter intimidation and attempted voter intimidation under the Voting Rights Act or the Ku Klux Klan Act?

2.      Did the district court abuse its discretion when, without explanation, it excluded a key video of a defendant speaking about USEIP's canvassing efforts at a large public gathering and stating that anyone involved in election fraud "deserves to hang"?

3.      Is the district court's finding that the canvassers who questioned a key witness "engaged in no conduct that could be objectively considered intimidating" clearly erroneous or based on the wrong legal standard?

4.      By refusing to consider the context in which challenged acts of voter intimidation and attempted voter intimidation occurred, did the district court apply the wrong legal standard to the plaintiffs' claims?

# Introduction

This case arises from a voter intimidation campaign launched after the 2020 presidential election by an organized group of election deniers. The defendants, armed with badges and weapons, went door-to-door across Colorado, interrogating voters about their participation in the 2020 election, pressing them for information on their method of voting, photographing their homes, and sometimes accusing them of outright voter fraud. They later publicized their "findings" and threatened severe consequences for anyone they believed to be involved in election fraud. These actions amounted to voter intimidation and attempted voter intimidation in violation of Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b), and a conspiracy to intimidate voters in violation of the Support or Advocacy Clause of Section 2 of the Ku Klux Klan Act, 42 U.S.C. § 1985(3). Because the district court's judgment to the contrary was the result of several legal and factual errors, this Court should vacate that judgment and remand the case for further proceedings.

# Statement of the Case

## I.    Statutory Background

## A.    The Voting Rights Act

Section 11(b) of the Voting Rights Act of 1965

comprehensively prohibits intimidation, threats, and coercion

related to voting, attempted voting, and urging or aiding someone

to vote:

> No person, whether acting under color of law or
> otherwise, shall intimidate, threaten, or coerce, or
> attempt to intimidate, threaten, or coerce any person for
> voting or attempting to vote, or intimidate, threaten, or
> coerce, or attempt to intimidate, threaten, or coerce any
> person for urging or aiding any person to vote or
> attempt to vote, or intimidate, threaten, or coerce any
> person for exercising any powers or duties under [other
> provisions of the Voting Rights Act].

52 U.S.C. § 10307(b) (formerly codified at 42 U.S.C. § 1973i(b)).

This broad statute reaches private conduct, s*ee League of United

Latin Am. Citizens v. Pub. Int. Legal Found.*, No. 18-CV-00423,

2018 WL 3848404, at *3 (E.D. Va. Aug. 13, 2018) ("*LULAC*"), and it

prohibits both intimidation and attempted intimidation. *See Nat'l

Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457,

485 (S.D.N.Y. 2020) ("*Wohl I*"). *See generally,* Ben Cady & Tom

14

Glazer, *Voters Strike Back: Litigating Against Modern Voter Intimidation*, 39 N.Y.U. Rev. L. & Soc. Change 173, 191 (2015). There is no requirement that a defendant acted with specific intent to intimidate voters, nor is there any requirement of racial animus. *See Wohl I*, 498 F. Supp. 3d at 480; *LULAC*, 2018 WL 3848404, at *3-4; *Willingham v. County of Albany*, 593 F. Supp. 2d 446, 462 (N.D.N.Y. 2006); *see also* H.R. Rep. No. 89-439, at 30 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 2437, 2462 (noting that "[t]he prohibited acts of intimidation need not be racially motivated").

"[T]hreats and intimidation include messages that a reasonable recipient familiar with the context of the message would interpret as a threat of injury tending to deter individuals from exercising their voting rights." *Wohl I*, 498 F. Supp. 3d at 477 (reviewing the text, caselaw, and similar statutes). *Accord Kennedy v. Meta Platforms, Inc.*, No. 3:24-cv-02869-WHO, 2024 WL 4031486, at *7 (N.D. Cal. Sept. 3, 2024); *Fair Fight, Inc. v, True the Vote, Inc.*, 710 F. Supp. 3d 1237, 1283 (N.D. Ga. 2024); *Ariz. All. for Retired Americans v. Clean Elections USA*, 638 F. Supp. 3d 1033,

1041 (D. Ariz. 2022), *opinion vacated, appeal dismissed as moot*,
No. 22-16689, 2023 WL 1097766 (9th Cir. Jan. 26, 2023).

"[U]nlawful threats or intimidation ... need not be violent or
physical, and may include communications inspiring fear of legal
consequences, economic harm, dissemination of personal
information, and surveillance." *Nat'l Coal. on Black Civic
Participation v. Wohl*, 661 F. Supp. 3d 78, 113 (S.D.N.Y. 2023)
("*Wohl III*"). Threats and intimidation "need not be conveyed in an
explicit or direct manner," and they "can be proscribed even where
the speaker has no intention of carrying them out." *Id.* at 118
(cleaned up); *cf. Virginia v. Black*, 538 U.S. 343, 352-57 (2003)
(recognizing that a cross burning can constitute a threat even
though it contains no explicit message and even if the speaker does
not intend to act upon the threat); *United States v. Dillard*, 795
F.3d 1191, 1200 (10th Cir. 2015) (recognizing that a threat can be
conditional).

And because "threats, intimidation or coercion may take on
many forms," *United States v. Beaty,* 288 F.2d 653, 656 (6th Cir.
1961), courts must consider the context in which challenged acts

occurred, including a defendant's "prior conduct and expressed goals." *Wohl I*, 498 F. Supp. 3d at 484-85; *see also United States v. McLeod*, 385 F.2d 734, 740, 744 (5th Cir. 1967) (explaining that the defendants' "acts cannot be viewed in isolation" and "must be considered against the background of contemporaneous events in Selma and the general climate prevailing there at the time"); *cf. Black*, 538 U.S. at 352-57 (explaining that cross burning is threatening because of the nation's social and historical context); *Dillard*, 795 F.3d at 1201 (in determining whether a message conveys a threat, "context is critical ... and history can give meaning to the message") (cleaned up); *United States v. Wheeler*, 776 F.3d 736, 743 (10th Cir. 2015) (determining whether a statement is a threat requires "a fact-intensive inquiry, in which the language, the context in which the statements are made, as well as the recipients' responses are all relevant") (citations omitted).

Intimidation, threats, and coercion obviously include acts of violence. *See, e.g., Allen v. City of Graham,* No. 1:20-CV-997, 2021 WL 2223772, at *7 (M.D.N.C. June 2, 2021) (beatings and pepper

spray)*; Katzenbach v. Original Knights of the Ku Klux Klan*, 250 F. Supp. 330, 341 (E.D. La. 1965) (brandishing weapons and using tear gas). But those terms also include subtle forms of intimidation that a reasonable person, familiar with the context, would nonetheless view as a threat of legal, economic, or other consequences. Examples have included: robocalls warning that police will use voter information to find and enforce old warrants, *Wohl III*, 661 F. Supp. 3d at 113-14; baseless arrests at a voter registration event, *McLeod*, 385 F.2d at 740-41; a letter warning of deportation against lawful citizens who are immigrants and their family members, *United States v. Nguyen*, 673 F.3d 1259, 1265 (9th Cir. 2012); threats of suing someone or suspending them without pay, *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001); publishing names, addresses, and phone numbers of registered voters in a report accusing them of committing various felonies, *LULAC*, 2018 WL 3848404, at *4; and photographing license plates at the polls, *Daschle v. Thune*, No. 04-cv-4177, ECF No. 6, (D.S.D. Nov. 2, 2004).

### B.    The Ku Klux Klan Act

The Support or Advocacy Clause of Section 2 of the Ku Klux Klan Act provides a civil cause of action when two or more persons "conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy" to any candidate for federal office. 42 U.S.C. § 1985(3); *see generally,* Cady & Glazer, *supra*, at 192; Note, *The Support or Advocacy Clause of 1985(3)*, 133 Harv. L. Rev. 1382, 1390-91 (2020). The elements of a claim under this clause are: (1) a conspiracy; (2) the purpose of which is to force, intimidate, or threaten; (3) an individual legally entitled to vote who is engaging in lawful activity related to voting in a federal election. *See Wohl III*, 661 F. Supp. 3d at 124. As with Section 11(b), neither state action nor racial animus is required. *See Kennedy*, 2024 WL 4031486, at *12; *Wohl III*, 661 F. Supp. 3d at 124-25; *LULAC*, 2018 WL 3848404, at *4-6.

Under federal law, a conspiracy requires: "(1) that two or more persons agreed to violate the law, (2) that the defendant knew at least the essential objectives of the conspiracy, (3) that the

defendant knowingly and voluntarily became a part of it, and (4) that the alleged coconspirators were interdependent." *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005). An explicit agreement is not required, so the agreement to commit an unlawful act "'may be informal and may be inferred entirely from circumstantial evidence.'" *United States v. Pulido-Jacobo*, 377 F.3d 1124, 1129 (10th Cir. 2004) (quoting *United States v. Lang*, 364 F.3d 1210, 1223 (10th Cir. 2004)).

Courts interpret force, intimidation, and threat under Section 1985(3) in a manner consistent with Section 11(b), so that conduct that would violate the Voting Rights Act will also violate the Ku Klux Klan Act if it is part of a conspiracy. *See Wohl III,* 661 F. Supp. 3d at 125-26.

## II.   The Plaintiffs' Lawsuit

The plaintiffs are three non-partisan civic engagement organizations that provide various services and support to Colorado voters. (App. 24-25.) They filed this lawsuit in March 2022 stating three claims for relief: (1) intimidating voters and potential voters

in violation of 52 U.S.C. § 10307(b); (2) attempting to intimidate voters and potential voters in violation of 52 U.S.C. § 10307(b); and (3) a conspiracy to intimidate voters and potential voters in violation of 42 U.S.C. § 1985(3). (App. 32-33.)

The original defendants were an unincorporated association known as the United States Election Integrity Plan ("USEIP") and three members of that group's core team: Shawn Smith, Ashley Epp, and Holly Kasun. (App. 25-26.) USEIP was founded in November 2020 in response to false claims of fraud during the 2020 presidential election. (App. 212.)

Following the close of discovery, the defendants moved for summary judgment on all claims as to all defendants. They argued that there was insufficient evidence of voter intimidation or attempted voter intimidation. (App. 64.) The defendants also argued that USEIP can't be sued under 52 U.S.C. § 10307(b) or 42 U.S.C. § 1985(3) because it's an unincorporated association. (App. 64.)

After full briefing, the district court issued a 16-page order denying the motion as to the individual defendants. (App. 66.) The

court found genuine disputes of material fact on the issues of voter

intimidation and attempted voter intimidation. (App. 66.)

     But the district court granted the defendants' motion for

summary judgment as to USEIP. (App. 69-70.) Finding itself

"bound by Tenth Circuit precedent" holding that unincorporated

associations are not "persons" entitled to bring suit under 42 U.S.C.

§ 1983, the district court concluded that it had no choice but to hold

that an unincorporated association is neither a "person" that is

prohibited from intimidating voters or attempting to intimidate

voters under the Voting Rights Act, 52 U.S.C. § 10307(b), nor a

"person[]" that is prohibited from conspiring to intimidate voters

under the Ku Klux Klan Act, 42 U.S.C. § 1985(3). (App. 68-69

(discussing *Lippoldt v. Cole*, 468 F.3d 1204 (10th Cir. 2006).) The

court therefore dismissed USEIP as a party defendant in the case.

(App. 70.)

     Despite following what it viewed as "binding precedent," the

district court noted that the Tenth Circuit is the only circuit to

interpret "person" in this manner, and it dropped a lengthy footnote

in which it "respectfully disagree[d]" with that interpretation. (App.

