No. 24-1328

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT
_____

COLORADO MONTANA WYOMING STATE AREA CONFERENCE OF THE
NAACP, et al.,

Plaintiffs-Appellants

v.

SHAWN SMITH, et al.,

Defendants-Appellants
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Hon. Judge Charlotte N. Sweeney, No. 1:22-CV-00581-CNS-NRN
_____

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE SUPPORTING
PLAINTIFFS-APPELLANTS AND URGING REVERSAL ON THE ISSUES
ADDRESSED HEREIN
_____

KRISTEN CLARKE
  Assistant Attorney General

BONNIE I. ROBIN-VERGEER
NOAH B. BOKAT-LINDELL
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

# TABLE OF CONTENTS

**PAGE**

INTEREST OF THE UNITED STATES ...................................................1

STATEMENT OF THE ISSUES.............................................................1

STATEMENT OF THE CASE ...............................................................2

    A.    Legal Background ...................................................2

        1.    The Support or Advocacy Clause of the KKK Act .........2

        2.    Section 11(b) of the VRA ...............................................5

    B.    Procedural History .................................................6

SUMMARY OF ARGUMENT .................................................................8

ARGUMENT

    I.    Plaintiffs can sue unincorporated associations for violations of Section 11(b) of the VRA. ...................................9

        A.    Section 11(b)'s text and legislative history treat unincorporated associations as "persons." .................10

        B.    State and federal law in 1965 treated unincorporated associations as suable "persons."........15

        C.    In 1965, the Dictionary Act treated unincorporated associations as "persons." .................18

    II.    Plaintiffs can sue unincorporated associations for violations of the Support or Advocacy Clause of the KKK Act. ...............................................................19

**TABLE OF CONTENTS (continued):**                    **PAGE**

A.  The Support or Advocacy Clause's text and legislative history treat unincorporated associations as "persons." ...........................................20

B.  Congress retroactively amended the Dictionary Act to treat unincorporated associations as "persons," and that amendment applies to the Support or Advocacy Clause. ......................................27

C.  The contemporaneous common-law conception of unincorporated associations' personhood cannot override Congress's choice to subject those associations to liability......................................32

CONCLUSION .........................................................................34

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES:**                                                 **PAGE**

*Aradia Women's Health Ctr. v. Operation Rescue,*
  929 F.2d 530 (9th Cir. 1991) ........................................ 33

*Becker v. Ute Indian Tribe of the Uintah & Ouray Rsrv.,*
  868 F.3d 1199 (10th Cir. 2017) ................................... 28

*Brever v. Rockwell Int'l Corp.,* 40 F.3d 1119 (10th Cir. 1994) ............... 23

*Brown v. United States,* 276 U.S. 134 (1928) .................................. 23, 32

*Calagaz v. Calhoon,* 309 F.2d 248 (5th Cir. 1962) ........................... 17-18

*California Rice Indus. v. Federal Trade Comm'n,*
  102 F.2d 716 (9th Cir. 1939) ........................................ 23

*Callaghan & Co. v. Federal Trade Comm'n,*
  163 F.2d 359 (2d Cir. 1947) ........................................ 23

*Chisom v. Roemer,* 501 U.S. 380 (1991) ................................. 17

*Denver & Rio Grande W. R.R. v.*
  *Brotherhood of R.R. Trainmen,* 387 U.S. 556 (1967) .................... 16

*District of Columbia v. Carter,* 409 U.S. 418 (1973) .......................... 4, 20

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale,*
  11 F.4th 1266 (11th Cir. 2021) ...................................... 7-8

*Grynberg v. Kinder Morgan Energy Partners, L.P.,*
  805 F.3d 901 (10th Cir. 2015) ...................................... 28

*Hoadley v. County Comm'rs of Essex,* 105 Mass. 519 (1870) ................. 28

*Inyo County v. Paiute-Shoshone Indians,* 538 U.S. 701 (2003) .............. 12

## CASES (continued): PAGE

*Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989)...................2, 20-21

*League of United Latin Am. Citizens - Richmond Region*
    *Council 4614 v. Public Int. Legal Found.*,
    No. 1:18-CV-00423,
    2018 WL 3848404 (E.D. Va. Aug. 13, 2018) .................................33

*Lippoldt v. Cole*,
    468 F.3d 1204 (10th Cir. 2006) .............. 7-10, 13, 15, 18, 24, 27, 32

*McMahon v. Rauhr*, 47 N.Y. 67 (1871) ...................................29

*Monell v. Department of Soc. Servs.*, 436 U.S. 658 (1978)...........21, 24-25

*Morse v. Republican Party of Va.*, 517 U.S. 186 (1996).........................11

*National Coal. on Black Civic Participation v. Wohl*,
    498 F. Supp. 3d 457 (S.D.N.Y. 2020) .............................................11

*New York State Nat'l Org. for Women v. Terry*,
    886 F.2d 1339 (2d Cir. 1989)..........................................................33

*Ngiraingas v. Sanchez*, 495 U.S. 182 (1990)................................28, 30-31

*Operative Plasterers' Int'l Ass'n v. Case*,
    93 F.2d 56 (D.C. Cir. 1937) ...........................................................16

*People of P.R. v. Russell & Co., Sucesores S. En. C.*,
    288 U.S. 476 (1933) ........................................................................29

*Rowland v. California Men's Colony, Unit II Men's Advisory*
    *Council*, 506 U.S. 194 (1993).........................................................19

*Smith v. Trump*, No. 21-cv-02265, 2023 WL 417952
    (D.D.C. Jan. 26, 2023), *aff'd*, No. 23-7010,
    2023 WL 9016458 (D.C. Cir. Dec. 29, 2023) .................................33

## CASES (continued):                             **PAGE**

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ...............................5

*Stewart v. Dutra Const. Co.*, 543 U.S. 481 (2005) ...................................30

*Textile Workers Union v. Lincoln Mills of Ala.*,
    353 U.S. 448 (1957) ........................................................................17

*Thompson v. Trump*, 590 F. Supp. 3d 46 (D.D.C. 2022),
    *aff'd sub nom. Blassingame v. Trump*,
    87 F.4th 1 (D.C. Cir. 2023).........................................................13, 33

