**No. 24-1328**

**In the**

**United States Court of Appeals**

**For the Tenth Circuit**

COLORADO MONTANA WYOMING STATE AREA

CONFERENCE OF THE NAACP, et al.,

Plaintiffs–Appellants

v.

SHAWN SMITH, et al.

Defendants–Appellees

Appeal from the United States District Court for the District of Colorado,

No. 1:22-cv-00581-CNS-NRN (Judge Charlotte N. Sweeney)

**PRO SE APPELLEE BRIEF**

*Ashley Epp, Pro Se Appellee*

## Table of Contents

*Table of Contents*..................................................................*2*

*Table of Authorities* ..............................................................*3*

*Statement of Related Cases* ....................................................*5*

*Statement of the Issues* ..........................................................*6*

*Statement of the Case*............................................................*7*

*Summary of Argument*..........................................................*16*

*Argument* ............................................................................*18*

*Conclusion* ..........................................................................*44*

*Oral Argument Statement*.....................................................*48*

*Certificate of Compliance* ....................................................*49*

## Table of Authorities

**Statutes**

28 U.S. Code § 1927 ..................................................................25

Ku Klux Klan Act, 42 U.S.C. § 1985 .......................................7

The Voting Rights Act, 52 U.S.C. § 10307(b) ..........................7

**Cases**

Baca v. Berry, 10th Circuit (2015) ...........................................23

Brandenburg v. Ohio, Supreme Court (1969)............................41

Citizens United v. FEC, Supreme Court (2010) ........................41

Danielson-Holland v. Standley & Assoc., LLC., 10th Circuit (2013)....................25

FAIR FIGHT INC. v. TRUE THE VOTE, ND Georgia (2024) ..............................16

Martin v. City of Struthers, Supreme Court (1943)...............7, 19

McGee v. Hayes, 10th Circuit (2002) (unpublished)................12

Meyer v. Grant, Supreme Court (1988) ....................................19

Muhammad v. Walmart Stores, 2nd Circuit (2013)...................25

Ngo v. ROSE CITY ANTIFA, Oregon Court of Appeals (2022)...........................28

Steinert v. Winn Group, Inc., 10th Circuit (2006) ....................23

Watchtower Bible v. Village of Stratton, Supreme Court (2002)...........................19

**Rules**

Fed. R. App. P. 30(b)(1) ...........................................................23

Fed. R. App. P. 38....................................................................25

Fed. R. Civ. P. 11(c)(3)............................................................25

Rules of Professional Conduct 3.1 ...........................................27

Fed. R. Evid. 402 .....................................................................35

Fed. R. Evid. 403 .....................................................................35

Fed. R. Evid. 801 .....................................................................33

**Other Authorities**

2015, Cady. "Voters Strike Back: Litigating against Modern Voter Intimidation." 19

2017, Matea. "The campaign to impeach President Trump has begun."..................41

2024, Goldberg. "17 Freedom of Speech Court Cases You Should Know."...........41

2018, CRS. "The Supreme Court's Overruling of Constitutional Precedent."........29

## **Statement of Related Cases**

There are no prior cases or appeals.

## **Statement of the Issues**

1. Can plaintiffs invent reversible error out of their own intentional actions, or does such conduct constitute a frivolous appeal?

2. Did the district court err by adhering to 10th Circuit precedent in dismissing USEIP as a defendant in the case?

3. Did the district court rightly exclude an irrelevant and prejudicial video after plaintiffs failed to make it relevant in the matter before the court?

4. Did the district court correctly find that canvassers who questioned Ms. Roberts "engaged in no conduct that could be objectively considered intimidating"?

5. Did the district court consider all appropriate and relevant context before rejecting plaintiffs' novel legal theory to expand 52 U.S.C. § 10307(b)?

6. Can plaintiffs repeatedly and overtly make misrepresentations before the court in pursuit of a novel legal theory, or must such conduct be sanctioned?

**Statement of the Case**

Since the inception of these proceedings, the plaintiffs have advanced a novel legal theory that maliciously and erroneously conflates political speech and lawful canvassing with voter suppression, intimidation, coercion and threats. Both political speech and lawful canvassing are protected by the First Amendment, and "so clearly vital to the preservation of a free society that, putting aside reasonable police and health regulations of time and manner of distribution, it must be fully preserved;" restrictions on canvassing are "invalid because in conflict with the freedom of speech and press." (Martin v. City of Struthers, 319 US 141, 1943) Certainly the plaintiffs, three civil rights organizations, know that political speech and canvassing do not, alone, amount to violations of the Ku Klux Klan Act, 42 U.S.C. § 1985 and The Voting Rights Act, 52 U.S.C. § 10307(b). So, too, must the two law firms and around a dozen lawyers who have signed pleadings throughout the history of this case.

Such plaintiffs and their counsel also must know that their theory of the case unconstitutionally seeks to enact content-based restrictions on the First Amendment; that is, plaintiffs have asked the court to infringe upon the defendants' protected rights because they disagree with the content of defendants' speech and the purpose of defendants' assembly.

## A. Parties

### i.    USEIP & The Named Defendants

USEIP is not a formal entity. It has no officers, bylaws, or formal structure. USEIP never engaged in any sort of commerce or fundraising. The named defendants, along with many other self-guided volunteers associated with USEIP, designed a lawful canvassing effort that would enable local civic groups and individuals to validate the official record of the 2020 election; gather data and identify anomalies; present the data gathered to government entities with jurisdiction; and encourage those entities to investigate the anomalies and remedy any defects in the official record, specifically the voter rolls. Many self-organized, grassroots teams at the county level canvassed their communities using the training materials, affidavit templates, walk list formats, etc. developed by individuals associated with USEIP.

None of the named defendants directed the canvassing efforts of any county or individual. Ms. Epp and Mr. Smith both attended training and canvassed, while Ms. Kasun never attended training or canvassed. When canvassing concluded in late 2021, independent county teams analyzed and cured their canvassing records, and they delivered records of true defects and anomalies to the government entities with jurisdiction to investigate and provide remedy, such as updating the voter

rolls, if required. Mr. Smith and Ms. Kasun are represented by counsel, and Ms. Epp is *pro se* in the matter before the court.

### ii.    *League of Women Voters Colorado*

Plaintiff League of Women Voters Colorado retained counsel for this action on September 23, 2021, and brought this lawsuit on March 9, 2022. The Complaint (App. 21.) was accompanied by a declaration of Executive Director Beth Hendrix, signed under pain and penalty of perjury, that "LWVCO members have reported concerns based on their own experience with visits from USEIP." (Epp S.A. 20.) Ms. Hendrix published false allegations about USEIP to her subscribers on September 4, 2021 (Epp S.A. 70.) and September 8, 2021 (Epp S.A. 72,), and evidence presented at trial showed that Ms. Hendrix further editorialized the false allegations in the complaint in her discussions with LWVCO members; e.g., Ms. Hendrix suggested to concerned members that "often armed" canvassers were "asking people how they voted." (Epp S.A. 63.)

