# CASE NO. 24-1328

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | |
|---|---|
| COLORADO MONTANA WYOMING STATE AREA CONFERENCE OF THE NAACP, et al., | ) ) ) ) |
| Plaintiffs–Appellants | ) ) |
| v. | ) ) |
| SHAWN SMITH, et al., | ) ) |
| Defendants–Appellees | ) |

---

On Appeal from the United States District Court
For the District of Colorado
The Honorable Judge Charlotte N. Sweeney
D.C. No. 1:22-cv-00581-CNS-NRN

---

## SUPPLEMENTAL APPENDIX OF APPELLEES KASUN AND SMITH

(Volume 1, pages 1-300)

---

Cameron Powell
Michael J. Wynne
GREGOR WYNNE ARNEY, PLLC
4265 San Felipe, Suite 700
Houston, Texas 77027
(832) 390-2644

*Attorneys for Appellees Shawn Smith and Holly Kasun*

---

# Index

| ECF | Document | Page |
|---|---|---|
| | District Court Docket Sheet……………………………….……… | 3 |
| 6 | Memorandum in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction...………...………..... | 35 |
| 30 | Order [Denying Appellants' Motion for a TRO]…………………….….. | 63 |
| 70-1 | Transcript – Portia Prescott (deposition excerpts)……..…………….... | 77 |
| 70-2 | Transcript – Beth Hendrix (deposition excerpts)....………………….... | 95 |
| 70-3 | Transcript – Salvador Hernandez (deposition excerpts)……..….…… | 113 |
| 187 | Shawn Smith – Day 1 Trial Transcript (excerpts) (07/15/2024).......| 127 |
| 187 | Ashe Epp – Day 1 Trial Transcript (excerpts) (07/15/2024)..….…… | 203 |
| 188 | Ashe Epp – Day 2 Trial Transcript (excerpts) (07/16/2024)……..... | 227 |
| 188 | Yvette Roberts – Day 2 Trial Transcript (excerpts) (07/16/2024). . | 235 |
| 188 | Beth Hendrix – Day 2 Trial Transcript (excerpts) (07/16/2024)..... | 253 |
| 189 | Beth Hendrix – Day 3 Trial Transcript (excerpts) (07/17/2024)..... | 266 |
| 189 | Holly Kasun – Day 3 Trial Transcript (excerpts) (07/17/2024)...... | 299 |

APPEAL,JD1,NDISPO,TERMED

## U.S. District Court - District of Colorado
### District of Colorado (Denver)
### CIVIL DOCKET FOR CASE #: 1:22-cv-00581-CNS-NRN

| | |
|---|---|
| Colorado Montana Wyoming State Area Conference of the NAACP et al v. United States Election Integrity Plan et al | Date Filed: 03/09/2022 |
| | Date Terminated: 07/18/2024 |
| Assigned to: Judge Charlotte N. Sweeney | Jury Demand: None |
| Referred to: Magistrate Judge N. Reid Neureiter | Nature of Suit: 441 Civil Rights: Voting |
| Case in other court: U.S Court of Appeals, 10th Cir., 24-01328 | Jurisdiction: Federal Question |
| Cause: 42:1985 Conspiracy to Interfere with Civil Rights | |

**Interested Party**

**United States of America**                    represented by    **Zeyen Julian Wu**
                                                                  U.S. Attorney's Office
                                                                  District of Colorado
                                                                  1801 California Street
                                                                  Suite 1600
                                                                  Denver, CO 80202
                                                                  303-454-0238
                                                                  Email: zeyen.wu@usdoj.gov
                                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Colorado Montana Wyoming State Area**        represented by    **Amira Marcella Mattar**
**Conference of the NAACP**                                      Free Speech For People
                                                                  48 North Pleasant Street
                                                                  Suite 304
                                                                  Amherst, MA 01002
                                                                  617-564-0464
                                                                  Email: amira@freespeechforpeople.org
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Ben Clements**
                                                                  Free Speech For People
                                                                  48 North Pleasant Street
                                                                  Suite 304
                                                                  Amherst, MA 01002
                                                                  617-943-1803
                                                                  Email: bclements@freespeechforpeople.org
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Brian Andrew Dillon**
                                                                  Lathrop GPM LLP
                                                                  80 South 8th Street
                                                                  IDS Center
                                                                  Suite 500
                                                                  Minneapolis, MN 55402
                                                                  612-632-3000
                                                                  Email: brian.dillon@lathropgpm.com
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Casey Carlton Breese**

Lathrop GPM LLP
675 15th Street
Suite 2650
Denver, CO 80202
720-931-3200
Email: casey.breese@lathropgpm.com
*ATTORNEY TO BE NOTICED*

**Courtney Marie Hostetler**
Free Speech For People
28 South Main Street
Suite 200
Sharon, MA 02067
617-249-3015
Email: chostetler@freespeechforpeople.org
*ATTORNEY TO BE NOTICED*

**Dion Richard Farganis**
Taft Stettinius & Hollister LLP
80 South 8th Street
IDS Center
Suite 2200
Minneapolis, MN 55402
612-977-8636
Fax: 612-977-8650
Email: dfarganis@taftlaw.com
*ATTORNEY TO BE NOTICED*

**Jean Paul Bradshaw , II**
Lathrop GPM LLP
2345 Grand Boulevard
Suite 2200
Kansas City, MO 64108
816-460-5507
Fax: 816-292-2001
Email: jeanpaul.bradshaw@lathropgpm.com
*ATTORNEY TO BE NOTICED*

**John C. Bonifaz**
Free Speech For People
1320 Centre Street
Suite 405
Newton, MA 02459
617-244-0234
Email: jbonifaz@freespeechforpeople.org
*ATTORNEY TO BE NOTICED*

**Kristin M. Stock**
Lathrop GPM LLP
80 South Eigth Street
Suite 3100
Minneapolis, MN 55402
612-632-3492
Email: kristin.stock@lathropgpm.com
*TERMINATED: 12/12/2024*

**Reid Kelly Day**

City of Kansas City, Missouri
414 East 12th Street
Kansas City, MO 64106
816-513-1313
Email: reid.day@gmail.com
*TERMINATED: 01/23/2023*

**Ronald Andrew Fein**
American Oversight
1030 15th Street NW
Suite B255
Washington, DC 20005
202-869-5246
Email: ron.fein@americanoversight.org
*TERMINATED: 04/11/2024*

**Amy Elizabeth Erickson**
Lathrop GPM LLP
80 South Eighth Street
IDS Center
Suite 500
Minneapolis, MN 55402
612-632-3470
Fax: 612-632-4470
Email: amy.erickson@lathropgpm.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**League of Women Voters of Colorado**          represented by    **Amira Marcella Mattar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ben Clements**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brian Andrew Dillon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Casey Carlton Breese**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Courtney Marie Hostetler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Paul Bradshaw , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John C. Bonifaz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kristin M. Stock**

(See above for address)
*TERMINATED: 12/12/2024*

**Reid Kelly Day**
(See above for address)
*TERMINATED: 01/23/2023*

**Ronald Andrew Fein**
(See above for address)
*TERMINATED: 04/11/2024*

**Amy Elizabeth Erickson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Mi Familia Vota                                 represented by    **Amira Marcella Mattar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ben Clements**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brian Andrew Dillon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Casey Carlton Breese**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Courtney Marie Hostetler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Paul Bradshaw , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John C. Bonifaz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kristin M. Stock**
(See above for address)
*TERMINATED: 12/12/2024*

**Reid Kelly Day**
(See above for address)
*TERMINATED: 01/23/2023*

**Ronald Andrew Fein**
(See above for address)
*TERMINATED: 04/11/2024*

**Amy Elizabeth Erickson**

(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**United States Election Integrity Plan**
*TERMINATED: 01/31/2023*

represented by **Jessica Lynn Hays**
Reisch Law Firm, LLC
1490 West 121st Avenue
Suite 202
Denver, CO 80234
303-291-0555
Fax: 720-904-5797
Email: jessica@reischlawfirm.com
*ATTORNEY TO BE NOTICED*

**R. Scott Reisch**
Reisch Law Firm, LLC
1490 West 121st Avenue
Suite 202
Denver, CO 80234
303-291-0555
Fax: 720-904-5797
Email: scott@reischlawfirm.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Shawn Smith**

represented by **Jessica Lynn Hays**
(See above for address)
*ATTORNEY TO BE NOTICED*

**R. Scott Reisch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ashley Epp**
*[E-filer effective 1/3/2024]*

represented by **Ashley Epp**
1132 Koa Ct
Castle Rock, CO 80104
303-591-8714
Email: asheinamerica@protonmail.com
PRO SE

**Jessica Lynn Hays**
(See above for address)
*TERMINATED: 01/02/2024*
*ATTORNEY TO BE NOTICED*

**R. Scott Reisch**
(See above for address)
*TERMINATED: 01/02/2024*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Holly Kasun**
*[E-filer effective 1/3/2024]*

represented by **Michael J. Wynne**
Gregor Wynne Arney PLLC

4265 San Felipe Street
Suite 700
Houston, TX 77027
281-450-7403
Email: mwynne@gwafirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cameron C. Powell**
Gregor Wynne Arney PLLC
4265 San Felipe Street
Suite 700
Houston, TX 77027
503-502-5030
Email: cpowell@gwafirm.com
*ATTORNEY TO BE NOTICED*

**Jessica Lynn Hays**
(See above for address)
*TERMINATED: 01/02/2024*
*ATTORNEY TO BE NOTICED*

**R. Scott Reisch**
(See above for address)
*TERMINATED: 01/02/2024*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Ashley Epp**                                    represented by    **Ashley Epp**
(See above for address)
PRO SE

**Jessica Lynn Hays**
(See above for address)
*TERMINATED: 01/02/2024*
*ATTORNEY TO BE NOTICED*

**R. Scott Reisch**
(See above for address)
*TERMINATED: 01/02/2024*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**United States Election Integrity Plan**          represented by    **Jessica Lynn Hays**
*TERMINATED: 01/31/2023*                                            (See above for address)
*ATTORNEY TO BE NOTICED*

**R. Scott Reisch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Holly Kasun**                                   represented by    **Michael J. Wynne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jessica Lynn Hays**
(See above for address)
*TERMINATED: 01/02/2024*
*ATTORNEY TO BE NOTICED*

**R. Scott Reisch**
(See above for address)
*TERMINATED: 01/02/2024*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Shawn Smith**                                     represented by   **Jessica Lynn Hays**
(See above for address)
*ATTORNEY TO BE NOTICED*

**R. Scott Reisch**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Colorado Montana Wyoming State Area**          represented by   **Ben Clements**
**Conference of the NAACP**                                      (See above for address)
*ATTORNEY TO BE NOTICED*

**Brian Andrew Dillon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Casey Carlton Breese**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Courtney Marie Hostetler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dion Richard Farganis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Paul Bradshaw , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John C. Bonifaz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Reid Kelly Day**
(See above for address)
*TERMINATED: 01/23/2023*

**Ronald Andrew Fein**

(See above for address)
*TERMINATED: 04/11/2024*

**Amy Elizabeth Erickson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**League of Women Voters of Colorado**          represented by   **Ben Clements**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brian Andrew Dillon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Casey Carlton Breese**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Courtney Marie Hostetler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Paul Bradshaw , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John C. Bonifaz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Reid Kelly Day**
(See above for address)
*TERMINATED: 01/23/2023*

**Ronald Andrew Fein**
(See above for address)
*TERMINATED: 04/11/2024*

**Amy Elizabeth Erickson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Mi Familia Vota**          represented by   **Ben Clements**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brian Andrew Dillon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Casey Carlton Breese**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Courtney Marie Hostetler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Paul Bradshaw , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John C. Bonifaz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Reid Kelly Day**
(See above for address)
*TERMINATED: 01/23/2023*

**Ronald Andrew Fein**
(See above for address)
*TERMINATED: 04/11/2024*

**Amy Elizabeth Erickson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Ashley Epp**                                    represented by   **Jessica Lynn Hays**
*[E-filer effective 1/3/2024]*                                     (See above for address)
                                                                   *TERMINATED: 01/02/2024*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **R. Scott Reisch**
                                                                   (See above for address)
                                                                   *TERMINATED: 01/02/2024*
                                                                   *ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Holly Kasun**                                   represented by   **Michael J. Wynne**
*[E-filer effective 1/3/2024]*                                     (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Jessica Lynn Hays**
                                                                   (See above for address)
                                                                   *TERMINATED: 01/02/2024*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **R. Scott Reisch**
                                                                   (See above for address)
                                                                   *TERMINATED: 01/02/2024*
                                                                   *ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Colorado Montana Wyoming State Area**
**Conference of the NAACP**

represented by **Amira Marcella Mattar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ben Clements**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brian Andrew Dillon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Casey Carlton Breese**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Courtney Marie Hostetler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dion Richard Farganis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Paul Bradshaw , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John C. Bonifaz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kristin M. Stock**
(See above for address)
*TERMINATED: 12/12/2024*

**Reid Kelly Day**
(See above for address)
*TERMINATED: 01/23/2023*

**Ronald Andrew Fein**
(See above for address)
*TERMINATED: 04/11/2024*

**Amy Elizabeth Erickson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**League of Women Voters of Colorado**

represented by **Amira Marcella Mattar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ben Clements**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brian Andrew Dillon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Casey Carlton Breese**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Courtney Marie Hostetler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Paul Bradshaw , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John C. Bonifaz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kristin M. Stock**
(See above for address)
*TERMINATED: 12/12/2024*

**Reid Kelly Day**
(See above for address)
*TERMINATED: 01/23/2023*

**Ronald Andrew Fein**
(See above for address)
*TERMINATED: 04/11/2024*

**Amy Elizabeth Erickson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Mi Familia Vota**                                represented by   **Amira Marcella Mattar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ben Clements**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brian Andrew Dillon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Casey Carlton Breese**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Courtney Marie Hostetler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Paul Bradshaw , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John C. Bonifaz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kristin M. Stock**
(See above for address)
*TERMINATED: 12/12/2024*

**Reid Kelly Day**
(See above for address)
*TERMINATED: 01/23/2023*

**Ronald Andrew Fein**
(See above for address)
*TERMINATED: 04/11/2024*

**Amy Elizabeth Erickson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Holly Kasun**                                          represented by   **Michael J. Wynne**
*[E-filer effective 1/3/2024]*                                            (See above for address)
                                                                          *LEAD ATTORNEY*
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **Jessica Lynn Hays**
                                                                          (See above for address)
                                                                          *TERMINATED: 01/02/2024*
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **R. Scott Reisch**
                                                                          (See above for address)
                                                                          *TERMINATED: 01/02/2024*
                                                                          *ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Ashley Epp**                                          represented by   **Jessica Lynn Hays**
*[E-filer effective 1/3/2024]*                                            (See above for address)
                                                                          *TERMINATED: 01/02/2024*
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **R. Scott Reisch**
                                                                          (See above for address)
                                                                          *TERMINATED: 01/02/2024*
                                                                          *ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Colorado Montana Wyoming State Area**                 represented by   **Amira Marcella Mattar**
**Conference of the NAACP**                                              (See above for address)

*ATTORNEY TO BE NOTICED*

**Ben Clements**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brian Andrew Dillon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Casey Carlton Breese**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Courtney Marie Hostetler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dion Richard Farganis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Paul Bradshaw , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John C. Bonifaz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kristin M. Stock**
(See above for address)
*TERMINATED: 12/12/2024*

**Reid Kelly Day**
(See above for address)
*TERMINATED: 01/23/2023*

**Ronald Andrew Fein**
(See above for address)
*TERMINATED: 04/11/2024*

**Amy Elizabeth Erickson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**League of Women Voters of Colorado**          represented by   **Amira Marcella Mattar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ben Clements**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brian Andrew Dillon**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Casey Carlton Breese**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Courtney Marie Hostetler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Paul Bradshaw , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John C. Bonifaz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kristin M. Stock**
(See above for address)
*TERMINATED: 12/12/2024*

**Reid Kelly Day**
(See above for address)
*TERMINATED: 01/23/2023*

**Ronald Andrew Fein**
(See above for address)
*TERMINATED: 04/11/2024*

**Amy Elizabeth Erickson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Mi Familia Vota**                    represented by   **Amira Marcella Mattar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ben Clements**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brian Andrew Dillon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Casey Carlton Breese**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Courtney Marie Hostetler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Paul Bradshaw , II**
(See above for address)

*ATTORNEY TO BE NOTICED*

**John C. Bonifaz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kristin M. Stock**
(See above for address)
*TERMINATED: 12/12/2024*

**Reid Kelly Day**
(See above for address)
*TERMINATED: 01/23/2023*

**Ronald Andrew Fein**
(See above for address)
*TERMINATED: 04/11/2024*

**Amy Elizabeth Erickson**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/09/2022 | 1 | COMPLAINT against All Defendants (Filing fee $ 402,Receipt Number ACODC-8355042)Attorney Amy Elizabeth Erickson added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla), Attorney Amy Elizabeth Erickson added to party League of Women Voters of Colorado(pty:pla), Attorney Amy Elizabeth Erickson added to party Mi Familia Vota(pty:pla), filed by Colorado Montana Wyoming State Area Conference of the NAACP, Mi Familia Vota, League of Women Voters of Colorado. (Attachments: # 1 Civil Cover Sheet, # 2 Summons Ashley Epp, # 3 Summons Holly Kasun, # 4 Summons Shawn Smith)(Erickson, Amy) (Entered: 03/09/2022) |
| 03/09/2022 | 2 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES:Amy Elizabeth Erickson. **DO NOT REFILE THE DOCUMENT. Action to take -** counsel must submit a change of contact request through the Manage my Account tab at the PACER website at https://www.pacer.gov/, pursuant to D.C.COLO.LAttyR 5(c) and 3.5 of the Electronic Case Filing Procedures (Civil cases).(Text Only Entry) (norlin, ) (Entered: 03/09/2022) |
| 03/09/2022 | 3 | Case assigned to Magistrate Judge Nina Y. Wang. Text Only Entry (norlin, ) (Entered: 03/09/2022) |
| 03/09/2022 | 4 | SUMMONS issued by Clerk. (Attachments: # 1 Summons, # 2 Summons, # 3 Magistrate Judge Consent Form) (norlin, ) (Entered: 03/09/2022) |
| 03/09/2022 | 5 | MOTION for Temporary Restraining Order , MOTION for Preliminary Injunction *against all defendants* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 03/09/2022) |
| 03/09/2022 | 6 | BRIEF in Support of 5 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *against all defendants* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 03/09/2022) |
| 03/09/2022 | 7 | DECLARATION of *Casey Breese* regarding MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *against all defendants* 5 by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Attachments: # 1 Exhibit A)(Erickson, Amy) (Entered: 03/09/2022) |

| 03/09/2022 | 8 | DECLARATION of *Beth Hendrix* regarding MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *against all defendants* 5 by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 03/09/2022) |
|---|---|---|
| 03/09/2022 | 9 | DECLARATION of *Portia Prescott* regarding MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *against all defendants* 5 by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 03/09/2022) |
| 03/09/2022 | 10 | DECLARATION of *Salvador Hernandez* regarding MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *against all defendants* 5 by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 03/09/2022) |
| 03/09/2022 | 11 | Proposed Order to 5 Motion for Temporary Restraining Order and Preliminary Injunction by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) Modified on 3/9/2022 to correct event text and create linkage (athom, ). (Entered: 03/09/2022) |
| 03/09/2022 | 12 | MINUTE ORDER by Magistrate Judge Nina Y. Wang on 03/09/2022. IT IS ORDERED that: The Clerk of the Court shall REDRAW this action to a District Judge for further proceedings. (alave, ) (Entered: 03/09/2022) |
| 03/09/2022 | 13 | CASE REASSIGNED pursuant to 12 Minute Order. This case is randomly reassigned to Judge Robert E. Blackburn. All future pleadings should be designated as 22-cv-00581-REB. (Text Only Entry). (alave, ) (Entered: 03/09/2022) |
| 03/09/2022 | 14 | MEMORANDUM RETURNING CASE by Senior Judge Blackburn. This case is randomly reassigned to Chief Judge Philip A. Brimmer and drawn to Magistrate Judge Nina Y. Wang. All future pleadings should be designated as 22-cv-00581-PAB. (athom, ) (Entered: 03/09/2022) |
| 03/16/2022 | 15 | SUMMONS Returned Executed by All Plaintiffs. Ashley Epp served on 3/14/2022, answer due 4/4/2022. (Erickson, Amy) (Entered: 03/16/2022) |
| 03/17/2022 | 16 | SUMMONS Returned Executed by All Plaintiffs. Shawn Smith served on 3/14/2022, answer due 4/4/2022. (Erickson, Amy) (Entered: 03/17/2022) |
| 03/23/2022 | 17 | NOTICE of Entry of Appearance by Amy Elizabeth Erickson on behalf of All Plaintiffs (Erickson, Amy) (Entered: 03/23/2022) |
| 03/23/2022 | 18 | NOTICE of Entry of Appearance by Reid Kelly Day on behalf of All Plaintiffs Attorney Reid Kelly Day added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla), Attorney Reid Kelly Day added to party League of Women Voters of Colorado(pty:pla), Attorney Reid Kelly Day added to party Mi Familia Vota(pty:pla) (Day, Reid) (Entered: 03/23/2022) |
| 03/23/2022 | 19 | NOTICE of Entry of Appearance by Brian Andrew Dillon on behalf of Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia VotaAttorney Brian Andrew Dillon added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla), Attorney Brian Andrew Dillon added to party League of Women Voters of Colorado(pty:pla), Attorney Brian Andrew Dillon added to party Mi Familia Vota(pty:pla) (Dillon, Brian) (Entered: 03/23/2022) |
| 03/23/2022 | 20 | NOTICE of Entry of Appearance by Jean Paul Bradshaw on behalf of All Plaintiffs Attorney Jean Paul Bradshaw added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla), Attorney Jean Paul Bradshaw added to party League of Women Voters of Colorado(pty:pla), Attorney Jean Paul Bradshaw added to party Mi Familia Vota(pty:pla) (Bradshaw, Jean) (Entered: 03/23/2022) |

| 03/23/2022 | 21 | NOTICE of Entry of Appearance by Ben Clements on behalf of All Plaintiffs Attorney Ben Clements added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla), Attorney Ben Clements added to party League of Women Voters of Colorado(pty:pla), Attorney Ben Clements added to party Mi Familia Vota(pty:pla) (Clements, Ben) (Entered: 03/23/2022) |
|---|---|---|
| 03/24/2022 | 22 | SUMMONS Returned Executed by All Plaintiffs. Holly Kasun served on 3/23/2022, answer due 4/13/2022. (Erickson, Amy) (Entered: 03/24/2022) |
| 03/25/2022 | 23 | NOTICE of Entry of Appearance by Ronald Andrew Fein on behalf of All Plaintiffs Attorney Ronald Andrew Fein added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla), Attorney Ronald Andrew Fein added to party League of Women Voters of Colorado(pty:pla), Attorney Ronald Andrew Fein added to party Mi Familia Vota(pty:pla) (Fein, Ronald) (Entered: 03/25/2022) |
| 03/25/2022 | 24 | NOTICE of Entry of Appearance by Casey Carlton Breese on behalf of All Plaintiffs Attorney Casey Carlton Breese added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla), Attorney Casey Carlton Breese added to party League of Women Voters of Colorado(pty:pla), Attorney Casey Carlton Breese added to party Mi Familia Vota(pty:pla) (Breese, Casey) (Entered: 03/25/2022) |
| 03/28/2022 | 25 | NOTICE of Entry of Appearance by Courtney Marie Hostetler on behalf of All Plaintiffs Attorney Courtney Marie Hostetler added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla), Attorney Courtney Marie Hostetler added to party League of Women Voters of Colorado(pty:pla), Attorney Courtney Marie Hostetler added to party Mi Familia Vota(pty:pla) (Hostetler, Courtney) (Entered: 03/28/2022) |
| 04/04/2022 | 26 | NOTICE of Entry of Appearance by R. Scott Reisch on behalf of All Defendants Attorney R. Scott Reisch added to party Ashley Epp(pty:dft), Attorney R. Scott Reisch added to party Holly Kasun(pty:dft), Attorney R. Scott Reisch added to party Shawn Smith(pty:dft), Attorney R. Scott Reisch added to party United States Election Integrity Plan(pty:dft) (Reisch, R.) (Entered: 04/04/2022) |
| 04/04/2022 | 27 | MOTION to Dismiss for Lack of Jurisdiction by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Reisch, R.) (Entered: 04/04/2022) |
| 04/06/2022 | 28 | NOTICE of Entry of Appearance by Jessica Lynn Hays on behalf of All Defendants Attorney Jessica Lynn Hays added to party Ashley Epp(pty:dft), Attorney Jessica Lynn Hays added to party Holly Kasun(pty:dft), Attorney Jessica Lynn Hays added to party Shawn Smith(pty:dft), Attorney Jessica Lynn Hays added to party United States Election Integrity Plan(pty:dft) (Hays, Jessica) (Entered: 04/06/2022) |
| 04/07/2022 | 29 | MOTION to Expedite , MOTION for Hearing/Conference re 27 MOTION to Dismiss for Lack of Jurisdiction , 5 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *against all defendants* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Attachments: # 1 Proposed Order (PDF Only))(Erickson, Amy) (Entered: 04/07/2022) |
| 04/08/2022 | 30 | ORDER by Chief Judge Philip A. Brimmer on 4/8/2022. **ORDERED** that the portion of plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction [Docket No. 5 ] that requests issuance of a temporary restraining order is **DENIED**. **ORDERED** that the portion of plaintiffs' Motion for Expedited Hearing on Plaintiffs' Motion for Preliminary Injunction and Defendants' Motion to Dismiss [Docket No. 29 ] that requests an expedited TRO hearing is **DENIED as moot**. (trvo, ) (Entered: 04/08/2022) |
| 04/08/2022 | 31 | MINUTE ORDER by Chief Judge Philip A. Brimmer on 4/08/2022. It is ORDERED that plaintiffs shall file a witness list by **April 20, 2022** using the form found at http://www.cod.uscourts.gov/JudicialOfficers/Active/ArticleIIIJudges/HonPhilipABrimmer.aspx, indicating the witnesses it intends to call at the preliminary injunction hearing and the length of its direct examinations. It is further ORDERED that defendants shall file by **April 27, 2022**, a |

| | | |
|---|---|---|
| | | witness list for the preliminary injunction hearing, using the same form, which shall include estimates of the time required for cross-examining plaintiffs' witnesses and estimates of time for conducting the direct examinations of defendants witnesses. It is further ORDERED that counsel shall jointly contact Chambers via conference call (303-335-2794) on **April 29, 2022** to schedule a preliminary injunction hearing. It is further ORDERED that defendants shall respond to the portion of plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction [Docket No. 5] requesting a preliminary injunction on or before April 20, 2022, and plaintiffs may reply on or before **April 25, 2022.** It is further ORDERED that plaintiffs shall respond to defendants' Motion to Dismiss [Docket No. 27] on or before **April 18, 2022,** and defendants may reply on or before **April 22, 2022.** (pabsec, ) (Entered: 04/08/2022) |
| 04/18/2022 | 32 | NOTICE of Entry of Appearance by John C. Bonifaz on behalf of All Plaintiffs Attorney John C. Bonifaz added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla), Attorney John C. Bonifaz added to party League of Women Voters of Colorado(pty:pla), Attorney John C. Bonifaz added to party Mi Familia Vota(pty:pla) (Bonifaz, John) (Entered: 04/18/2022) |
| 04/18/2022 | 33 | RESPONSE to 27 MOTION to Dismiss for Lack of Jurisdiction filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Attachments: # 1 Proposed Order (PDF Only))(Erickson, Amy) (Entered: 04/18/2022) |
| 04/20/2022 | 34 | Witness List by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 04/20/2022) |
| 04/20/2022 | 35 | RESPONSE to 5 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *against all defendants* filed by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Hays, Jessica) (Entered: 04/20/2022) |
| 04/22/2022 | 36 | REPLY to Response to 27 MOTION to Dismiss for Lack of Jurisdiction filed by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Hays, Jessica) (Entered: 04/22/2022) |
| 04/25/2022 | 37 | REPLY to Response to 5 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *against all defendants* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 04/25/2022) |
| 04/27/2022 | 38 | Witness List *for Preliminary Injunction Hearing* by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Hays, Jessica) (Entered: 04/27/2022) |
| 04/28/2022 | 39 | ORDER by Chief Judge Philip A. Brimmer on 04/28/2022. Defendants' Motion to Dismiss [Docket No. 27 ] is **DENIED**. (athom, ) (Entered: 04/28/2022) |
| 04/28/2022 | 40 | MOTION to Expedite *Limited*, MOTION for Discovery by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Attachments: # 1 Proposed Order (PDF Only))(Erickson, Amy) (Entered: 04/28/2022) |
| 04/29/2022 | 41 | MINUTE ORDER by Chief Judge Philip A. Brimmer on 04/29/2022 re 40 Motion for Limited Expedited Discovery. Defendants shall respond to plaintiffs' motion for expedited discovery on or before **Wednesday, May 4, 2022 at 5:00 p.m.** Text Only Entry (pabsec, ) (Entered: 04/29/2022) |
| 04/29/2022 | 42 | MINUTE ORDER by Chief Judge Philip A. Brimmer on 4/29/2022, re: 5 MOTION for Temporary Restraining Order. **ORDERED** that the Court will hold a full-day preliminary injunction hearing on **June 2, 2022 at 8:30 a.m. ORDERED** that the parties shall exchange exhibits, and submit to the Court electronically, on or before **May 23, 2022 at 5:00 p.m.** (sphil, ) (Entered: 04/29/2022) |

| | | |
|---|---|---|
| 05/02/2022 | 43 | RESPONSE to 40 MOTION to Expedite *Limited* MOTION for Discovery filed by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Hays, Jessica) (Entered: 05/02/2022) |
| 05/06/2022 | 44 | ORDER by Chief Judge Philip A. Brimmer on 5/6/2022, re: 40 plaintiffs' Motion for Limited Expedited Discovery is **DENIED**. (sphil, ) (Entered: 05/06/2022) |
| 05/12/2022 | 45 | MOTION to Withdraw 5 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *against all defendants* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 05/12/2022) |
| 05/12/2022 | 46 | ORDER by Chief Judge Philip A. Brimmer on 5/12/2022 re: 45 Motion to Withdraw is **GRANTED**. The portion of Plaintiff's 5 Motion for a Temporary Restraining Order and Preliminary Injunction requesting a preliminary injunction is **WITHDRAWN**. The Preliminary Injunction Hearing set for June 2, 2022 is **VACATED**. The portion of Docket No. 29 requesting an expedited preliminary hearing is **DENIED as moot**. Text Only Entry(pabsec, ) (Entered: 05/12/2022) |
| 05/12/2022 | 47 | NOTICE of Entry of Appearance *of Dion Farganis* by Dion Richard Farganis on behalf of Colorado Montana Wyoming State Area Conference of the NAACPAttorney Dion Richard Farganis added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla) (Farganis, Dion) (Entered: 05/12/2022) |
| 05/12/2022 | 48 | ANSWER to 1 Complaint,, , COUNTERCLAIM against Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota by Ashley Epp, United States Election Integrity Plan, Holly Kasun, Shawn Smith.(Hays, Jessica) (Entered: 05/12/2022) |
| 06/02/2022 | 49 | MOTION to Dismiss *Counterclaims for Defamation and Abuse of Process* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Attachments: # 1 Proposed Order (PDF Only))(Erickson, Amy) (Entered: 06/02/2022) |
| 06/17/2022 | 50 | RESPONSE to 49 MOTION to Dismiss *Counterclaims for Defamation and Abuse of Process* filed by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Hays, Jessica) (Entered: 06/17/2022) |
| 06/28/2022 | 51 | Proposed Scheduling Order *and Rule 26(f) Report* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Attachments: # 1 Exhibit A)(Erickson, Amy) (Entered: 06/28/2022) |
| 06/30/2022 | 52 | REPLY to Response to 49 MOTION to Dismiss *Counterclaims for Defamation and Abuse of Process* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 06/30/2022) |
| 08/01/2022 | 53 | REASSIGNMENT OF JUDGE. This action is reassigned to Judge Charlotte N. Sweeney upon her appointment. Unless otherwise ordered, the dates and times for all previously scheduled matters will be maintained and will now be handled by Judge Sweeney in Courtroom 204 in the Byron Rogers Courthouse. Her chambers are located in C-253 and her telephone number is (303) 335-2610. All future pleadings should be designated as 22-cv-00581-CNS. (Text only entry) (agarc, ) (Entered: 08/01/2022) |
| 08/05/2022 | 54 | MOTION for Judgment on the Pleadings by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Hays, Jessica) (Entered: 08/05/2022) |
| 08/26/2022 | 55 | RESPONSE to 54 MOTION for Judgment on the Pleadings filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 08/26/2022) |

| 08/29/2022 | 56 | Proposed Scheduling Order *and Rule 26(f) Report (Amended)* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 08/29/2022) |
|---|---|---|
| 08/29/2022 | 57 | ORDER REFERRING CASE to Magistrate Judge N. Reid Neureiter **non-dispositive matters**. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of Local Civ. R. 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other non-dispositive motions, (4) pursuant to Local Civ. R. 16.6 and at the discretion of the Magistrate Judge, convene such early neutral evaluation and/or settlement conferences and direct related procedures as may facilitate resolution of this case without the necessity of a motion or prior authorization of the undersigned. By Judge Charlotte N. Sweeney on 8/29/2022. Text Only Entry (cnssec. ) (Entered: 08/29/2022) |
| 08/30/2022 | 58 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 30 August 2022. It is hereby ORDERED that a Scheduling Conference is set for September 13, 2022 at 9:30 a.m. The parties are directed to call the conference line as a participant at (888) 398-2342, Access Code 5755390# at the scheduled time. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 08/30/2022) |
| 09/06/2022 | 59 | REPLY to Response to 54 MOTION for Judgment on the Pleadings filed by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Hays, Jessica) (Entered: 09/06/2022) |
| 09/13/2022 | 60 | MINUTE ENTRY for proceedings held before Magistrate Judge N. Reid Neureiter: Telephonic Scheduling Conference held on 9/13/2022. Discovery due by 12/2/2022. Dispositive Motions due by 12/16/2022.<br><br>A Discovery Conference is set for September 22, 2022 at 2:00 p.m. before Magistrate Judge N. Reid Neureiter in Courtroom C203, Second floor, Byron G. Rogers Courthouse, 1929 Stout Street, Denver, Colorado 80294.The parties are directed to prepare and email to Chambers (Neureiter_chambers@cod.uscourts.gov) by 12:00 PM on September 21, 2022 a short (no longer than five pages each, ten pages total) joint statement setting forth each side's respective position concerning the dispute. The parties are advised that the joint statement will be attached to the courtroom minutes and made a part of the record. If the parties resolve the dispute, then they shall jointly contact Judge Neureiter's Chambers to vacate the hearing. FTR: Courtroom C203. (rvill, ) (Entered: 09/13/2022) |
| 09/13/2022 | 61 | SCHEDULING ORDER by Magistrate Judge N. Reid Neureiter on September 13, 2022. (rvill, ) (Entered: 09/13/2022) |
| 09/20/2022 | 62 | MINUTE ORDER: A Final Pretrial Conference is set for 5/12/2023 at 8:30 AM in Courtroom C204 before Judge Charlotte N. Sweeney. The parties' Proposed Pretrial Order is due by 5/5/2023. By Judge Charlotte N. Sweeney on 9/20/2022. Text Only Entry (cnssec. ) (Entered: 09/20/2022) |
| 09/21/2022 | 63 | Minute ORDER by Magistrate Judge N. Reid Neureiter on 21 September 2022. In light of the parties' Joint Statement submitted to chambers, it is hereby ORDERED that the Discovery Hearing set for September 22, 2022 at 2:00 p.m. is VACATED. PLEASE READ ATTACHED MINUTE ORDER. (cmadr, ) (Entered: 09/21/2022) |
| 10/19/2022 | 64 | MOTION for Protective Order by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) Modified on 10/19/2022 to edit event type per chambers. (sphil, ). (Entered: 10/19/2022) |
| 10/19/2022 | 65 | MEMORANDUM regarding 64 MOTION for Protective Order. Motion 64 is referred to Magistrate Judge N. Reid Neureite, by Judge Charlotte N. Sweeney on 10/19/2022. Text Only |

| | | Entry (cnssec.) (Entered: 10/19/2022) |
|---|---|---|
| 10/19/2022 | 66 | MINUTE ORDER by Magistrate Judge N. Reid Neureiter on October 19, 2022. The Stipulation and Proposed Protective Order [Motion] (Dkt. # 64 ) is GRANTED. The Protective Order is APPROVED and made an Order of Court. (rvill, ) (Entered: 10/19/2022) |
| 10/19/2022 | 67 | PROTECTIVE ORDER by Magistrate Judge N. Reid Neureiter on October 19, 2022. (rvill, ) (Entered: 10/19/2022) |
| 11/11/2022 | 68 | CERTIFICATE of Mailing/Service *Plaintiffs' Expert Witness Disclosures* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 11/11/2022) |
| 11/21/2022 | 69 | NOTICE of Entry of Appearance by Kristin M. Stock on behalf of All Plaintiffs Attorney Kristin M. Stock added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla), Attorney Kristin M. Stock added to party League of Women Voters of Colorado(pty:pla), Attorney Kristin M. Stock added to party Mi Familia Vota(pty:pla) (Stock, Kristin) (Entered: 11/21/2022) |
| 12/02/2022 | 70 | MOTION for Summary Judgment by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Attachments: # 1 Exhibit 1- Prescott Deposition Transcript, # 2 Exhibit 2- Hendrix Deposition Transcript, # 3 Exhibit 3- Hernandez Deposition Transcript)(Hays, Jessica) (Entered: 12/02/2022) |
| 12/16/2022 | 71 | MOTION to Exclude *Expert Testimony* by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Attachments: # 1 Exhibit 1- Expert Opinion, # 2 Exhibit 2- Smith Deposition Transcript)(Hays, Jessica) (Entered: 12/16/2022) |
| 12/23/2022 | 72 | RESPONSE to 70 MOTION for Summary Judgment filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Attachments: # 1 Exhibit A - County & Local Organizing Playbook, dated August, 2021, # 2 Exhibit B - Colorado Canvassing Report, dated 3/11/2022, # 3 Exhibit C - 11/21/2022 Deposition of Salvador Hernandez - Transcript Excerpts, # 4 Exhibit D - 11/22/2022 Deposition of Portia Prescott - Transcript Excerpts, # 5 Exhibit E -11/23/2022 Deposition of Beth Hendrix Nieland - Transcript Excerpts, # 6 Exhibit F - Plaintiffs Second Amended Rule 26(A)(1) Disclosures, dated 12/2/2022, # 7 Exhibit G - 11/29/2022 Deposition of USEIP - Transcript Excerpts, # 8 Exhibit H - 8/16/2022 Deposition of Holly Kasun - Transcript Excerpts, # 9 Exhibit I - 8/15/2022 Deposition of Shawn Smith - Transcript Excerpts, # 10 Exhibit J - 8/23/2022 Deposition of Ashley Epp - Transcript Excerpts, # 11 Exhibit K - Hitchhikers Guide to Election Fraud Analytics, # 12 Exhibit L - April, 2021, Messages from Basecamp, # 13 Exhibit M - May, 2021, Messages from Basecamp, # 14 Exhibit N - April, 2021, Messages from Basecamp, # 15 Exhibit O - 10/5/2022 Deposition of Jeffrey Young - Transcript Excerpts) (Erickson, Amy) (Entered: 12/23/2022) |
| 12/23/2022 | 73 | DECLARATION of *Yvette Roberts* regarding MOTION for Summary Judgment 70 by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 12/23/2022) |
| 01/03/2023 | 74 | USA STATEMENT of Interest re 70 MOTION for Summary Judgment *Statement of Interest of the United States* by Interested Party United States of America. (Wu, Zeyen) Modified on 1/4/2023 to edit text. (sphil, ). (Entered: 01/03/2023) |
| 01/06/2023 | 75 | RESPONSE to 71 MOTION to Exclude *Expert Testimony of Professor Atiba Ellis* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 01/06/2023) |
| 01/06/2023 | 76 | REPLY to Response to 70 MOTION for Summary Judgment filed by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Attachments: # 1 Exhibit 1- Ashley Epp Deposition Transcript, # 2 Exhibit 2- Jeff Young Deposition Transcript, # 3 Exhibit 3- Jeff Young Declaration, # 4 Exhibit 4- Cory Anderson Declaration, # 5 Exhibit 5- USEIP 30(b)(6) Deposition Transcript, # 6 Exhibit 6- Holly Kasun Deposition Transcript, # 7 Exhibit 7- |

| | | |
|---|---|---|
| | | Shawn Smith Deposition Transcript, # 8 Exhibit 8- USEIP Training Materials, # 9 Exhibit 9-Photographs, # 10 Exhibit 10- Beth Hendrix Deposition Transcript)(Hays, Jessica) (Entered: 01/06/2023) |
| 01/16/2023 | 77 | RESPONSE to 74 Statement by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Hays, Jessica) (Entered: 01/16/2023) |
| 01/20/2023 | 78 | REPLY to Response to 71 MOTION to Exclude *Expert Testimony* filed by Defendants Ashley Epp, Holly Kasun, Shawn Smith, United States Election Integrity Plan. (Hays, Jessica) (Entered: 01/20/2023) |
| 01/23/2023 | 79 | MOTION to Withdraw as Attorney by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Day, Reid) (Entered: 01/23/2023) |
| 01/23/2023 | 80 | ORDER denying 79 Motion to Withdraw as Attorney. Denied for failure to comply with D.C.COLO.LAttyR 5(b). By Judge Charlotte N. Sweeney on 1/23/2023. Text Only Entry(cnssec.) (Entered: 01/23/2023) |
| 01/23/2023 | 81 | ORDER granting 49 Plaintiffs' Motion to Dismiss. Defendants' counterclaims for defamation and abuse of process are DISMISSED. by Judge Charlotte N. Sweeney on 1/23/23. Text Only Entry(jdyne) (Entered: 01/23/2023) |
| 01/23/2023 | 82 | MOTION to Withdraw as Attorney by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Day, Reid) (Entered: 01/23/2023) |
| 01/23/2023 | 83 | ORDER granting 82 Motion to Withdraw as Attorney. Attorney Reid Kelly Day is withdrawn. By Judge Charlotte N. Sweeney on 1/23/2023. Text Only Entry(cnssec. ) (Entered: 01/23/2023) |
| 01/31/2023 | 84 | ORDER denying 54 Motion for Judgment on the Pleadings; granting in part and denying in part 70 Motion for Summary Judgment by Judge Charlotte N. Sweeney on 1/31/23.(jdyne) (Entered: 01/31/2023) |
| 02/20/2023 | 85 | MOTION to Clarify re 81 Order on Motion to Dismiss by Counter Claimants Ashley Epp, Holly Kasun, Shawn Smith. (Hays, Jessica) (Entered: 02/20/2023) |
| 03/13/2023 | 86 | RESPONSE to 85 MOTION to Clarify re 81 Order on Motion to Dismiss filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 03/13/2023) |
| 03/31/2023 | 87 | ORDER granting 85 MOTION to Clarify re 81 Order on Motion to Dismiss. Defendants' filed a Motion for Clarification of this Court's Order from January 23, 2023 (ECF No. 81 ), regarding whether their counterclaims were dismissed with prejudice. The Court ruled that Defendants' defamation counterclaim was denied for failure to state a claim because the allegedly defamatory statements are contained within the Complaint and therefore absolutely privileged. This counterclaim was dismissed with prejudice. The Court also ruled that Defendants' second counterclaim, abuse of process, raised arguments that should have been brought under Federal Rule of Civil Procedure 12(b)(6). This counterclaim was also dismissed with prejudice because Defendants had the opportunity to file a Rule 12(b)(6) motion and failed to do so. The Court finds no reason to reconsider its prior order and will not do so. By Judge Charlotte N. Sweeney on 3/31/2023. Text Only Entry(cnssec. ) (Entered: 03/31/2023) |
| 05/03/2023 | 88 | MOTION for Leave to Appear *Remotely* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 05/03/2023) |
| 05/05/2023 | 89 | ORDER granting 88 MOTION for Leave to Appear Remotely. The Court will hold the Final Pretrial Conference set 5/12/2023 at 8:30 a.m. telephonically. The parties are directed to dial (571) 353-2301 and enter Access Code 770126989# when prompted. By Judge Charlotte N. Sweeney on 5/5/2023. Text Only Entry(cnssec. ) (Entered: 05/05/2023) |

| 05/05/2023 | 90 | Proposed Pretrial Order by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 05/05/2023) |
|---|---|---|
| 05/11/2023 | 91 | MOTION to Amend/Correct/Modify 90 Proposed Pretrial Order by Defendants Ashley Epp, Holly Kasun, Shawn Smith. (Attachments: # 1 Exhibit Amended Proposed Pretrial Order)(Hays, Jessica) (Entered: 05/11/2023) |
| 05/12/2023 | 92 | MINUTE ENTRY for proceedings held before Judge Charlotte N. Sweeney: Final Pretrial Conference held on 5/12/2023. 91 Motion for Leave to Amend Proposed Pretrial Order is DENIED as moot. Four-day Bench Trial set to commence 2/5/2024 at 8:30 AM in Courtroom A 702 before Judge Charlotte N. Sweeney with a Trial Preparation Conference on 1/23/2024 at 1:00 PM in Courtroom A 702 before Judge Charlotte N. Sweeney. Court Reporter: Sarah Mitchell. (jdyne, ) (Entered: 05/12/2023) |
| 05/12/2023 | 93 | ORDER SETTING TRIAL: Four-day Bench Trial set to commence 2/5/2024 at 8:30 AM in Courtroom A 702 before Judge Charlotte N. Sweeney with a Trial Preparation Conference on 1/23/2024 at 1:00 PM in Courtroom A 702 before Judge Charlotte N. Sweeney. by Judge Charlotte N. Sweeney on 5/12/23. (jdyne) (Entered: 05/12/2023) |
| 05/15/2023 | 94 | Proposed Pretrial Order by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Breese, Casey) (Entered: 05/15/2023) |
| 05/16/2023 | 95 | FINAL PRETRIAL ORDER by Judge Charlotte N. Sweeney on 5/16/23. (jdyne) (Entered: 05/16/2023) |
| 06/07/2023 | 96 | ORDER denying 71 Motion to Exclude Testimony of Atiba Ellis by Judge Charlotte N. Sweeney on 6/7/23.(jdyne) (Main Document 96 replaced on 6/7/2023 with executed signature page) (jdyne). (Entered: 06/07/2023) |
| 12/29/2023 | 97 | MOTION to Withdraw as Attorney by Defendants Ashley Epp, Holly Kasun. (Attachments: # 1 Proposed Order (PDF Only))(Hays, Jessica) (Entered: 12/29/2023) |
| 01/02/2024 | 98 | ORDER granting 97 Motion to Withdraw as Attorney. Attorney Jessica Lynn Hays and R. Scott Reisch are withdrawn as to Defendants Epps and Kasun. The Court orders that Defendants Epps and Kasun notify the Court and all parties on or before 1/5/2024 of their up-to-date contact information. By Judge Charlotte N. Sweeney on 1/2/2024. Text Only Entry(cnsja.) (Entered: 01/02/2024) |
| 01/02/2024 | 99 | MOTION in Limine by Defendant Shawn Smith. (Attachments: # 1 Exhibit, # 2 Proposed Order (PDF Only))(Hays, Jessica) (Entered: 01/02/2024) |
| 01/02/2024 | 102 | NOTICE of Change of Address/Contact Information by Defendant Holly Kasun (sphil, ) (Entered: 01/04/2024) |
| 01/03/2024 | 100 | NOTICE of Withdrawal of Counsel by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota (Farganis, Dion) (Entered: 01/03/2024) |
| 01/03/2024 | 101 | MINUTE ORDER re: 100 NOTICE of Withdrawal of Counsel filed by Mi Familia Vota, Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado. The Court will not act on a Notice of Withdrawal of Counsel. Consistent with this Court's Local Rules (See D.C.COLO.LAttyR 5(b)), please file a motion. By Judge Charlotte N. Sweeney on 1/3/2024. Text Only Entry (cnsja. ) Modified on 1/3/2024 to correct text. (cnsja.). (Entered: 01/03/2024) |
| 01/03/2024 | 103 | NOTICE of Change of Address/Contact Information by Defendant Ashley Epp (sphil, ) (Entered: 01/04/2024) |
| 01/04/2024 | 104 | First MOTION to Continue Hearing by Defendant Holly Kasun. (Kasun, Holly) (Entered: 01/04/2024) |

| | | |
|---|---|---|
| 01/05/2024 | [105] | RESPONSE to [104] First MOTION to Continue *Hearing or Trial* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 01/05/2024) |
| 01/05/2024 | 106 | MINUTE ORDER re: [104] First Motion to Continue Hearing filed by Holly Kasun. The Court is in receipt of the Plaintiffs' Response to Defendant Kasun's Motion to Continue. The Court requests that all other parties file a Response on or before 1/11/2024. By Judge Charlotte N. Sweeney on 1/5/2024. Text Only Entry (cnsja.) (Entered: 01/05/2024) |
| 01/08/2024 | [107] | First MOTION to Continue *Trial or Hearing* by Defendant Ashley Epp. (Epp, Ashley) (Entered: 01/08/2024) |
| 01/09/2024 | [108] | RESPONSE to [107] First MOTION to Continue *Trial or Hearing*, [104] First MOTION to Continue *Hearing of Hearing or Trial* filed by Defendant Ashley Epp. (Attachments: # [1] Exhibit Yvette Roberts Statements, # [2] Exhibit COSOS Investigation, # [3] Deposition Excerpts Plaintiff Deposition Excerpts, # [4] Exhibit LWV Safety Plan)(Epp, Ashley) (Entered: 01/09/2024) |
| 01/09/2024 | [109] | RESPONSE to [99] MOTION in Limine *by Defendant Shawn Smith* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 01/09/2024) |
| 01/09/2024 | [110] | RESPONSE to [104] First MOTION to Continue *Hearing*, [107] First MOTION to Continue *Trial or Hearing* filed by Defendant Shawn Smith. (Hays, Jessica) (Entered: 01/09/2024) |
| 01/09/2024 | [111] | RESPONSE to [99] MOTION in Limine *IN SUPPORT* filed by Defendant Ashley Epp. (Epp, Ashley) (Entered: 01/09/2024) |
| 01/09/2024 | [112] | RESPONSE to [99] MOTION in Limine *In Support* filed by Defendant Holly Kasun. (Attachments: # [1] Exhibit Exhibit 1, # [2] Exhibit Exhibit 2)(Kasun, Holly) (Entered: 01/09/2024) |
| 01/10/2024 | [113] | RESPONSE to [108] Response to [107] First MOTION to Continue *Trial or Hearing* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 01/10/2024) |
| 01/10/2024 | [114] | REPLY to Response to [104] First MOTION to Continue *Hearing*, [107] First MOTION to Continue *Trial or Hearing IN SUPPORT* filed by Defendant Ashley Epp. (Attachments: # [1] Exhibit Communications re: Intimidation)(Epp, Ashley) (Entered: 01/10/2024) |
| 01/11/2024 | [115] | REPLY to Response to [104] First MOTION to Continue *Hearing*, [107] First MOTION to Continue *Trial or Hearing* filed by Defendant Holly Kasun. (Attachments: # [1] Exhibit Exhibit 1, # [2] Exhibit Exhibit 2, # [3] Exhibit Exhibit 3)(Kasun, Holly) (Entered: 01/12/2024) |
| 01/16/2024 | 116 | MINUTE ORDER re: [104] First Motion to Continue *Hearing* filed by Holly Kasun and [107] First Motion to Continue *Trial or Hearing* filed by Ashley Epp. A Hearing on the pending motions to continue is set for 1/17/2024 at 1:00 PM before Judge Charlotte N. Sweeney. The hearing will be held by video teleconference. The Court's staff will provide connection information to the parties by separate email. By Judge Charlotte N. Sweeney on 1/16/2024. Text Only Entry (cnsja. ) (Entered: 01/16/2024) |
| 01/16/2024 | [117] | Witness List by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 01/16/2024) |
| 01/16/2024 | [118] | Witness List by Defendant Shawn Smith. (Hays, Jessica) (Entered: 01/16/2024) |
| 01/16/2024 | [119] | Exhibit List *(Joint)* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 01/16/2024) |
| 01/16/2024 | [120] | Witness List *Epp and Kasun* by Defendants Ashley Epp, Holly Kasun. (Epp, Ashley) (Entered: 01/16/2024) |
| 01/17/2024 | [121] | MOTION for Recusal by Defendant Shawn Smith. (Attachments: # [1] Exhibit 1- DU on the Bench, # [2] Exhibit 2- Matthew Shepard Foundation, # [3] Exhibit 3- FEC Report)(Hays, Jessica |

| | | (Entered: 01/17/2024) |
|---|---|---|
| 01/17/2024 | 122 | ORDER granting 104 Motion to Continue; finding as moot 107 Motion to Continue. Due to a water main break, the Arraj courthouse has been evacuated and closed for the day and the Court will be unable to proceed with the 1:00 p.m. hearing. Today's hearing is VACATED. However, the Court grants Defendant Kasun's First Motion to Continue 104 . The Bench Trial set for 2/5/2024 is VACATED. The Trial Preparation Conference set for 1/23/2024 at 1:00 is converted into a Status Conference (by Video Teleconference) at which time to Court will reset the trial and the trial preparation conference. The Court finds Defendant Epp's Motion to Continue 107 to be moot. The Court strongly encourages the parties to review the Uniform Civil Practice Standards, particularly as they relate to page-limitations for motions, responses, and replies. By Judge Charlotte N. Sweeney on 1/17/2024. Text Only Entry(cnsja. ) (Entered: 01/17/2024) |
| 01/22/2024 | 123 | NOTICE of Entry of Appearance by Amira Marcella Mattar on behalf of Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia VotaAttorney Amira Marcella Mattar added to party Colorado Montana Wyoming State Area Conference of the NAACP(pty:pla), Attorney Amira Marcella Mattar added to party League of Women Voters of Colorado(pty:pla), Attorney Amira Marcella Mattar added to party Mi Familia Vota(pty:pla) (Mattar, Amira) (Entered: 01/22/2024) |
| 01/22/2024 | 124 | First MOTION for Leave to *Reopen Limited Discovery* by Defendant Holly Kasun. (Kasun, Holly) (Entered: 01/22/2024) |
| 01/23/2024 | 125 | MINUTE ENTRY for proceedings held before Judge Charlotte N. Sweeney: Status Conference via Video Teleconference held on 1/23/2024. 121 Motion to Recuse Judge Sweeney is DENIED. 124 Motion for Leave to Reopen Limited Discovery is DENIED. Five-day Jury Trial set to commence 7/15/2024 at 8:00 AM in Courtroom A 702 before Judge Charlotte N. Sweeney with a Trial Preparation Conference on 6/21/2024 at 9:00 AM in Courtroom A 702 before Judge Charlotte N. Sweeney. Court Reporter: Sarah Mitchell. (jdyne) (Entered: 01/23/2024) |
| 01/23/2024 | 126 | AMENDED MINUTE ENTRY for proceedings held before Judge Charlotte N. Sweeney re 125 Status Conference via Video Teleconference held on 1/23/2024. Amended to reflect Bench Trial (not Jury Trial), as indicated. Court Reporter: Sarah Mitchell. (jdyne) (Entered: 01/23/2024) |
| 01/23/2024 | 127 | AMENDED ORDER SETTING TRIAL: Five-day Bench trial set to commence 7/15/2024 at 8:30 a.m. with a Trial Preparation Conference on 6/21/2024 at 9:00 a.m. By Judge Charlotte N. Sweeney on 1/23/24. (jdyne) (Entered: 01/23/2024) |
| 02/27/2024 | 128 | First MOTION for Sanctions *Emergency Under FRCP 26 & 37* by Defendant Holly Kasun. (Attachments: # 1 Deposition Excerpts Exhibit 1_ B. Hendrix LWV, # 2 Exhibit Exhibit 2_Pltf initial disclosures, # 3 Exhibit Exhibit 3_Pltf amended disclosures, # 4 Deposition Excerpts Exhibit 4_ P. Prescott NAACP, # 5 Deposition Excerpts Exhibit 5_ S.H. MFV, # 6 Exhibit Exhibit 6_Def Initial disclosures, # 7 Exhibit Exhibit 7_ Quick Ref. Guide Pltf violations, # 8 Exhibit Exhibit 8_LWV interrog, # 9 Exhibit Exhibit 9_ NAACP interrog, # 10 Exhibit Exhibit 10_MFV interrog, # 11 Exhibit Exhibit 11_pltf comm missing docs, # 12 Exhibit Exhibit 12_Def priv log)(Kasun, Holly) (Entered: 02/27/2024) |
| 03/12/2024 | 129 | RESPONSE to 128 First MOTION for Sanctions *Emergency Under FRCP 26 & 37* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 03/12/2024) |
| 03/12/2024 | 130 | DECLARATION of *Amy Erickson* regarding First MOTION for Sanctions *Emergency Under FRCP 26 & 37* 128 by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Erickson, Amy) (Entered: 03/12/2024) |
| 03/22/2024 | 131 | Renewed COUNTERCLAIM *Abuse of Process* against All Plaintiffs, filed by Ashley Epp, Holly Kasun. (Attachments: # 1 Exhibit Plaintiff Open Records Request, # 2 Exhibit James Cannon to SecState and AG, # 3 Exhibit Grand Junction Police Department -- No record of investigation, # 4 Exhibit Mesa County Sheriffs -- No record of investigation, # 5 Exhibit James Cannon -- cant recall records, # 6 Exhibit Full production from Mesa (1/2), # 7 Exhibit Full production from |

| | | |
|---|---|---|
| | | Mesa (2/2), # 8 Exhibit SecState -- First mention of VRA, # 9 Exhibit SecState -- Connects with Yvette Roberts)(Epp, Ashley) Modified on 3/25/2024 to edit event type per chambers. (sphil, ). (Entered: 03/22/2024) |
| 03/22/2024 | 132 | ERRATA re 131 Counterclaim,, *Abuse of Process* by Defendants Ashley Epp, Holly Kasun. (Attachments: # 1 Proposed Document Pleading updated to amend date of service)(Epp, Ashley) (Entered: 03/22/2024) |
| 03/26/2024 | 133 | REPLY to Response to 128 First MOTION for Sanctions *Emergency Under FRCP 26 & 37 Reply to Plaintiffs Response (ECF 129) to (ECF 128)* filed by Defendant Holly Kasun. (Kasun, Holly) (Entered: 03/26/2024) |
| 04/02/2024 | 134 | Amended COUNTERCLAIM *Abuse of Process* against All Plaintiffs, filed by Holly Kasun, Ashley Epp. (Attachments: # 1 Exhibit Unredacted Emails 1/2, # 2 Exhibit Unredacted Emails 2/2)(Epp, Ashley) Modified on 4/2/2024 to edit event type per chambers. (sphil, ). (Entered: 04/02/2024) |
| 04/11/2024 | 135 | MOTION to Withdraw as Attorney *Ronald Fein* by Counter Defendants Colorado Montana Wyoming State Area Conference of the NAACP, Colorado Montana Wyoming State Area Conference of the NAACP, Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, League of Women Voters of Colorado, League of Women Voters of Colorado, Mi Familia Vota, Mi Familia Vota, Mi Familia Vota, Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Fein, Ronald) (Entered: 04/11/2024) |
| 04/11/2024 | 136 | ORDER granting 135 Motion to Withdraw as Attorney. Attorney Ronald Andrew Fein is withdrawn. By Judge Charlotte N. Sweeney on 4/11/2024. Text Only Entry(cnsja, ) (Entered: 04/11/2024) |
| 04/12/2024 | 137 | RESPONSE to 134 MOTION for Order to, 131 MOTION for Order to filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Stock, Kristin) (Entered: 04/12/2024) |
| 04/17/2024 | 138 | REPLY to 137 Response to Motion *Counterclaim Abuse of Process* by Defendants Ashley Epp, Holly Kasun. (Epp, Ashley) (Entered: 04/17/2024) |
| 04/29/2024 | 139 | ORDER finding as moot 131 Renewed COUNTERCLAIM Abuse of Process. The Court finds the motion at ECF No. 131 to be moot in light of the filing of an Amended Motion at ECF No. 134 . By Judge Charlotte N. Sweeney on 4/29/2024. Text Only Entry(cnsja, ) (Entered: 04/29/2024) |
| 05/30/2024 | 140 | First MOTION in Limine by Defendant Ashley Epp. (Attachments: # 1 Proposed Order (PDF Only) Proposed Order on Epp Motion in Limine)(Epp, Ashley) (Entered: 05/30/2024) |
| 05/31/2024 | 141 | MOTION in Limine by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Stock, Kristin) (Entered: 05/31/2024) |
| 05/31/2024 | 142 | First MOTION in Limine *to Exclude Certain Evidence and Admit Certain Evidence* by Defendant Holly Kasun. (Attachments: # 1 Proposed Order (PDF Only) Order Re: Defendant Kasun's MIL)(Kasun, Holly) (Entered: 05/31/2024) |
| 05/31/2024 | 143 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re: 141 MOTION in Limine filed by attorney **Kristin Stock**. **DO NOT REFILE THE DOCUMENT. Action to take -** counsel must submit a change of contact request through the Manage my Account tab at the PACER website at https://www.pacer.gov/, pursuant to D.C.COLO.LAttyR 5(c) and 3.5 of the Electronic Case Filing Procedures (Civil cases). (Text Only Entry) (sphil, ) (Entered: 06/03/2024) |

| | | |
|---|---|---|
| 06/05/2024 | 144 | Unopposed MOTION for Leave to Appear *Virtually at the 6/21/2024 Trial Preparation Conference* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 06/05/2024) |
| 06/06/2024 | 145 | ORDER granting in part and denying in part 144 Unopposed Motion for Leave to Appear Virtually at the 6/21/2024 Trial Preparation Conference. The Court will require lead counsel for Plaintiffs and lead counsel for Defendant Smith to appear in person. All others may appear via Video Teleconference. The Court's staff will provide connection instructions to the parties by email prior to the hearing. By Judge Charlotte N. Sweeney on 6/6/2024. Text Only Entry(cnsja, ) (Entered: 06/06/2024) |
| 06/06/2024 | 146 | RESPONSE to 141 MOTION in Limine filed by Defendant Ashley Epp. (Epp, Ashley) (Entered: 06/06/2024) |
| 06/06/2024 | 147 | RESPONSE to 141 MOTION in Limine filed by Defendant Holly Kasun. (Kasun, Holly) (Entered: 06/06/2024) |
| 06/07/2024 | 148 | RESPONSE to 142 First MOTION in Limine *to Exclude Certain Evidence and Admit Certain Evidence* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 06/07/2024) |
| 06/07/2024 | 149 | RESPONSE to 140 First MOTION in Limine filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 06/07/2024) |
| 06/10/2024 | 150 | NOTICE *of Attorney Appearance* by Defendant Holly Kasun (Wynne, Michael) (Entered: 06/10/2024) |
| 06/11/2024 | 151 | NOTICE of Entry of Appearance by Cameron C. Powell on behalf of Holly KasunAttorney Cameron C. Powell added to party Holly Kasun(pty:dft) (Powell, Cameron) (Entered: 06/11/2024) |
| 06/11/2024 | 152 | ORDER denying 99 Motion in Limine; denying 128 Motion for Sanctions; denying 134 Motion for Order; granting in part and denying in part 140 Motion in Limine; granting in part and denying in part 141 Motion in Limine; granting in part and taking under advisement 142 Motion in Limine. By Judge Charlotte N. Sweeney on 6/11/24.(jdyne) (Entered: 06/11/2024) |
| 06/13/2024 | 153 | Witness List *with Time Allocation* by Defendant Ashley Epp. (Epp, Ashley) (Entered: 06/13/2024) |
| 06/14/2024 | 154 | Witness List by Defendant Shawn Smith. (Hays, Jessica) (Entered: 06/14/2024) |
| 06/14/2024 | 155 | Witness List by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 06/14/2024) |
| 06/14/2024 | 156 | Witness List by Defendant Holly Kasun. (Wynne, Michael) (Entered: 06/14/2024) |
| 06/14/2024 | 157 | Exhibit List *(Joint)* by Defendants Ashley Epp, Holly Kasun, Shawn Smith. (Wynne, Michael) (Entered: 06/14/2024) |
| 06/18/2024 | 158 | TRIAL BRIEF by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 06/18/2024) |
| 06/18/2024 | 159 | Proposed Findings of Fact *and Conclusions of Law* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Hostetler, Courtney) (Entered: 06/18/2024) |
| 06/19/2024 | 160 | TRIAL BRIEF by Defendant Ashley Epp. (Epp, Ashley) (Entered: 06/19/2024) |
| 06/19/2024 | 161 | Proposed Findings of Fact by Defendant Ashley Epp. (Epp, Ashley) (Entered: 06/19/2024) |
| 06/19/2024 | 162 | Proposed Findings of Fact by Defendant Holly Kasun. (Wynne, Michael) (Entered: 06/19/2024) |
| 06/19/2024 | 163 | TRIAL BRIEF by Defendant Holly Kasun. (Wynne, Michael) (Entered: 06/19/2024) |

| 06/19/2024 | [164](#) | TRIAL BRIEF by Defendant Shawn Smith. (Hays, Jessica) (Entered: 06/19/2024) |
| 06/19/2024 | [165](#) | Proposed Findings of Fact *and Conclusions of Law* by Defendant Shawn Smith. (Hays, Jessica) (Entered: 06/19/2024) |
| 06/21/2024 | [166](#) | MINUTE ENTRY for proceedings held before Judge Charlotte N. Sweeney: Trial Preparation Conference held on 6/21/2024. Court Reporter: Sarah Mitchell. (kmyha) (Entered: 06/21/2024) |
| 06/28/2024 | [167](#) | Witness List by Defendant Holly Kasun. (Wynne, Michael) (Entered: 06/28/2024) |
| 07/05/2024 | [168](#) | MOTION to Strike *Certain Witnesses* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Stock, Kristin) (Entered: 07/05/2024) |
| 07/08/2024 | 169 | MINUTE ORDER re: [168](#) Motion to Strike Certain Witnesses. The Court orders that Defendant Kasun respond to the Motion [168](#) on or before 7/10/2024. By Judge Charlotte N. Sweeney on 7/8/2024. Text Only Entry (cnsja, ) (Entered: 07/08/2024) |
| 07/10/2024 | [170](#) | Unopposed MOTION for Order to *Connect Public Conference Line for Trial* by Defendant Ashley Epp. (Epp, Ashley) (Entered: 07/10/2024) |
| 07/10/2024 | [171](#) | RESPONSE to [168](#) MOTION to Strike *Certain Witnesses* filed by Defendant Holly Kasun. (Attachments: # [1](#) Exhibit)(Wynne, Michael) (Entered: 07/10/2024) |
| 07/12/2024 | [172](#) | Witness List by Defendant Holly Kasun. (Wynne, Michael) (Entered: 07/12/2024) |
| 07/12/2024 | [173](#) | Witness List by Defendant Shawn Smith. (Hays, Jessica) (Entered: 07/12/2024) |
| 07/12/2024 | [174](#) | Exhibit List *Final List of Joint Exhibits* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 07/12/2024) |
| 07/12/2024 | [175](#) | ORDER granting [168](#) Motion to Strike Certain Witnesses. By Judge Charlotte N. Sweeney on 7/12/2024.(cnsja, ) (Entered: 07/12/2024) |
| 07/12/2024 | 176 | ORDER denying [170](#) Unopposed Motion for Order to Connect Public Conference Line for Trial. The Court declines to connect the public telephone line for a select few family members of one defendant as this trial will be held in-person in the courtroom and will be open to the general public to observe. By Judge Charlotte N. Sweeney on 7/12/2024. Text Only Entry(cnsja, ) (Entered: 07/12/2024) |
| 07/12/2024 | [177](#) | Witness List by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 07/12/2024) |
| 07/12/2024 | [178](#) | Witness List by Defendant Ashley Epp. (Epp, Ashley) (Entered: 07/12/2024) |
| 07/12/2024 | [179](#) | Witness List *AMENDED* by Defendant Ashley Epp. (Epp, Ashley) (Entered: 07/12/2024) |
| 07/12/2024 | [180](#) | Witness List *AMENDED* by Defendant Holly Kasun. (Wynne, Michael) (Entered: 07/12/2024) |
| 07/15/2024 | [181](#) | MINUTE ENTRY for proceedings held before Judge Charlotte N. Sweeney: Bench Trial Day One held on 7/15/2024. Opening statements given, evidence and testimony presented, trial continued. Court Reporter: Sarah Mitchell. (jdyne) (Entered: 07/15/2024) |
| 07/16/2024 | [182](#) | MINUTE ENTRY for proceedings held before Judge Charlotte N. Sweeney: Bench Trial Day Two held on 7/16/2024. Evidence and testimony presented, trial continued. Court Reporter: Sarah Mitchell. (jdyne) (Entered: 07/16/2024) |
| 07/17/2024 | [183](#) | MINUTE ENTRY for proceedings held before Judge Charlotte N. Sweeney: Bench Trial Day Three held on 7/17/2024. Evidence and testimony presented, trial continued. Court Reporter: Sarah Mitchell. (jdyne) (Entered: 07/17/2024) |
| 07/18/2024 | [184](#) | MINUTE ENTRY for proceedings held before Judge Charlotte N. Sweeney: Bench Trial Day Four held on 7/18/2024. Oral Motion for Judgment on Partial Findings under Fed. R. Civ. P. |

| | | |
|---|---|---|
| | | 52(c) is GRANTED, judgment to enter, trial concluded. Court Reporter: Sarah Mitchell. (jdyne) (Entered: 07/18/2024) |
| 07/18/2024 | 185 | FINAL JUDGMENT in favor of the defendants, Ashley Epp, Holly Kasun, and Shawn Smith, and against the plaintiffs, Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, and Mi Familia Vota. By Judge Charlotte N. Sweeney on 7/18/24. (jdyne) (Entered: 07/18/2024) |
| 07/26/2024 | 186 | TRANSCRIPT of Trial Preparation Conference held on June 21, 2024 before Judge Sweeney. Pages: 1-23. <br> **NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** <br> Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (smitc, ) (Entered: 07/26/2024) |
| 07/30/2024 | 187 | TRANSCRIPT of Bench Trial - Day 1 held on July 15, 2024 before Judge Sweeney. Pages: 1-303. <br> **NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** <br> Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (smitc, ) (Entered: 07/30/2024) |
| 07/30/2024 | 188 | TRANSCRIPT of Bench Trial - Day 2 held on July 16, 2024 before Judge Sweeney. Pages: 304-563. <br> **NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** <br> Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (smitc, ) (Entered: 07/30/2024) |
| 07/30/2024 | 189 | TRANSCRIPT of Bench Trial - Day 3 held on July 17, 2024 before Judge Sweeney. Pages: 564-819. <br> **NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** <br> Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (smitc, ) (Entered: 07/30/2024) |
| 07/30/2024 | 190 | TRANSCRIPT of Bench Trial - Day 4 held on July 18, 2024 before Judge Sweeney. Pages: 820-836. <br> **NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing,** |

| | | |
|---|---|---|
| | | **each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (smtc, ) (Entered: 07/30/2024) |
| 07/30/2024 | [191](#) | MOTION for Attorney Fees *and Costs* by Defendant Shawn Smith. (Attachments: # [1](#) Affidavit, # [2](#) Exhibit, # [3](#) Exhibit)(Hays, Jessica) (Entered: 07/30/2024) |
| 08/01/2024 | [192](#) | First MOTION for Attorney Fees *OPPOSED* by Defendant Ashley Epp. (Attachments: # [1](#) Exhibit Attorney Fee Schedule, # [2](#) Exhibit Epp Declaration / Affidavit, # [3](#) Exhibit Epp CV, # [4](#) Exhibit Epp 2023 Income, # [5](#) Exhibit Estimate of Entitled Reisch Fees, # [6](#) Exhibit Prescott Tweets During Trial)(Epp, Ashley) (Entered: 08/01/2024) |
| 08/01/2024 | [193](#) | BILL OF Costs by Defendant Ashley Epp. (Attachments: # [1](#) Exhibit)(Epp, Ashley) Modified on 8/1/2024 to edit title per chambers. (sphil, ). (Entered: 08/01/2024) |
| 08/01/2024 | [194](#) | Amended BILL OF COSTS re: [193](#) Unopposed first bill of costs by Defendant Ashley Epp. (Epp, Ashley) Modified on 8/2/2024 to edit title per chambers. (sphil, ). (Entered: 08/01/2024) |
| 08/01/2024 | [195](#) | NON-STIPULATED Proposed Bill of Costs by Defendant Holly Kasun. Parties conferred on 8/1/2024.<br><br>The following category or categories remain under dispute: Fees of the Clerk. Fees and disbursements for printing. Fees for exemplification and copies of papers necessarily obtained for use in the case.<br><br>Per court procedure, any objection to the Proposed Bill of Costs is due within 14 days (Attachments: # [1](#) Affidavit, # [2](#) Affidavit, # [3](#) Exhibit, # [4](#) Exhibit, # [5](#) Exhibit, # [6](#) Exhibit, # [7](#) Exhibit, # [8](#) Exhibit, # [9](#) Exhibit, # [10](#) Exhibit)(Wynne, Michael) (Entered: 08/01/2024) |
| 08/01/2024 | [196](#) | STIPULATED Proposed Bill of Costs by Defendant Shawn Smith. Parties conferred on 8/1/2024.<br><br><br>The Proposed Bill of Costs is stipulated to in its entirety by all parties. No costs remain under dispute (Attachments: # [1](#) Itemized Expenses)(Hays, Jessica) (Entered: 08/01/2024) |
| 08/13/2024 | [197](#) | RESPONSE to [195](#) Proposed Bill of Costs,, by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Erickson, Amy) (Entered: 08/13/2024) |
| 08/16/2024 | [198](#) | NOTICE OF APPEAL as to [185](#) Judgment, by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota (Filing fee $ 605, Receipt Number ACODC-9827127) (Erickson, Amy) (Entered: 08/16/2024) |
| 08/19/2024 | [199](#) | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the [198](#) Notice of Appeal filed by Mi Familia Vota, Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado to the U.S. Court of Appeals. ( Retained Counsel, Fee paid,) (Attachments: # [1](#) Preliminary Record)(sphil, ) (Entered: 08/19/2024) |
| 08/19/2024 | [200](#) | USCA Case Number 24-1328 for [198](#) Notice of Appeal filed by Mi Familia Vota, Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado. (sphil, ) (Entered: 08/20/2024) |
| 08/20/2024 | [201](#) | **"STRICKEN"** - RESPONSE to [192](#) First MOTION for Attorney Fees *OPPOSED* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women |

| | | |
|---|---|---|
| | | Voters of Colorado, Mi Familia Vota. (Attachments: # 1 Exhibit A)(Erickson, Amy) Modified on 8/22/2024 to STRIKE per 204 MINUTE ORDER (dgumb, ). (Entered: 08/20/2024) |
| 08/20/2024 | 202 | **"STRICKEN"** - RESPONSE to 191 MOTION for Attorney Fees *and Costs* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Attachments: # 1 Exhibit A)(Erickson, Amy) Modified on 8/22/2024 to STRIKE per 204 MINUTE ORDER (dgumb, ). (Entered: 08/20/2024) |
| 08/20/2024 | 203 | OBJECTION to 195 Proposed Bill of Costs,, by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. Any reply is due within 14 days. (Attachments: # 1 Exhibit A)(Erickson, Amy) (Entered: 08/20/2024) |
| 08/21/2024 | 204 | MINUTE ORDER re: 201 Response to 192 First MOTION for Attorney Fees and 202 Response to 191 Motion for Attorney Fees and Costs. The Responses at ECF Nos. 201 and 202 are STRICKEN for failure to comply with this Court's Uniform Civil Practice Standards. Specifically, CNS Civ. Practice Standard 10.1(c) which can be found here. The Court grants the Plaintiffs to and including 8/27/2024 to refile page-compliant responses. By Judge Charlotte N. Sweeney on 8/21/2024. Text Only Entry (cnsja, ) (Entered: 08/21/2024) |
| 08/27/2024 | 205 | RESPONSE to 192 First MOTION for Attorney Fees *OPPOSED* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Attachments: # 1 Exhibit A)(Erickson, Amy) (Entered: 08/27/2024) |
| 08/27/2024 | 206 | RESPONSE to 191 MOTION for Attorney Fees *and Costs* filed by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Attachments: # 1 Exhibit A)(Erickson, Amy) (Entered: 08/27/2024) |
| 08/27/2024 | 207 | OBJECTION to 195 Proposed Bill of Costs,, by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. Any reply is due within 14 days. (Attachments: # 1 Exhibit A)(Erickson, Amy) (Entered: 08/27/2024) |
| 08/29/2024 | 208 | TRANSCRIPT ORDER FORM re 198 Notice of Appeal by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota (Hostetler, Courtney) (Entered: 08/29/2024) |
| 08/29/2024 | 209 | LETTER TO USCA and all counsel certifying the record is complete as to 198 Notice of Appeal filed by Mi Familia Vota, Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado. A transcript order form was filed stating that the necessary transcript is already on file. ( Appeal No. 24-1328). Text Only Entry. (sphil, ) (Entered: 08/29/2024) |
| 09/03/2024 | 210 | REPLY to Response to 192 First MOTION for Attorney Fees *OPPOSED* filed by Defendant Ashley Epp. (Epp, Ashley) (Entered: 09/03/2024) |
| 09/03/2024 | 211 | REPLY to 203 Objection to Proposed Bill of Costs, by Defendant Holly Kasun. (Wynne, Michael) (Entered: 09/03/2024) |
| 09/03/2024 | 212 | REPLY to Response to 191 MOTION for Attorney Fees *and Costs* filed by Defendant Shawn Smith. (Hays, Jessica) (Entered: 09/03/2024) |
| 12/11/2024 | 213 | MOTION to Withdraw as Attorney *of Record (K. Stock)* by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. (Stock, Kristin) (Entered: 12/11/2024) |
| 12/12/2024 | 214 | ORDER granting 213 Motion to Withdraw as Attorney of Record (K. Stock) by Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, Mi Familia Vota. Attorney Kristin M. Stock is withdrawn. By Judge Charlotte N. Sweeney on 12/12/2024. Text Only Entry(cnsja, ) (Entered: 12/12/2024) |
| 12/12/2024 | 215 | MINUTE ORDER: Upon review of the filings in this case, the parties are ordered to review this Court's Uniform Civil Practice Standards. Specifically, CNS Civ. Practice Standard 10.1(a) which can be found here. The parties' future filings shall be made in Arial 12-point font. The |

| | | Court may summarily strike future filings that do not comply. By Judge Charlotte N. Sweeney on 12/12/2024. Text Only Entry (cnsja, ) (Entered: 12/12/2024) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/23/2024 08:09:09 | | | |
| **PACER Login:** | michaeljwynne | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-00581-CNS-NRN |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. ___1:22-cv-00581-NYW___

Colorado Montana Wyoming
State Area Conference of the NAACP,
League of Women Voters of Colorado, and
Mi Familia Vota,

      Plaintiffs,

v.

United States Election Integrity Plan, Shawn Smith,
Ashley Epp, and Holly Kasun,

      Defendants.

---

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

## **INTRODUCTION**

Voter intimidation poses a lethal threat to democratic government. Recognizing this danger, Congress has passed two statutes—the Voting Rights Act of 1965 ("VRA") and the Ku Klux Klan Act of 1871 ("KKK Act")—creating a private right of action against individuals or entities who seek to threaten, coerce, or suppress the right to vote. Courts have been equally stalwart in protecting voters from intimidation. *See, e.g.*, *Spencer v. Blackwell*, 347 F.Supp.2d 528, 535 (S.D. Ohio 2004) ("Voter intimidation severely burdens the right to vote.") (citing *Burson v. Freeman*, 504 U.S. 191, 206 (1992)); *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) ("[T]he right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and

1

48374360v4

political rights."). Simply put, our political and judicial institutions have long understood that free and fair elections are the lifeblood of American democracy:

> "The right to vote embodies the very essence of democracy. Absent free and fair elections uninfluenced by fear, the underpinnings of democratic rule would crumble. The United States Constitution, as enforced by Congress and the courts, enshrines these principles." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 464 (S.D.N.Y. 2020).

The Defendants in this case are carrying out a campaign to intimidate voters. Armed with badges and weapons, they travel door-to-door to the homes of some of Colorado's most vulnerable voters, demanding to know if they participated in the 2020 election, pressing them for information on how they cast their votes, interrogating them about so-called fraudulent ballots, and taking photographs of their homes. This well-funded and sophisticated conspiracy has a clear purpose: to strike fear in the hearts of certain Colorado voters so that they do not turn out at the polls in 2022. Defendants have made it clear to certain voters that intimidation and threats will follow them home from the polling place; that voting now carries the risk that armed vigilantes may come to their homes; and that they should be afraid to vote. It is a brazen, unapologetic, and malignant strain of voter intimidation—and it must be immediately stopped.

Plaintiffs are non-profit organizations that provide a wide range of services and support in the areas of voter education, registration, and political participation and activism. Because of Defendants' unlawful actions, these organizations have been forced to divert valuable time and resources from their core missions. This work remains on hold as Plaintiffs urgently seek to restore Colorado voters' trust in the electoral system, rehabilitate their sense of personal security, and ensure that voters of color can vote without fear of post-election intimidation and threats.

48374360v4

With 2022 campaigns beginning across the state, and primary and general elections on the horizon, an immediate injunction is needed to stop Defendants' voter intimidation campaign, and the harm this campaign continues to cause Plaintiffs and the Coloradans they represent.

## BACKGROUND

**A.    USEIP Is a Militant, Aggressive Voter Intimidation Group Disguised as an "Election Integrity Plan."**

United States Election Integrity Plan ("USEIP") was formed on November 7, 2020 in response to so-called "blatant election fraud" that USEIP falsely claims took place during the 2020 presidential election.[1]  (*See* https://useip.org/about/.)  While USEIP's stated purpose—"to get a better understanding of what happened in the 2020 election, to find truth, expose the truth, and share the truth . . .  If there was fraud in 2020 let's find it, fix it, and hold those responsible accountable"—may sound innocuous, both its history and its actions are anything but benign. (*See* https://useip.org/.)

USEIP's founders and early members initially met in online chatrooms and at rallies, stoking false claims of a stolen 2020 presidential election.  (*See, e.g.*, Eric Maulbetsch, *Colorado Republican Legislators Join Election Fraud Conspiracy Panel*, COLORADO TIMES RECORDER (Mar. 9, 2021), https://coloradotimesrecorder.com/2021/03/colorado-republican-legislators-join-election-fraud-conspiracy-panel/34839/ (noting that Defendant Ashley Epp organized several post-election "Stop the Steal" rallies in Denver, which—among other things—promoted the false claim that China "funded the voting machines" used to rig the 2020 presidential election) (hereinafter "Maulbetsch, *Election Fraud Conspiracy Panel*").)  In addition, the group has clear ties

---

[1] Defendants Shawn Smith, Ashley Epp, and Holly Kasun were among the original founders of USEIP. (Erik Maulbetsch, *Colorado Election Conspiracy Group Going Door-to-Door in Search of 'Phantom Ballots'*, COLORADO TIMES RECORDER (Aug. 17, 2021), https://coloradotimesrecorder.com/2021/08/colorado-election-conspiracy-group-going-door-to-door-in-search-of-phantom-ballots/38866/.

3

to QAnon, which has been linked to numerous violent acts since 2018, and which the FBI and Combating Terrorism Center at West Point have identified as a potential domestic terror threat and "novel challenge to public security," respectively.   (*See* Lois Beckett, *QAnon: a timeline of violence linked to the conspiracy theory*, THE GUARDIAN (Oct. 16, 2020), https://www.theguardian.com/us-news/2020/oct/15/qanon-violence-crimes-timeline   (describing acts of violence linked to QAnon); Erick Maulbetsch, *Colorado Election Conspiracy Group Going Door-to-Door in Search of 'Phantom Ballots*, COLORADO TIMES RECORDER (Aug. 17, 2021), https://coloradotimesrecorder.com/2021/08/colorado-election-conspiracy-group-going-door-to-door-in-search-of-phantom-ballots/38866/   (noting that USEIP has been linked to QAnon) (hereinafter "Maulbetsch, *Election Conspiracy Group Going Door-to-Door*").)

USEIP also actively recruited Coloradans to participate in the insurrection at the U.S. Capitol on the January 6, 2021, which resulted in the deaths of five individuals and countless other injuries.   An estimated 40 USEIP members—including Defendant Epp—participated. (Maulbetsch, *Election Fraud Conspiracy Panel* (describing USEIP's involvement in the January 6, 2021 insurrection); *Kenya* Evelyn, *Capitol attack: the five people who died*, THE GUARDIAN (Jan. 8, 2021), https://www.theguardian.com/us-news/2021/jan/08/capitol-attack-police-officer-five-deaths (describing the death of Capitol police officer Brian Sicknick, who was struck in the head by violent rioters, and noting that an additional 60 Capitol police officers were injured attempting to protect the Capitol from insurrectionists).   Further, in a chatroom that helped organize a caravan of USEIP members to Washington, D.C., members shared links to websites that sold weapons, such as stun guns, and offered strategy on ways to deal with physical confrontation, even going so far as to share a link to a manual of police foot tactics.   (Erik Maulbetsch, *CO GOP Selects Member of QAnon-Linked Conspiracy Group That Organized Jan

*6 Caravan As Its 'Election Integrity' Chair*, COLORADO TIMES RECORDER (Aug. 11, 2021),

https://coloradotimesrecorder.com/2021/08/co-gop-selects-member-of-qanon-linked-conspiracy-

group-that-organized-jan-6-caravan-as-its-election-integrity-chair/38507/.)

    More than a year since the insurrection, members of USEIP continue to impliedly and

explicitly threaten violence against individuals whom they allege were involved in election

fraud—in other words, people involved in the election of candidates opposed by USEIP.  Indeed,

the recent death threats made by USEIP founder Shawn Smith against Colorado Secretary of State

Jena Griswold are examples of these continued threats of violence.  Speaking at a February 10,

2022 rally hosted by FEC United,[2] Shawn Smith said of Secretary Griswold: "I think if you are

involved in election fraud then you deserve to hang. Sometimes the old ways are the best ways."

(Chase Woodruff, *At 'Emergency' Meeting, CO Election Conspiracist Says Officials Involved in*

*Fraud    'Deserve    to    Hang'*,    COLORADO    TIMES    RECORDER    (FEB.    12,    2022),

https://coloradotimesrecorder.com/2022/02/at-emergency-meeting-co-election-conspiracist-says-

officials-involved-in-fraud-deserve-to-hang/43057/.)

    USEIP's "County & Local Organizing Playbook," which sets forth USEIP's principles and

goals, makes clear that USEIP is willing to pull out all stops to uncover supposed election fraud,

even if it means engaging in violent and intimidating behavior.  (*See* USEIP, County & Local

Organizing            Playbook            (Aug.            2021),

https://useipdotus.files.wordpress.com/2021/08/useip_playbook_aug2021.pdf. (the "Playbook").)

The Playbook is replete with incendiary language that illuminates USEIP's violent and

intimidating behavior.  Among other things, the Playbook exclaims: "This is the fight . . . . No one

is coming to save us. It's time to stand up . . . . But we are not at a time of peace. And everyone

---

[2] FEC United's founder, Joe Oltmann, has called for the mass hanging of political opponents, including Colorado Governor Jared Polis.  FEC United also has an affiliated militia wing.

who values freedom and is committed to the fight for our Republic is now needed." (Playbook at 3-7.) The 29-page Playbook also warns USEIP volunteers to ensure that the group is not infiltrated by outsiders with ulterior motives, even pointing out how the group has altered its vetting procedures, as previous volunteers "had a criminal history of sexual misconduct." (Playbook at 9.) While USEIP claims to be a group of concerned citizens exploring the "truth" as it relates to election integrity concerns, the Playbook can be best described as a county-level guide to voter intimidation.

**B.    USEIP Goes Door-to-Door in Colorado Intimidating Voters Under the Guise of Uncovering Alleged Election Fraud.**

Employing the Playbook and using voter rolls purchased by Defendant Smith, USEIP is now taking its threatening and intimidating behavior directly to the homes of Colorado voters. (*See* Declaration of Casey Breese Ex. A.)  More specifically, in an effort to uncover purported election fraud, USEIP is going door-to-door across Colorado, interrogating Colorado voters under the pretense of seeking to uncover "phantom ballots." (Maulbetsch, *Election Conspiracy Group Going Door-to-Door* (noting that USEIP claims to have "evidence" consisting of graphs for each county that purport to show more votes cast that registered voters—a claim that has been debunked by county clerks and election experts).) Sometimes armed and often donning badges to present a false appearance of government officiality, USEIP volunteers ask voters to confirm their addresses, whether they participated in the 2020 election, and—if so—how they cast their vote. They tell voters falsely that their ballots were cast fraudulently or that election fraud was committed under their name or address. (*Id.*) USEIP also has begun to target purportedly "high-density housing" and areas where there are high numbers of registered Democrats. (Erik Maulbetsch, *Colorado Election Fraud Group is Training Conspiracists in Other States to Knock Doors in Search of 'Phantom Ballots'*, Colorado Times Recorder (Oct. 1, 2021),

https://coloradotimesrecorder.com/2021/10/colorado-election-fraud-group-is-training-conspiracists-in-other-states-to-knock-doors-in-search-of-phantom-ballots/39935/ (hereinafter "Maulbetsch, *Training Conspiracists*").)

Paving the way for further voter intimidation, USEIP is also using its canvassing efforts to build a database of photos of voters' residences. (Maulbetsch, *Election Conspiracy Group Going Door-to-Door*.) USEIP encourages its agents to arm themselves and has suggested that its armed agents coordinate with the unarmed members to provide "security" in their operations. (Maulbetsch, *Training Conspiracists*.) One member has even stated that it was USEIP's canvassing actions "right after the rigged 'lections (sic)" that led him to apply for his conceal and carry permit. (*Id.*) USEIP's door-to-door voter intimidation has prompted an official warning from Colorado Secretary of State Jena Griswold, reminding voters that the State of Colorado has not commissioned such activity and informing voters of their rights and how to respond if they feel harassed or threatened. (Colorado Secretary of State Jena Griswold, News Release, *In Response to Reported Unofficial Door-to-Door Canvassing of Colorado Voters, the Colorado Secretary of State's Office Reminds Voters of Their Constitutionally Protected Rights* (Sept. 9, 2021),

https://www.sos.state.co.us/pubs/newsRoom/pressReleases/2021/PR20210909Canvassing.html.); *see also* Eric Maulbetsch, *Election Fraud Conspiracists Still Knocking on Colorado Voters' Doors* (Nov. 23, 2021), https://coloradotimesrecorder.com/2021/11/election-fraud-conspiracists-still-knocking-on-colorado-voters-doors/41178/ (noting that federal and state officials are already investigating at least two people linked to USEIP) (hereinafter "Maulbetsch, *Election Conspiracists Still Knocking*").)

48374360v4

USEIP's reach continues to expand, now reaching at least seventeen counties in Colorado—including Jefferson, Boulder, El Paso, Douglass, Larimer, Otero, Mesa, and Weld—and coinciding with the first deadlines for the March Precinct Party Caucuses, which occurred in February 2022. (*See* Maulbetsch, *Election Conspiracists Still Knocking*; Maulbetsch, *Colorado Election Conspiracy Group Going Door-to-Door*; Secretary of State, *2022 Election Calendar*, https://www.sos.state.co.us/pubs/elections/calendars/2022ElectionCalendar.pdf.)   In addition, USEIP's actions (and the actions of similar and/or related groups) are reportedly expanding into other states across the country.   (*See, e.g.*, *Jonathan Shorman & Jeanne Kuang*, *In Missouri, 2020 election conspiracists persist as Jan. 6 attack anniversary approaches,* THE KANSAS CITY STAR (Jan. 5, 2022); Jan Wondra, *Election Conspiracy Fraud Group Expanding States in Door-to-Door Effort*, ARK VALLEY VOICE (Dec. 9, 2021) (discussing USEIP-like actions taking place across Utah).)

USEIP's door-to-door campaign intimidates voters who plan or had planned to vote in the upcoming elections. For voters, the threat posed by USEIP agents is only increased by the group's visible participation in the January 6, 2021 insurrection, its organization and publicization of "Stop the Steal" rallies, and its Playbook. USEIP's actions have created the intimidating environment in which voters must now decide whether they can safely exercise their right to vote.

## C.  USEIP's Actions Have a Chilling Effect on Civic Engagement Groups and Their Members, Who Are Colorado Voters.

In the Fall of 2021, Plaintiffs learned that USEIP was sending its members door-to-door in connection with the group's purported attempt to find evidence of voter fraud.  (*See* Declaration of Beth Hendrix ("Hendrix Dec.") ¶ 5; Declaration of Portia Prescott ("Prescott Dec.") ¶ 7; Declaration of  Salvador Hernandez ("Hernandez Dec.") ¶ 7.)  Because USEIP volunteers wear badges identifying themselves with official sounding names, such as "Voter Integrity Committee,"

48374360v4

possess specific information about voters, and are sometimes armed, their behavior is intimidating to Colorado voters, including Plaintiffs' members. (*See* Hendrix Dec. ¶¶ 7-9; Prescott Dec. ¶ 8; Hernandez Dec. ¶ 7.)  The door-to-door campaign is particularly intimidating for voters of color. Plaintiff groups represent members who have long experienced racial and ethnic discrimination, threats, and violence in their communities and homes, including actions to intimidate and suppress voters of color. (*See* Prescott Dec. ¶¶ 8-9; Hernandez Dec. ¶ 8.). The door-to-door campaign is "drastic and alarming in that they are showing up at the *homes* of Black (and other voters)." (Prescott Dec. ¶ 10.)  USEIP has put Plaintiffs' members on notice that voting may lead USEIP agents to their doors.

As a result, USEIP's actions are a direct assault on Plaintiffs' missions, which include ensuring that young, new, vulnerable, and minority voters in Colorado are able to safety participate in the political process on Election Day.  (*See* Hendrix Dec. ¶¶ 3-4; Prescott Dec. ¶¶ 2-6; Hernandez Dec. ¶¶ 2-6.)  Plaintiffs have been forced to redirect their resources to address USEIP's ongoing voter intimidation campaign.  (*See* Hendrix Dec. ¶ 11; Prescott Dec. ¶ 12; Hernandez Dec. ¶ 11.)  These are critical resources that could have been used elsewhere to further Plaintiffs' missions.  (*See* Hendrix Dec. ¶ 11; Prescott Dec. ¶ 12; Hernandez Dec. ¶ 11.)  By way of example, Plaintiff Mi Familia Vota will have to mobilize to disperse accurate information and respond to community concerns about voter safety in areas that have been targeted by USEIP.  (Hernandez Dec. ¶ 13.)

This diversion of resources means that Mi Familia Vota will have less resources to spend on ballot-level issues, efforts to build voter confidence and engagement, and efforts to spread awareness about upcoming elections and candidates.  (Hernandez Dec. ¶ 13.)  Likewise, Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP ("NAACP Colorado") and

48374360v4

League of Women Voters of Colorado ("LWVCO") have been forced to divert resources away from their core functions of educating voters on ballot initiatives and ensuring that every American has access to free and fair elections, and towards activities that combat disinformation disseminated and voter intimidation caused by USEIP and the individual Defendants.  (Hendrix Dec. ¶ 11; Prescott Dec. ¶¶ 12-14.)

USEIP's actions are a direct assault on the Voter Organizations' mission and voters' right to exercise their right to vote.  Defendants' intimidation of voters must be stopped.

## **ARGUMENT**

A party moving for an injunction must demonstrate: (1) a likelihood of success on the merits; (2) a likely threat of irreparable harm to the movant; (3) the harm alleged by the movant outweighs any harm to the non-moving party; and (4) an injunction is in the public interest.  *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) (citations omitted); *see also* Fed. R. Civ. P. 65; *People's Trust Federal Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018) (noting that the requirements are the same for temporary restraining orders and preliminary injunction orders).  The purpose of an injunction is "to preserve the status quo pending the outcome of the case."  *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986)).  Because Plaintiffs can demonstrate a likelihood of success on the merits, a likely threat of irreparable harm, that the balance of harms weighs in

48374360v4

favor of Plaintiffs, and their request for relief is in the public interest, they are entitled to an injunction enjoining Defendants from further intimidating Colorado voters.[3]

**A.      Plaintiffs Are Likely To Succeed.**

Section 11(b) of the Voting Rights Act of 1965 provides a private right of action for injunctive relief against private actors who engage in voter intimidation. *Allen v. State Bd. of Elections*, 393 U.S. 544, 554–56 (1969). The relevant portion of the provision states:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under [other provisions of this law].

52 U.S.C. § 10307(b) (formerly codified at 42 U.S.C. § 1973i(b)).

To succeed on a claim under Section 11(b), Plaintiffs must show that Defendants: (1) intimidated, threatened, or coerced, or attempted to intimidate threaten or coerce, another person;

---

[3] NAACP Colorado, LWVCO, and MFV have standing to bring this action because they have had to and/or will be forced to divert significant resources from their core activities to combat Defendants' voter intimidation. (*See* Prescott Dec. ¶¶ 12-14; Hendrix Dec. ¶¶ 11-12; Hernandez Dec. ¶¶ 11-21.)  The actual diversion and likely future diversion of resources by these organizations, caused directly by Defendants' wrongful conduct, confers direct organizational standing upon them to pursue this case. *See Pavek v. Simon*, No. 19 Civ. 3000 (SRN/DTS), 2020 WL 3183249, at *10 (D. Minn. June 15, 2020) (holding that Plaintiff political organizations had standing because they were forced to divert resources to counteract the effects of the statute being challenged in the litigation); *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 464 (S.D.N.Y. 2020) (same).  In addition, as a non-profit civic engagement organizations with missions that include encouraging informed and active participation of its members in government, many of whom have been intimidated by Defendants' actions from exercising their right to vote, Plaintiffs have standing on behalf of their members to seek an injunction.  *See Sierra Club v. Young Life Campaign, Inc.*, 176 F.Supp.2d 1070 (D. Colo. 2001) (holding that Sierra Club established standing to sue on behalf of its members by alleging that Defendant's failure to comply with the Clean Water Act caused injury to the past, present, and future interests of the Sierra Club and its members).

48374360v4

(2) in connection with voting, attempting to vote, or urging or aiding another to vote. 52 U.S.C. § 10307(b).

The operative language of Section 11(b) is broad, is not limited to any particular act, and is not restricted to overt acts of violence or physical threats. *See* 52 U.S.C. § 10307(b). Voter intimidation tactics violate Section 11(b) when they are undertaken by any private person, "whether acting under color of law *or otherwise*. . . ." 52 U.S.C. § 10307(b) (emphasis added). "[T]he language 'or otherwise' indicates Congressional intent to reach both government and private conduct under § 11(b)." *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Interest Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *3 (E.D. Va. Aug. 13, 2018) ("*LULAC*"). Moreover, as the *LULAC* court observed, "[i]ntimidation means putting a person in fear for the purpose of compelling or deterring his or her conduct." 2018 WL 3848404, at *4 (internal quotation marks and citation omitted). Thus, Section 11(b) is violated by, among other things, any actual or attempted action by any person to instill fear in connection with one's exercise of the right to vote. *See Daschle v. Thune*, Temporary Restraining Order, Case No. 04-4177 (D.S.D Nov 2, 2004) (finding that the defendants violated Section 11(b) and objectively intimidated Native American voters by following voters from polling places, copying down voters' license plate numbers, and by recording their license plates).

Passed as part of the Civil Rights Act of 1871, the Ku Klux Klan Act creates a cause of action against those who "conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy" to a candidate for national office. *See* 42 U.S.C. § 1985(3). To prevail on a claim under this section of the Act, a plaintiff must show: (1) a conspiracy of two or more, (2) to prevent by force, intimidation, or threat, (3) any citizen from giving his or her "support or advocacy" to a candidate—in this instance, by voting—for

48374360v4

federal office, and (4) an act in furtherance of that conspiracy.  *See LULAC*, 2018 WL 3848404, at *1, 5–6; *see also Kush* v. *Rutledge*, 460 U.S. 719, 724 (1983) (noting that Section 1985(3) "proscribe[s] conspiracies that interfere with" among other things "the right to support candidates in federal elections").

The "support or advocacy" clause protects civil rights in two separate ways.  First, it reflects Congress' "power to protect and enforce" the constitutional right to vote.  *See The Ku Klux Cases*, 110 U.S. 651, 665 (1884) (recognizing that the Fifteenth Amendment "confer[s] . . . the right to vote").  Second, it creates an independent cause of action to protect voters, which is both separate and complementary to its ability to vindicate the constitutional right to vote.  *See LULAC*, 2018 WL 3848404 at *1, 5–6; *see also Paynes v. Lee*, 377 F.2d 61, 64 (5th Cir. 1967) ("By the sometimes called Ku Klux Act, a Federal right was created to recover damages for interfering with Federal voting rights.").  A violation of Section 1985(3) does not require state action. *Griffin* v. *Breckenridge*, 403 U.S. 88, 96 (1971) ("On their face, the words of [§ 1985(3)] fully encompass the conduct of private persons."). Nor is there an intent requirement. *Kush*, 460 U.S. at 726.

### 1.    Plaintiffs Are Likely to Succeed Under Section 11(b) of the VRA

Defendants have engaged in actions to intimidate, threaten, and coerce voters, and have publicly admitted plans to continue their door-to-door voter intimidation campaign.  Defendants' conduct—whether or not they intend for their acts of intimidation, threats, and coercion to deter voters—violates the Voting Rights Act.

The words "intimidate," "threaten," and "coerce" have a broad meaning under Section 11(b). The Supreme Court has recognized that Congress intended to give the Voting Rights Act "the broadest possible scope." *Allen*, 393 U.S. at 567. Section 11(b) protects people who are "voting," "attempting to vote," or "urging or aiding any person to vote or attempt to vote." These

48374360v4

phrases have been interpreted expansively, as "voting" under the Voting Rights Act "includes 'all action necessary to make a vote effective.'" *Allen*, 393 U.S. at 566; *see also U.S. by Katzenbach v. Original Knights of Ku Klux Klan,* 250 F. Supp. 330, 353 (E.D. La. 1965) (stating that Section 131(b) "may be extended against interference with any activity having a rational relationship with the federal political process"); *United States v. McLeod*, 385 F.2d 734, 734 (5th Cir. 1967) (voter registration meetings protected by Section 131(b)); *Willingham v. Cnty. of Albany*, 593 F. Supp. 2d 446, 462-64 (N.D.N.Y. 2006) (filling out blank absentee ballots and ballot applications that were collected from eligible voters via questionable methods could give rise to a Section 11(b) claim).

So long as there is a sufficient nexus between the alleged intimidation and voting-related activity, the intimidation violates Section 11(b). *See United States v. Robinson*, 813 F.3d 251, 259 (6th Cir. 2016) ("That [the victim] had desired to vote for [a different mayoral candidate] but did not leave his house because of the presence of [defendants] amounted to intentional intimidation and oppression of voting rights."). The threat of an armed member of USEIP knocking on a voter's door to interrogate them about an alleged fraudulent ballot or perceived claims of voting fraud, or to accuse them or their family members of casting fraudulent ballots, is intimidating and threatening to even the most experienced voters. This is particularly true given the organization's Playbook, which pointedly declares that "we are not in a time of peace." (Playbook at 7.) The threat is also inescapable; USEIP's campaign means that, regardless of the method by which voters cast their ballots, voters risk having to face intimidating, armed agents showing up at their homes and taking photographs of their residences.

The threat and intimidation felt when a potentially armed stranger knocks on one's door is particularly acute for those in Black and Latino communities represented by Plaintiffs NAACP

14

48374360v4

Colorado and MFV.  People of color, in Colorado and across the country, have endured a long and ongoing history of racial and ethnic violence in their homes and communities.[4] Terror, threats, and violence—both at polling places and at voters' own homes—have been tools used to suppress the Black and Latino vote.[5]

Defendants' conduct clearly falls within the scope of voting related activity under Section 11(b).  Defendants cannot escape injunctive relief, or ultimate liability, by claiming they are merely having conversations with voters. According to the Department of Justice, voter intimidation includes a broad range of conduct "intended to force prospective voters to vote against their preferences, or refrain from voting, through activity reasonably calculated to instill some form of fear."[6]  The Ninth Circuit, in interpreting California's analogue to Section 11(b), noted that intimidation under that law "is not limited to displays or applications of force, but can be achieved through manipulation and suggestion." *United States v. Nguyen*, 673 F.3d 1259, 1265 (9th Cir. 2012) (finding a letter sent to Hispanic voters warning of incarceration or deportation resulting from illegal voting could have "constituted a tactic of intimidation" under California's voter

---

[4] For example, in the early twentieth century, Black Coloradans who attempted to move into predominantly white neighborhoods faced violence from the Klu Klux Klan in their own homes; Black people were threatened, confronted with burning crosses, and at least three homes owned by Black people were bombed, with housing discrimination and police brutality continuing for decades thereafter. *See, e.g.*, Richard Delgado & Jean Stefancic, *Home-Grown Racism: Colorado's Historic Embrace—And Denial Of—Equal Opportunity in Higher Education*, 70 U. Colo. L. Rev. 703, 733-737 (1999). Colorado just last year experienced a record high number of reported hate crimes, after trending upward annually since 2017 and increasing 22% from 2019 to 2020. Crimes against Black and Latino people motivated by hatred against their race or ethnicity spiked significantly. Elise Schmelzer, *Record Number of Hate Crimes Reported to Colorado Law Enforcement in 2020*, Denver Post Sept. 1, 2021, https://www.denverpost.com/2021/09/01/colorado-hate-crimes-2020/.

[5] Brad Epperly et al, *Rule by Violence, Rule by Law: Lynching, Jim Crow, and the Continuing Evolution of Voter Suppression in the U.S.*, 18 Perspectives on Politics 756 (2020) (examining use of violence, threats, and lynchings to terrorize potential voters and suppress the vote in the American South); *see also Paynes v. Lee*, 377 F.2d 61,63 (5th Cir. 1967) (men visited a Black potential voter at his home and threatened to "annihilate" him if he attempted to register to vote again).

[6] U.S. Department of Justice, *Federal Prosecution of Election Offenses,* 8th Ed., Dec. 2017, at 52, https://www.justice.gov/criminal/file/1029066/download.

intimidation statute); *see also Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 209 (3d Cir. 2012) (holding that a 1982 consent decree continued to be necessary "to help ensure that potential minority voters are not dissuaded from going to the polling station to vote" because, without it, RNC would likely resume intimidating "ballot security" activities, such as aggressive poll-watching and reporting registered minority voters as ineligible for having undeliverable addresses); Consent Decree, *United States v. N.C. Republican Party, et. al.*, No. 91-161-CIV-5-F (E.D.N.C Feb. 27, 1992) (entering a consent agreement under Section 11(b) prohibiting "ballot security" measures, after party sent thousands of postcards to registered African-American voters warning that it was a federal crime, "punishable by up to five years in jail," to give false information to an election official).

Defendants ostensibly claim they are investigating "fraud" in the 2020 election, but they are in fact coordinating their actions with the goal of intimidating certain groups of voters. Setting aside the fact that claims of "fraud" have been overwhelmingly rejected and discredited, Defendants' underlying goal has little to do with "fraud" but instead targets certain groups for intimidation under the guise of "fraud" in the election process. In a dangerous repetition of history, Plaintiffs and their voting members have become a target of Defendants' voter intimidation. *See Republican Nat'l Comm.*, 673 F.3d at 196 (describing "ballot security" measures that in fact targeted racial and ethnic minority voters for voter challenge list, and staffed minority precincts with intimidating off-duty law enforcement officers); *Council on American-Islamic Relations— Minnesota v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371, 379 (D. Minn. 2020) (finding likelihood of success on the merits and acknowledging targeting of organizations and voters with a "known political orientation" as part of intimidating conduct). Defendants' convenient cover story does not excuse them from liability under Section 11(b).

48374360v4

Section 11(b) reaches any *objectively* intimidating act. Conduct that has the "inevitable effect" of discouraging, intimidating, threatening, or coercing people seeking to exercise their right to vote is prohibited. *United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965). Likewise, Section 11(b) does not include an intent requirement. *See* 52 U.S.C. § 10307(b) ("No person . . . shall . . . *attempt* to intimidate, threaten, or coerce any person for voting or attempting to vote") (emphasis added). Courts have consistently protected voters from objectively intimidating behavior without examining defendants' intent.  In *LULAC*, the court found that plaintiffs stated a viable intimidation claim under § 11(b) (and the Ku Klux Klan Act), where defendants allegedly published and publicized reports that falsely accused Virginia voters of committing felony voting fraud by registering to vote and/or voting. 2018 WL 3848404, at *1. The Court rejected the defendants' argument that the publication of the reports could not amount to intimidation under Section 11(b), finding that "[p]laintiffs have alleged, plausibly, that the [] reports put them in fear of harassment and interference with their right to vote" and, on that basis, stated a cognizable Section 11(b) claim. *Id.* at *4.  In granting plaintiffs' preliminary injunction motion in *Council on American-Islamic Relations—Minnesota v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371 (D. Minn. 2020), the court held that the defendants' plan to staff privately hired armed agents at certain polling places allegedly to "protect the polls from 'antifa,'" was "certainly likely to intimidate voters." *Id.* at 379. And in *Daschle v. Thune*, the court found that recording potential Native American voters' license plates was objectively intimidating. In granting a temporary restraining order to block defendants from copying or recording the license plates of Native American voters and from following voters from the polling places, the court explained that preventative measures were required to protect voters regardless of the defendants' intent: "Whether the intimidation was intended or simply the result of excessive zeal is not the issue, as the result was the intimidation

17

48374360v4

of prospective Native American voters in Charles Mix County. This is a small Native American population within which word travels quickly." *Daschle v. Thune*, Temporary Restraining Order, Case No. 04-4177 (D.S.D Nov 2, 2004).

The courts' reasoning in *LULAC, Daschle*, and *CAIR-Minnesota* apply with equal force here. Defendants' conduct—including but not limited to armed canvassers going door-to-door targeting groups of voters, photographing their homes, and inquiring about perceived claims of voter fraud—is objectively intimidating and threatening. Voters should not have to face the threat of privately armed agents at their polling places or on their doorsteps.  And, like false accusations of voter fraud in Virginia or the RNC's intimidating "ballot security" measures, Defendants' door-to-door canvassing constitutes an attempt at intimidation, placing Colorado voters in fear of harassment, interference with their right to vote, and overt acts of violence, especially given the armed nature of the visits.

Regardless of why Defendants claim they are going door to door, their methods are objectively intimidating and threatening. Plaintiffs are highly likely to succeed on their claim that Defendants violated Section 11(b).

### 2.    Plaintiffs Are Likely to Succeed Under the Ku Klux Klan Act

To prevail on a claim under the Ku Klux Klan Act, a plaintiff must show: (1) a conspiracy of two or more,[7] (2) to prevent by force, intimidation, or threat any citizen from giving his or her "support or advocacy" to a candidate—in this instance, by voting—for federal office, and (4) an "overt act" act in furtherance of that conspiracy.  *See LULAC*, 2018 WL 3848404, at *1, 5–6; *Nat'l Coalition on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 487–488 (S.D.N.Y. 2020).

---

[7] Under federal law, a conspiracy is: (1) an agreement between two or more persons to commit an unlawful act; (2) knowingly engaging in the conspiracy intending to commit those offense that were the object of the conspiracy; and (3) commission of an "overt act" by one or more members of the conspiracy in furtherance of the conspiracy. *U.S. v. Reyes*, 302 F.3d 48, 53 (2 d Cir. 2002).

48374360v4

"A conspiracy 'need not be shown by proof of an explicit agreement.'" *Nat'l Coalition on Black Civic Participation*, 498 F. Supp. 3d at 487 (quoting *Cine Sk8, Inc. v. Town of Henrietta*, 507 F.3d 778, 792 (2d Cir. 2007)).  Plaintiffs can demonstrate a substantial likelihood of success on the merits of their claim under the Ku Klux Klan Act.

Plaintiffs have pleaded that Defendants Smith, Epp, and Kasun have engaged in the intimidating conduct and coordinated their activities through USEIP and its agents.  Further, Defendants Smith, Epp, and Kasun founded USEIP.  Defendants' private and public conduct shows the likely existence of a conspiracy of two or more, if not several conspiracies of two or more individuals, that work to support USEIP's illegal voter intimidation.

The remaining elements of the claim—intimidation and threats and an "overt act" in furtherance of the conspiracy—have been discussed at length above in support of Plaintiffs' claims for violations of the Voting Rights Act.  *See Nat'l Coalition on Black Civic Participation*, 498 F. Supp. 3d at 488 (reasoning that "threat or intimidation" have the same meaning under the KKK Act as under the VRA).  There is no question that Defendants have intimidated and threatened Colorado voters, thereby preventing or hindering them from giving support or advocacy to candidates for public office. While abiding by a playbook that asserts that "[t]his is the fight," and that tells its agents and anyone reading its publicly available manual that "we are not at a time of peace," and while proactively and publicly seeking armed agents to join their door-to-door campaign, USEIP is going to voters' residences, recording their homes, interrogating voters about their votes, and accusing voters of having cast fraudulent ballots. These acts threaten the right to vote, intimidate voters, and violate the KKK Act as well as the VRA.

Further, Defendants' canvassing actions constitute individual acts of an unknown number in furtherance of their conspiracy aimed at threating and intimidating voters as they go door-to-

19

53

door throughout the state.  Any message that makes a Coloradan fearful of voting—whether by mail or in person at the polls—is unlawful under the KKK Act. *See Nat'l Coalition on Black Civic Participation*, 498 F. Supp. 3d at 488; *Paynes v. Lee*, 377 F.2d 61, 64 (5th Cir. 1967) (construing the right to vote broadly as "[t]he right to be free from threatened harm and the right to be protected from violence for an attempted exercise of a voting right are no less protected than the right to cast a ballot on the day of the election").

Section 1985(3) entitles Plaintiffs to the relief they seek, including injunctive relief, compensatory damages, and punitive damages. *See Mizell v. N. Broward Hosp. Dist.*, 427 F.2d 468, 473 (5th Cir. 1970) (injunctive relief available); *Freeman & Bass, P.A. v. N.J. Comm'n of Investigation*, 359 F. Supp. 1053, 1059 (D.N.J. 1973) (same); *see also* 42 U.S.C. § 1985(3); *Great Am. Fed. S. L. Assn. v. Novotny*, 442 U.S. 366, 376-77 (1979) (rejecting Title VII as predicate for Section 1985(3) claim citing in part the availability of compensatory and punitive damages); *Forsberg v. Pefanis*, 634 Fed. App'x 676, 680 (11th Cir. 2015) (holding that § 1985 permits punitive damages, even in the absence of compensatory damages); *see also Paynes*, 377 F.2d at 64-65 (permitting plaintiff to seek damages against defendants who had allegedly attempted to intimidate the plaintiff from registering to vote). Plaintiffs are likely to succeed on their claims under the KKK Act.

**B.    Plaintiffs Face Irreparable Harm.**

"To show a threat of irreparable harm, a plaintiff must demonstrate 'a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages.'" *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016) (quoting *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009)).  "Irreparable harm also occurs 'if the district court cannot remedy [the injury] following a final determination on the merits.'"  *Id.* (quoting *Prairie Band of*

48374360v4

*Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)).  Here, Plaintiffs will be irreparably harmed absent preliminary relief.

If Defendants' misconduct is not stopped immediately, the irreparable harm will result in an "injury inflicted upon Plaintiffs' and other members of the electorate's right to vote free of intimidation." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 474 (S.D.N.Y. 2020). "This is an injury of constitutional significance, and . . . interference with or abridgment of the right to vote gives rise to a finding of irreparable injury." *See also Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016) (citing *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) ("When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (citing *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (quoting 11A Charles Allen Wright et. al., Federal Practice and Procedure § 2948.1 (2d ed. 1995)); *id.* ("Because there can be no 'do-over' or redress of a denial of the right to vote after an election, denial of that right to vote weighs heavily in determining whether plaintiffs would be irreparably harmed absent an injunction.").

Plaintiffs also will continue to suffer irreparable harm in the form of diverted resources. More specifically, NAACP Colorado, LWVCO, and MFV have had to and/or will have to divert resources from their core activities to take new steps to address Defendants' acts of voter intimidation, including actively monitoring the voter intimidation and its members' safety concerns, strategizing about how to combat Defendants' actions, and dispersing information and responding to community concerns.  Absent Defendants' ongoing voter intimidation campaign, NAACP Colorado, LWVCO, and MVF would be spending these resources on activities central to their missions such as voter education, voter registration, and advocacy.  (*See* Prescott Dec. ¶¶ 12-14; Hendrix Dec. ¶¶ 11-12; Hernandez Dec. ¶¶ 11-21.). A *post hoc* damages award will not enable

21

48374360v4

Plaintiffs to undue the harm that their voter education, registration, and advocacy efforts will suffer if they are required to continue to divert resources away from those efforts.

For these reasons, "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. N. Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)); *see also Flores v. Town of Islip*, 382 F. Supp. 3d 197, 228 (E.D.N.Y. 2019) (collecting cases) (holding that "that there would be irreparable harm if the upcoming elections were permitted to proceed under a framework that violated the VRA."); *United States v. Berks Cnty., Pa,,* 250 F. Supp. 2d 525, 540 (E.D. Pa. 2003) (collecting cases) ("[T]he holding of an upcoming election in a manner that will violate the Voting Rights Act constitutes irreparable harm to voters."). Further, courts have repeatedly made clear that plaintiffs "would certainly suffer irreparable harm if their right to vote were impinged upon." *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) ("A restriction on the fundamental right to vote . . . constitutes irreparable injury."). *Obama for Am. v. Husted,* 697 F.3d 423, 436 (6th Cir. 2012) (citing *Williams,* 729 F.2d at 326). Indeed, individuals deprived of the right to vote in violation of the Voting Rights Act have no post-deprivation remedy to redress the violation. *See Casarez v. Val Verde Cnty.*, 957 F. Supp. 847, 864–65 (W.D.Tex.1997) (granting preliminary injunction because monetary damages could not redress Voting Rights Act violation); *see also Democratic Nat'l Comm. v. Bostelmann*, 447 F. Supp. 3d 757, 770 (W.D. Wis. 2020) (citing *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)) ("[T]raditional legal remedies would be inadequate, since infringement on a citizen's constitutional right to vote cannot be redressed by money damages."). For this reason, courts often grant preliminary injunctions and temporary restraining orders against voter intimidation prohibited under Section 11(b). *See, e.g., Ariz. Democratic Party v. Ariz. Republican Party*, No. 16 Civ. 03752 (PHX/JJT), 2016 WL 8669978 (D. Ariz. Nov. 4, 2016); *Daschle*, *supra*; *see also*

22

*Joyner v. Browning*, 30 F. Supp. 512 (W.D. Tenn. 1939) (pre-VRA case enjoining planned deployment of armed troops on election day).

Here there is irreparable harm both because Defendants' actions have intimidated voters and are continuing to intimidate voters, and because Defendants' misconduct has forced Plaintiffs to divert resources. *See Ariz. Democratic Party*, 2016 WL 8669978, at *11 ("[I]f some potential voters are improperly dissuaded from exercising their franchise, it is unlikely those voters can be identified, their votes cannot be recast, and no amount of traditional remedies such as money damages would suffice after the fact."); *Fish*, 840 F.3d at 752 (enjoining the enforcement of the elimination of the same-day registration provision and prohibition on counting out-of-precinct ballots because failure to enjoin the provisions prior to an election would result in irreparable harm). This harm cannot be rectified by monetary relief after the fact. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting Second, Third, and Sixth Circuit cases and noting that "once the election occurs, . . . [t]he injury to [] voters is real and completely irreparable if nothing is done to enjoin [the discriminatory voting process]").

Defendants must be enjoined immediately to prevent irreparable harm to Colorado voters, including Plaintiffs' members, and to Plaintiffs' voting rights efforts. Being denied the right to vote through intimidation is an irreparable harm; the voter permanently loses that opportunity to vote.

**C.      The Balance of Harms and Public Interest Favor Injunctive Relief.**

The final preliminary injunction factors require the Court to balance the harms of granting or denying the requested injunction and consider whether the injunction is in the public interest. *Fish v. Kobach*, 189 F. Supp. 3d 1107, 1148-50 (D. Kan.) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 9 (2008)), *aff'd*, 691 F. App'x 900 (10th Cir. 2016), and *aff'd*, 840 F.3d 710 (10th Cir.

23

2016). "When considering the balance of harms, a court must balance 'the competing claims of injury and must consider the effect on the granting or withholding of the requested relief.'" *Colo. Christian Univ. v. Sibelius*, 51 F.Supp.3d 1052, 1064 (D. Colo. 2014) (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)); *see also Doubleclick v. Paikin*, 402 F.Supp.2d 1251, 1260 (D. Colo. 2005) (reasoning that under the balance of harms factor, a plaintiff is required "to demonstrate that the balance of harms weighs in their favor, and that denying the injunction will cause more harm than granting it"). Here, the balance of harms and consideration of the public interest both weigh in favor of an injunction to maintain the status quo and prevent Defendants from intimidating Coloradans at their doorsteps.

Plaintiffs and the public face significant hardship if an injunction is not issued. "[T]he public has a strong interest in exercising the fundamental political right to vote. That interest is best served by favoring enfranchisement and ensuring qualified voters' exercise of their right to vote is successful." *Fish*, 189 F.Supp.3d at 1150 (citing *Obama for American v. Husted*, 697 F.3d 423, 436-7 (6th Cir. 2012)) (internal quotations omitted). In fact, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). The Supreme Court has held that "voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quotation marks and citations omitted). Because the right to vote is "preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964). The public interest "favors permitting as many qualified voters to vote as possible." *Obama for Am.,* 697 F.3d at 437. And the Supreme Court has recognized that states

24

have "a compelling interest in protecting voters from confusion and undue influence." *Burson v. Freeman*, 504 U.S. 191, 199 (1992).

The public interest in favor of an injunction is particularly strong here because the right to vote freely is "the essence of a democratic society." *Reynolds,* 377 U.S. at 555.  It is clear that the public has a strong interest in all eligible voters being able to vote, because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1147 (10th Cir. 2013) (citing *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10 the Cir. 2012), *aff'd sub nom,* 573 U.S. 682.  For well over a century, the Supreme Court has viewed the right to vote as a "fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). The interest in "protecting voters from confusion and undue influence" is "compelling," *Burson* v. *Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion; Blackmun, J), and indeed the "right . . . regardless of political persuasion, to cast [] votes effectively" is voters' "most precious" right. *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968).

Courts have similarly recognized that "[t]he right to vote is among the most important benefits of citizenship." *See*, *e.g.*, *Kemler v.  Poston*, 108 F. Supp. 2d 529, 542 (E.D. Va. 2000). That overwhelmingly strong interest in protecting the unimpaired right to vote, free of intimidation, is vindicated by the injunctive relief requested here.  Indeed, "courts of equity may go to greater lengths to give 'relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.'" *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 826 (4th Cir. 2004) (quoting *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937)); *see also Gallagher v. N.Y. State Bd. of Elections*, No. 20 Civ. 5504 (AT), 2020 WL 4496849, at *21 (S.D.N.Y. Aug. 3, 2020) (enjoining New York State Board of Elections to tally mail-in ballots that

were improperly invalidated after recognizing the substantial burden to plaintiffs "fac[ing] disenfranchisement through no fault of their own.").

By contrast, Defendants face *no* legally protectable burden from the proposed injunction, which seeks only to enjoin their illegal activity. *See CAIR-Minnesota*, 497 F. Supp. 3d at 379-80 ("although Defendants have an interest in conducting their business as contracted, there can be no legally-protectable interest in intimidating voters, as the Voting Rights Act makes such conduct unlawful").  And the public interest would clearly be advanced by the injunction sought here, as Defendants should not be permitted to engage in conduct that impedes and threatens the exercise of the most basic right fundamental to American democracy.  Further, Plaintiffs' requested injunction is narrowly tailored to prevent Defendants from violating the law by threating to and intimidating voters at their doorsteps (including with weapons), and to assure voters that Defendants will not illegally intimidate or harass Colorado voters.  Enjoining Defendants from engaging in conduct that Congress and the Colorado Legislature specifically barred and has no public benefit is crucial to restoring Coloradans' trust that they can vote and participate in the electoral process without intimidation, and it is an appropriate use of the Court's injunctive powers. Plaintiffs' motion should be granted.

**D.    Waiver of the Bond Requirement Is Appropriate.**

Federal Rule of Civil Procedure 65 provides: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  Notably, however, "[t]rial courts have wide discretion under Rule 65(c) in determining whether to require security." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009) (internal quotation marks omitted); *Coquina Oil Corp. v. Transwestern Pipeline Co.,* 825 F.2d 1461, 1462 (10th Cir.1987) ("A trial court decision

26

to waive a Rule 65(c) bond is subject to an abuse of discretion test on appeal.").  A court may waive the bond requirement based on the strength of a plaintiff's case and the minimal damages that would be suffered as a result of the injunction.  *See, e.g.*, *Adams By & Through Adams v. Baker*, 919 F. Supp. 1496, 1505 (D. Kan. 1996).

In addition, courts frequently waive bond requirements in public interest cases involving the fundamental rights of citizens. *See* 11A Charles Alan Wright et al., Federal Practice & Procedure § 2954 n.29 (3d ed., Apr. 2017 update) (citing public rights cases where the bond was excused or significantly reduced); *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016) (reasoning that the court has discretion "to waive the bond requirement based on its evaluation of public interest in this specific case").  In *Denver Homeless Out Loud v. Denver*, for example, the Court held that waiver of the bond requirement was appropriate in a civil rights dispute brough by a non-profit organization against the City of Denver and several of its officials, citing to public interest cases in which the bond requirement was waived.  514 D.Supp.3d 1278 (D. Colo. 2021).

In light of the importance of the right to be vindicated and the fact that Plaintiffs are not-for-profit public interest entities, Plaintiff respectfully requests that the Court waive Rule 65's bond requirement in this matter.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiffs' motion and enter the proposed temporary restraining order and preliminary injunction enjoining Defendants from engaging in its door-to-door voter intimidation campaign or from engaging in other actions that may intimidate voters or interfere with voter access to the polls.

48374360v4

Dated:  March 9, 2022                    LATHROP GPM LLP

By /s/ Amy Erickson
Casey Breese (#51449)
Casey.breese@lathropgpm.com
Jean Paul Bradshaw
Jeanpaul.bradshaw@lathropgpm.com
Dion Farganis (Admission Pending)
Dion.farganis@lathropgpm.com
Reid Day
Reid.day@lathropgpm.com
Brian A. Dillon
Brian.dillon@lathropgpm.com
Amy Erickson (#54710)
Amy.erickson@lathropgpm.com
1515 Wynkoop Street, Suite 600
Denver, CO 80202
Telephone: (720) 931-3200

Courtney Hostetler
chostetler@freespeechforpeople.org
John Bonifaz
jbonifaz@freespeechforpeople.org
Ben Clements
bclements@freespeechforpeople.org
Ron Fein
rfein@freespeechforpeople.org
FREE SPEECH FOR PEOPLE
1320 Centre Street, Suite 405
Newton, MA 02459
Telephone: (617) 249-3015

*ATTORNEYS FOR Plaintiffs Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters of Colorado, and Mi Familia Vota*

28

48374360v4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 22-cv-00581-PAB

COLORADO MONTANA WYOMING STATE AREA CONFERENCE OF THE NAACP,
LEAGUE OF WOMEN VOTERS OF COLORADO, and
MI FAMILIA VOTA,

      Plaintiffs,

v.

UNITED STATES ELECTION INTEGRITY PLAN,
SHAWN SMITH,
ASHLEY EPP, and
HOLLY KASUN,

      Defendants.

---

**ORDER**

---

This matter is before the Court on the portion of plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction [Docket No. 5] that requests issuance of a temporary restraining order ("TRO") and the portion of plaintiffs' Motion for Expedited Hearing on Plaintiffs' Motion for Preliminary Injunction and Defendants' Motion to Dismiss [Docket No. 29] that requests an expedited TRO hearing. Plaintiffs also filed a brief in support of their motion for a TRO. *See* Docket No. 6. Defendants have not responded to plaintiffs' TRO motion.

## I. BACKGROUND[1]

Plaintiffs are non-profit organizations that support, among other things, "voter education, registration, and political participation and activism." *Id.* at 2. Defendant United States Election Integrity Plan ("USEIP")[2] has as a goal "to get a better understanding of what happened in the 2020 election, to find truth, expose the truth, and share the truth" and to find fraud, fix it, and hold people accountable. *Id.* at 3. Plaintiffs claim that USEIP, using voter rolls that Mr. Smith purchased from the Colorado Secretary of State, is threatening and intimidating Colorado voters by going door-to-door across the state to "interrogate" voters "under the pretense of seeking to uncover 'phantom ballots.'" *Id.* at 6, 14. Plaintiffs state that USEIP members are sometimes armed and wear badges, lending them an "appearance of government officiality." *Id.* at 6, 8. Plaintiffs claim that USEIP members or agents target high-density housing areas, where there are large numbers of registered Democrats, and ask "voters to confirm [the voters'] addresses, whether [the voters] participated in the 2020 election, and – if so – how [the voters] cast their vote[s]." *Id.* at 6. According to plaintiffs, USEIP members "tell voters . . . that their ballots were cast fraudulently or that election fraud was committed under their name or address." *Id.* at 6. Plaintiffs also

---

[1] The following background facts are taken from plaintiffs' motion. Plaintiffs' complaint is not verified, and plaintiffs have not affirmed that the factual allegations in the complaint are true. *Cf. Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013) ("given that . . . allegations were established through a verified complaint, they are deemed admitted for preliminary injunction purposes"), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

[2] According to the complaint, defendant Shawn Smith is a member of USEIP and was president and co-founder of the group. Docket No. 1 at 6, ¶ 17. Defendants Ashley Epp and Holly Kasun are members of USEIP. *Id.*, ¶¶ 18–19.

state that USEIP is "build[ing] a database" of photographs of voters' homes.  *Id.* at 7.

Plaintiffs claim that USEIP and its agents intimidate voters who plan or had planned to vote, and voters of color particularly are intimidated because of the history of "racial and ethnic discrimination" and efforts to "suppress voters of color."  *Id.* at 9.  These actions, plaintiffs state, have affected plaintiffs' missions, which include "ensuring that young, new, vulnerable minority voters in Colorado are safely able to participate in the political process," because plaintiffs have had to divert their resources to counteract USEIP's efforts, instead of supporting plaintiffs' other priorities.  *Id.* at 9–10.

Plaintiffs bring three claims for relief: (1) "intimidating voters and potential voters in violation of Section 11(b) of the Voting Rights Act of 1965," (2) "attempting to intimidate voters and potential voters in violation of Section 11(b) of the Voting Rights Act of 1965," and (3) "violation of the Ku Klux Klan Act (42 U.S.C. § 1985)."  Docket No. 1 at 12–13, ¶¶ 39–51.  Plaintiffs seek to enjoin defendants from "engaging in [defendants'] door-to-door voter intimidation campaign or from engaging in other actions that may intimidate voters or interfere with voter access to the polls."  Docket No. 6 at 27.

## II.  LEGAL STANDARD

To succeed on a motion for a temporary restraining order, the moving party must show (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest.  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Natural Res. Def.*

*Council, Inc.*, 555 US. 7, 20 (2008)); *see Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir.

2010).  "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief

must be clear and unequivocal."  *Beltronics USA, Inc. v. Midwest Inventory Distrib.,*

*LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v.*

*Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003)) (internal quotation marks omitted).

Granting such "drastic relief," *United States ex rel. Citizen Band Potawatomi Indian*

*Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888–89 (10th Cir. 1989),

"is the exception rather than the rule."  *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th

Cir. 1984).  The same considerations apply to the issuance of a temporary restraining

order.  *See Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980).

## III.  ANALYSIS

The Local Rules require a party seeking a TRO to provide notice, or attempt to

provide notice, of its motion to the opposing party.  Local Rule 65.1 states, in part,

> A [TRO] shall be requested by motion filed separately from the complaint.
> The motion shall be accompanied by a certificate of counsel or an
> unrepresented party, stating: (1) that actual notice of the time of filing the
> motion, and copies of all pleadings and documents filed in the action to
> date or to be presented to the court at the hearing, have been provided to
> opposing counsel and any unrepresented adverse party; or (2) the efforts
> made by the moving party to provide the required notice and documents.

D.C.COLO.LCivR 65.1(a).  Plaintiffs did not file a certificate indicating their efforts to

provide notice of the motion to defendants, which Local Rule 65.1 requires.[3]

_____

[3] Defendants are aware of the TRO motion and have filed a motion to dismiss
plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject
matter jurisdiction.  *See generally* Docket No. 27.  In that motion, defendants argue that
plaintiffs have shown no injury that could confer standing under Article III of the United
States Constitution.  *Id.* at 2–6.  Plaintiffs have not responded to the motion to dismiss;
however, the injury required for a TRO or preliminary injunction is not the same as the

Although defendants have not responded to the TRO motion, the motion is deficient and will be denied.  The Court begins its analysis by considering whether plaintiffs have shown irreparable harm.  "[B]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a [TRO], the moving party must first demonstrate that such injury is likely before the other requirements will be considered."  *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (internal quotation marks omitted).  "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical."  *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).  The "party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm."  *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005) (quoting *Heideman*, 348 F.3d at 1189).  "Purely speculative harm will not suffice."  *RoDa Drilling*, 552 F.3d at 1210; *see also* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Prac. & Proc.* § 2948.1 ("Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant;" "a [TRO] will not be issued simply to prevent the possibility of some remote future injury.").  "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff

_____

injury that is required for standing.  *Cf. Minn. RFL Republican Farmer Lab. Caucus v. Freeman*, 486 F. Supp. 3d 1300, 1311 (D. Minn. 2020) (finding Article III standing but not irreparable injury); *Kingman Park Civic Ass'n v. Gray*, 956 F. Supp. 2d 230, 257 (D.D.C. 2013) (same).

is entitled to such relief." *Winter*, 555 U.S. at 22.

Plaintiffs have not demonstrated that they will suffer or are suffering imminent, irreparable harm resulting from defendants' actions if a TRO is not issued before the Court can hold a preliminary injunction hearing. *See Tijuanas Produce, Inc. v. Shorty's Produce, Inc.*, No. 18-cv-00587-PAB, 2018 WL 1952600, at *1 (D. Colo. Mar. 29, 2018) ("The Court finds that plaintiff has failed to show that it will suffer irreparable harm if a TRO does not issue before a preliminary injunction hearing is held."). Plaintiffs claim that they are irreparably harmed because defendants "have intimidated voters and are continuing to intimidate voters," and defendants' "misconduct has forced [p]laintiffs to divert resources." Docket No. 6 at 23.[4] This "misconduct," according to plaintiffs, is that defendants "travel door-to-door to the homes of some of Colorado's most vulnerable voters," press voters for information about the voters' participation in the 2020 election, and take photographs of the voters' homes. *Id.* at 2.

First, plaintiffs state that members of USEIP "continue to impliedly and explicitly threaten violence against individuals whom they allege were involved in election fraud – in other words, people involved in the election of candidates opposed by USEIP." *Id.* at 5. Plaintiffs, however, do not assert that "people involved in the election of candidates"

---

[4] Diversion of resources may be sufficient for Article III standing. *See, e.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (holding that an organization may have standing to sue on its own to challenge action that causes it direct injury, when, for instance, a defendant's conduct makes it difficult or impossible for the organization to fulfill one of its essential purposes or goals, such as when the organization faces a drain on its resources or when the defendant's actions "have perceptively impaired" the organization's ability to carry out its mission). However, purely financial harm is insufficient to meet the irreparable harm requirement for a preliminary injunction. *See Heideman*, 348 F.3d at 1189 ("It is [] well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm.").

includes voters or members of the plaintiff organizations.  *See id.*  Rather, plaintiffs refer to death threats that Mr. Smith allegedly made to Colorado Secretary of State Jena Griswold.  *Id.*  Alleged threats to Secretary Griswold are not relevant to the purported harms that plaintiffs face.

Next, plaintiffs state that "USEIP is now taking its threatening and intimidating behavior directly to the homes of Colorado voters."  *Id.* at 6.  Plaintiffs rely on a declaration by one of their lawyers, Casey Breese.  *Id.* (citing "Declaration of Casey Breese Ex. A.").[5]  Mr. Breese's declaration, however, does not support plaintiff's statement that USEIP is currently threatening or intimidating voters.  Rather, his declaration states that Mr. Breese directed a research librarian at his law firm to "obtain[] the identity of individuals who had purchased voter rolls at some point during 2021 through the Colorado Secretary of State's Election Cycle Subscription service list."  Docket No. 7 at 1, ¶ 2.  On December 9, 2021, according to Mr. Breese's declaration, an employee of the Secretary of State's office provided a subscription list.  *Id.* at 1–2, ¶ 4.  The attachment to Mr. Breese's declaration indicates that someone named "Shawn Smith" purchased the voter rolls.  *See* Docket No. 7-1.  Mr. Breese does not state anything about USEIP, its alleged conduct, or when that conduct may have occurred.  *See generally id.*

Plaintiffs next state that "USEIP is going door-to-door across Colorado, interrogating Colorado voters under the pretense of seeking to uncover 'phantom ballots.'"  Docket No. 6 at 6.  For support, plaintiffs cite an article from August 17, 2021

---

[5] There is no "Ex. A" to Docket No. 6.  Mr. Breese's declaration is docketed separately.  *See* Docket No. 7.

by Erick Maulbetsch in the *Colorado Times Recorder*, "Colorado Election Conspiracy Group Going Door-to-Door in Search of 'Phantom Ballots,'" https://coloradotimesrecor der.com/2021/08/colorado-election-conspiracy-group-going-door-to-door-in-search-of- phantom-ballots/38866/. *Id.* Plaintiffs also rely on this article for allegations that USEIP volunteers wear badges and ask voters whether and how they cast ballots in the 2020 election. *Id.* Even assuming this article were admissible to substantiate plaintiffs' allegations of harm,[6] the article is nearly seven months old and does not indicate any "clear and present" harm, *see Schrier*, 427 F.3d at 1267, or that plaintiffs will suffer imminent, irreparable harm absent a TRO before the Court can order further relief. *See Tijuanas Produce*, 2018 WL 1952600, at *1.

Plaintiffs state that USEIP has begun to target "high-density housing" areas, where there are high numbers of registered Democrats, that "USEIP is also using its canvassing efforts to build a database of photos of voters' residences," and that USEIP's "reach" has expanded into seventeen Colorado counties. Docket No. 6 at 6–7. Again, plaintiffs rely on inadmissible articles by Mr. Maulbetsch. *See id.* (citing Erik Maulbetsch, "Colorado Election Fraud Group is Training Conspiracists in Other States

---

[6] The article is not admissible. *See, e.g.*, *Stine v. Lappin*, No. 08-cv-00164-WYD-KLM, 2009 WL 482630, at *5 (D. Colo. Feb. 25, 2009) (denying emergency injunctive relief that was requested in reliance on hearsay and holding that, "pursuant to Federal Rule of Evidence 801, hearsay, i.e., an out-of-court statement offered for its truth, is not admissible evidence. The statements contained within the article are clearly hearsay, as they are out-of-court statements offered by [p]laintiff to prove the truth of his claims, or that there is contamination of the ADX ventilation systems that is causing harm to the inmates." (citing *New Eng. Mut. Life Ins. Co. v. Anderson*, 888 F.2d 646, 650 (10th Cir. 1989) (recognizing that the trial court properly excluded statements in a newspaper article that were offered to prove the truth of the matter asserted)). None of the exceptions to hearsay appear to apply to Mr. Maulbetsch's article. *See* Fed. R. Evid. 801(d)(1), (2); Fed. R. Evid. 803.

8

to Knock Doors in Search of 'Phantom Ballots,'" *Colorado Times Recorder* (Oct. 1,

2021), https://coloradotimesrecorder.com/2021/10/colorado- election-fraud-group-

is-training-conspiracists-in-other-states-to-knock-doors-in-search- of-phantom-

ballots/39935; Eric Maulbetsch, "Election Fraud Conspiracists Still Knocking on

Colorado Voters' Doors," *Colorado Times Recorder* (Nov. 23, 2021), https://colorado

timesrecorder2021/11/election-fraud-conspiracists-still-knocking-on-colorado-voters-

doors/41178/).  Admissibility concerns aside, these articles are also months old and do

not indicate any ongoing conduct by USEIP or its members justifying emergency

injunctive relief.  *See Tijuanas Produce*, 2018 WL 1952600, at *1.

      Plaintiffs' other allegations are no more convincing.  *See Beltronics USA*, 562

F.3d at 1070 ("[B]ecause a preliminary injunction is an extraordinary remedy, the right

to relief must be clear and unequivocal.").  Plaintiffs state that defendants "have

engaged in actions to intimidate, threaten, and coerce voters, and have publicly

admitted plans to continue their door-to-door voter intimidation campaign," Docket No. 6

at 13; that "[Mr.] Smith, [Ms.] Epp, and [Ms.] Kasun have engaged in the intimidating

conduct and coordinated their activities through USEIP and its agents," *id.* at 19; and

that defendants "have intimidated and threatened Colorado voters, thereby preventing

or hindering them from giving support or advocacy to candidates for public office,"

which "threaten the right to vote [and] intimidate voters."  *Id.*  These allegations are

unsupported, and plaintiffs do not show that any of this alleged misconduct is ongoing,

such that drastic, emergency relief is necessary.  *See United States ex rel. Citizen

Band Potawatomi Indian Tribe of Okla.*, 883 F.2d at 888–89 (characterizing a

preliminary injunction as "drastic relief"); *GTE Corp.*, 731 F.3d at 678 (noting that emergency relief "is the exception rather than the rule").

Plaintiffs rely on declarations from (1) Beth Hendrix, Executive Director of the League of Women Voters of Colorado ("LWVCO"), *see* Docket No. 8; (2) Portia Prescott, State President of NAACP Colorado Montana Wyoming State-Area Conference of the NAACP ("NAACP Colorado"), *see* Docket No. 9; and (3) Salvador Hernandez, Colorado State Director of Mi Familia Vota ("MFV"). Docket No. 10. These declarations, however, do not establish exigency. Ms. Hendrix's declaration states that, in August 2021, LWVCO learned that USEIP "was sending its members door-to-door" and that LWVCO members "have reported that these USEIP agents are holding themselves out as part of an official government organization or audit." Docket No. 8 at 2, ¶ 5. Ms. Hendrix also states that USEIP's actions "will intimidate individuals from voting." *Id.*, ¶ 6. As a result, Ms. Hendrix asserts that "voters may question the validity of the political process." *Id.* at 3, ¶ 10. Aside from Ms. Hendrix's statement that LWVCO members have reported that USEIP agents are "holding themselves out" as government officials, which is hearsay, Ms. Hendrix does not indicate that any actions by USEIP or its agents are ongoing, or that any USEIP agent will imminently visit the home of a LWVCO member. *See RoDa Drilling*, 552 F.3d at 1210 ("Purely speculative harm will not suffice" for a preliminary injunction or TRO.). Moreover, even if that statement were admissible, it is not sufficient to establish "clear and unequivocal" entitlement to relief, *see Beltronics USA*, 562 F.3d at 1070, or imminent injury. *See Schrier*, 427 F.3d at 1267.

10

Ms. Prescott states in her declaration that NAACP Colorado "[r]ecently" learned that USEIP and "individuals connected to USEIP . . . were engaging in intimidating home visits to Colorado voters" and "w[ere] going door-to-door in Colorado 'looking for fraud' . . . in connection with the November 2020 election."  Docket No. 9 at 2, ¶ 7.  Ms. Prescott also states that USEIP agents are "showing up at the *homes* of Black and other voters."  *Id.* at 3, ¶ 10.  Ms. Prescott, however, does not indicate that a USEIP agent visited the home of any NAACP Colorado members or that one will do so soon.  *See RoDa Drilling*, 552 F.3d at 1210.  Ms. Prescott also does not provide any specific instance of USEIP agents allegedly engaging in misconduct, when that alleged misconduct occurred, or whether it is continuing.  *See generally id.*  Ms. Prescott's declaration, therefore, does not show that plaintiffs are clearly and unequivocally entitled to relief, *see Beltronics USA*, 562 F.3d at 1070, or that they are facing imminent harm.  *See Schrier*, 427 F.3d at 1267.

Mr. Hernandez states in his declaration that, in the fall of 2021, MFV learned that USEIP and individuals connected to USEIP "were engaging in intimidating home visits to Colorado voters," which is threatening to the population MFV serves.  Docket No. 10 at 2, ¶ 7.  Mr. Hernandez, however, does not state that a USEIP agent visited the home of any MFV member or will soon, *see RoDa Drilling*, 552 F.3d at 1210, and he provides no specific instance of any USEIP agent engaging in misconduct, indication of when USEIP's alleged misconduct occurred, or whether it is continuing.  *See generally id.*  Mr. Hernandez's declaration does not show that plaintiffs are clearly and unequivocally entitled to relief, *see Beltronics USA*, 562 F.3d at 1070, or that they face imminent harm.  *See Schrier*, 427 F.3d at 1267.

The Court finds that plaintiffs have not shown that they are facing "certain, great, actual and not theoretical" or speculative injury.  *See RoDa Drilling*, 552 F.3d at 1210; *Heideman*, 348 F.3d at 1189.  As the Tenth Circuit has stated, the "party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm."  *Schrier*, 427 F.3d at 1267.  This is "the single most important prerequisite for the issuance of a preliminary injunction."  *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (quoting *First W. Cap. Mgmt. Co.*, 874 F.3d at 1141).  Plaintiffs have failed to carry their burden.

Moreover, "delay is an important consideration in the assessment of irreparable harm for purposes of a preliminary injunction."  *GTE Corp.*, 731 F.2d at 679; *see also A.K. by & through Moyer v. Cherry Creek Sch. Dist. No. 5*, No. 20-cv-00392-PAB-NRN, 2020 WL 2197920, at *3 n.1 (D. Colo. May 6, 2020) ("[T]he Court finds that the delay in seeking injunctive relief cuts against plaintiff's assertions of imminent irreparable harm."); *Am. Ass'n of People With Disabilities v. Herrera*, 580 F. Supp. 2d 1195, 1246 (D.N.M. 2008) (finding that plaintiffs' two-week delay from filing lawsuit to seeking preliminary injunction "considerably undercut[ ] their allegation of irreparable harm"); *Heideman*, 348 F.3d at 1189 (internal quotation marks omitted) ("[T]he party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." (brackets, alterations, and emphasis in original) (citation omitted)).

Plaintiffs state in their motion that they learned about USEIP's door-to-door activities in the fall of 2021.  Docket No. 6 at 8.  Plaintiffs cite Mr. Breese's declaration.

*Id.* As the Court has noted, Mr. Breese declares that, on December 8, 2021, he directed a librarian at his law firm to request a list of all individuals who had purchased voter rolls from the Colorado Secretary of State. *See* Docket No. 7 at 1, ¶ 2. Plaintiffs also rely on the declarations that the Court considered previously. In her declaration, Ms. Hendrix states that LWVCO learned about USEIP's door-to-door activities in August 2021. *See* Docket No. 8 at 2, ¶ 5. Ms. Prescott states in her declaration that NAACP Colorado learned about USEIP's activities "[r]ecently," but she does not specify when that was. *See* Docket No. 9 at 2, ¶ 7. Mr. Hernandez states that MFV learned about USEIP in "[f]all of 2021." Docket No. 10 at 2, ¶ 7.

Plaintiffs, however, waited at least three months, from December 2021 to March 2022, to file their complaint and TRO motion.[7] *See* Docket Nos. 1, 5–6. Waiting three months to file this lawsuit and seek a TRO, however, is not consistent with plaintiffs' allegations that they are facing imminent harm. *See, e.g.*, *Found. Learning LLC v. Acad., Arts & Action Charter Acad.*, No. 17-cv-03182-RM-KLM, 2018 WL 3382933, at *3 (D. Colo. May 18, 2018) (waiting three months to file motion for emergency injunctive relief without explanation "strongly undermines plaintiff's suggestion that the moment of maximum harm is now at hand").

Because the Court finds that plaintiffs have not met their burden of demonstrating immediate irreparable harm so as to justify issuance of a temporary restraining order, the Court need not address the remaining TRO factors and will deny

---

[7] Plaintiffs' declarations indicate that they likely delayed even longer than three months, given that LWVCO and MFV learned about USEIP's alleged conduct in late summer or fall 2021. *See* Docket No. 8 at 2, ¶ 5; Docket No. 10 at 2, ¶ 7.

that portion of plaintiffs' motion.  *Cf. Big O Tires, LLC v. Felix Bros., Inc.*, 724 F. Supp.
2d 1107, 1121 (D. Colo. 2010) ("The Court declines to address the remaining
preliminary injunction elements, as the resolution of them will have no bearing on the
outcome.").

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the portion of plaintiffs' Motion for a Temporary Restraining
Order and Preliminary Injunction [Docket No. 5] that requests issuance of a temporary
restraining order is **DENIED**.  It is further

**ORDERED** that the portion of plaintiffs' Motion for Expedited Hearing on
Plaintiffs' Motion for Preliminary Injunction and Defendants' Motion to Dismiss [Docket
No. 29] that requests an expedited TRO hearing is **DENIED as moot**.


DATED April 8, 2022.


BY THE COURT:


PHILIP A. BRIMMER
Chief United States District Judge

# EXHIBIT 1

Prescott Deposition Transcript
Excerpts

1              IN THE UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF COLORADO

2

   Civil Action No. 1:22-cv-00581-CNS-NRN

3

   _____

4

5  Colorado Montana Wyoming

   State Area Conference of the

6  NAACP, League of Women Voters

   of Colorado, and Mi Familia

7  Vota,

8           Plaintiffs,

9  v.

10 United States Election Integrity

   Plan, Shawn Smith, Ashley Epp,

11 and Holly Kasun,

12          Defendants.

13

   _____

14

15          REMOTE DEPOSITION OF PORTIA PRESCOTT

16                  November 22, 2022

17 _____

18

19

20

21

22

23

24

25

                                            Page 1

```
 1              Q.     Who made the complaint?

 2              A.     That's private information.

 3              Q.     Who made the complaint, ma'am?

 4              A.     I don't recall.

 5              Q.     All right.  Have you turned over this

 6      complaint to your attorneys?

 7              A.     Yes.

 8              Q.     When did you turn that document over to

 9      your attorneys?

10                     MS. STOCK:  Objection to the form --

11                     THE DEPONENT:  I --

12                     MS. STOCK:  Hold on, Ms. Prescott.

13                     Objection to form.  Ms. Prescott did not

14      testify that she has any sort of documentation related

15      to a complaint.

16              Q.     (By Mr. Reisch)  Well, maybe I

17      misunderstood, Ms. Prescott.  I asked if you had

18      received a complaint against the United States Election

19      Integrity Plan.

20                     Do you recall that question?

21              A.     I recall you asking if NAACP, the

22      conference, received a complaint, not me, specifically.

23              Q.     Okay.  Your organization -- the one that

24      you're the president of -- when did they receive a

25      complaint against the United States Election Integrity
```

                                                    Page 13

1    Plan?

2          A.    I'm not sure.

3          Q.    Who made the complaint?

4          A.    I'm not sure.

5          Q.    When did the complaint come in?

6          A.    I'm not sure.

7          Q.    What was the nature of the complaint?

8          A.    Concerns about voting.

9          Q.    What concerns about voting came in to

10   the Colorado Montana Wyoming State Area Conference of

11   the NAACP regarding the United States Election

12   Integrity Plan?

13         A.    I'm not exactly sure of the wording.

14         Q.    Well, what weren't you sure -- you

15   aren't sure of my question, or you aren't sure of the

16   nature of the complaint?

17         A.    I'm not exactly sure how the complaint

18   was worded.

19         Q.    Okay.  Was the complaint documented?

20         A.    I'm not sure.

21         Q.    Who answered the phone or received the

22   email?

23               How would this complaint have come in to

24   the Colorado Montana Wyoming State Area Conference of

25   the NAACP?

                                        Page 14

1          A.     That's a play on words.  I'm saying a

2    member or an individual who is not a member.  Anyone

3    can make a complaint.

4          Q.     I understand.  So my question, then,

5    is -- let me ask it this way:

6                You can't point me to a member of the

7    Colorado Montana Wyoming State Area Conference of the

8    NAACP that made a complaint against the United States

9    Election Integrity plan, then what or who was the

10   non-member of the Colorado Montana Wyoming State Area

11   Conference of the NAACP who made a complaint to your

12   organization regarding the United States Election

13   Integrity Plan?

14         A.     I don't recall.

15         Q.     You don't recall, or you don't have any

16   members that made any complaint -- or non-members?

17         A.     I don't recall.

18         Q.     Well, ma'am, you initiated litigation as

19   the president of the Colorado Montana Wyoming State

20   Area Conference of the NAACP.  Correct?

21         A.     Correct.

22         Q.     You have a duty, as your attorneys do,

23   to investigate the allegations that you're making; so

24   is it fair to say that you never looked at a complaint

25   on paper, on email, somebody walking into your office,

Page 20

1    delivered via carrier pigeon -- I don't know -- you

2    never reviewed any complaint from a member or a

3    non-member of the Colorado Montana Wyoming State Area

4    Conference of the NAACP regarding the United States

5    Election Integrity Plan?

6              A.      Correct.

7                     MS. STOCK:  Objection to form.

8                     THE DEPONENT:  That question doesn't

9    even make sense.  I've received so many complaints -- I

10   don't even understand your question.  We've --

11             Q.     (By Mr. Reisch)  Who -- who made the

12   complaint, ma'am?

13                    Do you not keep track of complaints that

14   come in for litigation purposes?

15             A.     I'm the president.  I'm not a lawyer.  I

16   don't recall.

17             Q.     Okay.  You put your organization's name

18   on this document.  You did not investigate or have

19   any -- did anybody investigate, in your organization,

20   these allegations?

21             A.     I don't recall.

22             Q.     Who would be the designated person that

23   would investigate such allegations?

24             A.     I don't recall.

25             Q.     Is there a complaint department in your

                                        Page 21

```
 1    in voter intimidation.  Correct?

 2           A.    You -- you're directing -- like, you're

 3    playing on words.  Our job is protecting voter rights.

 4    I don't want to use the semantics of how you just

 5    coined it --

 6           Q.    And --

 7           A.    -- since we protect voter rights.

 8           Q.    Okay.  Your organization protects voter

 9    rights.

10                 You are the president of this

11    organization.  Correct?

12           A.    Yes.

13           Q.    You filed a lawsuit against the United

14    States Election Integrity Plan, Shawn Smith, Ashley

15    Epp, and Holly Kasun.  Correct?

16           A.    Correct.

17           Q.    You alleged allegations of voter

18    intimidation against these individuals and that entity.

19    Correct?

20           A.    Correct.

21           Q.    And my question to you, ma'am, is, who

22    was the person intimidated allegedly by the United

23    States Election Integrity Plan, Shawn Smith, Ashley

24    Epp, or Holly Kasun?

25           A.    I don't recall.
```

Page 24

```
 1              Q.     You don't recall, or you don't have
 2    anyone that you can point to and say, "This person made
 3    a complaint to us"?
 4              A.     I don't recall.
 5              Q.     Is it accessible somewhere?  You don't
 6    recall.
 7                     Is there anything that would refresh
 8    your recollection as to the identity of the name of the
 9    individual saying that they were an intimidated voter?
10              A.     Sir, I don't recall.
11              Q.     Okay.  Do you have a file regarding this
12    particular complaint that keeps the names or the
13    addresses -- names, telephone number, contact
14    information -- of people that made complaints?
15              A.     I don't recall.
16              Q.     You don't recall, or you don't have
17    anything?
18              A.     I don't recall.
19              Q.     Okay.  You said earlier, at some point,
20    you had some documentation of complaints, and that you
21    gave them to your attorneys.
22                     Did I hear that incorrectly?
23              A.     You keep saying me.  There was
24    information given to attorneys, not -- not me.
25              Q.     Okay.  What information was given to
```

Page 25

1    attorneys by not necessarily you, but your

2    organization?

3                    MS. STOCK:  Objection to the extent that

4    this question calls for attorney-client privileged

5    information or speculation.

6                    MR. REISCH:  A complaint made by a third

7    party to your organization is not attorney-client

8    privileged.

9                    MS. STOCK:  As I heard the question --

10                    MR. REISCH:  My question --

11                    MS. STOCK:  You asked her about

12    communications with her that she passed on to her

13    attorney, but if I misheard, then I rescind the

14    objection.

15                    MR. REISCH:  Very well.

16                    You may answer.

17                    THE DEPONENT:  What's the question?

18        Q.    (By Mr. Reisch)  What documents

19    regarding complaints of voter intimidation did you turn

20    over to your attorneys?

21        A.    I don't recall.

22        Q.    Well, did you turn over documents?

23        A.    I don't recall.

24        Q.    Did you prepare for this deposition with

25    your attorney?

                                        Page 26

```
1              A.      Uh-huh.   Yep.

2              Q.      Okay.   And paragraph 7 there states:

3                      "Recently, NAACP Colorado learned

4              that United States Election Integrity Plan,

5              (hereinafter USEIP) and other individuals

6              connected to the United States Election

7              integrity Plan were engaging in intimidation

8              home visits to Colorado voters."

9                      Do you see that sentence in paragraph 7?

10             A.      Right.   Yeah.   7, recently -- yes.   I

11     see that.

12             Q.      Okay.   When -- you dated this March 2,

13     so as of what date did you receive the information in

14     the first sentence of paragraph 7 on page 2 of your

15     declaration that was made under the pains of penalty of

16     perjury?

17             A.      I don't recall.

18             Q.      Do you remember who provided you that

19     information?

20             A.      I don't recall.

21             Q.      Okay.   "More specifically, the

22             NAACP learned that the group was going

23             door to door in Colorado, quote, 'looking

24             for fraud,' end quote; that the group

25             alleged occurred in connection with the
```

                                        Page 32

```
 1              November 2020 election."

 2                   Do you see that paragraph?

 3         A.     Uh-huh.

 4         Q.     And in that sentence, once again, you

 5    say that your organization that you're the president of

 6    warned the group was going looking for fraud.

 7                   Who did you learn that information from?

 8         A.     I don't recall.

 9         Q.     Did you recall who you learned that

10    information from when you signed this document under

11    the pains and penalties of perjury on March 2 of 2022,

12    when you initiated your federal lawsuit against the

13    four defendants?

14         A.     Can you please repeat that question?

15         Q.     Sure.  Did you recall -- because I asked

16    you where you learned this information from --

17    referring to page 2 of your declaration, paragraph 7,

18    second sentence -- I asked, when you signed this

19    declaration under the pains and penalty of perjury on

20    March 2, 2022, did you recall at that time who you

21    learned that information from?

22         A.     I can't recall.  It's so much

23    information, I can't -- I just can't recall.  Like,

24    there's a lot, so -- I wasn't the president, so I can't

25    recall.  I'm sorry.
```

Page 33

```
 1                being carried out by USEIP and related

 2                parties."

 3                     Do you see that?

 4           A.      Yes.

 5           Q.      Do you recall reading that before you

 6      signed this document?

 7           A.      Yes.

 8           Q.      Okay.  What resources were redirected?

 9           A.      Everything.

10           Q.      Well, like, for what?

11           A.      Programming, money, marketing, people --

12      everything.

13           Q.      Okay.  Let's talk about programming.

14                   What changed?

15           A.      Voter intimidation education, how --

16      simply what's the -- what -- what the Colorado laws

17      are, clarifying, meetings, traveling the state -- you

18      name it.  Can I --

19           Q.      Do you --

20           A.      You name it.  You name it.

21           Q.      Okay.

22           A.      I mean, just name it.  Pick one.

23           Q.      Okay.  Well, let's talk about

24      programming.  What changed?

25                   Did you produce some documents?
```

Page 42

1          A.     Yes.

2          Q.     Okay.  Do you still have that document?

3          A.     I produced documents.  We produced video

4    content, we produced marketing, digital media,

5    advertising -- those sort of -- yes.

6          Q.     And you still have all that?

7          A.     We -- I don't know if I have it all

8    because I don't save stuff like that, but you can go to

9    our website and go to our Facebook, Twitter, Instagram

10   and -- you can go anywhere and find it.

11         Q.     Okay.

12         A.     I don't -- I can't load my computer up

13   with everything.

14         Q.     Okay.  And so what other area was then

15   deprived because of these -- these changes in

16   marketing, programming, et cetera?

17         A.     Gun violence, health, education, LGBT

18   protections.  We had other programs that we focused on,

19   and that was in the Colorado Springs LGBT community

20   that suffered because of this -- because of this voter

21   intimidation; so there's a lot.

22         Q.     Are you saying that the shooting that

23   took place at Club Q is the result of alleged voter

24   intimidation?

25                MS. STOCK:  Objection.

                                         Page  43

```
 1                    THE DEPONENT:  No.

 2                    MS. STOCK:  Misstates her prior

 3     testimony.

 4                    You can answer, Ms. Prescott.

 5                    THE DEPONENT:  I'm not saying that, but

 6     I'm saying I find it interesting the one year we aren't

 7     directing as much as we worked with the multiple LGBTQ

 8     organizations and funded in Colorado Springs -- I find

 9     it interesting that the one year we don't do it,

10     there's a mass shooting.

11          Q.    (By Mr. Reisch)  Okay.  How much

12     resources do -- does your organization put towards

13     mental health?

14          A.    We put resources to -- we just -- oh, my

15     god -- thousands.  We just had a big thing for mental

16     health with Master P, funding that for the college tour

17     about mental health and talking about mental health.

18                    We couldn't spend as much --

19          Q.    And that's for the --

20          A.    -- but yeah.  We deal with mental

21     health, we deal with racism, we deal with maternal

22     health -- Black women and maternal health issues, we

23     deal with financial literacy, we deal with housing, we

24     deal with homelessness.

25                    MR. REISCH:  Okay.  I believe this would
```

                                                   Page  44

```
 1              Q.      You understand, as a plaintiff in a
 2      lawsuit --
 3              A.      Yeah.
 4              Q.      -- filed in the United States District
 5      Court --
 6              A.      And you understand that Colorado is an
 7      open carry state.  You understand that we take voter
 8      suppression extraordinarily seriously.
 9                      MS. STOCK:  Ms. Prescott, let Mr. Reisch
10      ask his question, and then respond to his question once
11      he's finished speaking.  Okay?
12                      THE DEPONENT:  Okay.  I'm responding,
13      but he keeps asking the same question.  I keep trying
14      to tell him, I don't recall.
15              Q.      (By Mr. Reisch)  Okay.  Well, ma'am, the
16      reason I keep asking the same question is, when this
17      case goes to trial --
18              A.      Okay.
19              Q.      -- you have to bring in the person that
20      filed -- that made these complaints that you are basing
21      your allegation upon.
22                      Thus far, no one has produced anyone
23      who's made these complaints.
24                      So you see my dilemma?
25              A.      No, I don't see your dilemma.
```

Page 73

```
 1                    You don't see my dilemma.  You don't
 2    know what it's like to be Black and live in an
 3    all-white neighborhood and to be targeted because of
 4    your blackness.
 5                    No, you don't know.  You don't see what
 6    I see.  You don't know what it's like to have your
 7    family targeted because they were Black and they -- and
 8    white people didn't want us on that block.
 9                    So I'm sorry -- and you be lucky with
10    your while male privilege that you never have to
11    experience what it's like to be targeted because of
12    your color of your skin.
13                    So no, we're not on the same page.
14        Q.    Well --
15        A.    Enjoy your privilege.  Enjoy your white
16    male privilege, because we're not on the same page.
17                    You don't know what it's like to be a
18    minority and targeted and hated and called a nigger
19    because -- as a child at school because they didn't
20    want niggers in their school in Colorado.
21                    MS. STOCK:  I think that right now might
22    be a good time for a ten-minute break.
23                    MR. REISCH:  No, I think we can keep
24    going.
25        Q.    (By Mr. Reisch)  Ms. Prescott, do you
```

Page 74

1    understand that if you don't have any proof to present,

2    that our abuse of process claim and defamation claims

3    are all but proven against the Colorado Montana Wyoming

4    State Area Conference of the NAACP?

5            A.    People shouldn't try and --

6                  MS. STOCK:  Objection.

7                  Ms. Prescott, please wait.

8                  Objection.  Calls for a legal

9    conclusion.

10                 Ms. Prescott, you can answer to the

11   extent that you are able to answer the question.

12                 THE DEPONENT:  I don't even remember

13   what the question is.

14                 Ask the question again, please.

15           Q.    (By Mr. Reisch)  Are you aware that if

16   you cannot produce the names of the individuals that

17   supposedly were intimidated by U.S. Election Integrity

18   Commission, Shawn Smith, Ashley Epp, or Holly Kasun,

19   that you are going to lose your lawsuit?

20                 MS. STOCK:  Objection.  Calls for a

21   legal conclusion.

22                 THE DEPONENT:  And I'm not a lawyer, so

23   no, I don't under -- I don't know.

24                 But do you understand that Colorado is

25   an open carry state?

                                              Page 75

```
 1              Do you understand that we had to pass

 2   legislation just earlier this year to make sure people

 3   weren't standing at polls with their guns in their

 4   pockets?

 5         Q.    (By Mr. Reisch)  Okay.  Do you also

 6   understand, ma'am, that we -- the United States

 7   Election Integrity Plan, Shawn Smith, Ashley Epp, and

 8   Holly Kasun -- have counter-sued you -- or the Colorado

 9   Montana Wyoming State Area Conference of the NAACP --

10   for defamation and abuse of process?

11         A.    One, I know how to read.  Two, I have a

12   Ivy League education.  I graduated with honors.  So

13   yes, I'm aware.

14         Q.    Okay.

15         A.    I'm aware.

16         Q.    What does that mean to you that you are

17   being sued for defamation?

18         A.    What do you mean, what does it mean to

19   me?

20              What do you want it to mean to me?

21         Q.    Well, do you know that it means that

22   we're suing you saying that you made false allegations

23   without investigating any of these --

24         A.    Okay.  You can say that, but you know,

25   you can lie, too.  I've been sued by a person who lied.
```

Page 76

# EXHIBIT 2

Hendrix Deposition Excerpts

1              IN THE UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF COLORADO

2

   Civil Action No. 1:22-cv-00581-CNS-NRN

3

   _____

4

5  Colorado Montana Wyoming

   State Area Conference of the

6  NAACP, League of Women Voters

   of Colorado, and Mi Familia

7  Vota,

8          Plaintiffs,

9  v.

10 United States Election Integrity

   Plan, Shawn Smith, Ashley Epp,

11 and Holly Kasun,

12         Defendants.

13

   _____

14

15      REMOTE DEPOSITION OF BETH HENDRIX NIELAND

16               November 23, 2022

17 _____

18

19

20

21

22

23

24

25

                                      Page 1

```
 1              Q.      Okay.  So up until you were contacted by

 2     the national level representative, you had no interest

 3     or desire in filing a federal lawsuit in the United

 4     States District Court?

 5              A.      I didn't know of the actions that were

 6     taking place.

 7              Q.      Okay.  What actions were you advised of

 8     from the national people?

 9              A.      Door-to-door canvassing by people who

10     are, at times, armed, asking -- you know, intimidating

11     voters.

12              Q.      Okay.  And what steps did you, as the

13     president of the League of Women Voters of Colorado, do

14     to investigate such a serious allegation made by

15     somebody apparently not in the state of Colorado?

16              A.      I am not the president.  I am the

17     executive director.

18              Q.      Okay.  I apologize.  So what actions did

19     you take as the executive director of the League of

20     Women Voters of the state of Colorado to investigate

21     such serious allegations of voter intimidation?

22              A.      I sent an email to our mailing list

23     asking people to let us know if they had received

24     visits.

25              Q.      Okay.  Have you turned that email over
```

Page 8

1   to your attorneys?

2          A.    Yes, I have.

3          Q.    Okay.  Tell me -- since I don't have it;

4   it hasn't been turned over in discovery -- what did

5   that email say?

6          A.    It was a very short email asking people

7   if they had received visits from representatives of a

8   group called the U.S. Election Integrity Plan asking

9   about their voting history and --

10         Q.    Okay.  And what was the response that

11  you received?

12         A.    We heard from one member who had

13  received a visit and felt it was off.

14         Q.    Okay.

15         A.    We --

16         Q.    Okay.  Go ahead.  I'm sorry.

17         A.    And I received a couple of emails

18  supporting the actions.

19         Q.    Okay.  So let's break that down.

20               You sent out this email asking if

21  somebody had received a visit from the USEIP going door

22  to door.  Right?

23         A.    Yes.

24         Q.    You received a response -- and how many

25  members did that go to?

                                          Page 9

1          Q.      Sometime in the spring of 2022?

2          A.      Yes I believe so.

3          Q.      Do you have access -- do you have access

4    to that email today?

5          A.      Yes.

6          Q.      Why don't we take a quick break so you

7    can get that and it can be distributed to us.

8                  MS. ERICKSON:  Scott, that email was

9    produced to you in discovery.  It was produced.

10                 MR. REISCH:  When?

11                 MS. ERICKSON:  With the documents that

12   were produced by the League of Women Voters.

13                 MR. REISCH:  Do you have a Bates stamp

14   number on that?

15                 MS. ERICKSON:  I mean, not off the top

16   of my head, but I can certainly look for that, but we

17   did produce that email.

18                 MR. REISCH:  Okay.

19         Q.      (By Mr. Reisch)  And the other members

20   that responded were in favor of the alleged voter

21   contact by the USEIP.

22                 Is that correct?

23         A.      They said that they did not feel

24   intimidated and didn't have a problem with the visit.

25         Q.      Okay.  And did you turn those emails

                                              Page 11

```
 1          A.     Yes.

 2          Q.     What did you learn from Karen Sheek?

 3          A.     That the member was in her front yard

 4   gardening when she received -- when two members of the

 5   USEIP approached her.  They were wearing lanyards with

 6   laminated nametags that she felt were trying to look

 7   governmental.

 8               When they began questioning her, she

 9   questioned them, and they became uncomfortable and

10   left.  I believe they took a picture of her home first.

11          Q.     Okay.  So she started questioning them.

12               Do you know what she said to these

13   individuals?

14          A.     I do not.  I -- I believe something

15   along the lines of, "Why are you asking me these

16   questions?"

17               League members tend to have a pretty

18   strong knowledge of our election systems and election

19   procedures, and she knew that this was not a normal

20   activity, a typical activity, and so she questioned it.

21          Q.     Okay.  So she wasn't intimidated; in

22   fact, she intimidated them, because they left.

23               Is that right?

24               MS. ERICKSON:  Objection to form.

25   Mischaracterizes the witness's testimony.
```

Page 13

```
 1              Q.     (By Mr. Reisch)  You can answer.

 2              A.     I -- I believe that this member is in

 3    her 70s.  I highly doubt that they were physically

 4    intimidated by her.  I think they were more possibly

 5    intimidated by the fact that she understood that they

 6    were doing something atypical.

 7              Q.     Okay.  And so they left -- right? --

 8    these USEIP people.

 9                     Is that right?

10        A.     Yes.

11              Q.     They didn't flash a gun at her.  Right?

12        A.     No.

13              Q.     She didn't observe a firearm?

14        A.     No.

15              Q.     She wasn't threatened to say that she

16    must answer their questions; she understood that it was

17    completely voluntary?

18              A.     I would assume so.

19              Q.     And she refused to answer those

20    questions.  Correct?

21              A.     Correct.

22              Q.     Okay.  When you spoke -- that's -- when

23    you spoke with Barbara -- and I can't read my own

24    writing here.  Was it Whinerly?

25              A.     Whinery.
```

Page 14

```
 1              Q.      Whinery.  Did you speak to her about the

 2   allegations of Ms. Armijo?

 3              A.      Yes.

 4              Q.      And what --

 5              A.      I believe so.

 6              Q.      -- did Barbara Whinery tell you?

 7              A.      The same things that I already told you;

 8   that she was out gardening, she was approached by two

 9   people wearing official-looking badges, and they began

10   questioning her about her voting record, especially in

11   the 2020 election, and when she questioned their

12   authority, they left.

13              Q.      Okay.  And what are the names of the

14   people that -- that were in favor of what USEIP was

15   doing?

16              A.      I don't know.  They're in the emails,

17   but those are not members -- I'm not sure they're

18   members.  I am not familiar with those people.

19              Q.      Okay.  But you sent this email request

20   looking for USEIP contacts to your members list; so did

21   you have --

22              A.      To our members and non-members as well.

23              Q.      Okay.  So other than this one woman,

24   Ms. Armijo, what -- what other complaints did you

25   receive in regards to USEIP?
```

                                                    Page 15

```
 1              A.      No other direct complaints.

 2              Q.      Okay.  Did you speak with the president

 3     of the Colorado Montana Wyoming State Area Conference

 4     of the NAACP prior to filing your lawsuit?

 5              A.      We played phone tag.  I don't believe we

 6     actually spoke.

 7              Q.      Okay.  And do you know who the president

 8     of the Colorado -- the Colorado Montana Wyoming State

 9     Area Conference of the NAACP is?

10              A.      At the time of the lawsuit filing, it

11     was Rosemary Lytle.

12              Q.      Okay.

13              A.      I understand that the presidency has

14     changed hands.

15              Q.      Okay.  At the time of the filing of the

16     lawsuit in March, you never spoke with Portia Prescott,

17     the then president of the Colorado Montana Wyoming

18     State Area Conference of the NAACP?

19              A.      I did not.

20              Q.      When did you speak with the executive

21     director of Mi Familia Vota in the Denver area?

22              A.      We traded phone calls as well, and

23     emails.  I did see him briefly at an event in early

24     2021, and he told me he wanted to partner on this

25     filing.
```

                                          Page 16

```
 1    email to all of your voters -- your members in the
 2    spring -- spring is generally March-April time frame.
 3                   Is that right?
 4         A.     Yes.
 5         Q.     Okay.  And maybe I misunderstood, but
 6    I -- I thought I heard you say that you had spoken with
 7    the executive director of Mi Familia Vota sometime in
 8    January of 2022, and you all agreed that you wanted to
 9    partner on this litigation.
10         A.     Yes.
11         Q.     Okay.  So in January of 2022, you were
12    already planning this litigation against USEIP.
13         A.     Yes.
14         Q.     All right.  Did you have complaints
15    prior to your email going out?
16         A.     No.  We had media reports.
17         Q.     Media reports.  What media reports are
18    you referring to?
19         A.     Namely articles in "The Denver Times
20    Gazette."
21         Q.     Okay.  All right.
22         A.     I'm sorry.  I'm not 100 percent sure of
23    the name of the paper.
24         Q.     Okay.  Do you remember the gist of the
25    conversation -- or the gist of the article?
```

Page 18

```
 1              A.     That a group called USEIP was sending
 2    armed -- or canvassers who were sometimes armed to
 3    interrogate voters about their voting record.
 4              Q.     All right.  Based upon that article that
 5    you were going to base your litigation upon, did you
 6    take any affirmative steps to -- I don't know -- talk
 7    to the author of that article?
 8              A.     Yes.
 9              Q.     You did.  And when did you speak with
10    the author of that article?
11              A.     I would need to look back, but that
12    email was included in discovery.
13              Q.     I don't recall seeing that one.
14              Are you sure you turned that over to
15    your attorneys?
16              A.     Yes.
17              Q.     Okay.  Well, and what did -- what did
18    that email entail, since I don't have it in front of
19    me?
20              A.     It said that the author had been
21    researching this group for some time and had a fair
22    amount of evidence of voter intimidation and
23    suppression.
24              Q.     Okay.  And was it via email or telephone
25    call?
```

Page 19

```
 1              A.     Email.

 2              Q.     All right.  And did the -- do you

 3    remember the name of the author, just for the record

 4    here today?

 5              A.     Erik Maulbetsch.

 6              Q.     Okay.  And what did Mr. Erik Maulbetsch

 7    say to you in your email -- that email that you -- who

 8    responded to your email?

 9              A.     What I just said, that he had been

10    researching this group for a while, and he had evidence

11    of -- that this canvassing was happening; that, by

12    USEIP's own admission, canvassers were at times armed

13    and had criminal records and were going door to door

14    interrogating voters about their voting history.

15              Q.     All right.  And what evidence did

16    Mr. Maulbetsch send to you?

17              A.     He did not.  I relied on his news

18    articles.

19              Q.     What -- well, did he tell you the

20    person -- persons that was -- he witnessed some conduct

21    by USEIP interrogate somebody?

22              A.     I don't know.

23              Q.     Did he provide you the location where he

24    personally witnessed somebody -- have USEIP come on

25    their property and threaten them or expose a firearm to
```

Page 20

```
 1   them?

 2          A.     No.

 3          Q.     Did you ever ask for any?

 4          A.     Ask for any what?

 5          Q.     Did you ask him for the evidence -- the

 6   name, the location, the person -- so that you could

 7   talk to them personally?

 8          A.     No.

 9          Q.     Why not?

10          A.     I'm not an investigative reporter.

11          Q.     Okay.  But you are somebody who is the

12   executive director in a federal lawsuit making some

13   serious allegations.  You relied upon a newspaper

14   report from Mr. Maulbetsch.

15                 MS. ERICKSON:  Object to the form.

16                 Beth, if you understand the question,

17   you can answer it.

18                 THE DEPONENT:  Yes.  And other reports

19   as well as --

20                 MR. REISCH:  Okay.

21                 THE DEPONENT:  -- our report from our

22   member --

23                 MR. REISCH:  What other --

24                 THE DEPONENT:  -- which corroborated

25   what the author of the article was saying.
```

                                          Page 21

```
 1            Q.     (By Mr. Reisch)   What other reports are
 2    you supposedly reply -- relying upon?
 3                   You said you relied upon
 4    Mr. Maulbetsch's newspaper article and other reports.
 5                   What other reports?
 6            A.     There were reports in a number of other
 7    media outlets about the same group doing the same
 8    activities.
 9            Q.     You -- was it newspaper?  Was it
10    television?
11            A.     Newspaper.
12            Q.     Did you save those articles which you
13    relied upon to base your federal litigation?
14            A.     Yes.
15            Q.     What -- do you recall what those
16    articles were, who wrote them?
17            A.     No.
18            Q.     Did you turn those over to your
19    attorneys?
20            A.     Yes.
21            Q.     Okay.  What date did you speak with
22    Mr. Maulbetsch, if you recall?
23            A.     I'm sorry.  I don't recall.  I would
24    assume --
25            Q.     In the --
```

Page  22

```
 1    your lawsuit, you -- you and your attorneys made an

 2    allegation that you had members -- that you're here

 3    trying to represent members that were, in fact,

 4    intimidated.

 5                 And I'm here as an officer of the court,

 6    asking you questions under oath, under the pains and

 7    penalties of perjury.

 8                 I'm asking you, what is the name of the

 9    person of your organization that was intimidated so

10    that I can go talk to them?

11                 MS. ERICKSON:  Object to the form.

12    Asked and answered.  Argumentative.

13         Q.    (By Mr. Reisch)  You may answer.

14         A.    As I told you, we had one member come

15    forward who was not intimidated.

16         Q.    And --

17         A.    I have seen multiple reports through the

18    media and from various county clerks that they have

19    received complaints of voters being intimidated.

20                 The League of Women Voters doesn't just

21    serve its membership.  We serve the general voting

22    public.

23         Q.    And ma'am, I understand that.  I truly

24    understand that.  But this is not a political campaign;

25    this is a court of law, and you, in your lawsuit, have
```

Page 29

1   to have somebody come to court and state under oath in

2   front of a federal district court judge and a jury that

3   they were intimidated, and I, as a defendant -- or

4   representing defendants in this case, am entitled to

5   know of the name of the person that was intimidated,

6   not the one that you said wasn't intimidated.

7            I want to know of the name of the person

8   that was intimidated so that I can interview them and

9   bring them to court and have them state that under

10  oath.

11           What is their name, ma'am?

12       A.   I don't know.

13       Q.   You don't know?

14           You don't want to tell me, or you don't

15  have anyone?

16       A.   As I told you, I know of one member --

17       Q.   Who was intimidated --

18       A.   -- who received a visit.

19           Yes.  We heard reports from multiple

20  media outlets and multiple county clerks around the

21  state of Colorado who received calls from voters who

22  felt intimidated.

23       Q.   Ma'am, I understand that, but that's not

24  legal evidence in a court of law.

25               MS. ERICKSON:  Object to the form.

Page 30

```
 1                      Is there a question?

 2                      MR. REISCH:  Yes.  Yes.

 3           Q.     (By Mr. Reisch)  What other

 4    complaints -- who else have you talked to that you've

 5    independently talked to and said that they were

 6    intimidated by USEIP?

 7           A.     I haven't spoken with anyone else.

 8           Q.     All right.  You said clerks and

 9    recorders have received complaints.

10                      Who are the clerks?

11           A.     It's my understanding that the clerks

12    and recorder -- the clerks of Weld County and La Plata

13    County and Pueblo Counties all received voter

14    complaints.

15                      I believe there were other counties as

16    well, but I'm not sure on that, as well as the

17    secretary of state.

18           Q.     Did you go to those clerks and recorders

19    and the secretary of state and get a copy of those

20    complaints?

21           A.     No.

22           Q.     Did you call any of the clerks and

23    recorders or the secretary of state and speak with her

24    or them about these complaints?

25           A.     I did not, but members of my board did.
```

Page 31

```
1              Q.     And what did your members or board
2      members receive back from these clerks?
3              A.     That they had all received multiple
4      complaints of visits by people, seemingly wanting to
5      represent a governmental entity, asking strange
6      questions and intimidating people enough that they
7      would make a call to their county clerk or secretary of
8      state.
9              Q.     Okay.  So did your board members receive
10     a copy of those complaints identifying those
11     individuals that made a complaint to the, let's say,
12     clerk or recorder of Weld County?
13             A.     I don't know.  I don't believe so.
14             Q.     Why not?
15             A.     Because we believed them.
16             Q.     And I understand, but like I said,
17     somebody doesn't get to come in to court and say what
18     somebody else said.  They -- the person actually -- and
19     I'm using air quotes here -- being intimidated has to
20     come to court and say, "I was intimidated."
21                    So you don't -- nobody collected, from
22     your board -- the then 11 board members of the League
23     of Women Voters -- not a single one of them said, "Hey,
24     I should get a copy of these complaints that were made
25     so I can go speak with those individuals.  We may need
```

Page 32

# EXHIBIT 3

## Hernandez Deposition Excerpts

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
     Civil Action No. 1:22-cv-00581-CNS-NRN
 3
     _____
 4
 5   Colorado Montana Wyoming
     State Area Conference of the
 6   NAACP, League of Women Voters
     of Colorado, and Mi Familia
 7   Vota,
 8          Plaintiffs,
 9   v.
10   United States Election Integrity
     Plan, Shawn Smith, Ashley Epp,
11   and Holly Kasun,
12          Defendants.
13
     _____
14
15         REMOTE DEPOSITION OF SALVADOR HERNANDEZ
16                  November 21, 2022
17   _____
18
19
20
21
22
23
24
25
                                              Page 1
```

```
 1   participate in these meetings?

 2          A.     They are varied throughout the year.  It

 3   just depends on what other organizations are doing, but

 4   maybe, like, once a month we meet with them.

 5          Q.     Was there a meeting last month -- so

 6   October?

 7          A.     Yeah, there was one.

 8          Q.     And can you remember which issues were

 9   discussed in that meeting?

10          A.     Whatever they are talking about -- you

11   know, the upcoming election, if you are talking about

12   October -- so just getting people out to vote, that

13   kind of thing.

14          Q.     Sure.  Did any of these meetings that

15   we're talking about discuss USEIP canvassing efforts?

16          A.     No.

17          Q.     Okay.  All right.  And let's go back to

18   this document under number 7, under that bold that was,

19   "USEIP voter intimidation."

20                 Do you see that?

21          A.     Still on page 2.  Right?

22          Q.     Yes, we are.

23          A.     Yes.

24          Q.     Okay.  So it looks like it says:

25                 "In the fall of 2021, MFV learned
```

Page 21

```
 1              that U.S. Election Integrity Plan and

 2              individuals connected to USEIP were

 3              engaging in intimidating home visits to

 4              Colorado voters."

 5                   Is that correct?

 6         A.     Yeah, that's what it says.  Uh-huh.

 7         Q.     Okay.  How did MFV learn of what's

 8    referenced in paragraph 7?

 9         A.     We first learned about it through the

10    League of Women Voters.

11         Q.     How did you learn about it through the

12    League of Women Voters?

13         A.     That's who called me -- Beth called me

14    and told me about the this group that was going door to

15    door, and that's basically how I learned about it.

16         Q.     And when you say Beth, are you

17    referencing Beth Hendrix?

18         A.     Yes.

19         Q.     Okay.  And were there any other sources

20    that you learned of USEIP's canvassing efforts?

21         A.     No.

22         Q.     And this conversation with Beth

23    Hendrix -- you said it was just a phone call?

24                   Is that right?

25         A.     Yeah.  The initial how I learned about
```

Page 22

```
 1    it was through a phone call.

 2         Q.     And what exactly did Beth tell you

 3    during this phone call?

 4         A.     She informed me about -- you know, that

 5    there was a group, you know, going door to door with,

 6    you know, people -- you know, potentially armed, you

 7    know, going -- asking people, you know, how they had

 8    voted -- basically, like, intimidating voters, and, I

 9    mean, that was basically it.

10         Q.     And do you know where Beth learned of

11    this information that she relayed to you?

12         A.     I don't recall where she learned.

13         Q.     Did you do anything to verify the

14    information that Beth told you?

15         A.     What do you mean by that?

16         Q.     Did you do any research into USEIP after

17    Beth had this call with you?

18         A.     Yeah.  I mean, I go on to one of their

19    website to see what they were about.

20         Q.     And were there any other conversations

21    with Beth regarding USEIP?

22         A.     Yeah.  That she mentioned, you know, the

23    potential for a lawsuit.

24         Q.     And what exactly did she say about this

25    potential for a lawsuit?
```

Page 23

```
 1              A.      That -- if Mi Familia Vota would be

 2    interested in participating in the lawsuit.

 3              Q.      And did you then agree to participate in

 4    the lawsuit?

 5              A.      Not -- not in the beginning.  I had to

 6    obviously talk to, you know, my organization to see if

 7    this is something that -- you know, that we wanted to

 8    do and --

 9              Q.      Okay.  Let's go back to the document,

10    same page number 2, but move on to the paragraph

11    numbered 8.  Do you see where it says:

12                   "In MFV's experience, many Latino

13              immigrant and other voters have difficulty

14              differentiating between government officials

15              and USEIP agents."

16                   Do you see that?

17              A.      Uh-huh.

18              Q.      What do you mean, "In MFV's experience,"

19    in this paragraph?

20              A.      From what we've heard.  You know, there

21    were -- you know, the groups that were going out there,

22    or the people that were going door to door, have, like,

23    the official-sounding names, like voter committee or

24    stuff like that, making it, I guess, like, hard for

25    people, like, voters, to distinguish -- right? -- if
```

Page 24

```
 1    they are government officials or a separate

 2    organization who was asking them questions.

 3             Q.    So did any member of MFV state that to

 4    you?

 5             A.    No.

 6             Q.    Are you just assuming that they have a

 7    difficulty differentiating between USEIP and a

 8    government official?

 9             A.    That's what we've heard.  Right?  We've

10    heard about this group going door to door.

11             Q.    But not from personal knowledge from

12    your -- your members.

13             A.    Yes.

14             Q.    Okay.  Let's go ahead and move to the

15    next paragraph, paragraph number 9, still on page 2.

16                   Do you see where it says:

17                   "By intimidating voters at their

18             doorsteps, USEIP's activities make it less

19             likely that Latino voters will answer the

20             door for anyone, including MFV's staff and

21             volunteers."

22                   Do you see that?

23             A.    Yes, I do.

24             Q.    Okay.  Has anyone not answered their

25    door for MFV staff after USEIP's canvassing efforts?
```

Page 25

```
 1              Q.      Okay.  So I know you've referenced in

 2      your testimony today the possibility of USEIP having

 3      armed agents going door to door.

 4              A.      Yes.

 5              Q.      How are you aware of USEIP having armed

 6      agents?

 7              A.      That's what we've heard -- right? --

 8      when we first learned about it, that there were

 9      potentially armed folks going door to door, and that's

10      basically how they learned.

11              Q.      Is that from Beth Hendrix?

12              A.      Yes.  From the -- yeah, the League of

13      Women Voters.

14              Q.      Have you received any information from

15      MFV members that a USEIP volunteer was armed during

16      their visit?

17              A.      No.  No.

18              Q.      Okay.  All right.  And then so the next

19      section on your declaration, Exhibit Number 1,

20      discusses the diversion of resources and frustration of

21      mission.

22                      Do you see that?

23              A.      Yes.  On page 3?

24              Q.      Yep.  That's right.

25                      So on paragraph number 12, it says that:
```

Page 27

```
 1                    MS. HAYS:  Okay.  You know, let's go
 2    ahead and take a five-minute break, if that's okay with
 3    you, Mr. Hernandez.
 4                    MR. BREESE:  Can we just start again at
 5    10:00?
 6                    MS. HAYS:  That sounds good.
 7                    THE DEPONENT:  That works.
 8                    MS. HAYS:  Okay.
 9                    (Recess taken.)
10         Q.    (By Ms. Hays)  Okay.  Let's discuss a
11    little bit more about your conversation with Beth
12    regarding USEIP's activities.
13                    Did you or MFV do anything to verify the
14    information that Beth stated to you?
15                    And you're muted, by the way.
16         A.    Can you hear me?
17         Q.    Yes.  Okay.  So did you or MFV do
18    anything to verify the allegations that Beth stated to
19    you regarding USEIP's canvassing?
20         A.    What do you mean by "verify"?
21         Q.    Sure.  Did you ask Beth where she
22    received this information?
23         A.    I don't recall that.
24         Q.    Do you know --
25         A.    It was a long time ago.
```

Page 31

```
 1              Q.     Do you know whether Beth spoke with an
 2      actual voter who claimed they were intimidated?
 3              A.     I don't recall if she said she actually
 4      spoke to a voter.  I'm not sure about that.
 5              Q.     Did she send you any sort of
 6      documentation regarding USEIP's canvassing?
 7              A.     What do you mean by that?
 8              Q.     Were there any police reports filed?
 9              A.     If they -- like, if she's sending police
10      reports?
11                     Is that what you mean?
12              Q.     Sure.  Did Beth send you any police
13      reports regarding USEIP?
14              A.     No.  No.
15              Q.     Did she send you any articles from the
16      internet regarding USEIP?
17              A.     No, not -- no.
18              Q.     Did she send you any complaints by
19      members of League of Women Voters regarding USEIP?
20              A.     No.
21              Q.     So the only information you got
22      regarding USEIP was Beth's claims?
23                     Is that true?
24              A.     Well, that's what we heard, like, how we
25      found out about it -- right? -- but we didn't hear from
```

Page 32

```
 1   anyone else, I guess.

 2           Q.    And from what Beth told you, you did

 3   nothing to confirm whether what she said was true?

 4           A.    Well, I try to, you know, do some

 5   research.  Right?  I went to the website of USEIP.  I

 6   think I Googled to see if I could find anything.

 7                 I didn't find, like, much, and so I --

 8   you know, I just looked at their website.  That was

 9   about it.

10           Q.    And what did -- what did you find on the

11   website?

12           A.    Just, like, the mission -- I don't think

13   there was much in there that I saw, what they're doing.

14           Q.    And based on what Beth informed you, you

15   decided to join this lawsuit?

16                 MR. BREESE:  Objection to form.

17                 Also instruct the witness to not reveal

18   any attorney-client communications.

19                 THE DEPONENT:  So I spoke to, you know,

20   the Mi Familia Vota team, and we decided that, you

21   know, if we wanted to join this lawsuit, and we did --

22   we did.

23           Q.    (By Ms. Hays)  Who is the team that you

24   are discussing?

25           A.    My national team, Carlos Duarte.
```

Page 33

1    difficult to track, you know, that particular --

2    exactly how you spend your time.

3                    Most of those budgets are spent on

4    staff, on, you know, training, hiring staff, and then

5    as part of the time that -- you know, that the staff

6    use to talk to voters.

7                    Other parts are spent on, you know,

8    training the staff to talk to voters, and because, you

9    know, we have to take additional time with our staff

10   talking to them about, you know, hey, there's that --

11   if you are hearing about this group, let us know.  Keep

12   an eye out in the community.

13                   Then that time, then, is spent doing

14   that, because, you know, we have the -- we just use

15   that to focus on making sure that, you know, people go

16   out and vote; that, you know, people know -- or our

17   staff know and train them, you know, letting people

18   know that there's an election coming, making sure that

19   the voters are confident about where they are going to

20   vote, meaning if they are going to go to a polling

21   location or they are going to drop off their ballot, do

22   they know where the drop boxes are -- those kinds of

23   things.

24            Q.    Okay.  So on number 20 on that -- on

25   your declaration, you can't say for certain that 20

                                              Page  43

1    percent of your civic engagement budget had been

2    sent -- spent as a result of USEIP.

3                       Is that true?

4            A.      It's an estimation.  Right?

5                    We don't -- there's not, like, an exact

6    science of how to, you know, calculate that, I guess.

7            Q.      So how did you come to that number -- or

8    how did you come to that estimate before you signed

9    your declaration for this lawsuit?

10           A.      Well, I guess it's an estimate.  Right?

11                   We think about, like, you know, the --

12   what we need to do in terms of spending time with the

13   staff, training them, those kinds of things; so, you

14   know, we make our best educated guess -- right? -- how

15   much time are we going to take every day to talk about

16   this with our staff and, you know, ongoing

17   conversations that we're having with them.

18                   The nature of these kinds of campaigns

19   is that you are constantly training staff, you know, as

20   people, you know, join the campaign, that, you know,

21   train their staff as people go -- you know, retraining

22   takes place.

23                   MR. BREESE:  To the extent that the new

24   clients are coming in, or if it's people from your

25   side, can you introduce them for the purpose of the

                                              Page 44

```
1    Exhibit Number 3, page 4, you testified today that you

2    have not spoken with members of MFV who are concerned

3    of Defendants' past and potential future actions.

4                    So is your answer to interrogatory

5    number 2 -- has it changed?

6                    MR. BREESE:  Objection to form.

7                    THE DEPONENT:  Yep.  I'm not sure, like,

8    though -- what do you mean by that?

9                    I mean, we've spoken to other groups --

10   right? -- the League of Women Voters being one of them.

11   They heard about, you know, the USEIP going to doors.

12                   We haven't heard directly from community

13   members about experiencing this on a firsthand basis,

14   if that's -- I don't know if that's clear.

15                   MS. HAYS:  Sure.  Okay.

16                   I have no further questions.

17                   Mr. Breese may have some questions for

18   you, so I'll pass you over to him.

19                   MR. BREESE:  Yeah.  Thank you,

20   Ms. Hayes.  Just a few follow-up questions.

21                        EXAMINATION

22   BY MR. BREESE:

23        Q.    Do you have -- Mr. Hernandez, do you

24   have this Exhibit 3 in front of you, your discovery

25   responses?
```

Page 55

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    194

1    when they said that.  I remember being surprised about that.

2            THE COURT:  All right.  So you said they didn't have

3    the training materials from USEIP when they began canvassing.

4    Did you ever or do you know if they ever received those

5    training materials?

6            THE WITNESS:  I don't know if they did, Your Honor.

7    They were posted in the county captains and the voter

8    verification rooms on Basecamp, but I don't know if they

9    downloaded them, and I don't know if they used them.  But I

10   know when they began their canvassing, they weren't using

11   them, and I suspect that -- at the end we couldn't use their

12   data because they had not asked the same questions or used the

13   same dataset to begin with, so we couldn't aggregate it.

14           THE COURT:  And when you say they didn't ask the same

15   questions, do you know offhand what the differences were in

16   the questions asked?

17           THE WITNESS:  No, ma'am.  I remember speaking I think

18   to Jeff about it, because the way it worked is that the

19   analytics people were pretty specialized.  They were the ones

20   doing the data analysis.  They would get the downloads or the

21   county excerpt.  They would go through the work of trying to

22   figure out how to parse it up into walk lists, because when

23   you get it it's not organized by neighborhood.  If you don't

24   organize it by neighborhood, your volunteers will be all over

25   the place all day long.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    195

1              And so Jeff was talking to those people, the

2    analytics people, and I remember Jeff saying that he didn't

3    think we would be able to use the data.  And I maybe had one

4    conversation -- I maybe had one conversation after that with

5    the person who was trying to organize their analytics.  But it

6    was a little bit different process where I think they had

7    begun their canvassing without starting necessarily with the

8    end in mind the way we had.

9              We wanted something that we could present to

10   officials that would then be adequate predicate for them to go

11   do the rest of the research.  Because you probably know, you

12   know, there are things that even in the Secretary of State's

13   data that are not provided to the public.  Like, the public is

14   not allowed to be told who's responsible for voter

15   registration of different voters.  And maybe if you had a

16   pattern of voter names that were not, you know, legitimate, or

17   information that was bad, you might find that there was some

18   organization connected to them, and so that was part of the

19   reason we wanted to make sure we gave that to law enforcement

20   officials.

21              THE COURT:  All right.  Thank you.

22              THE WITNESS:  Yes, ma'am.

23              THE COURT:  Any follow-ups based on the questions I

24   asked?

25              MR. REISCH:  Just briefly.  Just a mild

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN  Bench Trial - Day 1    07/15/2024    11

1  U.S. Capitol where he claimed repeatedly, as the defendants

2  have also claimed in their own public statements, that the

3  election was rigged and stolen, and encouraged a crowd not to

4  concede or give up.

5       The connection between the rhetoric of January 6th

6  and defendants' public words and actions afterwards is

7  unmistakable.  The evidence will also demonstrate that

8  defendants were part of the crowd that then marched to the

9  United States Capitol.  As we all know, the activities of the

10 crowd on that day caused the death of several individuals and

11 delayed the peaceful transfer of presidential authority.

12      Defendants' participation in the January 6th

13 insurrection and their many public statements regarding a

14 rigged or fraudulent election, their dog whistles about an

15 assault on our country, and their calls for a strong action in

16 response is precisely the type of prior conduct that the

17 Voting Rights Act instructs the Court to consider when

18 determining if actions rise to the level of voter

19 intimidation.

20      Second, the evidence will show that defendants and

21 USEIP adopted violent rhetoric in connection with its

22 canvassing campaign.  After founding USEIP in the days

23 following the November 2020 election, Defendants Epp and Kasun

24 quickly began recruiting others to their cause, including

25 Defendant Smith.  Having made up their mind that President

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    12

1    Biden's win over Mr. Trump in the 2020 election could only be

2    the result of one thing, election fraud, defendants set about

3    to collect evidence of what they had already concluded to be

4    true.

5           In order to do so, they developed a coordinated and

6    wide-reaching campaign to knock on the doors of voters across

7    Colorado and interrogate them about their participation in the

8    2020 election.  Defendant Epp for her part was the chief

9    architect of the playbook, which, as plaintiffs will

10   demonstrate through this trial, is the handbook for

11   defendants' voter intimidation campaign.  The playbook

12   expressly invokes images and sentiments of wartime, stating

13   that our country is not at peace, and that agents of USEIP are

14   patriots pitted against those who disagree with their views

15   who are referred to as enemies and communists.

16           The playbook also instructs its readers to fight the

17   enemy, stating, When they stole our election, their stole our

18   republic.  If we allow fraud to stand, we become complicit in

19   the destruction of the greatest nation in the history of

20   Earth.  We become complicit in their crime.  No one is coming

21   to save us.  It's time to stand up.  Such language when

22   considered alongside defendants' door-to-door campaign to

23   question voters about the 2020 election is objectively

24   intimidating.

25           Third, the evidence will show that USEIP's canvassing

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    13

1    efforts intentionally targeted those who did not consistently

2    vote prior to 2020.  Jeff Young, a USEIP volunteer who

3    developed the methodology they use to select which homes and

4    voters in Colorado to canvass, will testify that USEIP was

5    primarily concerned with what they dubbed low voter

6    opportunity score voters who might otherwise be known as low

7    propensity voters.

8            Defendants' theory was that these voters, voters who

9    did not vote consistently before the 2020 election, were the

10   most likely to have had a fraudulent ballot cast in their

11   name.  Mr. Young's testimony will establish the defendants'

12   methodology, which was neither peer-reviewed nor tested before

13   USEIP canvassers took it to voters' doorsteps, specifically

14   targeted low propensity voters and failed to account for any

15   valid reason why an individual voter may have voted for the

16   first time in Colorado in 2020.  For example, it does not

17   account for individuals who recently became citizens or who

18   had strong feelings about the candidates, Mr. Trump's four

19   years in office, of Mr. Trump's handling of the COVID-19

20   pandemic, for example.

21           Fourth, the evidence will demonstrate that USEIP's

22   intimidating canvassing efforts were widely publicized.

23   Defendant Kasun for her part created USEIP's communications

24   and recruitment materials, was a primary spokesperson for

25   USEIP, and frequently spoke publicly to promote their efforts

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    53

1  election you also started reading up on the election machines

2  or the voting machines and voting systems that were used in

3  the Colorado elections in 2020?

4  A.  That's correct.

5  Q.  You read the technical data package manual for those

6  voting systems, correct?

7  A.  Well, there are multiple manuals in the technical data

8  packages, but, yes.

9  Q.  Did you read all of the manuals?

10 A.  All of them.

11 Q.  And you read test reports from those voting systems,

12 correct?

13 A.  And the plans and the testing standards and the statutes

14 and the code and the voluntary voting systems guidelines and

15 the EAC program manuals for voting system testing labs.

16 Q.  A very deep dive into these issues it sounds like.

17 A.  Once I'm interested, I read everything I can find.

18 Q.  And after reading all of these materials, you immediately

19 concluded that our processes for testing the security of our

20 voting systems are inadequate, correct?

21 A.  Grossly.

22 Q.  And you determined that we are in trouble, right?

23 A.  That's correct.

24 Q.  And you came to the immediate conclusion that our

25 standards for testing our voting machines were insufficient to

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1      07/15/2024    54

1    determine the vulnerability of our election systems to

2    unauthorized interference, right?

3    A.   That's correct.

4    Q.   Meanwhile, at the same time you were reading media reports

5    suggesting that our 2020 election processes were safe and

6    secure, correct?

7    A.   Correct.

8    Q.   And you disagreed with those reports?

9    A.   I do.

10   Q.   And you had -- because you began to have grave concerns

11   about the transparency of our elections and the claims being

12   made about the high level of security integrity in our

13   election systems, correct?

14   A.   Correct.

15   Q.   And this is all in a matter of days after the

16   November 2020 election before the results of that election

17   were determined, correct?

18   A.   Well, I think it was evolving.  I mean, I never saw

19   anything -- and I've been at this now for several years.  I

20   have yet to see anything that restores any kind of confidence

21   or faith for me that we are protected in our voting rights,

22   that our franchise is protected by what are being purported as

23   the safeguards.  So it wasn't that it just immediately was

24   formed.  It's that I first was surprised by what I saw and

25   then alarmed, and then the more I've read, the worse that's

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    63

1    leftist organizations, correct?

2    A.   Demonstrably.

3    Q.   I want to talk about your January 6th experience.

4            MR. REISCH:  Objection, Your Honor.

5            THE COURT:  Let me interrupt you.  We're going not to

6    have any laughing.  If I hear it again, you're going to be

7    asked to leave.  This is a serious proceeding with serious

8    charges, so I'd ask folks in the gallery to keep an eye on

9    their behavior.

10           Go ahead.  And sorry, Mr. Reisch.

11           MR. REISCH:  Objection, 401, 403, Your Honor, as

12   relates to anything January 6th.  There's no relevance.

13           THE COURT:  I'll allow -- overruled.  I'll allow a

14   brief exploration of that to see where Mr. Dillon is going

15   with it.

16           MR. DILLON:  Thank you, Your Honor.

17   Q.   (By MR. DILLON) So, Mr. Smith, you traveled to Washington,

18   D.C. to be present during the January 6th gathering, correct?

19   A.   Correct.

20   Q.   And you claim that that rally was all about following the

21   Constitution, correct?

22   A.   I do believe that.

23   Q.   The same Constitution you swore a duty to defend and

24   protect?

25   A.   Correct.

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   64

1   Q.   And you listened to President Trump's speech while at the

2   rally on January 6th, correct?

3           MR. REISCH:   Objection, relevance.

4           THE COURT:   Overruled for the same reason.   And even

5   though you're way back there, I'll still have you stand when

6   you object.   It helps me hear better.

7           MR. REISCH:   Yes, Your Honor.   I apologize if I did

8   not.

9   A.   To some extent.   Where I was standing during the speech

10  was sort of behind the Ellipse, in between the Ellipse and the

11  Washington Monument, and it was really cold, and it was windy,

12  and there was a lot of crowd noise.   So I didn't go to hear

13  President Trump's speech, and I didn't hear all of that.   It

14  began very late.   I was more interested in talking with the

15  people around me, and there were people from all over the

16  country and all over the world, and we were meeting them

17  standing there kind of learning where they'd come from and

18  that kind of thing.

19  Q.   (By MR. DILLON) You're a man of self-study.   Have you

20  since read the text of the speech?

21  A.   No.   I've seen parts of it.   I've seen excerpts from it.

22  Q.   Okay.   Do you think it's fair to say that your beliefs and

23  concerns regarding the 2020 election align with many of the

24  concerns raised by President Trump during his January 6th

25  speech?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    65

1          MR. REISCH:  Objection, relevance, speculation,

2    hearsay.

3          THE COURT:  Overruled.

4    A.  Could you identify something specific that you want me to

5    identify whether my views align with them?

6    Q.  (By MR. DILLON) I would be happy to.  Do you believe the

7    election was stolen from the American people?

8    A.  I believe it's possible.

9    Q.  Do you believe the election was rigged?

10   A.  I believe that's possible.  I mean, our government does

11   that in other countries.  I've been part of trying to ensure

12   specific election outcomes in other countries.

13   Q.  Do you believe that there was fraud in the 2020 election

14   on a scale never seen before?

15   A.  I don't know about never seen before, but I believe there

16   was fraud on a large scale.

17   Q.  Do you believe that those involved in the 2020 election

18   fraud were engaged in a criminal enterprise?

19   A.  Yes.

20   Q.  Do you believe that the 2020 election fraud which you've

21   just described as a criminal enterprise constitutes a

22   comprehensive assault on our democracy?

23   A.  I don't know that I would describe it exactly that way.

24   I'm not certain that all of the fraud has been perpetrated by

25   the second people or in coordination with one another.  I

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN  Bench Trial - Day 1      07/15/2024    73

1           MR. DILLON:  No, and he asked me if I would go

2    through some of the claims made by President Trump, and he

3    adopted those, many of them, as his own and has confirmed that

4    he has shared those conclusions and his belief in public

5    forums.

6           THE COURT:  Well, that he heard them and agrees with

7    them does not make the tie that you're trying to establish.

8    So as long as you're moving on, that's fine.  But we are not

9    here to try January 6th.  We are here to talk about what

10   happened in Colorado after the election.

11          MR. DILLON:  Fair enough.

12          THE COURT:  All right.

13   Q.  (By MR. DILLON) So let's talk about what happened in

14   Colorado after the election, after January 6th.  You got

15   involved in USEIP activities in early 2021, correct?

16   A.  The end of February.

17   Q.  End of February.  So month and a half after the events of

18   January 6th, roughly?

19   A.  Yes.

20   Q.  And USEIP was founded by your codefendants, Ms. Epp and

21   Ms. Kasun, correct?

22   A.  Among others.

23   Q.  Among others.  Shortly after the 2020 election, right?

24   A.  I believe that's correct.

25   Q.  Okay.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   74

1    A.  I didn't know them at the time.

2    Q.  You've described USEIP as a free assembly of citizens

3    trying to promote and advance election integrity, right?

4    A.  Correct.

5    Q.  And you ultimately became a spokesperson for USEIP?

6    A.  I don't think it was that official.  I think what we

7    talked about was the likelihood based on what we saw of

8    leftist lawfare groups attacking citizens who were trying to

9    question or ask questions about election integrity, and we

10   were trying to protect, you know, other citizens from that

11   kind of lawfare and sort of vitriol.

12   Q.  Were you identified as somebody who would speak, go out

13   and speak on behalf of USEIP?

14   A.  Sure.

15          MR. REISCH:  Object as to foundation; date, time,

16   location.

17          THE COURT:  Well, I'll sustain.  If you can put a

18   timeframe on it.

19   Q.  (By MR. DILLON) Were you ever identified as someone who

20   would go out and speak on behalf of USEIP?

21          MR. REISCH:  Same objection, Your Honor.

22          THE COURT:  Overruled.

23   A.  Yes, I suppose.  I mean, when you say identified, we

24   talked about it, about who was going to go talk to various

25   groups.  Like I think it was maybe the 24th of April, 2021, we

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1     07/15/2024    76

1    That's what I thought I was doing.  I didn't even realize at

2    first that Ashe Epp who I had met in December at the

3    legislative audit committee hearing, because they made me

4    stand outside the hearing room for like eight hours, I met

5    Ashe standing out in the hallway, and I didn't realize that

6    USEIP was the group that she was part of, because we hadn't

7    had really contact, you know, after that point, after

8    December.  So I first was engaged with USEIP because I thought

9    I was talking to the analytics group because Dennis Haugh,

10   former computer scientist and mathematician, had asked me to

11   talk to them.

12   Q.  Going back to my question, my question related to the core

13   team, and I just want to -- you've acknowledged you became a

14   member of the core team as you understand that term, right?

15   A.  Yes.  I would say, if it helps, little C core, not big C

16   core.  It wasn't a title.  It was just these are the people

17   that show up on the weekly phone calls.

18   Q.  Fair enough.  And is it the case that Ms. Epp and

19   Ms. Kasun were also part of a core team?

20   A.  Yes.

21   Q.  And Jeff Young as well?

22   A.  Yes.

23   Q.  Okay.  And you participated along with Ms. Epp, Ms. Kasun,

24   and Mr. Young in regular meetings of the core team; is that

25   true?

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    79

1  before you move on.  Overruled.

2  Q.  (By MR. DILLON) What is Basecamp?  Can you explain it for

3  the Court?

4          MR. REISCH:  Objection, relevance.

5          THE COURT:  Overruled.

6  A.  Basecamp is -- I think it's actually a software tool and

7  site that's put out for the use of software development teams.

8  So it's, you know, like sort of an interaction tool.  So it

9  lets you establish affinity groups or groups to share

10 information, post documents, that kind of thing.  The USEIP

11 team, the people were using it to support coordination between

12 volunteers, both within their own counties and then without

13 their counties, and then to be able to sort of provide a

14 persistent place to provide information to them, like the

15 stuff we were getting back from open records requests.

16 Q.  (By MR. DILLON) Okay.  Was access to USEIP's Basecamp

17 platform, was it controlled?

18 A.  Well, when you say USEIP's Basecamp, it was like USEIP had

19 a site on -- I mean, it's used by thousands of organizations

20 and tens of thousands or millions of people, I don't know how

21 many.  But I believe it was controlled -- like you had to be

22 given access by somebody who already was an administrator or

23 something like that.  But I don't know how it was early on.  I

24 only know how -- I was given an invitation with a link, and

25 that's how I got into it, but I don't know if everybody who

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   84

1   citizen volunteers?

2   A.  We had previously tried to look at other methods.  I mean,

3   we had tried to go through the data and do analysis of the

4   data, but we concluded that if you want ground truth, you have

5   to go and see, especially because we had a lot of anecdotal

6   evidence.  And you've heard it, other people have heard it

7   about people getting extra ballots or people getting ballots

8   for people who didn't live at the houses or people who were

9   not sure if their ballot was counted or anything like that.

10  We thought let's just go collect the data.  We canvassed just

11  like all three plaintiff organizations canvass.  We all

12  canvass.  That's how you get truth.

13  Q.  I appreciate the extra detail.  I'm just simply asking you

14  to confirm that the method by which USEIP and its volunteers

15  went about testing the accuracy of the election-related data

16  --

17  A.  I wouldn't call it testing, but -- I'm sorry.  I did it

18  again.  I wouldn't call it testing.  We were just trying to

19  verify whether the Secretary of State's data was accurate.

20  Q.  Fair enough.  And you did that -- the method by which you

21  did that was door-to-door canvassing, questioning Colorado

22  residents, voters about the data personal to them?

23  A.  Exactly.

24  Q.  Okay.  Thank you.  And the work product of this effort

25  consisted of, among other things, affidavits that were

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   86

1    A.   That's correct.  Well, not necessarily uncomfortable.

2    Just didn't for some reason.  Like, sometimes there was a

3    language barrier or sometimes the individual they were talking

4    about wasn't present.

5    Q.   Citizen canvassers were also advised to take photographs

6    of residents where discrepancies were identified?

7    A.   Did you say residents or residences?

8    Q.   Residences.  Let me restate the question so that the

9    record is clear.  Citizen canvassers were also advised to take

10   photographs of the residences where discrepancies were

11   identified, correct?

12   A.   I think it's a little bit more detailed than that.  It was

13   more a matter of where the discrepancies were associated with

14   the residence itself.  It wasn't like here's a white house and

15   inside that is somebody who didn't vote or whatever.  It was

16   more like there's an address listed, and instead of being a

17   residential address, it's a storage location or it's an empty

18   lot or it's a commercial, you know, establishment from where

19   someone would not be permitted to, you know, be registered as

20   a voter.  Or it's -- you know, it's literally a street corner

21   that somebody is purported to have received and sent an

22   absentee ballot from.  So I think it was a -- I don't remember

23   the exact wording in the training, but I think it wasn't just

24   any anomaly.  It was about specifically where there was

25   something about the location that they wanted to document.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    87

1   Q.  Did USEIP maintain photographs that were taken by

2   canvassers?

3   A.  Well, again, USEIP is a -- you know, it's an affiliation

4   of an assembly of citizens.  We didn't have any kind of

5   central repository.  I never asked for photographs.  I don't

6   know how many were taken by the volunteers that did the

7   canvassing.  We never asked.  It wasn't important to the

8   report.  It was more a matter for them to sort of document

9   where they'd been.  Just like we had recommended that they

10  keep photos of the walk lists that they had completed so that

11  they could show if they were challenged or asked where they

12  had been and where they had not been.

13  Q.  What understanding do you have, if any, about where the

14  photographs taken by canvassers may be today?

15  A.  I don't know if any photographs were --

16          MR. REISCH:  Objection, speculation.

17          THE COURT:  Overruled.

18  A.  I don't know if any photographs were actually taken.  I

19  never asked anyone, so I don't understand -- I don't know if

20  there are photos and where they are, if there are any.

21  Q.  (By MR. DILLON) Okay.  What about audio recordings or

22  conversations between canvassers and folks who answered the

23  door when canvassers came knocking?

24  A.  Same answer.  And for the same reason, we recommended that

25  because Colorado's a one-party state and people can record if

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   88

1    they want to do that to protect their own interests and the

2    fidelity of the conversation, that canvassers would record

3    audio.  I think I started off saying you could record video,

4    and I thought people might be uncomfortable with that.  You

5    can just record audio if you want to with your phone or

6    whatever, and that way if somebody said that person, you know,

7    called me an epithet or that person threatened me or

8    something, then you could prove that you didn't do that.

9    Q.  But as you sit here today, you don't know if any audio

10   recordings were taken or where they might be if they were

11   taken?

12   A.  Correct.  They weren't important to what we were trying to

13   do with canvassing.  It was more that we wanted canvassers to

14   protect themselves.

15          THE COURT:  Mr. Dillon, is this a good time for a

16   break?

17          MR. DILLON:  Sure, Your Honor.

18          THE COURT:  Let's take a 15-minute break, and we'll

19   come back.  We'll be in recess.

20          THE COURTROOM DEPUTY:  All rise.  Court is in recess.

21     (Break was taken from 10:27 a.m. to 10:43 a.m.)

22          THE COURT:  Please be seated, and we'll continue.

23   Q.  (By MR. DILLON) Mr. Smith, I'd like to continue by

24   referring you to Exhibit 22.

25   A.  Okay.  22.

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    89

1   Q.  Do you see the first page of Exhibit 22, at the bottom

2   it's got what we lawyers refer to as a Bates stamp.  It says

3   USEIP_000930.

4   A.  I do.

5   Q.  Okay.  I'll just represent to you that this is a set of

6   documents that were produced by your counsel in this case.

7   A.  Okay.

8   Q.  Do you recognize these documents and particularly the

9   photographs that are included in this Exhibit 22?

10  A.  The first photograph I do not.  The second page with the

11  four photographs I do not.  The third page is not a

12  photograph, but an affidavit.  It's from Pueblo it says.  I

13  don't recognize that.  And then there are three photos on the

14  next page.  I don't recognize any of the photographs.  The

15  next page is another affidavit from Pueblo.  And then the

16  following page has two photographs, and I don't recognize

17  either of them.  Do you want me to keep going?

18  Q.  Well, let's turn back to the page with the Bates stamp

19  USEIP_000932.

20  A.  Okay.

21  Q.  And that's one of the affidavits that's in this set of

22  materials?

23  A.  Okay.

24  Q.  And in this affidavit a couple lines from the bottom it

25  says, quote, photos taken for this affidavit, period, closed

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   90

 1   quote.

 2           MR. REISCH:  Objection, hearsay, lack of foundation,

 3   lack of personal knowledge.

 4           MR. WYNNE:  Join the objection, Your Honor.

 5           THE COURT:  Sustained.

 6   Q.  (By MR. DILLON) Let me just back up.  You've testified

 7   already this morning that you're not sure if any volunteers

 8   took photographs when they were out canvassing or whether

 9   those photographs were maintained by anyone, correct?

10   A.  Correct.

11   Q.  Does this document refresh your recollection as to whether

12   any photographs were taken or maintained?

13   A.  Well, I didn't have a recollection.  I didn't realize that

14   these photos were included.  I don't know if these were part

15   of the data that was given to the Pueblo DA with the

16   affidavits or if these were solicited for the case and then

17   obtained and provided to counsel.  So it doesn't refresh

18   anything.  I didn't know that there were photos in it.

19   Q.  So your testimony remains unchanged.  You don't know if

20   volunteers took any photos and you don't know if any photos

21   were maintained?

22   A.  Well, this indicates --

23           MR. REISCH:  Your Honor, I'm going to ask him to not

24   to respond.  It's nonresponsive.

25           MR. WYNNE:  The question asked to elicit hearsay, so

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   91

1    we object.

2            THE COURT:  The objection is sustained.  He hasn't

3    seen the photos.  He's not familiar with them, so he can't

4    possibly answer any questions about them.

5            MR. DILLON:  Okay.  We'll move on.

6    Q.  (By MR. DILLON) Mr. Smith, you personally participated in

7    USEIP's canvassing, efforts, correct?

8    A.  I did.

9    Q.  You did three days of door-knocking work, correct?

10   A.  I think that's correct.

11   Q.  And you knocked on 70 to 75 doors, correct?

12   A.  Roughly.

13   Q.  And that was in two counties, correct, Weld and El Paso

14   County?

15   A.  That's correct.

16   Q.  And in your work you canvassed in at least two mobile home

17   parks, correct?

18   A.  Correct.

19   Q.  And collectively you're aware that USEIP volunteers

20   knocked on more than 9,400 doors?

21   A.  Correct.

22   Q.  And talked to more than 4,600 residents?

23   A.  Correct.

24   Q.  And all of that work was in Colorado, correct?

25   A.  Correct.

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    93

1   were executing or conducting voter verification, that they

2   could have the tool for that use, and we could get

3   standardized, you know, canvassing which was really important

4   to be able to aggregate the data.

5   Q.  Are you the principal drafter of this voter verification?

6   A.  I am.  I'm sorry.  I am.

7   Q.  And so you are -- and did you personally train volunteer

8   canvassers?

9   A.  Earlier I was going to say no, but there were a couple of

10  people when I showed up for the third -- we call them walks --

11  when we showed up for the third walk, there were some

12  volunteers who had arrived there who had not gone through the

13  training, which I only found out when we were getting ready to

14  go out, and so I just sat down with them and walked through

15  it.  But other than them, I didn't train anyone else.

16  Q.  Did you train any volunteers on how to train others, train

17  the trainer model?

18  A.  No.  There was a captain's guide that was really meant

19  more for the captains themselves, but other than that, no.  I

20  mean, we talked a little bit, but when I went to the first

21  training up in Boulder, at least the first training that I can

22  remember, the person who was giving the training was a

23  professional corporate trainer, and so I thought, well, you

24  know, my work here is done.  I don't need to do anything more

25  with this.

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   94

1    Q.  And was this professional trainer -- did that person use

2    your training guide here to train the canvassers?

3    A.  I think a version -- so the intent always was for the

4    county captains to tailor whatever tools to what they had

5    chosen to do and their circumstances, and that's what

6    happened.  In fact, there was a lot of experimentation with

7    what forms they would have used and things like -- so much I

8    didn't like, but they ended up adopting anyway.  So the intent

9    was to provide them with the tool, but with the understanding

10   they were their own county, and they were going to tailor it

11   to however they wanted to do it.

12   Q.  Did you personally follow the training -- this training

13   guide when you were doing your canvassing for USEIP?

14   A.  I would say for the most part.  I didn't record any audio,

15   and -- but I think for the most part I did.

16   Q.  And is it your understanding that other USEIP citizen

17   volunteers were instructed to follow this training as well in

18   their efforts?

19          MR. REISCH:  Your Honor, I object as to foundation

20   and hearsay, vague and speculative.

21          THE COURT:  Well, overruled.  Let me see if he can

22   answer.

23   A.  Could you repeat the question?

24   Q.  (By MR. DILLON) Is it your understanding that other USEIP

25   volunteers were trained in the manner that is described in

                  Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    95

1    this document that we're looking at, Exhibit No. 4?

2    A.  Or some version of it.  Like I said, this is a very early

3    draft, the first draft.  You can tell I did it, because it's

4    totally artless.  It's just pure text.  So what they used to

5    train them -- the important parts to us were that they would

6    be asking them the same questions, and they were following the

7    guidance about being, you know, professional and courteous.

8    Because nobody had to talk to us, right?  That's why we asked

9    them if they were willing to talk, and if they said no, then

10   we left.  And if they said yes, then we asked questions.

11   Q.  Well, let's page through the document.  At the bottom,

12   again, Bates numbers, let's direct your attention to

13   USEIP_0048.

14   A.  Okay.

15   Q.  And the title of this page is Purpose of Voter

16   Verification, correct?

17   A.  Correct.

18   Q.  And this document describes voter verification as a

19   process by which an independent audit of election records and

20   results would be obtained, correct?

21   A.  Correct.

22   Q.  And is this -- does this document accurately describe the

23   purpose of the voter verification efforts?

24   A.  Okay.

25   Q.  Let's turn your attention to the next page, and the title

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   96

1   of this page is Safety.  Do you see that?

2   A.  Yes.

3   Q.  Is it your understanding that citizen canvassers were

4   trained on safety-related issues?

5   A.  I hope they were.  We recommended that they be.  That's

6   why it was in the slide deck.

7   Q.  That was your intention, certainly, as the drafter of the

8   training materials?

9   A.  Correct.  We wanted people to be safe.

10  Q.  And you recognized that canvassing activity like this

11  carried some safety risk, correct?

12  A.  Any time you go to somebody else's house or go out

13  walking, I mean, people get hit crossing the street in their

14  neighborhood, so...

15  Q.  Let's turn to page USEIP_0056.

16  A.  Okay.

17  Q.  These are some frequently asked questions that you thought

18  trainers should be prepared to address, correct?

19  A.  Correct.

20  Q.  And one of those questions was what to do if approached

21  aggressively or attacked, correct?

22  A.  Yes.

23  Q.  So you recognized on the front end that was certainly

24  possible?

25  A.  It's always possible.

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    99

1    A.   Could you repeat the question, please?

2          MR. DILLON:  It's been a while.  Now I don't

3    understand exactly what the question was.  Would you mind

4    reading it back?

5          THE COURT:  Do you recall any conversations on the

6    Basecamp platform about trying to coordinate canvassers who

7    were carrying firearms with those who were concerned about

8    their safety?

9          THE WITNESS:  Thank you, Your Honor.

10   A.   I don't recall conversations from Basecamp, but I recall

11   reading Basecamp excerpts that I think were produced as

12   exhibits and maybe also were removed.  So there was a point

13   where the reporter that's being cited, Erik Maulbetsch, had

14   under false pretenses kind of infiltrated the site and had

15   done some excerpts, some very creative excerpts, and I think

16   he was addressing those.  And I think I saw those, but I don't

17   remember seeing them on Basecamp, if that's your question.

18   Q.   (By MR. DILLON) Why don't you take a look at Exhibit 25.

19   A.   Did you say 25?

20   Q.   2-5.

21   A.   Okay.

22   Q.   I'll just represent to you and for the record this is a

23   document that was produced by Jeff Young in response to a

24   subpoena in this case.  You can -- it's a fairly thick

25   document.  You can take some time to familiarize yourself with

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    100

1    it.  I've got some questions for you about it.

2    A.  You want me to just read through it?

3    Q.  It's a long -- just familiarize yourself generally with

4    the content of it.

5    A.  Just all excerpts from Basecamp conversations?

6    Q.  I believe that's what this is, and I would like you to

7    confirm that.

8    A.  I don't know if this is from that or not.  I mean, I'd

9    have to go back and look.  If they had my name on them like I

10   was one of the recipients or sent it, and you'll see it -- I

11   think it would just be Shawn, then I might have seen it, but

12   --

13        MR. REISCH:  Your Honor, I object as nonresponsive.

14   There's not a question pending.

15        MR. WYNNE:  And I'll object to any question along

16   these lines based on hearsay.  Even if in the rare event he

17   were able to authenticate it under 901, 902 as his own, it

18   would still be hearsay.

19        THE COURT:  Well, we haven't done anything with the

20   document yet, so I'll allow him to try and establish

21   familiarity with it.

22        MR. WYNNE:  Understood.  Just trying to save time.

23   Q.  (By MR. DILLON) Mr. Smith, do you recall when you were

24   first allowed access to the USEIP Basecamp page ?

25   A.  Not specifically, but it would have probably been the end

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1      07/15/2024    105

1   like the voter verification training, and then I had feedback

2   from other volunteers, including the people who had started

3   trying to use the materials that, Hey, you know, you explained

4   this wrong or whatever.  So there wasn't one update.  There

5   wasn't one draft.  And then there were versions in the various

6   counties.

7   Q.  When did USEIP start its canvassing efforts?

8   A.  That's a great question.  I don't remember the exact date

9   when I was up in -- I think -- I think that was one of the

10  first walks up in Weld County.  That was certainly the first

11  training that was using some version of what I had drafted,

12  and that's why I went to attend it, but I don't remember the

13  exact date.  It would have been in the -- you guys have all of

14  the walk list records, so if you see walk lists records for

15  me, it would have been the first one.

16  Q.  Was USEIP canvassing in May of 2021?

17  A.  Probably.  Probably in Weld County.

18  Q.  Okay.  Was it canvassing in Mesa County?

19  A.  No.  USEIP never canvassed in Mesa County, not a single

20  door.

21  Q.  Can I turn your attention to Exhibit 25, page 47?

22  A.  Okay.

23  Q.  The top half of that page seems to be a message posted by

24  you.  Is that what it appears to be to you?

25  A.  Yes.

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    107

1    witness because it is not my client's statement.

2             THE COURT:  Well, I understand that.

3             Proceed, please.

4             MR. DILLON:  Thank you, Your Honor.

5    Q.  (By MR. DILLON) Mr. Smith, this entry into Basecamp is

6    dated April 12th of 2021, and it -- there's a line in here

7    that refers to folks, quote, getting ready to begin VV in Mesa

8    County, period, closed quote.  VV, is that a reference to

9    voter verification?

10   A.  It is.

11   Q.  And who is the reference to they?  Who is getting ready to

12   do voter verification in Mesa County?

13   A.  I can't remember the name of their group.  There were some

14   people that we had connected to.  We realized that they were

15   going to do some -- they were wanting to do some of the same

16   kinds of things, and so we were sharing information back and

17   forth.  And one of their individuals in that group was USEIP's

18   county captain for Mesa, but they began their voter

19   verification using different procedures and a different data

20   set.  They were using an app called Sidekick or something like

21   that, and they used county data.  We never used county data.

22   We only used Secretary of State data.  So they never got our

23   data and canvassed with our data, and it wasn't USEIP people

24   doing it, although we were in contact with the people who were

25   organizing it.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    110

1           MR. WYNNE:  Yes.  Thank you very much, Counsel.

2   Q.  (By MR. DILLON) So my question was do you know who entered

3   this particular entry into Basecamp based on what you see

4   here?

5   A.  No.  Shawn doesn't refer to himself in the third person,

6   so I didn't write it.  I don't know who did.

7   Q.  Did you participate in training or organizing volunteers

8   in Boulder County?

9   A.  No.  When you say participate in training, I did not

10  train.  I was present for training conducted in Boulder

11  County, but it was for the canvassing that was taking place in

12  Weld.

13  Q.  Is this entry in Basecamp, does it refer to that training

14  that you just described?

15          MR. REISCH:  Your Honor, I object.  Referencing a

16  document that he didn't write.  Relevance, hearsay, lack of

17  foundation.

18          THE COURT:  Sustained as to relevance.  Again,

19  Mr. Dillon, you could ask him these question.  There's no need

20  to refer to this document.

21          MR. DILLON:  Your Honor, I don't think my last

22  question -- well, let me rephrase it then.

23          THE COURT:  All right.

24  Q.  (By MR. DILLON) Were -- the training that you referred to

25  in Boulder, Colorado, was there a concerted effort to include

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    112

1  don't know -- that the people there might be more or less

2  receptive because it was considered a very liberal

3  environment.

4  Q.  (By MR. DILLON) And so messaging was tailored to that

5  environment?

6  A.  I don't know if it was.  I remember there was some

7  discussion, but I think I remember it from the excerpts

8  presented as exhibits for the trial.  I don't remember it from

9  Basecamp.  It may have -- I'm not saying it didn't happen.  I

10  just don't know.  Like I said, Boulder County is not where I

11  lived.  I wasn't directly involved in a lot of the

12  county-level planning.  That was what county captains did.

13  Q.  Let me turn your attention to page 103 of Exhibit 25.

14  A.  Okay.

15        MR. DILLON:  And, Hashini, can you pop that up for

16  counsel, page 103.

17  Q.  (By MR. DILLON) In the middle of this page, Mr. Smith, do

18  you recognize a May 12th, 2021, entry by yourself into the

19  Basecamp platform?

20  A.  No, I don't recognize it.  But, again, it was a long time

21  ago, and that -- no, that wouldn't have been written by me,

22  because, again, see the statement where it says, And will get

23  the data to Jeff and Shawn.  Again, Shawn doesn't refer to

24  himself in the third person.  I wouldn't have written that.

25  Q.  Did you favor a more aggressive approach in canvassing

22-cv-00581-CNS-NRN   Bench Trial - Day 1   07/15/2024   113

1   after meeting with folks in Mesa County?

2   A.  No.  What do you mean by aggressive?  I didn't favor

3   anything aggressive.

4   Q.  Okay.  Did you write the word excellent in the middle of

5   page 103, Exhibit 25 with a thumbs up emoji?

6          MR. REISCH:  Objection, hearsay, lack of foundation.

7          THE COURT:  Overruled.  I'll allow the question.

8   A.  I don't remember writing it, but I do say excellent a lot.

9   Q.  (By MR. DILLON) Is that your entry, the thumbs up emoji?

10  A.  Probably, yes.

11  Q.  And was that in reference to whoever wrote the prior

12  message favoring a much more aggressive approach in Mesa

13  County?

14  A.  Well, it was -- it would have been a response to that

15  post, but it could have been about getting the data to Jeff

16  and Shawn.  If you look at the second line down where it says

17  and will get the data to Jeff and Shawn, so I would be very

18  happy if they got data to Jeff and Shawn.

19  Q.  Got it.  So is it your testimony that your response there

20  doesn't relate anything to the aggressive approach?

21  A.  I have no recollection of it, but, again, I've never

22  recommended an aggressive approach and certainly didn't.  If

23  you look at the voter verification training manuals from the

24  first draft through the last version used, I never saw anybody

25  aggressive.  We didn't recommend aggressive.  We explicitly

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    114

1    wanted people to be professional and courteous.  Also, just

2    looking at that it looks like --

3            THE COURT:  Let me stop you there.  You have to wait

4    for a question to be asked, even though you might have thought

5    of something else.

6            THE WITNESS:  Yes, ma'am.  I was trying to continue

7    the response.  Sorry.

8            THE COURT:  That's okay.  You can ask him a

9    follow-up, if you want.

10   Q.  (By MR. DILLON) Let's look at page 63, Exhibit 25.  And

11   before we look at the document, I asked you a question

12   previously if you were aware of efforts to -- for volunteers

13   who were concerned about their safety, sort of pairing them up

14   with other canvassers who were armed.  Do you recall that?

15   A.  I do.

16   Q.  And refresh my memory here.  Are you aware of those

17   discussions?

18   A.  I don't believe I was aware of them at the time.  I

19   believe I've read about them in the excerpts from Basecamp

20   that were provided as exhibits for -- in the course of the

21   case.

22   Q.  Okay.  And is this Exhibit 25, page 63, an example of

23   that.  Look at the bottom entry.

24           MR. REISCH:  Objection, relevance, lack of

25   foundation, hearsay.

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    115

1           THE COURT:  Overruled.

2           MR. REISCH:  Speculation.

3           THE COURT:  Overruled.

4    A.   What was your question again?

5    Q.   (By MR. DILLON) My question is the line -- the few lines

6    of text on the bottom of page 63 of Exhibit 25 an example of

7    the effort to -- that you're now aware of to pair voters up --

8    or pair canvassers up who are armed with those who were not?

9           MR. REISCH:  Objection, lack of foundation.

10           MR. DILLON:  That's a bad question.

11           THE WITNESS:  It's a terrible question.

12           THE COURT:  Sustained.  He's going to try again.

13    Q.   (By MR. DILLON) Is the last two lines on Exhibit 63 --

14    Exhibit 25, page 63, is this indicative of the correspondence

15    on Basecamp that you had indicated you were aware of of an

16    effort to try to pair canvassers who were concerned with

17    safety with other canvassers who were armed?

18           THE COURT:  Don't even say anything.  Sustained.

19    Let's -- you've got to stop referring to documents he's not a

20    part of.  If he's read it after the fact, it doesn't matter.

21    Let's ask him about his awareness at the time, and if he has

22    one, you don't need to refer to the document.  He's already

23    said he's read about it.  It has limited relevance.  If you

24    can ask him a follow-up about what he knew at the time, that

25    would have relevance.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    116

1    Q.  (By MR. DILLON) Well, what did you know at the time about

2    any effort to pair up canvassers who were concerned with

3    safety with other canvassers who were carrying firearms?

4    A.   Nothing.

5    Q.  And after the fact have you become aware of any such

6    efforts?

7             MR. REISCH:  Objection, relevance.

8             THE COURT:  Sustained.

9    Q.  (By MR. DILLON) Are you aware of any unpleasant

10   interactions between USEIP volunteers and homeowners during

11   canvassing efforts?

12            MR. REISCH:  Your Honor, I object to foundation.

13            THE COURT:  Overruled.  When he asks are you aware,

14   that's establishing some sort of attempt to do foundation, so

15   let's let him at least ask those original questions.  He said

16   no, so I assume we're moving on now.

17   Q.  (By MR. DILLON) Are you aware of any unpleasant

18   interactions between USEIP volunteers and residents of Boulder

19   County?

20   A.   No.  If I could go back, I think we originally thought

21   there was something, but it turned out to be like one

22   volunteer was going to another volunteer's house or something

23   and got part of their finger bitten off, so by time we heard

24   the rest -- not by the volunteer, by a dog.  And so that was

25   the only one I can remember hearing about.  But that's not

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    119

1   someone whose name was reflected on the Secretary of State's

2   --

3   A.   Correct.  Or is that person here, you know, do they live

4   here?

5   Q.   And then you would proceed, per Section 6F, to confirm the

6   address, whether the person was an eligible voter, whether

7   they were a registered voter, whether they voted in the last

8   election, and by what method?

9   A.   That's correct.

10  Q.   Okay.  And then that -- the responses would be logged

11  somehow?

12  A.   Right.  They had log sheets and clipboards, and they would

13  mark down what they got answered that confirmed, and if there

14  was a discrepancy, then that was a cause for them to create an

15  affidavit.

16  Q.   Got it.  And then 6J advises to take photographs of any

17  location or address where a discrepancy was noted, correct?

18  A.   That's what it says.  But, again, this was a first draft

19  of the training.  I don't think it was necessarily used that

20  way in all of the county training, but I don't know because I

21  never saw all the county training.  I wasn't present for it.

22  Q.   Do you know whether -- when folks were asked to sign an

23  affidavit, do you know whether they were advised why they were

24  being asked to sign an affidavit, what the affidavits would be

25  used for?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   120

1            MR. REISCH:  Objection, foundation, speculation,

2    hearsay.

3            THE COURT:  Overruled.  I'll allow him to answer, if

4    he knows.

5    A.  I don't.  I would expect that the individuals doing the

6    canvassing would say we're trying to verify this data is

7    incomplete.  We were telling people we're going to provide

8    this to Colorado authorities, and we did, right?  We've never

9    released like all the walk list collected data or the

10   affidavits.  We've only given them to district attorneys for

11   the respective counties and to the Attorney General.  We gave

12   the Attorney General of Colorado a complete copy of

13   everything.  And other than USEIP volunteers, they're the only

14   people that have them.  And you guys.

15   Q.  (By MR. DILLON) And when you refer to everything, what are

16   you referring to?

17   A.  The walk lists -- so my original plan was to have sort of

18   the walk lists and then a log separately.  It was a stupid

19   plan.  It didn't work.  The county captains changed it into a

20   single document so you were verifying off the same sheet --

21   and collecting data on the same sheet that you were reading

22   off of.  So the only real documentation from the canvassing

23   was the affidavits and the walk lists, or logs, which became

24   the same thing.  And so when I say everything, I'm talking

25   about those documentations.  So those were attached to copies

                     Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   122

1    utterly failed to satisfy her duties, correct?

2    A.  That's correct.

3    Q.  You believe she's failed to, number one, ensure the

4    integrity of elections in Colorado, correct?

5    A.  Correct.

6    Q.  That she's failed to investigate allegations of election

7    fraud?

8    A.  Correct.

9    Q.  And that she has failed to be transparent regarding

10   election-related data?

11   A.  Correct.  She hasn't even complied with her own rules.

12   Q.  Even worse, you contend that she has destroyed election

13   records that she is required by state and federal law to

14   preserve, correct?

15   A.  That's a matter of evidence in courts.

16   Q.  You believe she and her staff have engaged in criminal

17   conduct; is that true?

18   A.  That's correct.  And I've provided affidavits to that

19   extent to the Attorney General of Colorado.

20   Q.  You believe she has stonewalled and fed propaganda to you

21   and others regarding Colorado's elections, correct?

22   A.  Correct.

23   Q.  You believe you were lied to by the Secretary of State or

24   her staff, correct?

25   A.  I was lied to.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   124

 1              THE COURT:  I'll give him a short rope.  Overruled.

 2              MR. DILLON:  Thank you.  Can you read back the

 3      question, please?

 4          (The requested portion was read back.)

 5      Q.  (By MR. DILLON) And at those events you've talked about

 6      election integrity issues, correct?

 7      A.  That's correct.  That's why I was invited to speak.

 8      Q.  And isn't it true that at this event you stated publicly

 9      that you had in your possession evidence of criminal conduct

10      by the Secretary of State and her staff?

11              MR. REISCH:  Objection, relevance, 401, 403.

12              THE COURT:  Well, 403 really doesn't come into play

13      with a trial to the Court.  I'll allow a short rope to explore

14      what this is about.

15              MR. DILLON:  Thank you.

16      A.  Could you repeat the question, please?

17      Q.  (By MR. DILLON) Isn't it true at this event you stated

18      publicly that you have in your possession evidence of criminal

19      conduct by the Secretary of State and her staff?

20      A.  Which event?

21      Q.  At this FEC United event that we've been discussing.

22      A.  I've been to several.  Are you talking about specifically

23      at The Rock in Castle Rock?

24      Q.  That probably is the one, yes.

25      A.  Okay.  Yes .

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    125

 1   Q.   Okay.  When was that event?

 2   A.   I believe February of '22.

 3   Q.   Of '22?

 4   A.   Correct.  So long after canvassing was completed.

 5   Q.   Okay.  And at this event you also stated that you believe

 6   anyone involved in election fraud deserves to hang, correct?

 7           MR. REISCH:  Objection, relevance.

 8           THE COURT:  Overruled.

 9           MR. WYNNE:  I'm going to object based on hearsay.

10           THE COURT:  Overruled.  You may answer.

11   A.   I believe what I stated was much more extensive than that.

12   Q.   (By MR. DILLON) Did you say --

13   A.   Do you have a full quote?

14           MR. DILLON:  Look, Your Honor, we have the video.  I

15   would like to play the video so that Your Honor and the Court

16   can hear Mr. Smith's own words at this event.  I think it's

17   incredibly important, and I think that video should be entered

18   into evidence.

19           THE COURT:  Is there an objection?

20           MR. WYNNE:  Yes.  I object based on hearsay as to

21   both Ms. Kasun and Ms. Epp since it's not a statement by them

22   as parties.

23           THE COURT:  All right.  Mr. Reisch?

24           MR. REISCH:  I would object as to lack of foundation,

25   authenticity.

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    126

1          THE COURT:  All right.  I don't know anything about

2    the video.  Why don't we try asking him what he said?

3          MR. DILLON:  Well, that is what I've been doing.

4    Q.  (By MR. DILLON) So did you say --

5          THE COURT:  No, let's just ask him what he said.

6          MR. DILLON:  Sure.

7    Q.  (By MR. DILLON) Did you say that anyone involved in

8    election fraud --

9          THE COURT:  Mr. Dillon, you're not hearing me.  Ask

10   the witness what he said.  I'm not allowing you to show me the

11   video.  It seems to me he remembers what he said, so let's

12   just ask him.

13   Q.  (By MR. DILLON) What did you say at this February 2022 FEC

14   United event?

15   A.  Well, I said a lot, but what I think you're asking about

16   is I specifically said I have in my possession evidence of

17   violations of election law by Secretary of State Griswold,

18   which I did and which I provided to the Colorado Attorney

19   General under sworn affidavit, my own sworn affidavit.  I

20   stated I am in favor of due process.  I stated I've been

21   accused of advocating violence.  I'm not advocating violence.

22   And I stated that I believe that anybody who is involved in

23   election fraud -- not voter fraud -- election fraud deserves

24   to hang .

25          And I said that because if you're involved in

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    127

1    election fraud, then you are usurping the will and consent of

2    the people, and that is an act of treason, and there are

3    punishments under federal statute for treason, which have been

4    enacted by the federal government.  Hanging is one of the

5    methods of execution when treason has been found in a court of

6    law through due process.

7            But what your clients and now you repeatedly have

8    tried to do apparently is excerpt one aspect of that comment

9    from my statement.  My statement was intact.  It involved the

10    entirety of it.  I believe in due process.  I've supported

11    that my whole life.  So the idea that I would advocate for

12    some kind of extrajudicial action is a fantasy on the part of

13    your clients, and they helped create that with the media,

14    which did the same thing.  That was Kyle Clark.  That was Erik

15    Maulbetsch.  That was Quentin Young.  All deliberatively

16    excerpting my comments out of the context that surrounded them

17    and which was available to them and which is available to you.

18    Q.  So it's your testimony that your statements were taken out

19    of context?

20    A.  When you excerpt just that part and leave out that I

21    stated I am in favor of due process and I'm not advocating for

22    violence, yes.

23    Q.  Okay.

24    A.  And obviously.

25    Q.  After stating that anyone -- anyone involved in election

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    128

1    fraud deserves to hang, is it true that you also stated

2    sometimes the old ways are the best ways?

3    A.   That's correct.  And I was talking about accountability,

4    which we apparently lack in our state.

5    Q.   Are you aware of anyone in the United States being

6    executed by hanging for being found guilty of election fraud?

7    A.   No.  I think the last hanging in the United States was in

8    '96.

9    Q.   Okay.  You're aware there's a fairly dark history in the

10   United States of hanging and lynching Native and

11   African-American persons?

12             MR. REISCH:  Objection, relevance.

13             THE COURT:  Sustained.

14             MR. DILLON:  Your Honor, I have no further questions.

15             THE COURT:  All right.  Cross-examination,

16   Mr. Reisch.

17             MR. REISCH:  Yes, Your Honor.  Thank you.  If I can

18   have just a moment to get set up here, please.

19             THE COURT:  Mr. Reisch, I assume you're doing your

20   full examination?

21             MR. REISCH:  That was my understanding from the

22   Court's order.

23             THE COURT:  Yes, okay.

24             MR. REISCH:  That I should respond and ask questions

25   I would have asked if he was my witness.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    145

1   Q.  Okay.  And you've never been charged with anything related

2   to January 6th, have you, sir?

3   A.  That's correct.

4   Q.  Okay.  Now, you had -- you were asked questions about one

5   of the reasons why you left was you thought it was rather

6   unorganized.  Do you recall that?  What was unorganized?

7   A.  Everything.  Nothing about -- not the police, not the

8   rally goers, not the other people who didn't appear to be

9   rally goers who were active around the Capitol at that time.

10  Everything about it was disorganized.

11  Q.  All right.

12          MR. REISCH:  Is the Court going to stop for lunch at

13  12:00?  Is this a good stopping point?

14          THE COURT:  We can stop now.  You can go another

15  15 minutes if you want because we took a little late break.

16          MR. REISCH:  I'll defer to the Court.  If you'd like

17  me to keep going, I will.

18          THE COURT:  Let's go another 15 minutes.

19          MR. REISCH:  Yes, Your Honor.

20  Q.  (By MR. REISCH) All right.  So at some point back in

21  February of 2021, at some point do you start to get involved

22  with what is -- what then later becomes known as USEIP?

23  A.  That's correct.

24  Q.  Okay.  And you had mentioned that you were actually

25  invited to at some point speak to some state legislators; is

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    147

 1    of States, no election integrity work.  I didn't know anybody

 2    else who was doing anything.

 3    Q.  Okay.  And at some point how did you all keep having this

 4    conversation going?

 5    A.  Well, so one of the other speakers there that was invited

 6    was Dennis Haugh, another retired Air Force colonel and

 7    mathematician and computer scientist, had helped design -- he

 8    sat next to Andy Grove writing the original BIOS for the x86

 9    processor.  He's a very bright man.  He's passed now.  But he

10    was supposed to speak.  We were six feet apart in the room,

11    and he was so mad at the delays, because we were asked to come

12    speak, and then we waited -- I think I waited eight and a half

13    hours before I spoke to the committee.

14            He left pretty angry, but he and I talked before

15    then, and so I contacted him because we had exchanged contact

16    information.  Then he asked me to speak to some other people

17    he knew in El Paso County, and that's how I came to be

18    introduced to Jeff Young electronically, and it was Jeff and

19    Dennis that asked me to speak at the analytics meeting that

20    Jeff would chair or run or schedule or whatever.

21    Q.  What was going to be -- what was the general nature of the

22    analytics meeting?

23    A.  Well, I don't know what they normally did.  I didn't go to

24    them normally.  But at that particular analytics meeting

25    Dennis wanted me to explain to Jeff and the rest of the team

22-cv-00581-CNS-NRN    Bench Trial - Day 1        07/15/2024    148

1    what I was seeing from a perspective of the capabilities of

2    the voting systems and what might -- how they might be used in

3    an unauthorized manner.  So I had seen at that point some of

4    the configuration.  I had seen that the telecommunications

5    were not being tested at all by the voting system testing

6    labs.

7            I had seen that they were not mitigating known

8    vulnerabilities to the systems, and we saw some of these

9    effects from anecdotal reports from voters about things they

10   saw that they didn't expect.  We had heard about UOCAVA, the

11   uniformed and overseas civilian where they're allowed to do

12   remote voting.  We had heard about very high -- actually we

13   heard that from Senator Lundberg -- very high proportions of

14   those votes being cast for specific candidates that didn't

15   seem to make sense, to have a certain -- like a large number

16   of votes sequentially for a specific candidate.  It's just

17   unusual.

18   Q.  So when you're looking into all this information early on

19   back in 2020, had you come to this conclusion that there was

20   some sort of fraud, or were you still investigating this?

21   A.  In 2020 I was still investigating.  In 2021 I was still

22   investigating, although I became more and more suspicious the

23   more -- like we would send open records requests to the

24   Secretary of State and the Attorney General, and they would

25   play games with us.  Like we got a quote from the Attorney

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    149

1    General of Colorado for an open records request for

2    $4 million, which I came to understand that when they really

3    didn't want us to have something they would just put a high

4    price tag on it.  So then I started asking them for the basis

5    of their estimates, and no agency has ever provided me one or

6    even really responded to that.  They just say nothing is

7    available.

8    Q.  Okay.  And you were asked questions about expenses that

9    you have put forth to look into these issues; is that right?

10   A.  That's correct.

11   Q.  And there was a cost associated with the Secretary of

12   State's public information?

13   A.  That's correct.

14   Q.  What was that amount?

15   A.  Well, it was various amounts.  I've made a lot of open

16   records requests.  I would start off with one question, and

17   then sometimes get responsive documents.  Like, we got a big

18   stack back from the Secretary of State's Office.  That's where

19   I found out that they had given my name to the general counsel

20   for Dominion Voting Systems with their warm regards, or they

21   had provided transcripts of radio interviews I had done.  But

22   we would get the responsive documents back, and then get other

23   questions generated from those responsive documents.

24          I think I probably have made at this point maybe 200

25   open records requests.  Some of those have no fee where the

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    150

1  responding office said that they completed the response within

2  an hour, which was the statutory limit before they start

3  charging you.  And then others, I've got quotes -- like, I

4  asked the Secretary of State's Office for one day of e-mail

5  from Secretary of State Griswold.  And I asked for that day

6  because I had sent her an e-mail, because every other time we

7  never got an e-mail back from their office when we requested

8  it, and I knew she had gotten at least one because I sent it,

9  and they gave me back a quote for that response of $1,500.

10  Q.  And so when you're requesting this data, these e-mails,

11  what's your purpose?  What are you looking for?

12  A.  Information.  I want to know what's true.

13  Q.  So you go straight to the source?

14  A.  Correct.

15  Q.  Okay.  Now, at some point USEIP, I think you were asked

16  questions about a core team.  Do you recall that?

17  A.  I do.

18  Q.  How did that kind of come about?  Tell the Court.

19  A.  Well, I think it was just whoever was willing to show up

20  every week on the calls.

21  Q.  And was this, you know, some sort of -- was there an ad

22  put in the paper or were these people that had somehow voiced

23  similar concerns or inquiring minds as it relates to these

24  issues?

25  A.  I don't know how anybody else arrived on Basecamp.  And we

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    151

1    hadn't even -- I had met Ashe, but I don't even remember how

2    long it took before I met Jeff in person.  Most people you've

3    never -- you would work with them, and you've never met them

4    in person.  Sometimes I didn't meet them until canvassing.  So

5    I don't know how everybody got there.

6    Q.  So when you all met and started having these ongoing

7    conversations, I think it was described as this core group,

8    when, if ever, did you conspire with the two other

9    codefendants to force or intimidate or threaten voters?

10          MR. DILLON:  Objection, leading, calls for legal

11    objection.

12          THE COURT:  Sustained.

13          MR. REISCH:  I asked when, if ever, Your Honor.

14          THE COURT:  Well, yes, but then you went on to give a

15    leading portion to the question.  So let's try again.

16    Q.  (By MR. REISCH) When, if ever, did you conspire with the

17    codefendants to violate the Ku Klux Klan Act?

18          MR. DILLON:  Same objection.

19          THE COURT:  Sustained.

20    Q.  (By MR. REISCH) Have you ever formed a conspiracy to

21    violate the Ku Klux Klan Act?

22          MR. DILLON:  Same objection.

23          THE COURT:  I'll allow you to answer that question.

24    A.  No.

25    Q.  (By MR. REISCH) Have you ever engaged in conduct that

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    152

1    would be a violation of the Voting Rights Act?

2              MR. DILLON:  Same objection, Your Honor.

3              THE COURT:  Sustained as to that basis.

4    Q.  (By MR. REISCH) Have you ever engaged in conduct to

5    intimidate a voter?

6              MR. DILLON:  Same objection, Your Honor.  It calls

7    for a legal conclusion.

8              THE COURT:  I'll allow him to answer.  Overruled.

9    A.  No.

10   Q.  (By MR. REISCH) Okay.  Let's talk about a couple of

11   things, all right?  Let's take a look at Exhibit 1.  It should

12   be a stipulated exhibit, so it should be in evidence.  Let's

13   see if we can move along here as quickly as possible.  Now,

14   were you solely responsible for the drafting of this document?

15   A.  I wasn't responsible at all.  I don't think I even knew it

16   was being written.  But I like it.

17   Q.  And when -- do you know when it was actually finalized, if

18   you know?

19   A.  I don't.  I think it might actually have been at the event

20   where it was being handed out, just like right before it was

21   handed out.

22   Q.  And what was the purpose of the county and local

23   organizing playbook dated August 20th, 2021?

24             MR. DILLON:  Objection, Your Honor, foundation.

25             THE COURT:  Sustained.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    153

1           MR. REISCH:  Okay.

2    Q.  (By MR. REISCH) Well, did you teach from this document?

3    A.  No.

4    Q.  Okay.  You were asked questions about it.  If we can go to

5    page 19 of that document.  It's been previously admitted into

6    evidence by stipulation.

7    A.  Okay.

8    Q.  Is it up on the screen or do you have it?

9    A.  I have it.

10   Q.  And you were asked questions about why voter verification,

11   do you recall that?

12   A.  I do.

13   Q.  Okay.  What does that first paragraph say so it can read

14   into the record?

15   A.  To ensure free and fair elections, and to restore the

16   people's confidence in our election system, we must undertake

17   citizen audit activities to either refute or confirm serious

18   allegations of election malfeasance.

19   Q.  Okay.  And let's kind of break that down a little bit.

20   All right.  To ensure free and fair elections, right?  What

21   does that mean?

22           MR. DILLON:  Objection, Your Honor, foundation.

23   Q.  (By MR. REISCH) What does it mean to you?

24           THE COURT:  Well, sustained.  Now you may answer that

25   latter question.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    154

1   A.  Yes, ma'am.  To ensure free and fair elections means to

2   ensure that the will of the citizens is being respected as

3   they express their consent to be governed by the form of

4   government by the individuals that are representing them.

5   Q.  (By MR. REISCH) Okay.

6   A.  And that requires transparency into all of that election

7   operation.  Just like the rest of the government, but more

8   importantly -- most importantly, into those elections, because

9   that's the entire basis of credibility and authority for our

10  government.

11  Q.  Okay.  And where it says we must undertake citizen audit

12  activities, what does that mean to you?

13  A.  That means the citizens have the right to that

14  information, to transparency, to verify it for themselves.

15  Citizens have responsibility, and I would argue according to

16  the Founding Fathers, a distinct positive responsibility not

17  to trust their government, but instead to be vigilant.  That

18  was Jefferson's exact word, to be vigilant, in safeguarding

19  their liberty.

20  Q.  And it says to either refute or confirm serious

21  allegations of election malfeasance, correct, sir?

22  A.  Correct.

23  Q.  What does refute or confirm, what does that mean to you?

24  A.  Well, it means that we didn't know at that time exactly

25  what we were looking at.  We didn't have the data.  We didn't

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    157

1   analyst, right?  He's doing it for a major company.  That is

2   his business.  I'm a professional tester.  We do not speculate

3   about things.  We don't make wild hypotheses.  If we think

4   something might be true, we go find out, and then we tell the

5   truth about it no matter what.

6   Q.  And what do you need to be able to make your analysis?

7   A.  Data and evidence.  Same thing that any other auditor

8   does.

9          THE COURT:  Let's stop there since we're at 12:15.

10         MR. REISCH:  Thank you.

11         THE COURT:  We'll be in recess for an hour.  I have

12  an appointment I need to run to.  I should be back timely, so

13  let's plan on 1:15.  Let me just say one thing, because this

14  has turned into a bit of a broader matter than it needs to be.

15  This hearing isn't about January 6th.  This hearing isn't

16  about the Colorado Secretary of State.  It's not even really

17  about the validity of the election, so --

18         MR. REISCH:  I agree.

19         THE COURT:  -- I want you all to focus in on what

20  we're talking about, which is whether these three individuals

21  intimidated voters.  And let's get there sooner rather than

22  later, because we're spending a lot of time on matters that

23  aren't before me.  So with that, I'll give you a chance to

24  think about your next examinations, and we'll be in recess.

25         MR. REISCH:  Thank you, Your Honor.


                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   158

 1             THE COURTROOM DEPUTY:  All rise.  Court is in recess.

 2         (Break was taken from 12:16 p.m. to 1:20 p.m.)

 3             THE COURT:  Please have a seat.  Let's continue.

 4             MR. REISCH:  And, Your Honor, based upon the Court's

 5    comments afterwards, I'm going to try to be super focused

 6    here.

 7             THE COURT:  Excellent.  Okay.  Thank you.

 8    Q.  (By MR. REISCH) All right.  Mr. Smith, you understand

 9    you're still under oath?

10    A.  Yes, sir.

11    Q.  All right.  Let's talk about what you did -- what you did,

12    -- not everybody else -- but what you did as it related to

13    canvassing, all right?

14    A.  Okay.

15    Q.  How many homes did you canvass?

16    A.  Around 75, I think.

17    Q.  Okay.  What jurisdictions did you canvass?

18    A.  They were in Weld County and El Paso County, so they were

19    parts of the precincts where we were trying to collect all of

20    the doors or go to all the doors and collect the data.

21    Q.  Okay.  Now, you were asked questions on direct

22    examination, examination by the plaintiffs in this case, about

23    you filling out any discrepancies or anything along that line;

24    is that right?

25    A.  Yes.

22-cv-00581-CNS-NRN   Bench Trial - Day 1        07/15/2024    159

1    Q.   Okay.  And you didn't take any personal photographs or

2    make any notations as relates to discrepancies?

3    A.   No, I did.  I didn't take photographs, but I did -- I

4    think -- I'm trying to -- I think I did three or four

5    affidavits, and they would have been in the materials that

6    were turned over to the plaintiffs and what we submitted to

7    the DA and the Attorney General.

8    Q.   Now, you were also asked questions -- if we could pull up,

9    please, Exhibit 2, which has been admitted via stipulation.

10   If we can go to page USEIP identified page 37, please.

11   A.   37?

12   Q.   Yes, sir.  Do you have it, sir?

13   A.   I do.  Sorry.

14   Q.   The safety, what was your understanding as it relates to

15   safety?  Why would you work in a pair of -- teams of two?

16   A.   It's just easier to have one person able to observe what's

17   happening from a little bit more of a distance.  You know, one

18   person focused on questions, and one person kind of supporting

19   them.  And also they could switch off, because for somebody

20   like me, it gets exhausting.  I'm highly introverted.  I don't

21   like talking that much, so about the 30th person you've talked

22   to, you're kind of done.

23   Q.   And as it related to -- you were asked questions about

24   whether you can audio-record or video-record.  What was the

25   purpose of that?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   160

1   A.  For the purpose of the canvassers sort of safeguarding

2   against being falsely accused of things.

3   Q.  Okay.  So that was more for the canvassers' own

4   protection?

5   A.  Correct.

6   Q.  Your protection when you were canvassing?

7   A.  Correct.

8   Q.  What about doing it to intimidate voters?

9   A.  What about --

10  Q.  Is that what it was for?

11  A.  No.  I don't think the voters or the residents we were

12  speaking to would have even been aware.

13  Q.  Okay.  You said -- in this document it talks about one

14  approach, the other one remains on the sidewalk.  Why would

15  you do that when you were canvassing?

16  A.  So that the person who was further away could see the full

17  field of view.  Like, if you had a dog come around a corner or

18  something like that.  In the first day I was canvassing up in

19  Weld County, there was a house with a -- it was like a whole

20  sled team of huskies.  Like, if you were in an area they could

21  get to, they could come up behind you or something like that.

22  So it was for the safety of the volunteers.  And also I think

23  if you have a couple people right up in the door, that could

24  be a little bit alarming to somebody, and we didn't want

25  people to be alarmed.  We wanted them to talk to us.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    161

1   Q.  Okay.  We'll talk about that.  You also said -- what would

2   you do if you saw a no trespass sign or no soliciting sign?

3   Would you go to that house?

4   A.  Well, no.  You would never enter that area, and we told

5   people not to do that.  Don't put yourself in that position.

6   Don't violate any laws.

7   Q.  The next one here is why would you want to be polite to

8   people when you went to their front door?

9   A.  Because you're asking them to talk to you.  We were trying

10  to gather data and verify the Secretary of State's data.  If

11  they didn't talk to you, then you couldn't verify the data.

12  And also you don't want to be perceived as, you know, somehow

13  threatening to people.  That wouldn't -- everybody there are

14  people who care about their country trying to find the truth.

15  Q.  And, once again, why would you want to be honest with the

16  people if you were going to go talk with them at the door?

17  A.  Well, in the first place, you know, you should be honest.

18  Everybody ought to be.

19  Q.  Okay.

20  A.  But in the second place, what we were doing required that

21  we be credible, that, you know, we present ourselves as we

22  were, and that we be honest about our purposes, so that when

23  we presented the data, people would have confidence that it

24  was collected under conditions that they could trust what we

25  were asserting.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    162

1  Q.  Okay.

2  A.  Or verify it for themselves.

3  Q.  Okay.  And you have in the safety document training it

4  says don't argue with anyone.  Why would that be in there?

5  What would you do if somebody argued with you?

6  A.  Thank them for their time.  It's their house.  So just

7  walk away.  That's not -- we don't need any data badly enough

8  that we need to argue with people, and at that point if you're

9  in an argument with them, are you going to get accurate data?

10 Are they really going to be honest with you?  Probably not, if

11 they're hostile or they've taken some kind of offense.  Then

12 your whole purpose there is to verify the data.

13 Q.  Also it says don't argue, don't debate.  Did you engage in

14 debate with anybody while you were canvassing?

15 A.  No.

16 Q.  Okay.  What about dress?  What did you do as far as dress?

17 What did you do?  What did you wear?

18 A.  I believe I wore like a nondescript polo shirt and -- I

19 don't remember.  I'm not crazy about shorts.  I probably would

20 have worn pants.  I do wear shorts like at home, but I think

21 if you're doing some kind of meeting, I don't do that in

22 shorts, so...

23 Q.  Then let's take a look at page 40 of the same document,

24 please.

25 A.  Okay.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    163

1    Q.  Let's take a look there.  There's a procedure there under

2    paragraph 6, subparagraph E.  Do you see that, sir?

3    A.  I do.

4    Q.  Why would you introduce yourself as related to the --

5    you're a concerned citizen with the Election Integrity

6    Project.  Why would you do that?

7    A.  Why would you introduce yourself or state the

8    organization?

9    Q.  It says if the occupant answers, introduce yourself,

10   correct?

11   A.  Yes.

12   Q.  If you walked up to a door, what would you say when you

13   were canvassing, sir?

14   A.  I would have said, I'm Shawn Smith.  I'm with U.S.

15   Integrity Election Plan.  We're doing citizen volunteer

16   canvassing to verify the Secretary of State's data.  Would you

17   be willing to answer a few questions, something like that.

18   Q.  And if they agreed, then what would you ask them?

19   A.  Then we would say -- sometimes we'd show them the data,

20   especially if they showed interest, because we would have an

21   excerpt from the state's data on the clipboard.  That's how

22   you got your walk list, was it was excerpted.

23   Q.  And where did that excerpt come from?  What database?

24   A.  The Secretary of State's database.  It was directly --

25   directly out of the Secretary of State's database.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    164

1    Q.  Okay.  So if they agree to answer questions to you?

2    A.  Then you would ask are you this individual?  Is this

3    individual at home?  Sometimes there would be multiple names

4    listed at an address, and if you said are you John Smith, and

5    they said no, are you Mark Smith, whatever names were on the

6    list.  And if they're none of those people, you know, then you

7    ask them, well, do those people live here?  Did they live

8    here?  You know, how long have you lived here, that kind of

9    thing.  Because if they say they're not there or don't live

10   there, then you were trying to find out, well, did they live

11   there, how long has this individual lived there.  Sometimes

12   they say we don't know or we just moved in or whatever.

13   Sometimes they say, no, I've lived here since 1984, and that

14   person has never been there.  Or that was my son, they died

15   six years ago.  Or that's my daughter, she moved to Utah three

16   years ago, that kind of thing.

17   Q.  When you were canvassing, did you go to residences and

18   nobody answered the door?

19   A.  Yes, many.

20   Q.  When you're canvassing, were there people that didn't

21   speak with you?

22   A.  With me, no.  I don't remember any that wouldn't speak to

23   us.

24   Q.  Okay.  Were there any memorable people when you were

25   canvassing, memorable experiences when you were canvassing?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    165

1    A.   Just the ones I talked about during the deposition.  There

2    was the lady -- I think she was probably lonely.  She was

3    really sweet -- followed us around trying to give us hard

4    candy in one of the mobile home parks.  She was great.  There

5    was an older veteran, and he was giving me a hard time about

6    being young.  He was a Vietnam era veteran.  I told him I was

7    retired, and he was giving me a hard time about being young,

8    you know, how little I knew, that I was Air Force, et cetera,

9    et cetera.  He was Army.

10   Q.   Little inner military rivalry kind of thing?

11   A.   Right.

12   Q.   All right.  And did you have occasion to have interactions

13   with somebody that spoke Spanish when you were canvassing?

14   A.   Nobody spoke Spanish to me.  I could hear some accents

15   that I recognized as native Spanish speakers' accents, but no

16   one -- I don't remember encountering anyone who only spoke

17   Spanish or spoke Spanish with me.

18   Q.   If you had encountered somebody that spoke only Spanish to

19   you, would you have been able to communicate with them?

20   A.   Yes.

21   Q.   Why is that?

22   A.   Spanish is my first language.

23   Q.   Let's talk -- you were asked questions on -- questions by

24   the plaintiffs' counsel about Mesa County, all right?

25   A.   Yes.

22-cv-00581-CNS-NRN  Bench Trial - Day 1    07/15/2024    168

1   Q.  Okay.  When you were canvassing, did you ever, you know,

2   throw your jacket open or shirt open or something to let them

3   know that you were carrying a firearm?

4   A.  No.  I usually carry it at the small of back.  Somebody in

5   front of me would never see it or know.

6   Q.  Okay.  When you were canvassing, did you ever show it to

7   anybody to intimidate anybody?

8           THE COURT:  Hold on.  Mr. Wynne, what are you doing?

9           MR. WYNNE:  I'm sorry.  I was just checking a piece

10  of evidence to cut time down.

11          THE COURT:  Let's stay at counsel table.  It's

12  distracting.

13          MR. WYNNE:  I was just trying to save time in the

14  future.

15          THE COURT:  Can you ask your question again?

16          MR. REISCH:  I will try to, Your Honor.

17  Q.  (By MR. REISCH) Mr. Smith, when you were there canvassing

18  and you had a weapon, did you ever take your weapon out for

19  anything other than self-defense or was it to intimidate?

20          MR. DILLON:  Objection, compound.  And the last part

21  of the question calls for a legal conclusion.

22          THE COURT:  Overruled.  You may answer.

23  A.  I carried for the purpose of self-defense.

24  Q.  (By MR. REISCH) Okay.  And while you were canvassing, did

25  you ever have to draw your weapon for self-defense reasons in

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    170

1    have uniforms or anything.  It was just citizens going door to

2    door.  We didn't have anything in common.  It's not like we

3    coordinated on a color or anything like that.  And so we

4    thought, well, if citizens have this available to them, and

5    they have a complaint, we can say, okay, who was the person,

6    right?  What did their name tag say?  And if they said there

7    was no name tag, then we would know it's probably not our

8    person.  If they said it was one person instead of two -- so

9    that's what we were trying to do is make sure, one, our people

10   were accountable to themselves, to each other, and that they'd

11   be able to be identified.

12   Q.  All right.  So can you tell the Court when the canvassing

13   began you were involved with and when did it end?

14   A.  I don't know the exact dates.  The rough timeframe was

15   about August 2021, but, again, it was being conducted and led

16   in the counties by the county captains or whoever their walk

17   leader was or their canvassing coordinator.  And so it wasn't

18   like we directed them to start and stop.  It was whenever they

19   had enough volunteers, they would go out and do it.  When they

20   got enough of the doors knocked, then they were done.

21   Q.  So roughly August of 2021 your canvassing activities are

22   complete?

23   A.  I think that's about right.

24   Q.  And that's when -- what did you do with the data I guess

25   at that point?

Sarah K. Mitchell, RPR, CRR

189

22-cv-00581-CNS-NRN   Bench Trial - Day 1   07/15/2024   176

1    Honor?

2          THE COURT:  Sure.

3          MR. REISCH:  Thank you, Your Honor.  I'm done.  I

4    will collect my things and return to my seat.  Thank you.

5          THE COURT:  All right.  Mr. Wynne.

6                    CROSS-EXAMINATION

7    BY MR. WYNNE:

8    Q.  Mr. Reisch has deftly covered most of the things I was

9    going to ask, so I'm going to limit this.  Sir, the two- or

10   three-minute speech that has been discussed in your testimony

11   so far, when -- was that February of 2022?

12   A.  I believe that's right.

13   Q.  Okay.  And the canvassing by USEIP was -- tell me if I'm

14   correct -- approximately April of '21 through August of '21;

15   is that right?

16   A.  Yes, sir.

17   Q.  So the speech was about five months after the canvassing

18   ended?

19   A.  Yes, sir.

20   Q.  So as an expert in mathematics, is it fair to say that

21   anyone who might have been canvassed by USEIP would not have

22   heard something that took place five months after the

23   canvassing ended?

24   A.  That's how I see it, yes.

25          MR. WYNNE:  Thank you.  No further questions.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    177

1            THE COURT:  Ms. Epp.

2                         CROSS-EXAMINATION

3   BY MS. EPP:

4   Q.  Good afternoon, Mr. Smith.

5   A.  Good afternoon.

6            MS. EPP:  This is direct, right?  I can ask questions

7   other than what they asked?

8            THE COURT:  Yes.  Because we're just calling him up

9   to the stand once, you're allowed to cover the matters that

10  Mr. Dillon did, but you had him on your list, so you may cover

11  other matters.

12  Q.  (By MS. EPP) Mr. Smith, I want to go back to the immediate

13  aftermath of the 2020 election.  From your experience, what

14  you witnessed, was there misinformation spreading?

15  A.  Yes.

16  Q.  And did you take any personal action, if you were

17  confronted with misinformation, to dispute that

18  misinformation?

19  A.   Initially, no.  I mean, not on the day of.  When I first

20  saw, for example, the most-secure-election-ever statements, I

21  had no idea, you know, what they were referring to or basing

22  it on.  But once I saw the joint memorandum, once I had read

23  about and understood what the sector and government

24  coordinating councils were and their backgrounds and

25  investigated their organization, their training, their

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    178

1    education, who their employers were, other statements they had

2    made, the data sources available to them, voluntary voting

3    system guidelines and testing procedures --

4              THE COURT REPORTER:  I'm sorry.  Can you slow down,

5    please?

6              THE WITNESS:  I'm so sorry.

7    A.   Once I had done significant research, which didn't take me

8    very long because I -- you know, I pursue, you know,

9    diligently, within a week I understood that some of the

10   statements that had been made were just absolutely untrue or

11   completely unsupported by any evidence that would have been

12   available to them.

13   Q.   (By MS. EPP) What about statements on the -- kind of your

14   idealogical ally side for the purposes of this case, was there

15   misinformation spreading at the time after the 2020 election?

16   A.   Among like constitutionalists?

17   Q.   Watermarked ballots, things that were -- the direct

18   aftermath of 2020.

19   A.   Well, I don't know, because I wasn't -- I wasn't really in

20   contact with anybody else doing election integrity work.  I

21   didn't know I was doing election integrity work.  I was just

22   following my nose, if you will, at that point.  The first time

23   -- it was early December the first time that I actually spoke

24   to anyone -- any other human being about what I was seeing in

25   my research, and that was on a Convention of States volunteer

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    180

1    A.  No.

2    Q.  Did you ever ignore misinformation because it confirmed

3    your biases?

4    A.  Not that I know of.

5    Q.  Mr. Dillon asserted that canvassing was the method used to

6    verify the official results of the election.  Was canvassing

7    the only method that you used to verify?

8    A.  No.  We attempted electronic verification, looking at

9    records that way.  There were some people who tried doing

10   telephonic verification.  The problem with telephonic

11   verification is you don't know -- with portable cell phone

12   numbers and things like that, you don't know who you're

13   talking to at the other end.  They could tell you they're

14   sitting on Johnson Street in Weld County, and, in fact,

15   they're sitting in Bangladesh.  You just don't know.

16   Q.  Okay.  You mentioned that Mr. Maulbetsch infiltrated

17   Basecamp at some point, and then the exhibit was raised of

18   statements about security.  Do you believe that anybody ever

19   would have seen those statements -- were they intended for the

20   public, would anybody have seen them if it were not for

21   Mr. Maulbetsch?

22   A.  I don't know.  Probably not anybody outside of Basecamp.

23   Not anybody who wasn't, you know, a volunteer with USEIP.  You

24   know, I didn't have -- at that time in November -- let's see,

25   November through probably May of 2021, I was still doing

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1        07/15/2024    181

1    Convention of States, and I was a regional captain for

2    Convention of States, so I was kind of spending time -- I was

3    not reading everything on Basecamp.  I barely had time to keep

4    up with the stuff that mentioned me, let alone things that did

5    not.  I didn't go into all the subgroups to read them.  And if

6    I didn't, then I doubt any member of the public would have

7    been remotely aware if it hadn't been for the media taking

8    those excerpts out and then trying to represent them as

9    something they weren't.

10   Q.  And it was discussed about your remarks at the Rock Church

11   in February 2022.  Did you publish those remarks?

12   A.  No.

13   Q.  Did you intend those remarks for anybody outside of the

14   room?

15   A.  No.  I wasn't against it, but I guess you can say

16   Pollyanna, I didn't expect them to excerpt them to change the

17   meaning and exclude the context.

18   Q.  And when those remarks were published -- strike that.  One

19   more question.  It was mentioned that you were -- the playbook

20   was dedicated to you.  When did you receive the playbook, see

21   it for the first time?

22   A.  I saw it for the first time -- I think you gave me a copy.

23   It was in August up in South Dakota.  I had a vague idea that

24   -- I mean, everybody was working on trying to develop tools

25   and collect lessons learned and things like that, but I didn't

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    184

1   Q.  And that doesn't matter to you, how people may have

2   reacted to your canvassing?

3   A.  I'd say it's not that it doesn't matter.  It's that we

4   were very deliberate about trying to be courteous and

5   professional towards people.

6   Q.  Right.

7   A.  And that overwhelming what we experienced was people who

8   were glad to talk to us and were warm about it.  And if

9   somebody felt something based on some other issue that wasn't

10  how we conducted ourselves, and especially not how we intended

11  to conduct ourselves, then I think that's kind of a personal

12  responsibility for the other person.

13  Q.  That's on them, right?

14  A.  Yeah.  There are skyrocketing levels of mental illness in

15  the country, right?

16  Q.  There are.  And there's a highly polarized electorate out

17  there, isn't there?

18          THE COURT:  I can't hear the objection.

19          MR. REISCH:  Objection, argumentative.

20          THE COURT:  Well, overruled.  You may answer.

21  A.  Is there a highly polarized electorate, is that your

22  question?

23  Q.  (By MR. DILLON) Yes.

24  A.  I think so.

25  Q.  And you understand there's a highly polarized electorate

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    187

1  Q.  So there's no way for you to know as you sit here today

2  whether the people who gave you affidavits are even the people

3  who purported to sign those affidavits?

4  A.  Oh, no, there's a way.  You can go back and verify.  And

5  that's why we gave them to the Attorney General so they could

6  go investigate and verify them, but they won't do it.

7  Q.  Right.  So somebody else needs to follow up and make sure

8  that the work that you did was accurate?

9  A.  You mean the people with the sworn responsibility to

10  investigate under Colorado statute the affidavits that they

11  received?  Yes, them.

12  Q.  Those same people who you believe have engaged in criminal

13  conduct related to the 2020 election?

14  A.  The same people who I can prove have engaged in illegal

15  conduct.

16  Q.  Okay.  You would agree with me that the questions

17  canvassers asked -- USEIP canvassers asked related to past

18  voting activity, correct?

19  A.  No.  Not all the questions related to --

20  Q.  Not all the questions.  But as it relates to the 2020

21  election, canvassers were asking questions in 2021 related to

22  voting activity from 2020, correct?

23  A.  So, again, incorrect.  Some of the questions were related

24  to the voting history.  Some of the questions related to

25  information that would have been also present on voter

22-cv-00581-CNS-NRN   Bench Trial - Day 1     07/15/2024    188

1    registration, their name, their address, their registration

2    status, and their party affiliation.

3    Q.   Right.  And as it relates to any voting activity, all of

4    the questions related to voting activity related to past

5    voting activity, right?

6    A.   For the third time, Counsel, not correct.  The

7    registration, their name, and their address are not about

8    their voting activity.  They're about their status on the

9    rolls.

10   Q.   I don't want to get turned around in semantics.  Did you

11   ask -- was there a question asking folks how they voted --

12   whether they voted in the 2020 election?

13   A.   Yes.

14   Q.   Okay.  That's past voting activity, correct?

15   A.   That was one of the five questions, yes.

16   Q.   Okay.  Were any questions asked about their -- the voters'

17   future intention, whether they planned to vote again?

18        MR. REISCH:  Your Honor, I'm going to object.  Beyond

19   the scope of cross or direct.  I didn't get into any line of

20   future questioning.

21        THE COURT:  Well, I'm going to allow it just because

22   we've gone into a detailed amount about the questioning that

23   Mr. Smith asked, so I'll allow it.  You may answer.

24        THE WITNESS:  Thank you, ma'am.

25   A.   No, we didn't care.  We were asking about the Secretary of

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    192

1    captain?

2            THE WITNESS:  Well, USEIP wasn't just about

3    canvassing.  So in -- you know, I think Ashe and Holly will

4    testify and they have documented and their through depositions

5    they did a lot of rallies and things like that.  We would go

6    -- because I had technical expertise, I would go with citizens

7    when they wanted to engage with their clerks.  So I had

8    already been up to talk to like Carly Koppes in Weld County.

9    I had been to talk to Clerk Broerman in El Paso County.

10   Sometimes we would get on the phone or Zoom calls.

11           So we were doing a lot of activities trying to engage

12   -- like the April 2024 briefing that we gave to the Republican

13   subcommittee where Senator Lundberg had asked us to come, that

14   was a good example of where we were trying to present

15   information.  So we had already tried to present information

16   and engage with public officials, and it was just going

17   nowhere.  There was no -- they were very well buttressed

18   against citizen concerns.  And we were getting sort of active

19   opposition from Colorado county clerks.  And so the canvassing

20   was something that we thought, okay, maybe this is the next

21   thing we need to do, because there obviously have been

22   concerns about the voter rolls, about duplicate ballots, about

23   things like that, so let's find out what's true.

24           And in that same timeframe, it was either April or

25   May, I had been down to Maricopa -- we haven't really talked

                        Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    193

1  about this publicly, but Senator Fann from Arizona -- State

2  Senator Fann had some people that she was asking about how to

3  proceed with some of the audit decisions there, and Dennis

4  Haugh, the gentleman that I said had brought me sort of into

5  USEIP by asking me to go meet with Jeff Young in the analytic

6  session, Dennis was connected through somebody else to Senator

7  Fann.  So I ended up in this bizarre world where I ended up on

8  the phone with Senator Fann trying to answer questions about

9  who they should have do the audit of their ballots.

10        THE COURT:  Let me interrupt you, because I want to

11  stay on Mesa County.  Who was the Mesa County captain, if you

12  remember?

13        THE WITNESS:  I can't remember.  His first name is

14  Cory.  I can't remember his last name.

15        THE COURT:  Did you have any conversations with Cory

16  about canvassing?

17        THE WITNESS:  I don't remember if I did.  I knew that

18  they were going to do canvassing, but I didn't know when.  At

19  some point -- I did for sure at some point after they had

20  begun canvassing, but before we had any of our training

21  materials or anything like that ready.  And then it was only

22  much later, maybe the end of -- maybe in May when I figured

23  out that they weren't using -- I remember being really

24  surprised when I found out they weren't using the data from

25  the Secretary of State's data, they were using county data

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    196

1    clarification.

2                        RECROSS-EXAMINATION

3    BY MR. REISCH:

4    Q.  Sir, when you said that there was a USEIP captain in Mesa

5    County by the name of Cory, to your knowledge, there was no

6    canvassing on behalf of USEIP in Mesa County?

7    A.  That's correct.  Just like I was -- I was both with USEIP

8    and Convention of States, those are two separate

9    organizations.  They weren't related to each other.

10   Q.  And although maybe USEIP had somebody that was there,

11   sounds like they were doing rallies or something to that

12   effect, no canvassing authorized or requested?

13   A.  Well, There's no such thing as authorization.  We would be

14   basically providing tools to citizens in counties who had

15   stepped up to do it.  And what we said is, Look, you have to

16   ask these questions for us to be able to aggregate the data.

17   You have to start with the Secretary of State's data.  You

18   have to ask these questions.  If you don't do that, that's on

19   you, but we can't use the data, because we're trying to

20   aggregate across the state.

21   Q.  And so any data that USEIP collected, none of it came from

22   Mesa County, correct?

23   A.  Correct.

24           MR. REISCH:  Thank you, sir.

25           THE COURT:  All right.  Yes.


                   Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    198

1    much as possible, and we didn't know which counties citizens

2    would step up in.  It wasn't like we could direct people to do

3    it.  No force on earth could force volunteers to do something

4    they don't want to do.

5    Q.  Okay.  There was a question about -- maybe it's a

6    misphrasing -- a Mesa County captain.  Given what you've

7    testified about today, would it be more precise to say that

8    was a USEIP contact in Mesa County rather than a captain?

9            MR. DILLON:  I'm going to object, Your Honor.  He's

10    now testifying for a witness who's already testified, asking

11    him to change his prior testimony.

12            THE COURT:  Overruled.  I think Mr. Smith can handle

13    the question.  Go ahead.

14    A.  Captain is just what we called them.  We were trying to

15    distinguish between the roles and make sure there was somebody

16    who understood they were sort of the person -- not me, but

17    most of the people who were volunteering that were core team

18    -- again, little C core -- were working full time at other

19    things.  People were devoting their free time to this, nights

20    and weekends, and you don't have time to talk to 70 people in

21    a county.  You need somebody in that county to organize.

22    Plus, you don't organize the conditions there.

23            And so we called it a captain, just like we picked

24    the name, you know, chief of analytics so we would understand

25    what that person -- that's the person who makes analytics

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    199

1    decision, right?  This is the person who makes whatever kind

2    of decision.  The county captain was a point of contact, but

3    they also, if they wanted to have volunteers, they had to

4    recruit.  And sometimes people would come to them, but

5    sometimes they would recruit by just telling people what they

6    were doing and hoping they could come join them.

7    Q.  Thank you initially for your service, but I gather from

8    your testimony earlier that you're quite familiar with a chain

9    of command?

10   A.  I am.

11   Q.  And it's true then that the title conferred on whoever it

12   was, I guess Cory, does not suggest that he was a USEIP

13   caption (sic) for the purpose of USEIP's canvassing mission;

14   is that correct?

15   A.  Correct.  The canvassing -- in most places because a

16   county captain would be busy with other things we would

17   recommend that they actually have a canvassing or voter

18   verification coordinator separate from themselves.  But in

19   that case, again, Mesa County didn't do USEIP canvassing.  It

20   was a different organization that had self-organized, like

21   USEIP, was doing canvassing.  We were sharing information.  We

22   shared information with all kinds of groups.  In fact, there

23   was a group in California we shared information with, and then

24   we found out they said they're going to sue us if we didn't

25   change our name.  So it wasn't all friendly, but it was with

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    206

1   Q.   And USEIP has a website, correct?

2   A.   That's correct.

3   Q.   And is it USEIP.org, I believe?

4   A.   That's correct.

5   Q.   And you purchased the domain name for that website,

6   correct?

7   A.   Originally, yes.

8   Q.   Okay.  Is it fair to say that one of the primary goals of

9   USEIP is to find the truth, expose the truth, and to restore

10  election integrity?

11  A.   Absolutely.

12  Q.   And to enable people to take their self-governance back,

13  correct?

14  A.   Absolutely.

15  Q.   Which implies that it's been stolen, right?

16  A.   I don't know how to -- I'm not implying that.

17  Q.   Well, if it has to be taken back, doesn't it mean it had

18  to be taken from them?

19  A.   It could also have been forfeited and could also have

20  never been initiated in the beginning.

21  Q.   And one of the -- and the individuals involved with USEIP,

22  they seek to accomplish that goal, so that goal to find the

23  truth, expose the truth, restore election integrity, by

24  engaging in various activities to address election integrity

25  concerns, correct?

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   208

1    though, too, didn't you?

2    A.  I do.

3            MR. REISCH:  Objection, relevance.

4            THE COURT:  I'll allow a limited inquiry.  You may

5    answer.

6    A.  Yes.

7    Q.  (By MR. BREESE) But despite that belief, you did not found

8    or otherwise participate in any groups focused on election

9    integrity after the 2016 election, correct?

10   A.  I did not.

11   Q.  So USEIP was founded in late November of 2021.  I'd just

12   like to discuss a few of the events preceding that.  You

13   participated in numerous protests and marches in Colorado

14   beginning on November 7th, 2020, correct?

15   A.  Correct.

16   Q.  You also helped organize some of these protests, correct?

17   A.  Loosely, yes.

18   Q.  And November 7th was the Saturday after the election,

19   right?

20   A.  That's correct.

21   Q.  And similar to the founding of USEIP, these protests were

22   organized in response to the belief that election fraud had

23   occurred in the 2020 presidential election, right?

24   A.  Yes.

25   Q.  I believe the first protest -- I believe you testified in

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1      07/15/2024    210

1    January 6th, 2021, you were protesting in Washington D.C.,

2    correct?

3              MR. REISCH:  Objection, relevance.

4              THE COURT:  Overruled.  I'll allow limited

5    questioning.

6    A.   I was attending the President's speech January 6th, and I

7    did go to the Capitol compound on January 6th.

8    Q.   (By MR. BREESE) And many other individuals, to your

9    knowledge, involved with USEIP's efforts participated in these

10   protests as well, correct?

11             MR. REISCH:  Objection relevance.

12             THE COURT:  Overruled.

13   A.   There were many people involved in election integrity at

14   January 6th, yes.

15   Q.   (By MR. BREESE) I'm asking specifically about USEIP.

16   A.   Yes.

17   Q.   Including both your codefendants, correct?

18   A.   Yes.

19             MR. REISCH:  Objection, relevance.

20             THE COURT:  Overruled.

21   Q.   (By MR. BREESE) In fact, that's the first time -- I

22   believe you testified at your deposition that's the first time

23   you met Ms. Kasun in person, right?

24   A.   On January 5th.

25   Q.   January 5th.  So the day before.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1     07/15/2024    211

1   A.  Yes.

2   Q.  So USEIP is not the only group that you founded that

3   focuses on election integrity, correct?

4   A.  Founded or cofounded.

5   Q.  Founded.

6          MR. REISCH:  I'm going to object.  Relevance, lack of

7   foundation.

8          THE COURT:  Overruled.  I'll allow her to answer.

9   A.  Can you ask the question again?

10  Q.  (By MR. BREESE) Sure.  USEIP is not the only organization

11  that you founded or cofounded that focuses on election

12  integrity efforts, correct?

13  A.  That's correct.

14  Q.  You're also a founder of Cause of America, correct?

15  A.  That's correct.

16  Q.  And the purpose of Cause of America is to enable the

17  grassroots organizations around the country focused on

18  election integrity concerns, correct?

19  A.  That was the purpose at the time that we founded it.  I

20  have not been involved with Cause of America since July of

21  2022, so I cannot speak to what their purpose is today.

22  Q.  When did you found Cause of America?

23  A.  November of 2021.

24  Q.  And apologies.  I didn't hear you.  When did you say you

25  were no longer with Cause of America?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    214

1   USEIP did?

2   A.  It was -- so these are two completely separate

3   organizations.  There was no link between the two of them, and

4   they did have different purposes in the sense that USEIP was a

5   collection of -- or association of individuals across counties

6   working hands on in the states, specific activities within the

7   state, looking at data within the state.  Cause of America

8   broadly was connections across -- and my understanding at the

9   time of its founding, and, again, I haven't been there in

10  quite some time, so I can't speak to what they do.  But when

11  we said enable the grassroots, it was if the grassroots need

12  resources, expertise, knowledge, access to things, that -- to

13  enable their efforts for election integrity.  That Cause of

14  America may be able to provide some of those resources in a

15  truly enabling fashion.  So it's -- they were doing very

16  different things.

17  Q.  I appreciate that.  That answered my next three questions.

18  So kind of back to USEIP's goal, to expose the truth, the goal

19  is to expose the truth to the world, correct?

20  A.  Yes.  I said that in my deposition, and I think that's --

21  you know, in concept that's a true statement.

22  Q.  To the masses?

23  A.  To the world, yes.

24  Q.  So you describe USEIP as a free association made up of

25  individuals who voluntarily use their skills, talents, and

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    215

1    passions to engage in civic duty, correct?

2    A.   That's right.

3           THE COURT REPORTER:  Can you slow down, please.

4           MR. BREESE:  Yes, I apologize.

5    Q.   (By MR. BREESE) Because different individuals involved

6    with USEIP possess different skills, right?

7    A.   Yes.

8    Q.   In fact, it was the different skill sets that led you and

9    the other founder of USEIP to come together and collaborate,

10   correct?

11   A.   I think we came together and collaborated.  Then realized

12   that we had different and complementary skill sets, and that

13   propelled us to keep collaborating.

14   Q.   And we already discussed this, but one of the skills you

15   had was your background in organizational change management,

16   right?

17   A.   Yes.

18   Q.   As well as your writing and communications skills,

19   correct?

20   A.   Yes.

21   Q.   And I'd imagine that writing and communication is

22   certainly helpful for the expose-the-truth leg of USEIP's

23   mission, right?

24           THE COURT REPORTER:  I'm sorry.  You haven't slowed

25   at all.

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    218

1    drafted, it involved information gathered from USEIP

2    volunteers that were involved in canvassing as well, correct?

3    A.   That's correct.

4    Q.   And this playbook was at least at some point published on

5    the USEIP website, right?

6    A.   That's correct.

7    Q.   And Mr. Smith testified to this, but the release or

8    dissemination of this playbook was in conjunction with a cyber

9    symposium hosted in North Dakota in late August 2021, correct?

10   A.   Its development was developed in regards to that event,

11   yes.

12   Q.   And then it was disseminated at that event, correct?

13   A.   It was completed, printed in South Dakota, and

14   disseminated at the event, yes.

15   Q.   And then moving to page 1 at the bottom, and we've already

16   gone over this, but -- or Mr. Smith has already touched on

17   this but this dedication page, Colonel Shawn Smith that you

18   reference there is obviously one of your codefendants,

19   correct?

20   A.   Correct.

21   Q.   And then Michael Lindell, your cofounder of Cause of

22   America, correct?

23          MR. REISCH:  Objection, leading.  Sorry.  Objection,

24   relevance, Your Honor.

25          THE COURT:  Overruled.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    219

1    A.  Can you ask the question again?

2    Q.  (By MR. BREESE) When you refer to Mike Lindell in the

3    dedication portion, that's Mike Lindell, your cofounder of

4    Cause of America, correct?

5    A.  That's correct.

6    Q.  Who is Dr. Frank?

7    A.  Dr. Frank is a math -- a physicist and a math teacher, I

8    believe, who did a data analysis after the 2020 election.

9    Q.  Has USEIP collaborated with Dr. Frank in any fashion?

10          MR. REISCH:  Objection, relevance.

11          THE COURT:  Overruled.

12   A.  Not that I recall directly.

13   Q.  (By MR. BREESE) You're one of the super moms, right?  The

14   super moms in Colorado?

15   A.  Yes.  We never called ourselves that.  That's a term that

16   we used specifically for this playbook and never again.  But,

17   yes, it's referring to me, as well as others.

18   Q.  Who called you the super moms?

19   A.  Dr. Frank called people across the country super moms.

20   Q.  Okay.  And Ms. Kasun is also one of the super moms,

21   correct, as referenced here?

22   A.  As referenced here.

23   Q.  Let's move to the next page of the playbook.  The first

24   sentence there says the U.S. integrity plan began in response

25   to the November 2020 fraudulent election, correct?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    222

 1    we're doing here today.

 2            Go ahead.  You may answer.

 3    A.  Can you repeat the question?

 4    Q.  (By MR. BREESE) I asked you what other groups when the

 5    word we is used?

 6    A.  So there were many groups that were doing many things

 7    around election integrity in the State of Colorado.  Stand for

 8    the Constitution came up.  That's one of them.  The reason

 9    Mesa County is in the playbook is because some members of

10    Stand for the Constitution were at the cyber symposium.  And

11    there was a mom with me from Weld County.  I was there from

12    Douglas County.  Ms. Kasun was there from Summit County.

13    There were people there from Jefferson County and El Paso

14    County.

15            And then there was like eight people from Mesa

16    County, and it was coming from Colorado, and they were there

17    in the room, and it felt weird not to include them.  So that's

18    why -- that's why Mesa County is in the playbook at all.  And

19    so it's not -- it wasn't just USEIP.  When I said we in this

20    playbook, it was referring to people in Colorado, because the

21    audience of this playbook is people outside of the State of

22    Colorado.

23    Q.  Okay.  I appreciate that.  If you could turn to page 6,

24    and I believe it's not the sixth page of the -- it's got six

25    at the bottom right.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   223

1  A.  I'm there.

2  Q.  One of the information that's being shared throughout this

3  playbook is how to build a team, correct?

4  A.  That's correct.

5  Q.  And this team -- and there would be teams that USEIP used

6  for their canvassing efforts, correct?

7  A.  I disagree with your characterization.

8  Q.  Why do you disagree?

9  A.  Because the canvassing was initiated by people in the

10  counties and what teams were there, were the counties that

11  were the teams that were doing canvassing.  USEIP was not

12  using them.

13  Q.  So there were not teams within each county that were

14  focused specifically on canvassing?

15  A.  Specifically and exclusively?

16  Q.  Specifically on canvassing.

17  A.  I believe there were teams in each county that were -- in

18  some counties -- not each county -- that were focused on

19  canvassing, as well as other things.

20  Q.  And you -- Mr. Smith testified earlier about being a

21  member of the core team.  Would you agree that you also were a

22  member of the core team?

23  A.  Yes.

24  Q.  And these teams that you just described, they would report

25  data to the core team, correct?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    226

1    canvassing efforts, correct?

2    A.   I'm sure I did.  I had conversations with captains all the

3    time, mostly by phone.  There was a weekly call, and, you

4    know, on those weekly calls it was kind of knowledge sharing

5    about what people were doing.  So there would have been

6    discussions of canvassing by the counties that were

7    canvassing, because that was the purpose of the call was to

8    share knowledge and connect dots about what was happening in

9    the various counties.

10   Q.   USEIP recruited, correct?

11   A.   Define recruited.

12   Q.   How do you define recruiting?

13   A.   How do I define recruiting?

14   Q.   Uh-huh.

15   A.   Actively seeking.  I would define recruiting in a

16   corporate standpoint, which would be attempting to identify

17   employees, which is why I respond to the word choice, because

18   we weren't attempting to identify employees.  We were

19   attempting to help make people effective when they decide they

20   want to get involved.  We didn't go out and seek to find

21   people.  We wanted to make people effective once they kind of

22   raised their hands and wanted to do something.

23   Q.   Did USEIP host events?

24   A.   We hosted the marches.  Well, this was before USEIP was

25   named USEIP or anything, but that was what I would consider an

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1     07/15/2024    227

 1   event.  Other than that, I don't believe we hosted any events.

 2   We did -- you know, people did speak at events.  We gave, as

 3   Mr. Smith talked about, a presentation which was about voting

 4   system vulnerabilities, not about canvassing, at the

 5   April 24th Republican study council meeting because -- at the

 6   request of Senator Lundberg.  We gave a presentation at an

 7   event.  I don't recall us hosting events other than the very

 8   early marches.  And even then it wasn't USEIP.

 9   Q.  So your testimony today would be that USEIP did not

10   recruit in any fashion?

11   A.  Again, it depends on what the word that we're talking

12   recruit is.  Did we promote our efforts?  Did we have a form

13   that people that wanted to find out more or get involved with

14   election integrity, like, could fill out and then get plugged

15   in?  Yeah, we had that.  Did we have recruiters that went out

16   and found talent?  No.

17   Q.  If you look at page 7 of the playbook --

18   A.  Is that the number at the bottom?

19   Q.  Yes.  In the middle you say --

20   A.  Oh, it's not actually.

21   Q.  I apologize .

22   A.  Okay.  Now it is.  Okay.  Go ahead.

23   Q.  In the middle you say, But we are not in a time of peace,

24   correct?

25   A.  That's correct.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    231

1    on this, but you talked about most of this is information

2    sharing, but there were some documents and references to

3    documents at the end of this playbook, correct?

4    A.  Can you point me --

5    Q.  Page 15 at the bottom.

6    A.  Yes.  This is the index I was talking about.

7    Q.  That label under voter verification, that's referring to

8    the canvassing efforts, correct, that process?

9    A.  Voter verification refers to the canvassing efforts, yes.

10   Q.  And in this playbook you're offering to provide some of

11   these materials to the reader, correct?

12   A.  Upon request.

13   Q.  Upon request.  And why upon request?

14   A.  We weren't publishing all of our materials out to the

15   world, but if other states -- again, the audience of the

16   playbook was individuals in other states, and if they wanted

17   to dig deeper into one area of this, it also referenced that

18   this index is an appendix.  Voter verification information was

19   an index to the playbook itself.  The playbook itself was not

20   recruiting people to canvassing.  The playbook was tips and

21   tricks and knowledge sharing for organizing.

22   Q.  And did people reach out for these types of materials?

23   A.  Not to me.

24   Q.  To your knowledge, did they reach out to anybody else?

25   A.  Not to my knowledge.  I'm not saying they didn't.  I just

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    233

1    A.  I believe so.

2    Q.  Okay.  So it predates the founding of USEIP, correct?

3    A.  That's correct, yes.

4    Q.  And we touched on this earlier, but you talk about

5    politics, Colorado politics, national politics, local

6    politics, right?

7    A.  Among other things, yes.

8    Q.  What are some of those other things?

9    A.  I talk about --

10         MR. REISCH:  Objection, relevance.

11         THE COURT:  I'll allow it.  Go ahead and answer.

12   A.  I talk about corporate matters.  I do -- are we talking

13   about Ashe in America in the timeframe of canvassing or now?

14   Q.  (By MR. BREESE) Since its inception.

15   A.  So up to and including now?

16   Q.  Sure.

17   A.  So what's used -- so AsheinAmerica.com versus

18   AsheinAmerica.substack -- are we talking about me as a blogger

19   or the specific platform?

20   Q.  Describe the difference if you don't mind.

21   A.  Well, I blog on -- I write on many different platforms, so

22   I'm trying to understand are you asking me as a writer, or are

23   you asking me specifically about this platform?

24   Q.  Understood.  I'm asking specifically about the Ashe in

25   America blog.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1   07/15/2024   245

1  Q.  Is there anything stopping USEIP from canvassing after the

2  upcoming presidential election?

3          MR. REISCH:  Objection, relevance, Your Honor.

4          THE COURT:  Overruled.  I'm assuming it goes to

5  standing and the plaintiffs' request for relief in this case;

6  is that correct?

7          MR. BREESE:  Yes, Your Honor.

8          THE COURT:  Overruled.  Please answer.

9  A.  So in this argument here with regard to if USEIP's active

10  in all 64 counties, that is not with respect to canvassing.

11  It's with respect to USEIP, which is significantly greater

12  than just canvassing.  Canvassing was one activity that was

13  taken by groups of people around the state.  But when we say

14  active in all 64 counties, it could be one person.  It could

15  be 150.  And they could be doing canvassing.  They could be

16  doing meetings with their county clerks, research, all sorts

17  of activities, legislative endeavors, all sorts of things that

18  USEIP activists did.  So when you ask are they actively

19  engaged in all counties, I would say yes.  Are they planning

20  on canvassing in 2024, not to my knowledge.

21  Q.  (By MR. BREESE) That wasn't my question.  My question was

22  is there anything -- you've described USEIP as a free

23  association of people, correct?

24  A.  Uh-huh.

25  Q.  Is there anything stopping volunteers for USEIP from

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    249

1    or excuse me -- details his report on pages 124 through 127.

2              THE WITNESS:  I'm ready now.

3              MR. BREESE:  So I would imagine everything is after

4    that.

5    A.  So this e-mail from Matt Crane was specific to a Senate

6    Bill 22153, and there is information in there that's relevant

7    to canvassing.  This senate bill was something that I

8    personally, as well as others in USEIP, were actively engaged

9    in lobbying against.  We had written to the General Assembly.

10   Matt Crane, who is the director of the Colorado County Clerk

11   and Recorders Association, wrote to the General Assembly about

12   the Mesa reports, which is why that's referenced, as well as

13   the Colorado canvassing report.  Within his -- his analysis,

14   at no point does he mention intimidation or whatsoever.  It's

15   just not there.  And he goes pretty hard at USEIP canvassing,

16   and there's nothing in here that affirms the plaintiffs'

17   allegations.

18   Q.  (By MR. BREESE) So you described his remarks as defamatory

19   and libelist, though, correct?

20   A.  I do, yes.

21   Q.  And why is that?

22   A.  Oh, we can go to the specific parts if you'd like.

23              MR. REISCH:  Your Honor --

24   Q.  (By MR. BREESE) Well, regardless --

25              THE COURT:  Hold on.  What's the objection?

                   Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024    250

1          MR. REISCH:  Objection, hearsay.  And, I mean, it's

2    not even in this blog, this report.  So we have hearsay within

3    hearsay within hearsay.  So I object under hearsay and

4    relevance.

5          THE COURT:  All right.  Overruled.  They're not

6    talking about Matt Crane's report for the truth of the matter

7    asserted.  I think what he's going for is the reaction on

8    Ms. Epp.  She may answer.

9          Go ahead.

10   A.  So you asked about the libelist and defamatory.  In Matt

11   Crane's response on USEIP_0127, the second paragraph, USEIP

12   members collected a list of approximately 750 deceased peoples

13   who they claim had cast a ballot in the 2020 election.  That

14   was not USEIP.  That was a different group of people that Matt

15   Crane attributed to USEIP.  Additionally, he goes in -- you

16   know, throughout his remarks and disparages the work of USEIP.

17   At this point you can tell there's -- at 0126 there is a list

18   of questions that Matt Crane has about the USEIP canvassing

19   report.  None of them are relevant to this case.

20   Q.  (By MR. BREESE) Well, I didn't ask you if you think

21   they're relevant or not.  I asked you what the defamatory and

22   libelist remarks were.

23   A.  Attributing other people's work to us.  Amateur and

24   inaccurate work like this undermines the public trust.  I

25   think that his -- he was -- he was describing our work as

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    251

1   amateur and inaccurate without having seen it, because it

2   hadn't been published yet.

3   Q.  And you take offense to that?

4   A.  Absolutely.

5   Q.  And on USEIP_129, you say, And I know the technical

6   experts at USEIP will have something to say.

7   A.  Uh-huh.

8   Q.  And is that in reference to the forthcoming canvassing

9   report?

10  A.  Let's see, will have something to say about Crane's

11  defamatory and libelist remarks.

12  Q.  What did you anticipate that USEIP will say?

13  A.  I don't recall.  This was over two years ago.

14  Q.  So you have no idea what you meant when you said that?

15  A.  I don't recall what I believed that they would say.

16  Q.  And then moving to the last page, is that a Jena Griswold

17  in jail Photoshopped image?

18  A.  It is.

19  Q.  And, We're getting closer, all.  I assume that means

20  getting closer to her getting prisoned?

21  A.  Getting closer to accountability, yes.

22  Q.  Okay.  Mr. Dillon spoke earlier with Mr. Smith about

23  Basecamp.  Do you recall that testimony?

24  A.  I recall that they had that conversation.  Specifics --

25  you're going to have to be more specific.

22-cv-00581-CNS-NRN   Bench Trial - Day 1   07/15/2024   252

1    Q.  Do you recall them talking about Basecamp?

2    A.  Yes.

3    Q.  And you were active on Basecamp, correct?

4    A.  Yes.

5    Q.  What groups were you in on Basecamp?

6    A.  I was in Douglas County.  I was on the core team.  I was

7    in some other counties.  The town hall or town -- was it town

8    hall I think it was, which was the group Mr. Smith referenced

9    that we had to create another group for people that wanted to

10   talk about other things because it was clogging up the feeds.

11   There were hundreds of different rooms in there.  Those were

12   the ones in which I was probably the most active was Douglas

13   County and core team.  I think I was in -- I think I was in

14   one of the county voter verification rooms, but I don't know

15   that I was in the overall voter verification room where they

16   were designing the process and all of that kind of stuff.  I

17   don't believe I was.

18   Q.  Designing the process that the counties would then employ

19   in their canvassing efforts?

20   A.  Well, it was the counties coming together to design the

21   process to deploy in their canvassing efforts.

22   Q.  But there was one centralized room where this was

23   discussed in Basecamp?

24   A.  There were many county voter verification rooms.  I don't

25   know that it was the lone centralized room about voter

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   261

1    efforts, they can't be absolved of everything that USEIP

2    volunteers were doing when it came to canvassing.

3         So part of our case is that if volunteers from the

4    organization that they created and the canvassing that they

5    began and orchestrated through -- I mean, we've established

6    Basecamp posts -- there is -- at least our argument there is

7    some sort of centralized system here -- they can't be absolved

8    of liability for the volunteers that they tasked to go out

9    there and to get information for their canvassing reports.

10   That is part of our argument, so I'm only saying this because

11   the Court did just state that we are talking specifically

12   about what Ms. Kasun did and Ms. Epp did and what Mr. Smith

13   did.

14        THE COURT:  Okay.  But as of yet you don't have any

15   evidence that they did anything with canvassing.  Do you have

16   a canvasser who's going to testify?

17        MR. BREESE:  We do.

18        THE COURT:  And are they going to attribute to what

19   they were saying to one of these three individuals?

20        MS. EPP:  Not on the witness list there's not a

21   canvasser who's going to testify.

22        MR. BREESE:  To one of these three specific

23   individuals, I don't believe so, no.

24        THE COURT:  Who is the canvasser on the witness list?

25        MR. BREESE:  Her name is Yvette Roberts.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1      07/15/2024   262

1              MR. REISCH:  She's not a canvasser.

2              THE COURT:  You're saying canvasser.

3              MR. BREESE:  Sorry, sorry.  You're saying canvasser.

4    I apologize.  So can you repeat the question?

5              THE COURT:  Do you have any canvasser on the witness

6    list who's going to tie their conduct to any statement made by

7    these three defendants or the association?

8              MR. BREESE:  We have three -- we have the defendants

9    that are witnesses that have established the entire

10   organization, have established the canvassing -- the

11   canvassing techniques and trained these volunteers.  And then

12   we will have a witness --

13             THE COURT:  But let me stop you right there.  That's

14   not what the evidence has shown.  I'm concerned that you're

15   not listening to the evidence that's come in, because you've

16   got three shots at this, and we're on number two.  Nobody's

17   said anything like that to support that part of your claim.

18             MR. BREESE:  To support they have been intimidated?

19             THE COURT:  No.  That they are the ones drafting --

20   encouraging canvassers, to the extent you have one, to go out

21   and intimidate voters.

22             MR. BREESE:  Your Honor, that's not what the law

23   requires us to show.  The law asks us to ask the Court to

24   determine if the efforts and the canvassing itself is

25   objectively intimidating, which is different than the specific

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 1    07/15/2024    263

1    intent --

2          THE COURT:  You have two witnesses so far saying they

3    have nothing to do with canvassing, that it was run by the

4    counties on their own, that what they did was post a resource

5    site essentially, and encouraged them to get data and use the

6    Colorado Secretary of State.  You don't have any organized

7    canvassing effort by these three individuals or this

8    association yet.

9          MR. BREESE:  Well, we will show evidence that

10   connects all of these dots, Your Honor.  I think the notion

11   that there's no connection between the defendants, USEIP, and

12   the volunteers that were out getting the information that they

13   were needing to then disseminate to prove their conclusions --

14         THE COURT:  What is the evidence?  Who's it coming in

15   through?

16         MR. BREESE:  The evidence is in the playbook that

17   establishes the organizational structure which canvassing is

18   one part of.  In addition to that, the Basecamp posts

19   establish a centralized discussion, you know, forum by which

20   they all discussed canvassing.  They discussed the specifics

21   related to canvassing.

22         THE COURT:  Okay.  But you have Mr. Smith barely on

23   two of those posts.  You don't even have Ms. Epp on any of

24   those posts yet.

25         MR. BREESE:  I'm getting there.

                     Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024    270

1    to a walk, there were a few people that hadn't been trained,

2    so he quickly took them through a training because they hadn't

3    been trained.

4    Q.  And when you walked in Douglas, I believe you testified

5    that -- or you testified in your deposition that you walked in

6    groups of three, correct?

7    A.  In Douglas County, that's correct.

8    Q.  And how many -- I believe you testified that you canvassed

9    approximately 40 to 50 homes in El Paso County; is that

10   correct?

11   A.  Over the course of the two walks, I mean, that feels

12   right.  It's definitely a guess, but it's close.

13   Q.  And in total in Douglas County you canvassed approximately

14   20 apartments?

15   A.  That's right.

16   Q.  Is that apartments themselves or apartment buildings?

17   A.  No.  It was one apartment -- it was those apartment

18   complexes where you have multiple buildings -- it's a massive

19   apartment complex, so we probably hit four or five of the

20   individual buildings within that apartment complex, and then

21   20 apartments total.

22   Q.  And one interaction that you had while canvassing, I

23   believe in Douglas County, one of the canvassed individuals

24   was standoffish to you, correct?

25   A.  I testified to that in my deposition, yes.  She was an

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 1    07/15/2024   282

1    Q.  Why do you say for you?

2    A.  Well, because, as I said, there were some small -- like in

3    a small handful of counties, there was still -- there was

4    still cleanup, trying to hit the statistical threshold, you

5    know, get the last few houses to be able to have enough to

6    make assertions, that kind of thing.  But there was also the

7    curing process.  So the canvass -- at the end of the

8    canvassing process after the walking was done was curing of

9    affidavits, and then, you know, taking them through to -- as

10   Mr. Smith talked about, to the authorities with the ability to

11   do something about what we had found.  That was all part of

12   canvassing.  I just wasn't involved in it.

13   Q.  But looking at Mr. Smith's message, I think it's probably

14   fair to assume that there was some active canvassing, actual

15   walks going on based on the nature of his message, correct?

16   A.  In Boulder, yes.

17   Q.  So USEIP canvassing did not end in August of 2021,

18   correct?

19   A.  The broad majority of it did.  As I said, there were --

20   and I don't think -- I don't know that this happened in

21   October.  It was certainly being discussed .  The last

22   canvassing that I know people were doing was end of -- end of

23   August, beginning of September, and it was, again, a small

24   group, Boulder, Weld, Douglas County, cleaning up, trying to,

25   you know, hit the last of a neighborhood, the last of a

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    308

1  A.  Yes.

2  Q.  You never conspired with your codefendants to commit an

3  illegal act, did you?

4          MR. BREESE:  Same objection, Your Honor.

5          THE COURT:  I'm going to allow it based on her

6  understanding of the word conspiracy.

7          MR. BREESE:  I object to lack of foundation.

8          THE COURT:  Overruled.

9  Q.  (By MR. REISCH) You may answer.

10  A.  Can you ask the question again?

11  Q.  Sure.  You know what a conspiracy is, right?

12  A.  Yes.

13  Q.  It's an agreement to commit an illegal act, right?  And

14  you've been charged with a conspiracy alleging that you

15  engaged in activity related to voter activities, correct?

16  A.  Correct.

17  Q.  Did you ever conspire with your two codefendants to

18  intimidate or threaten anybody as it related to their voter

19  activity?

20  A.  I did not.

21  Q.  You never canvassed in Mesa County, correct?

22  A.  That's correct.

23  Q.  You had contacts throughout the state while you were

24  working as a -- I believe as a core member, with a small C is

25  I think what it's referred to, as a core member, which you had

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024    309

1   captains throughout the state, correct?

2   A.  That's correct.

3   Q.  But these captains around the state didn't necessarily

4   engage or coordinate voter canvassing as relates to USEIP,

5   correct?

6   A.  That's correct.

7        MR. REISCH:  That's all I have, Your Honor.  Thank

8   you.

9        THE COURT:  All right.  Okay.  Ms. Epp, you may

10  proceed as best you can, and then when you're done, I have a

11  few questions for you.

12       MS. EPP:  I don't have the ability to put up

13  exhibits, but can we go to the playbook, Exhibit 1.

14       THE COURT:  Sure.  I'll just be looking at a hard

15  copy while you are, so you can direct me to whatever page

16  you're referring to.

17       MS. EPP:  Okay.  It's page 3 at the bottom.

18       THE COURT:  All right.

19       MS. EPP:  And beginning in the middle of the second

20  paragraph, USEIP is an association of like-minded people

21  working together to effect change locally.  We don't raise

22  funds, and we don't accept donations for any of the work we

23  are doing.  No one owns USEIP, and we don't want your money

24  either.  We want you, no, not to join USEIP.  I mean, we are

25  awesome, but that's not our goal.  We want you to bring your

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    315

1   across the state, yes.

2         THE COURT:  Okay.  And in terms of voter verification

3   efforts, is there a percentage you can assign to how much time

4   you spent talking to county captains about that?

5         THE WITNESS:  It would be very small, and the

6   interaction would be me connecting them with whoever was -- I

7   can't recall any specific conversations about canvassing, but

8   if it was, I wouldn't be advising them on canvassing.  I would

9   be connecting them with the teams and people that were doing

10  that work.

11        THE COURT:  And who would that be?

12        THE WITNESS:  Tamara, perhaps Mr. Smith, perhaps

13  Mr. Young, depending on the context.

14        THE COURT:  Okay.  In terms of Mesa County, did you

15  ever have any conversation with the Mesa County captain about

16  their canvassing efforts?

17        THE WITNESS:  I'm sure I did.  I met Cory Anderson,

18  who was the Mesa County -- what I would call the Mesa County

19  captain, which is, of course, as I said yesterday, point of

20  contact.  They were canvassing earlier than we were, and so I

21  believe I had learned about canvassing from Mesa County.

22        THE COURT:  All right.  And as I understood

23  Mr. Smith's testimony, Mesa County was not utilizing the same

24  really database as you all were utilizing, nor was it being

25  trained by your group.  Is that fair to say?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    318

1   Q.  And the other reason that you all didn't share data is

2   that they were not asking the same questions that you all were

3   asking for voter verification, correct?

4   A.  That's my understanding.  I have no personal knowledge of

5   what questions they asked.

6   Q.  Okay.  The Court asked you questions about your own

7   canvassing experience, and you said for the most part it was

8   quite lovely, correct?

9   A.  Yes.

10  Q.  And the one outlier, as you called it, you said that a

11  woman acted a little standoffish, I think is maybe the best

12  way to describe it?

13  A.  Seemed more skeptical of why we were there, and she

14  appeared to live alone, an older lady, kind of -- she actually

15  lived in a complex close to my mother-in-law and kind of

16  reminded me of my mother-in-law, and that was kind of what I

17  felt, was some older lady living alone.  You know, people come

18  to their door.  She just seemed like who are you and what are

19  you doing, but it wasn't contentious in any way.

20  Q.  But she didn't ask you to leave?

21  A.  No.

22  Q.  Did she ask (sic) the questions that you politely asked?

23  A.  She answered our questions and added more information.

24  Q.  All right.  And you said one of the canvassers with you

25  had a shirt, I believe your testimony yesterday was 1776?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    329

1   that the two pages are connected and run together.  So I'm

2   admitting pages 47, 48.  You may proceed.

3       (Exhibit 25, pages 47 and 48 received.)

4           MR. WYNNE:  Your Honor, for the record, I'd like to

5   join in the objection to the second offer.  I don't think I

6   did that.

7           THE COURT:  All right.

8           MS. EPP:  And, Your Honor, 47 was admitted yesterday.

9           THE COURT:  All right.

10  Q.  (By MR. BREESE) Did you provide some testimony regarding

11  other activities beyond canvassing that USEIP participates in;

12  is that accurate?

13  A.  Can you ask that again?

14  Q.  You've provided testimony that canvassing is not the only

15  thing that USEIP is involved in, correct?

16  A.  That's correct.

17  Q.  So I'm going to focus strictly just on 2021, because we

18  confirmed yesterday that canvassing began sometime around

19  April of 2021, right?

20  A.  Right.

21  Q.  And the canvassing --

22  A.  Canvassing in Mesa County was going on in April of 2021.

23  Canvassing for USEIP was May.

24  Q.  Okay.

25  A.  In my understanding.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2        07/16/2024    330

1    Q.  USEIP, to your understanding, began canvassing sometime in

2    May?

3    A.  Correct.

4    Q.  And continued, at least with data that's in the canvassing

5    report, through August of 2021, correct?

6    A.  I can't be certain, because, as I mentioned yesterday,

7    there were, you know, different groups cleaning up, and I

8    wasn't involved in all of that, but I'm aware that it was

9    happening in September and October, but the majority of

10   canvassing, certainly my canvassing was done -- I think I was

11   finished canvassing in early July.

12   Q.  Okay.  Because we confirmed that it appeared that there

13   were some canvassing that was going on in Boulder County in at

14   least early October?

15   A.  At least discussions of additional canvassing, yes.

16   Q.  So during that time period, what were other USEIP

17   volunteers working -- what were some of the other activities?

18   A.  So during the period of April 12th, I was not deeply

19   involved in canvassing.  I was focused on legislative efforts

20   and specifically working with Representative Richard Holtorf

21   on different election -- election measures that they were

22   going to try and bring as bills.  And so, you know, a lot of

23   this was kind of peripherally going on for me.  Other counties

24   were meeting with their county clerks and county commissioners

25   sharing information about vulnerabilities, sharing what was

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    331

1    going on in other states.  There were a lot of meet-ups and

2    kind of connecting teams, gathering and, you know, building

3    teams, sharing -- sharing knowledge in counties.  I'm trying

4    to think of other activities, but there was, you know, 64

5    counties.  There was at least one person that I was aware of

6    in each county working on election integrity matters.  Less

7    than ten of those counties were canvassing.

8    Q.  So you say was it approximately ten counties that USEIP

9    did make efforts to canvass in?

10   A.  I don't believe I would characterize it as USEIP made

11   efforts to canvass in.  I would characterize it as ten or less

12   counties -- and I'm guessing a little bit, but if it's more

13   than that, it's one or two more.  It's not more, and I think

14   it's less -- that were -- that had decided to pursue

15   canvassing.

16   Q.  Do you have any idea in terms of head count how many USEIP

17   volunteers were involved in USEIP's canvassing efforts during

18   this time period that we're talking about?

19   A.  I do not, because the number of people would be determined

20   -- you know, the people involved would be in the counties, and

21   I really have no idea.

22   Q.  Based on -- what the canvassing report -- I think it said

23   that there was, at least the data that's presented in that,

24   around 9,000, 9,500-ish doors that were knocked on.

25   A.  I believe that's accurate, close to accurate.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024   333

1    A.  Can you repeat that question?

2    Q.  Sure.  Is it fair to say that the majority of volunteers,

3    so just talking about estimated head counts, were during this

4    April to October 2021 time period involved in USEIP's

5    canvassing as compared to other activities?

6    A.  I would disagree with that.

7    Q.  Why would you disagree with that?

8    A.  Because there's 64 counties and people working in all of

9    them, and less than ten counties were canvassing.  Canvassing

10   was one aspect of what USEIP was doing, and all counties were

11   active in some way.

12   Q.  Was canvassing USEIP's main focus during the April to

13   October time period?

14   A.  It wasn't my main focus.

15   Q.  But USEIP as a collective?

16   A.  I think it depends county to county.  I would not say it

17   was USEIP's main focus.  USEIP's main focus was find the

18   truth, expose the truth, and restore election integrity, and

19   that looked different in every county.

20   Q.  Has USEIP produced any report that is similarly robust to

21   the canvassing report?

22   A.  No.

23   Q.  So is it fair to say that the canvassing report is the

24   largest document that USEIP has produced?

25   A.  Largest in terms of number of pages, yes.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    466

1   A.   I have been a teacher and also in broadcast, radio, and

2   now I'm retired.

3   Q.   Congratulations.

4   A.   Thank you.

5   Q.   And thank you for your work as a teacher.  You were much

6   needed.  Do you recall making a complaint via the Secretary of

7   State's Office on June 23rd, 2021?

8   A.   Yes.

9   Q.   Could you tell me about the events that prompted you to

10  make this complaint?

11  A.   I had just had two people, a man and a woman, show up at

12  my door and explain to me that -- they introduced themselves.

13  I didn't catch their names.  They told me that they were

14  interested -- he told me -- I apologize -- that they were

15  wanting to --

16       MR. REISCH:  I'm going to object to hearsay, Your

17  Honor.

18       THE COURT:  Overruled.  You may go ahead.

19       THE WITNESS:  Yes.  Thank you.

20  A.   They were going to -- they were part of an investigation

21  in looking into the Colorado 2020 election, and then there was

22  some kind of a name like investigation or inquiry or something

23  of that, which I didn't think that I needed to remember.  So

24  at that point the gentleman -- I noticed that both of them,

25  they introduced themselves, and they had on some official

Sarah K. Mitchell, RPR, CRR

235

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    467

1  looking badges, and they -- they lacked an emblem, and also

2  the badges were professional looking.  I mean, you know, the

3  outsides.  But then it was clear that the printed material was

4  not as well done.  So I interpreted that as being an effort to

5  be official without really being official.  And then they --

6  the gentleman told me that --

7          MR. REISCH:  Objection, hearsay, foundation.

8          THE COURT:  Overruled, and you don't need to make it

9  each time.  You're just interrupting.  Your objection to

10 hearsay will persist throughout this testimony, but it's

11 unhelpful to interrupt her after every sentence.  You may

12 proceed.

13 A.  I'm sorry.  I don't know what --

14 Q.  (By MS. HOSTETLER) I can ask a question to keep things

15 going.  So you talked about the man and the woman came up to

16 your door.  Do you remember where they were standing?

17 A.  They were standing at my front door, and I was standing at

18 the top step of my porch.  So on my step I was almost eye to

19 eye with the gentleman, and I was really happy with that,

20 because it's for a short woman to have a face-to-face

21 conversation that close with a tall man, a tall stranger is a

22 little stressful.  So he proceeded to look down at his paper

23 clip -- clipboard is what I'm trying to say -- and he informed

24 me that he had this information and that the state had sent

25 it.  And I kind of glanced down.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2       07/16/2024    468

1          Of course, I couldn't see exactly what it was.  And

2     upside down too, that's not too easy to see.  So I sort of

3     figured he must have a voter roll.  Okay.  So fine and dandy.

4     And then he seemed to want to really with his -- his stance

5     and his way he was holding his clipboard to impress me that he

6     was official.  And I was thinking to myself, well, gosh, you

7     could have just gone down to the county and bought the voter

8     roll.  You didn't have to have the state send it to you, but

9     whatever, okay.

10          So he began to ask me questions about things like who

11     was in my household, and he didn't ask those directly, though.

12     He was asking things like are you the only registered voter in

13     your household, and I said yes.  And I said how many people

14     are in your household, and I kind of dodged that, because,

15     again, I'm a little old lady.  I don't want to tell any

16     strange man or woman on my doorstep that I live alone.  That's

17     not smart, okay?

18          So I kind of dodged questions where he was trying to

19     establish -- in my mind, I felt like he was establishing who I

20     lived with, whether they were voters, whether they were

21     citizens, that kind of thing.  And he went on, and I answered

22     things that I felt made me comfortable.  And then he finally

23     got around to asking me how I had submitted my ballot, and I

24     didn't think that was any of his business.  So I thought,

25     gosh, this has gone on long enough, and I asked them both to

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    469

1   leave.  And there was some discussion this way and that, and I

2   basically said I've had enough, please get off my property,

3   you're trespassing.

4            And then once I shut the door on those people, I made

5   sure they went all the way to the end of the drive and made a

6   turn to get completely out of sight almost.  You know, as long

7   as they were 20 feet past my mailbox, fine and dandy.  And I

8   shut the door, and I thought about that, and I went, oh, my

9   gosh.  Two things I thought.  One was I just told that guy a

10  whole lot of stuff I didn't want to.  I don't know exactly who

11  those people were.  He had told me in the beginning he was

12  somehow associated with the Republicans, and he sort of

13  flopped his fist off into the direction where I knew there was

14  a Republican campaign office at one time.  So I just sort of

15  assumed.

16           And then I thought about it, and I went I don't

17  actually know anything about those people, and I don't know

18  what kind of repercussions there would be for me just having

19  chased them off my property, and that was pretty scary.  And I

20  didn't want anybody else to go through that, so that's when I

21  went and filed the complaint.

22  Q.  Thank you.  I'm going to take you back a couple of steps,

23  and I would like to get to the complaint as well.  You

24  mentioned that the man I believe was standing on your front

25  step.  Where was the -- and there was a woman with him?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    471

1   for my sake, could you remind me what those badges looked like

2   to you?

3   A.  Something they got from an office supply store.  And there

4   were no emblems.  There was no identification.  There was

5   nothing on that that a regular kind of investigator I would

6   assume -- anybody who was trying to do something officially

7   would have normally had, in my mind.

8   Q.  And when they asked questions of you, or when the man

9   asked questions of you, did he have any information about you

10  already?

11  A.  Oh, yeah.

12  Q.  What information did he have?

13  A.  He knew my name.  He knew, of course, where I was living.

14  In my mind, I figured he was working off of a voter roll.  He

15  already had my phone number and my affiliation with political

16  parties, although he did not ask about that.

17  Q.  Did he ask about your citizenship or the citizenship of

18  anyone in your household?

19  A.  Yes.  And I told him that, well, everybody in my household

20  was a citizen, mainly because I have a dog that was born in

21  this country.  Again, you know, I did not want to tell him how

22  many people there were in my household, so I figured that was

23  a nice way to put it.

24  Q.  At some point during this encounter did you become

25  concerned?

Sarah K. Mitchell, RPR, CRR

239

22-cv-00581-CNS-NRN    Bench Trial - Day 2      07/16/2024    472

1   A.  Always when a little old lady meets a strange man at her

2   door, or strange people, there is an intimidation factor,

3   because one knows one is vulnerable, and so I had that

4   concern.  And then when he said he was investigating things,

5   then I had an additional concern, because I had read about

6   back East some groups that were doing something similar in an

7   effort apparently to intimidate people in the way they voted.

8   So I was on alert, yes.

9   Q.  And you mentioned that -- when you asked them to leave,

10  were they saying anything?  And I'm not asking you -- were

11  they talking as they left?

12  A.  They were.  I have no idea what they were saying, though,

13  because I wanted to emphasize I didn't want to have any more

14  interaction with them.  And I probably even told them that I

15  don't want to do this anymore.  I don't want to interact with

16  you.  I want you to leave now.

17  Q.  And sorry, to go back to the badges -- I know I'm popping

18  around.  I apologize.

19  A.  No.

20  Q.  In your affidavit in this case you mentioned that the

21  badges were official looking.  In your complaint to the

22  Secretary of State I believe you called them homemade, and I

23  think I'm getting these phrases right.

24  A.  Yes.

25  Q.  Could you explain those descriptions?  Do you see them as

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024    473

1   being at odds with each other?

2   A.  Not really, because I was trying to be as succinct as I

3   could be in my letter to the Secretary of State.  So I thought

4   homemade would pretty much accurately describe what was

5   something that was kind of put together and not officially

6   issued.  Is that --

7   Q.  Yes.  Thank you.  And did they provide you with any

8   physical identification?  Did they give you a business card or

9   a pamphlet or anything like that?

10  A.  Not a bit.

11  Q.  Did you think -- sorry.

12  A.  And if I can add, that was part of why when I closed the

13  door I went, oh, this is not good, because I didn't actually

14  know where those people were from, and I didn't really realize

15  it until I had shut the door and thought to myself, I don't

16  have anything that they provided with me that gave me any clue

17  about who they were or who they were working with or anything.

18  Q.  Did they give you any way to verify who they were?

19  A.  No.  No.

20  Q.  Did they give you a way to contact their organization with

21  any concerns you might have?

22  A.  No.

23  Q.  So you had no way to contact them or follow up after they

24  left?

25  A.  Not a bit.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2   07/16/2024   475

1   Q.  And then did you make the complaint to the Secretary of

2   State on the same day?

3   A.  Yes.

4   Q.  And how -- how did you make that complaint?

5   A.  I e-mailed.

6   Q.  By e-mail, okay.  And why did you make that complaint?

7   A.  Because I didn't want anybody else to go through what I

8   had just gone through.  And I could -- they had the paperwork,

9   and they were headed down the street, so I assumed there may

10  be more people that they planned to do this to, and I didn't

11  think that was appropriate.

12  Q.  Did you make any other complaint that day?

13  A.  I actually filed a report with the sheriff's department.

14  I -- and it was a report, yeah.

15  Q.  Why did you file that report?

16  A.  Because that's what teachers do.  I'm sorry.  We are used

17  to documenting things, and I felt that I needed to let the

18  sheriff's department know that these were people who were

19  going around, strangers, asking people strange questions.  And

20  it was just a matter of getting information out, so if someone

21  else ran into this, then the sheriff's department would know

22  this was not just a one-off.

23  Q.  Do you recall if anyone from the Secretary of State's

24  Office followed up with you?

25  A.  Yes.  I heard from them, and they told me that they had

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    477

1   are not asking me questions about my household.

2   Q.  When -- it sounded like they didn't -- you didn't get a

3   clear idea of who they were; is that correct?  In your

4   affidavit you wrote that you identified this group as USEIP.

5   Can you explain why you referred to them in that way?

6   A.  Kind of a process of elimination.  I had thought about it,

7   and there had been no talk, rumors, anything like that among

8   the local letters to the editor about this kind of thing.

9   There's an anonymous setup in the local paper that people can

10  comment, short comments about this, that, and the other, and

11  it's pretty free commentary, so lots of stuff comes up

12  politically in those things.  Nobody that I had any contact

13  with on Facebook, social media, any of that had said anything

14  at all about that.

15         So in my mind that meant this was not kind of a local

16  thing.  Yes, these were local people.  But it was from the way

17  they were asking questions and things, it seemed as though

18  they had had some kind of training, and they did have a list

19  that were asking the questions from, so that was organized.

20  So then after I had put together my letters and things like

21  that, I was contacted by...

22  Q.  And are you concerned that you'll get a visit from this

23  group if you vote in 2024?

24         MR. REISCH:  Objection, speculation.

25         MS. HOSTETLER:  Your Honor, this goes to her -- she

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    480

1    from Rangely, Colorado.

2    A.   Okay.

3    Q.   So you said the canvassers visited on the same day that

4    you wrote your e-mail to the Secretary of State's public

5    e-mail address?

6    A.   Yes.

7    Q.   Okay.  And you said the name that you got from them was --

8    involved the word investigations or inquiries?

9    A.   That is actually what they told me they were doing.  I

10   don't know if that was -- they didn't say they were

11   representing that.

12   Q.   Okay.

13   A.   They just told me what they were doing.

14   Q.   Okay.  And following that, though, you said I didn't need

15   to remember it.  Were you referring to the name of whoever

16   they said they were with?

17   A.   They didn't say they were with anybody.

18   Q.   Okay.  What was it you said you didn't need to remember?

19   A.   I didn't feel I needed to remember their names or what was

20   a big part of that.  I had no idea that I would end up doing

21   this.

22   Q.   Some of the details didn't seem so important at the time?

23   A.   No.

24   Q.   So in your e-mail that you sent to the state, you said --

25   do you have Exhibit 88 in front of you?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    485

1   conversation with the tall man was somewhat stressful?

2   A.  Uh-huh, yes.

3   Q.  Because he was physically large?

4   A.  Any old lady who meets a strange man is gauging what that

5   person might be capable of.

6   Q.  Okay.  And at the time that they -- that you sent the

7   e-mail to the Secretary of State that you're looking at, did

8   you mention in that e-mail that they had asked if you were a

9   resident of Colorado?

10  A.  Would you repeat the question?

11  Q.  Did you ask -- did you record in your e-mail whether you

12  had been asked by the canvassers if you were a resident of

13  Colorado?

14  A.  I may have.

15  Q.  Do you see it in there?

16  A.  I do not.

17  Q.  Okay.  Do you see in your e-mail whether you indicated to

18  the Secretary of State they asked if you were a registered

19  voter?

20  A.  I see that they asked me if I was registered to -- a

21  registered voter at that address.

22  Q.  Okay.  Did you answer that question?

23  A.  Yes.

24  Q.  Okay.  You also mentioned that they asked who else was in

25  the house.  Is that in your e-mail to the Secretary of State?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024      486

1   A.   It may not be.

2   Q.   Okay.

3   A.   Again, it's e-mail.  I wanted to be short and succinct.

4   Q.   When did you first learn the name United States Election

5   Integrity Plan?

6   A.   In my encounters with the organization that contacted me.

7   Q.   Who was that?

8   A.   My -- the plaintiffs' --

9   Q.   Okay.

10   A.   -- lead counsel.

11   Q.   Is that a counsel that's here today?

12   A.   Yes.

13   Q.   And they confirmed for you that it was USEIP canvassers

14   who had visited your home?

15   A.   It seemed logical given all this, the situation of how I

16   had interpreted the behavior.

17   Q.   Tell me more about that.

18   A.   Just as I mentioned before, they were locals, as far as I

19   knew.  That's how they had introduced themselves.  They had

20   been trained a little bit, I think maybe, or they had at least

21   prepared.

22   Q.   And that made them seem more likely to be USEIP than not?

23   A.   It seemed that they would belong to some kind of an

24   organization like that.  I didn't know which organization it

25   was.

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024   487

1   Q.  I see.

2   A.  Or any organization that --

3   Q.  Do you recall writing a declaration for this case?

4   A.  Yes.

5   Q.  Exhibit 89 --

6           MS. HOSTETLER:  Objection, Your Honor, hearsay.

7           THE COURT:  Well, I don't know what we're doing with

8   it yet, so overruled.

9           MR. REISCH:  I believe it's a stipulated exhibit.

10          THE COURT:  So it's already been admitted?

11          MR. REISCH:  Maybe I misspoke.  I'm sorry.

12          THE COURTROOM DEPUTY:  No, Your Honor.

13          MR. REISCH:  My apologies.  It's not stipulated.

14          THE COURT:  Well, let's see what your intention is.

15  Q.  (By MR. POWELL) You had just said you weren't sure who

16  they were with, but you earlier said through a process of

17  elimination or because of the local nature and their training,

18  it seemed to make sense that they were with USEIP; is that

19  right?

20  A.  A group.  I didn't know which group at that time.  It

21  seems a logical conclusion.

22  Q.  So can you look at paragraph 5 of Exhibit 89?

23  A.  I'm still trying to get there.

24  Q.  Okay.

25  A.  I'm there.

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    488

1   Q.  Okay.  I'll read it, and you let me know if I misread it.

2   After the 2020 election, a man and a woman affiliated with the

3   group United States Election Integrity Plan came to my home.

4   How was it that you were certain when you wrote this sentence?

5   A.  Oh, I am not there.

6   Q.  Exhibit 89, paragraph 5.

7   A.  Sorry.

8        THE COURTROOM DEPUTY:  Still don't have this in

9   evidence, right?

10       MR. POWELL:  Can I move it in evidence, Your Honor?

11       MS. HOSTETLER:  Your Honor, I object as hearsay.

12   She's here testifying.  He can ask her the questions that he

13   has.

14       THE COURT:  It's true.  You're just using it to

15   impeach her, I think.  So just have her -- you may read that

16   section to impeach her.  It's just as if it was a deposition

17   in my mind.

18   Q.  (By MR. POWELL) So do you see paragraph 5?

19   A.  Still working on it.

20   Q.  It's the very first page of Trial Exhibit 89.

21   A.  Okay.  Thank you.

22   Q.  So in this paragraph, it seems you confidently state they

23   were affiliated with the group United States Election

24   Integrity Plan; is that right?

25   A.  Again, I'm -- that was my conclusion based on the stuff

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    489

1   that I had learned.

2   Q.  From whom?

3   A.  From the -- my own experience of how they did things and

4   from what I had learned from the plaintiffs.

5   Q.  Did you type this up yourself?

6   A.  No.

7   Q.  Who typed this up?

8   A.  I'm not entirely certain who the person was.

9   Q.  Do you know what organization they were with?

10  A.  Yes.  It was with the plaintiffs' --

11  Q.  I see.

12  A.  -- group.

13  Q.  And the third page is a bit blurry.  Is that because you

14  signed it and then just faxed back the third page?

15  A.  What?

16  Q.  Page 3.

17  A.  It's blurry?

18  Q.  Does it not appear a little blurrier to you than page 2?

19  A.  And your regard to that?

20  Q.  I'm asking if you only faxed back this third page and not

21  all three of them.

22  A.  No.  All three of them I did.

23  Q.  I see.  When you wrote the e-mail to the Secretary of

24  State, did it not seem important at that time to include the

25  fact that you are part Native American?

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    492

1  Q.  Do you think, if you could get inside their heads, they

2  were trying to look official?

3  A.  Perhaps.

4  Q.  But it didn't -- you said it didn't have any emblems on it

5  or insignia?

6  A.  No.  So it wasn't high quality.

7  Q.  In your e-mail of Exhibit 50, if you could just look at

8  the second page -- well, I'm sorry.  Yours is all on one page.

9  You have a sentence, the penultimate paragraph, the

10  second-to-last paragraph --

11         THE COURTROOM DEPUTY:  I'm sorry, what page?

12         MR. POWELL:  It's Exhibit 50.  It's just the same

13  page.  No, I think it's page 6 of Exhibit 50.  It is the

14  second page of that e-mail.

15         THE COURTROOM DEPUTY:  I'm sorry.  Which page?

16         MR. POWELL:  Well, if they were numbered.  One is the

17  press release.

18         THE COURT:  I think it's page 6 again.

19         THE COURTROOM DEPUTY:  Still page 6.  Okay.

20  Q.  (By MR. POWELL) So you see toward the end of your e-mail

21  --

22  A.  Uh-huh.

23  Q.  -- there's a paragraph that begins This is a right wing

24  community.  If these people or their group don't like slash

25  approve voters' responses, I think the chances are high they

                  Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2      07/16/2024    506

1    Q.  All right.  And you explained to them you would like to

2    report what you believed to be suspicious activity?

3    A.  Yes.

4    Q.  Okay.

5    A.  I filed a report.

6    Q.  Yep.  With them over dispatch line --

7    A.  Uh-huh.

8    Q.  -- correct?  And that it was explained that nothing could

9    be done at this point because no illegal activity had taken

10   place.  Do you recall that?

11   A.  Yes.

12   Q.  Okay.  And you stated that if anything else occurred, you

13   would immediately call back and let the police know, correct?

14   Correct, ma'am?

15   A.  I probably did.

16   Q.  Okay.  And when you spoke with the individuals at the

17   Grand Junction Police Department, you never mentioned anything

18   there about them being associated with the Republican Party,

19   correct?

20   A.  That was -- no, I did not.

21   Q.  Okay.  And you were asked a couple of questions if you

22   were aware of other organizations doing canvassing in Mesa

23   County during June of 2021, correct?  Do you recall those

24   questions?

25   A.  Yes.

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024   510

1   cross-examination, it's now come to be found out that you have

2   no personal knowledge that the people that came to your door,

3   that canvassed at your door June 23rd, 2021, were associated,

4   affiliated with in any way USEIP, correct, ma'am?

5   A.   Correct.

6   Q.   Okay.  So when you signed this under the pains and

7   penalties of perjury, it turns out not to be true, correct,

8   ma'am?

9   A.   As my understanding was at the time, I believed it to be

10  true.

11  Q.   Okay.  You believed it to be true because they told you it

12  needed to be true.  Otherwise their lawsuit fails, correct?

13         MS. HOSTETLER:  Objection, Your Honor, argumentative.

14  She's answered the question.

15         THE COURT:  Sustained.

16         MR. REISCH:  Just a moment, Your Honor.

17         THE COURT:  All right.

18         MR. REISCH:  Nothing further, Your Honor.  Thank you.

19         Thank you for your time, ma'am.  Have a safe trip

20  home.

21         THE COURT:  We're about due for a break.  Ms. Epp,

22  let me say two things.  I don't believe I need to hear one

23  word more from this witness.  That doesn't mean you're not

24  allowed to ask questions, but I'd like you to keep them brief.

25  I think we've gone over this ad nauseam.  Can you do that?

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024   520

1    Q.  Can you describe what each of those roles, what sorts of

2    duties or responsibilities they are responsible for?

3    A.  The operations director does all of our bookkeeping, all

4    of our database management, general office logistics, as well

5    as some program support, communications and development,

6    weekly newsletters, as well as member and voting public

7    communications, as well as fundraising, grant writing,

8    fundraising requests from our membership and the general

9    public.  And the legislative liaison is responsible for

10   keeping our volunteer advocates together and in force and

11   trained and moving forward in the manner of the League.

12   Q.  And are each of these individuals paid employees of the

13   League?

14   A.  Yes.  Each of the four, yes.

15   Q.  Are you familiar with the organization named United States

16   Election Integrity Plan?

17   A.  Yes.

18   Q.  How did you become familiar with this organization?

19   A.  I believe that I first became aware of them through a call

20   from our lead counsel at our national office.

21   Q.  Do you know what involvement, if any, Ms. Kasun, Ms. Epp,

22   and Mr. Smith have with USEIP?

23   A.  It's my understanding they're the cofounders.

24   Q.  And how did you come to learn that information?

25   A.  I suppose through media reports.  There have been pretty

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024   521

1   extensive media reports about this group's activities.

2   Q.  Are you familiar with the USEIP's voter verification

3   canvassing project?

4   A.  Yes.

5   Q.  And how did you learn about that?

6   A.  Through the phone call from our lead counsel, as well as

7   media reports.

8   Q.  What did you learn about how the canvassing was carried

9   out?

10  A.  I learned that --

11        MR. POWELL:  Your Honor, I'm going to object to

12  hearsay.

13        THE COURT:  Sustained.

14  Q.  (By MS. STOCK) You mentioned that you became familiar with

15  USEIP's voter verification canvassing project, correct?

16  A.  Yes.

17  Q.  And you mentioned that you learned about that from media

18  reports?

19  A.  Yes.

20  Q.  Can you describe what you mean by media reports?

21  A.  A number of articles in various local and some national

22  newspapers and media outlets.

23  Q.  Did you take any steps to learn more about USEIP after it

24  was initially brought to your attention?

25  A.  Yes.  Google searches.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024   524

1  A.   That they were created by people who do not believe in the

2  validity of our elections, and who were -- who are not

3  believing the evidence that has been put to disprove their

4  claims.

5  Q.   Do you have any concerns about the materials that you've

6  reviewed related to USEIP?

7  A.   Yes.   I believe that they are spreading misinformation.

8          MR. REISCH:   Objection, relevance, Your Honor.   Lack

9  of foundation and improper opinion.

10          THE COURT:   Overruled.   You can answer.

11  A.   I believe that they and their canvassers were and are

12  continuing to spread information that the 2020 election was

13  fraudulent when there has been no court-approved evidence of

14  that.

15  Q.   (By MS. STOCK) Why is that concerning to you?

16  A.   I believe that people baselessly claiming that the

17  election was stolen will cause people to doubt the validity of

18  our elections, will suppress the vote, and will keep people

19  from voting.

20  Q.   And what makes you concerned that those materials will

21  keep people from voting?

22  A.   I believe that some people, if they are -- read materials

23  that tell them that the 2020 election was fraudulent and that

24  fraudulent activities continue, that it will cause them to

25  lose faith in our elections and therefore not vote.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024   525

1    Q.  Have the materials that you reviewed given you pause about

2    voting in upcoming election?

3    A.  No.

4    Q.  And why is that?

5    A.  I believe in the validity of our elections and the

6    accuracy of our elections.

7    Q.  Did your organization take any steps to notify the

8    League's members about USEIP's canvassing events?

9    A.  Yes.

10   Q.  And what did the League do?

11   A.  I sent an e-mail to our distro list asking people to

12   please contact me if they had received a visit by USEIP

13   canvassers.

14   Q.  Why did you send that e-mail?

15   A.  We wanted to see if people were feeling harassed and

16   intimidated.

17   Q.  I'd ask that you turn to a document that has been marked

18   as Exhibit 41 in the binder to your right.  Do you recognize

19   this document?

20   A.  I do.

21   Q.  What do you recognize this to be?

22   A.  The e-mail that I sent to our distro list.

23   Q.  What is the date of this e-mail?

24   A.  September 24th, 2021.

25             MS. STOCK:  Your Honor, I would offer to admit

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2   07/16/2024   527

1   Q.   (By MS. STOCK) Did you receive any responses from the

2   League membership as it relates to this e-mail communication?

3   A.   Yes.

4   Q.   Can you describe generally what the nature of that

5   correspondence was?

6   A.   There was one member who seems to have kind of chased off

7   the folks much as Ms. Roberts did, and there were several that

8   had received visits that they stated were very courteous and

9   nonintimidating.

10   Q.   Did your organization take any precautions as a result of

11   what you know about USEIP and the defendants?

12           MR. REISCH:   Objection, relevance.

13           THE COURT:   Overruled.

14   A.   Yes.  We -- ahead of putting out this e-mail and filing

15   suit we did draft a safety plan for staff, board, and

16   membership.

17   Q.   (By MS. STOCK) Why did you create a safety plan?

18   A.   Because of the violent rhetoric that has been used in

19   relation with USEIP.

20   Q.   And can you explain more about what you mean by violent

21   rhetoric?

22   A.   Calling for public hanging.

23   Q.   When you make that statement, are you referring to the

24   statements you previously discussed that were made public by

25   Shawn Smith?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/24   528

1    A.   Yes.

2    Q.   And who was the safety plan intended to be used by?

3    A.   Staff, board, and any member who felt intimidated.

4    Q.   I believe you testified to this already, but at some point

5    did you notify the League's membership about filing the

6    lawsuit?

7    A.   Yes.

8    Q.   After learning about USEIP's canvassing project, did the

9    League take any other steps in response?

10   A.   Yes.  We really upped our programming around recognition

11   of mis-, dis-, and malinformation.  We also began and

12   published a white paper on the safety and security of

13   Colorado's election system.

14   Q.   You mentioned publishing a white paper.  Can you describe

15   your involvement in that process?

16   A.   I began the process with a group of volunteers.  A few

17   months into the process as the paper was developing and I was

18   getting more and more busy, I handed that off to a board

19   member to take over leadership of that.  I continued to

20   provide some general oversight and advice.

21   Q.   Did other members of the League's staff contribute to that

22   white paper?

23   A.   Yes.  Both the communications and development director and

24   the operations director.

25   Q.   You also discussed creating some programming as a result

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    535

1    be a constitutional scholar.

2    Q.  (By MR. REISCH) Would you agree that political speech has

3    greater protection than just regular everyday speech?

4    A.  I don't know that to be true.

5    Q.  Okay.  Would you agree with me that people can believe,

6    say, the 2016 election was rigged or 2020 election was rigged

7    or maybe the next one will be rigged, but they can hold that

8    belief, correct?

9    A.  Yes.

10   Q.  And people should be allowed to have beliefs, even if you

11   or your organization doesn't believe in that belief that the

12   other people hold, correct?

13   A.  Yes.

14   Q.  That's called freedom?

15   A.  Yes.

16   Q.  Okay.  And in this particular case, you all said we don't

17   like what USEIP is doing and saying, and therefore you filed a

18   lawsuit, correct?

19   A.  No.  We didn't like the media reports coming out saying

20   that voters were intimidated.

21   Q.  Okay.  And let's just be clear.  The media reports, which

22   media report did you rely upon?

23   A.  Quite a number of articles.

24   Q.  Well, give me an example of one.

25   A.  I believe the Colorado Times Recorder put out a number of

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    536

1    articles.

2    Q.  Okay.

3    A.  I believe the Colorado Sun did.

4    Q.  Okay.

5    A.  I believe there were articles at the national level.

6    Q.  Okay.  Referencing USEIP, is that your understanding?

7    A.  Yes.

8    Q.  Okay.  And, for example, like Mr. Maulbetsch, that was the

9    Colorado -- well, what organization was he with, do you

10   remember?

11   A.  I'm sorry.  Who?

12   Q.  Erik Maulbetsch?

13   A.  Oh, I believe he is with the Times Recorder.

14   Q.  Okay.  And you talked to him, right?

15   A.  Yes.

16   Q.  Okay.  And you didn't go say, wow, can I get your sources

17   and go see who these people are that were supposedly

18   intimidated, were you, right?

19   A.  No.

20   Q.  Even in the course of this investigation you didn't call

21   up Mr. Maulbetsch and say, Hey, I need to find some people

22   that were actually intimidated.  Could I have those people

23   that he spoke with?  You didn't do that, did you, ma'am?

24   A.  No.

25   Q.  Okay.  And Mr. Maulbetsch, they're opinion pieces

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    537

1    masquerading as opinion articles, aren't they, ma'am?

2    A.   No, they're not.

3    Q.   He's a highly reputable Oscar -- or Pulitzer-prize winning

4    journalist, right?

5            MS. STOCK:  Objection, argumentative.

6            THE COURT:  Sustained.  I don't know.  Let's --

7    Q.  (By MR. REISCH) He's a blogger, isn't he, ma'am?

8    A.   No.  I believe he's a columnist.

9    Q.   A columnist.  And columnists, they present opinions,

10   correct, from their perspective?

11   A.   Okay.  I believe he's an investigative journalist.

12   Q.   Okay.  And does he tell you his political persuasions when

13   he says he's investigating an investigative journalist?

14           MS. STOCK:  Objection, foundation.

15           THE COURT:  Overruled.  You can answer.

16   Q.  (By MR. REISCH) Does he tell you his biases?

17   A.   No.  I mean, he -- he made it clear that he feels USEIP is

18   intimidating.

19   Q.   Okay.  And so he wrote a story that USEIP was

20   intimidating, right?

21           MS. STOCK:  Objection, hearsay.

22           MR. REISCH:  I'm not asking what was said, just that

23   he wrote a story.

24           THE COURT:  Overruled.

25   Q.  (By MR. REISCH) He wrote a story forming the conclusion --

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 2    07/16/2024    538

1    A.  From voters.

2    Q.  -- that USEIP was intimidated -- intimidating?

3    A.  Was intimidating voters, yes.

4    Q.  He didn't identify those voters, did he, ma'am?

5    A.  I don't recall.

6    Q.  He didn't turn over to you his sources of these alleged

7    intimidated voters, did he, ma'am?

8    A.  No.

9    Q.  Okay.  You would think if you have some credibility, that

10   you would have somebody come and say I was the person that was

11   intimidated, and therefore I would like my story told,

12   correct?

13          MS. STOCK:  Objection, argumentative.

14          THE COURT:  Overruled.

15   A.  Would you repeat the question, please?

16   Q.  (By MR. REISCH) Sure.  You never asked for his sources of

17   alleged intimidated voters, correct?

18   A.  Correct.

19   Q.  And he never provided those names, correct?

20   A.  Correct.

21   Q.  Okay.  And none of these people that were supposedly

22   intimidated, in his commentary, opinion slash investigative

23   reporting, never came forward and identified themselves

24   either, did they?

25   A.  People were identified in news articles.  I'm not sure

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2    07/16/2024    539

1  they were in Mr. Maulbetsch's articles, but in articles about

2  USEIP, names were -- names of victims were included.

3  Q.  All right.  And so I'm assuming that those people will be

4  here to testify at some point?

5  A.  I don't know.

6  Q.  As to that -- as to their experience with individuals they

7  were absolutely certain were member representative of USEIP,

8  correct?

9  A.  I don't know.

10 Q.  Okay.  Now, you said that voters were intimidated, right?

11 A.  Yes.

12 Q.  And you're protecting their rights as an organization,

13 right?

14 A.  Yes.

15 Q.  Now, do you remember when we had a deposition, you and I

16 together, our counterclaim still existed, correct?  Do you

17 remember that?  We sued you for various slanderous, defamatory

18 statements against the defendants.  Do you recall that?

19         MS. STOCK:  Objection, relevance.

20         THE COURT:  What is the relevance?

21         MR. REISCH:  We're getting to intimidation, Your

22 Honor.

23         THE COURT:  Which intimidation?

24         MR. REISCH:  Well, it goes to this lawsuit, Your

25 Honor.  I'm laying a foundation as to why they filed this

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2      07/16/2024    549

1   Vota and tried to recruit him to get involved in this

2   litigation, correct?

3   A.  I talked to him and asked if he was interested in

4   partnering, yes.

5   Q.  Okay.  You solicited the NAACP to get involved in this

6   litigation, didn't you?

7   A.  Yes, I did.

8   Q.  Okay.  You didn't provide them any newspaper articles, you

9   didn't provide anything other than you saying, Hey, this

10  litigation is coming down, and we're trying to get some people

11  together, right?

12  A.  I believe that is correct.

13  Q.  Okay.  And they all went along with it, right?

14  A.  Yes.

15  Q.  Okay.  And you, other than apparently yourself, have no

16  personal knowledge of anybody else coming to say they were

17  intimidated by Mr. Smith, correct?

18  A.  I don't know of anybody who said they've been intimidated

19  by Mr. Smith?

20  Q.  You have no personal knowledge of anyone that they

21  canvassed that said they were intimidated in the canvassing

22  process, correct, ma'am?

23  A.  In the canvassing process, correct.

24  Q.  Okay.  The statements that you referred to by Mr. Smith,

25  you have been here for the testimony, right?  You're a

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 2     07/16/2024   559

1   either, correct?

2   A.  No.  I believe they spoke to a board member, and they

3   confirmed that they had received complaints.

4   Q.  That they could not identify a specific person who was

5   allegedly -- thought that they felt uncomfortable by a

6   specific USEIP individual, correct, ma'am?

7   A.  I don't know that they couldn't.  They didn't to me or the

8   board, but I would think that's a matter of privacy too.

9   Q.  You talked about resources.  You prepared a white paper;

10  is that right?

11  A.  That's correct.

12  Q.  Okay.  And part of your organization's advocacy is to

13  encourage people to vote, right?

14  A.  Yes.

15  Q.  To get out the vote, correct?

16  A.  Yes.

17  Q.  And as things come up, you change your strategy or your

18  marketing information; is that right?

19  A.  Sure.

20  Q.  Okay.  And in this particular case, you thought that there

21  was misinformation or disinformation was coming about, so you

22  wanted to let people know that there was trust in the voting

23  system, correct?

24  A.  Correct.

25  Q.  And that was your white paper, right?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    567

1    didn't have evidence that Holly Kasun was personally engaged

2    in any of the conduct that you had alleged in your complaint,

3    right?  It was mostly about USEIP; is that right?

4    A.  Yes.  But as a cofounder, I believe she has

5    accountability.

6    Q.  And what do you understand her to have been a cofounder

7    of?

8    A.  USEIP.

9    Q.  And what is that?

10   A.  The United States Election Integrity Plan.

11   Q.  Okay.  And what sort of entity is that in your mind?

12   A.  An organization of volunteers.

13   Q.  Did you understand that -- it to have a

14   command-and-control structure?

15   A.  I don't know what you mean by that.

16   Q.  Well, that there are people above other people telling

17   them what to do and having control over their work?

18   A.  Yes, I would say so.

19   Q.  Okay.  What is the evidence for that?

20   A.  The fact that they called themselves cofounders.

21   Q.  And that means they have control over all the others?

22   A.  It means they should be accountable to all the others,

23   yes.

24   Q.  That's an assumption?

25   A.  That is my belief.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    570

1    about Holly Kasun or statements written by Holly Kasun?

2    A.  I suppose written about her.

3    Q.  Okay.  And that's where you got most of your information

4    is the media reports about her?

5    A.  That's correct.

6    Q.  Was there any information you got about her that did not

7    come from media report?

8    A.  No, I don't believe so.

9    Q.  Okay.  Did you know of any evidence that would indicate

10   Ms. Kasun exercised managerial control over anyone else in

11   USEIP?

12   A.  The fact that she's a cofounder.

13   Q.  Is that evidence of managerial control?

14   A.  I believe that being called a cofounder typically means

15   you have some managerial control.

16   Q.  Do you have evidence that she controlled any member of

17   USEIP?

18   A.  Control a member?

19   Q.  Controlled the work or supervised the work of any member

20   of USEIP?

21   A.  Well, as a cofounder, I would certainly assume that there

22   was oversight.

23   Q.  I hear the assumptions you're making.  I'm just asking if

24   you have any actual evidence or you did when you filed your

25   complaint?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3   07/17/2024   571

1  A.  The fact that she named herself as a cofounder.

2  Q.  So you think everything is wrapped up in the title

3  cofounder that someone can give themselves?

4  A.  Yes.

5  Q.  I see.  Do you have any evidence that she had the power to

6  terminate members of USEIP?

7  A.  I have no idea.

8  Q.  That she supervised anyone's work?

9  A.  As a cofounder, I would think she supervised others' work.

10  Q.  Do you have evidence of that?

11  A.  Outside of the fact that she calls herself a cofounder,

12  no.

13  Q.  I hear what you're saying.  Does the fact that she calls

14  herself a cofounder mean that she trained people in USEIP as

15  well?

16  A.  I would assume so.

17  Q.  But you don't know.  Do you know whether Holly Kasun asked

18  any residents to confirm their voter address?

19  A.  I don't.

20  Q.  Do you know if she asked any voter a question at their

21  door?

22  A.  I don't know that.

23  Q.  To your knowledge, did Ms. Kasun question any residents

24  about their participation in the 2020 election?

25  A.  I don't know.

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    572

1    Q.  What about their method for voting?

2    A.  I don't know.

3    Q.  So it was media reports that told you that a group called

4    USEIP was sending canvassers who were sometimes armed to

5    interrogate voters about the voting record?

6    A.  Correct.

7    Q.  Do you know what the evidence was in the media reports for

8    the idea they were sometimes armed?

9    A.  I would say probably the playbook.

10   Q.  The playbook is evidence that someone was armed?

11   A.  Yes.

12   Q.  How so?

13   A.  They discussed security and how they were planning to line

14   up people with people who carried.

15   Q.  So that's a statement of possible intent.  Do you have

16   evidence anyone did carry?

17   A.  Media reports stating that at times volunteers were openly

18   armed.

19   Q.  So, again, media reports are the evidence for your case?

20   A.  Yes, as well as some eyewitness accounts.

21   Q.  Did you talk to a witness who saw a USEIP canvasser was

22   armed?

23   A.  No.

24   Q.  Who in your organization did?

25   A.  I don't know that anyone did.

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024     573

1    Q.  Okay.  How do you know that the people who did the

2    canvassing that you're objecting to are actually with USEIP as

3    opposed to other canvassing groups in the state at the time?

4           MS. STOCK:  Objection, asked and answered.

5           THE COURT:  Overruled.

6    A.  We didn't know of any other groups doing similar types of

7    canvassing.

8    Q.  (By MR. POWELL) So it seemed a reasonable assumption that

9    it was USEIP?

10   A.  Well, and if their badges -- I believe there were plenty

11   of times that their badges stated they were with USEIP.

12   Q.  Plenty of times in what context?  Are you talking about

13   complaints you got?

14   A.  I'm talking about complaints and media reports, yes.

15   Q.  Were the media present at the canvassing?

16   A.  I don't know.

17   Q.  Okay.  They didn't say they were present at the

18   canvassing, did they?

19   A.  I don't believe so, no.

20   Q.  Okay.  Do you have any -- or know of any evidence that

21   Holly Kasun asked residents about allegedly fraudulent

22   ballots?

23   A.  I don't know.

24   Q.  Do you know whether she accused residents of casting

25   fraudulent ballots?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3   07/17/2024   574

1   A.  No, I don't know that.

2   Q.  Do you know if she took any photos of voters' residences

3   or parking lots?

4   A.  I don't.

5   Q.  Do you have any evidence that she threatened voters?

6   A.  No.

7   Q.  And I think I've heard you say you don't have evidence

8   that she asked people to do so and they did so at her

9   direction?

10          MS. STOCK:  Objection, asked and answered.

11          THE COURT:  Overruled.

12   A.  As a cofounder, I would assume she was involved in

13   volunteer oversight, yes.

14   Q.  (By MR. POWELL) Are you saying that you filed a complaint

15   based on assumptions?

16   A.  I filed a complaint -- or we filed a complaint based on

17   media reports and reports received by county clerks and the

18   Secretary of State, as well as feedback we got.

19   Q.  And those --

20   A.  And media reports.

21   Q.  How did those reports identify USEIP?  Just by saying that

22   it was them who did the canvassing?

23   A.  Yes.

24   Q.  I see.  Do you have any evidence that it was Holly Kasun

25   who was informing canvassers that she was attempting to line

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    575

1    up security?

2    A.  No.

3    Q.  Do you know whether she encouraged any gun-carrying

4    members to accompany unarmed agents and offer their contact

5    information to unarmed agents of USEIP?

6    A.  I don't know that.  As a cofounder and with that in the

7    playbook, I would assume she had some oversight over those

8    activities.

9    Q.  Do you know when the playbook was written?

10   A.  I believe it was August of '22.

11   Q.  That was well after the canvassing was finished, right?

12   A.  I don't know.  I believe canvassing was still going on.

13   Q.  You filed a complaint in March of '22, right?

14   A.  I believe that's correct.

15   Q.  Okay.  And so the playbook, if it was in March of -- or

16   August of '22, the canvassing that you were complaining about

17   had finished by then?

18   A.  As I said, I believe the canvassing continues today.

19   Q.  What's the basis for that belief?

20   A.  Continued media reports.

21   Q.  So media is, once again, the source of your information?

22   A.  Well, and as stated in earlier testimony, Ms. Epp filed

23   some sort of report in January stating that the organization

24   was active in all 64 counties.

25   Q.  You know the organization does more than canvassing, don't

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    576

1    you?

2    A.  I don't.

3    Q.  So your assumption was that the organization only existed

4    to do canvassing?

5    A.  Yes.

6    Q.  I see.  So is there any evidence that your organization

7    had when it filed the complaint that a volunteer carried a

8    weapon of any kind?

9    A.  Outside of the organization's playbook.

10   Q.  What is it in the playbook that made you think there were

11   weapons?  Are you talking about the chat room quotations?

12   A.  Those certainly, talk of tactical pins, as well as in the

13   playbook it talks about security and lining up volunteers who

14   don't carry with those who do.  Those are not the exact words,

15   but that's --

16   Q.  So is trying to make oneself secure, is that in your mind

17   an offensive act?

18   A.  When you're doing door to door knocking on people's doors,

19   yes, I find that offensive.

20   Q.  I mean offensive rather than defensive.  Do you have any

21   evidence that they were talking about tactical pins for some

22   reason other than self-protection?

23   A.  I don't know, but if you're knocking on peoples' doors, I

24   don't know why you would need self-protection.

25   Q.  Are you aware of the history of canvassers knocking on

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    577

1    doors and being harassed and threatened in this country?

2    A.   Then maybe they shouldn't do it.

3    Q.   I see.  So if it's risky, they shouldn't exercise their

4    rights of association?

5    A.   If they believe the risk is so great that they must carry

6    a weapon, I personally believe, yeah, that should be

7    reconsidered.

8    Q.   And so when you saw these chat room quotations in the

9    media, was there anything indicating to you that those

10   statements about security were actually written by human

11   beings as opposed to bots?

12   A.   I believe that there was prior testimony stating that the

13   playbook was written by the three cofounders.

14   Q.   Well, would you like to take a look at Exhibit 1, the

15   playbook and let me know what statements about weapons you're

16   referring to?

17   A.   I'm having trouble placing it now, but --

18   Q.   Are you referring to a statement that is written by the

19   author of the playbook, or are you referring to what we've

20   seen in other exhibits as screenshots from chat rooms?

21   A.   No.  I'm referring to a statement in the playbook.

22   Q.   I see.  Okay.

23   A.   I'm sorry.  I'm having trouble placing it, but in an

24   earlier copy there was a clear reference to security and

25   lining up security and connecting volunteers with other

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    578

1    volunteers who carried.

2    Q.  And you read this statement sometime after the playbook

3    was published and that concerned you?

4    A.  Yes.

5    Q.  Do you know if any registered voters read this statement

6    besides you?

7    A.  Well, I would assume that everyone involved with USEIP

8    did, and they're, I'm assuming, registered voters.

9    Q.  Do you think this intimidated USEIP voters?

10   A.  Probably not.  It certainly intimidated me.

11   Q.  I'm trying to understand.  This playbook is a private

12   document intended for USEIP members and other grassroots

13   organizations.  Are you aware of that?

14   A.  Yes.  But it was posted on their public-facing website.

15   Q.  Do you know if a registered voter read it?

16   A.  I'm a registered voter, and I read it.

17   Q.  Okay.  And the statement that you can't find intimidated

18   you?

19   A.  Yes.

20   Q.  I see.  People mentioning bringing security with them?

21   A.  Yes.

22   Q.  I see.  So of the information in the media reports and the

23   playbook that concerned you, did you investigate any of those

24   pieces of information to confirm whether they were true?

25   A.  No.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    579

1    Q.  Do you recall the media reports saying that USEIP was

2    doing canvassing statewide?

3    A.  I saw media reports stating that the -- all the counties

4    on the -- in CD4, the eastern part of the state had been

5    covered.  Jeffco, many more beyond the four --

6    Q.  Uh-huh.

7    A.  -- discussed here.

8    Q.  And was it your understanding that -- that the canvassers

9    were targeting vulnerable voters?

10   A.  Yes.

11   Q.  Why did you believe that?

12   A.  Well, it seemed that they were targeting registered

13   Democrats in conservative counties, and there seemed to be a

14   lot of people with last names that could be considered ethnic.

15   Q.  When you say it seemed, what are you referring to?  Seemed

16   from what?

17   A.  From the various media reports, folks that had reported

18   being visited often had names that sounded ethnic.

19   Q.  You're talking about people interviewed for media reports?

20   A.  Yes.

21   Q.  Do you understand that the people that were interviewed

22   were a random sample of everyone who was canvassed?

23   A.  I don't know that, but...

24   Q.  Isn't it possible that a few people were interviewed, and

25   it's not actually representative of the larger group?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024   580

1    A.  Yes, I suppose that's possible.

2    Q.  Did you consider that before you filed your complaint

3    saying that they were targeting?

4    A.  No.  I still believe they were targeting.

5    Q.  But that's just a belief?

6    A.  Yes.

7    Q.  Okay.  Did you believe they were targeting minority

8    voters?

9    A.  Yes.

10   Q.  For the same reason?

11   A.  Yes.

12   Q.  Because of the media reports quoting some people with

13   ethnic-sounding names?

14   A.  Yes.

15   Q.  I see.  And Democrat voters, how did you identify them as

16   being targeted?

17   A.  A media report interviewed a prominent Democrat I believe

18   in -- I can't remember the county, but she felt she had been

19   targeted.

20   Q.  So you agreed with that assessment?

21   A.  I believe her feelings to be valid.

22   Q.  Did you also believe when you filed the complaint that

23   USEIP volunteers in particular were canvassing high-density

24   housing and targeting those?

25   A.  I don't know that they were targeting those, but I did

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024   581

1   hear reports of large apartment complexes being canvassed.

2   Q.  Does your organization conduct canvassing?

3   A.  I feel certain we have in the past.  We have not during my

4   tenure.

5   Q.  Do you know if the national League of Women Voters does

6   canvassing in Colorado?

7   A.  I don't believe they do, no.

8   Q.  Do you have any familiarity with the kinds of questions

9   canvassers ask?

10  A.  It's my understanding they varied from volunteer to

11  volunteer.  Some were more aggressive.

12  Q.  And is that based on media reports?

13  A.  Yes.

14  Q.  In what way were they more aggressive, according to the

15  media reports?

16       MR. REISCH:  Your Honor, I'm going to object,

17  hearsay.

18       THE COURT:  Overruled.  The defendants have now

19  opened the door to these media reports, not for the truth of

20  them, but for what this witness did in reliance on them.

21       You may answer.

22  Q.  (By MR. POWELL) In what way were some allegedly more

23  aggressive?

24  A.  Volunteers coming in with a clear bias as to election

25  fraud, stating that, you know, election fraud happened,

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3   07/17/2024   582

1   happened possibly here at this address, and were generally

2   intimidating.  We also had reports that some were very

3   courteous and polite.

4   Q.  To your knowledge, did your organization ever have any

5   evidence that any of the canvassers believed Holly Kasun

6   wished them to act on her behalf?

7   A.  That's difficult to answer.  Again, as a cofounder, I

8   would think that she would want volunteers to carry out the

9   mission of the organization that she helped to create.

10  Q.  Well, moving away from assumptions about what cofounding

11  means, I want to talk about an actual canvasser, a human

12  being, and Holly Kasun, a human being.  And I want to

13  understand if you have any evidence whether they had an

14  agreement that the canvasser was going to act on Holly Kasun's

15  behalf?

16          MS. STOCK:  Objection, foundation.

17          THE COURT:  I'll allow her to answer, if she knows.

18  A.  I do not know.

19  Q.  (By MR. POWELL) Do you know if you had any evidence that

20  there was a canvasser from USEIP who agreed to act at the

21  direction of Holly Kasun?

22  A.  Well, I believe all volunteers with USEIP were acting at

23  the direction of the three cofounders.

24  Q.  Does that mean that you believe that the three cofounders

25  were giving explicit directions every time a volunteer acted,

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    583

1   that the volunteers never acted of their own volition on

2   anything?

3   A.  No.  Of course the volunteers acted on their own volition.

4   That's part of volunteer management.  But the cofounders laid

5   out the mission and purpose of the organization, and the

6   volunteers were there to carry that out.

7   Q.  That's your understanding?

8   A.  Yes.

9   Q.  I see.  So that sounds like a command-and-control

10  organization where somebody's in charge; is that right?

11  A.  Yes.

12  Q.  Okay.  I believe you said yesterday that when you filed

13  the complaint, it was because you wanted to stop intimidating

14  speech and actions of the defendants in USEIP; is that right?

15  A.  Yes.

16  Q.  Can you tell me what the intimidating speech of Holly

17  Kasun was?

18  A.  I don't know.  I believe that as a cofounder of the

19  organization, volunteers were carrying out the mission and

20  were at times intimidating.

21  Q.  You believe that because the media reports suggested that

22  to you?

23  A.  Yes.

24  Q.  What were the activities of Holly Kasun you were trying to

25  stop?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3   07/17/2024   584

1    A.   Organizing volunteers to canvass and intimidate voters.

2    Q.   So you've referred to USEIP intimidating voters.   How many

3    voters are we talking about that we actually know it was a

4    USEIP volunteer interacting with an intimidated voter, do you

5    know?

6    A.   Well, yes, we received a report also via phone call to a

7    board member who stated --

8            MR. REISCH:   Objection, hearsay.

9            THE COURT:   Overruled.   You may answer.

10   A.   -- that she had received a visit from USEIP agents who she

11   felt were trying to be intimidating.

12   Q.   (By MR. POWELL) The board member thought this?

13   A.   No.   The member told my board member this.

14   Q.   And did your board member tell you how the member

15   understood that it was a USEIP volunteer?

16   A.   From their badge and their introduction.

17   Q.   What county was this?

18   A.   Weld.

19   Q.   Okay.   Did anyone ever provide The League with evidence

20   that a canvasser was armed, such as a photograph?

21   A.   No.

22   Q.   A surveillance video?

23   A.   No.

24   Q.   Eyewitness testimony?

25   A.   Outside of the playbook, no.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024   585

1    Q.  Was it your understanding that if you brought the

2    litigation, that you could have the playbook suppressed so

3    that no one had to read USEIP's thoughts on security?

4            MS. STOCK:  Objection, calls for legal conclusion.

5            THE COURT:  Overruled.

6    A.  Would you repeat the question, please?

7    Q.  (By MR. POWELL) Was it your understanding and why you

8    brought this litigation that you wanted to suppress the

9    playbook, because you identified that a number of times as

10   something you believed to be intimidating.

11   A.  Among other things, yes.

12   Q.  So you would like it to be taken offline and never

13   available to anyone to see?

14   A.  As a part of canvassing actions by USEIP, yes.

15   Q.  Do you know when USEIP canvassing took place?

16   A.  Well, I believe that it started in the spring of '21 and

17   continues today.

18   Q.  Do you believe it continues because USEIP still continues?

19   A.  Correct.

20   Q.  But you don't know of them doing any canvassing?

21   A.  I don't.

22   Q.  So you don't actually know when the canvassing ended by

23   USEIP?

24   A.  No.

25   Q.  Okay.

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    586

1    A.  But I don't believe it has.

2    Q.  So if the playbook was released after the canvassing was

3    finished, would that have the same intimidating effect on

4    canvassed voters?

5         MS. STOCK:  Objection, calls for legal conclusion.

6         THE COURT:  Sustained as to how it's worded

7    currently.

8    Q.  (By MR. POWELL) If the canvassing had been completed

9    before the playbook was issued, do you think that the playbook

10   would have the same impact on any voter who happened to read

11   it who was canvassed?

12   A.  Yes.

13   Q.  Okay.  Do you know if any voters read the playbook after

14   they were canvassed?

15   A.  I don't.

16   Q.  Was one of the reasons that you wanted to bring suit

17   against the defendants to stop what you call misinformation?

18   A.  Yes.

19   Q.  And can you tell me what misinformation by Holly Kasun you

20   believe was potentially intimidating to a voter?

21   A.  I believe that USEIP and its three cofounders have been

22   continuing to state that the 2020 election was stolen and

23   rigged.

24   Q.  And they should be stopped from saying that?

25   A.  I believe that is not true.

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    588

1   information about what the canvassers were saying to the

2   residents that were canvassed?

3   A.  Yes.

4   Q.  And what was that source?

5   A.  Various e-mail reports.

6   Q.  From whom?

7   A.  Members and nonmembers.  When we sent out the -- my e-mail

8   in September --

9   Q.  Are you talking about Yvette Roberts and Deborah Powell or

10  other people?

11  A.  No, other people.

12  Q.  Do you know their names?

13  A.  Jean Hoffman.

14  Q.  Okay.

15  A.  And we did have a verbal report from another member.

16  Q.  Ms. Hendrix, do you have Exhibit 41 available in front of

17  you?

18  A.  Yes.

19  Q.  So you didn't personally or through your organization

20  perform an investigation of the claims that social media and

21  media reports were making; is that right?

22  A.  Outside of sending out the e-mail that's listed as

23  Exhibit 41.

24  Q.  This was a part of your investigation?

25  A.  Sure.

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    589

1   Q.  This is something you sent out about to 2,200 of your

2   members or subscribers?

3   A.  Both our members and nonmembers, yes.

4   Q.  So anyone who's a subscriber can get the e-mail, but they

5   don't have to be a member?

6   A.  That's correct.

7   Q.  So in this document dated September 4th, 2021, you say

8   below the logo of the League of Women Voters of Colorado, The

9   United States Election Integrity Plan, USEIP, is an

10  organization that is continuing to claim voter fraud in the

11  2020 election.  They have volunteers in Colorado who are going

12  door to door in an attempt to find evidence of voter fraud.

13  And your understanding of why they were going door to door is

14  from the media reports?

15          MS. STOCK:  Objection, reading from a document that's

16  not been admitted into evidence.

17          THE COURT:  Overruled.

18          MR. POWELL:  If this is not in evidence, can we move

19  it, Your Honor?

20          THE COURT:  It's already in evidence.

21          You may answer.

22  A.  I'm sorry.  Would you repeat the question, please?

23          (The requested portion of the transcript was read.)

24  A.  Yes.

25  Q.  (By MR. POWELL) Now, your next sentence says, These

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    590

1    actions may be intimidating to voters; is that right?

2    A.  Yes.

3    Q.  Prior to your sending this, had any of your members

4    reached out to you to report USEIP activities?

5    A.  No.

6    Q.  Did you think if you informed them that they had been

7    intimidated, that someone might step forward and agree?

8    A.  No.

9    Q.  Why did you think it was important to tell them that

10   actions may be intimidating?

11   A.  I suppose to provide a basis for the e-mail.  We want to

12   know if people are intimidating voters.

13   Q.  And then the next clause you say, Voter intimidation is a

14   federal crime; is that right?

15   A.  Yes.

16   Q.  Did you think that by making that statement you might

17   scare recipients of the e-mail who are afraid of criminals?

18   A.  No.

19   Q.  You didn't think that might be scary to them to understand

20   that they might be subject to criminal activity?

21   A.  To whom are you referring?

22   Q.  The recipients of your e-mail.

23   A.  No.

24   Q.  You didn't think this was alarmist in any way?

25   A.  It's based on media reports of canvassers intimidating

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    591

1    voters.

2    Q.  I hear that it's based on media reports.  Is it based on

3    any facts that you were personally aware of or your

4    organization was aware of?

5         MS. STOCK:  Objection, asked and answered.

6         THE COURT:  Overruled.  I'll allow her to answer.

7    A.  Media reports.

8    Q.  (By MR. POWELL) Did The League contribute to media reports

9    by talking to reporters?

10   A.  It's possible.  I don't recall.

11   Q.  Well, let's look at Exhibit 109.

12   A.  Yes.

13   Q.  Do you recognize that e-mail?

14   A.  Yes.

15   Q.  Do you recall receiving that e-mail?

16   A.  Not offhand, but I believe I did receive it.

17   Q.  Who is Marjorie Gray?

18        THE COURT:  Counsel, what exhibit are you on?

19        MR. POWELL:  109.

20        THE COURT:  Okay.  Sorry.  Go ahead.

21   A.  Marjorie Gray is a leader of our league in Chaffee County.

22   Q.  (By MR. POWELL) And do you recall what she wrote you there

23   about whether you wanted the article to go into the local

24   media?

25   A.  It's -- I don't recall receiving this e-mail, but I am not

Sarah K. Mitchell, RPR, CRR

287

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    595

1  A.  I can't confirm that it was the Times Recorder.  It was

2  definitely a media report.

3  Q.  Had you heard of the Colorado Times Recorder before you

4  read those articles?

5  A.  I believe so.

6  Q.  In what capacity?

7  A.  Just as a media outlet in Colorado.

8  Q.  Do you know if it's a news organization with multiple

9  employees or a personal blog?

10 A.  I don't know.  I'm figuring it's a professional media.

11 Q.  Why do you figure that?

12 A.  General presentation.

13 Q.  The website looks good?

14 A.  Yes.  And I believe that they're a legitimate media

15 outlet.

16 Q.  Did you take steps to confirm that belief at any point?

17 A.  What kind of steps?  No.

18 Q.  Well, do you know if they employ fact-checkers?

19 A.  I don't.

20 Q.  Do you know if it requires its reporters to be trained

21 journalists?

22 A.  I don't.

23 Q.  Do you know if they adhere to any journalistic ethics?

24 A.  I wouldn't certainly assume so, but I don't know.

25 Q.  But somehow you found that their report was credible?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024   596

1   A.   Yes.

2   Q.   Because why?

3   A.   Because it was backing up reports made by other media

4   outlets.

5   Q.   Is it possible that these media outlets are reporting on

6   what each other had reported?

7   A.   I don't believe so.

8   Q.   Did you have any indication that they were doing original

9   journalism or reporting on what was already in the media?

10        MS. STOCK:  Objection, foundation.

11        THE COURT:  Well, I'll overrule it.  You can answer,

12   if you know.

13   A.   I don't.

14        MR. POWELL:  I'm sorry.  Can you read back the

15   question that I asked?

16        (The requested portion of the transcript was read.)

17   A.   That was -- I mean, it was my impression that it was

18   original journalism.

19   Q.   (By MR. POWELL) And why is that?

20   A.   It was an impression.

21   Q.   So you filed a lawsuit based on an impression?

22   A.   No.  I filed a lawsuit -- we filed a lawsuit based on

23   multiple media reports, as well as eyewitness reports, as well

24   as the organization's own statements and playbook.

25   Q.   Now, two days after you e-mailed your subscribers, do you

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024   597

1    recall getting an e-mail from the Colorado Times Recorder

2    reporter Erik Maulbetsch?

3    A.  Yes.

4    Q.  Did you receive more than one e-mail from him?

5    A.  Possibly.

6    Q.  Did you speak to him by phone or in person?

7    A.  I spoke to him by phone, yes, as well as via Zoom.

8    Q.  And he told you about the investigation that he was doing?

9          MS. STOCK:  Objection, hearsay.

10         THE COURT:  Well, overruled.

11   A.  Yes.

12   Q.  (By MR. POWELL) Do you recall him telling you that he had

13   been researching USEIP for some time and had a fair amount of

14   evidence of voter intimidation and suppression?

15   A.  I would say something along those lines, yes.

16   Q.  Did he tell you what that evidence was that he had?

17   A.  I don't recall.

18   Q.  His articles said that -- claimed that some USEIP members

19   might have had criminal records?

20   A.  The playbook said that as well, yes.

21   Q.  Did that alarm you?

22   A.  Yes.

23   Q.  Did you confirm if it was true?

24   A.  I didn't feel the need to do that since the organization's

25   playbook stated that some of its volunteers were sexual -- had

          Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024   598

1   been convicted of sexual crimes.

2   Q.  Did Mr. Maulbetsch send any evidence to you?

3   A.  No.

4   Q.  Do you recall if he told you he had personally witnessed

5   any USEIP canvassers interrogating any residents?

6   A.  I don't recall.

7   Q.  Did he tell you where USEIP members had canvassed?

8   A.  I don't recall, but I also don't recall asking him.

9   Q.  Did he show you any of the notes he had used in writing

10  his stories?

11  A.  No.

12  Q.  So do you know whether he took realtime contemporaneous

13  notes of his interviews with people or if he wrote everything

14  up later?

15  A.  I don't know.

16  Q.  You knew he identified himself as a progressive

17  investigative reporter?

18  A.  No.  I considered him to be an investigative reporter.  I

19  didn't know about the progressive part.

20  Q.  Can I have you take a look at Exhibit 65, Ms. Hendrix.

21  A.  Okay.

22  Q.  Do you remember reading this article?

23  A.  Yes.

24  Q.  Did you discuss the contents of the article with

25  Mr. Maulbetsch before it happened?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024    601

1              THE COURTROOM DEPUTY:  Yes.

2              MR. POWELL:  Thank you.

3    Q.  (By MR. POWELL) Please turn to Exhibit 82.  Do you

4    recognize this article?

5    A.  I do not.

6    Q.  That appears to be from the ACLU of Pennsylvania?

7    A.  It appears that way.

8    Q.  And it's titled Rights of Canvassers in Pennsylvania?

9    A.  Yes.

10   Q.  But this is not a source of information for you?

11   A.  No.

12   Q.  Let me ask you to turn to Exhibit 102.  Do you recall this

13   e-mail?

14   A.  I believe so.

15   Q.  Do you recall speaking with this reporter before this

16   e-mail?  Before she sent this e-mail, do you recall having the

17   conversation she's referring to?

18   A.  I don't.  I'm not saying it didn't happen.  I just don't

19   recall it.

20   Q.  Did you think that the fact that several journalists

21   reported several facts made it more likely those facts were

22   true?

23   A.  Yes.

24   Q.  Did it occur to you that the later media reports could

25   have gotten their information from the earlier reports?

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3   07/17/2024   602

1          MS. STOCK:  Objection, asked and answered.

2          THE COURT:  Overruled.

3   A.  No.

4   Q.  (By MR. POWELL) That didn't occur to you?

5   A.  No.

6   Q.  So it didn't occur to you that they might not have been

7   doing independent verification, but tagging along?

8          MS. STOCK:  Objection, asked and answered.

9          THE COURT:  Well, sustained.

10  Q.  (By MR. POWELL) Do you have a way today of distinguishing

11  the reports you got from the media from rumors?

12  A.  Are you saying do I know that the media wasn't just

13  publishing rumors?

14  Q.  No.  I want to know if there's some way that you have to

15  distinguish what you read from rumors.

16  A.  Well, I don't believe that the articles about USEIP were

17  presented as rumors.

18  Q.  That's not my question.  I'm asking if you have any way to

19  differentiate them from rumors given that you did no

20  independent investigation.

21         MS. STOCK:  Objection, misstates her prior testimony.

22         THE COURT:  Overruled.  I'll allow her to answer.

23  A.  Do I know how to discern rumor from media report?

24  Q.  (By MR. POWELL) That's not exactly my question, but you

25  can answer that one to start.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    605

1          THE COURT:  Overruled.  I'll admit Exhibit 107.

2      (Exhibit 107 received.)

3   Q.  (By MR. POWELL) As far as you know you didn't speak with

4   Ms. Chapman further?

5   A.  I don't recall.

6   Q.  And you also concluded based on media reports that USEIP

7   was associated with QAnon; is that right?

8   A.  Yes.

9   Q.  What does it mean to be associated with QAnon?

10  A.  I don't really know.

11  Q.  Does that mean to speak about it?

12  A.  I suppose to speak about it and possibly hold the values

13  of.

14  Q.  Was it important to you in this litigation there might be

15  some association --

16  A.  No.

17  Q.  -- between the defendants and QAnon?

18  A.  No.

19  Q.  Now, you didn't speak to the Colorado Montana Wyoming

20  State Area Conference of the NAACP prior to filing the

21  complaint, right?

22  A.  No.

23  Q.  Did you send them any evidence backing up the complaint?

24  A.  I don't recall.

25  Q.  Do you recall if they sent you any information?

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024   606

1    A.  I don't recall.

2    Q.  You did speak with the executive director of Mi Familia

3    Vota; is that right?

4    A.  That's correct.

5    Q.  In January of 2022?

6    A.  Yes.

7    Q.  And he said he wanted to partner on this filing of the

8    complaint?

9    A.  Yes.

10   Q.  Did Mi Familia Vota send you any evidence that they had

11   gathered that would support the complaint?

12   A.  Not that I recall.

13   Q.  Did you send the executive director Mr. Hernandez any

14   evidence?

15   A.  It's possible, but not that I recall.

16   Q.  Let me ask you to turn to Exhibit 105, Ms. Hendrix.  We've

17   spoken about this document, I believe.  Does that look

18   familiar to you?

19   A.  Yes.

20   Q.  What is it?

21   A.  It's an e-mail notifying our membership that we had filed

22   this litigation.

23   Q.  Did you participate in its drafting?

24   A.  Yes.

25   Q.  Were you the primary draftsperson or did you supervise

22-cv-00581-CNS-NRN   Bench Trial - Day 3    07/17/2024    624

1    that's Exhibit 108, Your Honor, which is admitted.

2              THE COURT:  All right.

3    Q.  (By MS. EPP) And then you sent the same language to your

4    recipient audience again on September 10th; is that correct?

5    A.  I don't know.

6    Q.  Can you go to Exhibit 110, please?

7              MS. EPP:  That's also admitted, Your Honor.

8    A.  Okay.  This looks like a newsletter.

9    Q.  (By MS. EPP) So the same language --

10   A.  Uh-huh.

11   Q.  -- was sent September 7th -- or September 4th,

12   September 8th, and September 10th, correct?

13   A.  I'm not sure.  I would need to see them all side by side,

14   but --

15   Q.  Okay.  Well, let's do that.  You looked at the

16   September 4th notice yesterday, right?  So you know that that

17   one happened, correct?

18   A.  Sure.

19   Q.  Okay.  And we've just looked at September 10th.  We can

20   say that one happened.  Let's go to 108.  Can you confirm that

21   that is September 8th and the same language?

22   A.  Yes.  I'm a little confused, because it seems to just be a

23   duplicate.

24   Q.  It has a different date, though, correct?

25   A.  Yeah, I agree.

                    Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3      07/17/2024    625

1    Q.  So it was -- so based on the record of what we can see,

2    the same language was sent September 4th, September 8th, and

3    September 10th, correct?

4    A.  It looks that way, yes.

5    Q.  And do all of these communications -- so the e-mail blast

6    that you sent and your newsletter, is that the same audience

7    of 2,200 people?

8    A.  Yes.

9    Q.  Okay.

10   A.  It's 2,200 members.  More nonmembers.

11   Q.  So it's more than 2,200 people.  It's a broader list, but

12   2,200 of them are members?

13   A.  That's correct.

14   Q.  How big is the entire distribution?

15   A.  About 4,500.

16   Q.  Thank you.  After the two newsletters, September 8th and

17   September 10th, you received the e-mail from Matt Menza on

18   September 14th; is that accurate?

19   A.  Likely.

20   Q.  Okay.  Do you -- would you like to refresh your memory as

21   to date?  The dates are really important to me, so that's why

22   I'm belaboring this.

23   A.  Sure.

24   Q.  That's 111.  Can you confirm that was September 14th?

25   A.  Yes.

22-cv-00581-CNS-NRN    Bench Trial - Day 3    07/17/2024    636

1    A.  Yes.  We provide resources.

2    Q.  Can you give a quick summary of how you spot and recognize

3    misinformation?

4    A.  Critical thinking skills, doing backup research if you

5    have questions, looking at sources.

6    Q.  Anything else?

7    A.  That's the nutshell.

8    Q.  And did you -- in evaluating Mr. Maulbetsch's reporting

9    before bringing this lawsuit, did you use your critical

10   thinking skills, backup -- what was the second one that you

11   said?  I can't read my handwriting.  Did you conduct backup

12   research or look at sources?

13   A.  I conducted -- we looked at other articles written by

14   people other than Mr. Maulbetsch, other media sources, yes.

15   Q.  You didn't include them in your complaint, though?

16   A.  As I said, I'm sorry, I can't remember what articles we

17   referred to in the complaint.

18   Q.  Okay.  And finishing up on this time period, this

19   September time period with regards to media responses to your

20   efforts, the day after you spoke with Mr. Maulbetsch you began

21   coordinating press activities for your narrative against USEIP

22   with members of your staff or members of The League; is that

23   correct?

24        MS. STOCK:  Objection, misstates prior testimony.

25        THE COURT:  Overruled.  I'll allow her to answer.

Sarah K. Mitchell, RPR, CRR

22-cv-00581-CNS-NRN   Bench Trial - Day 3     07/17/2024    668

1    Q.  You are a founding member of the United States Election

2    Integrity Plan, correct?

3    A.  Correct.

4    Q.  And USEIP was founded in November of 2020, correct?

5    A.  Around there, yeah.  We just said it was the end of

6    November, early December.

7    Q.  Let's talk a bit about your involvement in USEIP.  In

8    addition to being a cofounder of USEIP, you were also a

9    volunteer, correct?

10   A.  Correct.

11   Q.  You were a -- or let me rephrase.  You are a part of the

12   core team; is that correct?

13   A.  Small C core team, yes.

14   Q.  How frequently did you attend USEIP meetings?

15   A.  About once a week, once every two weeks.

16   Q.  And what sorts of topics were addressed at those meetings?

17        MR. REISCH:  Your Honor, I'm going to object to

18   foundation.  That's a very broad subject.

19        THE COURT:  Overruled.  You can answer.

20   A.  A variety of topics.  We would talk about what was

21   happening in counties.  I would talk about press.  Shawn would

22   talk about technical types of information, results of his

23   research.  Ashe would talk about other groups that were

24   networking with USEIP.  That was the nature of the

25   conversations.

Sarah K. Mitchell, RPR, CRR

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2024, I electronically filed the foregoing using the court's CM/ECF system which will send notification to the following:

| **Attorneys for Appellants** | *Amicus Curiae* |
|---|---|
| Bryan L. Sells | Bonnie I. Robin-Vergeer |
| The Law Office of Bryan L. Sells, LLC | Noah B. Bokat-Lindell |
| Post Office Box 5493 | Department of Justice |
| Atlanta, Georgia 31107-0493 | Civil Rights Division |
| (404) 480-4212 | Appellate Section |
| | Ben Franklin Station |
| Courtney Hostetler | P.O. Box 14403 |
| John Bonifaz | Washington, D.C. 20044-4403 |
| Ben Clements | (202) 598-0243 |
| Amira Mattar | |
| Free Speech For People | |
| 48 North Pleasant St, Ste 304 | |
| Amherst, Massachusetts 01002 | |
| (617) 244-0234 | |

Date: December 23, 2024

/s/ Michael J. Wynne
Michael J. Wynne
Attorney for Holly Kasun & Shawn Smith
GREGOR WYNNE ARNEY, PLLC
4265 San Felipe, Suite 700
Houston, Texas 77027
mwynne@gwafirm.com
(281) 450-7403