## CASE NO. 24-1328

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE TENTH CIRCUIT

| | |
|---|---|
| COLORADO MONTANA WYOMING STATE AREA CONFERENCE OF THE NAACP, et al., | ) ) ) ) |
| Plaintiffs–Appellants | ) ) |
| v. | ) ) |
| SHAWN SMITH, et al., | ) ) |
| Defendants–Appellees | ) |

---

On Appeal from the United States District Court
For the District of Colorado
The Honorable Judge Charlotte N. Sweeney
D.C. No. 1:22-cv-00581-CNS-NRN

---

### CORRECTED BRIEF OF APPELLEES HOLLY KASUN AND SHAWN SMITH

---

Respectfully submitted,

Cameron Powell
Michael J. Wynne
GREGOR WYNNE ARNEY, PLLC
4265 San Felipe, Suite 700
Houston, Texas 77027
(832) 390-2644
cpowell@gwafirm.com

Oral Argument is not requested.

December 23, 2024

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES…………………………………………………iv

PRIOR OR RELATED APPEALS………………………………………...vi

STATEMENT REGARDING ORAL ARGUMENT……………………………1

STATEMENT OF THE ISSUES…………………………………………...2

INTRODUCTION…………………………………………………………3

STATEMENT OF THE CASE……………………………………………..4

SUMMARY OF THE ARGUMENT……………………………………...11

    Argument………………………………………………………...12

I.  Appellants Cannot Establish Standing Arising from Premature Overreactions to Unverified Media Reports and the Speech of Persons Not Credibly Alleged to be Agents of Appellees………………………12

    A.  Appellants Diverted Resources in Response Not to Actual Evidence of Intimidation but to Media Reports and "Misinformation"…………..13

    B.  Appellants Did No Due Diligence on the Media Reports Before Diverting Resources in Response…………………………………...16

    C.  Appellants Filed Suit Against Appellees Without Evidence that USEIP Volunteers Allegedly Referring to Weapons and Canvassing Were Appellees' Agents………………………………………………21

    D.  The district court did not err in refusing to join in Appellants' rank speculation…………………………………………………..23

        1.  A Community Organizing Playbook's Mention of "Mesa County" Means Nothing About USEIP Canvassing or Agency…………...23

i

2. That USEIP Had a "Captain" in Mesa County Says Nothing About Canvassing or Agency…………………………………………24

3. Unspecified Similarities in Canvassing Methods Signify Nothing…………………………………………………………..26

II. The Evidence Relating to USEIP Was Irrelevant and Excluding it Harmless Error…………………………………………………………28

III. The Video of Defendant Smith's Speech Regarding Election Fraud Was Irrelevant, Added Nothing to His Testimony, and Would Have Been Cumulative…………………………………………………………...29

A. Defendant Smith's Speech was Not Relevant to the Canvassing…...29

B. Because the Entire Content of Smith's Speech Was in Evidence Before the Court, the Video Was Unnecessary and Would have Been Cumulative………………………………………………………….30

IV. The District Court's Finding that the Canvassers of Ms. Roberts "Engaged in no Conduct that Could be Objectively Considered Intimidating" Was Not Error…………………………………….…34

A. The district court did not err in failing to perceive a connection between the canvassing of Ms. Roberts and the USEIP, let alone Appellees…………………………………………………………..34

B. The district court heard credible evidence that USEIP did not canvass in Mesa County in June 2021……………………………………...35

C. The district court did not err in finding that Ms. Roberts (or any other canvassed resident) was not objectively intimidated………………36

D. Even if Appellants Could Show Voters Were Objectively Intimidated by Appellees' Speech, They Have Failed the Necessary Showing of Appellees' Recklessness…………………………………………40

1. Counterman Governs Potentially Intimidating Speech…………41

ii

2. A Person Accused of Intimidating Speech Cannot Be Liable Unless She is Aware of or Recklessly Disregards Her Speech's Impact……………………………………………………..41

V. The District Court Did Not Err in Refusing to Consider a Boundary-less "Context" in which the Challenged Acts Occurred……………………43

A. The "surrounding facts" of "context" advanced by Appellants are not probative……………………………………………………………44

B. Appellants advance a boundless theory of context unmoored by time, location, agency, or party…………………………………………..47

CONCLUSION…………………………………………………………...52

CERTIFICATE OF COMPLIANCE…..……………………………………….55

CERTIFICATE OF SERVICE……………………………………………56

## TABLE OF AUTHORITIES

## CASES

Bronson v. Swensen,
    500 F.3d 1099, 1106 (10th Cir. 2007)……………………………….……………..12

Brown v. Entertainment Merchants Assn.,
    564 U.S. 786, 799 (2011)………………………………………..……………43

Cider Riot LLC v. Patriot Prayer USA, LLC,
    544 P.3d 363, 381 (Or. Ct. App. 2024)…………………………….………..43

City of S. Miami v. Governor of Fla.,
    65 F.4th 631 (11th Cir. 2023)………………………………………………….…12

Clapper v. Amnesty Int'l USA,
    568 U.S. 398, 416 (2013)……………………………………………….…..12

Counterman v. Colorado,
    600 U. S. 66 (2023)……………………………………………….…..11, 40-43, 47

Daschle v. Thune,
    No. 04-cv-4177 (D.S.D. Nov. 2, 2004)……………………..……………………..7

Defenders of Wildlife v. Everson,
    984 F.3d 918 (10th Cir. 2020)……………………………………………………12

Mckesson v. Doe,
    144 S.Ct. 913, 914 (2024)……………………………………………………..43

Moses v. the Diocese of Colorado,
    863 P.2d 310, 324 (Colo. 1993)……………………………………….…………22

Nat'l Coal. on Black Civil Participation v. Wohl,
    661 F. Supp. 3d 78, 113 (S.D.N.Y. 2023)…………………….....…….43, 47-52

Young v. Workman,
    383 F.3d 1233, 1238 (10th Cir. 2004)………………………………..……...33

United States v. McLeod,
   385 F.2d 734, 737 (5th Cir. 1967)……………………….....…..7, 43, 47-49, 52

U.S. v. Solomon,
   399 F.3d 1231, 1239-40 (10th Cir. 2005)…………………………..……..……33


## STATUTES

42 U.S.C. § 1985(3)……………………………………………….…....…….……9

52 U.S.C. § 10307(b)……………………………………………….…………9


## OTHER

Federal Rules of Appellate Procedure, Rule 34(a)…………………….…..………..1

Federal Rules of Civil Procedure, Rule 52(c)…………………..………………10

Federal Rules of Evidence, Rule 403……………………………………………..33

First Amendment………………………………………………….………10, 53

Ku Klux Klan Act………………………….……………….……………......2,9

SAMUEL WILLISTON, WILLISTON ON CONTRACTS
§ 308, at 450-51 (3d ed. 1959)…………………………………………….22

Voting Rights Act of 1965………………………….……………2, 9, 10, 53

# PRIOR OR RELATED APPEALS

None.

## STATEMENT REGARDING ORAL ARGUMENT

Because the district court's ruling turns on issues of fact that are fully developed in the record, Appellees believe that oral argument will not assist this Court in resolving the issues raised on appeal. Fed. R. App. P. 34(a).

# STATEMENT OF THE ISSUES

1. May plaintiffs manufacture standing by diverting resources solely (a) in response to overreactions to unverified media reports, including reports of speech by third parties not credibly alleged to have any agency relationship with defendants, or (b) in the form of speech to counter undesirable speech that is not otherwise actionable?

2. Did the district court correctly hold that that "unincorporated associations" could not be sued under either the Voting Rights Act or the Ku Klux Klan Act, and, if not, was the holding harmless error?

3. Did the district court correctly exclude a portion of a video depicting a defendant speaking at a large public gathering during which he reportedly declared "that anyone involved in election fraud deserves to hang"?

4. Did the district court correctly find that the "canvassers" who interviewed a purported "key witness" did not engage in conduct that could be deemed "intimidating" for purposes of the Voters Right Act and the Ku Klux Klan Act?

5. Did the district court consider sufficient "context" in which the challenged acts of alleged "voter intimidation" or "attempted voter intimidation" were made?

## INTRODUCTION

In Appellants' SLAPP suit designated as a voting rights case – indeed, Appellants seek to enjoin nothing here *but* speech[1] – they consistently pressed a theory of making Appellees Holly Kasun, Shawn Smith, and Ashe Epp (*pro se*) liable for the larger "context" in which Appellees' speech and support of a volunteer canvassing project occurred. Appellants purport to have both standing and merit on appeal based solely on media reports, and they advance a slippery, boundaryless precedent that purports to consider what a reasonable voter would have known and thought of all the historical "context" a plaintiff's lawyers can dig up, and how a voter's interpretation of such history can produce feelings of intimidation.

Though most of the speech contained in this "context" is not that of Appellees in the first place, and Appellants have failed to demonstrate either agency or conspiracy to tie Appellees to it, Appellants' theory relies on situating Appellees' speech and canvassing support within a sweeping historical narrative ranging from the Jim Crow era through the protests and violence of January 6 and beyond. The theory then attributes knowledge of that vast historical narrative to a seemingly omniscient "reasonable voter," to arrive at the argument, "That voter, knowing all

---

[1] See, for example, the argument of Appellants' counsel at trial: "[I]t is clear from the *playbook* that was put out, as well as the canvassing *report* that was put out, that the defendants' conduct was intimidating." Appellees' Supplemental Appendix Volume 2 ("SA2") 304 (emphases added).

the history we have subsequently researched for the court, would feel *intimidated* by the speech of these Appellees."

