FILED
United States Court of Appeals
Tenth Circuit

July 6, 2026

Christopher M. Wolpert
Clerk of Court

<u>PUBLISH</u>

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

COLORADO MONTANA WYOMING
STATE AREA CONFERENCE OF
THE NAACP; LEAGUE OF WOMEN
VOTERS OF COLORADO; MI
FAMILIA VOTA,

      Plaintiffs - Appellants,

v.

SHAWN SMITH; ASHLEY EPP;
HOLLY KASUN,

      Defendants - Appellees,

and

UNITED STATES ELECTION
INTEGRITY PLAN,

      Defendant.

-----------------------------

UNITED STATES OF AMERICA,

      Amicus Curiae.

_____

COLORADO MONTANA WYOMING
STATE AREA CONFERENCE OF
THE NAACP; LEAGUE OF WOMEN
VOTERS OF COLORADO; MI

No. 24-1328

FAMILIA VOTA,

      Plaintiffs - Appellees,

v.

SHAWN SMITH; ASHLEY EPP;
HOLLY KASUN,

      Defendants - Appellants,

and

UNITED STATES ELECTION
INTEGRITY PLAN,

      Defendant.

No. 25-1111

_____

**Appeals from the United States District Court
for the District of Colorado
(D.C. No. 1:22-CV-00581-CNS-NRN)**

_____

Submitted on the briefs:[*]

Courtney Hostetler, John Bonifaz, Ben Clements, and Amira Mattar, of Free Speech For People, Amherst, Massachusetts; and Bryan L. Sells of The Law Office of Bryan L. Sells, LLC, Atlanta, Georgia, for Plaintiffs-Appellants in 24-1328.

Cameron Powell and Michael J. Wynne, of Gregor Wynne Arney, PLLC, Houston Texas, for Defendants-Appellees Holly Kasun and Shawn Smith in 24-1328.

---

[*] The parties did not request oral argument. After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of these appeals. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). These cases are therefore ordered submitted without oral argument.

Ashley Epp, pro se in 24-1328.

Kristen Clarke, Assistant Attorney General; Bonnie I. Robin-Vergeer and Noah B. Bokat-Lindell, Civil Rights Division, Department of Justice, Washington, D.C., filed an amicus curiae brief on behalf of Plaintiffs-Appellants, for the United States of America in 24-1328.

Michael J. Wynne and Cameron Powell of Gregor Wynne Arney, PLLC, Houston, Texas, for Defendants-Appellants Holly Kasun, Shawn Smith, and Ashley Epp in 25-1111.

Courtney Hostetler, John Bonifaz, and Ben Clements, of Free Speech For People, Sharon, Massachusetts; and Bryan L. Sells of The Law Office of Bryan L. Sells, LLC, Atlanta, Georgia, for Plaintiffs-Appellees in 25-1111.

_____

Before **ROSSMAN**, **MURPHY**, and **FEDERICO**, Circuit Judges.

_____

**FEDERICO**, Circuit Judge.

_____

This appeal concerns a dispute over alleged voter intimidation by private citizens investigating claims of election fraud following the 2020 presidential election. Shortly following the election, Shawn Smith, Ashley Epp, and Holly Kasun (collectively, Individual Defendants) formed an unincorporated association, United States Election Integrity Plan (USEIP), to investigate what they believed was large scale election fraud. In 2021, USEIP recruited volunteers and canvassed thousands of households and voters to verify Colorado voter roll information. The Colorado Montana Wyoming State Area Conference of the NAACP, League of Women Voters,

and Mi Familia Vota (collectively, Voter Organizations) sued USEIP and the Individual Defendants to put a stop to these activities, which the Voter Organizations alleged to be voter intimidation.

The Voter Organizations sued Smith, Kasun, and Epp individually as well as USEIP as an entity. However, the district court granted summary judgment for USEIP and dismissed it from the case because it found that unincorporated associations such as USEIP could not be sued under the laws invoked by the suit. The district court then held a three-day bench trial, at the conclusion of which it granted judgment on partial findings in favor of the Individual Defendants because it found the Voter Organizations failed to prove their claims. *See* Fed. R. Civ. P. 52(c). Following the entry of final judgment, the Individual Defendants moved for a fee award, which the district court denied. We have consolidated the merits appeal, No. 24-1328, and the fee appeal, No. 25-1111, for purposes of disposition.

Exercising jurisdiction under 28 U.S.C. § 1291, we reverse on the merits and dismiss the fee appeal as moot.

## I

We begin by discussing this case's procedural history as it informs the issues raised in this appeal. The Voter Organizations filed a complaint against USEIP and the Individual Defendants in March 2022 alleging three claims: (1) intimidating voters and potential voters in violation of Section

4

11(b) of the Voting Rights Act of 1965 (VRA), 52 U.S.C. § 10307(b); (2) attempting to intimidate voters and potential voters in violation of Section 11(b) of the VRA; and (3) violation of the Ku Klux Klan Act, 42 U.S.C. § 1985.

The complaint alleged that USEIP and the Individual Defendants intimidated, conspired to intimidate, and attempted to intimidate voters by running a door-to-door canvassing campaign, during which volunteers asked voters if they had engaged in voter fraud, whether they had participated in the 2020 election, and who they voted for. According to the complaint, these volunteers were sometimes armed and wore badges that made them appear as if they were associated with an official government agency. Individual Defendants drafted a County & Local Organizing Playbook for USEIP that laid out the association's canvassing tactics, which included "threatening and intimidating voters in order to support debunked claims of election fraud." No. 24-1328, Aplt. App. at 29. Smith publicly stated, per the complaint, "I think if you are involved in election fraud then you deserve to hang. Sometimes the old ways are the best ways." *Id.* at 28. USEIP and the Individual Defendants eventually filed both a motion for judgment on the pleadings and a motion for summary judgment.