69.) Echoing the Eleventh Circuit's analysis of the issue, the court observed that developments after 1871 strongly suggest that Congress intended "person" in the Ku Klux Klan Act to include unincorporated associations even though the Dictionary Act of 1871 pointed in the opposite direction. (App. 69 (discussing *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1276-83 (11th Cir. 2021).) The court also noted the irony of concluding that an unincorporated association like the Ku Klux Klan would be exempt from the prohibitions in the Ku Klux Klan Act—a result "which is entirely contrary to the history and purpose of the Ku Klux Klan Act." (App. 70.)

The case then proceeded to trial without USEIP as a defendant.

### III.   The Bench Trial

The district court presided over a four-day bench trial in July 2024. (App. 111-21.) At trial, the plaintiffs called seven witnesses, including the three remaining defendants and one expert witness. (App. 111-19.) The court received more than 40 exhibits, including

USEIP's training manuals and "playbook" for recruiting, organizing, and canvassing. (App. 111-19, 226-63.) Written by one of the individual defendants, the playbook encourages readers to "stand up" and "fight" because "we are not in a time of peace" and "[n]o one is coming to save us." (App. 228.)

Because USEIP was no longer a party, however, the plaintiffs could not introduce several exhibits, including: (1) communications on USEIP's internal message board discussing the use of weapons during canvassing efforts and the targeting of minority communities (App. 131-32, 283); (2) photographs and affidavits from USEIP's canvassers (App. 127-29); and (3) USEIP's discovery responses. The district court limited out-of-court statements to those made by the three remaining individual defendants. (App. 151.)

The district court also refused to allow the plaintiffs to introduce a video, later published on social media, of defendant Smith discussing USEIP's canvassing efforts at a public event. During his remarks, Smith asserted that anyone involved in election fraud "deserves to hang" because "sometimes the old ways

are the best ways." (App. 136-38, 286.)[1] The plaintiffs offered the video into evidence during Smith's testimony, and the defendants objected to the video on the grounds of hearsay, lack of foundation, and authenticity. (App. 133-38.) The district court excluded it without explanation, saying simply "I'm not allowing you to show me the video." (App. 136.)

On the second day of trial, the plaintiffs presented the testimony of Yvette Roberts, a Colorado voter who had complained to the Secretary of State and her local sheriff about a visit from two canvassers in June 2021. According to Roberts, the canvassers wore "official looking badges" and explained that they were "looking into the Colorado 2020 election." (App. 168-69.) Addressing her by name, one of the canvassers informed Roberts that he had voting information from the State and proceeded to question her about her citizenship and the citizenship of other members of her household, her voter registration, and how she had submitted her ballot in the 2020 election. (App. 169-81.) Roberts told them things she didn't

---

[1] A flash drive containing a copy of the video will be filed with the Clerk of Court.

want to. (App. 171.) She described the incident as "pretty scary." (App. 171.) Even though she had received other canvassers in the past who didn't intimidate her, she felt intimidated by her encounter with these canvassers. (App. 178, 180-81.) And she felt compelled by the incident to report it as "voter intimidation" to the Secretary of State. (App. 180-81, 293-94.)

The plaintiffs rested their case at the end of the third day of trial. (App. 119.) The defendants then moved for judgment on partial findings under Rule 52(c) of the Federal Rules of Civil Procedure. (App. 119.) After hearing arguments from counsel, the district court took the motion under advisement and recessed for the day. (App. 119.)

## IV. Judgment on Partial Findings

On the fourth day of trial, the district court returned to the bench and granted the defendants' motion for judgment on partial findings. (App. 120.) The court found that the three individual defendants were members of USEIP's core team and that USEIP had canvassed about 9,400 doors across Colorado in 2021. (App.

210.) Reviewing USEIP's playbook and training manual, the court found "nothing in either document that is remotely or objectively intimidating on its face" but made no mention of the violent and militaristic rhetoric throughout. (App. 211.)

Turning to defendant Smith's statement that anyone involved in election fraud is committing treason and deserves to hang, the court described his statement "concerning" but found that "the plaintiffs have established no connection between this statement and an attempt to intimidate any particular voter or group of voters." (App. 211-12.) The court likewise found no evidence that defendants Epp and Kasun had done anything to intimidate any particular voters. (App. 212, 214.)

As to Roberts, the court declared as a matter of law that the canvassers "engaged in no conduct that could be objectively considered intimidating" and that the questions they asked of her were "not intimidating and not improper." (App. 218.) The court also observed that Roberts "did not suffer any threats of violence, threatening phone calls, [or] vandalism during or after the event." (App. 219.) Roberts's "sole regret," according to the court, "seemed

to be her own failure of memory to remember their names or what

organization they were with." (App. 218.)

The court then concluded that "there is simply insufficient

evidence to proceed any further in this matter." (App. 219.) "In

sum, plaintiffs have failed to introduce any evidence that can

remotely be perceived as intimidating or threatening on behalf of

the three defendants." (App. 219-20.)

## Standards of Review

When a district court enters judgment on partial findings under Rule 52(c) of the Federal Rules of Civil Procedure, this Court reviews its factual findings for clear error and its legal conclusions de novo. *See Romero v. City of Albuquerque*, 190 F. App'x 597, 601 (10th Cir. 2006). A finding of fact is clearly erroneous if it lacks factual support in the record or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made. *See United States v. Pena*, 115 F.4th 1254, 1259 (10th Cir. 2024).

A district court's decision to admit or exclude evidence is reviewed for abuse of discretion. *See Pierce v. Shorty Small's of Branson, Inc.*, 137 F.3d 1190, 1192 (10th Cir. 1998). But when the district court's "exercise of [] discretion *depended* on the resolution of a purely legal issue" this Court reviews that issue de novo. *Baca v. Berry*, 806 F.3d 1262, 1268 (10th Cir. 2015) (emphasis in original) (internal quotation marks omitted). "A district court abuses its discretion when it (1) fails to exercise meaningful discretion, such as acting arbitrarily or not at all, (2) commits an

29

error of law, such as applying an incorrect legal standard or
misapplying the correct legal standard, or (3) relies on clearly
erroneous factual findings." *Farmer v. Banco Popular of N. Am.*,
791 F.3d 1246, 1256 (10th Cir. 2015); *see also Dansie v. Union Pac.
R.R. Co.*, 42 F.4th 1184, 1198 (10th Cir. 2022) ("A district court
abuses its discretion when its decision is arbitrary, capricious or
whimsical or falls outside the bounds of permissible choice in the
circumstances." (quotation marks omitted)).

## Summary of the Argument

This Court should vacate the judgment below for four reasons.

*First*, the district court's dismissal of USEIP was legal error. The Voting Rights Act prohibits voter intimidation and attempted voter intimidation by any "person," 52 U.S.C. § 10307(b), and the definition of that term provided by the Dictionary Act, 1 U.S.C. § 1, has included unincorporated associations like USEIP since well before Congress enacted the Voting Rights Act. Similarly, the Ku Klux Klan Act provides a civil cause of action when two or more "persons" conspire to intimidate voters. 42 U.S.C. § 1985(3). Construing "persons" to exempt unincorporated associations, as the district court did, goes against the entire history and purpose of the Ku Klux Klan Act and the uniform practice of other federal courts.

*Second*, the district court's exclusion of a key video was an abuse of discretion. Even though the defendants had waived all objections to the video, the court still excluded it without explanation, saying simply, "I'm not allowing you to show me the video." (App. 136.) Without the video, the defendant's threat of

physical harm against future voters came into the record only through the defendant's own sanitized testimony and his attorney's inaccurate characterization of it.

*Third,* the district court's critical finding that certain canvassers "engaged in no conduct that could be objectively considered intimidating" was both clear error and legal error. (App. 218.) It was clear error because the canvassers wore badges, asked intrusive questions, knew personal details about the voters, and claimed to have information from the State. A reasonable person familiar with the context could find this conduct intimidating. The finding was based on legal error because the court focused too narrowly on whether the canvassers who interrogated voters were polite when they did so. The court refused to consider the context in which the questioning occurred.

*Fourth*, the district court applied the wrong legal standard to the plaintiffs' claims. In granting judgment as a matter of law, the court incorrectly stated that it must focus directly on the actions of the defendants, and it refused to consider the context in which those actions took place. But there is no such requirement in the

text or caselaw. Often, whether challenged conduct is objectively intimidating or an attempt at intimidation will depend on the context. For that reason, courts must consider "all of the surrounding facts" when evaluating claims of voter intimidation or attempted voter intimidation. *McLeod*, 385 F.2d at 744. And the district court refused to do that here.

These errors were highly prejudicial, narrowing the plaintiffs' claims beyond recognition and limiting the presentation of their case at trial. This Court should therefore vacate the judgment and remand the case to the district court for further proceedings.

## Argument

### I.    Unincorporated associations can be sued under the Voting Rights Act and the Ku Klux Klan Act.

### A.    The Voting Rights Act

Section 11(b) of the Voting Rights Act prohibits voter intimidation and attempted voter intimidation by any "person." 52 U.S.C. § 10307(b). The issue of whether USEIP—an unincorporated association—can be sued under Section 11(b) thus depends on whether the term "person" in the Act includes an unincorporated association.

It does. Statutory interpretation begins, as always, with the statutory text. "Unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006). The Voting Rights Act contains no special definition of "person," but the Dictionary Act does: "In determining the meaning of any Act of Congress, unless the context indicates otherwise * * * the word[ ] 'person' … include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as

individuals." 1 U.S.C. § 1.[2] The plain language of the text of Section 11(b) therefore includes unincorporated associations like USEIP. *See, e.g., Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1129 (10th Cir. 2013) (en banc) (describing the Dictionary Act as the "first resource" for interpreting the word "person"), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

Also, nothing about the context indicates that "person" doesn't include unincorporated associations. "Context" here generally means "'the text of the Act of Congress surrounding the word at issue, or the text of other related congressional Acts.'" *Hobby Lobby*, 723 F.3d at 1130 (quoting *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 199 (1993)). There is nothing surrounding the word "person" in the Voting Rights Act that suggests a limiting construction. To the contrary, the Supreme Court has instructed that the Voting Rights Act "should be interpreted in a manner that provides 'the broadest possible scope.'" *Chisom v. Roemer*, 501 U.S.

---

[2] Congress adopted this definition in 1948—17 years before it passed the Voting Rights Act. *See* Act of June 25, 1948, Pub. L. No. 80-772, § 6, 62 Stat. 683, 859 (1948).

380, 403 (1991) (quoting *Allen v. State Bd. of Elections*, 393 U.S. 544, 567 (1969)).

The text of a closely related statute likewise suggests that "person" isn't so limited. The Civil Rights Act of 1957 contains a provision like Section 11(b) that prohibits voter intimidation by any "person . . . for the purpose of" interfering in a federal election. 52 U.S.C. § 10101(b) (formerly codified at 42 U.S.C. § 1971). That provision is enforceable by injunctive relief in suits brought by the Attorney General, 52 U.S.C. § 10101(c), and the original version of the Act limited the penalties for contempt when the accused was a "natural person." Civil Rights Act of 1957, Pub. L. No. 85-315, § 131, 71 Stat. 634, 638 (1957). This limitation shows that "Congress is quite capable of narrowing the scope of a statutory entitlement or affording a type of statutory exemption when it wants to." *Hobby Lobby*, 723 F.3d at 1130. And when limitations like that are absent, "they do not apply." *Id.*

It is thus no surprise that courts have uniformly entertained voter intimidation claims against unincorporated associations under the Civil Rights Act of 1957 and the Voting Rights Act of

1965. *See, e.g., Wohl III*, 661 F. Supp. 3d at 90-91 (the defendants

included "Project 1599," an unincorporated political organization);

*Democratic Nat'l Comm., v. Republican Nat'l Comm.*, 671 F. Supp.