*United States by Katzenbach v. Original Knights of Ku*
    *Klux Klan*, 250 F. Supp. 330 (E.D. La. 1965)
    (three-judge court)..................................................................12, 14

*United Mine Workers v. Coronado Coal Co.*,
    259 U.S. 344 (1922) ...................................................................15-16

*United States v. A & P Trucking Co.*, 358 U.S. 121 (1958) ...............31-32

*United States v. Beaty*, 288 F.2d 653 (6th Cir. 1961) .............................12

*United States v. Bibb Cnty. Democratic Exec. Comm.*,
    222 F. Supp. 493 (M.D. Ga. 1962).................................................14

*United States v. Doe*, 572 F.3d 1162 (10th Cir. 2009) ..... 10-11, 13, 20, 28

*United States v. McLeod*, 229 F. Supp. 383 (S.D. Ala. 1964) .................14

*United States v. Mitchell*, 26 F. Cas. 1283 (C.C.D.S.C. 1871)
    (No. 15,790) ....................................................................................3

*Virginia v. Black*, 538 U.S. 343 (2003)....................................................2

*Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989) ...............11-12

**STATUTES:**                                                          **PAGE**

Act of Apr. 20, 1871, ch. 22, 17 Stat. 13......................................2, 4-5, 31

Act of May 31, 1870, ch. 144, 16 Stat. 141.................................................5

Civil Rights Act of 1957
    42 U.S.C. 1971(b).....................................................................5, 14
    52 U.S.C. 10101(b)...................................................................5, 14

Dictionary Act
    1 U.S.C. 1 (1964)......................................................................18-19
    1 U.S.C. 1...................................................................................18
    Pub. L. No. 80-772, § 6, 62 Stat. 859 (1948) ..................................18
    Rev. Stat. § 1, 18 Stat. 1 (1874) ...............................................30-31

Revised Statutes
    Rev. Stat. § 1980, 18 Stat. 348-349 (1874)....................................30
    Rev. Stat. § 5595, 18 Stat. 1091 (1874)........................................31

Support or Advocacy Clause of the Ku Klux Klan Act
    42 U.S.C. 1985(1)........................................................................13
    42 U.S.C. 1985(3)............................................................1-2, 19, 21

Voting Rights Act of 1965
    52 U.S.C. 10307(b)........................................................1, 6, 11, 17
    52 U.S.C. 10308(d).........................................................................1
    52 U.S.C. 10310(c)(1).....................................................................6

18 U.S.C. 241 ...................................................................................1

42 U.S.C. 1983......................................................................4, 7, 9, 20-21

**LEGISLATIVE HISTORY:**

Cong. Globe, 42d Cong., 1st Sess. (1871) ........................................4, 22-26

H.R. Rep. No. 439, 89th Cong., 1st Sess. (1965).................................5, 13

## LEGISLATIVE HISTORY (continued):                    PAGE

Senate Select Comm. to Investigate the Alleged Outrages
   in the S. States, S. Rep. No. 1,
   42d Cong., 1st Sess. (1871)....................................................3-4, 22

Voting Rights:  Hearing Before the H. Comm. on the Judiciary,
   89th Cong., 1st Sess. (1965) ...........................................................15

1 Rep. of the Joint Select Comm. Appointed to Inquire
   into the Condition of Affairs in the Late Insurrectionary
   States, S. Rep. No. 41, Pt. 1, 42d Cong., 2d Sess. (1872)................3

## RULES:

Fed. R. App. P. 29(a)(2) ...............................................................1

Fed. R. Civ. P. 17(b)(3)(A) ................................................. 16, 32

Fed. R. Civ. P. 17 advisory committee's note to subdiv. (b) ..................16

Fed. R. Civ. P. 52(c) ...................................................................8

## MISCELLANOUS:

*Black's Law Dictionary* (1st ed. 1891),
   https://perma.cc/MXH8-YQC9 ......................................................29

Eric Foner, *Reconstruction* (updated ed. 2014) .....................................3-4

U.S. Comm'n on C.R., *Voting in Mississippi* (1965),
   https://perma.cc/Y7Y5-AHEH ...................................................13-14

## INTEREST OF THE UNITED STATES

This appeal concerns the interpretation of Section 11(b) of the Voting Rights Act of 1965 (VRA), 52 U.S.C. 10307(b), and the Support or Advocacy Clause of the Ku Klux Klan Act (KKK Act), 42 U.S.C. 1985(3), laws passed to prevent intimidation in elections. The Attorney General enforces Section 11(b) directly via civil suits, *see* 52 U.S.C. 10308(d), and the KKK Act indirectly via criminal law, *see* 18 U.S.C. 241. The United States therefore has a significant interest in the statutes' interpretation.

The United States files this brief under Federal Rule of Appellate Procedure 29(a)(2).

## STATEMENT OF THE ISSUES

1. Whether unincorporated associations may be sued for alleged violations of Section 11(b) of the VRA.

2. Whether unincorporated associations may be sued for alleged violations of the Support or Advocacy Clause of the KKK Act.[1]

---

[1] The United States takes no position on any other issue.

## STATEMENT OF THE CASE

**A.    Legal Background**

**1.    The Support or Advocacy Clause of the KKK Act**

a.  In 1871, Congress passed, and President Grant signed into law, the KKK Act, which includes the Support or Advocacy Clause.  *See* Act of Apr. 20, 1871, ch. 22, § 2, 17 Stat. 13-14 (KKK Act).  "The immediate impetus for the bill was evidence of widespread acts of violence perpetrated against the freedmen and loyal white citizens by groups such as the Ku Klux Klan." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 722 (1989) (plurality opinion).  "The Klan fought Reconstruction and the corresponding drive to allow freed blacks to participate in the political process." *Virginia v. Black*, 538 U.S. 343, 352 (2003).

As it reads today, the Support or Advocacy Clause authorizes private damages suits "against any one or more of the conspirators" when "two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person" as a presidential elector or member of Congress.  42 U.S.C. 1985(3).