Critically, at trial, Ms. Hendrix "testified that she has no personal knowledge of any voter who felt intimidated by the defendants or USEIP's canvassing efforts," contradicting her prior sworn declaration. (App. 216.) Moreover, Ms. Hendrix testified that she brought this case because of the information she received from her national organization and her counsel, Free Speech for People, and because of

news reports from self-described "progressive" media outlets. (Epp S.A. 50.) More than any other plaintiff, Ms. Hendrix is responsible for propagating the false allegations against the named defendants, evidently to unsuccessfully identify witness testimony to bolster her frivolous claims.

### iii.    Mi Familia Vota

Plaintiff Mi Familia Vota joined this action at the beginning of October 2021 according to plaintiffs' Privilege Log, which was admitted at trial. (Epp S.A. 68.) Colorado State Director Sal Hernandez also issued a declaration accompanying the complaint, where he made specific and concrete factual assertions about his diversion of resources, under pain and penalty of perjury. (Epp S.A. 23.) Neither Plaintiff Mi Familia Vota nor Mr. Hernandez produced any responsive documents or other evidentiary support for their claims. During deposition, Mr. Hernandez testified that he joined this lawsuit because of the information he received from Ms. Hendrix. (Epp S.A. 73.) Mr. Hernandez was present in the gallery during the trial, but he did not testify.

### iv.    CO/MT/WY Area Conference of the NAACP

Plaintiff NAACP participated in these proceedings the least amount of any plaintiff organization. Like Ms. Hendrix and Mr. Hernandez, Portia Prescott issued a declaration accompanying the complaint, making specific and concrete factual

assertions about her organization's diversion of resources, under pain and penalty of perjury. (Epp S.A. 21.) Neither NAACP nor Ms. Prescott produced any responsive documents or other evidentiary support for their claims. Ms. Prescott was not present during the trial, but she was present for the reading of the verdict on July 18, 2024.  Candidly, even this trial was not a diversion of resources for Ms. Prescott or the NAACP, despite the case being filed with NAACP as the lead plaintiff, e.g., "NAACP et al v. USEIP et al."

### B. Procedural Background

Plaintiffs brought this action on March 9, 2022, alleging that USEIP and the named defendants are, "Planning to, threatening to, and actually deploying armed agents to knock on doors throughout the state of Colorado," with "the purpose and effect of intimidating Coloradans from voting, trying to vote, helping others to vote, supporting or advocating for certain political beliefs, or exercising the right to speak, peaceably assemble, or petition the government for redress of grievances, in violation of Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b)." Plaintiffs' complaint further alleges that the defendants are "Introducing themselves in ways that make voters believe that they are associated with government agencies…using public voter lists to target and intimidate voters," "encouraging agents to carry weapons," and "generating and spreading fear that voters can expect multiple armed and unarmed USEIP members to show up at their

doors at any moment to harass and interrogate them about their voting history."
Plaintiffs conclude that defendants' conduct is "...thereby intimidating voters and
preventing Coloradans who are lawfully entitled to vote from giving their support
or advocacy towards political candidates, in violation of the Ku Klux Klan Act, 42
U.S.C. § 1985." (App. 21.)

No evidence to support their claims materialized at trial.  In fact, at no point
in the history of these proceedings have plaintiffs provided evidence or witness
testimony of: (1) any specific and concrete harm; (2) any intimidating act; (3) any
injury to themselves or their members; (4) any intimidated, threatened, or coerced
individual; or (5) any causal connection to any named defendant or to anyone
associated with USEIP.  Plaintiffs and their counsel have maliciously multiplied
these proceedings with frivolous allegations, practically since their beginning.
This is not conjecture; it is a matter of record.

On May 22, 2022, Plaintiffs' Counsel withdrew their request for a temporary
restraining order after the court denied their motion for limited expedited
discovery, admonishing plaintiffs' failure to produce anything beyond allegations,
and stating, "The breadth of plaintiffs' requests also counsels against granting their
motion," (citing McGee v. Hayes, 43 F. App'x. 214, 217, 10th Cir. 2002
(unpublished) (noting that a district court is not "required to permit plaintiff to
engage in a 'fishing expedition' in the hope of supporting his claim"))  At this

point, plaintiffs had identified Ms. Roberts and knew that her complaint did not

implicate the defendants.  Rather than reevaluating and withdrawing their frivolous

claims, they withdrew their TRO, avoided the evidentiary hearing, and continued

the case. (Epp S.A. 25.)

On December 22, 2022, plaintiffs' counsel unethically coached Ms. Roberts

to name the defendants to prevail on summary judgement, which multiplied these

proceedings for 573 days, or from December 23, 2022 through the reading of the

final judgement on July 18, 2024. (App. 219.) Plaintiffs' counsel knowingly signed

and filed this misrepresentation with the district court on December 23, 2022. (Epp

S.A. 28.) As Ms. Roberts forms the basis of one of plaintiffs' four appellant claims,

this is further discussed in the "argument" section below.

On May 15, 2023, plaintiffs' counsel removed their request for

compensatory damages in the Pretrial Order (Epp S.A. 31.) without giving notice

to the defendants or the court. In response to Ms. Kasun's sanctions motion,

plaintiffs asserted they didn't bring a claim for compensatory damages, despite

compensatory damages being an explicit part of their case prior to May 2023. (Epp

S.A. 34.)

On December 24, 2023, defendants learned that plaintiffs' counsel withheld

the identity of key witness Tara Menza, a member of LWVCO *and* a USEIP

volunteer canvasser, as well as Ms. Menza's email communications with plaintiff Beth Hendrix.  Ms. Hendrix testified at trial that she produced "everything" to her attorneys, yet this witness and evidence were not produced during discovery. (Epp S.A. 51.) The court addressed this evidence during the January 23, 2024 Status Hearing (App. 14.), and the communications were admitted at trial. (Epp S.A. 65.) The communications support the defense, and the defense planned to call Ms. Menza during trial prior to the district court granting their 52(c) motion for judgement on partial pleadings. On January 3, 2024, plaintiffs' counsel ignored Ms. Epp's requests to discuss outstanding evidence issues; instead, they attempted to threaten, intimidate and coerce Ms. Epp into signing their consent decree – despite knowing that their claims were frivolous, and that they had a duty to withdraw them. Ms. Epp notified the court of this conduct in her response to Ms. Kasun's motion for continuance (App. 13.[1])