## STATEMENT OF THE CASE

In late 2020 and early 2021, Appellees and other Colorado citizens concerned about integrity in elections began associating, often by conference call, to discuss their concerns. App. 209-10; 212; Supplemental Appendix (SA) 132-33, 137. They came to call their association the United States Election Integrity Plan ("USEIP"). Appellees would come to consider themselves part of the "core group," App. 210 (Smith agreeing), 214 (Kasun agreeing), with a "small-c", SA 139 (Epp statement), SA 227-28 (Smith agreeing), SA 299 (Kasun statement). That's because they had no authority over anyone else in the association; they simply showed up more regularly. SA 139. USEIP volunteers collaborated on a software platform called Basecamp. SA 140.

Appellees began to gravitate toward projects in which they had experience. Ashe Epp, who had worked in change management consulting, produced a "Playbook", disseminated in August 2021, for use by grass-roots organizers. App. 213. It "did not really even address canvassing." *Id*. Holly Kasun, with a marketing communications background, helped association members understand how to promote their ideas to the media. App. 214. Mr. Smith spoke on behalf of USEIP (SA 138) and helped to develop voter verification training guide for use by

canvassers. SA 148. The district court found "[t]he guide makes perfectly clear that canvassers are to be polite," App. 210, and the canvassing was of a "benign nature." App. 214. USEIP canvassing was designed to gather data and identify any inconsistencies between the Secretary of State's data and the individual voter's experience, App. 212, to present this data to government entities, and encourage those entities to investigate and remedy the inconsistencies identified. App. 255.

From April to August 2021, USEIP volunteers canvassed 4600 voters to confirm the data in the Colorado Secretary of State's voter rolls. App. 124, 210, 245, 254, SA 98. Training materials given to county captains to tailor as they saw fit (SA 149) suggested that volunteers ask residents whether they had voted in the 2020 election, by what means they voted, whether they received any extra ballots at their address, and whether the state's information was otherwise accurate. App. 259. Mr. Smith and Ms. Epp each canvassed on three days in two counties. App. 129, 210, 212. Ms. Kasun did no canvassing. App. 214. The results of the canvassing were analyzed and published in a Canvassing Report by a volunteer named Jeffrey Young. App. 264-285.

In around the fall of 2021, a journalist, Erik Maulbetsch, working for a small website, dedicated to liberal causes, called the Colorado Times Recorder, infiltrated Basecamp, SA 152, and began posting alarming articles about USEIP's canvassing project. SA 36-42. Mr. Maulbetsch noted that some USEIP volunteers had gone to

the Capitol on January 6, and some had expressed doubts about the 2020 presidential election. He saw a post from an unidentified account in USEIP's Basecamp that said, "[W]e are attempting to line up security. However, anyone who carries protection might want to let us know so we can offer your cell phone numbers to those who are concerned." App. 287. Testimony at trial showed USEIP members were "concerned" about their own safety. SA 151 (Smith stating "We wanted people to be safe"). Ms. Kasun agreed. SA 303; *see also* App. 256 (Voter Verification "Safety" slide). No evidence suggested any offensive purpose to the discussion of safety or weapons. But the journalist began to cook up a stew of allegations of USEIP volunteers discussing the use of weapons in canvassing.

What happened next is a case study in confirmation bias. Appellants read the articles about the election doubts shared by some members of USEIP and decided USEIP was spreading "misinformation". The League's Executive Director, Beth Hendrix, agreed she "brought this litigation [because she] wanted to suppress the [USEIP] playbook", SA 282, and have it "taken offline and never available to anyone to see," *id*. To suppress Appellees' speech, the League signed up two co-Plaintiffs to file an action sounding in "intimidation", which, in the Memorandum in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (*see* SA 35 (hereafter "Memo ISO TRO")), transformed the media articles into hyperbolic allegations Appellants never came close to supporting:

The Defendants in this case are carrying out a campaign to intimidate voters. Armed with **badges and weapons**,[2] they travel door-to-door to the homes of some of Colorado's **most vulnerable voters**,[3] demanding to know if they participated in the 2020 election, pressing them for information on how they cast their votes, **interrogating them**[4] about so-called fraudulent ballots,[5] and **taking photographs**[6] of their homes. This well-funded and sophisticated

---

[2] Based on articles. SA 36 ("armed vigilantes"), 38, 40. Appellants' insinuated made-up danger with a heading that screamed, "USEIP Is a Militant, Aggressive Voter Intimidation Group..." SA 37. But Appellants' reference to third parties' mention of "security" in a private USEIP chat room unseen by no voter contained no hint of any weapons' use in an *offensive* capacity.

[3] Based on Appellants' own Declarations. SA 43. The League's Ms. Hendrix gleaned from *media reports* that USEIP was supposedly targeting "vulnerable voters", including "registered Democrats", "dense housing", "a lot of people with last names that could be considered ethnic," SA 36, 40, 276, and "minority voters," SA 277, though Appellants never produced any such evidence. She didn't even know if the people interviewed in the media reports represented a random sample of those canvassed, SA 276, and she admitted that those interviewed may not have been representative of the larger group. SA 276-77.

Appellants' evidence of "targeting" Democratic voters consisted of "a prominent Democrat" who "felt she had been targeted" combined with Ms. Hendrix's "belief" that "her feelings [were] valid." SA 277.

[4] Based on articles. SA 36, 40, 48, 53.

[5] Based on articles. SA 37-41. At trial, Appellants pressed all Appellees on their *beliefs* about the 2020 election. For example, Appellants brought out that Mr. Smith believed 2020 election was marred by fraud on a large scale. SA 135-36.

[6] Inspired by the absurdly corrupt sheriffs in *United States v. McLeod*, 385 F.2d 734, 737 (5th Cir. 1967), who "took down the license numbers of cars" belonging to voter-registration volunteers, and the license-plate photography in *Daschle v. Thune*, No. 04-cv-4177 (D.S.D. Nov. 2, 2004), Appellants repeated the scary narrative that unidentified canvassers (who were not agents of Appellees) allegedly took photos of voters' homes. SA 36, 41, 48, 52. But reality was not supportive of any malign

conspiracy has a clear purpose: to **strike fear** in the hearts of certain Colorado voters so that they do not turn out at the polls in 2022. Defendants have made it clear to certain voters that ***intimidation and threats will follow them home*** from the polling place; that voting now carries the risk that ***armed vigilantes*** may come to their homes; and that they should be ***afraid to vote***. It is a ***brazen, unapologetic, and malignant*** strain of voter intimidation—and it must be immediately stopped.

SA 36 (emphases added). Based on the articles, SA 38-39, Appellants further tried to dirty up Appellees with alleged ties to QAnon and its "numerous violent acts", and a supposed connection, based on articles, SA 38, to the January 6 insurrection, which Appellants made sure to note "resulted in the deaths of five individuals."

The Memo ISO TRO is an extraordinary document because it reveals Appellants' wholesale reliance on media citations for all the claims contained in their

---

motives of the canvassers, who, at most, may have taken pictures only of "anomalies" – empty lots or storage units that were listed as voter registration addresses – available on Google Maps. App. 220.

Mr. Smith explained, without testimony to the contrary, "It was more a matter of where the discrepancies were associated with the residence itself. It wasn't like here's a white house and inside that is somebody who didn't vote or whatever. It was more like there's an address listed, and instead of being a residential address, *it's a storage location or it's an empty lot or it's a commercial … establishment* from where someone would not be permitted to … be registered as a voter. Or it's ... literally a street corner that somebody is purported to have received and sent an absentee ballot from. ... I think it wasn't just any anomaly. It was about specifically where there was *something about the location* that they wanted to document." SA 142 (emphases added). But Mr. Smith, like Appellants, didn't even know if any photographs (or audio recordings) had even been taken, SA 143-44, and he recognized none of the photographs or the affidavit Appellants showed him. App. 127.

Complaint. Page after page, in the Rosetta Stone that is the Memo for a TRO, Appellants' utter dependence on media reports about (1) third parties unconnected to Appellees, (2) Appellees' speech, and (3) evidence-free insinuations, without a bit of due diligence, is made plain. Appellants did no due diligence on these allegations from the media reports.

Appellee Kasun retained new counsel, the undersigned, about three weeks prior to trial. Trial in this matter took place in July 2024, and featured scant evidence on whether Appellees had intimidated voters in violation of Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b), or engaged in a conspiracy to intimidate voters in violation of the Support or Advocacy Clause of Section 2 of the Ku Klux Klan Act, 42 U.S.C. § 1985(3). Appellants at trial attempted to show that Appellees' involvement in creating manuals for grass-roots organizing, in facilitating canvassing done by fellow volunteers, and in various acts of speech, all within a free association of individuals, was somehow intimidating to voters. The district court did not admit some evidence pertaining to USEIP, including statements made by unidentified persons or bots in USEIP's internal message system, photographs and affidavits from canvassers not shown to have any agency relationship with Appellees, and a video of a speech by Appellee Shawn Smith that was delivered months after the canvassing and whose contents were disclosed, in their entirety, at trial. At the close of Appellants' case, the court granted Appellees'

motion for judgment on partial findings under Rule 52(c) of the Federal Rules of

Civil Procedure. App. 122.

# SUMMARY OF THE ARGUMENT

Appellants' case has always been an attempt to stop Appellees' speech, and they have consistently tried to sidestep the clear barrier of the First Amendment through a magical invocation of "context", under the Voting Rights Act. But what Appellants complain of is the purely lawfare concern of unidentified voters' imaginary discomfort with their interpretation of a series of words – words Appellants have littered like so much rhetorical confetti before two courts now.