USEIP and the Individual Defendants' motion for judgment on the pleadings asserted that the Voter Organizations lacked prudential and

statutory standing to bring claims under the VRA. It also asserted that the Voter Organizations were not citizens who could vote, so they could not state a claim under § 1985. The district court held that USEIP and the Individual Defendants had waived their prudential standing argument by not asserting it in their earlier motion to dismiss, that the VRA conferred a private right of action, and that corporations were persons who could be sued under § 1985, so the Voter Organizations had prudential standing to bring their VRA and § 1985 claims.

In a motion for summary judgment, USEIP and the Individual Defendants asserted that the Voter Organizations failed to adduce evidence that a voter had been intimidated by their actions or that they had attempted to intimidate voters. It also asserted that USEIP was not a proper defendant because it is an unincorporated association, and unincorporated associations cannot be sued under the VRA or § 1985 according to this circuit's precedent, *Lippoldt v. Cole*, 468 F.3d 1204 (10th Cir. 2006).

Regarding the voter intimidation issue, the district court found that there was a genuine dispute of material fact because USEIP and the Individual Defendants denied they had contact with the voters identified by the Voter Organizations who were allegedly intimidated by USEIP's

actions. The district court therefore denied summary judgment on this issue.

As to the unincorporated association issue, the district court found that it was bound by this court's precedent in *Lippoldt*, where we held that unincorporated associations were not "persons" who could sue under 42 U.S.C. § 1983. The district court reasoned that, because § 1983 and § 1985 were enacted together in the Ku Klux Klan Act of 1871, it would "strain the court's analysis to hold that an entity could be considered a 'person' under one clause of the statute but not a 'person' within another clause of the same statute." Aplt. App. at 69. So, in the district court's view, an unincorporated association was not a "person" who could be sued under the VRA or under § 1985. *Id.* (citing *Lippoldt*, 468 F.3d at 1212–13). As a result, the district court granted summary judgment for USEIP and dismissed USEIP from the case.

The case then proceeded to a bench trial against the Individual Defendants. Next, we summarize the evidence as it was presented by the parties during the bench trial.

## II

### A

During the three-day bench trial, the Voter Organizations presented seven witnesses, including one expert witness. Each Individual Defendant

– Smith, Kasun, and Epp – were called as witnesses by the Voter Organizations and testified about their involvement in USEIP and their belief that the 2020 presidential election was plagued by election fraud.

Christopher Beall, the Colorado Deputy Secretary of State, was called as a witness by the Voter Organizations and testified about complaint calls and two e-mails the secretary of state's office received concerning alleged USEIP activities. Beall also testified that USEIP's activities presented a risk of voter intimidation.

Beth Hendrix, Executive Director of the League of Women Voters of Colorado, testified that she had no personal knowledge of any voter intimidated by USEIP or of USEIP's canvassing efforts. Rather, her organization had filed this case based on media reports of the same.

Professor Atiba Ellis was called by the Voter Organizations as an expert witness on voter intimidation generally. Professor Ellis described activities that have traditionally amounted to voter intimidation during his testimony, including economic retaliation, blocking voters from or following them to polling places, and placing threatening phone calls.

Yvette Roberts, a resident of Mesa County, Colorado, was the only canvassed voter who was called as a witness by the Voter Organizations. She testified about an interaction she had with two individuals who knocked on her door and wore badges that looked like they were "from an

office supply store" with the words "Colorado election" written on them. *Id.* at 173, 218. Roberts testified that the individuals did not provide her with any information that "gave [her] any clue about who they were or who they were working with." *Id.* at 175. She also testified that they "knew [her] name," "where [she] was living," her phone number, and her "affiliation with political parties," which she assumed was because they were "working off of a voter roll." *Id.* at 173. The individuals told her they were "investigating things," proceeded to ask her questions concerning who she lived with and if they were voters and/or citizens, and left when she indicated that she wanted them "to leave now." *Id.* at 170–71, 174. She also testified that she found the presence of the two individuals at her door intimidating, but that this one event would not "keep [her] from voting" in Colorado elections. *Id.* at 180–81.

**B**

Throughout the trial, the district court admitted into evidence most of the Voter Organizations' exhibits. The only exhibit that the Voter Organizations now challenge as excluded from evidence is a video of Smith speaking at a public event held in February 2022 at The Rock, a church in Castle Rock, Colorado. During his remarks, Smith claimed that he had evidence of criminal conduct undertaken by Colorado's secretary of state concerning election fraud. He then said, "[I]f you're involved in election

9

fraud then you deserve to hang. Sometimes the old ways are the best ways." No. 24-1328, Aplt. App. at 286, Ex. 8 at 0:35–0:50. He also remarked that he would be submitting this evidence to the district attorney. The video of these remarks was included prior to trial on the parties' joint exhibit list as exhibit 8 with no objection from the Individual Defendants noted as to its admissibility.

At trial, Smith testified on cross-examination about the statements he made that were captured on the video recording. The Voter Organizations moved to admit the video into evidence, arguing that it was important for the district court to see and hear Smith's words at the event. The Individual Defendants objected to admitting the video based on hearsay as to Kasun and Epp, as well as lack of foundation and authenticity. The district court did not admit the video into evidence, stating: "I don't know anything about the video. . . . Ask the witness what he said. I'm not allowing you to show me the video. It seems to me he remembers what he said, so let's just ask him." *Id.* at 136.

When asked what he said at the February 2022 event, Smith testified that he said that he had "in [his] possession evidence of violations of election law by Secretary of State Griswold, . . . which [he] provided to the Colorado Attorney General under sworn affidavit," and that he believes "that anybody who is involved in election fraud . . . deserves to hang." *Id.*

10

In addition to excluding the video exhibit, the district court also did not permit certain lines of questioning of witnesses that the Voter Organizations characterize as "relevant to the context in which the challenged acts occurred." Op. Br. at 52. Most saliently, the district court did not permit the Voter Organizations' attorney to continue a line of questioning during Epp's testimony concerning USEIP's blog posts about election fraud:

> THE COURT: All right. I need you to move. You haven't even established that she engaged in canvassing or talked to a single person. I want to know what Ms. Epp did, not – **I have dismissed the organization. It's not on trial here.** We're talking about three individuals and their actions for voter intimidation. You've got to tie this to Ms. Epp and what she is doing to intimidate voters, not express her opinion about the election. Do you understand the difference?
>
> [VOTER ORGANIZATIONS' COUNSEL]: I respectfully disagree, but I do understand what the Court is saying.
>
> THE COURT: Well, given that, let's try to proceed to that so we stop wasting so much time. I imagine – is there any dispute about any of these documents you sent? No. So you could point them out, let me read them.