2d 575, 579 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir. 2012) (the

defendants included the Republican National Committee, an

unincorporated political organization); *Original Knights of the Ku*

*Klux Klan*, 250 F. Supp. at 334 (the defendants included an

unincorporated paramilitary organization).

Here, the district court didn't separately address the meaning

of "person" under the Voting Rights Act. It analyzed only the Ku

Klux Klan Act, and it assumed that the meaning of "person" is the

same in both. (App. 69.) But that assumption was unwarranted

given the length of time between the two statutes, the intervening

adoption of a statutory definition of "person" that plainly

encompasses unincorporated associations like USEIP, and the

interpretive clue contained in the Civil Rights Act of 1957.

The court's assumption was also prejudicial. Dismissing

USEIP as a party defendant hamstrung the plaintiffs' presentation

of their case at trial, limiting the admission of certain exhibits and

completely excluding others.[3] For example, the district court refused to admit evidence from USEIP's internal message board discussing the use of weapons during canvassing efforts and the targeting of minority communities. (App. 131-32, 287.) The court refused to allow photographs taken and affidavits prepared by USEIP canvassers. (App. 127-29.) And the plaintiffs could not use USEIP's discovery responses and organizational deposition as substantive evidence. This evidence would have provided important context for the challenged conduct, which is essential to understand its impact or attempted impact on the voters. *See Wohl III*, 661 F. Supp. 3d at 113.

---

[3] The district court's dismissal of USEIP also appears to have led the district court to focus too narrowly on the actions of the three individual defendants rather than on the enterprise as a whole. Several times throughout trial, the plaintiffs tried to offer critical context about USEIP operations, but the district court admonished plaintiffs to "stop wasting so much time" because "I have dismissed the organization. It's not on trial here." (App. 150; *see also* App. 147-49.) *See infra* Part IV.

## B.    The Ku Klux Klan Act

The question of whether USEIP can be sued as a defendant under the Support or Advocacy Clause of the Ku Klux Klan Act also turns on the meaning of "person." The clause provides a civil cause of action when two or more "persons" conspire to intimidate voters. 42 U.S.C. § 1985(3). The district court concluded that it was bound by this Court's holding in *Lippoldt* that an unincorporated association is not a "person" who can bring suit as a plaintiff under a different statute—42 U.S.C. § 1983—to hold here that an unincorporated association is not a "person" who can be a defendant under 42 U.S.C. § 1985(3). (App. 69-70.)

But that conclusion overstates the holding of *Lippoldt*. "Not all text within a judicial decision serves as precedent." Bryan A. Garner et al., *The Law of Judicial Precedent* 44 (2016). "That's a role generally reserved only for the holding: the parts of a decision that focus on the legal question actually presented to and decided by the court." *Id.* "A holding consists of the 'court's determination of a matter of law pivotal to its decision.'" *Id.* (citation omitted).

In *Lippoldt*, the determination of whether an unincorporated association can be sued as a defendant under Section 1985 played no role in its determination of whether an unincorporated association can sue as a plaintiff under Section 1983. The case involved a different statute and a different posture. It presented a different question altogether, and the panel's decision did not purport to broaden the scope of its rule. *See Lippoldt*, 468 F.3d at 1216 (limiting its holding to 42 U.S.C. § 1983); *see also* Garner et al.*, supra*, at 88 ("It's normally thought to be within the court's discretion to decide the scope of a rule or standard: as long as it forms the basis of the holding, it's precedential."). Thus, while the actual holding of *Lippoldt* was binding on the district court, neither that court nor this one is bound to extend *Lippoldt*'s holding to Section 1985.

And there are at least two reasons not to. First is the legislative history of the Ku Klux Klan Act—the same legislative history on which this Court relied in *Lippoldt*. Surveying that history, this Court observed that "comments made by several members of Congress indicate a restricted view of who could qualify

as a proper Section 1983 plaintiff." *Lippoldt*, 468 F.3d at 1213.
Even if that's a correct reading of the legislative history concerning
who can be a plaintiff under Section 1983, it doesn't necessarily
follow that Congress didn't intend to provide a cause of action
against an unincorporated association like the Ku Klux Klan under
Section 1985.

As the Supreme Court has recognized repeatedly, the
legislative history of the Ku Klux Klan Act makes clear that the
Act was a direct response to atrocities committed by the Klan and
similar organizations in the South during Reconstruction.[4] *See, e.g.,*
*Monroe v. Pape*, 365 U.S. 167, 174 (1961) (Congress "had the Klan
'particularly in mind'" when it passed the Act); *Collins v.*
*Hardyman*, 341 U.S. 651, 662 (1951) ("the post Civil War Ku Klux

---

[4] The popular name of the Act also supports a construction that
would permit civil actions against unincorporated associations like
the Klan. *Cf. INS v. Nat'l Ctr. For Immigrants' Rights, Inc.,* 502
U.S. 183, 189 (1991) ("[T]he title of a statute or section can aid in
resolving an ambiguity in the legislative text."); Antonin Scalia &
Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*
221 (2012) ("The title and headings of a statute are permissible
indicators of meaning.").

Klan against which this Act was fashioned"); *see also Pape*, 365 U.S. at 200 (Harlan, J., concurring) ("We have not passed upon the question whether 42 U.S.C. § 1985 … was intended to reach only the Ku Klux Klan or other substantially organized group activity … [or] any conspiracy of two persons."); Note, *supra*, at 1388. This legislative history points emphatically in the opposite direction from *Lippoldt.*

A second reason not to extend *Lippoldt* is because of legitimate concern that *Lippoldt* itself was wrongly decided. The Eleventh Circuit articulated that view at length in *Fort Lauderdale Food Not Bombs*, pointing out that this Court's "otherwise thorough discussion [in *Lippoldt*] … did not account for the fact that Congress re-enacted the word 'person' in § 1983 twice after intervening developments in federal law clarified that unincorporated associations were 'persons.'" 11 F. 4th at 1283. Those re-enactments occurred in 1979 and 1996—before *Lippoldt,* yet well after the Dictionary Act and common usage included unincorporated associations within the meaning of "person." *See id.* at 1280-81. Perhaps because of that oversight, this Circuit "stands

42

alone" in its interpretation of "person" under Section 1983. *Id.* at 1283. And that's reason enough not to extend *Lippoldt*'s interpretation of "person" to Section 1985.

Instead, this Court should give "persons" in Section 1985 its ordinary meaning, which has long included unincorporated associations. *See* Scalia & Garner*, supra*, at 273. Doing so has the benefit of harmonizing the term with the legislative history of the Ku Klux Klan Act and the more recent re-enactments of Section 1983 that updated the meaning of "person" in that section. And it's consistent with the uniform practice of other courts that have entertained voter intimidation suits under Section 1985 against unincorporated associations like USEIP. *See, e.g., Wohl III*, 661 F. Supp. 3d at 90-91 (the defendants included "Project 1599," an unincorporated political organization).

## II.   The district court improperly excluded a video of a defendant stating that anyone involved in election fraud "deserves to hang."

To allow for meaningful appellate review, district courts are generally expected to articulate their reasons for admitting or

excluding evidence over an objection. *See generally* Fed. R. Evid. 103(a). Failure to do so can constitute reversible error if the court's ruling is prejudicial. *See id*.

Here, the district court excluded a key video of a defendant speaking about USEIP's canvassing efforts at a large public gathering and stating that anyone involved in election fraud "deserves to hang." (App. 136-38, 286.) The plaintiffs moved to introduce the video during the defendant's testimony, and the defendants objected to the video on the grounds of hearsay, lack of foundation, and authenticity. (App. 133-38.) The district court excluded it without explanation, saying simply "I'm not allowing you to show me the video." (App. 136.)

One might assume that the court excluded the exhibit on one of the grounds articulated by the defendants' attorneys. But the defendants had waived those objections by failing to make them in their pretrial disclosures as required by the final pretrial order. Fed. R. Civ. P. 26(a)(3). (App. 93.) In fact, the defendants didn't object to the video at all in their pretrial disclosures. (App. 98.)

Even if the defendants hadn't waived those objections, they would not have been well founded. The video was not hearsay because it was the statement of a party opponent and obviously not offered for the truth of the matter asserted. *See* Fed. R. Evid. 801. The sponsoring witness was on the stand, and he did not dispute that he had made the statements shown in the video. (App. 135-38.) Any specific issues of foundation or authenticity could have been resolved right then and there.

Without the video, evidence of the defendant's chilling statement and the crowd's enthusiastic response came in only through the defendant's own sanitized testimony and his attorney's inaccurate and self-serving representations about the video. (App. 197-205.) The defendant and his attorney tried to explain away what would have otherwise been a vivid demonstration of the violent rhetoric and denialist fervor that characterized USEIP's voter intimidation efforts after the 2020 presidential election. And the video itself, which was widely distributed on social media, is part of the defendants' attempt to intimidate voters in future elections. It's a thinly veiled threat of physical harm if this

vigilante group of election denialists believes that you've done something wrong. Excluding the video at the heart of the plaintiffs' case—and doing so without any explanation—was therefore an abuse of the district court's discretion and warrants reversal.

**III.  The district court's finding that the canvassers who questioned a key witness "engaged in no conduct that could be objectively considered intimidating" is clearly erroneous and based on the wrong legal standard.**

When an organized group of election denialists knocks on your door just weeks after the violent insurrection at the United States Capitol, a reasonable person like Roberts could be afraid. These weren't encyclopedia salesmen. They had badges. They said they had information from the State. They knew Roberts's name and voting history. And they questioned Roberts about her citizenship and fundamental right to vote—sensitive topics in an environment of recent political violence at the United States Capitol motivated by false claims of voter fraud. Roberts was

scared of reprisal, and she felt intimidated by the encounter.[5] (App. 171, 180-81.)

In May 2021, the Department of Justice warned that this sort of door-to-door canvassing for the purpose of voter verification "raises concerns regarding potential intimidation of voters." E-mail from Pamela S. Karlan, Principal Deputy Assistant Att'y Gen., to Karen Fann, President of the Arizona State Sen. (May 5, 2021), https://www.justice.gov/d9/case-documents/attachments/2021/05/05/civil_rights_division_letter_to_arizona_senate_president_5-5_final_ro_tag_prop.pdf. The warning came after the Arizona State Senate hired an outside contractor to investigate claims of voter fraud in Maricopa County following the 2020 presidential election. *Id.* The contractor's statement of work indicated that it had been "knock[ing] on doors to confirm if valid voters actually

---

[5] The district court's comment that Roberts's "sole regret seemed to be her own failure of memory to remember [the canvassers'] names or what organization they were from" cannot be reconciled with Roberts's testimony and is unsupported by the record. (App. 218.) Roberts provided details about the questions they asked and why she found their approach, demeanor, and questions to be intimidating. (App. 169-81.)

lived at" certain addresses and that it would conduct an audit of voting history by contacting certain voters through a "combination of phone calls and physical canvassing" to determine whether the individual had actually voted in the November 2020 election. *Id.* Based on the Department's "[p]ast experience with similar investigative efforts around the country," the Department warned that "[s]uch investigative efforts can have a significant intimidating effect on qualified voters that can deter them from seeking to vote in the future." *Id.*

And it's not hard to see why. This sort of "election fraud" investigation—even when conducted under the auspices of the Arizona State Senate—raises the specter of potential legal consequences because "it portends the risk of arrest" because of how someone voted in the past or for voting in the future. *Wohl III*, 661 F. Supp. 3d at 113. Here, of course, the investigation had no official sanction. It was led by a vigilante group of election denialists who had participated in the events of January 6. Given the recent violence motivated by claims of election fraud, a door-to-

door search for election fraud like this one also raises the specter of physical harm. Roberts's fear was reasonable.