There is no evidence that the early iteration of the KKK, which originated in 1866, or similar organizations like the Constitutional Union Guards and the Knights of the White Camelia, ever took a corporate form. Congressional reports and evidence admitted during Klan prosecutions showed that the organization had formal elements, including a constitution, bylaws, and membership oaths. *E.g.*, 1 Rep. of the Joint Select Comm. Appointed to Inquire into the Condition of Affairs in the Late Insurrectionary States, S. Rep. No. 41, Pt. 1, 42d Cong., 2d Sess. 10-11, 14, 27 (1872) (KKK Committee Report); Senate Select Comm. to Investigate the Alleged Outrages in the S. States, S. Rep. No. 1, 42d Cong., 1st Sess. LX-LXII (1871) (Report on Outrages); *United States v. Mitchell*, 26 F. Cas. 1283, 1283 (C.C.D.S.C. 1871) (No. 15,790). But the Klan was a clandestine organization whose members swore not to reveal its existence publicly on pain of death. *E.g.*, KKK Committee Report 12-13, 25; Report on Outrages LX, LXII; *Mitchell*, 26 F. Cas. at 1283.

b. Congress responded with a series of Enforcement Acts. The First and Second Enforcement Acts, adopted in 1870 and 1871, did not immediately stop the Klan's activities. Eric Foner, *Reconstruction* 454

(updated ed. 2014).  Congress therefore conducted an initial investigation into the KKK's activities, focusing on North Carolina. Report on Outrages II; *see* Cong. Globe, 42d Cong., 1st Sess. 152-156, 320-321, 443-444, App. 288-290 (1871) (statements of Sen. Sherman; Rep. Stevenson; Rep. Staughton; Rep. Butler) (discussing testimony from the report).[2]  Then, in response to a final message from President Grant laying out the dire situation in the South, "Congress enacted a far more sweeping measure" to curb the KKK's activities—the Third Enforcement Act.  Foner 454.

The Third Enforcement Act provided both the federal government and individuals more potent tools to protect people from the attacks and corrupting influence of associations of white supremacists, including the KKK (after whom the law is commonly named).  *See* KKK Act, 17 Stat. 13; *District of Columbia v. Carter*, 409 U.S. 418, 425-426 (1973). Section 1, now 42 U.S.C. 1983, provided a right of action for private parties to enforce their federal rights against violations by state actors. KKK Act, § 1, 17 Stat. 13.  Section 2, of which the Support or Advocacy

---

[2]  All citations herein to the Congressional Globe are to the 42d Cong., 1st Sess. (1871).

Clause is a part, listed nearly two dozen actions that "two or more persons within any State or Territory" were prohibited from conspiring to perform. *Id.* § 2, 17 Stat. 13-14.

### 2. Section 11(b) of the VRA

Section 11(b) of the VRA is one of a series of federal laws beyond the Support or Advocacy Clause that prohibit voter intimidation or other interference with the right to vote. Congress began with the First Enforcement Act in 1870, "which made it a crime for public officers and private persons to obstruct exercise of the right to vote." *South Carolina v. Katzenbach*, 383 U.S. 301, 310 (1966); *see* Act of May 31, 1870, ch. 144, §§ 4-6, 16 Stat. 141. Four score and seven years later, in the Civil Rights Act of 1957, *see* 42 U.S.C. 1971(b) (now 52 U.S.C. 10101(b)), Congress "prohibited threats and intimidations for the purpose of interfering with the right to vote in Federal elections," H.R. Rep. No. 439, 89th Cong., 1st Sess. 9 (1965) (VRA House Report). Yet "coercion" and atmospheres of "terror and reprisal" still denied many minority voters their right to vote. *Id.* at 37-38 (Republican Views of Rep. McCulloch et al.); *see Katzenbach*, 383 U.S. at 309, 312-315.

Congress strove to address this crisis through the VRA, including by strengthening federal prohibitions on voter intimidation. Section 11(b) of the VRA states, in relevant part, that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote" or "for urging or aiding any person to vote or attempt to vote." 52 U.S.C. 10307(b); *see* 52 U.S.C. 10310(c)(1) (defining the terms "vote" or "voting").

## B.    Procedural History

Three civil rights organizations sued the United States Election Integrity Plan (USEIP), an unincorporated association, and its founders, alleging violations of Section 11(b) of the VRA and the Support or Advocacy Clause of the KKK Act. A.24-26, 32-33.[3] They alleged that USEIP and its agents, "[s]ometimes armed and donning badges," engaged in door-to-door voter intimidation targeted at heavily Democratic or racially-diversifying communities. A.28-29.

---

[3] "A.__" refers to plaintiffs-appellants' appendix by page number.

After the district court denied a motion to dismiss, defendants filed a motion for judgment on the pleadings and a motion for summary judgment. A.55-56. The court held that defendants had waived their arguments that Section 11(b) and the Support or Advocacy Clause lacked private rights of action, but also rejected those arguments on the merits. A.60-64.

However, the district court granted summary judgment to USEIP on the ground that, as an unincorporated association, USEIP was not a "person" and thus not a proper defendant under either statute. A.66-70. The court relied on this Court's decision in *Lippoldt v. Cole*, 468 F.3d 1204 (10th Cir. 2006), which held that unincorporated associations were not "persons" who could bring actions under 42 U.S.C. 1983, along with other cases of this Court that have followed *Lippoldt*. *See* A.66-68. However, the court did not analyze whether *Lippoldt*'s underlying rationales would apply to Section 11(b) or the Support or Advocacy Clause. A.68-69.[4]

---

[4] The district court thought *Lippoldt* wrongly decided and found "persuasive" a more recent Eleventh Circuit decision, *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266 (11th Cir.

The case proceeded to a bench trial against the individual defendants. Midway through trial, defendants successfully moved for judgment on partial findings under Federal Rule of Civil Procedure 52(c). *See* A.122, 219-222.

## SUMMARY OF ARGUMENT

Unincorporated associations are "persons," and thus proper defendants, under both Section 11(b) of the VRA and the Support or Advocacy Clause of the KKK Act.