On January 8, 2024, plaintiffs admitted that they withheld the LWVCO 2022 Safety Plan despite (1) assigning it a non-existent Bates ID, and (2) representing to

---

[1] Ms. Epp is only raising this procedural history to demonstrate plaintiffs' pattern of conduct. Since Plaintiffs' coercion is only tertiarily related to the matter before the court, Ms. Epp will not include these citations in the supplemental appendix. However, should the court wish to examine Ms. Epp's credible arguments of coercion, they are outlined in ECF. No 114 at 9 ¶ 3 and supported by the exhibit at ECF No. 114-2. (App. 13.)

the court and defendants that they had produced it during discovery. The document was never produced before January 8, 2024, and the Bates ID does not appear in the discovery index file.  On January 8, 2024, they produced this document for the first time, then claimed that they produced it in error and attempted to claw it back. This "safety plan" was represented during depositions and before the court as evidence of LWVCO's diversion of resources.  The document is actually a notice to LWVCO executive team members that plaintiffs' intended to sue Mike Lindell, who is not a party to this case. Further, this document did not mention canvassing, USEIP, or the named defendants at all.  The court addressed this document during the Status Hearing (App. 14.), and it was admitted at trial. (App. 107.)

From the time they retained counsel through the trial in the district court, plaintiffs not only failed to present any evidence to support their salacious allegations, but they repeatedly and intentionally misled the fact finder with the result of frivolously multiplying these proceedings.  Plaintiffs' allegations have always been, and continue to be, without merit. Three renowned civil rights organizations, two law firms, and countless lawyers certainly must know this; yet they continue to pursue unconstitutional remedies for their imagined harm at Ms. Epp's and the other named defendants' expense.

## Summary of Argument

Ms. Epp disputes all plaintiffs' allegations as false. As the district court found, following the bench trial from July 15, 2024 to July 18, 2024, "…plaintiffs have failed to introduce any evidence that can remotely be perceived as intimidating or threatening…" (App. 219.) Plaintiffs claim the court erred and "hamstrung" them from bringing the evidence to make their case (Appellant Brief at 37), but no such evidence exists. Ms. Epp proved at trial that plaintiffs' complaint is entirely devoid of factual support, salacious, and libelous. There is "no legal support for the proposition that Section 11(b) imputes liability when a plaintiff shows that a defendant's actions merely attempted to affect a large number of the voting populace. There still must be some evidence that a defendant's otherwise lawful action intimidated or attempted to intimidate 'any voter.'" (FAIR FIGHT INC. v. TRUE THE VOTE, Dist. Court, ND Georgia 2024).

Plaintiffs' theory of this case seeks to weaponize civil rights laws to suppress lawful political engagement and frustrate the defendants' protected activities. Plaintiffs advance a novel legal theory from an academic social justice law review article, which is objectively unethical. Regardless of the ethics of this theory, plaintiffs' allegations in this case are not supported in fact or evidence. The first section of Ms. Epp's argument addresses this novel legal theory, and how it mirrors the plaintiffs' conduct in these proceedings since the inception of the case.

Ms. Epp has come to learn that this sort of "legal innovation" is astonishingly common in the practice of law; but it is unprecedented for such civil rights claims to advance to trial without support in fact or evidence.  That is where we find ourselves, and the only reason this case advanced all the way to trial is due to the plaintiffs' specific and concrete misrepresentations, overt acts, before the district court.  Plaintiffs are now continuing these misrepresentations before this honorable appellate court; indeed, at multiple points in their brief, plaintiffs further misrepresent the record of this case. The second section of Ms. Epp's argument addresses the most egregious misrepresentation in the district court and, when considered in the context of the procedural history above, its impact on multiplying these proceedings.

Plaintiffs' four specific appellant arguments seek to invent reversible error based on new misrepresentations and shift responsibility for their own procedural failures and lack of evidence onto the district court.  The third section of Ms. Epp's argument will address plaintiffs' attempts to rewrite the history of this case and their four appellant misrepresentations.

**Argument**

I

Plaintiffs' statement of the case in their appellant brief is remarkably different than their original complaint.  In their original complaint, plaintiffs alleged specific intimidating acts and personal knowledge. In contrast, in their appellant brief, plaintiffs admit the plot:  This is a First Amendment case.  This case is about speech and assembly.  There is no evidence of intimidation – there is only hypothetical intimidation by hypothetical canvassers upon hypothetical Colorado voters. Plaintiffs state in their brief, "When an organized group of election denialists knocks on your door just weeks after the violent insurrection at the United States Capitol, a reasonable person like Roberts could be afraid." (Appellant Brief at 46)

Plaintiffs are asking the court to find that speech they don't like – specifically, "election denialism" – is inherently intimidating, and that "election denialists" – specifically, the defendants – should lose access to their protected rights of speech and assembly as a result. Remember, there are no facts or evidence that support their intimidation claims; plaintiffs' theory of the case is that they don't need facts or evidence of intimidation, they just need speech or assembly that a hypothetical "reasonable person" would find intimidating.  Plaintiffs have

academic support in this theory: A 2015 article from the *NYU Social Justice Law Review* entitled, "Voters Strike Back: Litigating against Modern Voter Intimidation."[2]

Plaintiffs appear in this article's text, with NAACP appearing prominently, and the article has been referenced by plaintiffs throughout these proceedings. Before the trial court, plaintiffs' expert witness relied on "Voters Strike Back" in his expert report. (App. 105.) Plaintiffs also cite this article as an authority in their appellant brief. (Appellant Brief at 7) Plaintiffs' theory of this case appears directly lifted from "Voters Strike Back," and they posit that questioning the outcome of an election (speech) and knocking on doors (canvassing) is enough to separate their political opponents from their protected rights. The courts have repeatedly considered canvassing[34], and the courts have repeatedly affirmed canvassing as a protected First Amendment right.

---

[2] The full article can be reviewed here: https://socialchangenyu.com/wp-content/uploads/2015/09/cadyglazer.pdf

3 Martin v. City of Struthers, Supreme Court 1943. *Martin* was reaffirmed by the Supreme Court in 2002 in *Watchtower Bible*, "our precedent is clear that there must be a balance between these interests and the effect of the regulations on First Amendment rights." (Watchtower Bible & Tract Soc. of NY, Inc. v. Village of Stratton, Supreme Court 2002).