"January 6 insurrection," Appellants whisper.[7] "Election denialists," they add. Now Appellants are on a roll. And they've read the anti-intimidation case law. Like a grade-schooler in a xylophone recital, they dutifully hit on all the notes, never mind the lack of evidence available, at the time they filed their overheated Complaint or now. Their grievance from the start was based entirely on media reports, as we can see from the Memo ISO TRO.

This Court should affirm the district court for the following reasons. **First**, Appellants appear to have manufactured standing through their premature overreactions to media reports they did nothing to verify. **Second**, dismissal of the free association USEIP as a defendant, given (a) the weakness of the alleged "facts"

---

[7] Beginning with their Complaint, Appellants have tried to paint Appellees with a fuzzy responsibility for the January 6 insurrection. At trial, Appellants diligently elicited that Appellee Smith had traveled to Washington, D.C. for January 6, SA 134-35, and that Appellees Epp and Kasun traveled to DC and attended the outgoing president's speech. SA 205.

that could have been introduced through USEIP and (b) Appellants' failure to connect the acts of USEIP members to any Defendant by virtue of agency or conspiracy, was, if error, harmless error. ***Third***, the district court's exclusion of a video of a 1-minute speech by Appellee Shawn Smith was within the court's discretion, particularly because the speech took place months after the allegedly intimidating canvassing (App. 212) and every single element of Smith's speech was before the court and the video would have been cumulative. ***Fourth***, the district court properly found that Appellees' various forms of speech did not constitute objective intimidation of any voter. Moreover, Appellants cannot enjoin pure speech, per *Counterman v. Colorado*, 600 U. S. 66 (2023), without showing a *mens rea* on the part of Appellees (at least recklessness) that Appellants never pled and entirely ignored at trial. ***Fifth***, the district court did not apply the wrong legal standard for intimidation in voting, except to the extent it did not discuss the additional hurdles *Counterman* poses to restrictions on speech.

## Argument

### I. Appellants Cannot Establish Standing Arising from Premature Overreactions to Unverified Media Reports and the Speech of Persons Not Credibly Alleged to be Agents of Appellees

The district court elected not to review its prior conclusions on standing. App. 219. But Appellees believe it is important to note that Appellants based their choice to "divert resources" against Appellees not on actual evidence about Appellees but entirely on (1) unverified media reports about Appellees' speech and (2) unverified media reports of internal USEIP messages that were not known or intended to be known to voters, by third parties not shown to be agents of Appellees. Appellants cannot manufacture standing in this way. This Court recently held that "any party, including the court *sua sponte*, can raise the issue of standing for the first time at any stage of the litigation, including on appeal." *Defenders of Wildlife v. Everson*, 984 F.3d 918 (10th Cir. 2020). "This Court reviews *de novo* a district court's decision as to standing." *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007).

An organization cannot establish standing by diverting resources based on speculative fears. *City of S. Miami v. Governor of Fla.*, 65 F.4th 631 (11th Cir. 2023). Where a "hypothetical future harm" is not "certainly impending," Appellants "cannot manufacture standing merely by inflicting harm on themselves. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Here, when Appellants diverted their resources in the fall of 2021 and filed their Complaint in March 2022, Appellants

had no evidence of any harm *from Appellees* that was "certainly impending". Crucially, Appellants presented no evidence at trial, or in their Appendix, that would support standing here. What Appellants did have, and overreacted to, was hearsay reports in the media that they did nothing to verify – the very definition of self-inflicted harm.

### A. Appellants Diverted Resources in Response Not to Actual Evidence of Intimidation but to Media Reports and "Misinformation"

All three Appellants based their diversion of resources on media reports collected by the League of Women Voters. When asked why the League filed a lawsuit against Appellees, the Executive Director, Beth Hendrix stated, "We didn't like the media reports coming out saying that voters were intimidated". SA 259. By whom? By USEIP canvassers. *Id*. The League learned about USEIP's voter verification canvassing project from media reports. SA 254, 271. It was solely through media reports that the League believed Kasun, Epp, and Smith were cofounders of USEIP. SA 253.

It was media reports that told the League that USEIP (not Appellees) was sending canvassers who were sometimes armed to interrogate voters about their voting record. SA 269. Indeed, the League had no evidence, "outside of" the imaginary evidence in the Playbook, SA 273, that any USEIP member or agent of Appellees carried a weapon. SA 273. Ms. Hendrix admitted that "outside of the playbook", no one provided the League with evidence that a canvasser was armed.

SA 281. Indeed, only media reports implied any USEIP canvasser was allegedly "openly armed", aside from alleged "eyewitness" accounts by witnesses Ms. Hendrix did not talk to and didn't "know that anyone did." SA 269.

Ms. Hendrix believed USEIP's "County and Local Organizing Playbook," made available to fellow organizers in late August 2021 (and not contributed to by Kasun or Smith) constituted evidence a USEIP volunteer was armed. Why did she believe this? Because in the Playbook, she believed, "they discussed security and how they were planning to line up people with people who carried." SA 269. Yet on the stand, using Appellants' own Exhibit 1, Ms. Hendrix could not find any statements about weapons in the USEIP Playbook. SA 274; *cf.* App. 226.

The allegedly "aggressive" questioning the League believed in was based on media reports. SA 278. The League believed, based on media reports, that volunteers "were at times intimidating". SA 280. The League got no information about Appellee Kasun "that did not come from [a] media report". SA 267. The League concluded based on media reports that USEIP was "associated" with Q-Anon, SA 294, and though Ms. Hendrix admitted she didn't know what it meant to be so "associated", *id.*, the "association" was dutifully inserted into the Complaint. App. at 22, 28.

Nevertheless, on September 4, 8, and 10, 2021, the League began its diversion of resources, sending alarmist emails to the League's "distro list asking people to

please contact [her] if they had received a visit by USEIP canvassers". SA 256, 296-97. The emails stated, "They [USEIP] have volunteers in Colorado who are going door to door in an attempt to find evidence of voter fraud. These actions may be intimidating to voters ..." SA2 305. Ms. Hendrix didn't think it was alarmist to tell thousands of subscribers, three times, that USEIP was intimidating them. Why? Because, she said, the claim was "based on media reports." SA 286. That is no basis for reacting to divert resources to manufacture standing. Similarly, Appellants, having come to believe their own email campaigns' cries about the wolf of "intimidation", claimed they were "forced" to "ensure that *voters of color* can vote." SA 36 (emphasis added); *see also* SA 43, 45 n.3, 57 (complaining Appellants were "forced" to divert resources). But Appellants never had even a good faith belief that the canvassers, working from *state-provided voter rolls that lacked any information about voters' race*, targeted geographies where they somehow knew minorities resided.

Moreover, Appellants diverted resources not due to evidence of *intimidation* but because they believed USEIP was "spreading misinformation". SA 255. Specifically, the League "upped our programming around recognition of mis-, dis-, and mal information" and, *in response*, "published a white paper on the safety and security of Colorado's election system." SA 258, 265. But speech aimed at

correcting mere "misinformation" is clearly just counter-speech, not a response to actionable intimidation.[8]

### B. Appellants Did No Due Diligence on the Media Reports Before Diverting Resources in Response

Appellants performed no due diligence on the allegations contained in the media reports. Ms. Hendrix testified that the League recognizes misinformation by using "[c]ritical thinking skills, doing backup research if you have questions, looking at sources." SA 298. The League and its co-plaintiffs employed none of these measures before filing their Complaint. None of them performed "an investigation of the claims that social media and media reports were making" about Appellees, aside from the emails Ms. Hendrix sent to the League's distribution list. SA 284, SA2 305.

Ms. Hendrix's own efforts, on behalf of the League, to learn more about USEIP consisted of Google searches. SA 254. Those efforts yielded "lots of media reports." SA 254. Appellants did not exchange information beyond headlines and they did no due diligence with one another. Ms. Hendrix didn't speak to Appellant Colorado Montana Wyoming State Area Conference of the NAACP ("NAACP") at

---

[8] Ms. Hendrix claimed it was "[b]ecause of the violent rhetoric that has been used in relation with USEIP" that in the fall of 2021 the League drafted the "safety plan for staff, board, and membership." SA 257. What violent rhetoric? Mr. Smith's alleged "[c]alling for public hanging," *id.*, in a speech did not take place until February 2022, and that was followed by no diversion of resources other than the Complaint.

all before filing the complaint. SA 294. She didn't recall the League sending the NAACP any evidence to back up the complaint. *Id*. She didn't recall if the NAACP sent her any evidence. SA 294-95. Appellant Mi Familia Vota ("MFV") sent the League no evidence to support the complaint that she could recall. SA 295. She didn't provide them with any newspaper articles or other information other than saying, in essence, "Hey, this litigation is coming down, and we're trying to get some people together." SA 264. "And they all went along with it." SA 264.

Appellant MFV learned about USEIP and its allegedly intimidating actions solely through a phone call with the League's Beth Hendrix. Executive Director Salvador Hernandez had no "other sources", SA 116-17 ("Beth called me and told me about this group that was going door to door, and that's basically how I learned about it"), SA 122-23 ("we didn't hear from anyone else"). "[Other than the USEIP website] the only information I got regarding USEIP was Ms. Hendrix's claims." SA 122. He didn't even know how she knew the information, SA 117, and he did no verification beyond going to USEIP's website, SA 117, 121-23 ("I think I Googled . . . I didn't find, like, much . . . Just, like the mission . . . I don't think there was much in there that I saw, what they're doing"). MFV didn't even receive the articles on which the League relied. SA 122. Ms. Hendrix was the sole source of how MFV "heard" about USEIP members allegedly being armed. SA 120. It was Ms. Hendrix who concluded for Mr. Hernandez that the canvassing visits were intimidating. SA

116-17. Thus, based on his phone discussion with Ms. Hendrix, his Googling, his visit to the USEIP website, and his discussions with the MFV national team, MFV "decided . . . to join this lawsuit." SA 123.