No. 24-1328, Aplt. App. at 150 (emphasis added).

Similarly, at certain other points during the testimony of the Individual Defendants, the district court excluded or limited questioning about USEIP's activities as an organization, the events at the U.S. Capitol on January 6, 2021, and the Individual Defendants' opinions about election

11

fraud. Specifically, the district court found such questions were immaterial to the issues in the case because they did not relate to acts the Individual Defendants had taken themselves that would constitute voter intimidation, as opposed to acts taken by USEIP as an organization.

## C

When the Voter Organizations finished presenting their case, the Individual Defendants made an oral motion for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c). They argued that the Voter Organizations did not produce sufficient evidence to sustain a ruling in their favor. The Individual Defendants focused heavily upon Roberts' testimony. They contended that nothing the canvassers said or did when interacting with Roberts was objectively intimidating or threatening, and that Roberts did not have personal knowledge that the canvassers who came to her door were affiliated with USEIP. In fact, Roberts resided in Mesa County and the district court found that there was no evidence to indicate that USEIP ever canvassed in Mesa County.

The Voter Organizations argued that the issue was whether USEIP's door-to-door canvassing activities, taken into context with their public statements regarding the 2020 presidential election and election fraud, was objectively intimidating to a reasonable Colorado voter. The Voter Organizations pointed to USEIP's Playbook as exemplifying objectively

intimidating behavior, as well as testimony from Smith, Kasun, and Epp about USEIP's canvassing tactics, which included asking voters how they voted in the past to identify potentially fraudulent ballots, as having chilling effect on future voter activity.

The district court found that none of the witnesses' testimony or other evidence presented by the Voter Organizations indicated that the Individual Defendants or any of USEIP's members had engaged in conduct that was objectively intimidating to voters, and that the contents of USEIP's Playbook was also not objectively intimidating. The court also found that the Voter Organizations failed to present evidence that USEIP volunteers were surveilling voters' residences by taking photos. The district court granted the Individual Defendants' Rule 52(c) motion and entered judgment for them. This appeal timely followed.

## III

The Voter Organizations raise four issues on appeal: (1) the district court improperly applied *Lippoldt* to the VRA and § 1985(3) and thus its dismissal of USEIP was error; (2) the district court abused its discretion when it refused to admit the video of Shawn Smith's public remarks into evidence; (3) the district court clearly erred when it determined that the behavior of the canvassers with whom Roberts interacted with was not objectively intimidating; and (4) the district court applied the wrong legal

13

standard in its analysis of the Individual Defendants' motion under Federal Rule of Civil Procedure 52(c).

The Individual Defendants respond that: (1) the Voter Organizations did not have Article III standing to proceed with this case in the first instance;[1] (2) the district court was correct that the Voter Organizations had failed to tie the activities of the canvassers who interacted with Roberts to USEIP; (3) the video of Smith's public remarks was properly excluded for being irrelevant and cumulative; (4) canvassers engaged in protected speech and could not be held liable without a showing of recklessness; (5) the larger context between the events of January 6, 2021 and USEIP's activities and statements was not probative of liability because it was too far removed in time and location; and (6) the Voter Organizations and their attorneys should be sanctioned for bringing a frivolous lawsuit and appeal that targets political speech.

---

[1] The Individual Defendants do not challenge the district court's rulings on statutory and prudential standing. Rather, they revive their challenge to the Voter Organizations' Article III standing that they raised in a Rule 12(b)(1) motion to dismiss that was denied by the district court. This challenge was again raised in the Individual Defendants' response brief rather than by a cross-appeal.

We will now proceed to examine the parties' arguments.[2] For the reasons that follow, we reverse the district court's order dismissing USEIP as a defendant and its order granting judgment on partial findings to the Individual Defendants, vacate the district court's judgment, and remand for a new trial.

## IV

As an initial matter, we must assess whether the Voter Organizations have standing. The Individual Defendants argue that the Voter Organizations lack Article III standing because they did not suffer an injury in fact. Specifically, they challenge organizational standing, asserting that the Voter Organizations diverted resources based on speculation from media reports and so any harm was self-inflicted. This argument was initially raised by USEIP and the Individual Defendants in a Rule 12(b)(1) motion to dismiss before the district court. The district court denied that

---

[2] Smith and Kasun are represented by counsel in this appeal while Epp has proceeded pro se. Smith and Kasun filed a response brief jointly, and Epp filed her pro se response brief separately. We summarize and consider their arguments collectively across both briefs. USEIP did not participate in this appeal.

motion and found that the Voter Organizations had organizational standing.

Standing is a prerequisite to our jurisdiction, and any party may raise the issue of standing at any point in a litigation. *New England Health Care Emps. Pension Fund v. Woodruff*, 512 F.3d 1283, 1288 (10th Cir. 2008). We review standing de novo. *Awad v. Ziriax,* 670 F.3d 1111, 1119–20 (10th Cir. 2012). Because a "plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation,'" and this case proceeded to trial, "the specific facts set forth by the [Voter Organizations] 'must be supported adequately by the evidence adduced at trial.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (first quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 651 (1992); then quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)).

To establish standing, a plaintiff must show an injury-in-fact, causation, and redressability. *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 973 (10th Cir. 2020). Organizations "may have standing 'to sue on their own behalf for injuries they have sustained.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 393 (2024) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)). But organizations may not "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."

16

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Neither can an "organization that has not suffered a concrete injury caused by a defendant's action [] spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 394. Instead, an organization has suffered an injury when a defendant's actions have "directly affected and interfered with" its "core business activities." *Id.* at 395.