The district court's finding to the contrary is based on the wrong legal standard. The court focused too narrowly on whether the canvassers who interrogated Roberts about sensitive topics were polite when they did so. It refused to consider "all of the surrounding facts" that provide the context for the questioning. *McLeod*, 385 F.2d at 744; *see also Wohl III*, 661 F. Supp. 3d at 113 ("intimidation includes messages that a reasonable recipient, *familiar with the context of the communication*, would view as a threat of injury") (emphasis added). Indeed, the district court considered *none* of the surrounding facts that might lead a reasonable person familiar with the context—like Roberts—to view the canvassers as threatening.

The district court's finding is also clearly erroneous. No matter how polite the canvassers were, it is undisputed that they wore badges, asked intrusive questions, knew personal details

about Roberts, and claimed to have information from the State.[6] A reasonable person could find this conduct intimidating, as Roberts did, despite the canvassers' politeness. The district court's finding that there was no evidence of intimidation is a clear error.

The district court's erroneous finding that the Roberts canvassers engaged in no intimidating conduct was essential to its judgment. This Court should therefore vacate that judgment and remand the case for further proceedings.

---

[6] The district court incorrectly stated that Roberts had testified that the canvassers were carrying information from Mesa County. (App. 218.) In fact, Roberts testified that the canvassers told her that they obtained information from the State. (App. 169, 172.) That testimony is consistent with the defendants' testimony that USEIP canvassers used voter lists obtained from the Secretary of State and with other testimony that the Secretary of State's office had understood two complaints from Mesa County to be about USEIP. (App. 139-43, 166.) Although the court found that it was "unclear" whether the canvassers at Roberts's house were using USEIP's playbook or training manual, the district court relied on its misstatement of the record to infer that USEIP did not itself canvass Roberts's house. (App. 211.) Other evidence also counters the district court's erroneous inference: (1) the playbook itself, which mentions Mesa County extensively (App. 237); (2) defendant Smith's testimony that USEIP had a Mesa County captain (App. 130); and (3) Roberts's description of the canvassers' behavior, which mirrored the instructions in USEIP's training materials (App. 259).

**IV.  The district court applied the wrong legal standard to the plaintiffs' claims by refusing to consider the context in which the challenged acts occurred.**

Voter intimidation comes in "many forms." *Beaty,* 288 F.2d at 656. There is no requirement in the text or caselaw that it be physical or direct. Often, whether challenged conduct is objectively intimidating or an attempt at intimidation will depend on the context. *Cf. Black*, 538 U.S. at 352-57 (explaining that cross burning is threatening because of the nation's social and historical context); *Dillard*, 795 F.3d at 1201 (in determining whether a message conveys a threat, "context is critical ... and history can give meaning to the message") (cleaned up). For that reason, courts consider "all of the surrounding facts" when evaluating claims of voter intimidation or attempted voter intimidation. *McLeod*, 385 F.2d at 744; *cf. Wheeler*, 776 F.3d at 743 (determining whether a statement is a threat requires "a fact-intensive inquiry, in which the language, the context in which the statements are made, as well as the recipients' responses are all relevant") (citations omitted).

But the district court refused to do that here. In granting judgment as a matter of law, the court incorrectly stated that it "must focus on the acts of defendants directly or those of others who they specifically directed or controlled." (App. 208.) It refused to consider evidence "about the January 6th insurrection" or "about the defendants' collective belief that there was election fraud." (App. 208.) According to the court's view of the law, "[n]one of that actually matters." (App. 208.) Not surprisingly, then, its recitation of the facts included nothing about the context in which the challenged acts occurred: the former President—at a January 6 rally attended by all three defendants—had very recently incited a violent insurrection at the United States Capitol with false claims of election fraud that continue to reverberate to this day.

The district court also failed to consider other evidence that was especially relevant to the context in which the challenged acts occurred. For example, there were contemporaneous media reports that the canvassers were armed. (App. 182.) The defendants made many public statements about election fraud to publicize their efforts and recruit volunteers. (App. 183-96.) The defendants

instructed canvassers to prepare affidavits for state and local law

enforcement officials if the canvasser suspected wrongdoing after

speaking with a voter. (App. 124-26, 152-53.) The defendants

publicized a report on their canvassing efforts claiming to have

found "unexplained irregularities" in 5 to 11 percent of voters they

contacted and suggesting that up to 12 percent of elections in 2020

"may be questionable." (App. 193-94, 266.) And the Colorado

Secretary of State's office took the defendants' threats of violence so

seriously that it notified the Department of Justice, the Colorado

State Patrol, and the Colorado Department of Public Safety, and it

issued a warning to the public about USEIP's canvassing efforts.

(App. 154-65, 288.)

Of course, the district court wasn't required to comment on

every piece of evidence. But neither should it have considered such

evidence off limits as its ruling indicates and as its silence

illustrates.[7] The context is important here because a knock on the

---

[7] The district court's ruling that context doesn't matter to the
plaintiffs' claims is also consistent with its comments on the
evidence throughout the trial. (App. 144-45 ("[T]his just really isn't

door might well be perceived differently if voters are aware that an armed and organized bunch of election denialists are out hunting for fraud.

The district court's failure to consider the context in which the challenged conduct occurred was thus legal error. On remand, it should consider "all of the surrounding facts" to determine whether the challenged conduct was intimidating or an attempt at intimidation.

---

that germane to what we're doing here today."); App. 146 ("I understand the backdrop here, but we're not on anything that's even remotely close to what the claim in this case is."); App. 149 ("The issue for this case is is she guilty of voter intimidation, not sending out blogs, not talking about election fraud."); App. 150 ("We're talking about three individuals and their actions for voter intimidation.").)

## Conclusion

Voter intimidation has no place in our democracy. Partisans unhappy with the outcome of an election have every right to peaceably contest the results. To protest. To petition their government for redress of their grievances. But they don't have the right to strike fear into the hearts of their fellow citizens, as these defendants did, with door-to-door vigilantism backed by threats of violence.

The district court's judgment here may have unwittingly validated such efforts, but that judgment rests on error after error that render it infirm. This Court should therefore vacate the judgment and remand the case to the district court for further proceedings.

### Oral Argument Statement

This case arises from a voter intimidation campaign launched after the 2020 election by an organized group of election denialists. Congress has enacted two laws—the Ku Klux Klan Act and the Voting Rights Act—to protect voters from precisely this kind of harassment. The district court's rulings here undermine those protections and therefore merit oral argument because they present issues that are vital to our Republic.

Dated: November 7, 2024

**_/s/ Bryan L. Sells_**
Georgia Bar No. 635562
Attorney for the Appellants
The Law Office of Bryan L. Sells, LLC
Post Office Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212


Courtney Hostetler
John Bonifaz
Ben Clements
Amira Mattar
Free Speech For People
48 North Pleasant St, Ste 304
Amherst, Massachusetts 01002
(617) 244-0234


*Attorneys for the Appellants*

## Certificate of Compliance

This brief complies with the type-volume limitation of Rule 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure because, excluding parts of the brief exempted by Rule 32(f), it contains 7,665 words. This brief also complies with the typeface and type-style requirements of Rule 32(a)(5) and (6) because it has been prepared using Microsoft Word in the 14-point Century Schoolbook typeface in Roman style.

**/s/ Bryan L. Sells**
Georgia Bar No. 635562
Attorney for the Appellants
The Law Office of Bryan L. Sells, LLC
Post Office Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com

# Addendum

## 52 U.S.C. § 10307

## Prohibited acts

### (a) Failure or refusal to permit casting or tabulation of vote

No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote.

### (b) Intimidation, threats, or coercion

No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section 10302(a), 10305, 10306, or 10308(e) of this title or section 1973d or 1973g of Title 42.

### (c) False information in registering or voting; penalties

Whoever knowingly or willfully gives false information as to his name, address or period of residence in the voting district for the purpose of establishing his eligibility to register or vote, or conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting, or pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both: *Provided, however*, That this provision shall be applicable only to general, special, or primary elections held solely or in part for the purpose of selecting or electing any candidate for

the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands, or Resident Commissioner of the Commonwealth of Puerto Rico.

**(d) Falsification or concealment of material facts or giving of false statements in matters within jurisdiction of examiners or hearing officers; penalties**

Whoever, in any matter within the jurisdiction of an examiner or hearing officer knowingly and willfully falsifies or conceals a material fact, or makes any false, fictitious, or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**(e) Voting more than once**

**(1)** Whoever votes more than once in an election referred to in paragraph (2) shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**(2)** The prohibition of this subsection applies with respect to any general, special, or primary election held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands, or Resident Commissioner of the Commonwealth of Puerto Rico.

**(3)** As used in this subsection, the term "votes more than once" does not include the casting of an additional ballot if all prior ballots of that voter were invalidated, nor does it include the voting in two

jurisdictions under section 10502 of this title, to the extent two ballots are not cast for an election to the same candidacy or office.

## 42 U.S.C. § 1985

## Conspiracy to interfere with civil rights

### (1) Preventing officer from performing duties

If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties;

### (2) Obstructing justice; intimidating party, witness, or juror

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

## (3) Depriving persons of rights or privileges

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

# Summary Judgment Order

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:22-cv-00581-CNS

COLORADO MONTANA WYOMING STATE AREA CONFERENCE OF THE NAACP,
LEAGUE OF WOMEN VOTERS OF COLORADO,
MI FAMILIA VOTA,

      Plaintiffs,

v.

UNITED STATES ELECTION INTEGRITY PLAN,
SHAWN SMITH,
ASHLEY EPP, and
HOLLY KASUN,

      Defendants.

---

## ORDER

---

Before the Court is Defendants' (1) Motion for Judgment on the Pleadings and (2) Motion for Summary Judgment. (ECF Nos. 54, 70). The Court DENIES the motion for judgment on the pleadings and DENIES IN PART and GRANTS IN PART the motion for summary judgment for the following reasons.

### I. FACTS

Plaintiffs are civil- and voting-rights organizations who have filed this civil action against Defendants, raising three claims for relief: (1) intimidating voters and potential voters in violation of 52 U.S.C. § 10307(b); (2) attempting to intimidate voters and potential voters in violation of 52 U.S.C. § 10307(b); and (3) violation of 42 U.S.C. § 1985. (ECF No. 1, pp. 12-13). On April 4,

2022, Defendants moved to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1), which Chief Judge Brimmer denied on April 28, 2022. (ECF No. 39). Specifically, the Court determined that each Plaintiff had organizational standing under Article III and had sufficiently alleged that Defendants' conduct had caused Plaintiffs a redressable injury. The Court noted that Defendants did not argue that Plaintiffs lacked associational standing and would not analyze the issue because it had determined that each Plaintiff had organizational standing. (ECF No. 39, p. 19). Furthermore, the Court determined that neither party had raised the issue of prudential standing and declined to exercise its discretion to consider the issue. (*Id.*, p. 20).