1. All the indicia to which this Court looked in *Lippoldt v. Cole*, 468 F.3d 1204 (10th Cir. 2006), and successor cases to analyze the meaning of the word "person" in federal statutes confirm that unincorporated associations are "persons" under Section 11(b). The statute's text and legislative history support its application to unincorporated associations. State common law, as well as the Federal Rules of Civil Procedure, recognized unincorporated associations as persons capable of being sued long before 1965. And the 1948 version of

---

2021), which held that unincorporated associations *can* bring Section 1983 claims. A.69 & n.6.

the Dictionary Act, in place when the VRA was passed, expressly included "associations" among its definition of "persons."

2.  These same factors indicate that unincorporated associations are "persons" capable of violating the Support or Advocacy Clause as well.  The text and legislative history of Section 2 of the KKK Act—in contrast to that of Section 1, which became 42 U.S.C. 1983—support its application to unincorporated associations like the KKK itself.  Congress also retroactively amended the Dictionary Act in 1874 to ensure that partnerships, a form of unincorporated association, would be considered "persons" in all statutes passed after February 25, 1871, including the KKK Act.  While the common law generally did not treat such associations as legal persons in 1871, Congress was free to, and here did, override that general rule.

## ARGUMENT

## I.    Plaintiffs can sue unincorporated associations for violations of Section 11(b) of the VRA.

The district court erred by automatically applying this Court's ruling in *Lippoldt v. Cole*, 468 F.3d 1204 (10th Cir. 2006), which addressed the understanding of "persons" in the 1870s, to Section 11(b) of the VRA, a statute enacted over 90 years later.  Instead, to determine

whether unincorporated associations are "persons" under Section 11(b),
a court must examine the statute's "language and purpose, while
keeping in mind the legislative environment in which the word [person]
appears." *Id.* at 1212 (citations and internal quotation marks omitted;
alteration in original).

Drawing on Supreme Court cases interpreting Section 1983,
*Lippoldt* relied on three indicia to determine the meaning of the
statutory term "person":  "(1) the legislative history of Section 1983,
(2) the general understanding, as of 1871, regarding the legal
personality of unincorporated associations, and (3) the Dictionary Act of
1871."  468 F.3d at 1213; *see United States v. Doe*, 572 F.3d 1162, 1167-
1169 (10th Cir. 2009) ("first examin[ing] the statutory language," then
legislative history and Dictionary Act, to determine meaning of "person"
in Major Crimes Act of 1885).  Following *Lippoldt*'s method confirms
that Section 11(b) reaches unincorporated associations like USEIP.

## A.    Section 11(b)'s text and legislative history treat unincorporated associations as "persons."

The text and legislative history of Section 11(b) support its
application to unincorporated associations.

1.  "To determine what entities are 'persons' under" Section 11(b),
"we first examine the statutory language." *Doe*, 572 F.3d at 1167.
Section 11(b) provides, in relevant part, that "[*n*]*o person*, whether
acting under color of law or otherwise, shall intimidate, threaten, or
coerce . . . any person for voting or attempting to vote," "urging or aiding
any person to vote or attempt to vote," or "exercising any powers or
duties under" various other VRA provisions.  52 U.S.C. 10307(b)
(emphasis added).  The phrase "under color of law or otherwise" shows
that Section 11(b) applies to private actors.  *See Morse v. Republican
Party of Va.*, 517 U.S. 186, 249 (1996) (Kennedy, J., dissenting) (citation
omitted); *National Coal. on Black Civic Participation v. Wohl*, 498 F.
Supp. 3d 457, 476 (S.D.N.Y. 2020).

Notably, nothing in the statute differentiates between private
individuals and private associations or otherwise indicates that
Congress intended to exclude unincorporated associations from its
reach.  There would be no awkwardness, for instance, in reading
Section 11(b) to provide that "[n]o person, [including unincorporated
associations,] whether acting under color of law or otherwise, shall
intimidate, threaten, or coerce."  52 U.S.C. 10307(b); *cf. Will v.*

*Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989) (noting that adding States expressly to Section 1983's language "would be a decidedly awkward way of expressing an intent to subject the States to liability"). Nor is there a strong presumption against reading the word "person" to include unincorporated associations, as there is against reading it to include the sovereign. *See ibid.*; *Inyo County v. Paiute-Shoshone Indians*, 538 U.S. 701, 709-710, 712 (2003).

Moreover, through their artificial personhood, associations can engage in intimidation, threats, and coercion—acts that "may take on many forms." *United States v. Beaty*, 288 F.2d 653, 656 (6th Cir. 1961). Voter intimidation cases, though brought under other statutes, illustrate how this can be so. For instance, one case found that the Original Knights of the KKK—an unincorporated association—had published "a number of handbills" that "attempt[ed] to intimidate public officials" either "by threat of violence" or "by character assassination." *United States by Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 342 (E.D. La. 1965) (*Original Knights*) (three-judge court) (under 42 U.S.C. 1971(b)). And a more recent case found that the Proud Boys and the Oath Keepers—two unincorporated

associations—agreed to plan the January 6, 2021, attack on the Capitol to coerce Congress out of certifying the 2020 presidential election results.  *See Thompson v. Trump*, 590 F. Supp. 3d 46, 106 (D.D.C. 2022) (under 42 U.S.C. 1985(1)), *aff'd sub nom. Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023).

2.  "To the extent the plain meaning of the statutory language and context of 'person' is unclear," a look at the "'legislative environment' in which the word [person] appears" confirms that Section 11(b) reaches unincorporated associations.  *Doe*, 572 F.3d at 1169 (alteration in original) (quoting *Lippoldt*, 468 F.3d at 1212).  Congress was aware in enacting Section 11(b) that unincorporated associations can intimidate voters.  For instance, certain Republican members of the House Judiciary Committee supported Section 11(b) because of "incredible accounts of citizens in our own land living in an atmosphere of terror and reprisal if they even attempt to register."  VRA House Report 37-38 (Republican Views of Rep. McCulloch et al.).  The report they cited for these accounts, *see id.* at 38 n.5, included a description of a Black woman who had attempted to register to vote and then was visited by men who handed her a threatening card from the KKK.  *See* U.S.