4 Meyer v. Grant, Supreme Court 1988. "The First Amendment protects [one's] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing…" And, " ...the circulation of a petition involves the type of interactive communication

"Voters Strike Back" presents a novel theory that, "section 11(b) was a deliberate attempt to expand the existing laws against voter intimidation, including by eliminating any legal requirement of racial targeting" (Epp S.A. 75.) and that, "Today, voters are rarely overtly threatened with physical or economic harm as they were during the civil rights era; instead, voters are deterred from voting through subtler tactics, such as aggressive poll-watching, anonymous threats of harm, frivolous and excessive voter registration challenges, and coercion by employers." (Epp S.A. 74.) While the merits of this theory are debatable, the tactics suggested within this article are objectively unethical and, importantly, mirror the ongoing conduct of plaintiffs and their counsel throughout the history of this case.  The article states, "…the question at the heart of this article: how a statute prohibiting 'intimidation' applies to contemporary ballot security tactics," and it suggests that "voting rights litigators should consider an impact litigation strategy. 'Impact litigation' refers to 'cases in which the attorney's goals go beyond relief for the individual client and encompass some notion of effecting reform for all other [similarly situated] individuals.'" (Epp S.A. 79.) Impact litigation is positioned as a viable financial pursuit for NGOs, including the NAACP, as

―――――――――――――――

concerning political change that is appropriately described as core political speech."

20

"Compensatory damages will generally be rare in voter intimidation cases, but are not impossible to imagine…attorneys' fees are often a major source of revenue for nonprofit litigators, which could make it easier for civil rights organizations like the NAACP to justify filing suit." (Epp S.A. 80.)

The dubious ethics come into play in terms of the "messaging" and "branding" that such litigation allows plaintiffs to undertake – branding of the defendants. "Another reason to bring a KKK Act claim is for the purpose of political messaging. Liability under the Act carries the additional stigma of conspiracy and its association with the KKK's legacy of politicalized racism…the [KKK] Act creates the opportunity to brand a particular ballot security group or party committee with these deeply embarrassing associations…the threat of such associations could strengthen the law's deterrent effect and help drive settlement." (Epp S.A. 81.) Settlement is the goal of this sort of 11(b) claim, with success "defined as stopping the defendant's conduct." (Epp S.A. 78) Notably, if the defendants' conduct is lawfully protected civic engagement, then such messaging, branding, and outright legal harassment is unethical, for any party or officer of the court, but especially for internationally renowned civil rights organizations.

The merits of this theory are not presently before the court.  "Voters Strike Back" is relevant because plaintiffs cite it as an authority and, more importantly, because it explains plaintiffs' ongoing conduct. In their improper pursuit of this

21

novel legal theory, plaintiffs have made intentional, repeated misrepresentations before the district court and this appellate court.  Plaintiffs did and continue to "brand" Ms. Epp, the other named defendants, and anyone publicly associated with USEIP "with these deeply embarrassing associations."  Plaintiffs' frivolous claims resulted and continue to result in "the additional stigma of conspiracy and its association with the KKK's legacy of politicalized racism."  Ms. Hendrix testified at trial that her overriding goal was stopping the defendant's conduct, with no regard to whether the defendants' conduct was lawful and constitutionally protected. (Epp S.A. 49.)

These tactics may be legally acceptable, albeit ethically dubious, in cases where parties bring meritorious claims and have facts and evidence to argue before the court.  Plaintiffs are certainly within their rights to argue old laws in a new way as part of a factual case. In this case, however, the plaintiffs have no factual support for any of the allegations in their complaint. They've only progressed this far because of intentional misrepresentations, up to and including at trial. When considered in the context of the novel legal theory – which they have repeatedly referenced and cite as an authority in this case – the truth of plaintiffs' intentions becomes clear.  The claims against the defendants were always and continue to be without merit, and they are only before you because of plaintiffs' repeated

misrepresentations. The most egregious example of plaintiffs' misrepresentations is their conduct with regards to Ms. Roberts.

## II

In their pursuit of frivolous "impact law," plaintiffs have vexatiously multiplied these proceedings,[5] as outlined in the procedural history above.  At multiple points in these proceedings, including at trial, plaintiffs were undeniably aware that their allegations were without merit.  The court has access to the entire record[6], so Ms. Epp will focus here on the most egregious misrepresentation: Plaintiffs representation of Yvette Roberts.

The reason that this case proceeded all the way to trial is a direct result of plaintiffs' overt act to mislead the district court in their response to defendants' December 2022 Motion for Summary Judgement (App. 10.), and plaintiffs prevailed on Summary Judgement because the district court "relied almost

---

[5] Attorneys are expected to "regularly re-evaluate the merits of their claims and to avoid prolonging meritless claims." (Steinert v. Winn Group, Inc., 440 F.3d 1214, 1221-22 (10th Cir 2006) at 1224.) and "there must be a causal connection between the objectional conduct of counsel and the multiplication of proceedings, such that the conduct resulted in the proceedings that would not have been conducted otherwise." (Baca v. Berry, 806 F.3d 1262, 1268 (10th Cir. 2015)).

[6] Fed. R. App. P. 30(b)(1), as "The parties must not engage in unnecessary designation of parts of the record, because the entire record is available to the court."

exclusively" on plaintiffs' misrepresentation of Ms. Roberts. (App. 217.)  In

December 2022, discovery was closed.  All the parties plus Mr. Young had been

deposed.  Each plaintiff organizations' representative had admitted that they had no

personal knowledge of a voter being intimidated: Ms. Hendrix testified that she

brought this case based on inflammatory and unsubstantiated media reports and

information from her national organization and current counsel; Mr. Hernandez

testified that he brought this case based on the information he received from Ms.

Hendrix; and Ms. Prescott testified that she couldn't recall specifically why she

brought the case.  Following the close of discovery, Ms. Epp's prior counsel

informed plaintiffs' counsel of the imminent motion for summary judgment based

upon the lack of evidence. It was only then that Ms. Roberts "named" USEIP in a

sworn declaration, signed under pain and penalty of perjury. (Epp S.A. 28.) The

district court relied upon Ms. Roberts' declaration "almost exclusively," denying

defendants' summary judgement motion and allowing the case to proceed for 573

days. (App. 217.)  At trial, Ms. Roberts admitted that her decision to name the

defendants in December 2022 was ***at the suggestion of plaintiffs' counsel***.

> Counsel: When did you first learn the name United States Election
> Integrity Plan?
> Ms. Roberts: In my encounters with the organization that contacted
> me.
> Counsel: Who was that?
> Ms Roberts: My -- the plaintiffs' –
> Counsel: Okay.

Ms. Roberts: -- lead counsel.
Counsel: Is that a counsel that's here today?
Ms. Roberts: Yes.
(Epp S.A. 46.)

With this overt act, the intentional decision to deceive the court about Ms.

Roberts, plaintiffs crossed an uncrossable line for officers of the court.  They are

still on that side of the line in their appeal before you today. This conduct should be

sanctioned.[789] Ms. Roberts has three recorded statements in this case: her original

June 2021 complaint made at the time of her encounter (App. 293.), her December

2022 sworn declaration (Epp S.A. 28.), and her July 2024 testimony at trial (App.