Similarly, in her deposition, Ms. Prescott, of the NAACP chapter, repeatedly said "I don't recall" about any grounds for either standing or intimidation, including who made an alleged complaint about USEIP, SA 79, when it came in or whether it was documented, SA 80, who was designated within NAACP to review complaints, SA 82, what documents about complaints were turned over to her attorneys, SA 85, how she knew USEIP was intimidating voters, SA 86, or how she knew USEIP was "going door to door … 'looking for fraud'", SA 86-87, but she agreed that she "never reviewed any complaint from a member or a non-member of the [NAACP] regarding [USEIP]." SA 82.

Appellants did no independent investigation about the media reports before sending their emails to members, diverting resources, and filing the Complaint and TRO. None. As just a partial example of Appellants' confirmation bias and rush to judgment about "insurrectionists," "election denialists," and "vigilantes," the League did not ask for the sources of the Colorado Times Recorder's Maulbetsch, who wrote the bulk of the articles the League relied upon in the Complaint and Motion ISO TRO. SA 260 (Hendrix admitting she did not ask for sources, nor for leads on people who were intimidated), SA 262 (Hendrix admitting that Maulbetsch

did not identify any voters who were allegedly intimidating or turn over any sources). Mr. Maulbetsch did not send any evidence to her. Rather, she "relied on his news articles". SA 106. She didn't recall if he told her he had personally witnessed USEIP interrogating any resident. SA 97. He didn't tell her where the USEIP members had supposedly canvassed. *Id*. Hendrix believed, without any reason to do so, that Maulbetsch was "an investigative journalist". SA 261. She didn't know if he took contemporaneous notes of his discussions with residents. She didn't see his notes. SA 291.

Ms. Hendrix, who captained the League's diversion of resources due to media reports, didn't know if the Colorado Times Recorder was an actual news organization or just a personal blog. SA 288. The League took no steps to confirm that it was a legitimate media outlet. SA 288. She didn't know if the Recorder employed fact-checkers, SA 288, or whether it required reporters to be trained journalists, or to adhere to any journalistic ethics. SA 288. She spoke to Mr. Maulbetsch but didn't recall him telling her what evidence of voter intimidation he had, SA 290, or that he had personally witnessed any USEIP canvassers interrogating residents. SA 291. She didn't know if the media making the reports Appellants relied upon were present at the canvassing. SA 270. She didn't believe they said they were. SA 270. She didn't even recall if Maulbetsch told her where USEIP had canvassed. SA 291. The League did not investigate any of the

information in the media reports and the Playbook to confirm whether the information was true. SA 275.

Ms. Hendrix found the media reports credible because they were "backing up reports made by other media outlets." SA 289. But she couldn't say whether it was possible the media outlets were simply reporting on what one another had reported, nor whether the media were doing any original journalism. SA 289. No matter. She thought "the fact that several journalists reported several facts made it more likely those facts were true." SA 292. It did not occur to her that later media reports could have simply gotten their information from the earlier reports. SA 292-93. It was simply her "impression" that she was reading "original journalism." SA 289. As noted above, Appellants made clear in their Memo for a TRO that it was on the shaky foundation of these articles' reports that "Plaintiffs have been forced to redirect their resources to address USEIP's ongoing voter intimidation campaign." SA 43. To react to such hearsay reports without verifying anything in them is to manufacture standing.

### C. Appellants Filed Suit Against Appellees Without Evidence that USEIP Volunteers Allegedly Referring to Weapons and Canvassing Were Appellees' Agents

Much of Appellants' purported evidence against Appellees wasn't about Appellees at all. Appellants never produced any evidence that volunteers who canvassed with USEIP or made comments about security and weapons in chat rooms

were agents of Appellees. But without being able to tie these actors to Appellees, what harm from Appellees was "certainly impending"? The district court pointed out "as of yet you don't have any evidence that [Appellees] did anything with canvassing." SA 222-23. "You have two [Appellees] so far [Epp and Smith] saying they have nothing to do with canvassing, that it was run by the counties on their own, that what they did was post a resource site essentially and encouraged them to get data and use the Colorado Secretary of State. You don't have any organized canvassing effort by these three individuals or this association[9] yet." SA 224. As late as trial, Ms. Hendrix didn't know if any of the alleged victims of the canvass had even dealt with any representatives of USEIP. SA 263.

Under Colorado law, an agency relationship can be established by the conduct of the parties, even in the absence of an express agreement. Factors to consider in determining an agency relationship include the control a principal exercises over the agent, the agent's reasonable belief that the principal wishes the agent to act on its behalf, and the extent to which the agent is acting within the scope of its authority. See 2 SAMUEL WILLISTON, WILLISTON ON CONTRACTS § 308, at 450-51 (3d ed. 1959) (stating that each member of an unincorporated nonprofit association

---

[9] It's worth noting the district court stating it perceived no evidence of agency between the canvassers and the association USEIP. In short, the court saw no reason to attribute to USEIP (and thus to Appellants) any responsibility for canvassing done by its members, whether in or out of Mesa County.

is "liable only so far as he has personally assented to the transaction in question"); *Moses v. the Diocese of Colorado*, 863 P.2d 310, 324 (Colo. 1993). Appellants provided no such evidence at any stage of the proceedings.

Ms. Kasun's attorneys did ask for such evidence at trial, revealing the League had no evidence of any agreement a canvasser had to act on Defendant Kasun's behalf. SA 279. Ms. Hendrix had no idea if Ms. Kasun could terminate anyone at USEIP, whether she supervised others' work, whether she trained anyone at USEIP ("I would assume so"), or whether she asked any canvassed residents to confirm their address. *Id*. 268.[10]

The League's evidence that Appellees like Ms. Kasun exercised managerial control consisted entirely of the fact that "she's a cofounder." SA 267. Ms. Hendrix assumed that as a cofounder of the unincorporated USEIP association "there was some oversight". SA 271, 272 (similar). Based solely on the fact that Appellees were believed to be cofounders of USEIP, the League "believed" the USEIP had a command-and-control structure in which there were "people above other people telling them what to do and having control over their work" on the basis of "they called themselves cofounders." SA 266. Appellants neither alleged nor presented

---

[10] Nor whether Ms. Kasun had asked any voter a question, whether she asked any residents about their participation in the 2020 election, or whether she asked about their method of voting. SA 268

23

evidence Appellees told anyone within USEIP what to do or had control over their work.

## D. The district court did not err in refusing to join in Appellants' rank speculation.

Appellants argue that the district court should have inferred that the canvassers were agents of USEIP because of:

(1) "the playbook itself, which mentions Mesa County extensively"
(2) "defendant Smith's testimony that USEIP had a Mesa County captain"
(3) "Roberts's description of the canvassers' behavior, which mirrored the instructions in USEIP's training materials"

Aplt. Brf. (Doc 42) at 50 n.6.

We address these leaps of logic in turn.

## 1. A Community Organizing Playbook's Mention of "Mesa County" Means Nothing About USEIP Canvassing or Agency

First, the fact that a document intended for county organizers in Colorado mentions a county in Colorado says nothing whatsoever about whether the canvassers were agents of the playbook's author, Ms. Epp, or of the other Appellees, or that county was ever one of the few canvassed by USEIP and its agents. Indeed, testimony at trial established that only ten of Colorado's 64 counties were ever canvassed by USEIP. SA 233 (Epp).

Moreover, the playbook wasn't even about canvassing. It was a manual for community organizers. Ms. Epp stated without contradiction "[t]he playbook itself was not recruiting people to canvassing. The playbook was tips and tricks and

knowledge sharing for organizing." SA 215. Evidence at trial also established that the playbook was disseminated in "late August 2021", SA 209, well after the Mesa County canvassing.

The playbook's mentions of Mesa County were also explained by Ms. Epp. "The reason Mesa County is in the playbook is because some members of [another activist group working in Colorado] were at the [August 2021] cyber symposium [in South Dakota]". SA 211. Representatives from other Colorado counties were at the symposium, "[a]nd then there was like eight people from Mesa County, and [the playbook] was coming from Colorado, and they were there in the room, and it felt weird not to include them. So … that's why Mesa County is in the playbook at all." *Id*. Nothing favors Appellants' desired inference.

## 2. That USEIP Had a "Captain" in Mesa County Says Nothing About Canvassing or Agency

USEIP had captains in many of Colorado's 64 counties. That does not change the fact that USEIP canvassed only about 10 counties. Clearly, having a captain in a county was no guarantee of any canvassing activity. In fact, the odds were against it. Moreover, testimony showed the "captain" for Mesa County was not a title bestowed "for the purpose of USEIP's canvassing mission." SA 202. Ms. Epp agreed "these captains around the state didn't necessarily engage or coordinate voter canvassing as relates to USEIP." SA 228.

Ms. Epp's testimony established it would *not* be accurate to say "the majority of volunteers . . . during this April to October 2021 time period [were] involved in USEIP's canvassing as compared to other activities". SA 234. Why? "Because there's 64 counties and people working in all of them, and less than ten counties were canvass[ed by USEIP volunteers]. Canvassing was one aspect of what USEIP was doing." *Id*. She added, "I would not say [canvassing] was USEIP's main focus." *Id*.