According to the evidence adduced and proffered at trial, the Colorado Montana Wyoming State Area Conference of the NAACP is a civic engagement organization that engages in voter outreach and issue advocacy. The League of Women Voters of Colorado is a non-profit organization that engages in voter outreach, education, and issue advocacy. And Mi Familia Vota is a civic engagement organization that provides workshops, educational programs, and other initiatives to encourage Latino and immigrant communities to register for and participate in elections. All three organizations have diverted time, personnel, and resources from their regular programming into monitoring and combatting USEIP's canvassing efforts.

All three of the Voter Organizations' core business activities include engaging in some form of voter outreach and education to increase voter participation. The Voter Organizations' perception that USEIP's door-to-

17

door canvassing efforts were intimidating voters and discouraging civic participation caused each organization to divert resources from their normal outreach and education services to counter potential voter confusion or intimidation. For example, the League of Women Voters of Colorado diverted resources from their core activities to creating new outreach about recognizing misinformation, publishing a white paper on Colorado's election system, and fielding questions about USEIP's actions from its members and the public. Similarly, the NAACP had to update their voter outreach materials to include information about an individual's rights if a USEIP canvasser came to their door, and Mi Familia Vota had to revise the scripts and training it provides to their volunteer canvassers to include information on how to respond to voter reports who may have had contact with USEIP. Thus, the Voter Organizations presented evidence that USEIP's canvassing efforts "directly affected and interfered" with the organizations' core business activities. *All. for Hippocratic Med.*, 602 U.S. at 395 (citing *Havens Realty*, 455 U.S. 363).

We agree that the Voter Organizations have established their standing. Several other circuit courts have similarly found that organizations engaged in voter outreach activities are injured when a defendant's actions caused them to divert resources away to mitigate the effects of those actions on voters. For instance, the Fifth Circuit found that

the NAACP had standing to challenge Louisiana's congressional maps because "[t]hey were forced to reallocate staff and launch new initiatives to mitigate the effects of the maps on Black voter confidence and candidate viability." *Nairne v. Landry*, 151 F.4th 666, 682 (5th Cir. 2025), *vacated and remanded on other grounds*, No. 24-30115, 2026 WL 1255781 (5th Cir. May 7, 2026). And the Fourth Circuit found that the Republican National Committee had standing to sue the North Carolina State Board of Elections for alleged noncompliance with a federal statute concerning voting systems and voter access, accepting the Committee's allegations that its "organizational and voter outreach efforts" were "significantly stymied" due to its diversion of resources into addressing alleged defects in North Carolina's voter rolls. *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 394, 397 (4th Cir. 2024). We find no material difference between this case and the cases before the Fifth and Fourth Circuits and therefore align with our sister circuits. *See United States v. Thomas*, 939 F.3d 1121, 1130 (10th Cir. 2019) (holding courts should be "reluctan[t]" to create a circuit split).

Finally, it does not matter that the Individual Defendants assert that USEIP's actions were not, in fact, intimidating voters because that is a merits question. *See Smith v. Albany Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 121 F.4th 1374, 1378 (10th Cir. 2024) ("Standing in no way depends on the

19

merits of the plaintiff's contention that particular conduct is illegal." (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006) (en banc))). What matters is that USEIP's actions – benign or not – interfered with the organizations' core business activities. They did, so the organizations have standing.

We now proceed to consider the merits of the appeal.

**V**

We next examine the Voter Organizations' challenge to the district court's dismissal of USEIP as a defendant on summary judgment. The dismissal of USEIP from this case is central to the outcome of this appeal. We ultimately find the district court committed legal error by how it applied our precedent to § 1985 and the VRA, and USEIP's absence as a defendant subsequently led the district court to narrow its view of the relevant evidence at trial.

We review a district court's decision on summary judgment de novo and apply the same legal standard as the district court. *Peterson v. Nelnet Diversified Sols., LLC*, 15 F.4th 1033, 1037 (10th Cir. 2021). "[S]ummary judgment is appropriate 'if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

## A

In its decision granting summary judgment to USEIP and dismissing it from this case, the district court found it was bound to apply our precedent *Lippoldt v. Cole*, where we held that unincorporated associations were not "persons" who could sue under 42 U.S.C. § 1983. 468 F.3d at 1216. In so doing, the district court held that unincorporated associations, like USEIP, could not be sued under § 1985 or the VRA. We find that the district court committed legal error when it concluded unincorporated associations cannot be sued for alleged violations of Section 11(b) of the VRA or § 1985(3).[3]

*Lippoldt* concerned the City of Wichita's denial of a parade permit to Operation Save America during the summer of 2001. 468 F.3d at 1209. Operation Save America was an unincorporated association of volunteers who opposed abortion. *Id.* It had sought a parade permit to protest in front of a local abortion provider's clinic during its planned "Summer of Mercy Renewal" commemorating the ten-year anniversary of previous anti-abortion protests. *Id.* at 1209–10. After the parade permit was denied, Operation Save America sued the City of Wichita and several individuals,

---

[3] Though Individual Defendants on appeal do not defend the district court's reasoning on this legal question, we nevertheless examine the purported error in full because we determine that it was not harmless and thus affects our overall disposition of the appeal.

bringing claims under 42 U.S.C. §§ 1983 and 1985 that alleged violations of the First and Fourteenth Amendments. *Id.* at 1210–11. Relevant here, the district court held that Operation Save America, an unincorporated association, was a "person" under § 1983 and, thus, was entitled to seek relief pursuant to that statute. *Id.* at 1211. After the district court entered judgment for Operation Save America and awarded nominal damages, defendants appealed, and this court subsequently reversed the judgment. *Id.* at 1211, 1216.