In the instant motion, Defendants move for judgment on the pleadings and summary judgment under Federal Rules of Civil Procedure 12(c) and 56. (ECF Nos. 54, 70). In their motion for judgment on the pleadings, Defendants argue that (1) Plaintiffs lack prudential or statutory standing to pursue claims 1 and 2 in the Complaint and (2) Plaintiffs might have statutory standing for claim 3, but fail to state a claim because there is no State involvement or invidious discriminatory animus. (ECF No. 54, pp. 3-4). Defendants similarly argue in their motion for summary judgment that: (1) Plaintiffs' claims under 52 U.S.C. § 10307(b) and 42 U.S.C. § 1985(3) fail because Plaintiffs cannot establish an act of intimidation or attempt to intimidate or that the act was done with specific intent; (2) Plaintiffs do not have prudential standing to raise these claims; and (3) Defendant USEIP is an unincorporated association and cannot be sued under 52 U.S.C. § 10307(b) or 42 U.S.C. § 1985(3). (ECF No. 70, pp. 5-20)

## II. LEGAL STANDARD

### A. Rule 12(c)

The Court reviews a motion for judgment on the pleadings under Rule 12(c) under the same standard as a motion for Rule 12(b)(6). *Adams v. Jones*, 577 F. App'x 778, 781 (10th Cir. 2014). The Court will not grant a motion for judgment on the pleadings "unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." *Id.* at 782. Rule 12(g)(2) precludes successive motions under Rule 12; however, Rule 12(g) is subject to Rule 12(h)(2), which allows parties to raise certain defenses in any pleading allowed under Rule 7(a), in a motion for judgment on the pleadings under Rule 12(c), or at trial. *Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty., Colo.*, 771 F.3d 697, 701 (10th Cir. 2014).

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true and interpreted in the light most favorable to the non-moving party, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Additionally, the complaint must sufficiently allege facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed; however, a complaint may be dismissed because it asserts a legal theory not cognizable as a matter of law. *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007); *Golan v. Ashcroft*, 310 F. Supp. 2d 1215, 1217 (D. Colo. 2004). A claim is not plausible on its face "if [the allegations] are so general that they encompass a wide swath of conduct, much of it innocent," and the plaintiff has failed to "nudge[ the] claims

across the line from conceivable to plausible." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). The standard, however, remains a liberal pleading standard, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotations and citation omitted).

### B. Rule 56

Summary judgment is warranted when (1) the movant shows that there is no genuine dispute as to any material fact and (2) the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The factual record and reasonable inferences must be construed in the light most favorable to the nonmoving party. *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). The moving party bears the initial burden, but once met, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986). Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "[Q]uestions of intent, which involve intangible factors including witness creditability, are matters for consideration of the fact finder after a full trial." *Prochaska v. Marcoux*, 632 F.2d 848, 851 (10th Cir. 1980).

### III. ANALYSIS

### A. Judgment on the Pleadings

Defendants raise two arguments in their motion for judgment on the pleadings: (1) Plaintiffs lack statutory, or prudential, standing to raise claims under 52 U.S.C. § 10307(b) or

42 U.S.C. § 1985(3), and (2) Plaintiffs fail to show state action and racial animus to raise a claim under 42 U.S.C. § 1985(3).  (ECF No. 54, pp. 4-14).

### 1.  *Prudential Standing*

In April 2022, Defendants moved to dismiss the Complaint under Rule 12(b)(1) arguing that Plaintiffs lacked standing and failed to demonstrate any injury that would confer standing onto each organization.  (ECF No. 27, p. 4).  The Court denied the motion to dismiss, finding that Plaintiffs had Article III standing.  The Court noted that Defendants (1) did not address the issue of associational standing in their briefing and (2) failed to raise the issue of prudential standing and the Court would not examine this issue sua sponte.

Prudential standing is not a jurisdictional limitation and may be waived.  *The Wilderness Soc. v. Kane Cnty.*, 632 F.3d 1162, 1168 (10th Cir. 2011); *Advanced Exteriors, Inc. v. Allstate Vehicle & Prop. Ins. Co.*, No. 21-CV-01539-PAB-STV, 2022 WL 3577260, at *3 (D. Colo. Aug. 19, 2022).  There are three general principles under the prudential standing doctrine:  (1) "the general prohibition on a litigant's raising another person's legal rights"; (2) "the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches"; and (3) "the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (internal quotations and citation omitted).  Contrary to Plaintiffs' arguments, prudential standing was not abandoned by the Supreme Court and is still analyzed by courts in some contexts.  *Hill v. Warsewa*, 947 F.3d 1305, 1309 (10th Cir. 2020).  The Court does not need to reach the issue of whether Plaintiffs have prudential standing because (1) Defendants have

waived the argument and did not timely raise the argument within their first Rule 12 motion, and

(2) Plaintiffs have a cause of action under 52 U.S.C. § 10307(b) and 42 U.S.C. § 1985(3).

To begin, Defendants, citing *Grubbs v. Bailes*, 445 F.3d 1275, 1281 (10th Cir. 2006), misquote the Tenth Circuit when arguing that courts permit prudential standing to be examined under Rule 12(b)(6) motion. Rather, the Tenth Circuit indicated that courts may disregard the issue of prudential standing if the plaintiff had established standing under Article III and the court could dispose of the case on the merits. Specifically, the Tenth Circuit stated:

> It thus appears that plaintiff has asserted a direct injury sufficient to satisfy the prudential standing principles in *Alcan*. We need not, however, definitively resolve the matter here. It has been noted on many occasions that the Supreme Court's rejection of the practice of "hypothetical jurisdiction" in *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), prohibits federal courts from disposing of claims on the merits without first resolving Article III standing issues. Questions relating to prudential standing, however, may be *pretermitted* in favor of a straightforward disposition on the merits.

*Id*. at 1280–81 (emphasis added); *see Pretermit*, Black's Law Dictionary (11th ed. 2019) ("To ignore or disregard purposely"). Defendants fail to cite any caselaw that indicates that they are permitted to raise the issue of prudential standing in a motion under Rule 12(c).

Indeed, the Court finds that Defendants have waived this particular argument by failing to raise it in their first Rule 12 motion. In April 2022, Defendants filed the first Rule 12(b) motion and did not address the issue of prudential standing. Then in August 2022, Defendants filed the instant motion (styled as a motion under Rule 12(c)) raising the issue of prudential standing after the District Court had stated in its prior Order that the argument had not been raised and that the Court would not examine the issue sua sponte. (ECF Nos. 39, pp. 19-20; 54). The Tenth Circuit has clearly held that prudential standing "is not a jurisdictional limitation and may be waived."

*Niemi v. Lasshofer*, 770 F.3d 1331, 1345 (10th Cir. 2014).  In *Niemi*, the Tenth Circuit found that the defendants had filed an improper second motion to dismiss when challenging the plaintiffs' standing because they had filed a prior Rule 12 motion to dismiss wherein they argued improper service of process, lack of personal jurisdiction, and improper venue.  *Id*. at 1346.  The Tenth Circuit found that a challenge to prudential standing did not implicate subject-matter jurisdiction and therefore was not a proper motion brought under Rule 12(h)(3), but rather was an impermissible second motion to dismiss under Rule 12(g)(2).  *Id.*  Accordingly, this Court finds that Defendants waived the issue of prudential standing because they were aware of this argument and failed to include the issue in their first motion to dismiss.  *Id*.

But even if Defendant had not waived this argument,[1] the Court still finds that 52 U.S.C. § 10307(b) and 42 U.S.C. § 1985(3) permit a private right of action against private conduct.  The Supreme Court clarified in *Lexmark* "that the question of whether a party falls within the class of plaintiffs whom Congress has authorized to sue under a particular statute is not one properly labeled as prudential; rather, it is a question of statutory interpretation."  *Niemi*, 770 F.3d at 1344 (internal quotations and citation omitted).  "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  Accordingly, courts must determine whether Congress intended to create a private right of action by:  (1) determining whether "rights-creating language" is contained within the statute, and (2) the methods of enforcement in the statute "manifest an intent to create a private remedy."  *Id.* at 289.

---

[1] Defendants also raise the issue of prudential standing again in their motion for summary judgment, thus the Court finds it more efficient to address this issue once rather than ending the analysis at Defendants' waiver.  (*See* ECF No. 70, p. 16).

### a.   52 U.S.C. § 10307(b)

Section 11(b) of the Voting Rights Acts states:

> *No person*, whether acting under color of law *or otherwise*, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce *any person* for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce *any person* for urging or aiding *any person* to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section 10302(a), 10305, 10306, or 10308(e) of this title or section 1973d or 1973g of Title 42.

52 U.S.C. § 10307(b) (emphasis added).  The statute contains rights-creating language that pertains to any individual citizen.  Furthermore, a plain reading of the statutory language indicates that Congress intended that private action as well as government action be regulated.  *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found*., No. 1:18-CV-00423, 2018 WL 3848404, at *3 (E.D. Va. Aug. 13, 2018) ("Here, the language 'or otherwise' indicates Congressional intent to reach both government and private conduct under § 11(b).").  Moreover, Section 11(b) can be enforced through a civil action by a private individual.  *See Arizona All. for Retired Americans v. Clean Elections USA*, No. CV-22-01823-PHX-MTL, 2022 WL 15678694, at *3 (D. Ariz. Oct. 28, 2022); *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 509 (S.D.N.Y. 2021); *League of United Latin Am. Citizens*, 2018 WL 3848404, at *3; *see also Allen v. State Bd. of Elections*, 393 U.S. 544, 554-57 (1969) ("We have previously held that a federal statute passed to protect a class of citizens, although not specifically authorizing members of the protected class to institute suit, nevertheless implied a private right of action.").  In their reply, Defendants argue that "Plaintiffs fail to acknowledge the changing landscape of the VRA and subsequent judicial restraint when expanding congressional intent to infer private rights of actions." (ECF No. 59, p. 2)  However, Defendants fail to cite any caselaw

finding that there is no private right of action under 52 U.S.C. § 10307(b) and the Court finds this

argument unavailing.

*b. 42 U.S.C. § 1985(3)*

Plaintiffs state that they are pursuing a claim under the "Support or Advocacy Clause" of

42 U.S.C. § 1985(3).[2] (ECF No. 55, p. 8). This portion of section 3 (italicized) states:

> *[I]f two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy*; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

The Supreme Court has determined that "all indicators—text, companion provisions, and

legislative history—point unwaveringly to § 1985(3)'s coverage of private conspiracies." *Griffin*

*v. Breckenridge*, 403 U.S. 88, 101 (1971). Defendants argue that Plaintiffs are not citizens with a

---

[2] The first clause of 42 U.S.C. § 1985(3) is generally referred to as the "Equal Protection Clause" while the second clause of subsection 3 is referred to as the "Support or Advocacy Clause." *See generally, The Support or Advocacy Clause of § 1985(3)*, 133 Harv. L. Rev. 1382 (2020). The Equal Protection Clause of § 1985(3) states:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws.

Under this clause, a plaintiff must show that the conspiracy is aimed "at a deprivation of the equal enjoyment of rights secured by the law to all" and was motivated by a "racial" or "class-based, invidiously discriminatory animus." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). Under the Support or Advocacy Clause, there is no need to show racial animus. *See Kush v. Rutledge*, 460 U.S. 719, 726 (1983). Defendants concede as much in their reply regarding the motion for judgment on the pleadings, thus the Court will not consider this argument in the motion. (*See* ECF No. 59, pp. 8-9).

right to vote and therefore cannot maintain an action for damages.  This argument is unavailing.