Comm'n on C.R., *Voting in Mississippi* 27 (1965), https://perma.cc/Y7Y5-AHEH (reproducing card stating that "Thousands of Klansmen" were "*Watching . . . Waiting!*" followed by "Ku Klux Klan" in large font).

Even before Congress passed the VRA, the United States had used its authority under a near-identical voter-intimidation provision of the 1957 Civil Rights Act, 42 U.S.C. 1971(b) (now 52 U.S.C. 10101(b)), to sue unincorporated associations.[5] And mere months after President Lyndon Johnson signed Section 11(b) into law, a three-judge court expressly found "no merit to th[e] contention" that "a private organization"—there, an "unincorporated association"—is "beyond the reach of" Section 1971(b). *Original Knights*, 250 F. Supp. at 334. Knowing that Section 1971 had been applied against unincorporated associations, Section 11(b)'s drafters intentionally modeled the new law

---

[5] At least one case explicitly described a defendant as "an unincorporated association." *Original Knights*, 250 F. Supp. at 334. Other cases named as defendants entities that appear to have been unincorporated, though they are not directly labeled as such. *See, e.g.*, *United States v. McLeod*, 229 F. Supp. 383, 384 (S.D. Ala. 1964) (suit against, *inter alia*, Dallas County White Citizens Council); *see also United States v. Bibb Cnty. Democratic Exec. Comm.*, 222 F. Supp. 493, 494 (M.D. Ga. 1962) (case against county party committee for violation of 42 U.S.C. 1971(a) brought under Section 1971(c), which allows the Attorney General to sue any "person" violating Section 1971(a)).

after Section 1971(b).  *See Voting Rights:  Hearing Before the H. Comm. on the Judiciary*, 89th Cong., 1st Sess. 8, 64 (1965) (statement of Nicholas Katzenbach, Att'y Gen. of the United States).

### B.    State and federal law in 1965 treated unincorporated associations as suable "persons."

The underlying common law at the time of Section 11(b)'s passage also supports its application to unincorporated associations.  Unlike in 1871, when Congress passed Section 1983, by 1965 the "general understanding" was that unincorporated associations *could* be sued.  *Cf. Lippoldt*, 468 F.3d at 1213 (construing common law as of 1871).

"Undoubtedly at common law an unincorporated association of persons . . . could only sue or be sued in the names of its members, and their liability had to be enforced against each member."  *United Mine Workers v. Coronado Coal Co.*, 259 U.S. 344, 385 (1922).  However, in 1922 the Supreme Court recognized that both state common law and federal statutes had since abandoned this position, at least as to labor unions.  *Id.* at 385-392.  The Court also thought it would be "unfortunate if a great unincorporated association could . . . carry on widespread controversial activities, out of which unlawful injuries to

private rights might arise, free from liability for such injuries."

*Operative Plasterers' Int'l Ass'n v. Case*, 93 F.2d 56, 64 (D.C. Cir. 1937).

The Court accordingly held that labor unions could be named as

defendants in a federal suit despite their lack of incorporation.

*Coronado Coal*, 259 U.S. at 392.  In so doing, "[t]he Coronado case . . .

legitimate[d] suing the unincorporated association as an entity."

*Denver & Rio Grande W. R.R. v. Brotherhood of R.R. Trainmen*, 387

U.S. 556, 559 (1967).

In 1937, the Federal Rules of Civil Procedure codified a more

general version of the rule "declared in" *Coronado Coal*.  Fed. R. Civ. P.

17 advisory committee's note to subdiv. (b); *see Denver & Rio Grande W.

R.R.*, 387 U.S. at 559.  Rule 17 clarified that "a partnership or other

unincorporated association with no such capacity under that state's law

may sue or be sued in its common name to enforce a substantive right

existing under the United States Constitution or laws."  Fed. R. Civ. P.

17(b)(3)(A).  And Section 11(b) plainly grants a substantive right:  the

right of all those who are "voting or attempting to vote," "urging or

aiding any person to vote or attempt to vote," or "exercising any powers

or duties under" the Act to be free from intimidation, threats, and

coercion while doing so.  52 U.S.C. 10307(b); *cf. Chisom v. Roemer*, 501

U.S. 380, 392 (1991) (describing Section 2 of the VRA as "grant[ing] . . .

*a right* to be free from enactment or enforcement of [discriminatory]

voting qualifications . . . or practices" (alterations in original; emphasis

added; citation omitted)).

Even as to state law, the status of associations had changed

markedly by 1965.  Although "[d]octrinally, an association" still had "no

legal existence as an entity separate from its members," *Calagaz v.

Calhoon*, 309 F.2d 248, 251 (5th Cir. 1962), state law had shifted the

foundations beneath that doctrine.  Congressional testimony during

debate over the Taft-Hartley Act in 1947 indicated that, by that point,

"there [we]re only 13 States where unincorporated associations cannot

be sued in their common name in an action at law for breach of contract

or tortious conduct," while 35 States already had allowed associations to

be sued as separate entities.  *Textile Workers Union v. Lincoln Mills of

Ala.*, 353 U.S. 448, 515 (1957) (citation omitted).  Moreover, recognizing

the injustice of continuing to grant unincorporated associations "virtual

immunity from suit," courts for at least two decades before the VRA's

passage had "recognize[d] litigating capacity in an association when it

sues or is sued in a class action under [Federal Rule of Civil Procedure]

23(a)," either in its own name or via named representatives. *Calagaz*,

309 F.2d at 252 (discussing cases).

### C. In 1965, the Dictionary Act treated unincorporated associations as "persons."

Finally, at the time Congress enacted the VRA, the Dictionary Act

directed that, "[i]n determining the meaning of any Act of Congress,

unless the context indicates otherwise," the word "'person' . . . include[s]

corporations, companies, *associations*, firms, partnerships, societies,

and joint stock companies, as well as individuals." 1 U.S.C. 1 (1964)

(emphasis added); *see Lippoldt*, 468 F.3d at 1214-1215 (examining

Dictionary Act's definition "at the time the statute was enacted").

*Lippoldt* itself acknowledged that the Dictionary Act "clearly states,

*and has since 1948*, that the word 'person' 'include[s] . . . *associations*.'"