154.).

---

[7] Fed. R. App. P. 38 "If a court of appeals determines that an appeal is frivolous, it may, after a
separately filed motion or notice from the court and reasonable opportunity to respond, award
just damages and single or double costs to the appellee."

[8] Rule 11 sanctions are appropriate, though Ms. Epp is precluded from bringing a motion Rule 11
sanctions; she did not initiate Safe Harbor prior to Final Judgement.  Fed. R. Civ. P. 11(c)(3)
permits the court to initiate sanctions proceedings sua sponte, and "the court may impose
sanctions without providing opportunity to withdraw the misstatement." (*Muhammad v. Walmart
Stores* E., L.P., 732 F.3d 104, 108 (2d Cir. 2013) (per curiam)).

[9] Appellants continued misrepresentations as officers of the court require serious inquiry and
consideration of appropriate sanctions, including under 28 U.S. Code § 1927. This question is
currently pending before the district court. (ECF. No. 192) While usually defeating summary
judgement implies a meritorious case, it does not preclude § 1927 sanctions when evidence
actually "was insufficient to go forward." Danielson-Holland v. Standley & Assoc., LLC., 512
Fed.Appx. 850, 854 (10th Cir. 2013) (unpublished). Certainly this is the case when that "actually
insufficient evidence" was an overt misrepresentation by an Officer of the Court.

To date, Yvette Roberts remains plaintiffs' only witness alleging that defendants caused harm under Section 11(b) of the Voting Rights Act and the Ku Klux Klan Act. Ms. Roberts did not make any allegations of harm in her original complaint to the Colorado Department of State, a witness in this case, and she did not make any assertions that implicate the defendants.  Those allegations came over a year later, after the close of discovery, in the declaration she signed on December 22, 2022, which plaintiff counsel filed with the district court on December 23, 2022.

Further, Ms. Roberts' original complaint was reviewed by five county, state, and federal government entities in July of 2021, according to highly redacted open records from the Secretary of State's Office, produced by plaintiffs during discovery and admitted at trial. (Epp S.A. 66.) Open records from the Mesa County District Attorney's Office, produced by the pro se defendants and admitted at trial, revealed that those redactions covered details of the investigation that exonerated the defendants with regards to Ms. Roberts. The investigators were "unable to prove any crime" and, *critically*, the investigation of Ms. Roberts' complaint – across local, state, and federal entities – *did not mention the defendants or USEIP at all.* (Epp S.A. 66.) It was not until December 22, 2022, when plaintiffs were faced with a dispositive motion, that Ms. Roberts filed a sworn statement, under

pain and penalty of perjury, inexplicably naming USEIP, before admitting at trial that she never heard of USEIP until she met plaintiffs' counsel.

While the handling of Ms. Roberts presents the most egregious example of plaintiffs' misconduct, when combined with their (1) repeated failure to re-evaluate and withdraw their claims prior to proceeding to trial, and (2) repeated misrepresentations to the court that multiplied these proceedings, there is an undeniable pattern of misconduct. This pattern continues today as plaintiffs repeat their salacious and libelous allegations under pain and penalty of perjury before this honorable appellate court.

## III

As the record of this case is devoid of evidence or factual support for plaintiffs' allegations, their appellant arguments must be viewed critically, and in the context of the spirit and the letter of the Rules of Professional Conduct.[10] After all, plaintiffs are three renowned civil rights organizations pursuing civil rights

---

[10] Appellants action before the district court and this honorable court has no basis in fact. "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law.  (RPC 3.1)

claims in federal court.  Against that backdrop, Ms. Epp will now address plaintiffs' specific appellant arguments.

> i.    *The district court's adherence to binding precedent is not a reversible legal error.*

Plaintiffs argue that the District Court committed reversible legal error by adhering to binding precedent in the 10th Circuit Court.  The court was within its discretion in this decision.  For certain, the circuits are divided on the matter of the ability of unincorporated associations to sue and be sued. Even State courts are divided on this matter, and there are recent state court decisions that are consistent with the position of the district court in this case (see <u>Ngo v. ROSE CITY ANTIFA</u>, 513 P. 3d 628 - Or: Court of Appeals 2022, where Rose City Antifa was dismissed as a defendant in the case due to being an unincorporated association.) Importantly, the question before this court is ***not*** whether unincorporated associations can sue or be sued; the question before this court is whether the district court committed reversible error in adhering to 10th Circuit precedent in its decision to dismiss USEIP as a defendant in January 2023. It did not.

The principle of stare decisis[11] requires that lower courts "stand by things decided," and it governs how courts make decisions on legal arguments that have already been ruled on by a previous court. "The doctrine of stare decisis has 'horizontal' and 'vertical' aspects. A court adhering to the principle of horizontal stare decisis will follow its prior decisions absent exceptional circumstances… vertical stare decisis binds lower courts to follow strictly the decisions of higher courts within the same jurisdiction."[12]  The premise of plaintiffs' argument here is that a lower court committed a reversible legal error by adhering to the precedent established by the higher court within the same district.

The flawed premise is not the only problem with the first appellant argument.  Plaintiffs claim that "Dismissing USEIP as a party defendant hamstrung the plaintiffs' presentation of their case at trial, limiting the admission of certain exhibits completely excluding others." (Appellant Brief at 37) This argument is detached from the facts of these proceedings.  First, plaintiffs did not appeal or

---

[11] The full Latin phrase is "stare decisis et non quieta movere—stand by the thing decided and do not disturb the calm." See James C. Rehnquist, The Power That Shall Be Vested in a Precedent: Stare Decisis, The Constitution, and the Supreme Court, 66 B.U. L. REV. 345, 347 (1986).
[12] See "The Supreme Court's Overruling of Constitutional Precedent," September 2018. Congressional Research Service, https://crsreports.congress.gov/

seek clarification of the district court's ruling dismissing USEIP in a timely manner – at the time of the decision, during the pretrial motions, or at trial. Moreover, at multiple points in these proceedings, defendants opened the door for plaintiffs to introduce the evidence they now claim they were hamstrung from bringing – and plaintiffs intentionally fought against the defendants. The record of plaintiffs' intentional actions undermines their first appellant argument.