For similar reasons, the fact that an association had county "captains" to promote many types of election-related efforts, which extended well beyond canvassing alone, fails to provide even circumstantial evidence that the Mesa County USEIP captain canvassed in Mesa County. *See* SA 198-99 (Smith stating "USEIP wasn't just about canvassing"); *id*. at 212 (Epp testifying "there were teams in ... some counties ... that were focused on canvassing, as well as other things"); 217 (Epp mentioning "USEIP, which is significantly greater than just canvassing. Canvassing was one activity that was taken by groups of people around the state"). Indeed, testimony established that USEIP activities extended to:

- rallies
- engagement with county clerks
- briefings
- meetings with public officials
- discussing audits
- hosting marches
- hosting events
- speaking at events
- giving presentations

- research
- legislative endeavors

SA 198-99; 213-14; 217.

Consistent with the operations of a free association of members, captains did their own thing, further evidence against their being agents of Appellees. As Smith explained, "the intent always was for the county captains to tailor whatever tools [like the playbook] to what they had chosen to do and their circumstances, and that's what happened. In fact, there was a lot of experimentation with what forms they would have used and things like -- so much I didn't like, but they ended up adopting anyway. So the intent was to provide them with the tool, but with the understanding they were their own county, and they were going to tailor it to however they wanted to do it." SA 149.

### 3. Unspecified Similarities in Canvassing Methods Signify Nothing

Finally, the fact that canvassers with similar goals, who speak with each other and share information, allegedly behave similarly in their canvass is of little weight. Appellants don't even identify the similarities for us, so there is no way to assess the relevance. In any event, Mr. Smith testified without contradiction that Mesa County's organization and USEIP shared canvassing methods but did their own thing. And the district court was within its discretion to credit his testimony that USEIP didn't canvass in Mesa County:

We realized that they [a group getting ready to do voter verification in Mesa County] ... were wanting to do some of the same kinds of things, and so we were sharing information back and forth. And one of their individuals in that group was USEIP's county captain for Mesa, but they began their voter verification using different procedures and a different data set. They were using an app called Sidekick or something like that, and they used county data. We never used county data. We only used Secretary of State data. So they never got our data and canvassed with our data, and it wasn't USEIP people doing it, although we were in contact with the people who were organizing it."

SA 155.

As Mr. Smith explained without contrary evidence from Appellants, the allegedly similar methods employed by Mesa County's canvassers and USEIP's canvassers — including, most crucially, the question the canvassers asked — were not sufficiently similar as to allow USEIP to use the data Mesa County's canvassers generated. In other words, though the whole reason for USEIP's canvassing was data, Mesa County's data was useless to, and not used by, USEIP. Smith stated, "I know when [the Mesa County canvassers] began their canvassing, they weren't using [USEIP's training materials], and . . . at the end we couldn't use their data because they had not asked the same questions or used the same dataset [from the Secretary of State] to begin with . . ." SA 127-28; *see also id*. 200. In short, there's no evidence to make either USEIP's or Mesa County's canvassers agents of Appellees.

## II. The Evidence Relating to USEIP Was Irrelevant and Excluding it Harmless Error

Appellants argue that the district court's "assumption [that USEIP could not be sued] was ... prejudicial" because the district court refused to admit (1) evidence of "USEIP's internal message board discussing the use of weapons during canvassing efforts and the targeting of minority communities" and (2) "USEIP's discovery responses and organizational deposition." Aplt. Brf. at 38. The first problem here is Appellants' failure to allege, let alone establish, any agency relationship between any of the Appellees and the unidentified authors of the USEIP messages. The identity and intentions of the account holder of the messages are the *sine qua nons* of understanding whether an agency relationship exists with Appellees. But at no point did Appellants establish that the mention of weapons was authored by an identified human being, as opposed to the bots ubiquitous in digital spaces, or an infiltrator like the journalist Maulbetsch. They simply assumed it. Appellants also failed to make any headway in establishing a conspiracy between and among the Appellees and other USEIP members.

Second, as Appellants recognize, USEIP's message board was "internal". Smith stated "probably" no one outside of USEIP would have ever seen those messages if the journalist Maulbetsch had not infiltrated USEIP and published its messages. SA 193. Appellants fail to explain how Appellants could have violated anti-intimidation laws through the private messages of third parties.

Third, several witnesses testified without contradiction that the mention of security in the USEIP chatroom's internal messages was about the canvassers' safety, and not about threatening voters. SA 36-38, 40, 151, SA2 303; *see also* App. 256 (Voter Verification "Safety" slide). As for the USEIP discovery, Appellants have provided no indication what the desired discovery consists of or how it would have been probative. It cannot be considered here.

## III. The Video of Defendant Smith's Speech Regarding Election Fraud Was Irrelevant, Added Nothing to His Testimony, and Would Have Been Cumulative.

Appellants state that "[w]ithout the video [of Shawn Smith's 60 seconds of off-the-cuffs remarks], evidence of the defendant's chilling statement and the crowd's enthusiastic response came in only through the defendant's own sanitized testimony and his attorney's inaccurate and self-serving representations about the video." Aplt. Brf. at 45. But the video was not relevant; every last one of the key elements of Mr. Smith's speech was in evidence; and the video's inclusion would have been cumulative. Its exclusion was thus not error.

### A. Defendant Smith's Speech was Not Relevant to the Canvassing

The video of Mr. Smith's speech about election fraud by public officials, recorded in February 2022, months after USEIP's volunteers' canvassing had ended in 2021, was not relevant to the "context" of canvassed voters' interpretation of the earlier canvassing. The USEIP canvassing began in April 2021, SA 231, and was

finished by August 2021. SA 189-90; App. 210. In short, any speech delivered in February 2022 cannot serve as "context" for voters canvassed in 2021.

Second, the speech was irrelevant to voters because it was not directed at a voter but, rather, at election officials. As Chief Judge Brimmer wrote in his order denying Appellants' motion for a TRO:

> plaintiffs state that members of USEIP "continue to impliedly and explicitly threaten violence against individuals whom they allege were involved in election fraud – in other words, people involved in the election of candidates opposed by USEIP." [Docket No. 6] at 5. Plaintiffs, however, do not assert that "people involved in the election of candidates" includes voters or members of the plaintiff organizations. See *id*. Rather, plaintiffs refer to death threats that Mr. Smith allegedly made to Colorado Secretary of State Jena Griswold. *Id*.

SA 68-69.

Chief Judge Brimmer concluded that "Alleged threats to Secretary Griswold are not relevant to the purported harms that plaintiffs face." *Id*.

## B. Because the Entire Content of Smith's Speech Was in Evidence Before the Court, the Video Was Unnecessary and Would Have Been Cumulative

Appellants do not explain what the video of Smith's remarks would have added to the district court's knowledge. Appellants drew out at trial the entire content of Smith's remarks, as we show below.

| Speech from Video (Ex. 8) | Testimony at Trial |
|---|---|
| "I will also say I have in my possession ... evidence of criminal conduct by the Secretary of State and her staff, with respect to our voting." | "I specifically said I have in my possession evidence of violations of election law by Secretary of State Griswold …" SA 167-68 |
| | Q: Isn't it true at this event you stated publicly that you have in your possession evidence of criminal conduct by the Secretary of State and her staff?" SA 165; *see also* SA 164 |
| "I'm for due process. I am. And, uh, and, you know, justice. | "I stated I am in favor of due process. And I stated that I believe that anybody who is involved in election fraud -- not voter fraud -- election fraud deserves to hang. |
| And I think, uh, you know, if you [sic] involved in election fraud, then you deserve to hang." | "And I said that because if you're involved in election fraud, then you are usurping the will and consent of the |

| | people, and that is an act of treason, and there are punishments under federal statute for treason, which have been enacted by the federal government. Hanging is one of the methods of execution when treason has been found in a court of law through due process." SA 167-68. |
|---|---|
| "Sometimes the old ways are the best ways.  I was accused of endorsing violence.<br><br>I'm not endorsing violence. I'm saying once you put your hand on a hot stove, you get burned. And you ought to see it coming. And that's what happens to tyrants." | Q: "[I]s it true that you also stated sometimes the old ways are the best ways?"<br>A: "That's correct."<br>SA 169<br>"I stated I've been accused of advocating violence. I'm not advocating violence."<br>SA 167-68 |
| "So anyway, I'm going to be filing that evidence with an affidavit with district attorneys and the attorney general." | "I specifically said I have in my possession evidence of violations of election law by Secretary of State |

| | Griswold, which I did and which I provided to the Colorado Attorney General under sworn affidavit, my own sworn affidavit."<br>SA 166. |
|---|---|

It's all right there. Everything Appellants wanted to get in evidence about Smith's alleged threats was before the district court. Tellingly, Appellants have identified no part of Smith's statement, as captured on the video, that would add to or contradict Smith's own recollection, on the stand, of what he said. So the video was clearly cumulative. *See* Fed.R.Evid. 403 (testimony is properly excluded where it amounts to "needless presentation of cumulative evidence"); *Young v. Workman*, 383 F.3d 1233, 1238 (10th Cir. 2004) (holding district court's exclusion of evidence would not have been "anything more than cumulative"); *U.S. v. Solomon*, 399 F.3d 1231, 1239-40 (10th Cir. 2005) (affirming district court did not abuse its discretion in excluding cumulative photographs). The district court here, trying to manage a deluge of largely irrelevant testimony, made the right call.