We construed the term "persons" in § 1983 to exclude unincorporated associations. *Id.* at 1211. In doing so, we considered Supreme Court precedent discussing the meaning of "person" under § 1983, the relevant legislative history, and the common law understanding of what an unincorporated association was understood to be in 1871. *Id.* at 1213. We also considered the definition of "person" as set out in the Dictionary Act of 1871, which excluded associations and was in place at the time of § 1983's enactment. *Id.* at 1214. Thus, we found that the best interpretation of "person" in § 1983 excluded unincorporated associations. *Id.* at 1216. As mentioned, the district court relied upon *Lippoldt*'s holding and reasoning to dismiss USEIP as a defendant, a decision that we now conclude was error.

22

**B**

In applying *Lippoldt* to § 1985, the district court reasoned that, because there is a presumption of statutory interpretation that "identical words used in different parts of the same act are intended to have the same meaning," it would "strain the court's analysis to hold that an entity could be considered a 'person' under one clause of the statute but not a 'person' within another clause of the same statute." No. 24-1328, Aplt. App. at 69 (quoting *Lippoldt*, 468 F.3d at 1213). We disagree. Sections 1983 and 1985 are two different statutes and, while passed in the same Act, there are key differences between § 1983 and § 1985 that warrant interpreting the word "person" differently in each.

The district court was correct that courts usually presume "identical words in different parts of the same act are intended to have the same meaning." *Lippoldt*, 468 F.3d at 1213 (citing *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 214 (2001)). This presumption supported *Lippoldt*'s reasoning that we could rely upon *Monell*'s approach in interpreting the first usage of "person" in § 1983 – or who can be sued because they are a rights violator – to our task of interpreting the second usage – who can sue because their rights were violated. *Id.* However, the presumption "yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they

23

were employed in different parts of the act with different intent." *United States v. Doe*, 572 F.3d 1162, 1167 (10th Cir. 2009) (quoting *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 595 (2004)). Here, we must interpret the second usage of "person" in the context of a different statute, § 1985, passed as part of the same Act. Because the purposes underlying each statute are different, as understood and supported by their relevant legislative history, the presumption the district court applied carries little weight.

As we undertake our analysis, we take solace that it follows the same analytical path the Supreme Court took in *Monell* and this court followed in *Lippoldt* when interpreting the different meanings of "person" under § 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 686–89 (1978); *Lippoldt*, 468 F.3d at 1213. *Lippoldt* discussed the meaning of "person" in terms of who could *sue* under § 1983, an issue of first impression at the time. *See* 468 F.3d at 1216. This nuance is meaningful because § 1983 uses "person" in two different ways: (1) "[e]very person" who deprives someone of their rights and (2) a "citizen . . . or other person" within the jurisdiction of the United States who is deprived of their rights. 42 U.S.C. § 1983. Thus, § 1983 contemplates two separate and differently constrained usages of "person": (1) a person who is a potential defendant (the first usage), and (2) a person who is a potential plaintiff (the second usage). *Lippoldt* was

primarily concerned with interpreting the second usage, and in doing so, used the approach the Supreme Court took in *Monell* where the Supreme Court interpreted the first usage. *Lippoldt*, 468 F.3d at 1212. Because we are looking at the text of a different statute, § 1985(3), which constrains its own usages of the word "person" in different ways than the text of § 1983, we will similarly look to *Monell* and *Lippoldt*'s interpretative approach for guidance rather than, as the district court did, for a binding answer.

Where, as here, there is more than one interpretation of the text of a statute, we must "decide which of the competing interpretations reflects Congress' intent." *Wyodak Res. Dev. Corp. v. United States*, 637 F.3d 1127, 1131 (10th Cir. 2011). The first step in determining congressional intent is to examine the text of the statute. *Id*. Section 1985 states:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving . . . any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner . . . [the injured party] may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

And Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any

25

citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.

The district court concluded that the word "person" has the same meaning across these two statutes, but it is not so cut and dry. Under the plain text of § 1985(3), actions may be brought "against any one or more of the conspirators" – or, any one or more of the "two or more persons" who "conspire." *Id.* Nothing in the text of § 1985(3) prohibits the conclusion that an unincorporated association can form a conspiracy of "two or more persons." Nor does the text prohibit the conclusion that an unincorporated association can be one or more of the conspirators that a suit may be brought against.

Contrasting the text of § 1985 with the text of § 1983 illustrates why the term "person" does not have the same meaning across the two statutes. The plain text of § 1983 restricts application of liability to individual persons who act under color of state law to deprive other persons of their rights. Indeed, we noted in *Lippoldt* that municipalities were the entities that were targeted by this restricted conception of "person" in § 1983. 468 F.3d at 1213. Section 1985's conception of what "person" can be liable is not similarly restricted. As the above examination illustrates, the texts of

26

§§ 1983 and 1985 address civil rights violations perpetrated by different actors.

Because the plain text of these two statutes does not unambiguously answer the question of whether an unincorporated association is a person who can be sued under § 1985(3), other sources must be consulted. As done in *Lippoldt*, we look to "(1) the legislative history of [the statute], (2) the general understanding, as of 1871, regarding the legal personality of unincorporated associations, and (3) the Dictionary Act of 1871." *Lippoldt*, 468 F.3d at 1213. The following analysis will first examine the general understanding regarding unincorporated associations and the applicable Dictionary Act definition of "person" before ending with the legislative history of § 1985.

To be sure, these two statutes were enacted together in the Ku Klux Klan Act of 1871, when the common law understanding of an unincorporated association was that it lacked the capacity to sue or be sued, and when the Dictionary Act of 1871 was applicable to both. *Id.* at 1213. In the 1871 Dictionary Act, the definition of "person" did not include unincorporated associations. *Id.* at 1214.