Corporations are "persons" within the meaning of the Fourteenth Amendment's Equal Protection

clause and have been treated as plaintiffs under 42 U.S.C. § 1985(3) even though they do not have

the right to vote.  *See Triad Assocs., Inc. v. Chicago Hous. Auth.*, No. 87 C 5096, 1992 WL 349655,

at *9 (N.D. Ill. Nov. 13, 1992), *aff'd sub nom. Triad Assocs., Inc. v. Robinson*, 10 F.3d 492 (7th

Cir. 1993).  "When an [organization] meets the constitutional test of standing, as [Plaintiffs]

admittedly [do], prudential considerations should not prohibit [them from] asserting that

defendants, on racial grounds, are frustrating specific acts of the sort which the [organization] was

founded to accomplish."  *Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702, 706

(2d Cir. 1982) (citing *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 80 (1978)).

Defendants only argue that Plaintiffs cannot vote and therefore cannot raise a claim, which this

Court finds unavailing.  The Court does not need to delve further into this argument or the

organizational structure of each Plaintiff.

* * *

Accordingly, Plaintiffs are permitted to bring a private cause of action against Defendants

under 52 U.S.C. § 10307(b) and 42 U.S.C. § 1985(3).[3]

### B.  Summary Judgment

Defendants raise two arguments in their motion for summary judgment:  (1) Plaintiffs fail

to prove that a voter was intimidated, that Defendants attempted to intimidate a voter, or that

Defendants' actions were done with the intent to intimidate voters; and (2) USEIP is an

unincorporated association and cannot be sued under 52 U.S.C. § 10307(b) or 42 U.S.C. § 1985(3).

---

[3] The Court will not reexamine the issue of prudential standing in Defendants' motion for summary judgment.

(ECF No. 70, pp. 6-20).  Having reviewed the Complaint, the motions and related briefing, and the relevant legal authority, the Court finds that there are disputed questions of material fact that preclude summary judgment in favor of Defendants on the first issue; however, the Court finds that Defendants are entitled to summary judgment on the second issue.

     1.  *Voter Intimidation*

Defendants argue that they are entitled to summary judgment because Plaintiffs cannot produce evidence that (1) a voter was intimidated by Defendants' actions or (2) Defendants attempted to intimidate voters.  (ECF no. 70, pp. 6, 14).  Section 11(b) prohibits (1) any person from (2) intimidating, threatening, or coercing another person or (3) attempting to do so, (4) for voting, attempting to vote, urging or aiding another person to vote or (5) attempt to vote or exercising any powers or duties under certain provisions listed in the Voting Rights Act.  52 U.S.C. § 10307(b); *see Nat'l Coal. on Black Civic Participation*, 512 F. Supp. at 509-10.  Furthermore, Section 11(b) does not "proscribe only threatening and intimidating language that successfully prevents a person from voting" as the attempts to do so are equally proscribed.  *Nat'l Coal. on Black Civic Participation*, 512 F. Supp. 3d at 516.  Finally, there is no requirement in the language in Section 11(b) that requires Plaintiffs to establish that Defendants acted with the specific intent to intimidate voters.  *League of United Latin Am. Citizens*, 2018 WL 3848404, at *3.

42 U.S.C. § 1985(3) prohibits (1) conspiracy (2) to prevent by force, intimidation, or threat, (3) any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person or (4) to injure any citizen in person or property on account of such support or advocacy.  *See also Nat'l Coal. on Black Civic Participation*, 512 F. Supp. 3d at 512.

Defendants argue that Plaintiffs must prove that a voter was intimidated or that Defendants attempted to intimidate a voter.  Defendants stated during a deposition that they visited 9,472 homes and spoke to 4,601 individuals at their homes.  (ECF No. 72-7, p. 24).  Plaintiffs identified three voters in its Rule 26(a)(1) disclosures who were contacted by USEIP:  Anne Landman, Michelle Garcia, and Yvette Roberts.  (ECF No. 72, pp. 4-5).  Yvette Roberts, a registered Colorado voter and resident of Grand Junction, Colorado, submitted a declaration stating that she felt intimidated by the members of USEIP who visited her home after the 2020 election.  (ECF No. 73, p. 3).  Ms. Roberts states that a man and a woman affiliated with USEIP came to her home and asked invasive questions, told her that they had voting information from the state of Colorado, wanted to know (1) how she had voted in the last election, (2) who in the household is a citizen, and (3) whether she was the only voter in her household.  (*Id*., p. 2).  Ms. Roberts states that she felt intimidated and was concerned by Defendants' actions and lodged a complaint with the Office of the Colorado Secretary of State.  (*Id*., p. 3).  Defendants deny that the voters identified by Plaintiffs were contacted by USEIP members and claim that they did not conduct canvassing efforts in Mesa County.  (ECF No. 76, p. 2).  Accordingly, there is a genuine dispute as to any material facts and the issue should be left to the factfinder.  Accordingly, the Court denies Defendants' motion for summary judgment on this issue.

*2. Unincorporated Associations*

Defendants argue that Defendant USEIP is an unincorporated association and, therefore, cannot be sued as a "person" under 52 U.S.C. § 10307(b) or 42 U.S.C. § 1985(3).  (ECF No. 70, p. 18).  Defendants cite *Lippoldt v. Cole*, 468 F.3d 1204, 1211 (10th Cir. 2006), wherein the Tenth

Circuit determined that an unincorporated association was not a "person" entitled to sue under 42 U.S.C. § 1983.[4]

In *Lippoldt*, wherein an anti-abortion association and members brought a § 1983 action against the city of Wichita, the Tenth Circuit reasoned that an unincorporated association could only "be a Section 1983 plaintiff" if it was a "person" within the jurisdiction of the United States. *Id*. at 1212.  In light of *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) and its progeny, the Tenth Circuit considered the "(1) the legislative history of Section 1983, (2) the general understanding, as of 1871, regarding the legal personality of unincorporated associations, and (3) the Dictionary Act of 1871." *Id*. at 1213.  The Court determined that there was no "general understanding in 1871, when the precursor to Section 1983 was passed, that unincorporated associations should be treated as natural persons" that could sue a municipality and that "the language of the Dictionary Act of 1871 also shows that unincorporated associations were not intended to be 'persons' for Section 1983 purposes." *Id.* at 1213-14 ("Neither is a person in law, and, unless authorized by statute, they have no capacity to sue.").  "In sum, none of the aforementioned factors, legislative history, general understanding, or the Dictionary Act of 1871, suggest Congress' intent *to entitle unincorporated associations to seek redress* under Section 1983." *Id.* at 1215.

Furthermore, in *Becker v. Ute Indian Tribe of the Uintah & Ouray Rsrv.*, 868 F.3d 1199, 1202 (10th Cir. 2017), a contractor brought an action against the Ute Indian Tribe of the Uintah

---

[4] Defendants also cite *Hidden Lake Dev. Co. v. Dist. Ct. In & For Adams Cnty.*, 515 P.2d 632, 635 (Colo. 1973) and *Johnson v. Chilcott,* 599 F. Supp. 224 (D. Colo. 1984) for the proposition that an unincorporated association must have, inter alia, bylaws, a stated purpose, and officers in order to exist.  However, these arguments are unavailing as this inquiry is for a court when determining the existence of an unincorporated association under Colorado law and not a person under 52 U.S.C. § 10307(b) or 42 U.S.C. § 1985(3).

and Ouray Reservation and the tribe filed counterclaims against the contractor and sought to enjoin

the state-court proceedings under 42 U.S.C. § 1983 on the ground that the state court action

violated the Tribe's due-process rights. The Tenth Circuit again reaffirmed its narrow definition

of the term "person," noting that the Tribe was not a person under 42 U.S.C. § 1983:

> We recognize that Ute Energy Holdings, LLC, is also a plaintiff. But we said in
> *Lippoldt v. Cole,* 468 F.3d 1204 (10th Cir. 2006), that unincorporated associations
> are not persons entitled to sue under § 1983, and Ute Energy has presented no
> argument why an LLC should be distinguished from other unincorporated
> associations in this respect.[5]

*Becker v. Ute Indian Tribe of the Uintah & Ouray Rsrv.*, 868 F.3d 1199, 1206 n.5 (10th Cir. 2017)

(emphasis added). The Tenth Circuit again reaffirmed such a narrow reading of the word "person"

in *United States v. Doe*, 572 F.3d 1162, 1169-70 (10th Cir. 2009), wherein the defendants argued

that the use of "person" in 18 U.S.C. § 1153 only applied to living individuals. The Tenth Circuit

determined that a victim under 18 U.S.C. § 1153, was defined as "living individuals and

corporations, but [not] unincorporated associations." *Id.* However, the Tenth Circuit noted that

"the Dictionary Act definition does not apply if "the context indicates otherwise." *Hobby Lobby*

*Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1129–30 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby*

*Lobby Stores, Inc.*, 573 U.S. 682 (2014). The Tenth Circuit clarified that context means "the text

of the Act of Congress surrounding the word at issue, or the text of other related congressional

Acts." *Id*.

Here, the Court, being bound by Tenth Circuit precedent, finds that it must grant summary

judgment to Defendants on their claim that USEIP, as an unincorporated association, cannot be

---

[5] Arguably, by Defendants' own logic, Defendant USEIP would be barred from raising counterclaims against Plaintiffs. Regardless, the Court dismissed Defendants' counterclaims for failure to state a claim under Rule 12(b)(6). (ECF No. 81).

sued under 52 U.S.C. § 10307(b) or 42 U.S.C. § 1985(3).  As the Tenth Circuit has previously

noted, "[w]hile there is no per se rule of statutory interpretation that identical words used in

different parts of the same act are intended to have the same meaning, there is a presumption that

this is so." *Lippoldt*, 468 F.3d at 1213.  In *Lippoldt* and *Becker*, the Tenth Circuit determined that

unincorporated associations could not seek relief under 42 U.S.C. § 1983 as plaintiffs.  Here,

USEIP is a defendant in this case; however, the Tenth Circuit in *Lippoldt* noted that common law

"essentially held that unincorporated associations lacked the capacity to sue or be sued" and that

it would it strain the court's analysis to hold that an entity could be considered a "person" under

one clause of the statute but not a "person" within another clause of the same statute.  *Lippoldt*,

468 F.3d at 1212-13 (quoting *Rural Water Dist. No. 1, Ellsworth Cnty. v. City of Wilson*, 243 F.3d

1263, 1274 (10th Cir. 2001)).  Accordingly, the Court finds that an unincorporated association

cannot be considered a person, whether as a plaintiff or a defendant, under 52 U.S.C. § 10307(b)

or 42 U.S.C. § 1985(3).