468 F.3d at 1214 (emphases added; alteration in original) (first quoting

Pub. L. No. 80-772, § 6, 62 Stat. 859 (1948); and then quoting 1 U.S.C.

1).

By the Dictionary Act's plain text, then, unincorporated

"associations" or "partnerships"—and even more informal "societies"—

were presumptively considered persons under federal laws at the time

of the VRA's passage.  1 U.S.C. 1 (1964).  And, as shown above, "the context" of Section 11(b) does not "indicate[] otherwise."  *Ibid.*; *see Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 199 (1993) (stating that "[c]ontext," as that word is used in the Dictionary Act, "means the text of the Act of Congress surrounding the word at issue, or the texts of other related congressional Acts").  All the factors considered in *Lippoldt* and its progeny, then, point in the same direction:  unincorporated associations are "persons" who may be sued under Section 11(b) of the VRA.

## II.  Plaintiffs can sue unincorporated associations for violations of the Support or Advocacy Clause of the KKK Act.

Unincorporated associations also are proper defendants in actions under the Support or Advocacy Clause of the KKK Act, 42 U.S.C. 1985(3).  The Clause's text and legislative history indicate that unincorporated associations are capable of committing the acts it prohibits and that Congress intended to give the Clause a broad reach precisely to target the KKK and other associations engaging in intimidation.  Moreover, Congress decided in 1874 to retroactively amend the Dictionary Act's definition of "person" to include a form of

unincorporated association.  This definition squarely applies to the

Support or Advocacy Clause.  Given the Clause's different text,

legislative history, and purposes, *Lippoldt*'s conclusion about Section

1983's scope does not control.  The district court erred in effectively

holding that the Ku Klux Klan Act does not apply to the Ku Klux Klan.

### A.    The Support or Advocacy Clause's text and legislative history treat unincorporated associations as "persons."

1.  As with Section 11(b), courts must "first examine the statutory

language" of Section 1985(3) to "determine what entities are 'persons'"

under that statute.  *United States v. Doe*, 572 F.3d 1162, 1167 (10th Cir.

2009).  That inquiry leads to a different answer than *Lippoldt* found for

Section 1983.  "[W]hile the Klan itself provided the principal catalyst for

the [KKK Act]," *District of Columbia v. Carter*, 409 U.S. 418, 426 (1973),

Section 1—which is now 42 U.S.C. 1983—was instead addressed to the

actions of state and local officials who violated Americans'

constitutional rights.  *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 723

(1989) (plurality opinion).  As a result of this narrowed focus, Section

1983 restricts the defendants to whom it applies, limiting its reach to

any "person who, under color of any statute," deprives people of federal rights.  42 U.S.C. 1983.

By contrast, Sections "2 through 6 of the [Act] specifically addressed the problem of the private acts of violence perpetrated by groups like the Klan." *Jett*, 491 U.S. at 722-723; *see Monell v. Department of Soc. Servs.*, 436 U.S. 658, 665 & n.11 (1978).  As befits this focus on the KKK and other organizations engaging in illicit activities, the Support or Advocacy Clause applies without Section 1983's textual limitations on who can be a defendant.  It prohibits any "two or more persons" from "conspir[ing] to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner."  42 U.S.C. 1985(3).  The Clause also allows for damages actions "*against any one or more of the conspirators*" by any "party" injured in their "person or property" or deprived of their rights by "one or more persons engaged" in the conspiracy.  *Ibid.* (emphasis added).

Nothing in this language precludes unincorporated associations from violating the Clause.  Associations can intimidate, coerce, or

threaten to try to stop citizens from supporting or advocating for federal candidates, just as individuals or corporations can.

The floor debates over the KKK Act alone proved as much. Members of Congress introduced into the record notices that the KKK had placed in Democratic newspapers—either directly under the organization's name or on its behalf—that, among other things, told "[u]nholy blacks, cursed of God" to "take warning and fly," Cong. Globe App. 287 (statement of Rep. Stevenson); warned of "retributive justice" if a county's entire government did not resign, *id.* at 448 (statement of Rep. Butler); and informed a Union colonel in "a proclamation, drawn after the form of a military order, that, if he returned, he would suffer death," *id.* at 449 (statement of Rep. Butler).  One representative related that he and other members of the Arkansas state legislature had "frequently found upon their desks in the morning threatening letters expressed in the mysterious jargon of the Klan, and signed in red ink, indicating blood."  *Id.* App. 200 (statement of Rep. Snyder). Whenever the Klan sought to kill, threaten, or otherwise punish someone, the decision was ratified by a vote of the den.  *See* Report on Outrages XXI.

It was thus the Klan organization itself—not just particular individuals—that conducted these intimidating, coercive, or threatening acts.  Indeed, at least one congressman deemed the Klan's violent efforts "to deprive the colored race of the ballot" to be the organization's entire raison d'être.  Cong. Globe App. 195 (statement of Rep. Buckley).

Furthermore, Section 2 of the KKK Act is a conspiracy statute.  And unincorporated associations can engage in conspiracies.  *See, e.g.*, *Brown v. United States*, 276 U.S. 134, 141-142 (1928) (Sherman Antitrust Act); *Callaghan & Co. v. Federal Trade Comm'n*, 163 F.2d 359, 360, 373 (2d Cir. 1947) (Federal Trade Commission Act); *California Rice Indus. v. Federal Trade Comm'n*, 102 F.2d 716, 717, 722 (9th Cir. 1939) (same).  They can even conspire with their own agents.  *See Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1127 (10th Cir. 1994) (holding in Section 1985(2) case that doctrine forbidding intracorporate conspiracies does not apply to Section 1985).

2.  Likewise, the legislative history of Section 1985 supports the Support or Advocacy Clause's application to unincorporated associations.  In contrast to Section 1983, whose history "indicate[s] a restricted view of who could qualify as a proper Section 1983 plaintiff,"

*Lippoldt v. Cole*, 468 F.3d 1204, 1213 (10th Cir. 2006), the legislative history shows that Congress had a broad view of who could qualify as a proper Section 1985(3) defendant.