In January 2024, after Ms. Epp and Ms. Kasun terminated their counsel and pursued their defenses pro se, one of Ms. Epp's first actions was to file her witness list with the court, prior to the district court granting a continuance of trial. (Epp S.A. 32.) This witness list included several volunteers associated with USEIP, including Charity McPike, El Paso County Captain, and Karen Kennedy, Jefferson County Captain, as well as other USEIP volunteer canvassers and associates. Much of the evidence that plaintiffs claim they were "hamstrung" in bringing would have been admissible through these witnesses; however, plaintiffs objected to Ms. Epp and Ms. Kasun's witnesses, and the court ruled in plaintiffs' favor that the witnesses had to be removed. Additionally, Ms. Kasun moved to reopen discovery in January 2024, which plaintiffs strongly opposed, and the court again sided with the plaintiffs. (App. 14.) On the eve of the trial, Ms. Kasun, having obtained new counsel, again attempted to include Ms. Kennedy, and other USEIP fact witnesses at trial. (Epp S.A. 39.) These witnesses would have afforded plaintiffs the

opportunity to introduce any of the evidence they now claim they were now

hamstrung from bringing; yet plaintiffs objected again to these witnesses and the

court, again, sided with the plaintiffs. (App. 17.)

To be specific, plaintiffs claim on appeal that, "the district court refused to

admit evidence from USEIP's internal message board discussing the use of

weapons during canvassing efforts and the targeting of minority communities."

(Appellant Brief at 38) First, the district court allowed the defendants to be

questioned about many of the internal message board postings. Plaintiffs include

many of these exchanges in their appendix. (App. 130. 132.) Second, there is only

one message in the record that mentions "weapons" and it has nothing to do with

canvassing. Irrelevant evidence is not admissible[13], and the court rightly excluded

this exhibit, but plaintiffs could have attempted to admit the evidence through Ms.

Kennedy at trial. The irrelevant message was posted by Ms. Kennedy, and she was

sharing an advertisement for her friend's local gun shop. Ms. Kennedy is an

associate of the NAACP as well as a County Captain for USEIP. The court sided

with plaintiffs in denying the defense the ability to call Ms. Kennedy. Had

---

[13] Fed. R. Civ. P. 402. "Irrelevant evidence is not admissible."

Plaintiffs wanted to explore these exhibits at trial, they should not have objected to defendants' repeated attempts to call these witnesses.

Plaintiffs continue in their brief, "The court refused to allow photographs taken and affidavits prepared by USEIP canvassers." (Appellant Brief at 38) Ms. McPike organized and led the canvassing in El Paso County, including the curing of records and submitting affidavits to the local clerk and district attorney. The evidence that plaintiffs are referencing here, photos and affidavits, could have come into the record through Ms. McPike. Again, plaintiffs repeatedly objected to calling Ms. McPike at trial. They go on, "And the plaintiffs could not use USEIP's discovery responses and organizational deposition as substantive evidence." (Appellant Brief at 38) This is another overt misrepresentation. The court denied Ms. Kasun's motion *in limine* to exclude the USEIP 30(b)(6) deposition, which was given by Ms. Kasun. "The Court also denies Defendant Kasun's request to exclude under Rule 403 her testimonial evidence she provided as USEIP's Rule 30(b)(6) deponent." (Epp S.A. 35.)  They were, in fact, permitted to "use USEIP's discovery responses and organizational deposition as substantive evidence." The truth of the matter is that plaintiffs failed to prosecute those claims to begin with, even before USEIP was dismissed from the case.

At no point during discovery and depositions, during pretrial motions, or during trial, did plaintiffs attempt to develop the record and determine the truth of

the matter with regards to USEIP broadly; in fact, plaintiffs repeatedly objected to defendants' attempts to clear the name of USEIP. Plaintiffs allege that USEIP's dismissal prevented their ability to introduce hearsay evidence, but USEIP was dismissed *after* the close of discovery. Plaintiffs could have deposed the "speakers" of the communications and other evidence they wanted admissible, but they never sought to depose anyone other than the three named defendants and Mr. Young. It is important to note that, even if USEIP remained a defendant in the case, the nonparty out-of-court statements – for example, of Ms. McPike and Ms. Kennedy – that plaintiffs now claim constitute reversible error, would have remained hearsay. (Fed. R. Evid. 801) Plaintiffs never attempted to make this evidence admissible by deposing the speakers, and they actively and repeatedly opposed defendants' efforts to question these witnesses at trial. It was plaintiffs' specific, intentional actions that led to the outcome they now claim is error. When considering the totality of this action, plaintiffs' arguments are a clear attempt to shift responsibility for their own procedural shortcomings, failures to prosecute, and lack of evidence onto the district court.

It is not a reversible error for a lower court to adhere to binding precedent within their circuit. It is also improper for plaintiffs to claim prejudice when they explicitly, at multiple points in these proceedings, advocated for the outcome that they now claim was prejudicial. For these reasons, the court must reject plaintiffs'

appellant argument that the lower court committed reversible error in dismissing USEIP as a defendant in this case.

ii.   *The district court properly excluded the video of Shawn Smith.*

Appellants claim that Mr. Smith's remarks came into the record "only through the defendant's own sanitized testimony and his attorney's inaccurate characterization of it." This is a patently false statement and misrepresents the record. During trial, plaintiffs called the three named defendants as adverse witnesses during their case in chief. Every aspect of Mr. Smith's statement, including its substance and context as well as Mr. Smith's intent, was explored during plaintiffs' direct examination of Mr. Smith at trial. Counsel for the plaintiffs asked many questions about the statement, which the court allowed over repeated defense objections. Mr. Smith was cross-examined by defense counsel, and then he was further questioned on redirect by plaintiff counsel. (Epp S.A. 41.)

The district court allowed plaintiffs to extensively explore Mr. Smith's unrelated, out of court statement, even though the statement was made in February 2022 and wholly irrelevant to the matter of USEIP canvassing and hypothetical "intimidation" during the summer of 2021. Mr. Smith was not speaking at the event in question as a representative or leader of USEIP. He was not speaking

about canvassing.  The event and his statement were made months after USEIP canvassing had concluded.  Plaintiffs don't even represent that anyone involved in this case heard the statement. After more than 15 questions, where plaintiffs probed Mr. Smith with this irrelevant, inadmissible, and highly prejudicial line of questioning, the court sustained an objection on relevance. (Epp S.A. 45.)