IV.  **The District Court's Finding that the Canvassers of Ms. Roberts "Engaged in no Conduct that Could be Objectively Considered Intimidating" Was Not Error**

A. **The district court did not err in failing to perceive a connection between the canvassing of Ms. Roberts and the USEIP, let alone Appellees.**

There is no evidence in the record that any of the Appellees or their agents were among the unidentified canvassers who engaged with witness Yvette Roberts in Mesa County. Substantial evidence was presented showing Roberts' canvassers were not affiliated with USEIP in the first place. First, immediately after her canvassing, Ms. Roberts' contemporaneous report pointed away from USEIP. In an email complaint to the Secretary of State dated June 23, 2021, she stated the canvassers wore "homemade badges" saying "Colorado Election .... something or other." App. 218. At trial, she said, "I didn't know which organization it was." SA 246. "They didn't say they were with anybody." SA 244. "[T]here was some kind of a name like investigation or inquiry or something of that, which I didn't think that I needed to remember." SA 235. She admitted she had "no personal knowledge that the people that came to [her] door, that canvassed at [her] door June 23rd, 2021, were associated, affiliated with in any way USEIP." SA 252.

Thus, only in her Declaration of December 2022, written for her by Appellants' counsel, did Ms. Roberts claim, with borrowed confidence, that the canvassers were with the USEIP. SA 248-49. She admitted she first learned the name United States Election Integrity Plan in her "encounters" with the Appellants'

organization's "lead counsel". SA 246. And it was that same lead counsel who, she said, "confirmed for [her] that it was USEIP canvassers who had visited [her] home." SA 246. In short, the district court did not err in finding Appellants had failed to connect USEIP (to say nothing of Appellees) to Ms. Roberts' canvass.

## B. The district court heard credible evidence that USEIP did not canvass in Mesa County in June 2021.

Meanwhile, the district court was well within its discretion to conclude that Appellees' testimony that USEIP never canvassed Mesa County was more credible.[11] Smith stated, "USEIP never canvassed in Mesa County, not a single door." SA 154. Appellee Epp testified without contradiction that she did not canvass in Mesa County. SA 227. The district court credited this testimony. App. 211, 212.

---

[11] The district court could also have concluded that Ms. Roberts' testimony, like the December 2022 Declaration on which she'd apparently been guided by an attorney of Appellants, was so inconsistent with the initial complaint she filed immediately after the visit that it rendered her testimony of minimal evidentiary value.

Ms. Roberts admitted that in her contemporaneous email complaint to the Secretary of State she did not mention that the canvassers had asked (1) if she was a resident of Colorado, (2) if she was a registered voter, or (3) who else was in the house, SA 245, and (4) she did not report that a canvasser had allegedly mentioned the Republican Party. SA 251. She recalled all these facts only after exposure to Appellants' counsel 18 months later, when she signed the summary-judgment-defeating Declaration that Appellants' counsel prepared for her. App. 217 (noting court denied Defendants' motion "based almost exclusively on the affidavit provided by Ms. Roberts"). At trial, the district court heard that Ms. Roberts did not write her Declaration herself. Appellants' counsel did. SA 249. The district court was within its discretion to find Ms. Roberts' testimony inconsistent, compromised, and not probative.

Indeed, Ms. Roberts' inability to tie her canvassers even to USEIP, let alone any Appellee, is so clear that Appellants have resorted to trying to create an inference that the source of the voter rolls her canvassers used somehow implicates only USEIP. Aplt. Brf. at 50 n.6. But the district court was entitled to credit that in Ms. Roberts' contemporaneous emailed complaint to the Secretary of State, Ms. Roberts said the canvassers had a copy of the "*Mesa County* registered voter roll." App. 293 (emphasis added). Appellants also try to press an inference about the canvassers' use of the playbook, Aplt. Brf. at 50 n.6, but the playbook was first available in late August 2021, well after the canvass of Ms. Roberts in June. Time travel cannot save Appellants' attempt to place USEIP on the scene.

### C. The district court did not err in finding that Ms. Roberts (or any other canvassed resident) was not objectively intimidated.

Appellants perceive error in the lower court's finding that Ms. Roberts was not intimidated by her unidentified canvassers under an objective standard. In Appellants' view, the unidentified canvassers were objectively intimidating because:

1. They appeared over seven months after a "violent insurrection"
2. They had "badges" aka nametags
3. They said they had information from the State.
4. They knew Roberts's name and voting history.
5. They questioned Roberts about her citizenship and right to vote
6. They weren't encyclopedia salesmen.

Aplt. Brf. at 46.

First and foremost, not one of these facts pertains to an Appellee, or even to USEIP. Second, the "insurrection," in particular, took place over six months before Ms. Roberts' canvass and over 1900 miles (or 701 hours' walk by canvassers) away, according to Google Maps[12], while Ms. Roberts believed the canvassers looked like "local people". SA 243.

Third, the lower court could well have found Roberts' testimony about "homemade" "supply store" "badges" was not credible, and therefore neither was her testimony about intimidation. Name tags are not inherently intimidating. They are, in fact, what we expect to see on canvassers and encyclopedia salesmen alike. Indeed, had the canvassers failed to bear any identification, Appellants would surely be arguing that canvassers who fail to identify themselves are inherently intimidating.

Fourth, the district court also did not err in perceiving no reasonable intimidation in the allegation that the canvassers "had information from the State" that was publicly available, including the State-provided information of Ms.

---

[12] *See* https://www.google.com/maps/dir/Grand+Junction,+Colorado/United+States+Capitol,+Washington,+DC+20004/@37.8577338,-114.0089256,4z/data=!3m1!4b1!4m14!4m13!1m5!1m1!1s0x8746d6e322e77057:0xcc63f451cebf7c56!2m2!1d-108.5506486!2d39.0638705!1m5!1m1!1s0x89b7b82921a2cf17:0x482a3f7c10cf8c4!2m2!1d-77.0090505!2d38.8899389!3e2?entry=ttu&g_ep=EgoyMDI0MTIxMS4wIKXMDSoASAFQAw%3D%3D (accessed December 20, 2024).

Roberts' name and voting history. Even if Appellants had successfully tied the canvassers to USEIP, and USEIP to Appellees, the record is clear that USEIP volunteers were encouraged to ask not for whom a canvassed voter had voted but "*whether* they voted in the 2020 election." SA 197 (emphasis added); *see also* App. 259. Appellants' counsel asked Mr. Smith, "Were any questions asked about their - - the voters' future intention, whether they planned to vote again?" SA 197. Smith answered, "No, we didn't care," without contradiction from Appellants. *Id*.

There is no reason to think having such information is inherently intimidating, particularly when such information is both public and traditionally used by canvassers. On its website, the Colorado Secretary of State makes clear that voter records are public records, and that those public records include voters' names and whether they have voted in prior elections, among other information:

Q3: What information in my voter record is considered a "public record"?

A3: Several pieces of information in your voter record are considered a "public record." The Secretary of State is required by law to provide this information to any member of the public who requests it. This information includes, your full name, residential address, political party affiliation and date of affiliation, phone number (if provided by the voter), gender identity (if provided by the voter), birth year, and information about whether you have voted in prior elections.

*See*

https://www.sos.state.co.us/pubs/elections/FAQs/VoterRegistrationData.html

(accessed November 18, 2024).

On the subject of the questions the canvassers asked and who wrote the script, the district court was within its discretion to credit the testimony of the Appellees, and the documents that canvassers were given as suggestions. Referring to the USEIP Voter Verification training guide, App. 243-263, Appellants elicited the following testimony from Mr. Smith:

> A: ... there was a script that the county captains developed, and so they would kind of follow that script. You know, Hi, this is who I am. This is what I'm doing. Are you this person? I'm a volunteer trying to verify this information. Is this information accurate?
>
> Q. And then you would proceed, per Section 6F, to confirm the address, whether the person was an eligible voter, whether they were a registered voter, whether they voted in the last election, and by what method?
> A. That's correct.

SA 162; 181-87.

Returning to Ms. Roberts, she testified that she was "stressed" and felt "an intimidation factor" as a result of the mere presence, and height, of the man who canvassed her – a "context" that Appellees would agree is relevant to whatever reasonable intimidation she could have felt from the man's words alone. Ms. Roberts explained that being a short woman talking to a tall man "is a little stressful". SA 236. She said, "Any old lady who meets a strange man is gauging what that person might be capable of." SA 245. She answered questions from Appellants' counsel about whether she eventually became "concerned" by pointing out she was "a little old lady," and "always" in such cases "there is an intimidation factor." SA 240. In

short, it's entirely unclear how much of her discomfort had nothing to do with anything within the canvassers' control, including their speech and conduct. App. 218.

Ms. Roberts said she then answered several questions the man asked "that I felt made me comfortable." SA 237. "[T]he questions asked of her were not intimidating and not improper." SA 273. At some point, she thought, "gosh, this has gone on long enough, and I asked them both to leave. And there was some discussion this way and that, and I basically said I've had enough, please get off my property, you're trespassing." SA 237-38. And they left. The district court did not err in finding this lone encounter of speech not objectively intimidating, while Appellants failed entirely to establish the requisite *mens rea* on the part of the canvasser, let alone an Appellee, as discussed below.