However, "the successive enactments" of the Dictionary Act and of § 1985 "further reveal the lack of . . . intent on the part of Congress" to exclude unincorporated associations from what "persons" could be sued

27

under § 1985(3). *Ngiraingas v. Sanchez*, 495 U.S. 182, 189 (1990). In 1874, Congress amended the Dictionary Act's definition of person to substitute "partnerships and corporations" for "bodies politic and corporate," and explicitly stated its revisions should be referenced when "determining the meaning of the revised statutes." *Id.* at 190–91 & n.10 (quoting Rev. Stat. § 1, 18 Stat. 1 (1874)). Under the common law at the time, partnerships were viewed as a catchall for those "association[s] of individuals" that were not incorporated. *Hoadley v. Cnty. Comm'rs of Essex*, 105 Mass. 519, 526 (1870) (holding that a voluntary association of individuals could not be taxed as a corporation, but rather should be taxed as a copartnership); *see also, e.g.*, *McMahon v. Rauhr*, 2 Sickels 67, 70 (N.Y. 1871) (noting that "voluntary association[s] not incorporated" have "rights" and "modes of enforcing" such rights that are "not materially different from those of partners"). And because § 1985(3) was reenacted in the revised statutes along with the Dictionary Act in 1874, "it becomes clear" that a person who could be sued under § 1985(3) included forms of unincorporated associations. *Ngiraingas*, 495 U.S. at 191; *see* Rev. Stat. § 1980, 18 Stat. 349 (1874).

Additionally, the legislative history of § 1985 supports the reading that its language is properly construed to include unincorporated associations. "To the extent the plain meaning of the statutory language

28

and context of 'person' is unclear, we turn to the "'legislative environment" in which the word [person] appears,' searching for an 'indicia of congressional intent at the time the statute was enacted.'" *Doe*, 572 F.3d at 1169 (alteration in original) (quoting *Lippoldt*, 468 F.3d at 1212).

Section 1985 was enacted to suppress the violent actions of the Ku Klux Klan, an unincorporated association. *See Monell*, 436 U.S. at 665; *see also United States v. Mitchell*, 26 F. Cas. 1283 (C.C.D.S.C. 1871) (No. 15,790) (charging jury in § 1985 case brought against members of the Ku Klux Klan for their actions taken to prevent others from voting). Indeed, during floor debates over the Ku Klux Klan Act, members of Congress repeatedly stated that Section 2 of the Act was meant to prohibit *organizations* of persons from denying "any class or condition of men equal protection." Cong. Globe, 42d Cong., 1st Sess. app. at 69, 251–53 (1871); *see also id.* at 821. Notably, Senator George Edmunds, in defending a failed amendment to the Act which would have expanded liability to counties, stated his view that "all kinds of organizations, partnerships, and communities[,] . . . are . . . persons in the eye of the law, and as persons . . . are subject to the judicial authority of the United States." *Id.* at 821. And members of Congress repeatedly noted that the Ku Klux Klan's acts of violence and terror were attributable to it as a political organization, rather than to any of its individual members. *See, e.g., id.*, app. at 252–53 ("[The

29

Ku Klux Klan] is a confederacy, existing in a number of States[.] . . . *It electioneers by murder, and persuades men by the lash and destruction of their property.*" (emphasis added)).

In sum, § 1983 is targeted to address individual state actors who violate civil rights, while § 1985 is targeted to "specifically address[] the problem of the private acts of violence perpetrated by groups like the Klan." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 722–23 (1989). The differences in the text and purpose of §§ 1983 and 1985, as well as the legislative history indicating Congress's intent to target organizations and unincorporated associations with § 1985, necessitates a finding that the meaning of the word "person" is different across these two sections of the Act. We hold that "persons" under § 1985 include unincorporated associations.

Finally, given our holding and analysis we are compelled to say explicitly that this opinion does not overrule *Lippoldt*. Rather, we find that *Lippoldt*'s holding as to § 1983 is not dispositive here because, for the reasons stated above, it is not applicable to § 1985.

## C

The district court also applied *Lippoldt*'s holding to the meaning of the word "person" in § 11(b) of the VRA. But there was no basis to do so. Section 11(b) of the VRA provides: "No person, whether acting under color

of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote[.]" 52 U.S.C. § 10307(b).

Section 11(b)'s usage of person covers both public and private actors by broadening the word with the phrase "whether acting under color of law or otherwise." *Id.* (emphasis added). "Under color of law" implicates state action, including by private actors "jointly engaged with state officials in [a] prohibited action." *United States v. Price*, 383 U.S. 787, 794 (1966). And the phrase "or otherwise," in the context of the text of § 11(b), is a disjunctive, catchall term that "captures material that does not fit neatly into the statute's enumerated categories but is nevertheless meant to be covered." *Helsinn Healthcare S.A. v. Teva Pharms., USA, Inc.*, 586 U.S. 123, 132 (2019).

It follows, then, that the "or otherwise" language in § 11(b) captures persons who are not acting under color of state law, or said another way, private actors. And there is nothing in the text of § 11(b) to indicate that an unincorporated association cannot be a private "person" that can be sued under it, such as "adjectives or conditions . . . that are nonsensical when applied outside of the living individual context" or "tests . . . that would be irrelevant to artificial entities." *Doe*, 572 F.3d at 1168. Unincorporated associations are capable of "intimidat[ing], threaten[ing], or coerc[ing]" just

31

as living individuals can do the same. 52 U.S.C. § 10307(b); *see, e.g.*, *Thompson v. Trump*, 590 F. Supp. 3d 46, 62, 96, 106–07 (D.D.C. Feb. 18, 2022) (finding plaintiffs had stated a § 1985(1) civil conspiracy claim against the Oath Keepers, an "organized militia group"), *aff'd sub nom. Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023).

Section 11(b)'s legislative history supports the view that unincorporated associations qualify as persons who can be sued. In the House Report on the VRA, Congress indicated its contemporaneous awareness of the "incredible accounts of citizens in our own land living in an atmosphere of terror and reprisal if they even attempt[ed] to register [to vote]," including accounts of actions taken by unincorporated associations like the Ku Klux Klan. H.R. Rep. No. 89-439, at 37–38 (1965) (citing United States Comm'n on Civil Rights, *Voting in Mississippi*, ch. III, 27 (1965) (recounting testimony from family members who were visited by the Ku Klux Klan and handed a card stating "Thousands of Klansmen, Watching . . . Waiting!" after they took the voter registration test in Jefferson County, Mississippi)).