While this Court agrees with Plaintiffs that the Tenth Circuit's holding in *Lippoldt* "stands

alone against the trend of treating unincorporated associations as 'persons,'" that does not permit

this Court to ignore binding precedent.  *See Fort Lauderdale Food Not Bombs v. City of Fort

Lauderdale*, 11 F.4th 1266, 1283 (11th Cir. 2021).[6]  Accordingly, this Court finds that Defendants

---

[6] This Court respectfully disagrees with the conclusion in *Lippoldt* and finds the Eleventh Circuit's analysis persuasive.
First, the Tenth Circuit only defined the term "person" by the general understanding in 1871 and examined the
legislative history of the 1871 Civil Rights Act and the 1871 Dictionary Act, but failed to examine the developments
that occurred *after* 1871.  Indeed, as the Eleventh Circuit noted, "Congress re-enacted the word 'person' in § 1983
twice after intervening developments in federal law clarified that unincorporated associations were 'persons.'" *Fort
Lauderdale Food Not Bombs*, 11 F.4th at 1283.  The ramifications of concluding that an unincorporated association
is not a person under 42 U.S.C. 1985(3) based on a definition frozen in 1871 cannot be ignored given the history of
the Ku Klux Klan Act when enacted within the Civil Rights Act of 1871.  Indeed, during the Reconstruction Era when
the legislation was passed, the Ku Klux Klan and private individuals were acting in concert to "subvert state law
enforcement mechanisms and insure unequal application of state law."  Stephanie M. Wildman, *42 U.S.C.A. §
1985(3)—A Private Action to Vindicate Fourteenth Amendment Rights: A Paradox Resolved*, 17 SAN DIEGO L REV

are entitled to summary judgment for this particular claim and Defendant USEIP is dismissed from the case.

## IV. CONCLUSION

Accordingly, Defendants' Motion for Judgment on the Pleadings is DENIED and the Motion for Summary Judgment is DENIED IN PART AND GRANTED IN PART consistent with the analysis above. (ECF Nos. 54, 70). Defendant USEIP is DISMISSED from the case.

DATED this 31st day of January 2023.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge

---

317, 321 (1980). Moreover, the term, unincorporated association, was a relatively recent legal development at the time that the Ku Klux Klan Act was being drafted, thus explaining why this term was not listed in the initial version of the Dictionary Act in 1871:

> In the interval between the acceptance of the principle that a corporation in English law arises only as a result of state concession, and the passing of the first Companies Act in 1862, there were established many unincorporated associations, some of them of very great importance. Such an association enjoyed no legal existence distinct from that of its members. Its legal status was simply that of an association of persons, linked by contract, and the rights of members were determined by their contractual rights, in respect of the association.

*Association*, Black's Law Dictionary (11th ed. 2019) (citing G.W. Keeton, *The Elementary Principles of Jurisprudence* 169 (2d ed. 1949)). What results from *Lippoldt* is that civil rights organizations cannot seek relief against unincorporated associations under 42 U.S.C. § 1985(3) to halt an allegedly discriminatory conspiracy committed by the group's members – which is entirely contrary to the purpose and history of the Ku Klux Klan Act. *See generally, Griffin*, 403 U.S. at 97. The Supreme Court instructs courts to examine the context of the text, the Act of Congress surrounding the word at issue, or the text of other related congressional acts. *Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 199 (1993). The Dictionary Act also gives the courts context about how to determine the meaning of a word or phrase in an Act of Congress, however, the Supreme Court noted that the inquiry permits a court to not accept a definition in the Dictionary Act if it is a "poor fit" with the text of the statute. *Rowland*, 506 U.S. at 200 ("Where a court needs help is in the awkward case where Congress provides no particular definition, but the definition in 1 U.S.C. § 1 seems not to fit. There it is that the qualification 'unless the context indicates otherwise' has a real job to do, in excusing the court from forcing a square peg into a round hole."). By ignoring the context of the Ku Klux Klan Act, and disregarding congressional action thereafter, which continued to utilize the term "person" after federal law made clear that unincorporated associations were "persons" under the law, it does appear that this result is contrary to the text and meaning under 42 U.S.C. § 1985(3).

## Judgment on Partial Findings

22-cv-00581-CNS-NRN   Bench Trial - Day 4   07/18/2024   821

1                    *        *        *        *        *

2          (The proceedings commenced at 9:12 a.m.)

3              THE COURT:  You will recall we left off yesterday

4    with defendants making a Rule 52(c) motion.  Let me just put

5    some standards on the record.  Rule 52(c) is the equivalent of

6    Rule 50(a) which is used in jury trials.  In a trial to the

7    Court we operate under Rule 52(c) which allows the Court -- if

8    a party has been fully heard on a particular issue during a

9    trial and the Court believes judgment is appropriate against

10   that party, the Court may issue that finding.  The standard is

11   similar, frankly, to a summary judgment standard in the sense

12   that it really requires the Court to look at whether or not

13   every piece of evidence presented by the plaintiffs is true,

14   and if it is, is judgment appropriate.

15             The parties know we are here based -- on the basis of

16   two claims.  The first is an alleged violation of Section

17   11(b) of the Voting Rights Act.  That section provides that no

18   person shall intimidate, threaten, or coerce, or attempt to

19   intimidate, threaten, or coerce any person from voting or

20   attempting to vote.  Courts have defined intimidate as making

21   timid or fearful, or to inspire or affect with fear,

22   especially to compel action or inaction as by threats.

23             To threaten means to utter threats against or to

24   promise punishment, reprisal, or other distress.  To coerce

25   means to restrain, control, or dominate, nullifying individual

                      Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 4    07/18/2024    822

1    will or desire.

2         It is well settled that there's a private right of

3    action under Section 11(b), and it's also equally settled that

4    it does not require plaintiffs to establish that defendants

5    acted with specific intent to intimidate voters.  We must

6    focus on the acts of defendants directly or those of others

7    who they specifically directed or controlled.

8         The second claim is under the Ku Klux Klan Act, 42

9    U.S.C. Section 1985(3), which prohibits conspiring to prevent

10   by force, intimidation, or threat any citizen from giving

11   support or advocacy to a candidate, which simply means in this

12   context interfering with the right to vote.  Let me just

13   remind everyone here that the United States Election Integrity

14   Plan is not a defendant.  They were dismissed earlier in the

15   case because no action exists under the above statutes against

16   an unincorporated association, so that has left us with three

17   individual defendants.

18        Let me just note that it seems that all parties want

19   this case to be about something it is not about.  It's not

20   about the January 6th insurrection or the history of voter

21   intimidation in this country.  It's not about the defendants'

22   collective belief that there was election fraud.  It's not

23   about the security or lack of security of elections in

24   Colorado.  It's not about alleged vulnerabilities of voting

25   machines in Colorado, and it's not about the actions or

 1    inactions of the secretary of state in Colorado.  It's

 2    certainly not about who is paying for this litigation for

 3    either party -- any party.

 4          These are all sideshows, and I was careful to try and

 5    reel those sideshows in to focus us on the sole issue which is

 6    before this Court which is did the plaintiffs prove that

 7    defendants violated Section 11(b) of the Voter Rights Act or

 8    42 U.S.C. Section 1985(3).  And for purposes of Rule 52, I am

 9    now looking at whether or not there is any evidence to allow

10    the Court to find in the plaintiffs' favor on the issue of

11    voter intimidation.  For the following reasons, I find there

12    is not.

13          After consideration of the evidence, I make the

14    following findings of fact.  There's little dispute about each

15    defendants' role in forming or working with the USEIP,

16    including whether, where, and how often each defendant

17    canvassed Colorado voters.  The Court will briefly summarize

18    the testimony of the defendants, plaintiffs' one

19    representative called, and the remaining witnesses called by

20    the plaintiffs.

21          Mr. Smith testified as to his interest in the

22    integrity of elections.  Following the 2020 election, he set

23    about a course of conduct to conduct an investigation, in his

24    mind.  He shortly thereafter met Defendants Epp and Kasun, and

25    he was prompted to get involved with the USEIP at the end of

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 4    07/18/2024    824

1    February 2021.  He admits to being a member of the core team

2    of USEIP, along with Jeff Young, Ms. Kasun and Ms. Epp.  He

3    attended weekly meetings of the core team.  Mr. Smith believes

4    there's not enough information to verify the 2020 election and

5    believes there's been large-scale election fraud.  None of

6    that actually matters.  What matters is whether or not he

7    engaged in proven actions that can be said to objectively

8    intimidate voters.

9           Mr. Smith conducted three days of canvassing in Weld

10   and El Paso Counties as part of the voter verification effort

11   undertaken by USEIP.  Such effort was loosely designed to test

12   accuracy of voter registration and voter history.  This

13   occurred during the spring of 2021.  The testimony of all of

14   the defendants' witnesses indicate it was during April through

15   August.  The voter verification guide, which has been admitted

16   into evidence, is clear on how one must go about canvassing.

17          The guide makes perfectly clear that canvassers are

18   to be polite.  They may go two to a house.  One should go to

19   the door.  One should stay back so as not to intimidate

20   people.  If there's a trespassing sign, they're advised not to

21   enter that property.  Mr. Smith was an integral part of

22   drafting that voter registration guide.

23          Throughout 2021, USEIP canvassed approximately 9,400

24   doors.  4,600 people were contacted.  Importantly, the

25   testimony reveals that other organizations may have been

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 4    07/18/2024    825

1    canvassing in Mesa County.  What is clear through the

2    testimony of defendants that has gone unrebutted is that USEIP

3    did not canvass in Mesa County.  The Court has reviewed the

4    playbook and the voter verification training guide in detail.

5    The parties highlighted some parts of those documents, but the

6    Court has thoroughly reviewed them all.  The Court finds

7    nothing in either document that is remotely or objectively

8    intimidating on its face.

9         The voter verification guide was provided to county

10   captains, as also a captain's manual was provided.  In

11   reviewing the history of Ms. Epp's contacts with county

12   captains, it appears that individual counties were somewhat

13   organized on their own.  The meetings held with captains were

14   primarily to get updates from individual county captains, and

15   that was the purpose of those meetings.  There was no evidence

16   of what canvassers in Mesa County were trained to do.

17   Apparently they did -- Mesa County canvassers or the captain

18   did receive a copy of an early version of the voter

19   verification materials of USEIP, but it is unclear to this

20   Court if they were actually using that manual or using a

21   manual of their own.

22        With respect to Mr. Smith, the most concerning action

23   was a speech he gave in February of 2022 at an event at a

24   church in Castle Rock.  Apparently Mr. Smith made a comment

25   about treason and the notion that anyone involved in election

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 4    07/18/2024    826

1    fraud is committing treason and deserves to hang.  This was

2    well after -- this comment was made well after canvassing had

3    ceased.  The Court, of course, does not condone this type of

4    language, nor the action it apparently elicited from folks in

5    the crowd, but that is certainly not the standard for voter

6    intimidation, and plaintiffs have established no connection

7    between this statement and an attempt to intimidate any

8    particular voter or group of voters, much less how the

9    statement in February 2022 can be used to prove that the

10   alleged intimidating nature of canvassing occurred back a full

11   six months prior.

12        Ms. Epp for her part was one of the founders of the

13   organization in November of 2020.  She testified that the

14   purpose of the organization was to verify the official record

15   to ensure the integrity of the elections.  She was a member of

16   the core team.  She herself canvassed three times, twice in El

17   Paso and once in Douglas County.  Never in Mesa or Weld

18   Counties.  There's no evidence that's been provided that she

19   did anything personally during canvassing to intimidate a

20   voter.

21        Again, it is worth highlighting that there is no

22   evidence that defendants canvassed in Mesa County where Grand

23   Junction sits.  Although there was some testimony about this

24   attenuated connection between the canvassing in Mesa County

25   and USEIP, the evidence does not establish that USEIP was

Sarah K. Mitchell, RPR, CRR

1    controlling that canvassing or, frankly, had any part in

2    controlling the canvassers there or dictating what those

3    canvassers said to any individual voters.