To start, the Act's principal sponsors made statements showing that Section 2 of the KKK Act was "intended to give a broad remedy for violations of federally protected civil rights." *Monell*, 436 U.S. at 685 (discussing similar statements regarding Section 1). Congressman Samuel Shellabarger, the statute's principal author, "describe[d] how the courts would and should interpret" the Act. *Id.* at 684. He stated that "[t]his act is remedial, and in aid of the preservation of human liberty and human rights," and that "the largest latitude consistent with the words employed is uniformly given in construing such statutes." Cong. Globe App. 68. Likewise, Senator George Edmunds— the statute's Senate manager, *see Monell*, 436 U.S. at 684, and the Support or Advocacy Clause's author, *see* Cong. Globe 704—stated that Section 2 of the Act "provides for the punishment of a conspiracy . . . to deprive citizens of the United States, in the various ways named, of the rights which the Constitution and the laws of the United States made pursuant to it give to them," *id.* at 568.

Indeed, Senator Edmunds expressed the view that the Act could extend to unincorporated associations.  In defending a failed amendment to make counties liable for private violations of the Act, *see Monell*, 436 U.S. at 664 (discussing Sherman amendment), Senator Edmunds contended that such associations were "persons" subject to suit:  "I can show you many, many cases of suits pending now in the United States courts against cities and against counties, *and against all kinds of organizations, partnerships*, and communities.  *They are all persons in the eye of the law*."  Cong. Globe 821 (emphases added).  This statement from the Clause's author bolsters the argument that Congress intended to treat partnerships and other unincorporated associations as "persons" within the Clause's meaning.

Congress recognized that the Klan—the principal target of the law—was just such an association.  Members of Congress repeatedly attributed the Klan's "intimidation and violen[t] acts" not just to individual members but to the "political organization" itself.[6]  As

---

[6]  Cong. Globe App. 285 (statement of Rep. Stevenson); *see, e.g.*, *id.* at 153-156, 320-321, 442-443, 487; *id.* App. 108-109, 193, 199, 286, 290, 295-299.

Senator Oliver P. Morton, a prominent supporter of the Act, put it:
"This society is a confederacy, existing in a number of States, and
binding them together by its secret and murderous ties. . . . It
electioneers by murder, and persuades men by the lash and destruction
of their property."  Cong. Globe App. 252-253.  Or as another Member
lamented:  "[T]he only *habeas corpus* that reaches their [victims'] poor
bodies is the midnight decree of a Klan, signed in blood by the chief of
the den."  *Id.* App. 202 (statement of Rep. Snyder).

Congress thus recognized that Section 2's ban on conspiracies was
really a ban on interference with constitutional rights by organizations
like the KKK.  Senator Morton argued that the similarly worded First
Enforcement Act "proceeded upon the hypothesis . . . that Congress had
the power to protect and enforce [the Fifteenth Amendment's] right [to
vote] against individuals *or organizations*."  Cong. Globe App. 251
(emphasis added).  He then asserted that the KKK Act likewise was
designed to prohibit "*organizations* in any of the States having for their
purpose to deny to *any class or condition of men* equal protection."  *Ibid.*
(first emphasis added).  Likewise, Representative Shellabarger said
when introducing the initial version of Section 2 that "[i]t punishes, not

individual crime, but only *banded, mastering, confederated* violence."
*Id.* App. 69 (emphasis added).  The final version of Section 2, while
narrowing the types of conspiracies the Act covered, *id.* at 478
(statement of Rep. Shellabarger) (introducing and explaining
substituted Section 2), did not change this fundamental truth.

> **B.    Congress retroactively amended the Dictionary Act to treat unincorporated associations as "persons," and that amendment applies to the Support or Advocacy Clause.**

Congress's retroactive amendment in 1874 to the Dictionary Act's
definition of "person" also supports interpreting the Support or
Advocacy Clause to apply to unincorporated associations.

In finding that unincorporated associations cannot bring Section
1983 claims, *Lippoldt* focused entirely on the 1871 Dictionary Act,
which extended the meaning of "person" only to "bodies politic and
corporate" (*i.e.*, private and governmental corporations).  468 F.3d at
1214 (citation omitted).  The Court believed that Congress did not
expand the definition until "more than seventy years" later, in 1948.  *Id.*
at 1215.  Another decision of this Court likewise relied on the 1871
Dictionary Act to read an 1885 statute, thinking that Congress did not
amend the Dictionary Act to include any non-corporations until 1948.

*See Doe*, 572 F.3d at 1169; *cf. Becker v. Ute Indian Tribe of the Uintah & Ouray Rsrv.*, 868 F.3d 1199, 1206 n.5 (10th Cir. 2017) (rejecting LLC as potential Section 1983 plaintiff under *Lippoldt*).  But this assumption was incorrect.

In fact, Congress amended the Dictionary Act's definition of "person" in 1874 as part of its codification of federal laws into the Revised Statutes.  *See Ngiraingas v. Sanchez*, 495 U.S. 182, 190-191 & n.10 (1990).  It replaced the phrase "bodies politic and corporate" with "partnerships and corporations."  *Id.* at 191 & n.10.  Congress changed the definition of "person," among other reasons, because of its view "that partnerships ought to be included."  1 Revision of the United States Statutes as Drafted 19 (1872); *accord Ngiraingas*, 495 U.S. at 191.  And partnerships were at the time—and remain today—a form of unincorporated association.  *See, e.g.*, *Grynberg v. Kinder Morgan Energy Partners, L.P.*, 805 F.3d 901, 906 (10th Cir. 2015) (stating limited partnerships are unincorporated associations); *Hoadley v. County Comm'rs of Essex*, 105 Mass. 519, 526 (1870) (stating that corporations "can only be created and exist by sanction of the

legislature," and that "a voluntary association of individuals . . . constitute[s] a copartnership").

Indeed, the common law generally treated *all* unincorporated associations as equivalent to partnerships. *See People of P.R. v. Russell & Co., Sucesores S. En. C.*, 288 U.S. 476, 480 (1933) ("The tradition of the common law is to treat as legal persons only incorporated groups and to assimilate all others to partnerships."); *McMahon v. Rauhr*, 47 N.Y. 67, 70 (1871) (stating that associates of a "voluntary association not incorporated," even one whose object "is innocent pleasure," have "rights" and "modes of enforcing them" that "are not materially different from those of partners in the partnership property"); *Black's Law Dictionary* 236 (1st ed. 1891), https://perma.cc/ MXH8-YQC9 (stating in definition of "company" that "every unincorporated society is, in its legal relations, a partnership"). Unincorporated associations, then, presumptively became "persons" under the Revised Statutes in 1874.