In their brief, plaintiffs claim that "The video was not hearsay because it was the statement of a party opponent and obviously not offered for the truth of the matter asserted." (Appellant Brief at 45) This legal conclusion does not seem obvious to Ms. Epp.  If the video was not offered for the truth of the matter asserted, then what was plaintiffs' relevant intention for it? What would make it admissible and why, after Mr. Smith's statement, context, and intent had been fully examined, cross-examined, and redirected before the court, would a video of Mr. Smith's statement change the court's decision on its relevance?  If it is not offered for the truth of the matter asserted, how can its exclusion constitute reversible error?  Appellants make no effort to answer these questions.  The statement was and continues to be irrelevant, irrelevant evidence is inadmissible, and excluding it is not reversible error. (Fed. R. Evid. 402) The video of the statement, then, is also inadmissible; more importantly, its probative value is far outweighed by its potential for undue prejudice. (Fed. R. Evid. 403)

Regardless of relevance, the substance of Mr. Smith's statement was fully explored at trial and plaintiffs are attempting to mislead this honorable court by suggesting that the video's exclusion had any impact on the fact finder's determination about the relevance of the statement and the merits of their case. The district court properly excluded this irrelevant and prejudicial video at trial, a decision that must be affirmed.

iii.    *The district court properly found "no conduct that could be objectively considered intimidating."*

Plaintiffs claim that "the district court's finding that the canvassers who questioned a key witness 'engaged in no conduct that could be objectively considered intimidating' is clearly erroneous and based on the wrong legal standard." This is another misrepresentation. As the district court noted in final judgement, "The Court denied defendants' motion for summary judgment based almost exclusively on the affidavit provided by Ms. Roberts by plaintiffs in this action." (App. 217.) Plaintiffs failed to establish a causal connection between (1) the canvassers that questioned Ms. Roberts in June 2021, and (2) the defendants, either individually or to the USEIP association. At trial, Ms. Roberts testified that she only named USEIP upon the suggestion of plaintiff counsel. (Epp S.A. 46.) The district court's denial of summary judgement, based upon this misrepresentation, unnecessarily multiplied these proceedings from January 2023

through trial, which concluded on July 18, 2024. Plaintiffs never established who was at Ms. Roberts' door. Notably, the defendants ***also do not know*** who was at Ms. Roberts' door, as canvassing in Mesa County was not a USEIP canvassing effort; indeed, this finding is supported by an extensive state, local, and federal government investigation, for which evidence was admitted at trial. (Epp S.A. 66.). Defendants have no records of Mesa County canvassers, what homes they visited, what script or training materials they used, or the results of the canvassing efforts in that county.

Still, despite plaintiffs' failure to connect the defendants to Ms. Roberts, or even to canvassing in Mesa County, the district court allowed plaintiffs to examine both Ms. Roberts and the named defendants about the encounter, and the court rightly found that no suppression, intimidation, coercion, or threats occurred. As described in final judgement, the court considered all the events surrounding Ms. Roberts encounter:

> "She established that two people knocked on her door during the middle of the day, one being a tall man. As an older woman living alone, she was fearful and, indeed, a bit intimidated right off the bat because of the tall man who was at her door. However, the two people simply introduced themselves and the group they represented. They were wearing some sort of badge, and badge I shouldn't even say. Some sort of name tag that she described as an informal marking perhaps from something you might get at Staples of a name label perhaps on a lanyard that said something like Colorado election intimidation, interrogation -- she wasn't sure, but she knew the

first two words were Colorado election.  The two individuals, regardless, engaged in no conduct that could be objectively considered intimidating… the questions asked of her were not intimidating and not improper. When she asked them to leave, they left with no trouble whatsoever." (App. 217.)

Setting aside Plaintiffs' misrepresentation of Ms. Roberts' encounter – both before the district court and in this appellate court – the district court was correct in its finding that no suppression, intimidation, coercion, or threats occurred with regards to Ms. Roberts.  Even if Ms. Roberts was a credible witness – and she was not – a tall man knocking on the door of an elderly woman living alone, politely asking her questions about publicly available data, and leaving immediately upon being asked does not rise to the level of voter suppression, intimidation, coercion and threats under the Voting Rights Act or KKK Act.  Further, plaintiffs failed to establish any connection between the defendants and Ms. Roberts, let alone any causal connection. The district court's findings regarding Ms. Roberts must be affirmed.

iv.     *The district court properly considered all relevant context*
        *during trial.*

Having failed to establish any intimidating conduct by USEIP canvassers, or

even non-USEIP canvassers – in the case of Ms. Roberts, or otherwise – plaintiffs

attempt to expand the circumstances of their action to include the trope of election

denialism, or "wrong think," and the entirely irrelevant events at the US Capitol on

January 6, 2021. They claim the court "refused to consider 'all of the surrounding

facts' that provide the context for the questioning…Indeed, the district court

considered none of the surrounding facts that might lead a reasonable person

familiar with the context—like Roberts—to view the canvassers as threatening."

(Appellate Brief at 49, *citation omitted*)

While Ms. Epp agrees with the district court's findings that these factors are

irrelevant to the questions presented in this case, plaintiffs' assertion that the court

did not consider these factors at trial is patently false and disputed by the record.

First, consider the irrelevant events of January 6, 2021. In their motions *in limine*,

the defendants sought to exclude evidence and questioning related to January 6 on

the grounds of relevance, and the court denied those requests, saying, "As to

relevance, the Court finds that this evidence clearly meets the "low bar" for

relevant evidence." (Epp S.A. 35.) At trial, the court allowed the plaintiffs to

examine Ms. Epp and the other defendants about their actions on January 6, 2021,

overruling repeated objections from defense counsel. This questioning was wholly irrelevant to canvassing that occurred months later in the summer of 2021 in various Colorado counties. Neither the named defendants nor any individual associated with USEIP, nor the USEIP association generally, were charged or, to Ms. Epp's knowledge, even subjects of an investigation in conjunction with the events of January 6. The court indulged plaintiffs on this line of questioning before rightly determining that the plaintiffs failed to establish the relevance of January 6 to the question of USEIP canvassing months later.

In their appellant brief, plaintiffs state that, "When an organized group of election denialists knocks on your door just weeks after the violent insurrection at the United States Capitol, a reasonable person like Roberts could be afraid." (Appellant Brief at 46) This is an inflammatory and entirely hypothetical statement that is not supported by the facts, the evidence, or the law in this case. Residents that were visited by USEIP canvassers had no reason to believe the people at their door were "election denialists" or that they had any connection to the events of January 6. In fact, plaintiffs produced no evidence or witness testimony to support this assertion for *any* resident contacted by *any* canvasser, including but not limited to any canvasser from USEIP. Plaintiffs certainly attempted to identify witnesses that were investigated by USEIP. At trial, Plaintiff Beth Hendrix testified to her unsuccessful efforts to identify material witnesses – efforts that predate the filing

of this case by months. (Epp S.A. 47.)  If anything, the district court allowed the plaintiffs to go too far in their irrelevant examination of the defendants about January 6.  Plaintiffs were not prevented in any way from questioning the defendants about January 6, but they failed to make the events of January 6 relevant to the matter before the court – because they are not relevant.