### D. Even if Appellants Could Show Voters Were Objectively Intimidated by Appellees' Speech, They Have Failed the Necessary Showing of Appellees' Recklessness

Voter intimidation cannot be proven by such a low and vague bar as a voter's discomfort or annoyance, which is a more accurate term for what Appellants speculate voters experienced when unidentified third parties who were not agents of Appellees canvassed their homes. The difficulty with using such a loose, vague standard, based on parroting words from a statute, is not just that it invites witness coaching, but that it makes the speaker's *mens rea* irrelevant. Under *Counterman v.*

*Colorado*, that is no longer permissible. Appellants presented no evidence tending to show any Appellee believed what he or she was saying could be considered intimidating, and recklessly spoke anyway.

### 1. *Counterman* Governs Potentially Intimidating Speech

In *Counterman*, the defendant was charged under a Colorado statute making it unlawful to communicate with another person in "a manner that would cause a reasonable person to suffer serious emotional distress." The Court thus considered a statute employing the same objective "reasonable plaintiff" standard, without regard to the defendant's awareness or *mens rea*, that Appellants advance here. In *Counterman*, the plaintiff "never noticed" the defendant engaging in action beyond speech. 600 U. S. at 71 n.1. Thus, the charge against Counterman was based solely on his "speech". *Id*. The same is true here, except that Appellants are also trying to attribute the speech of unidentified canvassers and chat room accounts to Appellees.

### 2. A Person Accused of Intimidating Speech Cannot Be Liable Unless She is Aware of or Recklessly Disregards Her Speech's Impact

The defendant in *Counterman* argued that the First Amendment required that for him to be found liable for speech, his statements must not only be objectively threatening, but that he must have been aware of (or recklessly disregarded) their threatening nature. The Supreme Court agreed, balancing the competing rights at issue in favor of more speech and holding that a subjective standard for the alleged

perpetrator is still required lest legal action chill too much protected expression. *Id.* at 75, 78, 80.

Thus, the Supreme Court held that in cases of speech alleged to be problematic, the minimum required *mens rea* is recklessness—i.e., that a person "consciously disregards a substantial and unjustifiable risk that the conduct will cause harm to another." *Id.* at 79 (citation omitted; cleaned up). "[R]ecklessness is morally culpable conduct, involving a deliberate decision to endanger another." *Id.* (citation omitted). "In the threats context, it means that a speaker is aware that others could regard his statements as threatening violence and delivers them anyway." *Id.* (citations omitted). In the voter intimidation context, it would mean that a defendant accused of intimidating speech was aware at the time of each act of speech that relevant voters could regard the speech as intimidating with respect to voting — and the defendant delivered it anyway.

While *Counterman* involved a criminal statute, the Supreme Court's reasoning was not limited to criminal cases. The Court's warnings against chilling speech clearly apply in the civil context. *See id.* at 75 ("Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries. A speaker may be unsure about the side of a line on which his speech falls. Or he may worry that the legal system will err, and count speech that is permissible as instead not"). Similarly, discussing incitement, the Court said, "the First Amendment precludes

punishment, *whether civil or criminal*, unless the speaker's words were 'intended' (not just likely) to produce imminent disorder." *Id*. at 76 (emphasis added).

Justice Barrett agreed, stating in her dissent that the *Counterman* "holding affects the civil consequences for true threats just as much as it restricts criminal liability." *Id*. at 118. In the Court's later denial of certiorari in the civil case of *Mckesson v. Doe,* 144 S.Ct. 913, 914 (2024), Justice Sotomayor, quoting the "whether civil or criminal" language above, encouraged lower courts in the case to "give full and fair consideration to arguments regarding *Counterman's* impact." In *Cider Riot LLC v. Patriot Prayer USA, LLC,* 544 P.3d 363, 381 (Or. Ct. App. 2024), an appellate court in Oregon applied *Counterman* in a civil First Amendment lawsuit to conclude that "the First Amendment does not allow for imposition of liability for speech or for protest organization based on a negligence standard." While the Court has said the standard for scienter should be high when a person is at risk of being punished criminally for speech that threatens violence, a civil defendant should have no less protection for pure political speech. This is especially true for speech that Appellants seek to penalize based on its content, such as speech alleging election fraud. *Brown v. Entertainment Merchants Assn.*, 564 U.S. 786, 799 (2011).

## V. The District Court Did Not Err in Refusing to Consider a Boundary-less "Context" in which the Challenged Acts Occurred.

Appellants argue that the district court should have considered "'all of the surrounding facts' that provide the context for the [canvassers'] questioning." Aplt. Brief at 49 (citing *United States v. McLeod*, 385 F.2d 734, 744 (5th Cir. 1967) and *Nat'l Coal. on Black Civil Participation v. Wohl*, 661 F. Supp. 3d 78, 113 (S.D.N.Y. 2023) (*Wohl III*). There are several problems with Appellants' reasoning. The first is that there is no evidence in the record that any voter knew each of the "surrounding facts" adduced by Appellants.

Second, Appellants cannot say what the district court did or did not "consider", though the court did make clear that it found the testimony of Appellants' historical-context witness, Professor Ellis, "helpful and insightful." App. 221. The court also considered the context of the cases Professor Ellis referred to in comparison to the context here. *Id*. Third, absent a showing of an agency relationship between Appellees and their co-equal, fellow USEIP volunteers*,* considering more surrounding facts of activities of USEIP members (nearly all to do with pure speech) cannot help Appellants.

### A. The "surrounding facts" of "context" advanced by Appellants are not probative

Appellants engaged in an exhaustive research effort to identify additional "surrounding facts", many of which arose elsewhere in the United States and related

to third parties, and most of which no voter is alleged to have known about. Because the fruits of all this research appear to have been known only to Appellants' lawyers, we call this "context" the Lawyers' Research. This court should refrain from establishing, in voting rights cases, an Omniscient Voter precedent that rewards Lawyers' Research by assuming that anything posted to a website or to social media was seen by all voters, or even a particular subset of them. Appellants' surrounding facts of context include:

| "Surrounding Fact" from Lawyers' Research | Response |
|---|---|
| What has variously been called the January 6 insurrection or riot (Aplt. Brf. at 52) | The event took place 7 months before the canvass of Ms. Roberts, over 1900 miles away, and about 9 months before USEIP's canvassing. |
| Some Americans, allegedly including Appellees, have expressed concern about election fraud, *id*. | This is pure political speech, and no Colorado voter is alleged to have heard of Appellees' speech. |
| "The defendants publicized a report on their canvassing efforts claiming to have found 'unexplained irregularities' in 5 to 11 percent of voters they contacted and suggesting that up to 12 | The report was a publication of pure political speech, not targeting any voter, and certainly not objectively intimidating. |

| | |
|---|---|
| percent of elections in 2020 'may be questionable.'" *Id.* at 53. | |
| Internal messages in USEIP chatrooms, *id.* at 24, 38. | There is no evidence these unauthenticated messages were authored by actual people associated with USEIP. Appellants failed to prove up the source of these messages, or that their authors were agents of Appellees.<br><br>There is also no evidence the messages were seen by a voter, let alone in a context that could have felt reasonably intimidating. |
| "contemporaneous media reports that the canvassers were armed," *id.* at 52 | This "context" speaks for itself: it consists of more media reports, not evidence, and there's no indication any voter was aware of it – outside of Appellants' own efforts to amplify Appellees' activities to broader |

| | audiences by sending alarmist emails built on assumptions. |
|---|---|
| "The defendants instructed canvassers to prepare affidavits for state and local law enforcement officials if the canvasser suspected wrongdoing after speaking with a voter." *Id*. at 52-53. | First, this is an allegation of pure speech. Second, Appellants presented no evidence of agency, or that canvassers acted at Appellees' direction. Third, there was no evidence any voter was aware of this "context". |

It is unclear how principles of due process comport with Appellants' attempt to attribute all of the information in the Lawyers' Research to the knowledge of any voter, not to mention the scienter, per *Counterman*, required of Appellees about the potential of the speech contained in the Lawyers' Research to cause intimidation.

## B. Appellants advance a boundless theory of context unmoored by time, location, agency, or party

No one should argue that context is thoroughly irrelevant in voting rights cases. The question is how closely connected that "context" should be to both the defendant and the allegedly affected voter. Appellants' theory requires virtually no connection: if the act or speech happened in the past, even if by other parties not before the court, it is fair game. If the act or speech was ever published, even if not by defendants, anywhere online, we must assume all voters not only saw it but shared

48

the same interpretation of it that Appellants do. The problems with this boundary-less approach are obvious.

Appellants emphasize two cases – *McLeod* and *Wohl* – that do contain judicious boundaries, and thus cannot bear the weight Appellants put on them. First, in both cases, the defendants did and said things, themselves, that the plaintiffs were able to prove, whereas Appellants here relied on vaporous allegations and inferences, many about third parties. *McLeod* and *Wohl* involved direct evidence about defendants. Appellants' speculation and confirmation bias about unidentified USEIP members do not even rise to the level of circumstantial evidence.