By 1965, when the VRA was enacted, the common law and the Dictionary Act had abandoned their understanding of "person" that this court relied upon in *Lippoldt*. By 1922, the common law rule against suing unincorporated associations as entities had become outmoded, as the

Supreme Court recognized in *United Mine Workers of Am. v. Coronado Coal Co.*, 259 U.S. 344, 385–86 (1922). And in 1948, the Dictionary Act was expanded to include unincorporated associations in the definition of "persons." *See Lippoldt*, 468 F.3d at 1214 (noting that the Dictionary Act "clearly states, and has since 1948, . . . that the word 'person' 'include[s] . . . associations'" (second alteration in original)). By 1964, the definition of person in the Dictionary Act included "corporations, companies, *associations*, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1 (1964) (emphasis added). Hence, the entire foundation upon which *Lippoldt*'s reasoning rested had been torn down and rebuilt by the time the VRA was enacted.

Furthermore, the Supreme Court has counseled that the VRA should be construed "in a manner that provides 'the broadest possible scope' in combating racial discrimination." *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (citation omitted). Here, following all the signs that point in the same direction, we hold that the term "person" in the VRA includes unincorporated associations.

## D

Notably, the Individual Defendants do not dispute that the district court erred in applying *Lippoldt* to the VRA and to § 1985 and in dismissing USEIP as a defendant. Instead, they argue that this amounted to harmless

error because the Voter Organizations failed to connect them to a conspiracy with other USEIP members or show that they had an agency relationship with the organization or its members.

For their part, the Voter Organizations retort that the district court's decision to dismiss USEIP as a defendant affected their substantial rights under Federal Rule of Civil Procedure 61. The Voter Organizations reason that the district court narrowed its trial focus down to the individual actions taken by Smith, Kasun, and Epp, and thereby ignored USEIP's overall "intimidation campaign" that "its leaders orchestrated [and] recruited for." Reply Br. at 10. Most saliently, the Voter Organizations note that the district court refused to consider evidence from USEIP's message boards wherein members discussed canvassing while armed.

In civil cases, a new trial will not be granted, and a verdict will not be set aside for error by the court unless such error affects a party's "substantial rights." Fed. R. Civ. P. 61; *see also* 28 U.S.C. § 2111. "An error affecting a substantial right of a party is an error which had a substantial influence or which leaves one in grave doubt as to whether it had such an effect on the outcome." *Bridges v. Wilson*, 996 F.3d 1094, 1099 (10th Cir. 2021) (quoting *Hill v. J.B. Hunt Transp., Inc.*, 815 F.3d 651, 659 (10th Cir. 2016)). In applying this rule, the court must look at the circumstances of the case holistically, "exercise[] common sense," and assess whether a

34

practical likelihood exists "that the result in the district court would have been different had the error not occurred." *Id.* Finally, "[a]n important factor" in this inquiry is "the strength of the case in support of the verdict." Mary Kay Kane & Allen Stein, 11 Wright & Miller, Federal Practice and Procedure § 2883 (3d ed. 2026).

While this is a close call, we conclude that the dismissal of USEIP had a substantial influence on the outcome of the bench trial because it narrowed the scope of the evidence the district court considered. As always, it is somewhat unclear and predictive how a trial would have proceeded if USEIP remained in the case as a defendant. But despite this lack of clarity, it is certain that the Voter Organizations would have presented a stronger case if USEIP remained a defendant and part of the alleged conspiracy. Thus, the error in dismissing USEIP as a defendant had a substantial influence in the outcome of the bench trial that resulted in a judgment in favor of the Individual Defendants.

The district court noted in its Rule 52(c) verdict in favor of the Individual Defendants that it found the Voter Organizations had "failed to introduce any evidence that can remotely be perceived as intimidating or threatening on behalf of the three defendants" only. Aplt. App. at 219–20. The district court also noted its view that evidence not directly tied to Smith, Kasun, and Epp was irrelevant because USEIP was "not on trial

here." *Id.* at 150. The district court's narrowed view on relevance also led it to limit questioning on USEIP members' message board discussions about volunteers planning to carry weapons with them while canvassing and on USEIP volunteers taking photos of voters' residences. The district court's decision to limit questioning on these topics and the related exhibits was also based on hearsay grounds, something that may not have been an appropriate basis for the exclusion of such evidence if USEIP was a defendant. *See* Fed. R. Evid. 801(d)(2).

Given the effect of USEIP's dismissal from the case on the district court's view on the relevance and admissibility of evidence, and because the district court's application of the law to the facts without consideration of USEIP's conduct "cannot be remedied piecemeal," we find that USEIP's dismissal affected the Voter Organizations' substantial rights, the district court's error in dismissing USEIP is reversible, and a new trial as to all defendants is warranted. *Perkins v. Chris Hunt Water Hauling Contractor, Inc.*, 46 F. App'x 903, 910 (10th Cir. 2002)[4] (remanding for a new trial for all defendants after reversing summary judgment granted in favor of two defendants accused of third-party negligence); Fed. R. Civ. P. 61; 28 U.S.C. § 2111.

---

[4] We cite unpublished decisions for their persuasive value only and do not treat them as binding precedent. 10th Cir. R. 32.1(A).

**VI**

We now turn to briefly address the remaining issues the Voter Organizations raise in their appeal. Because we remand this case for a new trial before the district court, we deem it proper to discuss and resolve the remaining issues relating to evidentiary objections and sufficiency of the evidence.

**A**

The Voter Organizations appeal the district court's exclusion of a video of Smith's statements made at a public event in February 2022 where he stated, "If you're involved in election fraud you deserve to hang. Sometimes the old ways are the best ways." No. 24-1328, Aplt. App. at 286, Ex. 8 at 0:35–0:50. This video was listed as exhibit 8 in the parties' final list of joint exhibits and was also listed in the pretrial order. The Individual Defendants did not object to the admission of the video prior to trial.