4            The canvassers in Mesa County were apparently using

5    different datasets, specifically information that they had

6    received from the county clerk's office, whereas USEIP

7    canvassers were relying on information obtained from the

8    secretary of state.  Ms. Epp created the playbook.  She

9    testified it was not a training document, not used in

10   training.  It was for knowledge sharing.  In review of the

11   playbook, it is clear that it appears to be a playbook that

12   governs organizing for various groups that could be used by

13   groups to really get their own groups in order, and it, in

14   fact, did not really even address canvassing.

15           There is an appendix where apparently folks could ask

16   for more information on other training materials, but within

17   the playbook itself there was no guide for canvassing and no

18   guide on voter verification efforts.  The claims against

19   Ms. Epp appear to be based solely on her founding of USEIP

20   and/or her status as a member of the core team.  What is

21   notably lacking, however, is any evidence that she or anyone

22   under her direction attempted to intimidate a voter.  Did she

23   attempt to organize?  Yes.  Did she provide a manual for

24   organizing?  Absolutely.  Does the manual contain hyperbole or

25   false information?  Maybe.  But, again, that is not the issue

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 4   07/18/2024   828

 1   in front of this Court.  There is no objective effort to

 2   intimidate voters through the creation of that document.  No

 3   such evidence that that document was thereafter used by others

 4   to intimidate voters has been presented to the Court.

 5         Turning to Defendant Kasun, of the three defendants,

 6   the least amount of information has been provided about her

 7   alleged wrongdoing.  She testified that she too was a founding

 8   member of USEIP, she helped form the organization in 2020,

 9   and, like her codefendants, was a member of the core team.

10   She testified she was in charge of press for USEIP and handled

11   many press inquiries.

12         Defendant Kasun herself never canvassed, and there

13   are no allegations that she did individually engage in conduct

14   that was intimidating to any particular voter.  Her

15   involvement is apparently due to her being a spokesperson for

16   USEIP, but no language has been set forth for this Court that

17   could be construed as objectively intimidating.  The brief

18   excerpts of a radio interview that plaintiffs introduced

19   wholly fail to demonstrate any attempt to intimidate voters

20   and, in fact, reiterated the benign nature of the canvassing

21   that was ongoing.

22         Plaintiffs called Christopher Beall, or Chris Beall,

23   the Deputy Secretary of State in support of their claims.

24   Mr. Beall testified that the secretary of state's office

25   received two e-mails regarding alleged USEIP activities, one

Sarah K. Mitchell, RPR, CRR

 1    from Yvette Roberts and one from a Ms. Powell, both in Mesa

 2    County.  Mr. Beall also claimed that county clerks received

 3    complaint calls.  However, there was no admissible testimony

 4    offered regarding those alleged complaints because those

 5    complaints were never documented.

 6            One would expect the county clerks and/or the

 7    secretary of state's office to document official complaints in

 8    some way, shape, or form, but no such documentation exists.

 9    As such, the Court deemed that those complaints could not be

10    considered in this action.  There was no real investigation by

11    the secretary of state into the two e-mails received.  Those

12    were turned over to authorities, and no charges were filed.

13            A review of those e-mails simply does not support any

14    claim of voter intimidation.  There were no active threats, no

15    intimidating conduct revealed in those e-mails.  It was simply

16    reporting a matter of public concern, more as if to notify the

17    secretary of state's office that people were going door to

18    door.

19            Mr. Beall testified that the playbook instructs

20    people on how to canvass, and that was the source of his

21    concern.  As I've already indicated, it does not, however.  He

22    has not seen any training materials of USEIP.  Mr. Beall's

23    testimony revealed he's concerned about canvassing in general,

24    more along the lines of a statistician.  He thinks it must be

25    statistically relevant and utilize traditional survey

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 4    07/18/2024    830

 1    techniques.  That is not a matter for this Court to determine.

 2    The right of canvassing in this country is long and true, and

 3    certainly does not require canvassing to have any statistical

 4    significance to it, nor does it require folks to use

 5    particular methods to canvass.

 6         Importantly, his testimony was that with respect to

 7    USEIP, and by extension these three defendants, there was no

 8    effort of voter intimidation, but simply a risk of voter

 9    intimidation.  This Court will not act on risks that have

10    proven unfounded.

11         Ms. Hendrix is the executive director of one of the

12    plaintiffs, the League of Women Voters of Colorado.  She

13    testified that she has no personal knowledge of any voter who

14    felt intimidated by the defendants or USEIP's canvassing

15    efforts.  Her organization decided to file this lawsuit in

16    large part based on numerous articles and media reports of

17    voter intimidation by defendants.

18         Some of those media reports were admitted into

19    evidence not for the truth of the complaints, but to establish

20    why the plaintiffs felt the need to file this action, so I

21    considered those in this context.  And while they may have

22    supported a need to file an action, it is certainly not

23    something that I can base a finding of liability on in the

24    sense that the reports contained in those media reports are

25    hearsay, and the actual complainants that the news journalists

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 4    07/18/2024    831

1    relied on did not come forward to offer any particular

2    testimony, and there was no abilities of the defendants to

3    cross-examine such witnesses.

4        There was a passing reference to Jean Coleman I

5    believe in Weld County as somebody who had contacted a board

6    member and relayed information as to intimidation.  However,

7    despite my belief that defendants opened the door to such

8    testimony being admitted, the plaintiffs did not offer that

9    testimony into evidence, so I have no idea what Ms. Coleman

10   reported, and I cannot rely on that either.  Surely the board

11   member who spoke to Ms. Coleman could have been called to

12   testify, even if Ms. Coleman did not wish to testify.  So with

13   respect to any possible evidence offered by Ms. Hendrix to

14   support a finding of liability, the Court finds there was

15   none.

16       So that would leave us with Ms. Roberts.  The Court

17   denied defendants' motion for summary judgment based almost

18   exclusively on the affidavit provided by Ms. Roberts by

19   plaintiffs in this action.  Yvette Roberts is from Grand

20   Junction.  The Court finds no ill will in her testimony, and

21   she seemed to be doing her best to recall the events as she

22   knew them.  However, her testimony was wholly unhelpful to the

23   plaintiffs.  She established that two people knocked on her

24   door during the middle of the day, one being a tall man.  As

25   an older woman living alone, she was fearful and, indeed, a

Sarah K. Mitchell, RPR, CRR

1    bit intimidated right off the bat because of the tall man who

2    was at her door.

3           However, the two people simply introduced themselves

4    and the group they represented.  They were wearing some sort

5    of badge, and badge I shouldn't even say.  Some sort of name

6    tag that she described as an informal marking perhaps from

7    something you might get at Staples of a name label perhaps on

8    a lanyard that said something like Colorado election

9    intimidation, interrogation -- she wasn't sure, but she knew

10   the first two words were Colorado election.  The two

11   individuals, regardless, engaged in no conduct that could be

12   objectively considered intimidating.

13          She was apparently unsure if they were carrying voter

14   information from the state or from Mesa County.  In court she

15   indicated she believed it was from Mesa County, which would

16   support the notion that the Mesa County canvassers that were

17   unaffiliated with the USEIP were using Mesa County voter rolls

18   to canvass.  Regardless, the questions asked of her were not

19   intimidating and not improper.  When she asked them to leave,

20   they left with no trouble whatsoever.

21          Her sole regret seemed to be her own failure of

22   memory to remember their names or what organization they were

23   with, but that surely cannot be the fault of the canvassers

24   who actually introduced themselves and the organization with

25   whom they were with.  She had no basis or reason to conclude

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 4    07/18/2024    833

1    that these two were from USEIP and, in fact, did not know from

2    which group they hailed.

3          It was upon suggestion apparently from plaintiffs'

4    counsel that USEIP was the group canvassing in her county that

5    she got -- at which point she adopted that position and

6    included it in her affidavit.  The law, however, requires much

7    more than this.  We cannot act upon a suggestion from counsel

8    as to actual evidence in a case.

9          Ms. Roberts, regardless, even if these folks were

10   from USEIP, testified that she did not suffer any threats of

11   violence, threatening phone calls, vandalism during or after

12   the event, and that the single canvassing event would not

13   affect her decision to vote in future elections.

14         So with that, the Court finds that there is simply

15   insufficient evidence to proceed any further in this matter.

16   Normally I would have reviewed my prior conclusions on

17   standing as part of this analysis, but I find no need to do

18   that.  The conclusions of this Court would likely have

19   remained the same on that issue.  But since the issue of

20   liability was teed up through these witnesses, the Court felt

21   it was appropriate to entertain a Rule 52(c) motion on the

22   issue of voter intimidation itself in the interest of judicial

23   economy.

24         In sum, plaintiffs have failed to introduce any

25   evidence that can remotely be perceived as intimidating or

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 4      07/18/2024    834

1    threatening on behalf of the three defendants.  There's no

2    evidence that any defendant or even an agent of USEIP engaged

3    in canvassing that objectively could rise to the level of

4    voter intimidation.  The playbook, which has been discussed

5    extensively, is also not objectively intimidating.

6          The timing of the alleged canvassing efforts is

7    important to the Court's analysis, although not discussed much

8    by the parties.  The canvassing efforts were after the

9    election and well in advance of the next election.  There was

10   no indication or evidence offered that any of the canvassing

11   attempted to assess a voter's intention to vote in the next

12   election or even discussed an upcoming election.  The

13   questions concerned the prior election, and in this context,

14   the evidence would be required to show an intent to interfere

15   with the right to vote in a much more significant way, and no

16   such evidence was presented.

17         Plaintiffs have made much of the fact that

18   photographs were allegedly taken of some residences.  There

19   was no real evidence of this, but regardless, even if true,

20   that would not rise to the level of surveillance that has been

21   found to support a claim for voter intimidation.  Such photos

22   are available on Google maps, and there's no evidence

23   presented in this case that any voter had such actions taken

24   against them or that they found that action to be

25   intimidating.

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 4        07/18/2024    835

 1              Sensing a lack of evidence to support their claims,

 2     plaintiffs attempted to broaden the theory of the case

 3     midstream.  I did not allow that.  The pretrial order controls

 4     the claims brought in a case, and that claim was not argued

 5     that way or asserted that way in the pretrial order.  Even if

 6     it was, that would not have commanded a different result, as

 7     there was simply no evidence of sufficient voter intimidation

 8     here.

 9              I will add that I found Professor Ellis's testimony

10     helpful and insightful as to the abstract issue of voter

11     intimidation.  The Court has no doubt that indirect voter

12     intimidation efforts as described by the professor have

13     occurred in this country and continue to occur in this

14     country.  Yet, the Court cannot infer that these defendants

15     are part of that effort without credible evidence establishing

16     that connection.

17              The alleged actions here are nothing like the cases

18     referred to by Professor Ellis or plaintiffs in any of their

19     briefs.  I will simply note a couple of those.  This is not

20     akin to following Native American voters into polling places

21     or recording license plate numbers of those who voted.  It is

22     similarly not threatening phone calls or asserting economic

23     retaliation over folks.  It is not blocking people from their

24     polling stations.  And it is also not indicating that the

25     ballot drop box is under any type of surveillance and fraud

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 4    07/18/2024    836

1  will result in crimes being pursued.  This is simply far too

2  remote without any testimony of any voter who found any of

3  these efforts to be intimidating.

4        As a result, the Court finds that plaintiffs have

5  failed to show any violation of Section 11(b) or Section

6  1985(3) by any of the named defendants in this case, and

7  judgment shall enter in favor of the defendants.

8        With that, I will thank counsel for their

9  professionalism, and we will be in recess.

10        THE COURTROOM DEPUTY:  All rise.  Court is in recess.

11      (The proceedings were concluded at 9:36 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sarah K. Mitchell, RPR, CRR