Despite coming three years after the KKK Act, this revised definition of "person" applies to the Support or Advocacy Clause. Congress rendered the new definition retroactive to any statute passed

after February 25, 1871—nearly two months *before* Congress passed the KKK Act. *See* Rev. Stat. § 1, 18 Stat. 1 (1874) ("In determining the meaning of the revised statutes, *or of any act or resolution of Congress passed subsequent to February twenty-fifth, eighteen hundred and seventy-one*, . . . the word 'person' may extend and be applied to partnerships and corporations." (emphasis added)). Thus, this amended definition of "person" "clarified the definition of those whose actions could give rise to § 1983 liability," *Ngiraingas*, 495 U.S. at 191, and by the same logic, to Section 1985(3) liability as well. *See also Stewart v. Dutra Const. Co.*, 543 U.S. 481, 489 (2005) (following definition of "vessel" from 1874 version of the Dictionary Act "because the [statute at issue] is an Act of Congress passed after February 25, 1871").

Notably, Congress enacted the current version of the Support or Advocacy Clause in the same legislation that adopted the new definition of "person." As part of its codification of the Revised Statutes, Congress reenacted and altered Section 2 of the KKK Act. Congress broke up Section 2 into three separate paragraphs. Rev. Stat. § 1980, 18 Stat. 348-349. And Congress further broadened the Support or Advocacy Clause's reach, clarifying that it could be violated by any "two or more

persons," § 1980, 18 Stat. 349, rather than only by "two or more persons within any State or Territory," as the original law prescribed for all of Section 2, KKK Act, § 2, 17 Stat. 13-14.  Congress then repealed all prior laws that were even partially included in the Revised Statutes and decreed that the newly enacted code constituted "the statutes of the United States."  Rev. Stat. § 5595, 18 Stat. 1091.

As the Supreme Court recognized with respect to a closely related updated definition:  "It is significant that the definition of 'whoever' in 1 U.S.C. s 1, was first enacted into law as part of the very same statute which enacted into positive law" the statute being interpreted there. *United States v. A & P Trucking Co.*, 358 U.S. 121, 123 n.2 (1958). Likewise, here, in the same statute in which Congress reenacted a new version of the Clause into positive law, and in which they expanded the statute to apply to geographically unrestricted conspiracies of "persons," "Congress pointedly redefined the word 'person' to make it clear" that a form of unincorporated association would be included.  *Ngiraingas*, 495 U.S. at 191.  And Congress provided that this new definition of "person" must be applied "[i]n determining the meaning of the revised statutes." Rev. Stat. § 1, 18 Stat. 1.

**C.    The contemporaneous common-law conception of unincorporated associations' personhood cannot override Congress's choice to subject those associations to liability.**

It is true, as the *Lippoldt* court noted, that the common law in 1871 generally did not treat unincorporated associations as "persons." 468 F.3d at 1213-1214.  However, this common-law baseline cannot overcome the other textual and contextual evidence that unincorporated associations may be sued under the Support or Advocacy Clause.

While "the common law made a distinction between a corporation and a partnership, deeming the latter not a separate entity for purposes of suit," "the power of Congress to change the common-law rule is not to be doubted." *A & P Trucking Co.*, 358 U.S. at 124.  Congress need not render associations subject to suit by name; it may do so via "a necessary implication arising from statutory provisions although the statute does not in terms so provide." *Brown*, 276 U.S. at 141.  And Congress did change the common-law rule in the Support or Advocacy Clause, for there is "nothing in that section which would justify our not applying to the word ['person'] the definition given it in 1 U.S.C. s 1, which includes partnerships." *A & P Trucking Co.*, 358 U.S. at 124 (construing the term "whoever"); *see also* Fed. R. Civ. P. 17(b)(3)(A)

(authorizing unincorporated associations to "sue or be sued in [their] common name" to "enforce a substantive right existing under" federal law, regardless of their status as legal persons under state law).

Not surprisingly, courts regularly have treated unincorporated associations as persons subject to liability under Section 1985.[7]

For all these reasons, unincorporated associations are "persons" within the meaning of the Support or Advocacy Clause.

---

[7] *See, e.g.*, *Aradia Women's Health Ctr. v. Operation Rescue*, 929 F.2d 530, 533 (9th Cir. 1991) (rejecting argument that Operation Rescue, as unincorporated association, was not amenable to suit under Section 1985(3)'s equal protection provision); *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352, 1359 (2d Cir. 1989) (holding that Operation Rescue conspired to violate Section 1985(3)'s equal protection provision, and rejecting argument that it was not a legal entity subject to contempt for violating order issued under that provision); *Smith v. Trump*, No. 21-cv-02265, 2023 WL 417952, at *5-6 (D.D.C. Jan. 26, 2023) (holding that plaintiffs had stated Section 1985(1) claim for conspiracy that included unincorporated associations such as the Proud Boys), *aff'd*, No. 23-7010, 2023 WL 9016458 (D.C. Cir. Dec. 29, 2023); *Thompson v. Trump*, 590 F. Supp. 3d 46, 106 (D.D.C. 2022) (same), *aff'd sub nom. Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023); *cf. League of United Latin Am. Citizens - Richmond Region Council 4614 v. Public Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *6 (E.D. Va. Aug. 13, 2018) (holding that plaintiff unincorporated organization had stated Support or Advocacy Clause claim).

## CONCLUSION

This Court should reverse the judgment in favor of USEIP on the issues addressed herein.

Respectfully submitted,

KRISTEN CLARKE
  Assistant Attorney General

s/ Noah B. Bokat-Lindell
BONNIE I. ROBIN-VERGEER
NOAH B. BOKAT-LINDELL
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because it contains 6492 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) and Tenth Circuit Rule 32(A) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
 Attorney

Date:  November 14, 2024