Plaintiffs also allege that the court refused to consider the "context" of the defendants "election denialism."  The assertion that "election denialism" is a form of voter suppression, intimidation, coercion, and threats is not supported by law; but plaintiffs' attempt to reverse final judgement based on the court refusing to declare "election denialism" as voter intimidation is particularly egregious. Not only it is this position historically inaccurate and unconstitutional – it is akin to being prosecuted for "wrong think" – but it amounts to a direct assault on the First Amendment by three civil rights organizations. And it gets worse: Plaintiffs and their counsel engaged in specific and concrete actions of "election denialism" in 2016 when former Secretary of State Hillary Clinton was unexpectedly defeated on election night by President Donald Trump.  In response to the 2016 election, League of Women Voters published, "The 2016 Presidential Election was Rigged"

41

on November 23, 2016.[14] Additionally, on President Trump's Inauguration Day —

January 20, 2017 — plaintiff counsel Free Speech For People launched a campaign

to impeach the President, announcing the effort in a Washington Post article

entitled, "The Campaign to Impeach President Trump Has Begun."[15]  To Ms. Epp's

knowledge, no one was prosecuted for questioning the outcome of the 2016

election. Speech that is critical of the government is our most protected form of

expression in America.[16] (see <u>Brandenburg v. Ohio, 395 U.S. 444 (1969)</u> (speech is

protected unless it incites imminent lawless action); see also, <u>Citizens United v.

FEC</u>, 558 U.S. 310 (2010) (affirming robust protections for political expression).

　　　Defendants questioning the outcome of a US Presidential election is not

unprecedented, even for plaintiffs and their counsel in the wake of the 2016

election.  Questioning the outcome of elections has happened throughout our

---

[14] This article is still up on their website. https://www.lwv.org/newsroom/press-releases/2016-presidential-election-was-rigged

[15] Gold, Matea. Washington Post. "The campaign to impeach President Trump has begun." January 20, 2017. "The organizers behind the campaign, Free Speech for People, and RootsAction…" https://web.archive.org/web/20170122053553/https://www.washingtonpost.com/news/post-politics/wp/2017/01/20/the-campaign-to-impeach-president-trump-has-begun/

[16] Goldberg, Kevin. "17 Freedom of Speech Court Cases You Should Know." "Freedom of speech court cases, like these and many others in courts across the country, ensure that people can continually push back on government attempts to infringe on First Amendment rights." Freedom Forum. Copyright, 2024.

nation's history and, importantly, it has been a contributing factor in positive changes to the electoral franchise, as outlined in Ms. Epp's Trial Brief. (App. 16. at 160) The district court rightly denied plaintiffs attempts to conflate the defendants' First Amendment-protected activities and speech with voter suppression, intimidation, coercion, and threats, entering final judgement in favor of the defense at trial.

The court must affirm the district court's consideration and rejection of plaintiffs' attempt to conflate speech and assembly with voter suppression, intimidation, coercion, and threats, and the court must reject plaintiffs' attempts to rewrite the history of this case and invent reversible error from their own actions in these proceedings.

## **Conclusion**

Overextending statutes like the 42 U.S.C. § 1985 and 52 U.S.C. § 10307(b) to apply to political speech and lawful canvassing or other forms of assembly can and will create a chilling effect on political advocacy. There is grave danger should courts begin allowing political ideology and unrelated and irrelevant political events to color the legal interpretation of lawful activities.

Appellants conclude their brief with, "Voter intimidation has no place in our democracy.  Partisans unhappy with the outcome of an election have every right to peaceably contest the results.  To protest.  To petition their government for redress of their grievances." (Appellant Brief at 55) Ms. Epp agrees with this statement, wholeheartedly.  Ms. Epp is not a partisan, she is a proudly unaffiliated and highly engaged voter; still, Ms. Epp believes that every American has full access to the First Amendment, and that speech and assembly that is critical of the government is most profoundly protected by our Bill of Rights.  Ms. Epp agrees that she retains her right to seek redress of grievances with her government, including gathering information, speaking to her fellow citizens in public spaces and events or at their homes through canvassing, and petitioning for clean voter rolls and other election integrity outcomes.

Appellants then go on to state, "But they don't have the right to strike fear into the hearts of their fellow citizens, as these defendants did, with door-to-door vigilantism backed by threats of violence." (Appellant Brief at 55) Plaintiffs failed to produce a single account of any voter that was intimidated or threatened with violence by anyone engaging in lawful canvassing. Plaintiffs didn't produce a single voter that interacted with the named defendants, or any person associated with USEIP, broadly. Yet, plaintiffs assert confidently before the court, "as these defendants did." This statement is another misrepresentation. The record is devoid of any evidence, witness testimony, or other factual support that any of the named defendants or any person associated with USEIP "struck fear" into the hearts of any fellow citizen. The conduct alleged by plaintiffs has been a fabrication since before they filed this case. The record shows that plaintiffs engaged in multiple public outreach efforts, a robust discovery process, and two and a half years of proceedings. The lack of *any* supporting evidence or witness testimony at trial supports the truth that plaintiffs' claims were always and continue to be without basis in fact or law. The district court gave plaintiffs every opportunity to prove their case at trial, but their case has been without merit since its inception, in September 2021, when they hatched a plot to fabricate claims and reimagine the law at the defendants' expense. That is what the record proves – pre-trial, at trial,

and even now in these proceedings. The district court's judgment was above reproach in this case.

Finally, plaintiffs' frivolous pursuit of this novel legal theory amounts to an end run around the First Amendment, and ruling in favor of plaintiffs will have the unacceptable effect of deterring lawful political participation. Should plaintiffs prevail, the court will effectively be declaring lawful speech and assembly, including canvassing, as inherently intimidating, encouraging the suppression of political support and advocacy – under the guise of preventing the same. The First Amendment and the robust history of American civil rights cannot tolerate such a violation.

This court must (1) affirm the district court's judgment on all grounds, (2) explicitly determine that this appeal is frivolous, (3) review the record of this case under Fed. R. App. P. 38, and (4) levy appropriate sanctions and take any other actions that the court determines appropriate for deterrence, given the unprecedented nature of these proceedings.

Executed on this 23rd Day of December, 2024 in Castle Rock, CO.

s/*Ashley Epp*

Ashley Epp
Pro Se Appellee
+1 (303) 591-8714
asheinamerica@protonmail.com

## **Oral Argument Statement**

Oral argument is not required, and Ms. Epp believes this court can decide this appeal on the briefs.

## <u>Certificate of Compliance</u>

This brief complies with the type-volume limitation of Rule 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure. This brief is 9,469 words in total, and 9,011 words when excluding the sections outlined in Rule 32(f).

This brief also complies with the typeface and typestyle requirements of Rule 32(a)(5) and (6) because it has been prepared using Microsoft Word in the 14-point in Times New Roman style.

Executed on this 23rd Day of December, 2024 in Castle Rock, CO.

/s/Ashley Epp

Ashley Epp
Pro Se Appellee
+1 (303) 591-8714
asheinamerica@protonmail.com