Second, the *McLeod* and *Wohl* courts placed boundaries around time, geography, parties, and the obviousness of the defendants' malign intent that acted as boundaries for the reasonableness of voters' feelings of intimidation. Specifically, the "context" in *McLeod* was a single small town's conflict between a discrete, vicious gang of bullies in the real, offline world – the sheriff's department – and peaceful people just trying to vote while Black on the other. The sheriffs and the Blacks who suffered at their hands were close (1) in physical space – a single small town of around 28,385 people[13] – (2) in time – a months-long period of egregiously

---

[13] *See* "1960 Census of Population: Volume 1. Characteristics of the Population" at 11 (https://www2.census.gov/library/publications/decennial/1960/population-volume-1/vol-01-02-c.pdf accessed Nov. 20, 2024).

targeted harassment just prior to an election – and (3) in harassment done with the clear purpose of keeping the Blacks from exercising their right as Americans to vote. *McLeod* featured police conduct so corrupt it strikes modern readers as a parody. Sheriffs arrested peaceful Black demonstrators (but no whites) on grounds their peaceful demonstration was about to incite the white mob to a fury. Sheriffs arrested groups of Black boys and men and made up the charges only once they'd reached the jailhouse (the boys were charged with "truancy," playing hooky from school; the men with "unlawful assembly"). Sheriffs arrested 29 people for going to a voter registration meeting. In short, the "context" in *McLeod* was a single small town, a single sheriff's department, and egregious behavior targeted against a discrete group of people, with motives that were both bigoted and openly attempting to penalize voting efforts. "In each case, the person arrested was prominently active in the [voter] registration drive. In each, there was no basis for the arrest." 385 F.2d at 741.

Similarly, in *Wohl*, the defendants made plain their scheme[14] to create Robocall messaging, shortly before an election, with the express purpose of bigoted

---

[14] Appellants' effort to equate the *Wohl* Prospectus with USEIP's Playbook of best practices for organizing grass-roots organizations falls flat. The Prospectus was a cynical expression of a clear intention to suppress "left-wing" votes, describing "Wohl's plans to utilize social media, traditional media, and other technology to suppress voter turnout among 'important Demographics of Democrat voters,' which included Black voters." *Wohl III*, 661 F. Supp. 3d at 91.

voter suppression. In terms of healthy guardrails to the voting rights acts and boundaries around the First Amendment, *Wohl*'s world is a small snow globe compared to Appellants' entire United States. Whereas Appellants' "context" of "surrounding facts," involving speech by Appellees and third parties, spans across decades and involves a cast of characters of thousands, with no plausible inference that Appellees had any intent to harm or damage anything or anyone, *Wohl* gave us the boundary of a single set of actors, hatching one plan, featuring one set of false and misleading messages, recorded by one clear agent of the actors, with – last but hardly least — the clear intent of directly suppressing voting by making people so afraid of or discouraged about voting that they would quite plausibly become less likely to vote. It's not even close.

Then there's the matter of timing. The district court agreed that in the instant case, it mattered that Appellees' "canvassing efforts were after the election and well in advance of the next election. There was no indication or evidence offered that any of the canvassing attempted to assess a voter's intention to vote in the next election or even discussed an upcoming election. The questions concerned the prior election, and in this context, the evidence would be required to show an intent to interfere with the right to vote in a much more significant way, and no such evidence was presented." App. 220.

Moreover, in *Wohl* the defendants tailored the messages to scare specific categories of people in known demographics (people who had been previously convicted[15]; people who, at the height of the pandemic, were afraid of voting in person and getting COVID[16]; people suffering from medical debt[17]). In short, the intimidation in *Wohl* showed a tightly cabined connection among defendants, message, and victims.

And in *Wohl*, unlike here, the defendants' internal communications demonstrated unequivocal intent, not merely a vague "context": "The emails

---

[15] Plaintiff Steinberg found the call to be "particularly traumatic" in part "because of his past nonviolent criminal conviction." *Id*. at 93-94. The court held "the evidence shows that some voters perceived the Robocall as threatening legal action if they voted by mail." *Id.* at 114.

[16] Plaintiff Mary Winter "'felt intimidated by [the Robocall]' on account of the precautions she had been taking to avoid contracting COVID-19 and the fact that the call sought to 'undermine [her] confidence in voting by mail.'" *Id*. at 93-94. Gene Steinberg found the call distressing "because he was planning to vote by mail to protect himself from COVID-19." *Id.* The court reasoned, "At the time this message was delivered, there was public uncertainty and skepticism towards the yet-unavailable COVID-19 vaccines, including questions about their safety, efficacy, and administration. Thus, an ordinary recipient of the Robocall, hearing that the CDC would use vote-by-mail records to track voters in order to administer mandatory vaccines, would likely find such a warning to be threatening bodily harm, in turn having a chilling effect on voting. A reasonable jury could thus find that the message threatened bodily harm if people voted by mail." *Id.* at 115.

[17] Plaintiff Andrea Sferes "felt 'shocked, furious and sickened,' by the Robocall after she listened to it on account of her outstanding medical debt." 661 F. Supp. 3d at 94. The court took "judicial notice of the history of discriminatory lending and debt collection practices in the Black community and does so again here." *Id*. at 114.

exchanged between Wohl and Burkman, the ACPI Prospectus describing Wohl's voter suppression plan, and the features of the Robocall making it appear legitimate, such as its claim that it was being made from a civil rights organization, demonstrate that the Robocall was a calculated attempt to deter Black voters by exploiting fears and stereotypes, and not merely the expression of an opinion." 661 F. Supp. 3d at 115. The defendants hired a voice actor to tell lies about who she was, what organization she was with, and what kind of bad things could happen to the recipients of the robocall. The "context" was that each of the victims had a known wound, and the defendants exploited that wound, creating understandable fear and distress on the part of the victims.

Against the backdrop of *McLeod's* 1967 Alabama, the sheriffs' arrests of people for the act of registering to vote, and the Robocalls in *Wohl* that laser-targeted the wounds of the people who answered calls with false information *intended* to suppress voting, we have Appellants, who complain of various acts of speech committed by third parties not under Appellees' control, in internal communications, and by three Appellees in blogs, training materials, and one speech, to audiences internal and online, along with canvassing that was carried out by all accounts courteously, even as a few people may have felt uncomfortable about it.[18] The

---

[18] Even so, Ms. Roberts did not contradict Mr. Smith's testimony that residents did not have to talk to canvassers. "[N]obody had to talk to us, right? That's why we

district court made no errors in finding Appellants' allegations alternately unproven and unequivocally not intimidating to a reasonable voter.

## CONCLUSION

Appellants do not allege that Appellees directed any speech at their alleged victims, the voters (or more absurdly, Democratic, vulnerable, or minority voters), or that any particular voters were targeted for suppression, or that any speech was false or its speakers were attempting to mislead. No, Appellants think Appellees' speech includes "misinformation" and they want to stop it. Appellants complain that Appellees *said* things, as part of their own political speech in the marketplace of ideas, that Appellants disagree with and in some cases believe were incorrect. This isn't a case about the speech of canvassing, or USEIP's role in it. Appellants flog the canvassing narrative ("armed vigilantes," "interrogations") because they think it can be made to look scary, and thus act as more "context" for other speech – blogs, training materials – that Appellants know isn't intimidating on its own.

Appellants also argue the misinformation about election concerns was dangerous to democracy and therefore scary to individual voters. Cranking up the danger, Appellants lean heavily on an "insurrection" involving other people, over half a year before the canvassing, and Appellants throw around words like "armed

---

asked them if they were willing to talk, and if they said no, then we left. And if they said yes, then we asked questions." SA 150.

vigilantes" even if there were no vigilantes and no weapons, and no voters knew of them, and any discussion of weapons was just as plausibly done by people seeking to protect themselves, the canvassers, not to threaten or harm others.

But Appellants' theory is not how the First Amendment works. It's not even how the Voting Rights Act works. This is not a hard case. It's not a close case. Appellants' complaints about Appellees' discrete acts of speech – a blog or a voter verification manual here, an impromptu remark on stage or organizing playbook there – just aren't intimidating, and were not proven to have been done recklessly. Appellants' theory of what happened, based entirely on alarmist media reports that generated errors and exaggerations at the same rate they generated clicks, began to unravel as soon as they filed their Complaint and sought a TRO. There is now nothing left of Appellants' allegations in the Complaint but the vaporware of the rhetoric. The evidence never appeared. This appeal has not made it so.

Dated: December 23, 2024

_____

Cameron Powell, Colorado Bar #22016
Michael J. Wynne, Texas Bar #785289
Gregor Wynne Arney
4265 San Felipe, Suite 700
Houston, Texas 77027
(832) 390-2644

Attorneys for Appellees Shawn Smith and Holly Kasun

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This document complies with the type-volume limitation of FED. R. APP. P. 32(g) because, excluding parts of the document exempted by FED. R. APP. P. 32(f), it contains 12,613 words.

This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this document has been has been prepared in a proportionally spaced typeface using Microsoft Word in the 14-point Times New Roman.

Date: December 23, 2024.

/s/ Cameron Powell
Cameron Powell
Colorado Bar #22016
*Attorney for Appellees Shawn Smith and Holly Kasun*
GREGOR WYNNE ARNEY, PLLC
4265 San Felipe, Suite 700
Houston, Texas 77027
cpowell@gwafirm.com
(503) 502-5030

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2024, I electronically filed the foregoing using the court's CM/ECF system which will send notification to the following:

**Attorneys for Appellants**

Bryan L. Sells
The Law Office of Bryan L. Sells, LLC
Post Office Box 5493
Atlanta, Georgia 31107-0493
(404) 480-4212

Courtney Hostetler
John Bonifaz
Ben Clements
Amira Mattar
Free Speech For People
48 North Pleasant St, Ste 304
Amherst, Massachusetts 01002
(617) 244-0234

*Amicus Curiae*

Bonnie I. Robin-Vergeer
Noah B. Bokat-Lindell
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 598-0243

Date: December 23, 2024

/s/ Michael J. Wynne
Michael J. Wynne
Attorney for Holly Kasun & Shawn Smith
GREGOR WYNNE ARNEY, PLLC
4265 San Felipe, Suite 700
Houston, Texas 77027
mwynne@gwafirm.com
(281) 450-7403

57