"We review a court's evidentiary rulings for an abuse of discretion, according 'deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters.'" *Frederick v. Swift Transp. Co.*, 616 F.3d 1074, 1083 (10th Cir. 2010) (quoting *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008)). We "will not reverse if the district court's ruling falls within the bounds of permissible choice in the circumstances and is not arbitrary, capricious or whimsical." *United*

*States v. Durham*, 902 F.3d 1180, 1222 (10th Cir. 2018) (quoting *United States v. Willis*, 826 F.3d 1265, 1270 (10th Cir. 2016)).

When the Voter Organizations moved to admit the video during Smith's testimony, the Individual Defendants objected for lack of foundation, authenticity, and hearsay. Instead of ruling on these objections, the district court stated, "I don't know anything about the video. . . . [L]et's just ask [Smith] what he said. . . . I'm not allowing you to show me the video." No. 24-1328, Aplt. App. at 136.

The Individual Defendants' objections to the video were untimely because they failed to object to the Voter Organizations' pretrial disclosure identifying the video as an exhibit. So, their untimely objections were required to be excused for good cause before a court could consider them. *See* Fed. R. Civ. P. 26(a)(3)(B). The Individual Defendants did not make such a showing, nor did the district court make findings as to good cause or waiver. That alone is sufficient to find an abuse of discretion in excluding the video exhibit from evidence because the objections were waived. *See*, *e.g.*, *Griffeth v. United States*, 672 F. App'x 806, 813 (10th Cir. 2016).

However, putting the waiver aside, none of objections to the video seem viable upon a review of the record. The Voter Organizations did appear to lay sufficient foundation (or were building the foundation when cut off by the district court) for the admission of the video as authentic when

38

they elicited testimony from Smith where he explained that he spoke publicly about election integrity at the February 2022 event the video captured. *See* Fed. R. Evid. 602, 901. And Smith's statement would not have been hearsay, as it was offered by the Voter Organizations against Smith and his alleged co-conspirators, Kasun and Epp. *See* Fed. R. Evid. 801(d)(2)(A), (E). Given the insufficiency of the Individual Defendants' objections, and Rule 26 waiver for their objections being untimely made, we find that the exclusion of the video was an abuse of discretion.

## B

The Voter Organizations appeal the district court's determination in its judgment on partial findings that Roberts' testimony concerning canvassers who came to her door did not establish any behavior that could be objectively considered intimidating. The Voter Organizations also argue that the district court legally erred when it failed to consider the political context underlying the Individual Defendants' actions.

We treat the appeal of the district court's judgment on partial findings "as a challenge to the factual and legal sufficiency of the district court's determinations based on all the evidence" and, thus, "review the district court's fact findings for clear error and its legal conclusions de novo." *Nieto v. Kapoor*, 268 F.3d 1208, 1217 (10th Cir. 2001). "If a view of the evidence is permissible, that view cannot be clearly erroneous." *Ramos v. Bondi*, 155

F.4th 1154, 1165 (10th Cir. 2025) (citation modified) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)).

Based upon the evidence presented at trial, we cannot say that the district court's findings as to Roberts' testimony are clearly erroneous. She testified that the canvassers who came to her door asked her personal questions, including who lived in her household and how she submitted her ballot, but that she refused to answer their questions and that the canvassers left when she asked them to leave. She also testified that the canvassers wore "badges" but that the badges looked "homemade." Finally, she testified that while she found the encounter intimidating, she wasn't deterred from voting again in the next election. The district court's view that the canvassers' behavior wasn't objectively intimidating is permissible on this mixed record and was not clearly erroneous.

However, the Voter Organizations assert that the district court applied an incorrect legal standard when it evaluated the sufficiency of its evidence by failing to consider "the context in which the challenged acts occurred." Op. Br. at 51. We view this as similar to the Voter Organizations' harmless error argument concerning the dismissal of USEIP.

Judgment on partial findings may only be granted when "a party has been fully heard on an issue." Fed. R. Civ. P. 52(c). As explained above, USEIP's dismissal from the case as a defendant narrowed the scope of the

evidence, including contextual evidence, that the district court considered, so the Voter Organizations were not fully heard on the issue of whether USEIP took any actions that constituted voter intimidation, rather than whether Smith, Kasun, or Epp acted individually to intimidate voters. *See* Fed. R. Civ. P. 52(c) advisory committee's note to 1991 amendment (Rule 52(c) "authorizes the court to enter judgment at any time that it can *appropriately* make a dispositive finding of fact on the evidence" (emphasis added)); *Finley v. United States*, 123 F.3d 1342, 1349 (10th Cir. 1997) (en banc) (remanding for new trial where plaintiff did not have opportunity to adduce evidence to support his claim due to legal error in jury instructions); *Stuart v. Jackson*, 24 F. App'x 943, 949 (10th Cir. 2001) (affirming denial of defendant's judgment as a matter of law made after plaintiff's opening statements because plaintiff had not received opportunity to present evidence). Given that the Voter Organizations were not fully heard at trial, we therefore also reverse the district court's grant of judgment on partial findings for the Individual Defendants. Whether and how the trial evidence on remand may be presented, admitted into evidence, and considered to make findings is left to the sound discretion of the district court.

## VII

Following the district court's judgment on partial findings, the Individual Defendants moved for fees under § 1985 and the VRA, both of

41

which allow for a fee award to the prevailing party. *See* 42 U.S.C. § 1988(b); 52 U.S.C. § 10310(e). They also moved for fees under 28 U.S.C. § 1927, which provides for an award of fees against an attorney who "multiplies the proceedings in any case unreasonably and vexatiously." The district court denied their motion, which the Individual Defendants separately appealed in Appeal No. 25-1111. Because we vacate the district court's final judgment and remand for further proceedings, we dismiss Appeal No. 25-1111 as moot.

**\* \* \***

We REVERSE the district court's order granting summary judgment to USEIP and dismissing it from the case, REVERSE the district court's order granting judgment on partial findings in favor of the Individual Defendants, VACATE the district court's final judgment, and REMAND for further proceedings consistent with this opinion. We DISMISS the Individual Defendants' appeal from the district court's denial of its request for fees as moot.